## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| WILMER CUTLER PICKERING HALE AND DORR LLP,<br><br>          *Plaintiff*,<br><br>     v.<br><br>EXECUTIVE OFFICE OF THE PRESIDENT<br>1600 Pennsylvania Avenue NW<br>Washington, DC 20500<br><br>U.S. DEPARTMENT OF JUSTICE,<br>950 Pennsylvania Avenue NW<br>Washington, DC 20530<br><br>U.S. DEPARTMENT OF DEFENSE,<br>1000 Defense Pentagon<br>Washington, DC 20301<br><br>U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES,<br>200 Independence Avenue SW<br>Washington, DC 20201<br><br>U.S. DEPARTMENT OF EDUCATION<br>400 Maryland Avenue SW<br>Washington, DC 20202<br><br>U.S. DEPARTMENT OF VETERANS AFFAIRS<br>810 Vermont Avenue NW<br>Washington, DC 20420<br><br>OFFICE OF MANAGEMENT AND BUDGET,<br>725 17th Street NW<br>Washington, DC 20503<br><br>OFFICE OF THE DIRECTOR OF NATIONAL INTELLIGENCE,<br>Office of General Counsel<br>Washington, DC 20511<br><br>CENTRAL INTELLIGENCE AGENCY<br>Litigation Division, Office of General Counsel<br>Central Intelligence Agency<br>Washington, DC 20505 | Civil Case No. _____ |

ENVIRONMENTAL PROTECTION AGENCY
1200 Pennsylvania Avenue NW
Washington, DC 20460

DEPARTMENT OF HOMELAND SECURITY
2707 Martin Luther King Jr Avenue SW
Mail Stop 0485
Washington, DC 20528

DEPARTMENT OF STATE
Suite 5.600, 600 19th Street NW
Washington DC 20522

DEPARTMENT OF ENERGY
1000 Independence Avenue SW
Washington, DC 20585

DEPARTMENT OF THE TREASURY
1500 Pennsylvania Avenue NW
Washington, DC 20220

DEPARTMENT OF LABOR
200 Constitution Avenue NW
Washington, DC 20210

DEPARTMENT OF AGRICULTURE
1400 Independence Avenue SW
Washington, DC 20250

DEPARTMENT OF COMMERCE
1401 Constitution Avenue NW
Washington, DC 20230

DEPARTMENT OF HOUSING AND
URBAN DEVELOPMENT
451 Seventh Street SW
Washington, DC 20410

SMALL BUSINESS ADMINISTRATION
409 Third Street SW
Washington, DC 20416

OFFICE OF THE UNITED STATES
TRADE REPRESENTATIVE
600 17th Street NW
Washington, DC 20508

DEPARTMENT OF THE INTERIOR
1849 C Street NW
Washington, DC 20240

DEPARTMENT OF TRANSPORTATION
1200 New Jersey Avenue SE
Washington, DC 20590

SECURITIES AND EXCHANGE COMMISSION
100 F Street NE
Washington, DC 20549

FEDERAL TRADE COMMISSION
600 Pennsylvania Avenue NW
Washington, DC 20580

UNITED STATES PATENT AND TRADEMARK
OFFICE
600 Dulany Street
Alexandria, VA 22314

EQUAL EMPLOYMENT
OPPORTUNITY COMMISSION
131 M Street NE
Washington, DC 20507

THE UNITED STATES OF AMERICA,
U.S. Attorney's Office for the District of Columbia
601 D Street NW
Washington, DC 20530

PAMELA J. BONDI, in her official capacity as
Attorney General of the United States
950 Pennsylvania Avenue NW
Washington, DC 20530

PETER B. HEGSETH, in his official capacity as
the Secretary of Defense
U.S. Department of Defense
1000 Defense Pentagon
Washington, DC 20301

ROBERT F. KENNEDY, JR., in his official
capacity as Secretary of Health and Human
Services
U.S. Department of Health and Human Services
200 Independence Avenue SW
Washington, DC 20201

LINDA M. MCMAHON, in her official capacity
as Secretary of Education
U.S. Department of Education
400 Maryland Avenue SW
Washington, DC 20202

DOUGLAS A. COLLINS, in his official capacity
as Secretary of Veterans Affairs
Department of Veterans Affairs
810 Vermont Avenue NW
Washington, DC 20420

RUSSELL T. VOUGHT, in his official capacity
as Director of The U.S. Office of
Management and Budget
725 17th Street NW
Washington, DC 20503

TULSI GABBARD, in her official capacity as
U.S. Director of National Intelligence
1500 Tysons McLean Drive
McLean, VA 22102

JOHN L. RATCLIFFE, in his official capacity as
Director of the Central Intelligence Agency
Office of Public Affairs, Central Intelligence
Agency
Washington, DC 20505

LEE M. ZELDIN, in his official capacity as
Administrator of the Environmental
Protection Agency
1200 Pennsylvania Avenue NW
Washington, DC 20460

KRISTI NOEM, in her official capacity as
Secretary of Homeland Security
2707 Martin Luther King Jr Avenue SW
Mail Stop 0485
Washington, DC 20528

MARCO RUBIO, in his official capacity as
Secretary of State
Suite 5.600, 600 19th Street NW
Washington DC 20522

CHRIS WRIGHT, in his official capacity as
Secretary of Energy
1000 Independence Avenue SW
Washington, DC 20585

SCOTT BESSENT, in his official capacity as
Secretary of the Treasury
1500 Pennsylvania Avenue NW
Washington, DC 20220

LORI CHAVEZ-DEREMER, in her official
capacity as Secretary of Labor
200 Constitution Avenue NW
Washington, DC 20210

BROOKE L. ROLLINS, in her official capacity as
Secretary of Agriculture
1400 Independence Avenue SW
Washington, DC 20250

HOWARD LUTNICK, in his official capacity as
Secretary of Commerce
1401 Constitution Avenue NW
Washington, DC 20230

SCOTT TURNER, in his official capacity as
Secretary of Housing and Urban Development
451 Seventh Street SW
Washington, DC 20410

KELLY LOEFFLER, in her official capacity as
Administrator of the U.S. Small
Business Administration
409 Third Street SW
Washington, DC 20416

JAMIESON GREER, in his official capacity as
United States Trade Representative
600 17th Street NW
Washington, DC 20508

DOUG BURGUM, in his official capacity as
Secretary of the Interior
1849 C Street NW
Washington, DC 20240

SEAN DUFFY, in his official capacity as
Secretary of Transportation
1200 New Jersey Avenue SE
Washington, DC 20590

MARK T. UYEDA, in his official capacity as
Acting Chairman of the Securities and Exchange
Commission
100 F Street NE
Washington, DC 20549

ANDREW N. FERGUSON, in his official
capacity as Chairman of the Federal Trade
Commission
600 Pennsylvania Avenue NW
Washington, DC 20580

COKE MORGAN STEWART, in her official
capacity as Acting Under Secretary of Commerce
for Intellectual Property and Acting Director of the
United States Patent and Trademark Office
600 Dulany Street
Alexandria, VA 22314

ANDREA R. LUCAS, in her official capacity as
Acting Chair of the Equal Employment
Opportunity Commission
131 M Street NE
Washington, DC 20507I

*Defendants*.

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

# INTRODUCTION

1.      "[T]he right to counsel is the foundation for our adversary system," *Martinez v. Ryan*, 566 U.S. 1, 12 (2012), and the "courage" of attorneys who take on unpopular clients has long "made lawyerdom proud," *Sacher v. United States*, 343 U.S. 1, 4 (1952).  John Adams famously embodied these principles by defending eight British soldiers in the "Boston Massacre" trial, an effort he described as "one of the best pieces of service I ever rendered my country."[1]  And British monarchs' practice of punishing attorneys "whose greatest crime was to dare to defend unpopular causes"—which threatened to reduce lawyers to "parrots of the views of whatever group wields governmental power at the moment"—helped inspire the Bill of Rights.  *Cohen v. Hurley*, 366 U.S. 117, 138-40 (1961) (Black, J., dissenting).  It is thus a core principle of our legal system that "one should not be penalized for merely defending or prosecuting a lawsuit."  *F. D. Rich Co. v. United States ex rel. Indus. Lumber Co.*, 417 U.S. 116, 129 (1974).

2.      In an unprecedented assault on that bedrock principle, the President has issued multiple executive orders in recent weeks targeting law firms and their employees as an undisguised form of retaliation for representing clients and causes he disfavors or employing lawyers he dislikes.[2]  These "personal vendetta[s]" are so facially improper that the first court to address the merits of one of these orders concluded that it likely violates multiple foundational

---

[1] David McCullough, *John Adams* 68 (2001).

[2] *See Addressing Risks from Jenner & Block*, The White House (Mar. 25, 2025) ("Jenner Order"), https://tinyurl.com/u7ts9x49; *Addressing Risks from Paul Weiss*, The White House (Mar. 14, 2025) ("Paul Weiss Order"), https://tinyurl.com/5w4j69fv; *Addressing Risks from Perkins Coie LLP*, The White House (Mar. 6, 2025) ("Perkins Order"), https://tinyurl.com/547rwhna; *Suspension of Security Clearances and Evaluation of Government Contracts*, The White House (Feb. 25, 2025) ("Covington Mem."), https://tinyurl.com/4xtrb52x.

safeguards enshrined in the Bill of Rights.  Tr. of TRO Hearing at 74:7-21, 101:24, *Perkins Coie LLP v. U.S. Dep't of Just.*, No. 1:25-cv-716 (D.D.C. Mar. 12, 2025), Dkt.22 ("*Perkins* Tr.").

3.      The latest such directive ("Order"), dated March 27, 2025, targets Wilmer Cutler Pickering Hale and Dorr LLP ("WilmerHale" or the "Firm").[3]  Titled "Addressing Risks From WilmerHale LLP," the Order avowedly punishes WilmerHale for various matters the Firm has handled, including some it has taken on pro bono, and for its employment of certain attorneys who participated in the Department of Justice's investigation of the 2016 presidential election.  In particular, WilmerHale has been a professional home for public servants like Robert Mueller and represented (among many others) President Trump's political opponents, including in litigation on behalf of the Democratic National Committee and the Biden and Harris campaigns in the two most recent presidential elections.  This past month, WilmerHale also filed a lawsuit challenging the President's sudden dismissal of eight inspectors general at major federal agencies.

4.      The Order's declared purpose is to retaliate against WilmerHale—and certain of its clients—for WilmerHale attorneys' constitutionally protected advocacy in matters that President Trump perceives to be adverse to his personal and/or political interests.  Among other things, the Order accuses WilmerHale of "abus[ing] its pro bono practice," specifically referencing the Firm's election- and immigration-related litigation and its defense of race-based college admission policies.  Order §1.  The Order also singles out retired WilmerHale partners Robert Mueller and James Quarles and current partner Aaron Zebley because of their involvement in the Department of Justice's investigation into allegations of Russian interference in the 2016 presidential election, in which Mr. Mueller served as Special Counsel.  *Id.*

---

[3] For the Court's convenience, a copy of the Order is attached to this complaint as Exhibit A.  The order is available at https://tinyurl.com/4m8a79jn.

5.    While most litigation requires discovery to unearth retaliatory motive, the Order makes no secret of its intent to punish WilmerHale for its past and current representations of clients before the Nation's courts and for its perceived connection to the views that Mr. Mueller expressed as Special Counsel.

6.    Section One of the Order vigorously criticizes WilmerHale for advocating in favor of clients and causes that the President disfavors.  The Order accuses WilmerHale of "earmarking hundreds of millions of [its] clients' dollars for destructive causes" and "engag[ing] in activities that undermine justice and the interests of the United States."  *Id.*  It also accuses the Firm of "abus[ing] its pro bono practice" to "engage[] in obvious partisan representations to achieve political ends, support[] efforts to discriminate on the basis of race, back[] the obstruction of [immigration-enforcement] efforts," and "further[] the degradation of the quality of American elections, including by supporting efforts designed to enable noncitizens to vote."  *Id.*  The Order makes clear that these allegations are based on actions WilmerHale has taken in certain client representations before this Nation's courts, many of which have been successful and drawn plaudits—and certainly not sanctions—from the courts that directly oversaw the litigation.

