**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

---

WILMER CUTLER PICKERING HALE AND DORR LLP,

*Plaintiff*,

v.

EXECUTIVE OFFICE OF THE PRESIDENT, U.S. DEPARTMENT OF JUSTICE, U.S. DEPARTMENT OF DEFENSE, U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES, U.S. DEPARTMENT OF EDUCATION, U.S. DEPARTMENT OF VETERANS AFFAIRS, OFFICE OF MANAGEMENT AND BUDGET, OFFICE OF THE DIRECTOR OF NATIONAL INTELLIGENCE, CENTRAL INTELLIGENCE AGENCY, ENVIRONMENTAL PROTECTION AGENCY, DEPARTMENT OF HOMELAND SECURITY, DEPARTMENT OF STATE, DEPARTMENT OF ENERGY, DEPARTMENT OF THE TREASURY, DEPARTMENT OF LABOR, DEPARTMENT OF AGRICULTURE, DEPARTMENT OF COMMERCE, DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT, SMALL BUSINESS ADMINISTRATION, OFFICE OF THE U.S. TRADE REPRESENTATIVE, DEPARTMENT OF THE INTERIOR, DEPARTMENT OF TRANSPORTATION, SECURITIES AND EXCHANGE COMMISSION, FEDERAL TRADE COMMISSION, U.S. PATENT AND TRADEMARK OFFICE, EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, THE UNITED STATES OF AMERICA, *and, in their official capacities*, PAMELA J. BONDI, PETE HEGSETH, ROBERT F. KENNEDY, JR., LINDA M. MCMAHON, DOUGLAS A. COLLINS, RUSSELL T. VOUGHT, TULSI GABBARD, JOHN L. RATCLIFFE, LEE M. ZELDIN, KRISTI NOEM, MARCO RUBIO, CHRIS WRIGHT, SCOTT BESSENT, LORI CHAVEZ-DEREMER, BROOKE L. ROLLINS, HOWARD LUTNICK, SCOTT TURNER, KELLY LOEFFLER, JAMIESON GREER, DOUG BURGUM, SEAN DUFFY, MARK T. UYEDA, ANDREW N. FERGUSON, COKE MORGAN STEWART, ANDREA R. LUCAS,

*Defendants*.

Case No. 1:25-cv-917

---

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S MOTION FOR A TEMPORARY RESTRAINING ORDER AND <u>PRELIMINARY INJUNCTION</u>**

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................ 1

BACKGROUND ................................................................................................ 5

    A.   WilmerHale Is A Global Law Firm That Represents A Wide Array Of Clients, Including In Some Matters Adverse To President Trump ........................... 5

    B.   President Trump Takes Aim At Law Firms That Have Represented His Political Opponents ........................................................................... 8

    C.   President Trump Issues An Order And "Fact Sheet" Targeting WilmerHale ...................................................................................... 13

ARGUMENT .................................................................................................... 16

I.   There Is No Obstacle To Providing Immediate Relief. .................................... 16

II.  WilmerHale Is Likely To Succeed On The Merits. ......................................... 19

    A.   The Order Violates the First Amendment Several Times Over. .............. 19

        1.   The Order is a textbook example of retaliation for constitutionally protected expression............................................................ 19

        2.   The Order openly discriminates against disfavored speakers and viewpoints ........................................................................ 23

        3.   The Order violates the Petition Clause ....................................... 26

        4.   The Order abridges the freedom of association ........................... 27

    B.   The Order Exceeds the President's Authority and Violates the Separation of Powers ................................................................... 30

    C.   The Order Violates Due Process and Equal Protection. ........................ 33

    D.   The Order Violates WilmerHale Clients' Fifth and Sixth Amendment Rights to Engage Counsel of Their Choice........................................ 38

III.  The Order Inflicts Irreparable Harm On WilmerHale, Its Employees, And Its Clients .................................................................................................... 40

IV.  The Balance Of The Equities And Public Interest Strongly Favor An Injunction .................................................................................................. 42

V.  This Court Should Exercise Its Discretion To Waive FRCP 65(c)'s Security Requirement .............................................................................................. 44

CONCLUSION ................................................................................................. 44

## INTRODUCTION

In recent weeks, the President has launched an unprecedented assault on a handful of law firms that have represented clients and causes he disfavors or previously employed lawyers he disfavors, even if no longer with the firm. The President's orders impose draconian sanctions on these firms in retaliation for constitutionally protected advocacy, without notice or any opportunity to be heard. Those orders are profoundly at odds with bedrock constitutional principles, including freedom of expression, the right to petition, the separation of powers, due process, the right to counsel, and the deep-seated value that the "courage" of attorneys who take on unpopular clients has long "made lawyerdom proud." *Sacher v. United States*, 343 U.S. 1, 4 (1952). Recognizing as much, on March 12, 2025, a court in this District issued temporary relief against one of these extraordinary orders, aimed at Perkins Coie LLP,[1] concluding that it likely violates "at least" the First, Fifth, and Sixth Amendments. Tr. of TRO Hearing at 74:7-21, *Perkins Coie LLP v. U.S. Dep't of Just.*, No. 1:25-cv-716 (D.D.C. Mar. 12, 2025), Dkt.22 ("*Perkins* Tr."). Undeterred, the President issued another executive order two days later imposing similar sanctions on Paul, Weiss, Rifkind, Wharton & Garrison LLP, and another Order on March 25, 2025, imposing similar sanctions on Jenner & Block LLP.[2]

The most recent directive—which issued yesterday evening—targets Wilmer Cutler Pickering Hale and Dorr LLP ("WilmerHale").[3] It suffers from the same constitutional flaws and

---

[1] *Addressing Risks from Perkins Coie LLP*, The White House (Mar. 6, 2025) ("Perkins Order"), https://tinyurl.com/547rwhna.

[2] *See Addressing Risks from Jenner & Block*, The White House (Mar. 25, 2025) ("Jenner Order"), https://tinyurl.com/u7ts9x49; *Addressing Risks from Paul Weiss*, The White House (Mar. 14, 2025) ("Paul Weiss Order"), https://tinyurl.com/5w4j69fv.

[3] *Addressing Risks from WilmerHale*, The White House (Mar. 28, 2025) ("Order"), https://tinyurl.com/4m8a79jn.

should likewise be immediately enjoined.  The Order begins by baselessly accusing WilmerHale of "abus[ing] its pro bono practice," specifically referencing the Firm's election- and immigration-related litigation and its defense of race-based college admission policies.  Order §1.  The Order also singles out retired WilmerHale partners Robert Mueller and James Quarles and current partner Aaron Zebley because of their involvement in the Department of Justice's investigation into allegations of Russian interference in the 2016 presidential election, in which Mr. Mueller served as Special Counsel.  *Id.*  It then directs top federal officials to "immediately … suspend any active security clearances held by individuals at WilmerHale" and review whether they should be permanently revoked.  *Id.* §2(a).  Next, the Order directs federal agencies to "require Government contractors to disclose any business they do with WilmerHale" and instructs agency heads to review these contracts and seek to terminate them.  *Id.* §3.  The Order also references a portion of the Perkins Order that directed federal officials to "investigate" diversity, equity, and inclusion policies at "large, influential, or industry leading law firms."  *Id.* §4.  Finally, the Order directs federal officials to restrict WilmerHale employees' access to "Federal Government buildings"; stop "engaging with WilmerHale employees"; "refrain from hiring employees of WilmerHale," absent a special waiver; and "expeditiously cease" providing any "Government goods, property, materials, [or] services" that "benefit" WilmerHale.  *Id.* §§ 2(b), 5.

The President has made crystal clear that he is imposing these sweeping sanctions in retaliation for WilmerHale attorneys' constitutionally protected advocacy on behalf of his political opponents and in matters that he perceives as adverse to his personal and/or political interests. While most litigation requires discovery to unearth retaliatory motive, the Order makes no secret of its intent to punish WilmerHale for its past and current representations of clients before the Nation's courts.  It unabashedly says the quiet part out loud:  It openly admits that the President is

targeting WilmerHale for its supposed "engage[ment] in obvious partisan representations to achieve political ends," its defense of race-based college admission policies, its advocacy on behalf of "illegal aliens," and its involvement in litigation related to "American elections." *Id.* §1.  The executive orders directed at Perkins Coie, Paul Weiss, and Jenner & Block likewise made no secret of the fact that they were issued as retaliation for protected advocacy with which the President takes issue.  And President Trump's public remarks during and after the 2024 presidential campaign reinforce that conclusion, as he has repeatedly and unabashedly vowed to "go[] after" not only his political opponents, but also their "Lawyers."[4]

This unprecedented retaliation campaign violates a host of foundational constitutional principles.  The First Amendment protects the rights of WilmerHale, its employees, and its clients to speak freely, petition the courts and other government institutions, and associate with clients and counsel of their choice without facing retaliation and discrimination by federal officials.  And as the Supreme Court unanimously reaffirmed just this past Term, government officials may neither "use the power of the State to punish or suppress disfavored expression" nor "attempt to coerce private parties in order to" accomplish those forbidden ends.  *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 180, 188 (2024).

The Order also violates the separation of powers twice over.  The President's role is to enforce the law—not to create new law or adjudicate litigation conduct before the courts—and no statute or constitutional provision empowers the President to unilaterally sanction WilmerHale in

---

[4] Alex Woodward, *Trump Confirms Retribution Campaign Against Law Firms That Clash with His Agenda*, The Independent (Mar. 9, 2025), https://tinyurl.com/45knwmeb; Michael Goldberg et al., *Trump Threatens Prison Sentences for Those Who 'Cheat' in the Election if He Wins*, PBS News (Sept. 8, 2024), https://tinyurl.com/2j35xdn5; *see, e.g.*, *Speech: Donald Trump Addresses the Staff at the Department of Justice*, Roll Call (March 14, 2025), https://tinyurl.com/44bfad44 (denouncing "crooked law firms," "violent, vicious lawyers," and "fake lawyers").

this manner.  That is unsurprising; any legislative effort to restrict lawyers' access to government buildings, services, and materials just for representing disfavored clients or causes would be patently unconstitutional.  And any executive-branch effort to deter private attorneys from representing particular clients or advancing particular arguments "threatens severe impairment of the judicial function," as courts depend on attorneys to "present all … reasonable and well-grounded arguments" on their clients' behalf.  *Legal Servs. Corp. v. Velazquez*, 531 U.S. 533, 545-46 (2001).