7.    Section One further criticizes WilmerHale for "employing" certain "lawyers" whom President Trump dislikes.  *Id.*  Specifically, the Order criticizes WilmerHale for "welcoming" Robert Mueller, James Quarles, and Aaron Zebley back to the Firm after the conclusion of the Special Counsel investigation into the 2016 election.  *Id.*  The Order accuses these attorneys—all of whom were involved in a Justice Department investigation conducted under an appointment by the Acting Attorney General of the United States—of having "weaponize[d] the prosecutorial power to upend the democratic process and distort justice" during "[Mr.] Mueller's investigation" and states that this alleged "weaponization of the justice system must not

be rewarded, let alone condoned." *Id.* The Order specifically criticizes WilmerHale for claiming that Mr. Mueller "embodies the highest value of our firm and profession," when, in the President's view, he "l[ed] one of the most partisan investigations in American history." *Id.*

8. Section Two directs "[t]he Attorney General, the Director of National Intelligence, and all other relevant heads of executive departments and agencies" to immediately "suspend any active security clearances held by individuals at WilmerHale" and to review whether to revoke them permanently. *Id.* §2. This direction bypasses the existing procedures for granting and revoking security clearances and addresses individuals at the Firm without regard to when they joined the Firm and whether they had any personal connection to any of the representations criticized in the Order.

9. Section Three takes aim at WilmerHale's finances by pressuring its current clients to leave the Firm and prospective clients to stay away. The Order accomplishes this by directing federal agencies to (1) "require Government contractors to disclose any business they do with WilmerHale"; (2) seek to "terminate any contract … for which WilmerHale has been hired to perform any service"; and (3) reassess all "contracts with WilmerHale or with entities that do business with WilmerHale," suggesting that such relationships may not "align[] with American interests." *Id.* §3.

10. Section Four references a portion of the Perkins Order (*see supra* n.2) that instructs federal officials to "investigate" diversity, equity, and inclusion policies at "large, influential, or industry leading law firms."

11. Lastly, Section 5 of the Order directs federal agencies to "limit[]" WilmerHale employees' "access" to "Federal Government buildings" and stop "engaging with WilmerHale employees" whenever it would "be inconsistent with the interests of the United States." *Id.* §5. It

also instructs agency officials to "refrain from hiring employees of WilmerHale, absent a waiver from the head of the agency, made in consultation with the Director of the Office of Personnel Management." *Id.*

12.     The President's sweeping attack on WilmerHale (and other firms) is unprecedented and unconstitutional.  The First Amendment protects the rights of WilmerHale, its employees, and its clients to speak freely, petition the courts and other government institutions, and associate with the counsel of their choice without facing retaliation and discrimination by federal officials. Indeed, the Supreme Court recently reaffirmed the bedrock law that the government may neither "use the power of the State to punish or suppress disfavored expression" nor "attempt to coerce private parties in order to" accomplish those forbidden ends.  *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 180, 188 (2024).

13.     The Order also violates the separation of powers twice over.  The President's role is to enforce the law—not to create new law or adjudicate litigation conduct before the courts— and no statute or constitutional provision empowers him to unilaterally sanction WilmerHale in this manner.  That is unsurprising; any legislative effort to restrict lawyers' access to government buildings, services, and materials just for representing disfavored clients or causes would be patently unconstitutional.  And any executive-branch effort to deter private attorneys from representing particular clients or advancing particular arguments "threatens severe impairment of the judicial function," as courts depend on attorneys to "present all … reasonable and well-grounded arguments" on their clients' behalf.  *Legal Servs. Corp. v. Velazquez*, 531 U.S. 533, 545-46 (2001).

14.     On top of that, the Order flagrantly violates due process.  It imposes severe consequences without notice or any opportunity to be heard; it uses vague, expansive language

that does not adequately inform WilmerHale (or its clients) of what conduct triggered these extraordinary sanctions; and it unfairly singles out WilmerHale based on its perceived connections to disfavored individuals and causes.

15.     Finally, the Order violates the right to counsel protected by the Fifth and Sixth Amendments and imposes unconstitutional conditions on federal contracts and expenditures.

16.     For any and all these reasons, the Order cannot stand.

## PARTIES

17.     WilmerHale is a limited liability partnership established in Delaware and formed from a 2004 merger of the Boston-headquartered firm Hale and Dorr LLP and the Washington D.C.-headquartered firm Wilmer Cutler & Pickering LLP.

18.     WilmerHale is led by a Management Committee, comprising 17 partners, which is responsible for the day-to-day management of the Firm and which implements the decisions of the broader partnership.

19.     Most of the named defendants are (1) federal agencies that are directed to implement the Order and (2) the heads of those agencies.  The Order expressly directs some of these agencies to obstruct the ability of WilmerHale employees to practice law and serve the Firm's clients.  Other named agencies have significant contracts with WilmerHale clients and are at least implicitly directed by the Order to encourage WilmerHale's clients to terminate their relationships with the Firm (e.g., through the threat of cancelling government contracts).[4]

---

[4] As detailed in the accompanying declaration, WilmerHale's global practice requires attorneys and employees to interact with dozens of federal agencies.  Because the Order generally directs all federal agencies to take specified actions, WilmerHale has named 26 agencies (as well as the heads of those agencies) as defendants out of an abundance of caution.

20.     The Executive Office of the President is a federal agency headquartered in Washington, D.C.

21.     The U.S. Department of Justice is a federal agency headquartered in Washington, D.C.

22.     The U.S. Department of Defense is a federal agency headquartered in Washington, D.C.

23.     The U.S. Department of Health and Human Services is a federal agency headquartered in Washington, D.C.

24.     The U.S. Department of Education is a federal agency headquartered in Washington, D.C.

25.     The U.S. Department of Veterans Affairs is a federal agency headquartered in Washington, D.C.

26.     The Office of Management and Budget ("OMB") is a federal agency headquartered in Washington, D.C.

27.     The Office of the Director of National Intelligence is a federal agency headquartered in McLean, Virginia.

28.     The Central Intelligence Agency is a federal agency headquartered in McLean, Virginia.

29.     The Environmental Protection Agency is a federal agency headquartered in Washington, D.C.

30.     The Department of Homeland Security is a federal agency headquartered in Washington, D.C.

31.     The Department of State is a federal agency headquartered in Washington, D.C.

32.     The Department of Energy is a federal agency headquartered in Washington, D.C.

33.     The Department of the Treasury is a federal agency headquartered in Washington, D.C.

34.     The Department of Labor is a federal agency headquartered in Washington, D.C.

35.     The Department of Agriculture is a federal agency headquartered in Washington, D.C.

36.     The Department of Commerce is a federal agency headquartered in Washington, D.C.

37.     The Department of Housing and Urban Development is a federal agency headquartered in Washington, D.C.

38.     The Small Business Administration is a federal agency headquartered in Washington, D.C.

39.     The Office of the United States Trade Representative is a federal agency headquartered in Washington, D.C.

40.     The Department of the Interior is a federal agency headquartered in Washington, D.C.

41.     The Department of Transportation is a federal agency headquartered in Washington, D.C.

42.     The Securities and Exchange Commission is a federal agency headquartered in Washington, D.C.

43.     The Federal Trade Commission is a federal agency headquartered in Washington, D.C.

44.    The United States Patent and Trademark Office is a federal agency headquartered in Alexandria, Virginia.

45.    The Equal Employment Opportunity Commission ("EEOC") is a federal agency headquartered in Washington, D.C.

46.    Pamela J. Bondi is the Attorney General of the United States and the head of Defendant U.S. Department of Justice.  She is sued in her official capacity.

47.    Peter B. Hegseth is the Secretary of Defense and the head of Defendant U.S. Department of Defense.  He is sued in his official capacity.

48.    Robert F. Kennedy, Jr. is the Secretary of Health and Human Services and the head of Defendant U.S. Department of Health and Human Services.  He is sued in his official capacity.

49.    Linda M. McMahon is the Secretary of Education and the head of Defendant U.S. Department of Education.  She is sued in her official capacity.

50.    Douglas A. Collins is the Secretary of Veterans Affairs and the head of Defendant U.S. Department of Veterans Affairs.  He is sued in his official capacity.

51.    Russell T. Vought is the Director of Defendant OMB.  He is sued in his official capacity.

52.    Tulsi Gabbard is the Director of National Intelligence and the head of Defendant Office of the Director of National Intelligence.  She is sued in her official capacity.

53.    John L. Ratcliffe is the Director of the Central Intelligence Agency and the head of Defendant Central Intelligence Agency.  He is sued in his official capacity.

54.    Lee M. Zeldin is the Administrator of the Environmental Protection Agency and the head of Defendant Environmental Protection Agency.  He is sued in his official capacity.

55.     Kristi Noem is the Secretary of Homeland Security and the head of Defendant Department of Homeland Security.  She is sued in her official capacity.

56.     Marco Rubio is the Secretary of State and the head of Defendant Department of State.  He is sued in his official capacity.

57.     Chris Wright is the Secretary of Energy and the head of Defendant Department of Energy.  He is sued in his official capacity.

58.     Scott Bessent is the Secretary of the Treasury and the head of Defendant Department of the Treasury.  He is sued in his official capacity.

59.     Lori Chavez-DeRemer is the Secretary of Labor and the head of Defendant Department of Labor.  She is sued in her official capacity.

60.     Brooke L. Rollins is the Secretary of Agriculture and the head of Defendant Department of Agriculture.  She is sued in her official capacity.

61.     Howard Lutnick is the Secretary of Commerce and the head of Defendant Department of Commerce.  He is sued in his official capacity.

62.     Scott Turner is the Secretary of Housing and Urban Development and the head of Defendant Department of Housing and Urban Development.  He is sued in his official capacity.

63.     Kelly Loeffler is the Administrator of the Small Business Administration and head of Defendant U.S. Small Business Administration.  She is sued in her official capacity.

64.     Jamieson Greer is the United States Trade Representative and head of Defendant Office of the United States Trade Representative.  He is sued in his official capacity.

65.     Doug Burgum is Secretary of the Interior and head of Defendant Department of the Interior.  He is sued in his official capacity.

66.     Sean Duffy is Secretary of Transportation and head of Defendant Department of Transportation.  He is sued in his official capacity.

67.     Mark T. Uyeda is the Acting Chairman of Defendant Securities and Exchange Commission.  He is sued in his official capacity.

68.     Andrew N. Ferguson is the Chairman of Defendant Federal Trade Commission. He is sued in his official capacity.

69.     Coke Morgan Stewart is the Acting Under Secretary of Commerce for Intellectual Property and the Acting Director of Defendant United States Patent and Trademark Office.  She is sued in her official capacity.

70.     Andrea R. Lucas is Acting Chair of Defendant EEOC.  She is sued in her official capacity.

71.     The United States of America is responsible for the exercise of executive action by the named Defendants and all other agencies that are directed by the Order to take action with respect to WilmerHale and its clients.  Given that WilmerHale's employees interact with—and their attorneys appear before—dozens of different federal agencies, and the Order at issue generally directs all federal agencies to take specified action, the United States of America is included as a defendant to ensure that the relief ordered by the Court will apply government-wide.

## JURISDICTION & VENUE

72.     This Court has subject matter jurisdiction under 28 U.S.C. §1331 because WilmerHale's causes of action arise under the Constitution and laws of the United States.  This Court also has jurisdiction under 28 U.S.C. §1346(a)(2) because the defendants are United States officials.

73.     Venue is appropriate under 28 U.S.C. §1391(1)(A) because at least one defendant resides in this district.

74.     The Court has authority to enter a declaratory judgment and to provide temporary, preliminary, and permanent injunctive relief pursuant to Rules 57 and 65 of the Federal Rules of Civil Procedure; the Declaratory Judgment Act, 28 U.S.C. §§2201-02; the All Writs Act, 28 U.S.C. §1651; and the Court's inherent equitable powers.

75.     WilmerHale has a non-statutory right of action to enjoin unlawful official action that is *ultra vires*. *See, e.g.*, *Chamber of Com. of U.S. v. Reich*, 74 F.3d 1322, 1327-28 (D.C. Cir. 1996). This Court has inherent equitable power to enjoin executive conduct that violates the Constitution. *See Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 491 n.2 (2010). Therefore, "the President's actions may … be reviewed for constitutionality." *Franklin v. Massachusetts*, 505 U.S. 788, 801 (1992).

76.     Federal courts possess the power in equity to grant injunctive relief "with respect to violations of federal law by federal officials." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326-27 (2015). The Supreme Court has repeatedly allowed equitable relief against federal officials who act "beyond th[e] limitations" imposed by federal statute. *Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 689 (1949).