On top of that, the Order flagrantly violates due process.  It imposes severe consequences without notice or any opportunity to be heard; it uses vague, expansive language that does not adequately inform WilmerHale (or its clients) of what conduct triggered these extraordinary sanctions; and it unfairly singles out WilmerHale based on perceived connections to disfavored clients and causes.  The Order violates the right to counsel protected by the Fifth and Sixth Amendments, too.  For any and all of these reasons, WilmerHale is highly likely to succeed on the merits.

WilmerHale readily satisfies all remaining requirements for preliminary relief.  The Firm is already suffering and will continue to suffer irreparable harm absent preliminary relief, both because the ongoing violation of its constitutional rights is irreparable and because the Order threatens to tarnish WilmerHale's reputation, permanently damage its relationships with clients, and inflict devastating economic harm.  Indeed, that is its whole point.  The equities and public interest also tilt decisively in favor of immediate relief.  While WilmerHale faces an imminent threat of constitutional, reputational, and economic injuries, the government would suffer no injury if prevented from implementing this unconstitutional Order while its constitutionality is litigated. And the public interest would not be served in the slightest by allowing it to remain in effect, as

the Order is not only a threat to WilmerHale, but inimical to our Nation's constitutional order and the rule of law.  WilmerHale respectfully asks this Court to immediately enter a TRO and promptly schedule a preliminary injunction hearing.

## BACKGROUND

**A.**     **WilmerHale Is A Global Law Firm That Represents A Wide Array Of Clients, Including In Some Matters Adverse To President Trump.**

WilmerHale was formed via a 2004 merger of Wilmer Cutler & Pickering LLP and Hale and Dorr LLP.  Berman Decl. ¶6.  Today, the Firm is home to over 2,000 employees, about 1,200 of whom are lawyers, spread across offices throughout the United States and Europe.  *Id.* ¶5.  As did its two predecessor firms, WilmerHale provides world-class legal services to a wide variety of clients, ranging from corporations to universities to individuals and more.  *Id.* ¶8.

Much of WilmerHale's work is government-facing, meaning its attorneys must regularly engage with federal agencies and their employees on all manner of legal matters.  *Id.* ¶¶17-29.  To give just a few examples:  WilmerHale attorneys representing individual criminal defendants often meet with prosecutors in U.S. Attorneys' offices in-person to advocate for their clients.  *Id.* ¶¶20-21.  Attorneys representing inventors and technology corporations routinely interact with Patent and Trademark Office officials and administrative law judges to protect clients' intellectual property rights.  *Id..* ¶27.  Attorneys in the Firm's Securities and Financial Services Department regularly participate in enforcement proceedings and compliance matters before federal agencies such as the Securities and Exchange Commission, the Commodity Futures Trading Commission, the Office of the Comptroller of the Currency, the Treasury Department, and the Federal Reserve.  *Id.* ¶25.  And attorneys in WilmerHale's Government and Regulatory Litigation group routinely interact with and advocate before myriad other federal agencies, including the Environmental Protection Agency, the Department of Labor, and the Department of Health and Human Services.

Many of WilmerHale's clients also have other connections to the federal government. For example, at least 21 of the Firm's 25 largest clients in 2024 have contracts with federal agencies. These 21 clients accounted for more than 30% of the Firm's revenue in 2024—nearly $500 million. *Id.* ¶30.

WilmerHale has never shied away from difficult—and at times even unpopular or controversial—legal work. From facing down Senator McCarthy to defending civil liberties in the years following the terrible events of 9/11, WilmerHale attorneys have time and again demonstrated a willingness to take on challenging representations, including on a pro bono basis. *Id.* ¶¶13, 15-16. In recent years, for example, WilmerHale has challenged laws that prohibited congregants from attending in-person religious services during the COVID-19 pandemic and defended the right of churches to make ecclesiastical hiring and firing decisions free from unconstitutional government interference. *Id.* ¶45. WilmerHale has challenged laws restricting access to abortion in the aftermath of the Supreme Court's decision in *Dobbs v. Jackson Women's Health Organization*, 597 U.S. 215 (2022). Berman Decl. ¶45. And the Firm has represented advocates for stricter gun laws. *Id.* ¶44. The Firm's decisions to take on clients and matters that some may find controversial or disagree with are themselves a reflection of the Firm's values. *Id.* ¶43. In some cases, the Firm's representations reflect a deliberate choice to avoid representing one side of a controversy, such as declining to represent tobacco companies in health-related matters, while in others they reflect a commitment to ensuring that both sides of a controversial issue are well represented. *Id.* ¶¶42, 44. In either scenario, the Firm's decisions about which representations to undertake have an expressive component, *id.* ¶43—as the first paragraph of the Order underscores.

WilmerHale also has not shied away from taking on the federal government, regardless of which political party is in power. *Id.* ¶¶42, 47. WilmerHale brought multiple lawsuits against the

Clinton, Obama, and Biden administrations, as well as against the Bush and Trump administrations. *Id.* ¶¶47-53. It has also taken on many representations in the political sphere. In 2024, WilmerHale attorneys represented the Democratic National Committee in lawsuits adverse to the Republican National Committee, President Trump, and his allies in Arizona, Georgia, Michigan, New Hampshire, North Carolina, and Pennsylvania. *Id.* ¶55. And just this past month, WilmerHale lawyers filed a lawsuit challenging President Trump's sudden dismissal of Inspectors General at eight of the federal government's largest agencies, including Defense, State, and Health and Human Services. *Id.* ¶53. At the same time, in both Republican and Democratic Administrations, WilmerHale lawyers have cooperated with government agencies and lawyers, including in cases where the government has been asked to support WilmerHale clients as amicus curiae. *Id.* ¶29.

Given WilmerHale's government-adjacent work, many of its attorneys leave the Firm to work in government service and may rejoin the Firm after working in the government. *Id.* ¶11. One of WilmerHale's most prominent alumni, Robert S. Mueller III, is well known for his work as FBI Director from 2001 to 2013. *Id.* ¶36. In May 2017, Mr. Mueller was appointed by Rod Rosenstein—the Deputy Attorney General President Trump himself appointed—as Special Counsel to investigate alleged Russian interference in the 2016 presidential election.[5] Mr. Mueller had a long and distinguished career in public service. *Id.* ¶37. A graduate of Princeton University and University of Virginia Law School, he was a decorated Marine Corps Officer and served with distinction in in the Vietnam War, earning the Bronze Star and the Purple Heart. *Id.* ¶37. He also held numerous high-level positions in the Department of Justice prior to becoming the FBI Director. *Id.* ¶37. While WilmerHale had no role in Mr. Mueller's work as Special Counsel (and indeed represented clients adverse to the Special Counsel's Office at the time), Mr. Mueller

---

[5] *See* Press Release, *Appointment of Special Counsel*, U.S. Department of Justice (May 17, 2017), https://tinyurl.com/yc59yed4.

rejoined WilmerHale at the conclusion of the investigation and remained a partner there until he retired more than three years ago. *Id.* ¶40.

**B.    President Trump Takes Aim At Law Firms That Have Represented His Political Opponents.**

During Mr. Mueller's tenure as Special Counsel, President Trump repeatedly railed against the investigation Mr. Mueller oversaw, calling it a "hoax" and a "witch hunt."[6]  The President also engaged in inflammatory personal attacks against Mr. Mueller's team, calling them "thugs,"[7] members of a "hit squad,"[8] and a "National Disgrace!"[9]  At other times, he described them as "very sick and dangerous people"[10] whose investigation—initiated and overseen by President Trump's Department of Justice—amounted to an "attack on our country"[11] and potentially made them guilty of "very serious crimes,"[12] including "Treason."[13]  And, during and after the 2024

---

[6] *See, e.g.*, Meredith McGraw, *Trump Attacks Mueller After He Agrees to Testify to Congress*, ABC News (June 26, 2019), https://tinyurl.com/59s56ffh.

[7] John Wagner, *Trump Calls Mueller Lawyers 'Thugs' and 'A National Disgrace!'*, Wash. Post (Aug. 20, 2018), https://tinyurl.com/74z89vjc.

[8] Martin Pengelly, *Trump Attacks Robert Mueller's 'Hit Squad' in Row over 'Wiped' Phones*, The Guardian (Sept. 12, 2020), https://tinyurl.com/zxfrdxxe.

[9] Wagner, *supra* n.7.

[10] Brett Samuels, *Trump: Some Statements About Him in Mueller Report Are 'Total Bulls—'*, The Hill (Apr. 19, 2019), https://tinyurl.com/yftm6bpe.

[11] Jeremy Diamond, *Trump Claims Victory in the Wake of Mueller Testimony*, CNN (July 24, 2019), https://tinyurl.com/58u87krx.

[12] Samuels, *supra* n.10.

[13] *Id.*

presidential election, President Trump repeatedly vowed to use his official authority to "go[] after" not only his political adversaries, but also "Lawyers" and "law firms" connected to them.[14]

In recent weeks, the President has followed through on those threats.  On February 25, 2025, he targeted Covington & Burling LLP for providing legal advice to Jack Smith, who, as Special Counsel, brought criminal charges against President Trump.  *Suspension of Security Clearances and Evaluation of Government Contracts* (Feb. 25, 2025).  Specifically, the President issued a memorandum to various intelligence community agency heads directing them "to suspend any active security clearances held by Peter Koski and all members, partners, and employees of Covington & Burling LLP who assisted former Special Counsel Jack Smith during his time as Special Counsel, pending a review … to terminate any engagement of Covington." *Id*.

On March 6, 2025, the President issued an executive order targeting Perkins Coie LLP for "representing failed Presidential candidate Hillary Clinton," Perkins Order §1.  The Perkins Order was accompanied by a "fact sheet" stating that the firm "has "worked with activist donors, including George Soros, to judicially overturn enacted election laws" and that one of the firm's former partners, Michael Sussman, was "indicted for lying to the FBI" about "claims of secret Trump-Russia communications" (without mentioning that Mr. Sussman was subsequently acquitted at trial).[15]  The Perkins Order directs agency heads, *inter alia*, to terminate contracts with Perkins Coie, to require all government contractors to disclose any business with Perkins Coie and then review all contracts with Perkins Coie's clients, to limit official access of Perkins Coie

---

[14] *See, e.g.*, Michael Goldberg et al., *Trump Threatens Prison Sentences for Those Who 'Cheat' in the Election if He Wins*, PBS News (Sept. 8, 2024), https://tinyurl.com/2j35xdn5; Alex Woodward, *Trump Confirms Retribution Campaign Against Law Firms That Clash with His Agenda*, The Independent (Mar. 9, 2025), https://tinyurl.com/45knwmeb.