## FACTUAL ALLEGATIONS

### *WilmerHale Represents a Wide Array of Clients on a Wide Range of Matters, Including Matters Adverse to President Trump.*

77.     WilmerHale is a large law firm with clients located throughout the United States and around the world. Today, WilmerHale has more than 2,000 employees, approximately 1,200 of whom are lawyers based in 12 offices throughout the world. Many of WilmerHale's lawyers work at the intersection of government and business to support clients across a range of industries, from finance to life sciences to technology to education, while others represent and advise clients

in a range of areas that have no immediate connection to the federal government or other governments.

78.    WilmerHale's employees come from all walks of life and hold diverse political views.  Before or after working at the Firm, WilmerHale attorneys have served as federal judges, cabinet secretaries, governors, ambassadors, business executives, and academic leaders—in many cases on both sides of the aisle.  For instance, among several former WilmerHale lawyers currently serving in the federal judiciary, two were appointed by President Trump.

79.    WilmerHale represents a wide array of clients, ranging from large corporations, colleges and universities, and Native American tribes to nimble start-ups and individuals accused of criminal and civil wrongs.  The work required to represent such a broad clientele necessarily involves entering federal buildings and communicating with federal agencies and employees on a daily basis.  To give just a few examples:  WilmerHale attorneys representing criminal defendants often meet with prosecutors in U.S. Attorneys' offices in-person to advocate for their clients.  Members of the Firm's Intellectual Property department represent patent applicants, patent holders, and patent challengers before U.S. Patent and Trademark Office in patent prosecution and post-grant proceedings.  Attorneys in the Firm's Securities and Financial Services Department regularly participate in enforcement proceedings and compliance matters before federal agencies such as the Securities and Exchange Commission, the Commodity Futures Trading Commission, the Office of the Comptroller of the Currency, the Treasury Department, and the Federal Reserve.  And so on.  Indeed, an entire WilmerHale department (Regulatory and Government Affairs) is devoted to addressing matters involving regulatory and administrative disputes, and another practice group (Government and Regulatory Litigation) is devoted to handling government-facing litigation.

80.    Ever since predecessor firm Hale and Dorr LLP was founded in 1918, WilmerHale's attorneys have played important roles in legal matters that have shaped history.  For instance, Wilmer Cutler & Pickering co-founder Lloyd Cutler successfully defended the NAACP before the U.S. Supreme Court in *NAACP v. Claiborne Hardware Co.*, which reversed the Mississippi Supreme Court in holding that the First Amendment protects "a nonviolent, politically motivated boycott designed to force governmental and economic change."  458 U.S. 886, 914 (1982).  During the Army-McCarthy hearings, Hale and Dorr's Joseph Welch took on pro bono representation of the United States Army in a time when anti-communist sentiment was at its height.  Welch's advocacy—and his famous "Have you no decency, sir" rejoinder—began the process that ended Senator McCarthy's career.  More recently, WilmerHale's attorneys represented Harvard University at the trial, appellate, and Supreme Court levels in *Students for Fair Admissions v. President and Fellows of Harvard College*, a case challenging the university's use of race in its admission practices, 600 U.S. 181 (2023), and persuaded the Supreme Court that a man who had been on death row for decades was there because of prosecutorial misconduct and thus constitutionally entitled to a new trial, *Glossip v. Oklahoma*, 145 S.Ct. 612 (2025).  In short, WilmerHale attorneys have not shied away from controversial matters.  And, win or lose, their zealous advocacy has helped shape the law and enabled courts to resolve cases based on undaunted and skilled adversarial presentations.

81.    WilmerHale's litigation practice has long advocated for clients and causes across the ideological spectrum.  In recent years, for example, the Firm has challenged laws that prohibited congregants from attending in-person religious services during the COVID-19 pandemic and defended the right of churches to make ecclesiastical hiring and firing decisions free from unconstitutional government interference.  WilmerHale has challenged laws restricting

access to abortion in the aftermath of the Supreme Court's decision in *Dobbs v. Jackson Women's Health Organization*, 597 U.S. 215 (2022). And the Firm has represented advocates for stricter gun laws. The Firm's decisions to take on clients and matters that some may find controversial or disagree with are themselves a reflection of the Firm's values. In some cases, the Firm's representations reflect a deliberate choice to avoid representing one side of a controversy, such as generally declining to represent tobacco companies in health-related matters, while in others it represents a commitment to ensuring that both sides of a controversial issue are well represented.

82.     The Firm has not shied away from taking on the federal government. To the contrary, WilmerHale has frequently represented clients in litigation against the federal government, during both Republican and Democratic administrations. *See, e.g.*, *Career Coll. Ass'n v. Duncan*, No. 1:11-cv-138 (D.D.C. Jan. 21, 2011) (Obama administration); *FERC v. Barclays Bank PLC*, No. 2:13-cv-02093 (E.D. Cal. Oct. 9, 2013) (Obama administration); *Chamber of Com. of U.S. v. DOL*, No. 3:16-cv-1476 (N.D. Tex. June 1, 2016) (Obama administration); *City of Chicago v. Sessions*, 888 F.3d 272 (7th Cir. 2018) (Trump administration); *United Farm Workers v. DOL*, No. 1:20-cv-1690 (E.D. Cal. Nov. 30, 2020) (Trump administration); *Express Scripts, Inc. v. FTC,* No. 4:24-cv-1549 (E.D. Mo. Nov. 19, 2024) (Biden administration); *Intuit, Inc. v. FTC*, No. 24-60040 (5th Cir. Jan. 24, 2024) (Biden administration); *Am. Council of Life Insurers v. DOL*, No. 4:24-cv-482 (N.D. Tex. May 24, 2024) (Biden administration).

83.     Continuing this longstanding part of its government-litigation practice and commitment to pro bono representations, WilmerHale filed a lawsuit in February on behalf of the inspectors general of eight federal agencies—the Departments of Defense, State, Veterans Affairs, Education, Health and Human Services, Agriculture, and Labor, and the Small Business

Administration—alleging that President Trump improperly fired them in violation of the removal procedures set forth in the Inspectors General Act. *See Storch v. Hegseth*, No. 1:25-cv-415 (D.D.C. Feb. 12, 2025).

84.     In addition to litigating against the government during both of his terms (and during the terms of virtually every President of either party going back decades), WilmerHale has represented clients in matters directly adverse to President Trump's personal and political interests. For example, WilmerHale represented the House of Representatives Committee on Ways and Means in its litigation against the Department of the Treasury and President Trump, in his personal capacity. As a result of this litigation, the President's personal tax returns were ultimately disclosed to Congress and entered the public record. *See* Mem. Op., *Comm. on Ways & Means v. U.S. Dep't of Treasury*, No. 1:19-cv-1974 (D.D.C. Dec. 14, 2021), Dkt.148 (granting Committee's motion to dismiss the President's counterclaim and permitting public disclosure of his personal tax records).

85.     WilmerHale has also represented several of President Trump's political opponents—including the Joe Biden campaign in 2020 and 2024, and the Kamala Harris campaign in 2024—in litigation concerning ballot access, voting rights, and election certification.

86.     In November and December 2020, WilmerHale represented the Biden for President campaign, the Democratic National Committee, and state-level Democratic Party organizations in numerous lawsuits brought by the Trump campaign and/or its allies challenging the results of the 2020 presidential elections. *See, e.g.*, *Donald J. Trump for President, Inc. v. Secretary of Pennsylvania*, 830 F.App'x 377 (3d Cir. 2020); *Trump v. Wis. Elections Comm'n*, 983 F.3d 919 (7th Cir. 2020).

87.     In the leadup to the 2024 general election, WilmerHale once again represented Democratic Party entities in numerous cases in which they were adverse to President Trump's

campaign, the Republican National Committee, or others aligned with then-candidate Trump. In Georgia, for example, WilmerHale represented the Democratic National Committee ("DNC") in multiple state-court cases concerning the vote counting and election certification rules enacted by Georgia's State Election Board. *See Cobb Cnty. Bd. of Elections & Registration v. State Election Bd.*, No. 24CV012491 (Ga. Super. Ct. Oct. 2, 2024); *Democratic Party of Ga., Inc. v. State Election Bd.*, No. 24CV012349 (Ga. Super. Ct. Sept. 30, 2024); *Abhiraman v. State Bd. of Elections*, No. 24CV010786 (Ga. Super. Ct. Aug. 26, 2024). And WilmerHale represented (or is still representing) the DNC and/or state Democratic parties in numerous state and federal cases in Pennsylvania regarding the rules for counting mail, absentee, and provisional ballots. *See, e.g.*, *Republican Nat'l Comm. v. Genser*, No. 24-786 (U.S. Jan. 21, 2025); *Pa. State Conf. of NAACP Branches v. Secretary of Pennsylvania*, 97 F.4th 120 (3d Cir. 2024); *Reschenthaler v. Schmidt*, No 1:24-cv-1671 (M.D. Pa. Sept. 30, 2024); *Baxter v. Phila. Cnty. Bd. of Elections*, Nos. 1 EAP 2025, 2 EAP 2025 (Pa. Jan. 17, 2025); *Black Pol. Empowerment Project v. Schmidt*, No. 68 MAP 2024 (Pa. Sept. 2, 2024); *In re Canvass of Provisional Ballots in the 2024 Primary Election*, No. 55 MAP 2024 (Pa. July 24, 2024); *Republican Nat'l Comm. v. Schmidt*, 108 MM 2024 (Pa. Sept. 18, 2024); *Ctr. for Coalfield Just. v. Wash. Cnty. Bd. of Elections*, No. 1172 C.D. 2024 (Pa. Commw. Ct. Sept. 24, 2024).

***WilmerHale's Tradition of Public Service.***

88.    WilmerHale has long encouraged its attorneys to answer the call of public service, and the Firm has frequently invited those attorneys to return to the Firm when their service is complete. Many of its attorneys have held positions in the federal government, including in the White House (under Presidents of both parties), in the military (in both civilian and uniformed capacities), in the Department of Justice, and in numerous other federal agencies. Other attorneys continue to serve in reserve units of the United States military.

89.     Among the WilmerHale attorneys who have answered the call to public service is Robert S. Mueller III.  Mr. Mueller is a graduate of Princeton University and University of Virginia Law School who served in the Marine Corps during the Vietnam War and received a Bronze Star for heroism and a Purple Heart, among many other honors for combat-related valor.  He served with distinction in numerous government posts before becoming a partner at the Firm in 1993.  He remained at the Firm until 1995, when he left to serve in a variety of roles in the Department of Justice, including Director of the Federal Bureau of Investigation from 2001 through 2013.  In 2014, Mr. Mueller rejoined WilmerHale.  On May 17, 2017, he again left WilmerHale for the Justice Department upon being appointed by Rod Rosenstein, in his capacity as Acting Attorney General, to serve as Special Counsel charged with investigating allegations of Russian interference in the 2016 presidential election.[5]  While serving in this position, Mr. Mueller had no ties, financial or otherwise, with the Firm.

90.     In the years following Mr. Mueller's appointment as Special Counsel, President Trump repeatedly railed against the work of the Special Counsel's Office, calling it a "hoax" and Mr. Mueller's investigation a "witch hunt."[6]  The President also engaged in inflammatory personal attacks against Mr. Mueller's team, calling them "thugs,"[7] members of a "hit squad,"[8] and a

---

[5] *See* Press Release, *Appointment of Special Counsel*, U.S. Dep't of Just. (May 17, 2017), https://tinyurl.com/yc59yed4.

[6] *See, e.g.*, Meredith McGraw, *Trump Attacks Mueller After He Agrees to Testify to Congress*, ABC News (June 26, 2019), https://tinyurl.com/59s56ffh.

[7] John Wagner, *Trump Calls Mueller Lawyers 'Thugs' and 'A National Disgrace!'*, Wash. Post (Aug. 20, 2018), https://tinyurl.com/74z89vjc.

[8] Martin Pengelly, *Trump Attacks Robert Mueller's 'Hit Squad' in Row over 'Wiped' Phones*, The Guardian (Sept. 12, 2020), https://tinyurl.com/zxfrdxxe.