[15] *Fact Sheet: President Donald Trump Addresses Risks from Perkins Coie LLP*, The White House (Mar. 6, 2025) ("Perkins Fact Sheet"), https://tinyurl.com/8trncswm.

employees to federal government buildings, and to prevent government officials from engaging in their official capacity with Perkins Coie employees.  On March 11, 2025, Perkins Coie sued to enjoin the Perkins Order on the grounds that it violates the constitutional rights of the firm and its clients.  Complaint, *Perkins Coie*, No. 1:25-cv-716 (D.D.C. Mar. 11, 2025), Dkt.1.  The district court held a hearing the following day and immediately issued a temporary restraining order. Order, *Perkins Coie*, No. 1:25-cv-716 (D.D.C. Mar. 12, 2025), Dkt.21 ("*Perkins* TRO").

Undeterred, the President issued a third executive order just two days later targeting another large law firm: Paul, Weiss, Rifkind, Wharton & Garrison LLP ("Paul Weiss").[16]  The Paul Weiss Order accused former Paul Weiss partner Mark Pomerantz of leaving the firm "to join the Manhattan District Attorney's office solely to manufacture a prosecution against" the President; of "unethically le[ading] witnesses in ways designed to implicate" the President; and of "engag[ing] in a media campaign to gin up support for this unwarranted prosecution."  Paul Weiss Order §1.  The Paul Weiss Order imposed the same basic punishments as the Perkins Coie Order, including stripping all Paul Weiss employees of their security clearances, requiring government contractors to disclose their attorney-client relationships with Paul Weiss, and restricting Paul Weiss employees' ability to access federal buildings, engage with federal employees, and obtain federal employment.  *Id.*  In the wake of that order, Paul Weiss filed a motion to withdraw as counsel based on a client decision to drop the firm in light of the Paul Weiss Order.  Mem. in Support of Motion to Withdraw as Counsel at 2, *United States v. Coburn*, No. 2:19-cr-120 (D.N.J. Mar. 19, 2025) ("*Coburn* Withdrawal Mem.").

Although the Paul Weiss Order punished only one firm, its "Background" provision was more expansive.  It stated that "[g]lobal law firms have for years played an outsized role in

---

[16] *See Addressing Risks from Paul Weiss*, The White House (Mar. 14, 2025) ("Paul Weiss Order"), https://tinyurl.com/5w4j69fv.

undermining the judicial process and in the destruction of bedrock American principles." Paul Weiss Order §1. The order singled out representations taken "pro bono, or ostensibly 'for the public good,'" and declares that "[m]y Administration will no longer support taxpayer funds sponsoring such harm." *Id.*

On March 20, 2025, President Trump announced that he had "agreed to withdraw his March 14, 2025 Executive Order" regarding Paul Weiss "in light of a meeting with [the firm's] Chairman, Brad Karp, during which Mr. Karp acknowledged the wrongdoing of former Paul, Weiss partner, Mark Pomerantz, the grave dangers of Weaponization, and the vital need to restore our System of Justice."[17] According to the President's announcement, Paul Weiss agreed that "[l]aw firms should not favor any political party when it comes to choosing their clients," and that it "will not deny representation to clients, including in pro bono matters and in support of non-profits, because of the personal political views of individual lawyers."[18]

The President further stated that Paul Weiss has agreed to undertake "pro bono matters that represent the full spectrum of political viewpoints of our society, whether 'conservative' or 'liberal'"; "dedicate the equivalent of $40 million in pro bono legal services over the course of President Trump's term to support the Administration's initiatives"; "not adopt, use, or pursue any DEI policies"; and submit "to … a comprehensive audit of all of its employment practices."[19] On

---

[17]    @realDonaldTrump, *TruthSocial* (Mar. 20, 2025, 6:10 p.m.), https://tinyurl.com/3bj68n4r.

[18] *Id.*

[19] *Id.*; *see also* Lauren Edmonds, *Read the Email Paul Weiss Chairman Brad Karp Sent to Staff After Striking a Deal with Trump: 'Clients Perceived Our Firm as Being Persona Non Grata'*, Bus. Insider (Mar. 23, 2025), https://tinyurl.com/54t8yy5m.

March 21, 2025, the President issued an order formally rescinding the Paul Weiss Order, citing the firm's "remarkable change of course."[20]

On March 22, 2025, the President issued yet another directive aimed at law firms and lawyers he disfavors, accompanied by another "fact sheet." *See Preventing Abuses of the Legal System and the Federal Court*, The White House (Mar. 22, 2025) ("Sanctions Mem."); *Fact Sheet: President Donald J. Trump Prevents Abuses of the Legal System and the Federal Courts*, The White House (Mar. 21, 2025).[21] This time, the President asserted that "far too many attorneys and law firms have long ignored" the ethical requirements of Federal Rule of Civil Procedure 11 "when litigating against the Federal Government or in pursuing baseless partisan attacks." Sanctions Mem. In particular, the President accused "Marc Elias, founder and chair of Elias Law Group LLP"—which describes itself as "a mission-driven firm committed to helping Democrats win," whose "attorneys have collectively represented hundreds of Democratic campaigns, organizations, and PACs … over a dozen presidential campaigns"[22]—of "grossly unethical misconduct" in connection with Mr. Elias' 2016 representation of "failed Presidential candidate Hillary Clinton." *Id.*

In light of these purported "concerns," the President "direct[ed] the Attorney General to seek sanctions against attorneys and law firms who engage in frivolous, unreasonable, and vexatious litigation against" the federal government. *Id.* The President also directed the Attorney General "to review conduct by attorneys or their law firms in litigation against the Federal

---

[20] *Addressing Remedial Action by Paul Weiss*, The White House (Mar. 21, 2025), https://tinyurl.com/35xs2bhs ("Rescission Order").

[21] The executive order is available at https://tinyurl.com/t7c88y86. The Fact Sheet is available at https://tinyurl.com/48zbufb8.

[22] Elias Law Group, *About*, https://tinyurl.com/yyutr6h8 (last visited Mar. 28, 2025).

Government over the last 8 years" for potential "misconduct." *Id.* Finally, the President further directed the Attorney General to consider whether allegedly improper attorney conduct also warrants "reassessment of security clearances held by the attorney or termination of any Federal contract for which the relevant attorney or law firm has been hired to perform services." *Id.*

On March 25, 2025, the President issued another executive order and fact sheet, this time concerning the law firm of Jenner & Block LLP. *See Addressing Risks from Jenner & Block*, The White House (Mar. 25, 2025) ("Jenner Order"); *Fact Sheet: President Donald J. Trump Addresses Risks from Jenner & Block,* The White House (Mar. 25, 2025).[23] That Order lambastes former Jenner partner Andrew Weissman for supposedly "engaging in partisan prosecution as part of Robert Mueller's entirely unjustified investigation," which the Order calls an "overt demand that the Federal Government pursue a political agenda against me." Jenner Order §1. The Jenner Order imposes the same basic punishments as the Perkins and Paul Weiss Orders. *See id.* §§2-5.

### C.    President Trump Issues An Order And "Fact Sheet" Targeting WilmerHale.

On March 27, 2025, the President issued the Order at issue in this case, which takes aim at WilmerHale. The Order begins by announcing the Administration's "commit[ment] to addressing the significant risks associated with law firms, particularly so-called 'Big Law' firms, that engage in conduct detrimental to critical American interests." Order §1. It asserts that "[m]any firms take actions that threaten public safety and national security, limit constitutional freedoms, degrade the quality of American elections, or undermine bedrock American principles." *Id.* And it criticizes "law firms" for "regularly conduct[ing] this harmful activity through their powerful pro bono practices, earmarking hundreds of millions of their clients' dollars for destructive causes." *Id.*

---

[23] The executive order is available at https://tinyurl.com/u7ts9x49. The Fact Sheet is available at https://tinyurl.com/392wr2rs.

The Order next turns to WilmerHale, describing it as "yet another law firm that has abandoned the profession's highest ideals and abused its pro bono practice to engage in activities that undermine justice and the interests of the United States." *Id.* As one "example," the Order asserts that WilmerHale "engages in obvious partisan representations to achieve political ends," an apparent reference to WilmerHale's representation of President Trump's political opponents—namely, the Democratic National Committee, state-level Democratic Party organizations, and the presidential campaigns of Joe Biden and Kamala Harris. The Order's second "example" of WilmerHale's supposedly "egregious conduct" is "support[ing] efforts to discriminate on the basis of race," an apparent reference to WilmerHale's representation of Harvard in the *Students for Fair Admissions* litigation. The Order next accuses WilmerHale of "back[ing] the obstruction of efforts to prevent illegal aliens from committing horrific crimes and trafficking deadly drugs within our borders," *id.*, an apparent reference to the Firm's litigation-related pro bono practice and successful challenges to certain immigration-related policies during President Trump's first term. The Order also accuses WilmerHale of "further[ing] the degradation of the quality of American elections, including by supporting efforts designed to enable noncitizens to vote," *id.*, an apparent reference to WilmerHale's involvement in challenges to state voter-identification and voter-registration laws.

Like the Perkins, Paul Weiss, and Jenner Orders, the WilmerHale Order singles out certain current and former WilmerHale partners, including Robert Mueller, for special criticism. In particular, it asserts that Mr. "Mueller's investigation epitomizes the weaponization of government," describing it as "one of the most partisan investigations in American history." *Id.* The Order further accuses Mr. Mueller, Mr. Zebley, and Mr. Quarles of "weaponiz[ing] the prosecutorial power to upend the democratic process and distort justice." *Id.*

14

The Order directs the Attorney General, Director of National Intelligence, and all other relevant agency heads to "immediately take steps consistent with applicable law to suspend any active security clearances held by individuals at WilmerHale, pending a review of whether such clearances are consistent with the national interest." *Id.* §2(a). The Order further provides that agency heads "shall," to the extent permissible by law, "require Government contractors to disclose any business they do with WilmerHale and whether that business is related to the subject of the Government contract." *Id.* §3(a). "The heads of agencies shall review all contracts with WilmerHale or with entities that disclose doing business with WilmerHale…." *Id.* §3(b). The Order then directs agency heads "to terminate any contract" with WilmerHale "to the maximum extent permitted by applicable law." *Id.* §3(b)(i). "Within 30 days of the date of this order, agencies shall submit to the Director of the Office of Management and Budget an assessment of contracts with WilmerHale or with entities that do business with WilmerHale effective as of the date of this order and any actions taken with respect to those contracts in accordance with this order." *Id.* §3(b)(ii).

In addition, the Order directs agencies to issue guidance "limiting official access" to federal government buildings "to employees of WilmerHale when such access would threaten the national security of or otherwise be inconsistent with the interests of the United States." *Id.* §5(a). The Order also directs that "heads of agencies shall provide guidance limiting Government employees acting in their official capacity from engaging with WilmerHale employees to ensure consistency with the national security and other interests of the United States." *Id.* §5(a). And the Order directs agency officials to "refrain from hiring employees of WilmerHale, absent a waiver from the head of the agency, made in consultation with the Director of the Office of Personnel Management, that such hire will not threaten the national security of the United States." *Id.* §5(b).