"National Disgrace!"[9]  At other times, he described them as "very sick and dangerous people"[10] whose investigation—initiated and overseen by President Trump's Department of Justice— amounted to an "attack on our country"[11] and potentially made them guilty of "very serious crimes,"[12] including "Treason."[13]

91.    Mr. Mueller personally became a target of President Trump's ire.  The President has accused Mr. Mueller of committing unspecified "illegal acts"[14] and engaging in unethical conduct, calling him a "totally conflicted"[15] person whose actions "will certainly be looked at."[16]  He also insinuated that Mr. Mueller initiated his investigation for purely personal reasons related to alleged business dealings between Mr. Mueller and President Trump—albeit without providing any evidence for his claims.[17]

---

[9] Wagner, *supra* n.7.

[10] Brett Samuels, *Trump: Some Statements About Him in Mueller Report Are 'Total Bulls—'*, The Hill (Apr. 19, 2019), https://tinyurl.com/yftm6bpe.

[11] Jeremy Diamond, *Trump Claims Victory in the Wake of Mueller Testimony*, CNN (July 24, 2019), https://tinyurl.com/58u87krx.

[12] Samuels, *supra* n.10.

[13] *Id.*

[14] John Parkinson & Jordyn Phelps, *Trump Calls Mueller Investigation 'Attempted Coup,' Barr Says 'Spying' Needs to Be Investigated*, ABC News (Apr. 10, 2019), https://tinyurl.com/4pyvj73m.

[15] John Wagner, *Trump Attacks Mueller, Says He Would Have Brought Charges if He Had Evidence of a Crime*, Wash. Post (May 30, 2019), https://tinyurl.com/yc8cayht.

[16] *See* Associated Press, *Trump Claims Launching Russia Probe 'Treasonous'*, PBS News (Mar. 25, 2019), https://tinyurl.com/5n6ka843.

[17] Wagner, *supra* n.15.

92.     In 2019, the Special Counsel's Office issued its Report on the Investigation into Russian Interference in the 2016 Presidential Election.  The Report, which was delivered to then-Attorney General William Barr, did not find that members of the Trump campaign conspired or coordinated with the Russian government.  Nor did it determine whether President Trump had obstructed justice.  The Report also concluded, consistent with longstanding Department of Justice policy, that a sitting President could not be indicted.

93.     After the Special Counsel's Office completed its 2019 report, Mr. Mueller rejoined the Firm.  As noted, WilmerHale itself had no role in the report or Mr. Mueller's work as Special Counsel, and indeed represented a number of clients adverse to the Special Counsel's office during that time.  Mr. Mueller retired from the Firm more than three years ago.

### *President Trump Takes Aim at Law Firms That Have Represented His Political Opponents.*

94.     In recent months, the President has unambiguously stated his intention to retaliate against his political adversaries and attorneys who represent them.  During the 2024 presidential campaign, for example, the President threatened to "go after" his political opponents[18] and warned that "WHEN I WIN, those people that CHEATED will be prosecuted to the fullest extent of the Law."  He further warned:  "Please beware that this legal exposure extends to Lawyers."[19]  After winning the election, the President reaffirmed his intent to punish the law firms that he believed

---

[18] Amy B Wang, *Trump Says He'd Have 'Every Right' to Seek Prosecutions of Political Foes*, Wash. Post (June 6, 2024), https://tinyurl.com/5n78w9w8.

[19] Michael Goldberg et al., *Trump Threatens Prison Sentences for Those Who 'Cheat' in the Election if He Wins*, PBS News (Sept. 8, 2024), https://tinyurl.com/2j35xdn5.

had wronged him, telling Fox News that "[w]e have a lot of law firms that we're going to be going

after, because they were very dishonest people."[20]

95.    On February 25, 2025, the President issued a memorandum to various intelligence-

community agency heads directing them "to suspend any active security clearances held by Peter

Koski and all members, partners, and employees of Covington & Burling LLP who assisted former

Special Counsel Jack Smith during his time as Special Counsel" pending a review to "terminate

any engagement of Covington."  As Special Counsel, Jack Smith brought criminal charges against

then-former President Trump in two cases involving his challenges to the 2020 election results and

his retention of sensitive government documents after leaving office in 2021.  The President

referred to the February 25 directive as "the deranged Jack Smith signing or bill," and said

afterward of the pen used to sign the memorandum, "Why don't you give it to Jack Smith?"[21]

96.    On March 6, 2025, the President signed a substantially more expansive executive

order entitled "Addressing Risks from Perkins Coie LLP," and issued an accompanying fact

sheet.[22]  The Perkins Order imposed firm-wide penalties on Perkins Coie for "representing failed

Presidential candidate Hillary Clinton."  The Perkins Order directed agency heads to terminate

contracts with Perkins Coie, to require all government contractors to disclose any business with

Perkins Coie and then review all contracts with Perkins Coie's clients, to limit official access of

---

[20] Alex Woodward, *Trump Confirms Retribution Campaign Against Law Firms That Clash with His Agenda*, The Independent (Mar. 9, 2025), https://tinyurl.com/45knwmeb.

[21] Janna Brancolini, *Trump Hits Jack Smith's Lawyers with Bombshell Executive Order*, The Daily Beast (Feb. 26, 2025), https://tinyurl.com/z6mmybxj.

[22] *Fact Sheet: President Donald Trump Addresses Risks from Perkins Coie LLP*, The White House (Mar. 6, 2025) ("Perkins Coie Fact Sheet"), https://tinyurl.com/8trncswm.

Perkins Coie to federal government buildings, and to limit government officials from engaging in their official capacity with Perkins Coie employees.

97.    The fact sheet accompanying the Perkins Order explained that the President was taking action against Perkins Coie "[t]o ensure taxpayer dollars no longer go to contractors whose earnings subsidize partisan lawsuits against the United States."  The fact sheet cited as an example of Perkins Coie's supposedly "unethical and discriminatory actions that threaten our elections, military strength, and national security" the fact that the firm had "filed lawsuits against the Trump Administration."  It also cited Perkins Coie's purported attempt to help "steal an election while representing failed presidential candidate Hillary Clinton"; alleged "push[ing of] debunked claims of secret Trump-Russia communications"; "work[] with activist donors, including George Soros, to judicially overturn enacted election laws"; and purportedly "partisan" "host[ing of] an FBI workspace."  The fact sheet further explained that "President Trump signed [the Perkins] Order to end" what the President perceived to be "the weaponization of Federal Government … 'and the abuse of law enforcement against political opponents.'"[23]

98.    The President declared at the signing ceremony that it was "an absolute honor to sign" the Perkins Order because Perkins Coie had engaged in "weaponization against a political opponent," which "should never be allowed to happen again."[24]  A senior White House official later elaborated on "the sensitive decision-making behind the order," explaining that "[t]he president doesn't believe [Perkins Coie] should have the privileges afforded to companies of their

---

[23] *Id.*

[24] Woodward, *supra* n.20.

stature to work and operate with the federal government, since they have made it very clear they are vehemently against the president of the United States, and their work proves that."[25]

99.    On March 12, 2025, a court in this District issued a temporary restraining order against the Perkins Order, holding that Perkins Coie is likely to prevail in establishing that the order violates "at least" the First, Fifth, and Sixth Amendments.  *See Perkins* Tr. at 74:7-21.

100.    Undeterred, the President issued a similar executive order two days later concerning the law firm of Paul, Weiss, Rifkind, Wharton & Garrison LLP.  That order accused former Paul Weiss partner Mark Pomerantz of leaving the firm "to join the Manhattan District Attorney's office solely to manufacture a prosecution against" the President; of "unethically le[ading] witnesses in ways designed to implicate" the President; and of "engag[ing] in a media campaign to gin up support for this unwarranted prosecution."  Paul Weiss Order §1.  The Paul Weiss Order imposed the same basic punishments as the Perkins Order, including stripping all Paul Weiss employees of their security clearances, requiring government contractors to disclose their attorney-client relationships with Paul Weiss, and restricting the ability of Paul Weiss employees to enter federal buildings, engage with federal employees, and obtain federal employment.  In the wake of that Order, Paul Weiss filed a motion to withdraw as counsel based on a client decision to drop the firm in light of the Executive Order.  Mem. in Support of Motion to Withdraw as Counsel at 2, *United States v. Coburn*, No. 2:19-cr-120 (D.N.J. Mar. 19, 2025) ("*Coburn* Withdrawal Mem.").

101.    Although the Paul Weiss Order punished only one firm, its "Background" provision was more expansive.  It states that "[g]lobal law firms have for years played an outsized role in undermining the judicial process and in the destruction of bedrock American principles."  Paul

---

[25] Perry Stein & Michael Birnbaum, *Trump Expands Retribution Campaign Against Law Firms That Aided His Foes*, Wash. Post (Mar. 6, 2025), https://tinyurl.com/bdh8mad6.

Weiss Order §1. The provision singled out representations taken "pro bono, or ostensibly 'for the public good,'" and declares that "[m]y Administration will no longer support taxpayer funds sponsoring such harm." *Id.*

102. On March 20, 2025, President Trump announced that he had "agreed to withdraw his March 14, 2025 Executive Order" regarding Paul Weiss "in light of a meeting with [the firm's] Chairman, Brad Karp, during which Mr. Karp acknowledged the wrongdoing of former Paul, Weiss partner, Mark Pomerantz, the grave dangers of Weaponization, and the vital need to restore our System of Justice."[26] According to the President's announcement, Paul Weiss agreed that "[l]aw firms should not favor any political party when it comes to choosing their clients," and that it "will not deny representation to clients, including in pro bono matters and in support of non-profits, because of the personal political views of individual lawyers."[27]

103. The President further stated that Paul Weiss has agreed to undertake "pro bono matters that represent the full spectrum of political viewpoints of our society, whether 'conservative' or 'liberal'"; "dedicate the equivalent of $40 million in pro bono legal services over the course of President Trump's term to support the Administration's initiatives"; "not adopt, use, or pursue any DEI policies"; and submit "to … a comprehensive audit of all of its employment

---

[26] Donald J. Trump (@realDonaldTrump), Truth Social (Mar. 20, 2025, 6:10 p.m.), https://tinyurl.com/3bj68n4r ("Paul Weiss Agreement").

[27] *Id.*

practices."[28]  On March 21, 2025, the President formally rescinded the Paul Weiss Order, citing

the firm's "remarkable change of course."[29]

104.    On March 22, 2025, the President issued yet another directive aimed at law firms

and lawyers he disfavors, accompanied by another "fact sheet."[30]  This time, the President asserted

that "far too many attorneys and law firms have long ignored" the ethical requirements of Federal

Rule of Civil Procedure 11 "when litigating against the Federal Government or in pursuing

baseless partisan attacks."  Sanctions Mem.  In particular, the President accused "Marc Elias,

founder and chair of Elias Law Group LLP"—which describes itself as "a mission-driven firm

committed to helping Democrats win," whose "attorneys have collectively represented hundreds

of Democratic campaigns, organizations, and PACs … and over a dozen presidential

campaigns"[31]—of "grossly unethical misconduct" in connection with Mr. Elias' 2016

representation of "failed Presidential candidate Hillary Clinton."  *Id.*

105.    In light of these purported "concerns," the President "direct[ed] the Attorney

General to seek sanctions against attorneys and law firms who engage in frivolous, unreasonable,

and vexatious litigation against" the federal government; "to review conduct by attorneys or their

law firms in litigation against the Federal Government over the last 8 years" for potential

---

[28] *Id.*; *see also* Lauren Edmonds, *Read the Email Paul Weiss Chairman Brad Karp Sent to Staff After Striking a Deal with Trump: 'Clients Perceived Our Firm as Being Persona Non Grata'*, Bus. Insider (Mar. 23, 2025), https://tinyurl.com/54t8yy5m.

[29] *See Addressing Remedial Action by Paul Weiss*, The White House (Mar. 21, 2025), https://tinyurl.com/35xs2bhs ("Rescission EO").

[30] *See Preventing Abuses of the Legal System and the Federal Court*, The White House (Mar. 22, 2025), https://tinyurl.com/t7c88y86 ("Sanctions Mem."); *Fact Sheet: President Donald J. Trump Prevents Abuses of the Legal System and the Federal Courts*, The White House (Mar. 21, 2025), https://tinyurl.com/48zbufb8.

[31] Elias Law Group, *About*, https://tinyurl.com/yyutr6h8 (last visited Mar. 28, 2025).