Like the Perkins, Paul Weiss, and Jenner Orders, the WilmerHale Order cites no statute or constitutional provision authorizing the President's actions. Instead, it vaguely references "national security." *Id.* §1. Also like those prior orders, the WilmerHale Order was issued with an accompanying (and even more incendiary) Fact Sheet. *See* Dkt.1-2. The Fact Sheet brands WilmerHale as a "rogue law firm[]," summarizes the various retaliatory actions being taken against WilmerHale, and asserts that the Order will "ensure accountability for past misconduct" and help "to end weaponization of the Federal government." *Id.*

## ARGUMENT

This case cries out for immediate relief. A temporary restraining order or preliminary injunction is warranted when (1) the plaintiff is likely to succeed on the merits, (2) the plaintiff is likely to suffer irreparable harm absent preliminary relief, (3) the balance of equities tips in the plaintiff's favor, and (4) an injunction is in the public interest. *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008); *Harris v. Bessent*, 2025 WL 521027, at *2 (D.D.C. Feb. 18, 2025) (same four-factor test for preliminary injunctions and restraining orders). The last two equitable "factors merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009); *Karem v. Trump*, 960 F.3d 656, 668 (D.C. Cir. 2020) (affirming order granting preliminary injunction). Every factor here favors immediate relief: The Order is unconstitutional several times over; it is designed to and does inflict immediate and irreparable injury; and the equities overwhelmingly favor preserving the status quo and the principles on which our adversary system of justice depends while this case is litigated to final judgment.

## I.    There Is No Obstacle To Providing Immediate Relief.

At the outset, there are no threshold barriers to judicial review of the Order. It is "well established that '[r]eview of the legality of Presidential action can ordinarily be obtained in a suit seeking to enjoin the officers who attempt to enforce the President's directive.'" *Chamber of Com.*

*of U.S. v. Reich*, 74 F.3d 1322, 1328 (D.C. Cir. 1996) (brackets in original) (quoting *Franklin v. Massachusetts*, 505 U.S. 788, 828 (1992) (Scalia, J., concurring in part and concurring in the judgment)).   Indeed, the Supreme Court has repeatedly reviewed constitutional challenges to executive orders and presidential proclamations.  *See, e.g.*, *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 582 (1952); *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 795-96 (1985); *Trump v. Hawaii*, 585 U.S. 667, 682-83 (2018).   And this Court has not hesitated to grant TROs enjoining enforcement of executive orders that violate the constitutional rights of private parties.  *See, e.g.*, *Perkins Coie*, No. 1:25-cv-716 (D.D.C. Mar. 12, 2025), Dkt.21 (issuing TRO to block implementation of executive order); *Jones v. Trump*, 1:25-cv-00401 (D.D.C. Feb. 24, 2025), Dkt. 28 (same).

This action is also ripe.  The President has "formalized" his directives to federal agencies in the Order, and the Order's "effects" on WilmerHale and its clients are already being "felt in a concrete way."  *Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 807-08 (2003); *see* Berman Decl. ¶¶73-86.  There are no "contingencies [or] speculation that [would] impede judicial review," because WilmerHale's injuries are not "dependent on 'contingent future events that may not occur as anticipated.'"  *Trump v. New York*, 592 U.S. 125, 131 (2020) (per curiam).  The Order is aimed directly at WilmerHale and its clients and threatens serious repercussions.  And while the Order contains boilerplate statements that it shall be carried out "consistent with applicable law" and subject to further action by agency heads, Order §§2, 3(b), Defendants "ha[ve] not suggested that" it "will not be enforced" at all, *Virginia v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383, 393 (1988).  To the contrary, the Fact Sheet states unequivocally that "the Federal Government will terminate contracts that involve WilmerHale," "[t]he Federal Government will … restrict [WilmerHale] employees' access to government buildings," and "Federal Agencies will also

17

refrain from hiring WilmerHale employees unless specifically authorized."  Dkt.1-2.  Moreover, because the Order violates the First Amendment rights of WilmerHale and its clients, "the courts' willingness to permit pre-enforcement review is 'at its peak,'" given the importance of "avoid[ing] the chilling effects that come from unnecessarily expansive proscriptions" on free expression, association, and petitioning activity.  *N.Y. Republican State Comm. v. SEC*, 799 F.3d 1126, 1135-36 (D.C. Cir. 2015).

While the D.C. Circuit has held that courts generally cannot review the substance of an adverse security clearance determination, *see Lee v. Garland*, 120 F.4th 880, 885 (D.C. Cir. 2024), that case involved an effort to second-guess the reasons for revoking an individual security clearance pursuant to well-established procedures.  Nothing in *Lee* disturbs the principle that courts may review constitutional challenges to the process used revoke a person's security clearance, *see El-Ganayni v. U.S. Dep't of Energy*, 591 F.3d 176, 183 (3d Cir. 2010) (distinguishing between challenges to the substantive revocation of clearance on the merits and challenges to the denial of revocation procedures and rejecting government's argument that court lacked jurisdiction over the latter); *Ralls Corp. v. Comm. on Foreign Inv. in U.S.*, 758 F.3d 296, 314 (D.C. Cir. 2014); *Webster v. Doe*, 486 U.S. 592, 602 n.7 (1988), much less a "process" like this one that on its face retaliates against a group of unidentified individuals solely based on their protected associations.  Nor did *Lee* remotely sanction depriving a group of unidentified individuals of the normal revocation procedures in retaliation for disfavored speech, representations, and associations.  And, of course, Lee did not address a situation where the denial of the ordinary procedures for revocation was just one of multiple punishments inflicted on employees of a law firm based on a single set of constitutionally infirm findings (i.e., §1 of the Order) that purports to justify all the actions set forth in the order.  Simply put, there is nothing severable or salvageable about the security-

provision section of the Order, and no basis for allowing that section alone to take immediate effect, especially when the consequences are severe, immediate, and irreparable.

## II.    WilmerHale Is Likely To Succeed On The Merits.

### A.    The Order Violates the First Amendment Several Times Over.

#### 1.    The Order is a textbook example of retaliation for constitutionally protected expression.

Blacklisting law firms simply because they have represented a President's political rivals and perceived opponents is anathema to our constitutional order. "[T]he First Amendment prohibits government officials from retaliating against individuals for engaging in protected speech." *Lozman v. City of Riviera Beach*, 585 U.S. 87, 90 (2018). And because litigation serves crucial political, social, and expressive purposes, "state action designed to retaliate against and chill an attorney's advocacy for his or her client strikes at the heart of the First Amendment." *Eng v. Cooley*, 552 F.3d 1062, 1069 (9th Cir. 2009) (brackets omitted) (quoting *Soranno's Gasco, Inc. v. Morgan,* 874 F.2d 1310, 1314 (9th Cir. 1989)).

To prevail on its claim for First Amendment retaliation, WilmerHale must establish that "(1) [it] engaged in conduct protected under the First Amendment; (2) the [government] took some retaliatory action sufficient to deter a person of ordinary firmness in [WilmerHale]'s position from speaking again; and (3) a causal link between the exercise of a constitutional right and th[at] adverse action." *Aref v. Lynch*, 833 F.3d 242, 258 (D.C. Cir. 2016). WilmerHale is very likely to prove each of these three elements because the Order is undisguised retaliation that satisfies every element on its face. It unapologetically—and severely—punishes WilmerHale for its attorneys' advocacy on behalf of clients and causes that the President does not like. And it does so for the avowed purpose of deterring other law firms from engaging in the same constitutionally protected conduct.

*First*, WilmerHale's advocacy on behalf of its clients is unquestionably protected by the First Amendment. The Supreme Court has held that "advocacy by [an] attorney to the courts" is "speech and expression" that enjoys First Amendment protection. *Velazquez*, 531 U.S. at 542-49. "[G]overnment action seeking to limit an attorney's advocacy 'on behalf of' a client implicates the client's, as well as the attorney's, First Amendment interests—the attorney is, after all, the client's speaker hired to deliver the client's message." *Eng*, 552 F.3d at 1069. In short, WilmerHale "attorneys and [clients] retain their First Amendment rights even as participants in the judicial process," and they may not constitutionally be punished for having taken positions in court that the President does not like. *In re Halkin*, 598 F.2d 176, 187 (D.C. Cir. 1979), *overruled in part on other grounds by Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 31-32, 37 (1984).

The Supreme Court has also held that the First Amendment's Petition Clause protects "filing a complaint in court," *McDonald v. Smith*, 472 U.S. 479, 484 (1985), and "[t]he right of access to a court" to prosecute a civil case for "redress of alleged wrongs," *Bill Johnson's Rests., Inc. v. NLRB*, 461 U.S. 731, 741 (1983). The First Amendment right of association likewise protects "[t]he right to retain and consult an attorney," *e.g.*, *Denius v. Dunlap*, 209 F.3d 944, 953-54 (7th Cir. 2000) (collecting cases), which is "an indispensable means of preserving other individual liberties," *Roberts v. U.S. Jaycees*, 468 U.S. 609, 618 (1984). WilmerHale's advocacy is thus protected by the First Amendment several times over. *See, e.g.*, *Eng*, 552 F.3d at 1069 ("The First Amendment's prohibition against state retaliation for *hiring* a lawyer would ring hollow if the state could simply retaliate for the lawyer's *advocacy* on behalf of the client instead."); *Ukrainian-Am. Bar Ass'n, Inc. v. Baker*, 893 F.2d 1374, 1380 (D.C. Cir. 1990) ("[The First Amendment] is violated if the Government affirmatively interferes with constitutionally protected litigation.").

20

*Second*, the Order plainly "constitutes a sufficiently adverse action" against WilmerHale "to give rise to an actionable First Amendment claim," *Hous. Cmty. Coll. Sys. v. Wilson*, 595 U.S. 468, 477 (2022).  It punishes the firm in myriad ways, including by: (1) vilifying it as bad actor that "engage[s] in conduct detrimental to critical American interests," Order §1; (2) immediately suspending WilmerHale employees' security clearances, *id.* §2; (3) forcing WilmerHale's clients to disclose their relationships with the Firm, *id.* §3(a); (4) seeking to terminate federal contracts held by WilmerHale clients, *id.*; and (5) restricting WilmerHale employees' access to federal officials, buildings, services, materials, and employment, *id.* §§2(b), 5.