"misconduct"; and to consider whether allegedly improper attorney conduct warrants "reassessment of security clearances held by the attorney or termination of any Federal contract for which the relevant attorney or law firm has been hired to perform services." *Id.*

106.    On March 25, 2025, the President issued yet another executive order, this time concerning the law firm of Jenner & Block LLP.  That order lambastes former Jenner partner Andrew Weissman for supposedly "engaging in partisan prosecution as part of Robert Mueller's entirely unjustified investigation" of the President, which the order calls an "overt demand that the Federal Government pursue a political agenda against me."  Jenner Order §1.  The Jenner Order imposes the same punishments as the Perkins and Paul Weiss Orders, including immediately stripping all Jenner employees of their security clearances, requiring government contractors to disclose their attorney-client relationships with Jenner, and restricting the ability of Jenner employees to enter federal buildings, engage with federal employees, and obtain federal employment.

### President Trump Issues the Order and "Fact Sheet" Regarding WilmerHale.

107.    On March 27, 2025, the President issued the Order at issue in this case, which takes aim at WilmerHale.  The Order begins by announcing the Administration's "commit[ment] to addressing the significant risks associated with law firms, particularly so-called 'Big Law' firms, that engage in conduct detrimental to critical American interests."  Order §1.  It asserts that "[m]any firms take actions that threaten public safety and national security, limit constitutional freedoms, degrade the quality of American elections, or undermine bedrock American principles."  *Id.*  And it criticizes "law firms" for "regularly conduct[ing] this harmful activity through their powerful pro bono practices, earmarking hundreds of millions of their clients' dollars for destructive causes."  *Id.*

108.    The Order next turns to WilmerHale, describing it as "yet another law firm that has abandoned the profession's highest ideals and abused its pro bono practice to engage in activities that undermine justice and the interests of the United States." *Id.* As one "example," the Order asserts that WilmerHale "engages in obvious partisan representations to achieve political ends," an apparent reference to WilmerHale's representation of President Trump's political opponents—namely, the Democratic National Committee, state-level Democratic Party organizations, and the presidential campaigns of Joe Biden and Kamala Harris.

109.    The Order's second "example" of WilmerHale's supposedly "egregious conduct" is "support[ing] efforts to discriminate on the basis of race," an apparent reference to WilmerHale's representation of Harvard in the *Students for Fair Admissions* litigation.

110.    The Order next accuses WilmerHale of "back[ing] the obstruction of efforts to prevent illegal aliens from committing horrific crimes and trafficking deadly drugs within our borders," *id.*, an apparent reference to the Firm's litigation-related pro bono practice and successful challenges to immigration-related policies.

111.    The Order also accuses WilmerHale of "further[ing] the degradation of the quality of American elections, including by supporting efforts designed to enable noncitizens to vote," *id.*, an apparent reference to WilmerHale's involvement in challenges to state voter-identification and voter-registration laws.

112.    Like the Perkins, Paul Weiss, and Jenner Orders, the WilmerHale Order singles out certain current and former WilmerHale partners, including Robert Mueller, for special criticism. In particular, it asserts that Mr. "Mueller's investigation epitomizes the weaponization of government," describing it as "one of the most partisan investigations in American history." *Id.*

27

The Order further accuses Mr. Mueller, Mr. Zebley, and Mr. Quarles of "weaponiz[ing] the prosecutorial power to upend the democratic process and distort justice." *Id.*

113.    The Order directs the Attorney General, Director of National Intelligence, and all other relevant agency heads to "immediately take steps consistent with applicable law to suspend any active security clearances held by individuals at WilmerHale, pending a review of whether such clearances are consistent with the national interest." *Id.* §2(a).

114.    The Order further provides that agency heads "shall," to the extent permissible by law, "require Government contractors to disclose any business they do with WilmerHale and whether that business is related to the subject of the Government contract." *Id.* §3(a). "The heads of agencies shall review all contracts with WilmerHale or with entities that disclose doing business with WilmerHale …." *Id.* §3(b). The Order then directs agency heads "to terminate any contract" with WilmerHale "to the maximum extent permitted by applicable law." *Id.* §3(b)(i). Finally, "[w]ithin 30 days of the date of this order, agencies shall submit to the Director of the Office of Management and Budget an assessment of contracts with WilmerHale or with entities that do business with WilmerHale effective as of the date of this order and any actions taken with respect to those contracts in accordance with this order." *Id.* §3(b)(ii).

115.    The Order directs agencies to issue guidance "limiting official access" to federal government buildings "to employees of WilmerHale when such access would threaten the national security of or otherwise be inconsistent with the interests of the United States." *Id.* §5(a).

116.    The Order also directs that "heads of agencies shall provide guidance limiting Government employees acting in their official capacity from engaging with WilmerHale employees to ensure consistency with the national security and other interests of the United States." *Id.* §5(a). And the Order directs agency officials to "refrain from hiring employees of

WilmerHale, absent a waiver from the head of the agency, made in consultation with the Director of the Office of Personnel Management, that such hire will not threaten the national security of the United States." *Id.* §5(b).

117.    The Order does not cite any statute as purported authority for any of the directives, and the President has not asserted in any other context that he acted under authority of any specific statute in issuing the Order or any of the others.

118.    Like the Perkins, Paul Weiss, and Jenner Orders, the WilmerHale Order was issued with an accompanying "Fact Sheet."[32]  The Fact Sheet brands WilmerHale as a "rogue law firm[]," summarizes the various retaliatory actions being taken against WilmerHale, and asserts that the Order will "ensure accountability for past misconduct" and help "to end the weaponization of the Federal government."

### *The Order Has Harmed and Will Continue to Irreparably Harm WilmerHale and Its Clients.*

119.    WilmerHale has suffered irreparable harm in the 16 hours since the Order issued, and it will continue to suffer irreparable harm unless and until it obtains judicial relief.

120.    First, as explained further below, the Order violates WilmerHale's and its clients' constitutional rights under the First, Fifth, and Sixth Amendments.  It is well-established that a loss of constitutional freedoms even for a brief interval constitutes irreparable harm, particularly when it comes to First Amendment rights.

121.    Second, the Order irreparably damages WilmerHale's reputation and its goodwill with clients.  WilmerHale has been vilified by the most powerful person in the country as a "rogue law firm[]" that "engage[s] in conduct detrimental to critical American interests."  That will

---

[32] For the Court's convenience, a copy of the Fact Sheet is attached to this complaint as Exhibit B.  The order is available at https://tinyurl.com/49cp8zrb.

immediately and irreparably impede the Firm's ability to attract and retain clients. Indeed, the Order directly interferes with the attorney-client relationship between WilmerHale and its existing clients, by forcing clients to disclose their representation by WilmerHale to the government even when that representation is not public.

122.    Proving the point, on March 19, 2025, Paul Weiss attorneys moved to withdraw from a major criminal case, explaining that the defendant "terminated [the firm]'s representation of him" "[i]n response to the March 14 Executive Order," out of "concern[] that Paul, Weiss's ongoing involvement in the matter could in and of itself prejudice the review of his case." *Coburn Withdrawal Mem.* at 2-3.

123.    The harm to WilmerHale's reputation will negatively affect its ability to recruit and retain employees, especially given the Order's restrictions on the Firm's lawyers from engaging in Executive Branch employment, including in traditionally non-partisan roles, such as Assistant United States Attorneys. Left standing, the Order will impose severe limitations on WilmerHale's ability to hire and keep the best and brightest—be they attorneys, paralegals, IT professionals, secretaries, or the many others who make WilmerHale the law firm it is today.

124.    Third, WilmerHale will suffer substantial economic injuries from the Order, as its draconian restrictions threaten the very viability of the Firm's business model. These economic injuries are irreparable because sovereign immunity prevents WilmerHale from suing the government for monetary damages in the absence of an express waiver of this immunity by Congress.

125.    Given the serious constraints it places on WilmerHale's employees' ability to do their jobs, the Order creates significant uncertainty for WilmerHale's existing clients about whether WilmerHale can continue to represent them effectively. Every day the Order remains in force, the

Firm will inevitably receive more inquiries from clients who are contemplating terminating their engagements with the Firm due to the Order. And the Order's terms and odious language will invariably dissuade potential clients from retaining WilmerHale for new or expanded legal matters. Indeed, that is the Order's point.

126.    The Order also creates uncertainty for WilmerHale's existing clients about whether a continued representation will come at the cost of lucrative governmental contracts. Many of WilmerHale's most important clients have contracts with the U.S. Government, and are thus required by the Order to "disclose any business they do with WilmerHale." That appears to include even instances where the client's engagement with WilmerHale is otherwise confidential and/or has no relationship with the government contract at issue. And the Fact Sheet that accompanied the Order makes plain that their government contracts may be at risk if they continue their relationship with WilmerHale.

127.    In sum, the Order will inevitably cause extensive, lasting damage to WilmerHale's current and future business prospects. It will severely hinder the Firm's ability to effectively serve its clients—the lifeblood of any law firm. And, by design, it discourages clients from retaining or maintaining WilmerHale as their counsel. The harm to the Firm's financial health, professional reputation, free expression, and its clients' right to counsel and freedom of association will be immediate and profound—unless this Court promptly issues relief.

128.    That the Order directs agencies to issue guidance or take other action does not make the harm it inflicts any less imminent. Only one day after President Trump signed the Perkins Order, OMB issued guidance implementing it.[33] And not even two weeks after the Perkins Order

---

[33] Russell T. Vought, *Implementation of the Executive Order on "Addressing Risks from Perkins Coie LLP"*, OMB (Mar. 7, 2025), https://tinyurl.com/5bvxkuay.

issued, the EEOC began to implement the Perkins Order's directive to conduct investigations of various law firms, including WilmerHale.[34]  Notably, the "Fact Sheet" states unequivocally that "the Federal Government will terminate contracts that involve WilmerHale," "[t]he Federal Government will … restrict [WilmerHale] employees' access to government buildings," and "Federal Agencies will also refrain from hiring WilmerHale employees unless specifically authorized."

### CLAIMS FOR RELIEF

### Count I
(Against All Defendants)
### Violation Of The First Amendment - Retaliation for Protected Expression

129.     The paragraphs above are incorporated and reasserted as if fully set forth herein.

130.     The Supreme Court has repeatedly held that "the First Amendment prohibits government officials from retaliating against individuals for engaging in protected speech." *Lozman v. City of Riviera Beach*, 585 U.S. 87, 90 (2018); *see, e.g.*, *Hous. Cmty. Coll. Sys. v. Wilson*, 595 U.S. 468, 474 (2022); *Hartman v. Moore*, 547 U.S. 250, 256 (2006).  The Order blatantly defies this bedrock principle of constitutional law.

131.     As discussed, WilmerHale engages in written and oral advocacy on behalf of a wide array of clients, including some of President Trump's political opponents, in a wide array of matters, including some adverse to President Trump's interests.  *See supra* ¶¶77-87.  For example, WilmerHale attorneys have represented both the Democratic National Committee and the presidential campaigns of Joe Biden and Kamala Harris in voting-related litigation in the two most recent presidential elections.  WilmerHale attorneys also represented the House of Representatives

---

[34] Andrea R. Lucas, *Review of Perkins Coie LLP's Compliance with Title VII of the Civil Rights Act of 1964*, EEOC (Mar. 17, 2025), https://tinyurl.com/3zddk5bb.

Committee on Ways and Means in its attempt to obtain, and ultimately to disclose, President Trump's personal tax returns. And WilmerHale attorneys currently represent eight inspectors general who have sued the President and several members of his cabinet to challenge their recent purported terminations. Some of these representations have been paid, while others have been pro bono; all have been in service of the Firm's clients.

132.    WilmerHale's advocacy on behalf of these clients is unquestionably protected speech and petitioning activity. *See, e.g.*, *Velazquez*, 531 U.S. at 542-49 ("advocacy by [an] attorney to the courts" is "speech and expression" that enjoys First Amendment protection); *Lehnert v. Ferris Fac. Ass'n*, 500 U.S. 507, 528 (1991) (plurality) ("We long have recognized the important political and expressive nature of litigation."); *Ukrainian-Am. Bar Ass'n v. Baker*, 893 F.2d 1374, 1380 (D.C. Cir. 1990) ("[The First Amendment] is violated if the Government affirmatively interferes with constitutionally protected litigation[.]"); *In re Halkin*, 598 F.2d 176, 187 (D.C. Cir. 1979) ("[A]ttorneys and parties retain their First Amendment rights even as participants in the judicial process."), *overruled in part on other grounds by Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 31-32, 37 (1984). The Supreme Court has likewise held that "filing a complaint in court is a form of petitioning activity" protected by the First Amendment. *McDonald v. Smith*, 472 U.S. 479, 484 (1985); *see Borough of Duryea v. Guarnieri*, 564 U.S. 379, 387 (2011) (collecting cases).