These draconian punishments easily meet the standard for "adverse action."  There can be no serious dispute that the Order will—if not enjoined—"damage WilmerHale's business prospects," "disrupt its relations with current and future clients," and "impede its lawyers' ability to zealously advocate as counsel."  Berman Decl. ¶76; *see id.* at ¶¶76-81.  Proving the point, on March 19, 2025, Paul Weiss attorneys moved to withdraw from a major criminal case, explaining that the defendant "terminated [the firm]'s representation of him" "[i]n response to the March 14 Executive Order," out of "concern[] that Paul, Weiss's ongoing involvement in the matter could in and of itself prejudice the review of his case."  *Coburn* Withdrawal Mem. at 2-3.  Those grave harms would "deter a [lawyer] of ordinary firmness" from representing the President's political opponents or advancing positions that are adverse to his interests.  *Cf. Aref*, 833 F.3d at 258. Indeed, that is their whole point.

That conclusion is reinforced by the fact that the adverse actions have been taken by the President himself.  The "objective inquiry" into whether adverse action is sufficiently deterrent takes into account "[t]he power that a government official wields," because "the greater and more direct the government official's authority, the less likely a person will feel free to disregard a

directive from the official." *Vullo*, 602 U.S. at 191-92.  It is hard to imagine a greater and more direct threat than one personally delivered by the President of the United States to be carried out by the heads of all federal agencies.  And the Order cannot be "'reasonably understood'" as anything other than a "threat[ of] adverse action" against those who would follow in WilmerHale's footsteps, as it directs agency heads to bar WilmerHale attorneys from doing the day-to-day work necessary to represent their clients, particularly in government-facing practices.  *Id.* at 189 (citing *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 67-68 (1963)).  Moreover, the directive for agencies to terminate contracts with any WilmerHale client who does not disassociate itself from the Firm "violate[s] the First Amendment through coercion of a third party." *Id*. at 191.  As Judge Howell concluded with respect to the Perkins Order, "the plain language of [the] Executive Order … confirms that … government officials are attempting to … punish and suppress views that the government, or at least the current administration, disfavors." *Perkins* Tr. 79:15-20.

*Third*, it is unmistakable from the face of the Order that the President's "retaliatory motive" was "a 'but-for' cause" of the injuries that the Order inflicts on WilmerHale—i.e., "that the adverse action against [the Firm] would not have been taken absent the retaliatory motive." *Nieves v. Bartlett*, 587 U.S. 391, 398-99 (2019).  The Order admits on its face that it is animated by WilmerHale's alleged "engage[ment] in obvious partisan representations to achieve political ends," its defense of race-based college admission policies, its advocacy on behalf of "illegal aliens," and its involvement in litigation related to "American elections."  Order §1.  The accompanying Fact Sheet also expressly acknowledges that the Order is designed to punish WilmerHale for representing clients in litigation—in other words, for engaging in First Amendment activity.  It asserts, for example, that WilmerHale has "abused its pro bono practice to engage in activities that undermine justice and the interests of the United States."  Dkt.1-2.

Context provides further corroboration.  The Order is one of several similar orders targeting law firms that have represented the President's perceived political and personal opponents or employed lawyers that have undertaken public representations adverse to the President.  Berman Decl. ¶¶57-74; Compl. ¶¶94-118.  The President's rescission of the Paul Weiss Order underscores the retaliatory motive behind these orders, as it was accompanied by a compelled mea culpa and a commitment to spend $40 million on pro bono work that aligns with the Administration's views.  *See* Rescission Order.  And the timing of the WilmerHale Order—mere weeks after WilmerHale filed a lawsuit on behalf of a group of Inspectors General challenging their sudden firing by the Trump Administration, and only hours after the district judge presiding over that case made a special point to thank and applaud the Firm for its pro bono representation in the case—reinforces the conclusion that the Order is meant to punish WilmerHale for its First Amendment-protected advocacy.  *Accord Perkins* Tr. 79:15-20 (concluding that the Perkins Order is an effort "to punish and suppress views that the government, or at least the current administration, disfavors").

In sum, it is hard to imagine a more blatant example of governmental retaliation for protected speech and petitioning activity.  WilmerHale is thus exceedingly likely to prevail on Count I of its complaint.

> ### 2.  The Order openly discriminates against disfavored speakers and viewpoints.

The Order violates another core First Amendment principle: the prohibition on viewpoint discrimination.  "[N]o official, high or petty, can prescribe what shall be orthodox in politics, … religion, or other matters of opinion."  *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943).  Needless to say, the higher the official, the more problematic the effort to prescribe orthodoxy and the more obviously unconstitutional viewpoint discrimination becomes.  While the President may "share h[is] views freely and criticize particular beliefs," the First Amendment

forbids "us[ing] the power of the State to punish or suppress disfavored expression." *Vullo*, 602 U.S. at 188.  "The government must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." *Rosenberger v. Rector of Univ. of Va.*, 515 U.S. 819, 829 (1995).

The Order discriminates based on viewpoint in multiple respects.  First, it attributes to WilmerHale certain viewpoints and then punishes the Firm and all its employees and clients because the President disagrees with those viewpoints.  For example, the Order targets WilmerHale for using "its pro bono practice to engage in activities that"—in the President's view—"undermine justice and the interests of the United States."  Order §1.  The Order criticizes WilmerHale's pro bono work as "partisan" and "political," specifically criticizing its defense of race-based college admission policies ("efforts to discriminate on the basis of race"), its alleged "obstruction" of the Administration's immigration-enforcement policies, and its involvement in litigation regarding "American elections," which the Order derides—inaccurately—as "efforts designed to enable noncitizens to vote."  *Id.*  The Order characterizes all these representations as a "weaponization of the justice system."  *Id.*  In short, the Order punishes the Firm for taking on clients and advancing arguments with which the President disagrees.  Indeed, President Trump's decision to withdraw the Paul Weiss Order after that firm agreed to provide $40 million in pro bono services to support the Administration's initiatives, *see supra* pp.11-12, confirms that one goal of these Orders is to interfere with law firms' constitutionally protected right to choose which clients and causes to take on.

The First Amendment prohibits the government from taking actions to punish or restrict expressive activity, and President Trump's actions "caus[e] precisely th[e] same harm" regardless of whether WilmerHale attorneys actually have the political affiliations or viewpoints that the

government attributes to them.  *Heffernan v. City of Paterson*, 578 U.S. 266, 273-374 (2016).  This viewpoint discrimination is particularly evident with respect to the Order's direction that WilmerHale be prioritized for investigation of recruiting and advancement policies that the Perkins Order itself describes as widely shared among large law firms.  The only basis for prioritizing investigation of WilmerHale vis-à-vis other firms with materially analogous policies is the viewpoint that the Order attributes to WilmerHale's representations.

The Order also targets WilmerHale based on the speech and viewpoints of a former partner, Robert Mueller, and on WilmerHale's own characterization of Mueller's public service.  President Trump has repeatedly expressed the view that Mr. Mueller's investigation into whether the 2016 Trump campaign colluded with Russia was a "witch hunt"—arguing that "the Special Counsel … should never have been appointed and there should be no Mueller Report."[24]  The Order likewise asserts that Mr. "Mueller's investigation epitomizes the weaponization of government," and specifically criticizes WilmerHale for "welcoming" Mr. Mueller, Mr. Zebley, and Mr. Quarles back "to the [F]irm" while "claim[ing]" that Mr. Mueller "'embodies the highest value of our firm and profession.'"  *Id.* §1.  While the President is free to disagree with that assessment (or with some of the viewpoints WilmerHale attorneys have advanced on behalf of their clients), pointing to it as the basis for multiple adverse government actions is undisguised viewpoint discrimination.

Similarly, while the President may disagree with Mr. Mueller's decision to serve as Special Counsel and the viewpoints expressed in his report and related public statements, and with the Firm's decision to welcome him back after his service, the President may not penalize Mr. Mueller's former law firm based on a perceived association with those viewpoints.  Nor can he constitutionally punish WilmerHale attorneys' expressive decisions to represent certain clients or

---

[24] *See, e.g.*, Rebecca Morin, *Trump Says 'There Should Be No Mueller Report'*, Politico (Mar. 15, 2019), https://tinyurl.com/yc77yfkc (ellipsis in original).

causes and not others, *see infra* p.30—even if he deems certain lawsuits to be "harmful" or "detrimental to critical American interests," Order §1.  Government action "cannot be aimed at the suppression of ideas thought inimical to the Government's own interest," whether those ideas are expressed in the town square or propounded by "litigants and their attorneys."  *Velazquez*, 531 U.S. at 548-49.

### 3.    The Order violates the Petition Clause.

The Order also violates the First Amendment right "to petition the Government for a redress of grievances."  U.S. Const. amend. I.  The Supreme Court has held that "the right to petition extends to all departments of the Government," including "administrative agencies" and "courts."  *Cal. Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 510 (1972).  Accordingly, the Court has treated "a lawsuit" as a form of "petition" within the meaning of the Petition Clause.  *Borough of Duryea v. Guarnieri*, 564 U.S. 379, 390 (2011); *see id.* at 387 (collecting "precedents confirm[ing] that the Petition Clause protects the right of individuals to appeal to courts and other forums established by the government for resolution of legal disputes").  The Order violates the Petition Clause in at least three ways.

*First*, the Supreme Court has long accepted "the proposition that when a person petitions the government for redress"—e.g., by filing a lawsuit—"the First Amendment prohibits any sanction on that action … so long as the petition was in good faith."  *Nader v. Democratic Nat'l Comm.*, 567 F.3d 692, 696 (D.C. Cir. 2009) (discussing the *Noerr-Pennington* doctrine).  The Order violates this doctrine by sanctioning WilmerHale attorneys for bringing good-faith—and in many cases, successful—claims on behalf of their clients.  *See* Order §1.  Simply put, the Petition Clause does not allow the President to punish WilmerHale or its clients for "fil[ing] lawsuits against the Trump Administration."  *Cf.* Perkins Fact Sheet.

*Second*, the Order's directive to federal agencies to prohibit their employees from engaging with WilmerHale employees precludes the Firm from petitioning the government on its or its clients' behalf. The Order prohibits WilmerHale's employees from—in many cases—meeting or even speaking with the very government officials who could hear such a petition (e.g., administrative law judges, prosecutors, and regulators).

*Third*, the directive to exclude WilmerHale employees from all federal government buildings prevents WilmerHale employees from entering federal government buildings that house judicial and administrative proceedings. The Order also arbitrarily withdraws WilmerHale attorneys' access to the sensitive information they need to represent clients in proceedings involving classified subject matter.