133.    It is plain as day that President Trump issued the Order to retaliate against WilmerHale for that protected First Amendment activity. Indeed, unlike a typical case where discovery is needed to root out a forbidden retaliatory motive, the Order openly proclaims its retaliatory intent. The Order admits on its face that it is animated by WilmerHale's alleged "engage[ment] in obvious partisan representations to achieve political ends," its defense of race-

based college admission policies, its advocacy on behalf of "illegal aliens," and its involvement in litigation related to "American elections."  Order §1.

134.    The accompanying Fact Sheet also expressly acknowledges that the Order is designed to punish WilmerHale for representing clients in litigation—in other words, for engaging in First Amendment activity.

135.    Other statements by the President reinforce that naked retaliatory motive.  As discussed, then-candidate Trump stated during the 2024 presidential campaign that he intended to "go after" not only his political opponents but also "Lawyers" associated with them.  *Supra* ¶94.  And, after winning the election, he reiterated his intent to "go[] after" "a lot of law firms," based on his belief that they employ "dishonest people."  *Supra* ¶94.  The Order's timing—issuing just a month after WilmerHale filed a high-profile pro bono suit against the Administration on behalf of eight inspectors general, and hours after a public hearing during which the trial court lauded WilmerHale for bringing that litigation and doing so pro bono—also corroborates its retaliatory motivation.  The President singled out WilmerHale because he views some of the lawsuits it has handled as "harmful," Order §1, and he wishes to discourage other law firms from taking on similar lawsuits in the future.

136.    The President's withdrawal of the Paul Weiss Order also underscores the retaliatory motive of his orders targeting law firms.  The President removed the retaliatory sanctions against Paul Weiss only after the firm (1) "acknowledged the [purported] wrongdoing of its former partner Mark Pomerantz," who participated in a successful criminal prosecution of President Trump; (2) jettisoned certain "'diversity, equity, and inclusion' policies" that the President disfavors; and (3) committed to taking on pro bono clients and causes that support the Administration's initiatives. Rescission EO §1; *see* Paul Weiss Agreement ¶¶2-5.  The rescission order thus confirms that the

Paul Weiss Order was intended to punish Paul Weiss for previous exercises of First Amendment rights with a compelled mea culpa (itself a First Amendment violation) the only available route to recission. The Order targeting WilmerHale shares the same structure and retaliatory purpose.

137.    It is equally plain that the Order "constitutes a sufficiently adverse action" against WilmerHale "to give rise to an actionable First Amendment claim," *Wilson*, 595 U.S. at 477. Each of the Order's directives impedes the ability of WilmerHale's lawyers to practice their professions, disrupts the Firm's relations with clients, and damages the Firm's business prospects.

138.    For example, restricting WilmerHale attorneys' access to federal buildings (such as courthouses) and ability to engage with government officials (such as advocacy on behalf of clients in investigations and regulatory matters) profoundly undercuts their ability to provide effective advocacy. Order §5(a).

139.    Moreover, multiple WilmerHale attorneys hold security clearances that permit them to access classified information. The suspension and threatened revocation of security clearances held by individuals at WilmerHale in retaliation for protected speech, *id.* §2(a), impedes WilmerHale's ability to serve clients in cases involving sensitive government information.

140.    Threatening targeted investigations by the EEOC and Attorney General, with potential prosecution, *id.* §4; Fact Sheet, damages WilmerHale's reputation, with follow-on harm to client relationships and the Firm's business prospects.

141.    Forcing government contractors to disclose their business with WilmerHale and threatening to reassess those clients' government contracts, even if unrelated to business with WilmerHale, Order §3, damages WilmerHale's relations with existing clients and its ability to attract future ones. Those provisions are calculated to try to force those clients to stop doing business with the Firm. And as the Supreme Court unanimously held last year, "a government

entity's 'threat of invoking legal sanctions and other means of coercion' against a third party 'to achieve the suppression' of disfavored speech violates the First Amendment." *Vullo*, 602 U.S. at 180).

142.    These draconian punishments easily meet the standard for "adverse action" because they "would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights," *Connelly v. County of Rockland*, 61 F.4th 322, 325 (2d Cir. 2023)—i.e., they would deter lawyers from representing the President's political opponents or advancing positions that are adverse to his interests.  Indeed, that is their whole point.

143.    Neither a general statement purporting to require nominal adherence to the law nor a directive to an agency official to exercise judgment or make some factual finding is sufficient to avoid judicial review or to undermine the Order's clear purpose and effect.

144.    Defendants' First Amendment violations have caused WilmerHale ongoing and irreparable harm.

<u>**Count II**</u>
(Against All Defendants)
<u>**Violation Of The First Amendment - Viewpoint Discrimination**</u>

145.    The paragraphs above are incorporated and reasserted as if fully set forth herein.

146.    The Order violates another core First Amendment principle: the prohibition on viewpoint discrimination.  The Supreme Court has long held that "[t]he government must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction."  *Rosenberger v. Rector of Univ. of Va.*, 515 U.S. 819, 829 (1995).  While "[a] government official can share her views freely and criticize particular beliefs," the First Amendment forbids "us[ing] the power of the State to punish or suppress disfavored expression."  *Vullo*, 602 U.S. at 188.  Viewpoint-based sanctions constitute a "blatant and egregious form of content discrimination" that is anathema to the First Amendment.  *Reed v.*

*Town of Gilbert*, 576 U.S. 155, 168-71 (2015) (quotation marks omitted) (quoting *Rosenberger*, 515 U.S. at 829).

147.    The Order attributes to WilmerHale certain viewpoints and then punishes the Firm and all its employees and clients because the President disagrees with those viewpoints.   For example, the Order targets WilmerHale for using "its pro bono practice to engage in activities that"—in the President's view—"undermine justice and the interests of the United States."  Order §1.  The Order criticizes WilmerHale's pro bono work as "partisan" and "political," specifically criticizing its defense of race-based college admission policies ("efforts to discriminate on the basis of race"), its alleged "obstruction" of the Administration's immigration-enforcement policies, and its involvement in litigation regarding "American elections," which the Order derides— inaccurately—as "efforts designed to enable noncitizens to vote."  *Id.*  The Order characterizes all these representations as "harmful" and asserts that they "undermine justice and the interests of the United States."  *Id.*  In short, the Order punishes the Firm for advancing arguments with which the President disagrees.  This viewpoint discrimination is particularly evident with respect to the Order's direction that WilmerHale be prioritized for investigation of recruiting and advancement policies that the Perkins Order itself describes as widely shared among large law firms. *See id.* §1; Perkins Order §4.  The only basis for prioritizing investigation of WilmerHale vis-à-vis other firms with materially analogous policies is the viewpoint that the Order attributes to WilmerHale's representations.

148.    The Order also targets WilmerHale based on the speech and viewpoints of a former partner, Robert Mueller, and on WilmerHale's own characterization of Mr. Mueller's public service.  President Trump has repeatedly expressed the view that Mr. Mueller's investigation into whether the 2016 Trump campaign colluded with Russia was a "witch hunt"—arguing that the

Special Counsel "should never have been appointed and there should be no Mueller Report."[35] The Order likewise asserts that "[Mr.] Mueller's investigation epitomizes the weaponization of government," and specifically criticizes WilmerHale for "welcoming" Mr. Mueller, Mr. Zebley, and Mr. Quarles "to the [F]irm" while "claim[ing]" that Mr. Mueller "'embodies the highest value of our firm and profession.'"  Order §1.  While the President is free to disagree with that assessment, pointing to it as the basis for multiple adverse government actions is undisguised viewpoint discrimination.

149.    The President's decision to rescind the Paul Weiss Order after Paul Weiss agreed to criticize Mark Pomerantz, eliminate its DEI policies, and undertake pro bono representations that support the Administration's initiatives underscores that the President is using the power of his office to suppress law firms' and lawyers' protected expression and induce them to align with his political views.  The First Amendment prohibits such coercion.

150.    While the President may disagree with some of the viewpoints that he attributes to WilmerHale and/or its clients, the First Amendment does not allow him to punish the Firm based on those viewpoints.  Similarly, while the President may disagree with Mr. Mueller's decision to serve in the Justice Department as Special Counsel—at the request of the Deputy Attorney General President Trump himself appointed—and the viewpoints expressed in his report and related public statements, and with the Firm's decision to welcome him back after his service, the President may not penalize Mr. Mueller's former law firm based on a perceived association with those viewpoints.

151.    Nor can the President constitutionally punish WilmerHale attorneys' expressive decisions to represent certain clients or causes and not others, *see infra* ¶¶168-69—even if he

---

[35] *See, e.g.*, Rebecca Morin, *Trump Says 'There Should Be No Mueller Report'*, Politico (Mar. 15, 2019), https://tinyurl.com/yc77yfkc.

deems certain lawsuits to be "harmful" or "detrimental to critical American interests."  Order §1.

Government action "cannot be aimed at the suppression of ideas thought inimical to the

Government's own interest," whether those ideas are expressed in the town square or propounded

by "litigants and their attorneys."  *Velazquez*, 531 U.S. at 548-49.

152.    Defendants' First Amendment violations have caused WilmerHale ongoing and

irreparable harm.

### Count III
(Against All Defendants)
### Violation Of The First Amendment - Right To Petition The Government

153.    The paragraphs above are incorporated and reasserted as if fully set forth herein.

154.    The Order violates the First Amendment right "to petition the Government for a

redress of grievances," U.S. Const. amend. I.  The Supreme Court has held that "the right to petition

extends to all departments of the Government," including "administrative agencies" and "courts."

*Cal. Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 510 (1972).  Accordingly, the Court

has treated "a lawsuit" as a form of "petition" within the meaning of the Petition Clause.  *Borough

of Duryea*, 564 U.S. at 390; *see id.* at 387 (collecting "precedents confirm[ing] that the Petition

Clause protects the right of individuals to appeal to courts and other forums established by the

government for resolution of legal disputes").

155.    The Order violates the Petition Clause in multiple ways.  First, the Supreme Court

has long accepted "the proposition that when a person petitions the government for redress"—e.g.,

by filing a lawsuit—"the First Amendment prohibits any sanction on that action … so long as the

petition was in good faith."  *Nader v. Democratic Nat'l Comm.*, 567 F.3d 692, 696 (D.C. Cir. 2009)

(discussing the *Noerr-Pennington* doctrine).  The Order violates this doctrine by sanctioning

WilmerHale attorneys for bringing good-faith—and in many cases, successful—claims on behalf

of their clients.  Simply put, the Petition Clause does not allow the President to punish WilmerHale or its clients for "filing lawsuits against the Trump Administration."  *Cf.* Perkins Coie Fact Sheet.

156.    Second, the Order's directive to federal agencies to prohibit their employees from engaging with WilmerHale precludes the Firm from petitioning the government on its or its clients' behalf.  The Order prohibits WilmerHale's employees from—in many cases—meeting or even speaking with the very government officials who could hear such a petition (e.g., administrative law judges, prosecutors, and regulators).

157.    Third, the directive to exclude WilmerHale from all federal government buildings prevents the Firm's employees from accessing buildings that house federal judicial and administrative proceedings.  The Order also arbitrarily withdraws WilmerHale attorneys' access to the sensitive information they need to represent existing clients in ongoing proceedings involving classified subject matter.

158.    WilmerHale has standing to assert this First Amendment claim both on its own behalf and on behalf of its existing clients based on attorney-client relationships.  *See Kowalski v. Tesmer*, 543 U.S. 125, 130-31 (2004).

159.    Defendants' First Amendment violations have caused WilmerHale and its clients ongoing and irreparable harm.

**Count IV**
(Against All Defendants)
**Violation Of The First Amendment - Free Association**

160.    The paragraphs above are incorporated and reasserted as if fully set forth herein.

161.    The Order's requirement that government contractors "disclose any business they do with WilmerHale" violates WilmerHale's clients' freedom of association under the First Amendment.  "[C]ompelled disclosure of affiliation with groups engaged in advocacy may constitute as effective a restraint on freedom of association as other forms of governmental action."

40

*Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 606 (2021) (alterations omitted) (quoting *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 462 (1958)).