### 4. The Order abridges the freedom of association.

The Order's demand that government contractors "disclose any business they do with WilmerHale" violates WilmerHale's clients' freedom of association under the First Amendment. "[C]ompelled disclosure of affiliation with groups engaged in advocacy may constitute as effective a restraint on freedom of association as other forms of governmental action." *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 606 (2021) (alterations omitted) (quoting *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 462 (1958)).

The Order subjects WilmerHale clients who have government contracts to risks of economic reprisal and other forms of governmental hostility simply because they have chosen to retain and associate with WilmerHale. The Order is a thinly veiled threat to government contractors who have associated themselves with WilmerHale that they are at risk of losing those contracts as a result of that association. The Order provides that "[w]ithin 30 days of the date of this order, agencies shall submit to the Director of the Office of Management and Budget an assessment of contracts with WilmerHale or with entities that do business with WilmerHale

effective as of the date of this order and any actions taken with respect to those contracts in accordance with this order." This is a naked secondary boycott of government contractors who do business with WilmerHale. On any reasonable understanding of the Order, any government contractor who has associated with WilmerHale can expect economic consequences and other repercussions in short order.

Indeed, the Fact Sheet admits as much. It expressly states that "the Federal Government will terminate contracts that involve WilmerHale" in a purported effort to "ensure taxpayer dollars no longer go to contractors whose earnings subsidize activities not aligned with American interests." Dkt.1-2. The open and acknowledged goal of the demand for disclosure is thus to chill clients' constitutionally protected activity of choosing to retain and associate with WilmerHale.

This burden on the right to association triggers exacting scrutiny, which the Order abjectly flunks. *See Ams. for Prosperity*, 594 U.S. at 607. The lone governmental interest underlying the Order—trying to impede the ability of law firms to represent clients in matters the President does not like—is not even legitimate, let alone a "sufficiently important" interest to satisfy exacting scrutiny. *See id.* Nor is the Order narrowly tailored to that (illegitimate) interest. "Narrow tailoring is crucial where First Amendment activity is chilled—even if indirectly—'because First Amendment freedoms need breathing space to survive.'" *Id.* at 609 (alterations omitted) (quoting *NAACP v. Button*, 371 U.S. 415, 433 (1963)). Forced disclosure of "any business [clients] do with WilmerHale," Order §3(a), even if not related to a government contract or to any of the litigation with which the President takes issue, is not narrowly tailored to any professed interest in avoiding subsidizing particular litigation. *See USAID v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 214-15 (2013). Nor is forced disclosure of "whether that business is related to *the subject of* the Government contract." Order §3(a) (emphasis added). Those disclosures are instead simply

designed to leverage the government's control over federal funding to punish WilmerHale.  But "Government officials cannot attempt to coerce private parties in order to punish or suppress views that the government disfavors."  *Vullo*, 602 U.S. at 180.

A facial challenge to the Order is appropriate here because a substantial number (indeed all) of its applications are unconstitutional.  The Order's lack of tailoring to any government interest is categorical—that is, present in every case—as is the illegitimacy of the government interest.  Every forced disclosure that might chill association therefore fails exacting scrutiny.  WilmerHale has both direct standing to challenge a secondary boycott targeted at it and third-party standing to bring this First Amendment claim on behalf of its existing clients based on attorney-client relationships.  *See Kowalski v. Tesmer*, 543 U.S. 125, 130-31 (2004).  Clients are hindered from bringing claims themselves because, to do so, they would have to disclose their business with WilmerHale—the precise First Amendment harm that WilmerHale seeks to prevent.  Moreover, the existence of that attorney-client relationship is protected by attorney-client privilege.  The Order cites no authority that could possibly justify requiring such sweeping disclosures.

Furthermore, the First Amendment protects WilmerHale attorneys' expressive choices about which clients and causes they choose to represent.  The Supreme Court has expressly held that "the First Amendment offers protection when an entity engag[es] in expressive activity, including compiling and curating others' speech."  *Moody v. NetChoice, LLC*, 603 U.S. 707, 731 (2024).  That principle applies not only to newspapers, bookstores, and social media companies, but also to attorneys' decisions about which clients to associate with—particularly when it comes to pro bono matters.  WilmerHale attorneys have a First Amendment right to take on pro bono clients such as the eight inspectors general who are challenging their recent termination by the President, the jurisdictions (i.e., "sanctuary cities") that challenged the Administration's

immigration-related policies during the President's first term, and the United Farm Workers that resisted a Department of Labor rule that would have depressed migrant farmworkers' wages.

To be sure, WilmerHale attorneys have diverse views—political and otherwise—that inform their decisions about what matters to pursue. "But a private speaker does not forfeit constitutional protection simply by combining multifarious voices, or by failing to edit their themes to isolate an exact message as the exclusive subject matter of the speech." *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 569-70 (1995). Simply put, the Order restricts WilmerHale attorneys' constitutionally protected "'discretion in the selection and presentation' of content"—i.e., the cases on which they choose to work, and particularly those they agree to handle pro bono—which itself is a form of "'speech activity.'" *NetChoice*, 603 U.S. at 731. The government cannot punish WilmerHale for its attorneys' expressive choices about which clients to represent.

**B.      The Order Exceeds the President's Authority and Violates the Separation of Powers.**

In addition to violating the First Amendment in myriad ways, the Order exceeds the President's authority and interferes with federal courts' exercise of "[t]he judicial Power," U.S. Const. art. III, §1.

It is "black letter law" that the President's power to issue an executive order or similar proclamation "'must stem either from an act of Congress or from the Constitution itself.'" *Minnesota v. Mille Lacs Band of Chippewa Indians*, 526 U.S. 172, 188-89 (1999); *accord Youngstown*, 343 U.S. at 585. The Order identifies no statutory authority that empowers the President to sanction a law firm for representing his political opponents or handling lawsuits that

he perceives to be contrary to his interests or those of the United States.[25]  That is unsurprising; no statute confers such authority, and any statute that purported to do so would raise grave constitutional concerns.  *See Youngstown*, 343 U.S. at 588 ("The President's order does not direct that a congressional policy be executed in a manner prescribed by Congress—it [improperly] directs that a *presidential policy* be executed in a manner prescribed by the President." (emphasis added)).  The Order finds no support in the President's inherent Article II powers either.  There is no "executive practice, long pursued to the knowledge of the Congress and never before questioned," of Presidents using the office to punish law firms for taking on representations or to try to deter law firms from doing so.  *See Youngstown*, 343 U.S. at 610 (Frankfurter, J., concurring); *accord United States v. Midwest Oil Co.*, 236 U.S. 459, 473-74 (1915).  No other President has even tried to claim such a power.

Nor could Article II reserve any such power to the President, as to do so would empower the President to interfere with "the proper exercise of the judicial power."  *Velazquez*, 531 U.S. at 545.  In our adversarial system of litigation, "courts must depend" on attorneys to "present all the reasonable and well-grounded arguments necessary for proper resolution of [a] case."  *Id.*  The separation of powers thus precludes either Congress or the Executive from attempting to "exclude from litigation those arguments and theories [it] finds unacceptable but which by their nature are within the province of the courts to consider."  *Id.* at 546.  And while the legislature has authority to create or eliminate causes of action and to enact rules of professional conduct, courts have "inherent power[]" to determine whether an attorney (or a litigant) has "abuse[d] the judicial

---

[25] Indeed, the Order's restrictions on hiring WilmerHale employees squarely conflict with a statutory prohibition on "discriminat[ing] for or against" any "applicant for [federal] employment" based on factors—including "political affiliation"—that are not related to the applicant's ability to do the job.  5 U.S.C. §2302(b)(1)(E), (2), (3), (10), (12).

process" and "to fashion an appropriate sanction." *Goodyear Tire & Rubber Co. v. Haeger*, 581 U.S. 101, 107 (2017) (quoting *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44-45 (1991)).

The Order flouts these "accepted separation-of-powers principles," "threaten[ing] severe impairment of the judicial function." *Velazquez*, 531 U.S. at 544-46. The imposition of draconian consequences on law firms that challenge Executive action necessarily makes other law firms think twice about doing so. That prospect undermines the rule of law, and its victims include the courts that will receive less zealous advocacy from lawyers who pull their punches for fear of retribution. The Order thus undermines the "informed, independent" adversarial presentation on which an "informed, independent judiciary" depends. *Id.* at 545.

To make matters worse, the Order attempts to sanction WilmerHale for its legal advocacy without providing the notice, opportunity to be heard, or proper adjudicative fact-finding that is a prerequisite to such sanctions. *See infra* pp.33-35. To the extent the Executive Branch believes that a private law firm has engaged in improper legal advocacy in a particular case, it may appeal to the judiciary to make appropriate findings and fashion an appropriate sanction. *See Goodyear*, 581 U.S. at 107. Even as to matters already fully litigated, Rule 60 and courts' inherent powers allow aggrieved parties to alert a court to fraud and other serious misconduct. But the Executive Branch cannot simply take it upon itself to declare filings directed toward a coordinate branch of government to be so far beyond the pale as to warrant sanction. As the Supreme Court recently reiterated, the Constitution forbids "concentrat[ion] [of] the roles of prosecutor, judge, and jury in the hands of the Executive Branch." *SEC v. Jarkesy*, 603 U.S. 109, 140 (2024). Yet that is precisely what the Order endeavors to accomplish.

On top of that, the Order—which effectively functions as a "prepared and proclaimed governmental blacklist[]"—"possess[es] almost every quality of [an unlawful] bill[] of attainder."

*Joint Anti-Fascist Refugee Comm. v. McGrath*, 341 U.S. 123, 143-44 (1951) (Black, J., concurring).  It punishes WilmerHale—and only WilmerHale—"without any formal investigation, trial, or even informal process."  *See Perkins* Tr. at 89:10-22.  From the Founding, such measures have been "forbidden to both national and state governments."  *McGrath*, 341 U.S. at 144 (Black, J., concurring).  It cannot be "that the authors of the Constitution, who outlawed the bill of attainder, inadvertently endowed the executive with power to engage in the same tyrannical practices that had made the bill such an odious institution."  *Id.*

### C. The Order Violates Due Process and Equal Protection.

The Order also violates several basic safeguards enshrined in the Fifth Amendment against the abuse of governmental power.

1. The Fifth Amendment's Due Process Clause guarantees that "[n]o person shall … be deprived of life, liberty, or property, without due process of law."  To resolve a due process claim, courts perform a "familiar two-part inquiry," asking (a) whether the plaintiff has been "deprived of a protected interest," and (b) "if so, what process" was due.  *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 428 (1982).