162.    The Order subjects WilmerHale clients who have government contracts to risks of economic reprisal and other forms of governmental hostility simply because they have chosen to retain and associate with WilmerHale.  The Order is a thinly veiled threat to government contractors who have associated themselves with WilmerHale that they are at risk of losing those contracts as a result of that association.  The Order provides that "[w]ithin 30 days of the date of this order, all agencies shall submit to the Director of the Office of Management and Budget an assessment of contracts with WilmerHale or with entities that do business with WilmerHale effective as of the date of this order and any actions taken with respect to those contracts in accordance with this order."  This is a naked secondary boycott of government contractors who do business with WilmerHale.  On any reasonable understanding of the Order, any government contractor who has associated with WilmerHale can expect economic consequences and other repercussions in short order.

163.    Indeed, the Fact Sheet admits as much.  It expressly states that "the Federal Government will terminate contracts that involve WilmerHale" in a purported effort to "ensure taxpayer dollars no longer go to contractors whose earnings subsidize activities not aligned with American interests."  The unambiguous goal of the disclosure demand is thus to chill clients' First Amendment choice to retain and associate with WilmerHale.

164.    The lone governmental interest underlying the Order—trying to impede the ability of law firms to represent clients in matters that the President does not like—is not even legitimate, let alone a "sufficiently important" interest to satisfy exacting scrutiny.  *See Ams. for Prosperity*, 594 U.S. at 607.

165.    Nor is the Order narrowly tailored to that (illegitimate) interest.  "Narrow tailoring is crucial where First Amendment activity is chilled—even if indirectly—'because First Amendment freedoms need breathing space to survive.'"  *Id*. at 609 (alterations omitted) (quoting *NAACP v. Button*, 371 U.S. 415, 433 (1963)).  Forced disclosure of "any business [clients] do with WilmerHale," Order §3(a), even if unrelated to any government contract or any litigation with which the President takes issue, is not narrowly tailored to any professed interest in avoiding subsidizing particular litigation.  *See also USAID v. All. for Open Soc'y Int'l, Inc*., 570 U.S. 205, 214-15 (2013).  Nor is forced disclosure of "whether that business is related to *the subject of* the Government contract."  Order §3(a) (emphasis added).  Those disclosures are simply designed to leverage the government's control over federal funding to punish WilmerHale.  But "Government officials cannot attempt to coerce private parties in order to punish or suppress views that the government disfavors."  *Vullo*, 602 U.S. at 180.

166.    A facial challenge to the Order is appropriate because a substantial number of its applications are unconstitutional.  Indeed, all of them are.  The Order's lack of tailoring to any government interest is categorical—that is, present in every case—as is the illegitimacy of the government interest.  Every forced disclosure that might chill association therefore fails exacting scrutiny.

167.    WilmerHale has both direct standing to challenge a secondary boycott targeted at it and third-party standing to bring this First Amendment claim on behalf of its existing clients based on attorney-client relationships.  *See Kowalski*, 543 U.S. at 130-31.  Clients are hindered from bringing claims themselves because, to do so, they would have to disclose their business with WilmerHale—the precise First Amendment harm that WilmerHale seeks to prevent.  Moreover,

the existence of that attorney-client relationship is protected by attorney-client privilege. The Order cites no authority that would justify requiring such sweeping disclosures.

168.    Furthermore, the First Amendment protects WilmerHale attorneys' expressive choices about which clients and causes they choose to represent. The Supreme Court has held that "the First Amendment offers protection when an entity engag[es] in expressive activity, including compiling and curating others' speech." *Moody v. NetChoice, LLC*, 603 U.S. 707, 731 (2024). That principle applies not only to newspapers, bookstores, and social media companies, but also to attorneys' decisions about which clients to associate with—particularly when it comes to pro bono matters. WilmerHale attorneys have a First Amendment right to take on pro bono clients such as the eight inspectors general challenging to their recent termination by the President, the jurisdictions (i.e., "sanctuary cities") that challenged the Administration's immigration-related policies during the President's first term, and the United Farm Workers that resisted a Department of Labor rule that would have depressed migrant farmworkers' wages.

169.    To be sure, WilmerHale attorneys have diverse views—political and otherwise— that inform their decisions about what matters to pursue. "But a private speaker does not forfeit constitutional protection simply by combining multifarious voices, or by failing to edit their themes to isolate an exact message as the exclusive subject matter of the speech." *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 569-70 (1995). Simply put, the Order restricts WilmerHale attorneys' constitutionally protected "'discretion in the selection and presentation' of content"—i.e., the cases on which they choose to work, and particularly those they agree to handle pro bono—which itself is a form of "'speech activity.'" *NetChoice*, 603 U.S. at 731. The government cannot punish WilmerHale for its attorneys' expressive choices about which clients to represent.

170.    Neither a general statement purporting to require nominal adherence to the law nor a directive to an agency official to exercise judgment is sufficient to avoid judicial review.

171.    Defendants' First Amendment violations have caused WilmerHale and its clients ongoing and irreparable harm.

### Count V
(Against All Defendants)
### *Ultra Vires* Presidential Action - Separation Of Powers

172.    The paragraphs above are incorporated and reasserted as if fully set forth herein.

173.    In addition to violating the First Amendment in myriad ways, the Order exceeds the President's authority and interferes with federal courts' exercise of "[t]he judicial Power," U.S. Const. art. III, §1.

174.    It is "black letter law" that the President's power to issue an executive order "'must stem either from an act of Congress or from the Constitution itself.'"  *Minnesota v. Mille Lacs Band of Chippewa Indians*, 526 U.S. 172, 188-89 (1999); *accord Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952).

175.    The Order identifies no statutory authority that empowers the President to sanction a law firm for representing his political opponents or handling lawsuits that he perceives to be contrary to his interests or those of the United States.[36]  That is unsurprising; no statute confers such authority, and any statute that purported to do so would raise grave constitutional concerns. *See Youngstown*, 343 U.S. at 588 ("The President's order does not direct that a congressional policy

---

[36] To the contrary, the Order's restrictions on hiring WilmerHale employees squarely conflict with a statutory prohibition on "discriminat[ing] for or against" any "applicant for [federal] employment" based on factors—including "political affiliation"—that are not related to the applicant's ability to do the job.  5 U.S.C. §2302(b)(1)(E), (2), (3), (10), (12).

be executed in a manner prescribed by Congress—it [improperly] directs that a *presidential policy* be executed in a manner prescribed by the President." (emphasis added)).

176.    The Order finds no support in the President's inherent Article II powers either. There is no "executive practice, long pursued to the knowledge of the Congress and never before questioned," of Presidents using the office to punish law firms for taking on representations or to try to deter law firms from doing so. *See Youngstown*, 343 U.S. at 610 (Frankfurter, J., concurring); *accord United States v. Midwest Oil Co.*, 236 U.S. 459, 473-74 (1915). No other President has even tried to claim such a power.

177.    Nor could Article II reserve any such power to the President, as to do so would empower the President to interfere with "the proper exercise of the judicial power." *Velazquez*, 531 U.S. at 545. In our adversarial system of litigation, "courts must depend" on attorneys to "present all the reasonable and well-grounded arguments necessary for proper resolution of [a] case." *Id.* The separation of powers thus precludes either Congress or the Executive from attempting to "exclude from litigation those arguments and theories [it] finds unacceptable but which by their nature are within the province of the courts to consider." *Id.* at 546. And while the legislature has authority to create or eliminate causes of action and to enact rules of professional conduct, courts have "inherent power[]" to determine whether an attorney (or a litigant) has "abuse[d] the judicial process" and "to fashion an appropriate sanction." *Goodyear Tire & Rubber Co. v. Haeger*, 581 U.S. 101, 107 (2017) (quoting *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44-45 (1991)).

178.    The Order flouts these "accepted separation-of-powers principles," "threaten[ing] severe impairment of the judicial function." *Velazquez*, 531 U.S. at 544-46. The imposition of draconian consequences on law firms that challenge Executive action cannot help but make other

45

law firms think twice about doing so.  That prospect undermines the rule of law, and its victims include the courts that will receive less zealous advocacy from lawyers who pull their punches for fear of retribution.  The Order thus threatens the "informed, independent" adversarial presentation on which an "informed, independent judiciary" depends.  *Id.* at 545.

179.    To make matters worse, the Order attempts to sanction WilmerHale for its legal advocacy without providing the notice, opportunity to be heard, or proper adjudicative fact-finding that is a prerequisite to such sanctions.  *See infra* ¶¶192-97.

180.    To the extent the Executive Branch believes that a private law firm has engaged in improper legal advocacy in a particular case, it may appeal to the judiciary to make appropriate findings and fashion an appropriate sanction.  *See Goodyear*, 581 U.S. at 107.  Even as to matters already fully litigated, Rule 60 and courts' inherent powers allow aggrieved parties to alert a court to fraud and other serious misconduct.  But the Executive Branch cannot simply take it upon itself to declare filings directed toward a coordinate branch of government to be so far beyond the pale as to warrant sanction.  As the Supreme Court recently reiterated, the Constitution forbids "concentrat[ion] [of] the roles of prosecutor, judge, and jury in the hands of the Executive Branch." *SEC v. Jarkesy*, 603 U.S. 109, 140 (2024); *see also* Antonin Scalia, *The Essential Scalia:  On the Constitution, the Courts, and the Rule of Law* 41 (J. Sutton & E. Whelan, eds., 2020) (when a constitution does "not prevent the centralization of power in one person…, the game is over").  Yet that is precisely what the Order endeavors to accomplish.

181.    On top of that, the Order—which effectively functions as a "prepared and proclaimed governmental blacklist[]"—"possess[es] almost every quality of [an unlawful] bill[] of attainder." *Joint Anti-Fascist Refugee Comm. v. McGrath*, 341 U.S. 123, 143-44 (1951) (Black, J., concurring).    It punishes WilmerHale—and only WilmerHale—"without any formal

investigation, trial, or even informal process." *See Perkins* Tr. at 89:10-22. From the Founding, such measures have been "forbidden to both national and state governments." *McGrath*, 341 U.S. at 144 (Black, J., concurring). It cannot be "that the authors of the Constitution, who outlawed the bill of attainder, inadvertently endowed the executive with power to engage in the same tyrannical practices that had made the bill such an odious institution." *Id.*

182.    The *ultra vires* nature of the Order has already harmed and continues to irreparably harm WilmerHale.

### Count VI
(Against All Defendants)
### Violation Of The Fifth Amendment - Due Process Clause (Procedural Due Process)

183.    The paragraphs above are incorporated and reasserted as if fully set forth herein.

184.    The Fifth Amendment's Due Process Clause guarantees that "[n]o person shall … be deprived of life, liberty, or property, without due process of law." And the Supreme Court has held that when courts impose civil sanctions for "'abuse[ of] the judicial process,'" they "must be compensatory rather than punitive in nature." *Goodyear*, 581 U.S. at 107-08. Before a court may impose a "punishment for [a] sanctioned party's misbehavior," it must "provide procedural guarantees applicable in criminal cases, such as a 'beyond a reasonable doubt' standard of proof" and a jury trial. *Id.* at 108. The Order flouts these established constitutional principles by imposing draconian punishments on WilmerHale without *any* meaningful process.

185.    The Order deprives WilmerHale and its employees of protected liberty and property interests. Specifically, the Order interferes with the rights of WilmerHale and its attorneys to follow their chosen profession by interfering with its attorneys' ability to practice law, including representing clients in court and before government agencies.

186.    WilmerHale represents clients in litigation in federal courts and in regulatory and other matters before federal agencies. WilmerHale lawyers must be able to enter federal

government buildings and engage with federal government employees to be able to represent those clients effectively.

187.    The Order similarly deprives WilmerHale non-lawyer employees of their protected liberty interests.  The Order targets all WilmerHale "employees," meaning that all WilmerHale support professionals—paralegals, mailroom staff, information technology specialists, paralegals, human resources workers, and janitorial staff—are now suffering the reputational and practical consequences of being barred from government buildings and government employment (potentially even for matters unrelated to the employment at WilmerHale).  As the district court explained in enjoining the Perkins Order, "every person working at [this firm] … face[s] extra hurdles if they should seek a job at the federal government, even if they aspire to public service, even if they want to help the President in achieving his political agenda." *Perkins* Tr. at 81:6-13.

188.    The Order also harms WilmerHale's constitutionally protected property interests by seeking to terminate private contractual relationships between WilmerHale and its clients.  The Order further impairs WilmerHale's constitutionally protected property interests by prohibiting the Firm from participating in federal contracting.  And the Order harms WilmerHale's cognizable interest in its reputation because it stigmatizes the Firm as a "rogue law firm[]" that "engage[s] in conduct detrimental to critical American interests."  Order §1; Fact Sheet.  Finally, the Order deprives WilmerHale of its protected liberty interest in its First Amendment right to petition the government because it restricts access to government buildings and government personnel.