The Order deprives WilmerHale of at least three independently cognizable liberty and property interests.  *First*, it interferes with the constitutionally protected right of the Firm and its attorneys to pursue their chosen profession, "the practice of law."  *Schware v. Bd. of Bar Exam'rs*, 353 U.S. 232, 238 (1957).  The government denies the right to pursue one's chosen profession by an act that (1) "formally or automatically exclude[s]" someone from work on government contracts "or from other government employment opportunities," or (2) has "the broad effect of largely precluding" her "from pursuing her chosen career."  *O'Donnell v. Barry*, 148 F.3d 1126, 1141 (D.C. Cir. 1998) (quoting *Kartseva v. Dep't of State*, 37 F.3d 1524, 1528 (D.C. Cir. 1994)).  The Order does both.  It specifically prohibits WilmerHale, its employees, and its clients from working

for the government.  Order §§2, 3, 5(b).  And it restricts attorneys' ability to represent clients in court and before government agencies, *id.* §5(a)—provisions that "largely preclud[e]" WilmerHale employees from providing effective legal services, *O'Donnell*, 148 F.3d at 1141.  *See* Berman Decl. ¶¶76-81.  No opportunity "to pursue other kinds of legal work … make[s] up for this loss of huge portions of" a law firm's "practice and the sole purpose of the work of many of" its attorneys and staff.  *Perkins* Tr. 84:19-23.

*Second*, the Order deprives WilmerHale of its "good name, reputation, honor, [and] integrity." *Wisconsin v. Constantineau*, 400 U.S. 433, 437 (1971); *see also Perkins* Tr. 85:5-9. The Supreme Court has made clear that Executive Branch "findings of wrongdoing" that "could have an adverse impact on [an entity's] reputation" must be issued in accordance with due process. *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253-56 (2012); *see, e.g., Goss v. Lopez*, 419 U.S. 565, 574-75 (1975); *Nat'l Counsel of Resistance of Iran v. Dep't of State*, 251 F.3d 192, 204 (D.C. Cir. 2001).  The Order tarnishes the Firm's reputation in no uncertain terms, announcing that all WilmerHale attorneys are unworthy to work on government contracts (or for government contractors); possess national security information; enter government buildings; engage with government employees; receive government funds, property, or services; or be hired by government agencies.  *See* Order §§1, 2, 3, 5.  The Order also contains a long series of assertions about the purportedly "harmful" or "egregious" nature of WilmerHale's actions, stating (for example) that the Firm "has abandoned the profession's highest ideals," "often … harm[s] [its] own clients," and is "bent on employing lawyers who weaponize the prosecutorial power to upend the democratic process and distort justice." *Id.* §1.

*Third*, the Order deprives WilmerHale of its constitutionally protected property interest in contracts with its clients.  *See FDIC v. Mallen*, 486 U.S. 230, 240 (1988); *see also Toxco Inc. v.*

*Chu*, 724 F.Supp.2d 16, 27 (D.D.C. 2010) ("[N]umerous courts have held that contracts between private parties may give rise to property interests sufficient to trigger Fifth Amendment due process protections."). As discussed, the Order punishes WilmerHale's clients for contracting with the Firm by, for example, depriving those clients of government contracts. *Supra* p.15. This interferes directly with WilmerHale's own "private contractual agreements … with its clients," because it effectively penalizes clients for choosing to follow through on their contractual obligations to retain the Firm. *Perkins* Tr. 86:4-8 (citing *UAW Loc. 737 v. Auto Glass Emps. Fed. Credit Union*, 72 F.3d 1243, 1250 (6th Cir. 1996), and *Brock v. Roadway Express*, 481 U.S. 252, 260 (1987) (plurality opinion)); *see* Berman Decl. ¶77.

The President has imposed these crippling sanctions on WilmerHale with exactly zero process. At its core, due process requires "notice of the proposed official action and 'the opportunity to be heard at a meaningful time and in a meaningful manner.'" *Ralls Corp. v. Comm. on Foreign Inv. in U.S.*, 758 F.3d 296, 318 (D.C. Cir. 2014). "Both the Supreme Court and [the D.C. Circuit] have recognized that the right to know the factual basis for the action and the opportunity to rebut the evidence supporting that action are essential components of due process." *Id.* None of that was provided here. The government never notified WilmerHale that it was considering issuing any order against it. Berman Decl. ¶75. Nor has WilmerHale been given any "opportunity to speak up in [its] own defense," *Fuentes v. Shevin*, 407 U.S. 67, 81 (1972), including to refute the President's unfounded accusations or to explain why the sanctions are unwarranted and unconstitutional. Berman Decl. ¶75. That is an open-and-shut due process violation.

2. The Due Process Clause also embodies the "fundamental principle … that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required." *Fox*,

567 U.S. at 253.  A law is unconstitutionally vague if it "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement."  *United States v. Williams*, 553 U.S. 285, 304 (2008). "When speech is involved, rigorous adherence to those requirements is necessary to ensure that ambiguity does not chill protected speech." *Fox*, 567 U.S. at 253-54.  After all, vague laws risk chilling would-be speakers by forcing them "to 'steer far wider of the unlawful zone'" than they otherwise would "if the boundaries of the forbidden areas were clearly marked." *Baggett v. Bullitt*, 377 U.S. 360, 372 (1964).  For that reason, laws touching on speech must themselves speak "only with narrow specificity." *Button*, 371 U.S. at 433.

The Order is unconstitutionally vague by any standard, because it gives WilmerHale no (let alone fair) notice of what it prohibits and how WilmerHale can avoid violating it.  While the Order leaves no doubt that WilmerHale is being punished because it has represented some of the President's political opponents and advanced positions with which he disagrees, the Order does not specify what aspect of WilmerHale's conduct triggered its massive sanctions.  It instead vaguely accuses the Firm of "tak[ing] actions that threaten public safety and national security, limit constitutional freedoms, degrade the quality of American elections, [and] undermine bedrock American principles"; "earmarking hundreds of millions of their clients' dollars for destructive causes"; and "abus[ing] its pro bono practice to engage in activities that undermine justice and the interests of the United States."  Order §1.

The Order is similarly vague about when, and to what extent, WilmerHale employees must be prevented from entering federal government buildings, "engaging with" federal employees, and being hired by the federal government. *Id.* §5.  It just directs agencies to impose these restrictions consistent with "national security" and "the interests of the United States," without offering any

specificity about the content of those expansive terms.  *Id.*  Tellingly, in *Perkins Coie*, government counsel "concede[d] that we don't know exactly what [a materially identical provision] means." *Perkins* Tr. 88:21.  These standards are so amorphous as to invite arbitrary and discriminatory enforcement between and within agencies.  And they leave WilmerHale employees unable to ascertain when (let alone why) they may be prevented from entering government buildings, engaging with federal employees, or being hired by the federal government—and what, if anything, they could do to avoid such extraordinary sanctions.  Accordingly, the Order is void for vagueness.

3. The Equal Protection Clause of the Fourteenth Amendment, as incorporated against the federal government through the Fifth Amendment, protects all individuals and entities from unjust discrimination by the federal government.  Though the Fifth Amendment "does not contain an equal protection clause," it is well established that discrimination by the federal government that would run afoul of the Equal Protection Clause if undertaken by a State is "violative of due process."  *Bolling v. Sharpe*, 347 U.S. 497, 499 (1954).

When the government singles out particular private entities for adverse treatment, it must articulate a constitutionally legitimate justification for treating them differently from other, similarly situated entities.  *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (per curiam). The justification cannot be arbitrary, irrational, or pretextual—in other words, it cannot serve only to mask the government's true, illegitimate motive for singling out the entity.  Moreover, "a bare desire to harm a politically unpopular group" is not a "legitimate state interest[]."  *City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 446 (1985) (ellipsis omitted).

The Order cannot be squared with these equal protection principles, as no credible or rational justification exists for singling out WilmerHale.  The avowed goal of the Order is an impermissible one: collective punishment of WilmerHale—lawyers and non-lawyers alike—

because of the constitutionally protected actions of a handful of its current and former attorneys. *See* Order §1.  The government has no legitimate justification for singling out WilmerHale—and only WilmerHale—for extraordinary and punitive measures that do not apply to similarly situated firms or lawyers, particularly when the President himself complains that certain practices are widespread among large law firms.  *See id.*; *see also* Perkins Order §4.  This singling out alone demonstrates that the Order was motivated by a bare intent to punish WilmerHale, and is reinforced by public statements made by President Trump that reflect his deep-seated animus toward WilmerHale and his desire to pursue a "personal vendetta" against it.  *See Perkins* Tr. at 101:24. That is a blatant equal protection violation.

### D. The Order Violates WilmerHale Clients' Fifth and Sixth Amendment Rights to Engage Counsel of Their Choice.

On top of all that, the Order violates WilmerHale's clients' constitutional rights to establish and maintain attorney-client relationships.  The Fifth Amendment protects the client's right to choose counsel and the lawyer's corresponding right to maintain that representation free from arbitrary or unjustified governmental interference.  *See DOL v. Triplett*, 494 U.S. 715, 720-21 (1990).  The Order seriously undermines this basic right by penalizing attorney and client alike for bringing potentially meritorious civil suits that the President views as "harmful."  Order §1.  In addition, the Sixth Amendment guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right … to have the Assistance of Counsel."  U.S. Const. amend. VI.  That right includes both "the right to the effective assistance of counsel," *Strickland v. Washington*, 466 U.S. 668, 686 (1984), and the "right to choose one's own counsel," *Wheat v. United States*, 486 U.S. 153, 159 (1988).  The Order deprives WilmerHale's clients of both—threatening a "fundamental" aspect of our country's criminal justice system and the rule of law.  *See Gideon v. Wainwright*, 372 U.S. 335, 344 (1963).

*First*, WilmerHale cannot effectively represent its clients if WilmerHale employees are restricted from engaging with government employees and accessing government buildings, services, and materials.   By attempting to "interfere[] with [WilmerHale's] professional obligation[s]" to its clients, the Order infringes upon clients' rights to effective counsel.  *Wounded Knee Legal Def./Offense Comm. v. FBI*, 507 F.2d 1281, 1284 (8th Cir. 1974).  Specifically, the Order directs "[t]he heads of agencies"—including the Department of Justice—to "limit[] Government employees acting in their official capacity from engaging with WilmerHale employees" and "limit[] official access from Federal Government buildings to employees of WilmerHale."  Order §5(a).  These restrictions impede WilmerHale attorneys from performing a huge range of tasks required of counsel, from conferring on discovery requests to negotiating plea agreements (and assisting clients in cooperating once plea agreements are struck) to interfacing with all manner of administrative and regulatory agencies.  Because the Order threatens to block the Firm's attorneys from engaging in just such discussions on behalf of its clients, it threatens those clients' constitutional rights and the Firm's ability to effectively and zealously represent them.  *See, e.g.*, *Perkins* Tr. 24:15-25:3, 92:5-19, 98:13-17.