189.    WilmerHale received no notice whatsoever before the Order issued.  Among other things, Defendants did not provide WilmerHale with the purported factual findings or sanctions, much less provide an opportunity to challenge them, before the Order issued.  And since the Order issued, WilmerHale has not been given any opportunity to be heard or to otherwise challenge it.

190.    No compelling interest justifies this violation of WilmerHale's due process rights. The Order was adopted for illegitimate and retaliatory reasons that could not justify the deprivation of *any aspect* of due process, let alone justify the deprivation of any due process *at all*.

191.    Defendants' violations of due process have caused WilmerHale ongoing and irreparable harm.

### Count VII
(Against All Defendants)
### Violation Of The Fifth Amendment - Due Process Clause (Void For Vagueness)

192.    The paragraphs above are incorporated and reasserted as if fully set forth herein.

193.    A government enactment, including an executive order, is unconstitutionally vague, and thus violates the Due Process Clause, if it "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." *United States v. Williams*, 553 U.S. 285, 304 (2008).

194.    The Order is unconstitutionally vague because it does not give WilmerHale fair notice of what is prohibited and how the Firm can avoid sanctions in the future.  To the contrary, the Order appears deliberately crafted to deter future speech and legal advocacy by forcing both WilmerHale and its clients "to 'steer far wider of the unlawful zone'" than they would "if the boundaries of the forbidden areas were clearly marked." *Baggett v. Bullitt*, 377 U.S. 360, 372 (1964).

195.    While the Order leaves no doubt that WilmerHale is being punished because it has represented some of the President's political opponents and advanced positions with which he disagrees, the Order does not specify what aspect of WilmerHale's conduct triggered its massive sanctions.  It instead vaguely accuses the Firm of "tak[ing] actions that threaten public safety and national security, limit constitutional freedoms, degrade the quality of American elections, [and] undermine bedrock American principles"; "earmarking hundreds of millions of their clients'

dollars for destructive causes"; and "abus[ing] its pro bono practice to engage in activities that undermine justice and the interests of the United States."  Order §1.

196.    Moreover, the Order is so standardless that it authorizes and encourages discriminatory enforcement.  For example, it does not articulate any clear standard by which agencies are to limit WilmerHale's official access to federal government buildings and federal employees.  The Order states only that access to buildings should be limited when it "would threaten the national security of or otherwise be inconsistent with the interests of the United States," and that government employees acting in their official capacity should not "engag[e]" with WilmerHale employees when doing so would be inconsistent with the national security "and other interests of the United States."  *Id.* §5(a).  These standards are unclear to such a degree that they authorize and encourage discriminatory enforcement between and within agencies.  And they leave WilmerHale employees with no notice of what conduct would prevent their access to federal government buildings and what, if anything, they could do to ensure access.  Similarly, the order provides no clear notice about what kind of "engag[ement]" with federal employees is prohibited and what, if anything, they could do to enable such engagement.

197.    Defendants' violations of due process have caused WilmerHale to suffer ongoing and irreparable harm.

## Count VIII
(Against All Defendants)
### Violation Of The Fifth Amendment - Equal Protection

198.    The paragraphs above are incorporated and reasserted as if fully set forth herein.

199.    The Equal Protection Clause of the Fourteenth Amendment, as incorporated against the federal government through the Fifth Amendment, protects all individuals and entities from unjust discrimination by the federal government.  Though the Fifth Amendment "does not contain an equal protection clause," it is well established that discrimination by the federal government

that would run afoul of the Equal Protection Clause if undertaken by a State is "violative of due process." *Bolling v. Sharpe*, 347 U.S. 497, 499 (1954).

200.    The government violates equal protection when, as here, it singles out similarly situated entities for adverse treatment without a constitutionally legitimate justification. *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (per curiam).

201.    In cases where it does treat similarly situated individuals or entities differently, therefore, the government must articulate a legitimate interest for doing so.  Such justification cannot be arbitrary, irrational, or pretextual—that is, it cannot serve only to mask the government's true, illegitimate motive for singling out the entity.  A desire to single out that group will not suffice. *City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 446 (1985).

202.    The Order cannot be squared with those equal-protection principles.  The Order's very purpose is to discriminate against WilmerHale and WilmerHale alone.  It imposes on the Firm extraordinary and punitive measures that it does not apply to many similarly situated firms or lawyers, even when the Order itself complains that certain practices are widespread among large law firms.  This singling out alone demonstrates that the Order was motivated by a bare intent to punish WilmerHale.

203.    Although the Order's discriminatory intent is evident on its face, it is reinforced by public statements made by President Trump that reflect his deep-seated animus toward WilmerHale and his desire to seek retribution against its lawyers for their constitutionally protected advocacy.

204.    No credible or rational justification exists for singling out WilmerHale.   The Order's stated reasons are arbitrary, irrational, and do not even try to conceal its true motive:

punishing WilmerHale for engaging in constitutionally protected speech and legal advocacy that President Trump does not like.

205.    Defendants' violations of equal protection have caused WilmerHale to suffer ongoing and irreparable harm.

## Count IX
### (Against All Defendants)
### Violation Of The Fifth Amendment - Right To Counsel

206.    Plaintiff repeats and realleges the allegations set forth in each of the preceding paragraphs as if fully set forth herein.

207.    The Fifth Amendment protects both lawyers' and clients' due-process rights in establishing and maintaining attorney-client relationships, including the client's right to choose counsel and the lawyer's corresponding right to maintain that representation free from arbitrary or unjustified governmental interference.  *See DOL v. Triplett*, 494 U.S. 715, 721 (1990).

208.    The Order's stated reasons for interfering with these relationships—to punish the Firm for its First Amendment activity—are not rationally related to any legitimate government interest.  Its restrictions therefore infringe the rights of lawyers and clients under the Fifth Amendment.

209.    Defendants' violations of the right to counsel have caused WilmerHale and its clients ongoing and irreparable harm.

## Count X
### (Against All Defendants)
### Violation Of The Sixth Amendment - Right To Counsel

210.    The paragraphs above are incorporated and reasserted as if fully set forth herein.

211.    The Sixth Amendment to the United States Constitution guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right … to have the Assistance of Counsel for his defence."  U.S. Const. amend. VI.  Actions that interfere with "the right to select and be

represented by one's preferred attorney," *Wheat v. United States*, 486 U.S. 153, 159 (1988), violate the Sixth Amendment by denying defendants "a fair opportunity to secure counsel of his own choice," *Luis v. United States*, 578 U.S. 5, 11 (2016) (plurality).

212.    In light of the "special" relationship between an attorney and his or her client, attorneys have third-party standing to contest government actions that impair their clients' abilities to exercise their constitutional rights, *Caplin & Drysdale, Chartered v. United States*, 491 U.S. 617, 623 n.3 (1989), including the "right to obtain legal representation" of one's choice, *Triplett*, 494 U.S. at 720.    WilmerHale thus has standing to challenge the Order's unconstitutional interference with the right to counsel of the criminal defendants it represents in proceedings against the government.

213.    The Order directly infringes the Sixth Amendment right to counsel of those clients by instructing all federal-agency leaders to limit government employees from engaging with WilmerHale personnel.    This prohibition eviscerates the Firm's ability to provide effective representation and advocacy for its clients in proceedings against the government.

214.    The Order further violates these clients' Sixth Amendment right to counsel by mandating that agency leaders restrict WilmerHale lawyers' access to all government buildings. This limitation severely impedes the Firm's ability to effectively advocate for its clients in government forums, hearings, and proceedings.

215.    The Order contravenes these clients' Sixth Amendment right to counsel by compelling government contractors to publicly disclose their business relationships with WilmerHale.    This command coerces clients to choose between retaining their government contracts—and, in many cases, their economic survival—and exercising their constitutional right to select counsel of their choice.

216.    The restrictions collectively represent unlawful governmental interference with the attorney-client relationship, constituting clear and substantial violations of the Sixth Amendment.

217.    Defendants' violations of the right to counsel have caused WilmerHale and its clients ongoing and irreparable harm.

**Count XI**
(Against All Defendants)
**Violation Of The Spending Power (U.S. Const. Art. I, §8) -
Unconstitutional Conditions On Government Contracts**

218.    The paragraphs above are incorporated and reasserted as if fully set forth herein.

219.    When the government funds an activity pursuant to the spending power (art. I, §8), it is not permitted "to leverage funding to regulate speech outside the contours of the federal program itself." *USAID*, 570 U.S. at 214-15.  And while the government may require certain restrictions on the freedom of government contractors as part of the deal, the government may not terminate contracts because of the contractor's protected expression "on matters of public concern," *Bd. of Cnty. Comm'rs v. Umbehr*, 518 U.S. 668, 675 (1996), or deny or terminate a government contract on a basis that infringes the contractor's constitutional rights, *id.* at 674.

220.    In light of the "special" relationship between an attorney and his or her client, attorneys have third-party standing to contest government actions that impair their clients' abilities to exercise their constitutional rights—including the "right to obtain legal representation" of ones' choice.  *Triplett*, 494 U.S. at 720; *see Caplin & Drysdale*, 491 U.S. at 623 n.3.  WilmerHale thus has standing to challenge the Order's unconstitutional interference with its clients' rights not to be subject to unconstitutional conditions on federal government contracts.

221.    The attorney-client relationship between WilmerHale and its clients is not relevant to any of those clients' suitability as a federal contractor.  This is particularly true when WilmerHale's representation of the client is substantively unrelated to any federal contract.

54

222.    Aside from the leverage provided by the federal contracting process, neither Congress nor the President is authorized by the Constitution to require any person to disclose its retention of WilmerHale attorneys or to prohibit any person or entity from engaging WilmerHale lawyers to provide legal representation.

223.    The Order's directive that federal agencies require contractors to disclose whether they have any attorney-client relationship with WilmerHale is irrelevant to the merits of any federal contracting decision and violates the First Amendment right to freedom of association of any WilmerHale client subject to that compelled disclosure requirement.  And by attempting to withhold or terminate federal contracts to try to force clients to abandon WilmerHale, and thus limit the Firm's financial resources to represent clients in supposedly "harmful" litigation, including through its "pro bono practice[]," Order §1, the directive violates the Firm's First Amendment rights as well.

224.    By threatening to terminate any federal government contract held by any WilmerHale client who refuses to end its attorney-client relationship with WilmerHale, the Order has the effect of making it a *de facto* condition of all federal government contracts that the contractor is prohibited from retaining any WilmerHale lawyer to represent it for any purpose. This *de facto* condition is an unlawful governmental interference with the attorney-client relationship, constituting clear and substantial violations of the First, Fifth and Sixth Amendments.

225.    The Order thus imposes unconstitutional conditions on federal contracts.

226.    Defendants' attempts to impose unconstitutional conditions on federal contracts have caused and will continue to cause ongoing and irreparable harm to WilmerHale and its clients.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court declare that the Order is unconstitutional and award any other relief the Court deems necessary and just, including using its equitable powers to enter interim, preliminary, and permanent orders providing that:

A.     Defendants are enjoined from implementing or giving effect to the Order in any way, including by relying on any of the statements in §1;

B.     Defendants are directed to rescind any and all guidance or direction that has already issued that relates to implementing or enforcing the Order;

C.     Defendants are directed to immediately issue guidance to their officers, staff, employees, and contractors to disregard the Order and carry on with their ordinary course of business as if the Order had never issued;

D.     Defendants U.S. Department of Justice; Pamela Bondi, in her official capacity as U.S. Attorney General; the Office of Management and Budget; and Russell Vought, in his official capacity as Director of the Office of Management and Budget, are directed to immediately issue guidance to all other agencies subject to the Order to suspend and rescind any implementation or enforcement; and

E.     Defendants are directed to take, in good faith, any other steps that are necessary to prevent the implementation or enforcement of the Order.

March 28, 2025

Respectfully submitted,

s/Paul D. Clement
PAUL D. CLEMENT (D.C. Bar. No. 433215)
ERIN E. MURPHY (D.C. Bar No. 995953)
JOSEPH J. DEMOTT (Virginia Bar No. 93981,
    D.D.C. Bar ID #D00561)
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
paul.clement@clementmurphy.com

*Attorneys for Plaintiff Wilmer Cutler
Pickering Hale and Dorr LLP*

57