*Second*, the Order denies WilmerHale's clients the right to counsel of their choice.  "The right to select counsel of one's choice … has been regarded as the root meaning of the constitutional guarantee."  *United States v. Gonzalez-Lopez*, 548 U.S. 140, 147-48 (2006).  The Order prevents WilmerHale's clients from exercising this right in several ways, including preventing clients from hiring their preferred counsel by handicapping WilmerHale's ability to provide effective assistance and forcing clients to choose between continuing their relationship with WilmerHale and complying with the Order's compelled disclosure of any relationship with the Firm—which would put them at risk of losing their government contracts.  It is immaterial that

the Order does not expressly bar clients from hiring the Firm.  The Order intends to achieve that goal indirectly, and "a government official cannot do indirectly what []he is barred from doing directly."  *Vullo*, 602 U.S. at 190; *see also Perkins* Tr. 94:1-4.

WilmerHale has standing to challenge these violations of the right to counsel.  WilmerHale itself has suffered an Article III injury-in-fact because the Order inflicts severe reputational and economic harm that can be redressed by a ruling enjoining the Order.  *See* Berman Decl. ¶83.  And WilmerHale has third-party standing to challenge infringements of the right to counsel on behalf of its clients given the "special consequence" of the attorney-client relationship and the obvious "obstacle[]" that the threat of further retaliation poses to the clients' ability to protect their own interests.  *See Caplin & Drysdale, Chartered v. United States*, 491 U.S. 617, 623 n.3 (1989); *see also Wounded Knee*, 507 F.2d at 1284 ("[A] lawyer has standing to challenge any act which interferes with his professional obligation to his client and thereby, through the lawyer, invades the client's constitutional right to counsel."); *Perkins* Tr. 91:1-92:23 (holding that Perkins Coie had standing to challenge Sixth Amendment violations on behalf of its clients).

## III.    The Order Inflicts Irreparable Harm On WilmerHale, Its Employees, And Its Clients.

WilmerHale readily satisfies the second requirement for a TRO, as the Firm, its employees, and its clients face an imminent likelihood of grave, irreparable injury unless the Order is blocked from taking effect.  *See League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 7-8 (D.C. Cir. 2016).

***Constitutional Injuries***.  "The loss of First Amendment freedoms"—particularly the rights to engage in political speech and to petition the government for redress—"for even minimal periods of time, unquestionably constitutes irreparable injury."  *Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 19 (2020) (per curiam); *see Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 301-03 (D.C. Cir. 2006).  Here, as discussed, WilmerHale and its

employees have already experienced and will continue to experience violations of their First Amendment speech, association, and petitioning rights, as well as their Fifth Amendment due process rights. And WilmerHale's clients are similarly experiencing a violation of their rights to expression, association, and counsel. These ongoing constitutional violations constitute irreparable injury, as many of them are incapable of being redressed even if WilmerHale ultimately prevails on the merits. *See Chaplaincy*, 454 F.3d at 303-04. For example, the forced disclosure of a confidential attorney-client relationship to the government can never be clawed back, even if and when WilmerHale ultimately succeeds on its claims. Moreover, the injuries extend to WilmerHale clients, who will plainly be irreparably harmed if *inter alia* their lawyers cannot enter government buildings or contact government lawyers. On any given day, WilmerHale lawyers appear before administrative bodies such as the Patent Trial and Appeal Board, negotiate with government lawyers such as federal prosecutors, and handle sensitive government-facing matters for clients. Being blacklisted immediately and irreparably harms those ongoing representations. Indeed, that seems to be the Order's chief objective.

***Economic injuries.*** Economic injury is usually not irreparable because it can be remedied by money damages at the conclusion of litigation. But there are two important exceptions to that general rule. First, "economic loss that threatens the survival of the movant's business can amount to irreparable harm." *Nat'l Mining Ass'n v. Jackson*, 768 F.Supp.2d 34, 50 (D.D.C. 2011). Second, significant economic injuries constitute irreparable harm, even if they do not threaten to destroy the entire business, if "no 'adequate compensatory or other corrective relief will be available at a later date.'" *In re NTE Conn., LLC*, 26 F.4th 980, 990 (D.C. Cir. 2022); *see Air Transp. Ass'n of Am. v. Exp.-Imp. Bank of U.S.*, 840 F.Supp.2d 327, 335 (D.D.C. 2012) ("significant" economic

harm constitutes irreparable injury "where it is irretrievable because a defendant has sovereign immunity").

Both forms of irreparable economic injury are present here. Sovereign immunity bars WilmerHale from recovering money damages for the Order's impact on the Firm's business directly from the President or agency heads. And if left in place, the Order will almost certainly cause clients to terminate longstanding and substantial business relationships with WilmerHale due to fear of losing government contracts or otherwise incurring the President's ire based on association with WilmerHale. Berman Decl. ¶77. This will cause significant losses of anticipated revenue, as 21 of WilmerHale's 25 largest clients are government contractors and that subset of clients makes up 30% of WilmerHale's annual revenues. *Id.* ¶30. Moreover, a large proportion of the Firm's practice requires its lawyers to engage with the federal government. *Id.* ¶¶19-28. If WilmerHale's lawyers cannot undertake those responsibilities for any meaningful period of time, WilmerHale's very existence (and the livelihood of its employees) would be under threat. *Id.* ¶83.

*Reputational injuries.* Because reputational harms and the loss of goodwill are "not easily measurable in monetary terms," they, too, generally constitute irreparable harm. *Xiaomi Corp. v. Dep't of Def.*, 2021 WL 950144, at *9 (D.D.C. Mar. 12, 2021); *see, e.g.*, *Perkins* Tr. 85:10-14, 90:21-24, 100:12-101:1; *Beacon Assocs., Inc. v. Apprio, Inc.*, 308 F.Supp.3d 277, 288 (D.D.C. 2018); *Patriot, Inc. v. HUD*, 963 F.Supp. 1, 5 (D.D.C. 1997). By using the prestige of his office to brand WilmerHale as a "rogue law firm[]," Dkt.1-2, the President has irreparably tarnished WilmerHale's reputation and corporate goodwill, and his unconstitutional Order will continue to taint the Firm unless and until its enforcement is enjoined. Berman Decl. ¶¶85-86.

## IV. The Balance Of The Equities And Public Interest Strongly Favor An Injunction.

"[W]hen the Government is the opposing party," the court's assessment of the equities and the public interest "merge." *Guedes v. ATF*, 920 F.3d 1, 10 (D.C. Cir. 2019). In weighing whether

this combined factor favors preliminary relief, courts consider "the competing claims of injury and … consider the effect on each party [and the public] of the granting or withholding of the requested relief." *Winter*, 555 U.S. at 24.

Here, the equities tilt decisively in favor of granting an injunction. Through his Order, the President has used the trappings of his office to punish WilmerHale because of the Firm's representation of and connections to his perceived adversaries. As explained, the Order has inflicted and will continue to inflict severe and irreparable harms to the constitutional rights, finances, and reputations of WilmerHale, its employees, and its clients. *See supra* pp.40-42; Berman Decl. ¶¶77-86. Those injuries alone tilt the scales heavily in WilmerHale's favor.

Making matters worse, the Order threatens to deter attorneys across the Nation from taking on clients and causes for fear of drawing the ire of an Administration that has laid bare its willingness to impose harsh sanctions on those who express opposition to its policies. This chilling effect will ultimately make it difficult for lawyers to fulfill their duty to provide their "client and [] the legal system" with "zealous[]" and "vigorous representation" "within the bounds of the law"—a responsibility of "paramount importance" to our "system of justice" and to the public interest. D.C. R. Prof'l Conduct 1.3 cmt. [1]; *Penson v. Ohio*, 488 U.S. 75, 84 (1988). The Order will also deter potential litigants from challenging the Administration's policies. In short, the "adverse impact" on the public interest "cannot be [over]stated," *see Perkins* Tr. at 102:13-14, as it puts in peril the "informed, independent bar" on which our judicial system depends, *Velazquez*, 531 U.S. at 545. Moreover, "[i]t is always in the public interest to prevent the violation of a party's constitutional rights." *Costa v. Bazron*, 456 F.Supp.3d 126, 137 (D.D.C. 2020) (brackets in original) (quoting *Simms v. District of Columbia*, 872 F.Supp.2d 90, 105 (D.D.C. 2012)).

43

On the other side of the ledger, Defendants will experience no cognizable harm from invalidation of the Order, much less from a temporary suspension of its implementation to maintain the status quo while this suit is litigated. *See Perkins* Tr. at 101:8-10 ("The government … would suffer no cognizable injuries from the issuance of a TRO."). The government is not harmed by preliminary relief that protects foundational constitutional rights. *See Newby*, 838 F.3d at 9 ("There is generally no public interest in the perpetuation of unlawful agency action."). Nor can it claim any valid interest in implementing and enforcing a nakedly retaliatory and unconstitutional order. On the contrary, there is a "substantial public interest" in ensuring that "'governmental agencies abide'" by the law. *Id.* The balance of equities and public interest thus weigh decisively in favor of temporarily restraining and enjoining implementation of the Order and preserving the status quo.

## V. This Court Should Exercise Its Discretion To Waive FRCP 65(c)'s Security Requirement.

Finally, WilmerHale respectfully requests that the Court waive the security requirement in Rule 65(c) of the Federal Rules of Civil Procedure pursuant to its "wide discretion" to require no bond. *Am. First Legal Found. v. Becerra*, 2024 WL 3741402, at *16 n.11 (D.D.C. Aug. 9, 2024). It is wholly appropriate for the district court to "dispense with any security requirement whatsoever" in situations like this one, "where the restraint will do the defendant no material damage" and "where there has been no proof of likelihood of harm." *Id.* (quoting *Fed. Prescription Serv., Inc. v. Am. Pharm. Ass'n*, 636 F.2d 755, 759 (D.C. Cir. 1980)).

## CONCLUSION

Plaintiff's motion for a temporary restraining order and preliminary injunction should be granted.

March 28, 2025

Respectfully submitted,

*/s/ Paul D. Clement*

PAUL D. CLEMENT (D.C. Bar. No. 433215)
ERIN E. MURPHY (D.C. Bar No. 995953)
JOSEPH J. DEMOTT (Virginia Bar No. 93981,
    D.D.C. Bar ID #D00561)
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
paul.clement@clementmurphy.com

*Attorneys for Plaintiff Wilmer Cutler
Pickering Hale and Dorr LLP*