**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

WILMER CUTLER PICKERING HALE AND DORR LLP,

*Plaintiff,*

v.

EXECUTIVE OFFICE OF THE PRESIDENT, U.S. DEPARTMENT OF JUSTICE, U.S. DEPARTMENT OF DEFENSE, U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES, U.S. DEPARTMENT OF EDUCATION, U.S. DEPARTMENT OF VETERANS AFFAIRS, OFFICE OF MANAGEMENT AND BUDGET, OFFICE OF THE DIRECTOR OF NATIONAL INTELLIGENCE, CENTRAL INTELLIGENCE AGENCY, ENVIRONMENTAL PROTECTION AGENCY, DEPARTMENT OF HOMELAND SECURITY, DEPARTMENT OF STATE, DEPARTMENT OF ENERGY, DEPARTMENT OF THE TREASURY, DEPARTMENT OF LABOR, DEPARTMENT OF AGRICULTURE, DEPARTMENT OF COMMERCE, DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT, SMALL BUSINESS ADMINISTRATION, OFFICE OF THE UNITED STATES TRADE REPRESENTATIVE, DEPARTMENT OF THE INTERIOR, DEPARTMENT OF TRANSPORTATION, SECURITIES AND EXCHANGE COMMISSION, FEDERAL TRADE COMMISSION, UNITED STATES PATENT AND TRADEMARK OFFICE, EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, THE UNITED STATES OF AMERICA, *and, in their official capacities,* PAMELA J. BONDI, PETE HEGSETH, ROBERT F. KENNEDY, JR., LINDA M. MCMAHON, DOUGLAS A. COLLINS, RUSSELL T. VOUGHT, TULSI GABBARD, JOHN L. RATCLIFFE, LEE M. ZELDIN, KRISTI NOEM, MARCO RUBIO, CHRIS WRIGHT, SCOTT BESSENT, LORI CHAVEZ-DEREMER, BROOKE L. ROLLINS, HOWARD LUTNICK, SCOTT TURNER, KELLY LOEFFLER, JAMIESON GREER, DOUG BURGUM, SEAN DUFFY, MARK T. UYEDA, ANDREW N. FERGUSON, COKE MORGAN STEWART, ANDREA R. LUCAS,

*Defendants.*

Civil Case No. _____

**DECLARATION OF BRUCE M. BERMAN IN SUPPORT OF
PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER
AND PRELIMINARY INJUNCTION**

I, Bruce M. Berman, pursuant to 28 U.S.C. § 1746, hereby declare as follows:

1.     I am one of two General Counsel of Wilmer Cutler Pickering Hale and Dorr LLP ("WilmerHale" or "the Firm").  I submit this Declaration in support of the Motion to which this Declaration is attached.  I am of the age of majority and competent to make this declaration.

2.     I joined one of the Firm's predecessors, Wilmer Cutler & Pickering LLP, as an associate in 1980 and have worked at Wilmer Cutler & Pickering (which later became Wilmer Cutler Pickering LLP) and WilmerHale ever since, nearly 45 years.  I became a partner on January 1, 1987, and have served as General Counsel since 2009.  During my time at WilmerHale, I have served on numerous firm committees, including the Compensation Committee and the Nominating Committee (which nominates candidates to serve on the Management Committee and as Managing Partner).  I also headed the Firm's Higher Education practice for more than a decade.  I am a member in good standing of the District of Columbia bar and a registered foreign lawyer in England and Wales.  I previously served on the American Bar Association Litigation Section's Federal Practice Task Force.

3.     As General Counsel, I am familiar with the Firm's business and operations and have been involved in the Firm's efforts to prepare for, assess, and address the March 27, 2025 Executive Order targeting WilmerHale.  The facts set forth in this declaration are based on my personal knowledge of the Firm's history and operations or business records with which I am familiar.

4.     As General Counsel, I provide advice and counsel to WilmerHale management, partners, counsel, and associates, and I represent the Firm in professional responsibility and legal ethics matters and in other legal matters.  I am also involved in decisions about the Firm's client

relationships and the matters it takes on. And I help assess potential conflicts and reputational or policy concerns raised by the matters the Firm takes on. Finally, as a member of WilmerHale's New Business Intake Committee, I review every new matter that the Firm agrees to handle.

## I. WILMERHALE IS A LARGE GLOBAL LAW FIRM WITH A STRONG TRADITION OF PUBLIC SERVICE

5. WilmerHale is a large international law firm that employs approximately 2,061 people—roughly 1,194 of whom are lawyers—and serves clients located throughout the United States and the world.[1]

6. Formed after a 2004 merger of Hale and Dorr LLP and Wilmer Cutler Pickering LLP, the Firm now has twelve offices across the United States and Europe.

7. WilmerHale is currently led by a single Managing Partner and a Management Committee—comprising 17 partners—that is responsible for the day-to-day management of the Firm and which implements the decisions of the broader partnership.

8. WilmerHale lawyers represent a range of clients—including large multinational corporations, family businesses, individuals, government entities and sovereign nations, and non-profit organizations—across a range of industries and endeavors. While many of WilmerHale's lawyers work at the intersection of government, technology, and business, others represent and advise clients in areas that have no immediate connection to the federal government or any other government—for example, on transactions or disputes between private entities or individuals. WilmerHale attorneys practice across a broad span of industries, ranging from work in education, to energy and national resources, to national security, to media and entertainment, to artificial intelligence and cryptocurrency, to healthcare and financial services, to civil and criminal defense.

---

[1] Except where noted, all statistics regarding WilmerHale's employees, clients, and open matters were calculated as of March 27, 2025, using Firm records that are maintained in the normal course of business.

9.    The approximately 867 non-lawyers at WilmerHale include paralegals, information technology specialists, mailroom staff, and other professionals who support the Firm's work.

10.    WilmerHale's attorneys and employees cover the full political and ideological spectrum and come from a variety of backgrounds.  Lloyd Cutler, for example, was White House Counsel to Presidents Carter and Clinton, and C. Boyden Gray was White House Counsel to President George H.W. Bush.  In keeping with this tradition, the Firm has recruited lawyers from every administration over the last forty years and has bipartisan leadership of the practices that involve legal and public policy.  WilmerHale lawyers have represented people and causes across the political and ideological spectrum.  Its lawyers, on their own time, have worked for the campaigns of both parties in each of the presidential elections over at least the last twenty years.

11.    Many of WilmerHale's former employees and partners have served in the federal government, across all three branches.  Current and past WilmerHale alumni serve or have served as judicial law clerks, state and federal court judges, White House officials under presidents of both parties, high-ranking Department of Justice officials and officials of other departments, as well as military service members.

12.    WilmerHale's attorneys and employees include parents, teachers, scientists, members and leaders of religious communities, members of the military and other public servants, pro bono board members, and volunteers.

13.    Chief among WilmerHale's defining features is its commitment to securing equal access to justice.  Ever since its predecessor firm Hale and Dorr LLP was founded in 1918, WilmerHale's attorneys have played important roles that have shaped the history of legal services in the United States.  Hale and Dorr partner Reginald Heber Smith—considered the father of legal aid in the United States—authored the seminal book *Justice and the Poor*, which galvanized the

organized bar nationally to secure equal justice for those unable to afford counsel. More than seven decades later, in 1992, Wilmer Cutler & Pickering partner John Pickering led the effort to establish the Pro Bono Institute's Law Firm Pro Bono Challenge—which encourages law firms to commit a minimum of 3-5% of annual total billable hours to legal pro bono services—and ensured that the firm was its charter signatory.

14.     WilmerHale is consistently and widely recognized as one of the leading law firms, and one of the best law firm employers, in the nation. The year 2025 marks WilmerHale's twenty-first year in a row on *The American Lawyer*'s annual A-List and WilmerHale's ninth consecutive year in the A-List top 10. WilmerHale routinely ranks at the top of other prestigious legal rankings, including Chambers USA, Benchmark Litigation, the National Law Journal, and Vault Law. Moreover, WilmerHale has for many years been named a top employer by publications such as *The Washington Post*, *Forbes*, and *The Boston Globe*, which rank employers on such metrics as supportiveness and responsiveness to employee needs. More than 50% of WilmerHale's non-lawyer business professionals have been employed with the Firm for over 10 years.

15.     WilmerHale's pro bono work—across a wide variety of perspectives and causes—is a central pillar of the Firm's identity. In 2024, 96.4% of active U.S. lawyers spent 20 or more hours on over 1,400 pro bono matters, for a total of 148,551 pro bono hours firm wide and an average of 123 hours per active U.S. lawyer. In total, WilmerHale contributed attorney time equivalent to roughly $120 million on pro bono matters in 2024. These matters range from high-profile, high-impact matters to direct representation of hundreds of low-income individuals, including veterans, survivors of sex trafficking, and criminal defendants. The Firm's pro bono work reflects the diversity of its lawyers' political and social views: it has defended the free

exercise of religion—including the right to attend church during the COVID-19 shutdowns—and it has represented clients committed to protecting reproductive rights.

16.     As a result of these efforts, WilmerHale has been consistently ranked among the very top law firms in the country for its pro bono efforts.  In 2024 alone, WilmerHale placed second in *Law360 Pulse*'s Pro Bono ranking and third in *The American Lawyer*'s 2024 Pro Bono Scorecard.  And in the opening months of 2025, WilmerHale has been recognized by the New York State Bar Association and the Lawyers' Committee for Civil Rights of the San Franciso Bay Area for its pro bono efforts.

## II.     WILMERHALE'S INTERACTION WITH THE FEDERAL GOVERNMENT

### A.     WilmerHale Routinely Interacts With The Federal Government On Behalf Of Its Clients

17.     As a full-service law firm, WilmerHale represents a wide range of clients—including large corporations, colleges and universities, Native American tribes, start-ups, and individuals accused of criminal and civil wrongs—in litigation, transactional, and regulatory matters.  The Firm's employees interact with the federal government on behalf of the Firm's clients on a daily basis and in innumerable ways.  For example, the Firm's attorneys appeared in federal court over 340 times since March 1, 2024, and the Firm has more than 380 cases pending before federal district and bankruptcy courts and more than 160 cases pending before federal appellate courts.  Its attorneys have upcoming appearances scheduled before agencies and in courtrooms, including before the Supreme Court of the United States.  And they interact with a variety of government agencies on behalf of the Firm's clients, including, among others, the Departments of Justice, Treasury, Veterans Affairs, Labor, Defense, Interior, Health and Human Services, Housing and Urban Development, Agriculture, and Education, the Patent and Trademark Office, the Office of the Director of National Intelligence, the Federal Bureau of Investigation, the Central

Intelligence Agency, the Federal Communications Commission, the Environmental Protection Agency, the Federal Energy Regulatory Commission, the Federal Reserve Board, the Securities and Exchange Commission, and the Federal Trade Commission.

18.    WilmerHale has five departments (with some attorneys who are cross-listed in two or more departments): Litigation and Controversy, Regulatory and Government Affairs, Securities and Financial Services, Transactional, and Intellectual Property. All of these groups intersect with the federal government in some way and include clients with business before the federal government.

19.    In the course of representing the Firm's clients, WilmerHale lawyers frequently meet with federal officials from numerous agencies. Although it is difficult to quantify precisely, based on a review of the Firm's client-matter list, a large number of WilmerHale clients have matters that require the Firm's lawyers to interact with the federal government. Such work requires entering government buildings and interacting with federal agencies' employees.

20.    The Firm's Litigation and Controversy Department includes approximately 563 attorneys. A large proportion of the litigation matters handled by this department are pending in federal court and require WilmerHale attorneys to enter federal buildings and engage with federal employees in order to represent Firm clients. Within that department, the Investigations and Criminal Litigation practice group includes approximately 81 attorneys. This practice focuses on representing clients in criminal prosecutions and investigations in proceedings involving many agencies of the federal government, including the Department of Justice, Federal Bureau of Investigation, Comptroller of the Currency, Department of Defense, Department of Health and Human Services, Department of Education, Federal Communications Commission, Environmental Protection Agency, Federal Trade Commission, U.S. Attorneys' Offices, the

Commodity Futures Trading Commission, and the Securities and Exchange Commission, among others. Also within the Litigation and Controversy Department, the Government and Regulatory Litigation practice group includes approximately 60 attorneys. This practice involves representing clients in investigations and litigation involving myriad federal agencies, including the Environmental Protection Agency, the Department of Labor, and the Department of Health and Human Services. WilmerHale Litigation and Controversy Department lawyers also routinely take on pro bono matters that require interaction with, and litigation before, the Department of Veterans' Affairs and the Social Security Administration.

21.     WilmerHale Litigation and Controversy Department lawyers must interact with federal employees and enter federal buildings in order to fulfill their duties to clients, for example, to make presentations to prosecutors and federal agency employees on WilmerHale clients' behalf.

22.     The Firm's Regulatory and Government Affairs Department includes approximately 127 attorneys. This practice involves navigating the intersection of law, public policy, and business, which in turn relies on WilmerHale's expertise in the complex policies and regulations governing its clients' industries—including leveraging the experience and insight of WilmerHale attorneys who have worked in the executive branch or on Capitol Hill. Needless to say, a legal practice involving regulation and legislation requires interaction with federal officials.

23.     Within the Regulatory and Government Affairs Department are practices involving national security, trade, the energy and environment sectors, antitrust, congressional investigations, education, and more. The Defense, National Security, and Government Contracts Practice requires interaction with the Department of Defense, the Office of the Director of National Intelligence, the National Security Agency, the Federal Bureau of Investigation, and the Central Intelligence

Agency, among others. The Firm has multiple attorneys with active security clearances; such clearances are vital to serving clients operating in the national security space.

24.     Also within the Firm's Regulatory and Government Affairs Department is the Higher Education practice group, which includes approximately 48 attorneys and requires interaction with many federal departments and agencies. The Regulatory and Government Affairs Department also encompasses the Firm's Energy, Environment and Natural Resources Practice, which represents oil and gas companies, alternative energy companies, and those involved in mining and in critical minerals industries. WilmerHale attorneys in this practice area routinely engage with the Department of the Interior, the Environmental Protection Agency, and other agencies.

25.     The Firm's Securities and Financial Services Department includes approximately 155 attorneys. It represents securities firms and banking entities in the full range of regulatory and enforcement matters before federal agencies such as the Securities and Exchange Commission, the Commodity Futures Trading Commission, the Office of the Comptroller of the Currency, the Treasury Department, and the Federal Reserve. Additionally, WilmerHale lawyers routinely engage with regulators on their clients' behalf.

26.     The Firm's Transactional Department includes approximately 200 attorneys. The department's matters often involve financings, mergers and acquisitions, collaborations, and other transactions between private entities or persons. In connection with many of these matters, WilmerHale lawyers often interact with federal employees, including staff from the Securities and Exchange Commission, Federal Trade Commission, Food and Drug Administration, and other federal agencies. The Transactional Department also represents private entities in transactions that have no nexus to the federal government and do not involve any interaction with federal agency

staff. However, many of these private company clients have contracts with federal agencies, and Transactional attorneys often refer litigation work that arises from transactions to other Firm departments.

27. The Firm's Intellectual Property Department, which includes roughly 52 attorneys, and the Firm's Intellectual Property Litigation practice group, which includes roughly 111 attorneys, depend heavily on access to and interaction with the federal government to represent WilmerHale clients. As a representative example, attorneys in these departments frequently represent patent applicants, patent owners, and patent challengers before the U.S. Patent and Trademark Office (USPTO) in patent prosecution and post-grant proceedings, including in administrative trials before the Patent Trial and Appeal Board (PTAB). WilmerHale is currently representing over 3750 clients in over 1,150 live trademarks or trademark applications and over 200 clients in over approximately 2,450 live patents or patent applications before the USPTO (including International Applications filed with the U.S. Receiving Office), as well as representing clients in over 25 active post-grant proceedings before the PTAB.

28. As of March 26, 2025, WilmerHale attorneys are working on hundreds of matters before or involving at least the following federal agencies, which together implicate approximately 1,110 matters:

- The Securities and Exchange Commission;
- The Department of Justice (including approximately 25 U.S. Attorney's Offices);
- The Federal Trade Commission;
- The Consumer Financial Protection Bureau;
- The Department of Health and Human Services;
- The Environmental Protection Agency;
- The Department of Defense;
- The Department of Homeland Security;
- The Federal Bureau of Investigation;
- The Department of Navy;
- The Commodity Futures Trading Commission;
- The Department of State;

- The Department of Energy;
- The Department of the Treasury;
- The Department of Labor;
- The Department of Agriculture;
- The Department of Veterans Affairs;
- The Air Force;
- The Department of Education;
- The Office of the Comptroller of the Currency;
- The Internal Revenue Service;
- The Central Intelligence Agency;
- The Office of Management and Budget;
- The Department of Commerce;
- The Agency for International Development;
- The Federal Reserve;
- The Department of Housing and Urban Development;
- The Farm Credit Administration;
- The Occupational Health and Safety Administration;
- The Patent and Trademark Office;
- The Pension Benefit Guaranty Corporation; and
- The International Trade Commission.

29.     WilmerHale lawyers have cooperated with government agencies and lawyers in both Republican and Democratic administrations, including in cases where the United States has filed an amicus curiae brief in support of WilmerHale clients. *See, e.g.*, Brief for the United States as Amicus Curiae, *Students for Fair Admissions, Inc. v. President & Fellows of Harvard College*, No. 20-1199 (U.S. Dec. 8, 2021); Brief of the United States as Amicus Curiae, *Hardeman v. Monsanto*, No. 19-16636 (9th Cir. Dec. 20, 2019), ECF No. 32.

**B.      Many Of WilmerHale's Clients Are Government Contractors**

30.     Many of the Firm's clients—both traditional government contractors and commercial enterprises that contract with the federal government—are government contractors or otherwise have a funding relationship with the federal government. At least 21 of the Firm's 25 largest clients in 2024 have contracts with federal agencies. These 21 clients accounted for more

than 30% of the Firm's revenue in 2024—nearly $500 million.  The Firm also has numerous other clients that have federal contracts.

31.     WilmerHale often represents clients in connection with disputes regarding government contracts, including handling clients' bid protests and disputes surrounding contract claims.  The Firm's attorneys are currently handling over 100 open government contracting matters involving various federal agencies.  And there are many more Firm clients with government contracts that have engaged WilmerHale to represent them in matters unrelated to those contracts.

**C.     WilmerHale's Attorneys Often Serve In The Federal Government**

32.     WilmerHale is committed to public service, and many attorneys and staff choose to work at the Firm because of its commitment to public service.

33.     Many WilmerHale attorneys work, will work, or have worked in the federal government at some point in their professional career.

34.     The U.S. Senate, for example, recently confirmed a President Trump-nominated former WilmerHale partner to serve as Under Secretary for Industry and Security at the U.S. Department of Commerce.  The current Deputy Attorney General under President Trump and the current Acting Head of the Criminal Division in President Trump's Department of Justice are also both alumni of WilmerHale.

35.     At least 130 current WilmerHale employees have served as public servants in offices across the federal government, in the federal judiciary, or in agencies ranging from the Federal Reserve Board to the Central Intelligence Agency.  WilmerHale also proudly counts numerous public servants among its alumni, including two federal judges appointed by President Trump and two federal judges appointed by President Biden.

36.     One notable example is Robert S. Mueller III, a longtime Republican who was appointed Director of the Federal Bureau of Investigation by President George W. Bush and was

later appointed by the Department of Justice in the first Trump administration as special counsel to investigate allegations of foreign interference in the 2016 presidential election. WilmerHale had no role in his appointment.

37.     Mr. Mueller has had a long and distinguished public service career. He graduated from Princeton University and volunteered for the United States Marine Corps during the Vietnam War, earning a Bronze Star with Valor and Purple Heart. After returning from Vietnam, he attended the University of Virginia School of Law and went on to serve for decades in both the Department of Justice and various United States Attorney's offices under Presidents Ronald Reagan, George H. W. Bush, Bill Clinton, and George W. Bush. Between his stints in public service, Mr. Mueller became a partner at Hale and Dorr, specializing in white-collar criminal defense.

38.     Mr. Mueller was appointed to serve as special counsel by Acting Attorney General Rod Rosenstein on May 17, 2017 during the first administration of President Trump. He was tasked specifically with investigating Russian government efforts to interfere in the 2016 U.S. presidential election. The appointment required him to investigate and prosecute actions that interfered with that work, including potential obstruction of justice by President Trump or any of his associates that could be charged with obstruction of justice. The special counsel's office included roughly 20 attorneys. Mr. Mueller and those attorneys were employed by the United States government.

39.     As required by Department of Justice regulations that govern a special counsel, Mr. Mueller and other lawyers employed by the U.S. government delivered a confidential report on the investigation to then-Attorney General William Barr. The report did not conclude that members of the Trump campaign conspired or coordinated with the Russian government. Nor did

the report determine whether President Trump had obstructed justice. The report also concluded, consistent with longstanding Department of Justice policy, that a sitting president could not be indicted.

40.     WilmerHale had no role in the Report or Mr. Mueller's work as special counsel, and indeed represented clients adverse to the special counsel's office. Mr. Mueller rejoined the Firm in 2019 following the conclusion of the special counsel investigation and retired from the Firm over three years ago. Approximately 54% of WilmerHale's current attorneys joined the Firm after Mr. Mueller's retirement.

41.     Among the attorneys who worked in the special counsel's office under Mr. Mueller are James L. Quarles III and Aaron M. Zebley. Mr. Quarles and Mr. Zebley returned to the Firm as partners around the same time as Mr. Mueller, in 2019. Both Mr. Quarles and Mr. Zebley had distinguished careers in public service before joining WilmerHale. Mr. Quarles served as an assistant special prosecutor on the Watergate Special Prosecution Force from 1973 to 1975 before joining Hale and Dorr in 1975. Mr. Quarles retired from WilmerHale in 2021. Mr. Zebley first joined WilmerHale as a partner in 2014. Before that time, he had served in multiple roles in federal law enforcement, including as an FBI special agent, an assistant United States Attorney, senior counselor in DOJ's National Security Division, and as FBI chief of staff. Mr. Zebley remains a partner in WilmerHale's Washington D.C. office.

## III.     WILMERHALE'S RELEVANT LITIGATION

42.     WilmerHale has represented clients in dozens of federal and state courts, and in tribunals across the world. WilmerHale's litigation practice has long included cases against the federal government (across both Democratic and Republican presidential administrations), as well as cases that span the ideological spectrum.

43.     The Firm has an established process for assessing whether to take on new business, including both new clients and new matters for existing clients. I play an important role in that process by reviewing every new matter. The Firm's decisions about whether (or not) to represent certain clients or to advocate on behalf of clients in favor of particular policies—including some that are controversial or unpopular—are one way in which the Firm expresses its values.

44.     For example, WilmerHale has long declined to represent tobacco companies in health-related matters. WilmerHale also successfully defended the Truth Campaign—the most successful public health campaign in recent memory, dedicated to persuading young people not to take up smoking—against efforts by the tobacco industry to shut it down. *See Lorillard Tobacco Co. v. American Legacy Foundation*, 903 A.2d 728 (Del. 2006). And WilmerHale has represented advocates for gun control pro bono, such as Everytown for Gun Safety, in litigation concerning the constitutionality of gun control laws. *See, e.g.*, *California Rifle & Pistol Ass'n v. Los Angeles County Sheriff's Dep't*, No. 23-cv-10169 (C.D. Cal.) (counsel for defendant); Brief for Everytown for Gun Safety as Amicus Curiae In Support of Petitioner, *United States v. Rahimi*, No. 22-915 (U.S.).

45.     WilmerHale has also participated in lawsuits that advanced civil rights in a wide range of contexts—often pro bono. The Firm has, for example, defended the religious liberties of its clients by challenging laws that prohibited congregants from attending in-person religious services during the COVID-19 pandemic and, more recently, defending the right of churches to make ecclesiastical hiring and firing decisions free from unconstitutional government interference. *See, e.g.*, *King James Bible Baptist Church v. Simmons*, No. 20-cv-65 (N.D. Miss.); *Capitol Hill Baptist Church v. Bowser*, No. 20-cv-2710 (D.D.C.); *McRaney v. North American Mission Bd. of Southern Baptist Convention*, No. 19-60293 (5th Cir.). WilmerHale has also represented clients

in defending reproductive rights following the Supreme Court's decision in *Dobbs v. Whole Women's Health*. *See, e.g.*, *Planned Parenthood of Montana v. State of Montana*, No. DA 23-288 (S. Ct. Mont.). WilmerHale also represented clients in challenging the constitutionality of the Defense of Marriage Act. *See Massachusetts v. U.S. Dep't of Health and Human Servs.*, 682 F.3d 1 (1st Cir. 2012). And WilmerHale has filed lawsuits on behalf of clients with disabilities, securing, for example, a favorable settlement ensuring that hearing-impaired prisoners in Massachusetts received essential accommodations such as hearing aids and interpreters. *See Briggs v. Dep't of Corrections*, 15-cv-40162 (D. Mass.). The Firm also represents Wisconsin voting rights and disability groups in ongoing litigation seeking to ensure that voters who have a disability preventing them from reading or marking paper ballots receive accessible electronic absentee ballots by email. *Disability Rights Wisconsin v. Wisconsin Elections Comm'n*, No. 24-CV-1141 (Wis. Cir. Ct.).

46.     WilmerHale also has stood up for the rights of criminal defendants and low-income families via pro bono representation. For example, WilmerHale secured the release of Dewey Bozella, who was imprisoned for 26 years for a murder he did not commit, and obtained a $7.5 million settlement for Mr. Bozella based on his wrongful conviction. *See Bozella v. Cnty. of Dutchess, N.Y.,* No. 10-cv-04917, ECF No. 285 (S.D.N.Y Jan. 12, 2015); *People v. Bozella*, 901 N.Y.S.2d 908 (Cnty. Ct.). Through its support for the Family Justice Clinic at the WilmerHale Legal Services Center of Harvard Law School, moreover, the Firm provides pro bono representation to parents facing Department of Children and Families investigations, addressing critical gaps in legal support for low-income families.

A.     **WilmerHale's Litigation Against The Government**

47.     The Firm has been involved in suits against the federal government for decades, regardless of who was in the White House at the time. The Firm sued the Clinton Administration

16

on behalf of clients at least 28 times. For example, it represented telecommunications companies in their challenge of a Federal Communications Commission rule that restricted the areas in which they could provide cable television programming. *U.S. West, Inc. v. United States*, No. 93-cv-1523 (W.D. Wa.). The Firm also brought a lawsuit on behalf of the *Washington Post* under the Freedom of Information Act, seeking to require the Department of Agriculture to release basic identifying details about the recipients of funds under a certain department program. *Wash. Post v. U.S. Dep't of Agriculture*, No. 95-cv-656 (D.D.C.).

48.     WilmerHale also was involved in at least 125 lawsuits against the Obama Administration. For example, the Firm represented several life insurance and financial services trade associations in successfully challenging the Obama Administration's retirement security rule ("the fiduciary rule"), which the Fifth Circuit held exceeded the Department of Labor's authority. *Chamber of Commerce v. Dep't of Labor*, No. 17-10238 (5th Cir.). The Firm also represents insurers challenging a Department of Housing and Urban Development rule issued by the Obama Administration that imposed Fair Housing Act liability for neutral underwriting practices. *Property Casualty Insurers Ass'n v. Dep't of Housing and Urban Dev.*, No. 13-cv-8564 (N.D. Ill.). And the Firm represented mining companies challenging an Obama-era opinion that terminated their rights under longstanding mineral leases and later defended them as intervenors supporting the Trump Administration's reinstatement of those leases. *Franconia Minerals (US) LLC v. United States*, No. 16-cv-3042 (D. Minn. 2016); *Voyageur Outward Bound School v. United States*, No. 18-cv-1463 (D.D.C.); *Wilderness Society v. Bernhardt*, No. 20-cv-1176 (D.D.C.).

49.     The Firm also represented clients in at least 97 cases against the Biden Administration. Among the lawsuits the Firm brought against the Biden Administration was a suit to vacate a revised version of the fiduciary rule that was promulgated by the Department of Labor.

*American Council of Life Insurers v. Dep't of Labor*, No. 24-cv-482 (N.D. Tex.). WilmerHale also brought a lawsuit alongside the State of Louisiana contesting President Biden's purported withdrawal of more half a billion acres of offshore waters from oil and natural gas leasing. *See Louisiana v. Biden*, No. 25-cv-71 (W.D. La.). The case built on the Firm's prior representation in a suit seeking to obtain information about the Biden Administration's meetings with third parties in connection with an Interior Department rule regarding oil reserves in Alaska. *Alaska Oil & Gas Association v. Dep't of the Interior*, No. 24-cv-2653 (D.D.C.).

50.     Also during the Biden Administration, WilmerHale filed several lawsuits on behalf of clients raising constitutional challenges to the structure of administrative proceedings at such agencies as the Federal Trade Commission and the Federal Energy Regulatory Commission. *See, e.g.*, *Intuit Inc. v. Federal Trade Comm'n*, No. 24-60040 (5th Cir.) (Article II, Article III, due process, and non-delegation challenges); *Express Scripts v. Federal Trade Comm'n*, No. 24-cv-1549 (E.D. Mo.) (Article II, Article III, and due process challenges).

51.     WilmerHale has also brought suits on behalf of clients against Republican administrations. For example, WilmerHale provided pro bono representation to a number of individuals detained as enemy-combatants at the Guantanamo Bay Naval Base in litigation against the government, resulting in a landmark decision by the Supreme Court of the United States expanding the availability of judicial relief to prisoners detained without process in military facilities overseas. *Boumediene v. Bush*, 553 U.S. 723 (2008).

52.     WilmerHale was also involved in at least 45 lawsuits against the first Trump Administration on behalf of clients, including in several notable cases involving immigration policy. For example, the Firm served as pro bono co-counsel with Farmworker Justice to represent the United Farm Workers in their successful challenge of a Department of Labor rule that would

have frozen wages for thousands of farmers. *See United Farm Workers v. Department of Labor*, No. 20-cv-1690 (E.D. Cal.); *United Farm Workers v. Perdue*, No. 20-cv-1452 (E.D. Cal.). WilmerHale also represented the City of Chicago pro bono when the City sued the first Trump Administration for imposing funding conditions on "sanctuary cities" that had adopted immigration policies contrary to those favored by the Administration. *City of Chicago v. Sessions*, 888 F.3d 272 (7th Cir. 2018). And the Firm brought a lawsuit on behalf of Harvard University and the Massachusetts Institute of Technology challenging Immigration and Customs Enforcement regulations that would have exposed students on F-1 visas to deportation as schools moved to online learning in the wake of the COVID-19 pandemic. *President & Fellows of Harvard College, et al. v. U.S. Dep't of Homeland Security*, No. 20-cv-11283 (D. Mass.).

53.     WilmerHale lawyers followed this long tradition of representing clients in bringing suit against the federal government when, on February 12, 2025, WilmerHale filed suit on behalf of the nonpartisan inspectors general of eight federal agencies—the Departments of Defense, State, Veterans Affairs, Education, Health and Human Services, Agriculture, Labor, and the Small Business Administration—who were fired in violation of the removal procedures set forth in the Inspectors General Act. *See Storch v. Hegseth*, No. 25-cv-415 (D.D.C.). At the conclusion of a public hearing yesterday in the matter, the Court applauded WilmerHale for pursuing the litigation on behalf of its estimable public servant clients, and for doing so pro bono.

**B.      WilmerHale's Election-Related Representations**

54.     WilmerHale also has a long tradition of litigating in defense of the United States' democratic electoral system generally and for clients who span the political spectrum, often pro bono. For instance, in 2003, the Firm successfully represented Republican Senator John McCain and Democratic Senator Russ Feingold in defense of the landmark Bipartisan Campaign Reform Act they co-sponsored. *See McConnell v. Federal Election Commission*, 540 U.S. 93 (2003).

Later, in 2015, the Firm successfully defended the constitutionality of Arizona's non-partisan redistricting commission. *See Arizona State Legislature v. Arizona Independent Redistricting Commission*, 576 U.S. 787 (2015). And in 2021, WilmerHale filed suit on behalf of voters and community organizations to challenge Georgia's legislative redistricting plans as diluting Black voters' voting strength, in violation of Section 2 of the Voting Rights Act. *Alpha Phi Alpha Fraternity, Inc. v. Raffensperger*, No. 21-cv-5337 (N.D. Ga.).

55.     One of WilmerHale's many clients is the Democratic National Committee. The Firm has long represented the DNC in matters relating to the rule of law, ballot access, and election integrity. The Firm also represented the Joe Biden campaign in 2020 and 2024, and the Kamala Harris campaign in 2024. In 2020, for example, the Biden campaign and the Democratic National Committee retained the Firm to provide representation in potential litigation regarding the integrity and certification of the presidential election. The Firm went on to represent the Biden for President campaign, the Democratic National Committee, and state-level Democratic Party organizations in numerous lawsuits regarding the 2020 election in at least six states: Arizona, Georgia, Michigan, New Hampshire, North Carolina, and Pennsylvania. This included representing the Democratic National Committee in opposition to lawsuits that sought to change election results or prevent certification of elections. *See, e.g., Donald J. Trump for President, Inc. v. Secretary of the Commonwealth of Pennsylvania*, 830 F.App'x 377 (3d Cir. Nov. 27, 2020); *Trump v. Wisconsin Elections Commission*, 983 F.3d 919 (7th Cir. 2020); *see also Feehan v. Wisconsin Elections Commission*, 506 F.Supp.3d 596 (E.D. Wis.) (amicus curiae brief). And in the leadup to the 2024 general election, WilmerHale represented Democratic Party entities in numerous cases. *See, e.g., Cobb Cnty. Bd. of Elections & Registration v. State Election Bd.*, No. 24CV012491 (Ga. Super.

Ct. 2024); *Pennsylvania State Conference of NAACP v. Schmidt*, 97 F.4th 120 (3d Cir. 2024); *Republican National Committee v. N. Carolina State Bd. Of Elections*, No. 24-2044 (4th Cir. 2024).

56.     As with the Firm's other longstanding client relationships, the Democratic Party's continued retention of WilmerHale speaks not to the Firm's own political ideology, but to its excellence in representing and advocating for its clients.  The Firm is proud of its advocacy for all of its clients, including those that may not be politically or ideologically favorable to any particular presidential administration.  For instance, the Firm has advised many people nominated by President Trump to positions in both of his administrations.

### IV.     THE EXECUTIVE ORDERS TARGETING OTHER LAW FIRMS HAVE ALREADY INFLICTED SIGNIFICANT HARM ON THOSE FIRMS AND ON THE INDUSTRY, INCLUDING ON WILMERHALE

57.     On February 25, 2025, President Trump signed a memorandum directed to the heads of various federal agencies in the intelligence community, titled "Suspension of Security Clearances and Evaluation of Government Contracts," that targets the law firm Covington & Burling LLP ("Covington Memo").  The Covington Memo singles out a specific partner of Covington & Burling "who assisted former Special Counsel Jack Smith" (a former Department of Justice prosecutor who criminally investigated President Trump).  The Covington Memo directs the agency heads to "suspend any active security clearances held by" that specific partner and "all members, partners, and employees of Covington & Burling LLP who assisted former Special Counsel Jack Smith during his time as Special Counsel," and "to terminate any engagement of Covington & Burling LLP by any agency."

58.     On March 6, 2025, President Trump signed Executive Order 14237, titled "Addressing Risks From Perkins Coie LLP" ("Perkins Order").  Perkins Coie is another large, global law firm.  The Perkins Order described what it called the "dishonest and dangerous activity of the law firm Perkins Coie LLP," including that firm's "representing failed Presidential candidate

Hillary Clinton," which the Perkins Order asserted was "part of a pattern" of "egregious activity." Perkins Order § 1. For instance, the Perkins Order asserted that "Perkins Coie has worked with activist donors including George Soros to judicially overturn popular, necessary, and democratically enacted election laws, including those requiring voter identification"—apparently referring to Perkins Coie's well-known representation of Democratic Party organizations in voting rights and election law litigation. *Id.* The Perkins Order directed federal agencies to, among other things, "suspend security clearances held by individuals at Perkins Coie" until further notice, require government contractors to disclose any business they do with Perkins Coie, "terminate any contract" with Perkins Coie "to the maximum extent permitted by applicable law," issue guidance "limiting [the] official access" of Perkins Coie employees to federal government buildings "when such access would threaten the national security of or otherwise be inconsistent with the interests of the United States," issue guidance "limiting Government employees acting in their official capacity from engaging with Perkins Coie employees to ensure consistency with the national security and other interests of the United States," and "refrain from hiring employees of Perkins Coie" absent special conditions. *Id.* §§ 2-5. The Perkins Order also directed the Chair of the Equal Employment Opportunity Commission to investigate "the practices of representative large, influential, or industry leading law firms" for practices it describes as "discrimination under 'diversity, equity, and inclusion' policies." *Id.* §§ 1, 4.

59.     On March 11, 2025, Perkins Coie sued to enjoin the Perkins Order, arguing that it began experiencing harm from the Order "[t]he day after" its issuance, when a federal agency official informed a Perkins Coie client that Perkins Coie lawyers "should not attend a scheduled meeting with an office in that agency." *Perkins Coie LLP v. Department of Justice*, No. 25-cv-716, ECF No. 2-2 ¶ 25 (D.D.C. Mar. 11, 2025). Because of the Perkins Coie Order, that client

said it would be "forced to hire other law firms" in connection with federal litigation. *Id.* Perkins Coie described other immediate and ongoing harms as a result of the Perkins Order, including: numerous clients terminating legal engagements with Perkins Coie, communicating that they did not feel comfortable proceeding with Perkins Coie in the future, or otherwise halting or withdrawing work; Perkins Coie incurring additional costs to secure backup personnel to attend impending hearings; clients requesting "frequent updates relating to the Order in order to assess whether Perkins Coie can continue to represent them"; candidates for Perkins Coie employment communicating that they needed to reevaluate "the economic health of the firm"; and a Department of Justice attorney informing Perkins Coie that DOJ "could not proceed with a previously set meeting relating to another Perkins Coie client" without further guidance in light of the Perkins Order, *id.* at ¶¶ 26-27, 29, 33.

60.     Based on the limited publicly available information regarding how the Perkins Order was implemented before its enforcement was enjoined—i.e., the information provided in the Perkins Coie declaration—I understand Perkins Coie has suffered substantial harm from the promulgation of the Perkins Order. I understand that harm poses an existential threat to Perkins Coie, given that it derives approximately one-fourth of its total revenue from its largest 15 clients, all of which hold contracts with the federal government that are subject to termination under the terms of the Order. *Id.* at ¶ 30. As discussed below, it seems very likely that—unless the relief sought in the accompanying motion is granted—WilmerHale too will be barred from meeting with federal officials and will lose current and/or potential future clients based on fear of reprisal from the federal government.

61.     On March 12, 2025, Judge Beryl A. Howell of the U.S. District Court for the District of Columbia issued a temporary restraining order enjoining enforcement of several aspects

of the Perkins Order. *See Perkins Coie LLP v. Department of Justice*, No. 25-cv-716, ECF No. 21 (D.D.C. Mar. 12, 2025).

62.     On March 14, 2025, President Trump signed Executive Order 14237, titled "Addressing Risks From Paul Weiss" ("Paul Weiss Order").[2] The Paul Weiss Order generally attacked "[g]lobal law firms," asserting that they "engaged in activities that make our communities less safe, increase burdens on local businesses, limit constitutional freedoms, and degrade the quality of American elections." Paul Weiss Order § 1. The Paul Weiss Order also emphasized that the supposedly improper litigation brought by "[g]lobal law firms" includes not only work done on behalf of paying clients, but also work done "pro bono" or "'for the public good.'" *Id.*

63.     In addition to the broad statements about law firms in general, the Paul Weiss Order targeted specific Paul Weiss partners who had played key roles in criminal investigations of President Trump, referring to one Paul Weiss partner as a "leading prosecutor in the office of Special Counsel Robert Mueller." Paul Weiss Order § 1. The Paul Weiss Order directed government officials to impose substantially the same sanctions against Paul Weiss and its employees as the Perkins Order purported to impose on Perkins Coie. *Id.* §§ 2-5.

64.     At least one of Paul Weiss's clients cited the Executive Order as the reason for terminating his representation by Paul Weiss attorneys. The client is set to begin trial on federal bribery charges and told the district court that Paul Weiss's involvement could prejudice the Department of Justice's review of his case (even if prosecutors were permitted to engage with Paul

---

[2] *Addressing Risks From Paul Weiss*, The White House (Mar. 14, 2025), https://www.whitehouse.gov/presidential-actions/2025/03/addressing-risks-from-paul-weiss/.

Weiss attorneys). *See* Mem. in Support of Motion to Withdraw as Counsel for Defendant Steven Schwartz at 2, *United States v. Coburn*, No. 19-cr-120, ECF No. 1012 (D.N.J. Mar. 19, 2025).[3]

65.     On March 20, 2025, President Trump posted on social media that he had "agreed to withdraw his March 14, 2025 Executive Order regarding [Paul Weiss], which has entered into [an] agreement with the President."[4] According to the social media post, Paul Weiss agreed to undertake "pro bono matters that represent the full spectrum of political viewpoints of our society, whether 'conservative' or 'liberal'"; "dedicate the equivalent of $40 million in pro bono legal services over the course of President Trump's term to support the Administration's initiatives"; "not adopt, use, or pursue any DEI policies"; and submit "to … a comprehensive audit of all of its employment practices."[5] Finally, President Trump's post stated that he had "'met[] with Paul, Weiss Chairman, Brad Karp, during which Mr. Karp acknowledged the wrongdoing of former Paul, Weiss partner, Mark Pomerantz, the grave dangers of Weaponization, and the vital need to restore our System of Justice.'"[6]

66.     President Trump formalized this deal the following day, when he issued Executive Order 14244 officially revoking the Paul Weiss Order. Though President Trump continued to assert that Paul Weiss was "one of many law firms" that have "for years played an outsized role in undermining the judicial process and in the destruction of bedrock American principles," he justified the reversal by citing what he characterized as the firm's "remarkable change of course."[7]

---

[3] M. Tribe & J. Wise, *Paul Weiss Fired by Cognizant Executive Over Trump Order*, Bloomberg (Mar. 19, 2025), https://news.bloomberglaw.com/business-and-practice/paul-weiss-fired-by-cognizant-executive-over-trump-order.
[4] D. Trump, Truth Social (Mar. 20, 2025), https://truthsocial.com/@realDonaldTrump/posts/114197044617921519.
[5] *Id.*
[6] *Id.*
[7] *Addressing Remedial Action by Paul Weiss*, The White House (Mar. 21, 2025), https://www.whitehouse.gov/presidential-actions/2025/03/addressing-remedial-action-by-paul-weiss.

Specifically, he claimed that Paul Weiss "acknowledged the wrongdoing of its former partner Mark Pomerantz" and agreed to implement policy changes, including "adopting a policy of political neutrality with respect to client selection and attorney hiring"; prioritizing "merit-based hiring, promotion, and retention" rather than "diversity, equity, and inclusion" policies; and dedicating "$40 million in pro bono legal services" for causes such as "assisting our Nation's veterans, fairness in the justice system, and combating anti-Semitism."[8]

67.     Beyond the sweeping statements made in the original March 14 Paul Weiss Order, President Trump has made several broad assertions suggesting he intends to target law firms that have represented clients he fears or dislikes.  When he signed the Perkins Order, President Trump stated that his team "was looking at about 15 different firms" as potential targets for similar sanctions.[9]  A few days after he issued the Perkins Order, President Trump said in an interview that "[w]e have a lot of law firms that we're going to be going after because they were very dishonest people."[10]  And the same day that President Trump issued the March 14 Paul Weiss Order, he delivered a speech at the Department of Justice denouncing "crooked law firms," "violent, vicious lawyers," and "fake lawyers."[11]

---

[8] *Id.*

[9] I. Schwartz, "Trump Signs Executive Order To Revoke Security Clearances From Perkins Coie: "This Is An Absolute Honor," *RealClear Politics* (Mar. 6, 2025), https://www.realclearpolitics.com/video/2025/03/06/trump_signs_executive_order_to_revoke_security_clearances_from_perkins_coie_this_is_an_absolute_honor.html.

[10] E. Mulvany & C.R. Barber, *Fear of Trump Has Elite Law Firms in Retreat*, Wall St. J. (Mar. 9, 2025) https://www.wsj.com/us-news/law/fear-of-trump-has-elite-law-firms-in-retreat-6f251dec.

[11] *See Donald Trump Addresses the Staff At the Department of Justice* (March 14, 2025), https://rollcall.com/factbase/trump/transcript/donald-trump-speech-department-of-justice-march-14-2025.

68.     In a Presidential Memorandum dated March 22, 2025, President Trump further directed the Attorney General to assess whether attorneys and law firms currently litigating against the federal government have engaged in "misconduct" and to "seek sanctions" or recommend other disciplinary actions—including "reassess[ing]" security clearances held by the firms' lawyers and "terminat[ing] … any federal contract" under which they provide services—whenever the Attorney General feels their conduct warrants such measures.[12]  He also instructed the Attorney General to review attorney conduct in litigation against the federal government over the past eight years and to recommend the same range of disciplinary actions if the Attorney General "identifies misconduct that may warrant additional action, such as filing frivolous litigation or engaging in fraudulent practices."[13]

69.     In the same March 22 memorandum, President Trump asserted that these measures are necessary to combat what he described as "grossly unethical misconduct" by attorneys and law firms, which, he claimed, "threatens our national security, homeland security, public safety, or election integrity."[14]

70.     On March 25, 2025, President Trump signed an executive order titled "Addressing Risks from Jenner & Block" ("Jenner Order").[15]  The Jenner Order continued the Administration's practice of targeting "so-called 'Big Law' firms," alleging that such firms "regularly conduct … harmful activity through their powerful pro bono practices, earmarking hundreds of millions of their clients' dollars for destructive causes, that often directly or indirectly harm their own

---

[12] *Preventing Abuses of the Legal System and the Federal Court*, The White House (Mar. 22, 2025), https://www.whitehouse.gov/presidential-actions/2025/03/preventing-abuses-of-the-legal-system-and-the-federal-court.

[13] *Id.*
[14] *Id.*
[15] *Addressing Risks from Jenner & Block*, The White House (Mar. 25, 2025), https://www.whitehouse.gov/presidential-actions/2025/03/addressing-risks-from-jenner-block/.

clients."[16] The Jenner Order singled out Jenner for purportedly "abus[ing] its pro bono practice" by "engag[ing] in obvious partisan representations to achieve political ends, support[ing] attacks against women and children based on a refusal to accept the biological reality of sex, and back[ing] the obstruction of efforts to prevent illegal aliens from committing horrific crimes and trafficking deadly drugs within our borders."[17] Like the Paul Weiss Order, the Jenner Order also singled out a specific Jenner partner based on his role in what the Order described as "Robert Mueller's entirely unjustified investigation."[18] The Jenner Order directed government officials to impose substantially the same sanctions against Jenner and its employees as the Perkins Order purported to impose on Perkins Coie and as the now-withdrawn Paul Weiss Order purported to impose on Paul Weiss.[19]

71.     The media has in the past speculated whether WilmerHale would be among the targets of a future executive order because it once counted Mr. Mueller as a partner and is among the "big-name firms involved in litigation against the administration," including its lawsuit on behalf of eight inspectors general who were purportedly terminated by President Trump.[20] Indeed, WilmerHale is among the relatively small set of firms whose employment practices the administration is investigating—a step some in the media interpreted as signaling to WilmerHale

---

[16] *Id.*
[17] *Id.*
[18] *Id.*
[19] *Id.*
[20] E. Mulvany & C.R. Barber, *Fear of Trump Has Elite Law Firms in Retreat*, Wall Street Journal (Mar. 9, 2025) https://www.wsj.com/us-news/law/fear-of-trump-has-elite-law-firms-in-retreat-6f251dec; J. Henry &T. Monnay, *Trump's Big Law Fury Shows Additional Firms Are Target Risks*, Bloomberg (Mar. 19, 2025), https://news.bloomberglaw.com/business-and-practice/trumps-big-law-fury-shows-additional-firms-are-target-risks.

and the other listed firms that they are likely to face further investigation or punishment by the Administration.[21]

72.     WilmerHale has also been forced to expend significant resources to address the risk that it would be targeted by an executive order. For instance, since early March 2025, WilmerHale attorneys have devoted hundreds of hours to analyzing the Covington Memo, Perkins Order, Paul Weiss Order, and Jenner Order, and to preparing WilmerHale's strategy for responding should the Firm be targeted by President Trump. WilmerHale also retained outside counsel at Clement & Murphy to assess the risk to WilmerHale and to be prepared to protect the Firm through litigation, if necessary.

## V.     WILMERHALE HAS SUFFERED—AND IS SUFFERING—IRREPARABLE AND ENDURING HARM FROM THE EXECUTIVE ORDER TARGETING WILMERHALE

73.     On March 27, 2025, President Trump signed an Executive Order entitled "Addressing Risks from WilmerHale" (the "Order" or "WilmerHale Order").[22] President Trump also issued an accompanying "fact sheet" that purported to further support the Order.[23] The Order directs government officials to, among other things, (A) "suspend any active security clearances held by individuals at WilmerHale, pending a review of whether such clearances are consistent with the national interest," (B) require "[g]overnment contractors to disclose any business they do with WilmerHale," (C) "terminate any contract" with WilmerHale "to the maximum extent

---

[21]   P. Hodkinson, *Big Law at War*, Am. Lawyer (Mar. 23, 2025), https://www.law.com/americanlawyer/2025/03/23/big-law-at-war/.
[22]   *Addressing Risks from WilmerHale*, White House (Mar. 27, 2025),https://www.whitehouse.gov/presidential-actions/2025/03/addressing-risks-from-wilmerhale.

[23] *Fact Sheet: President Donald J. Trump Addresses Risks from WilmerHale*, White House (Mar. 27, 2025) ("WilmerHale Fact Sheet" or "Fact Sheet"), https://www.whitehouse.gov/fact-sheets/2025/03/fact-sheet-president-donald-j-trump-addresses-risks-from-wilmerhale.

permitted by applicable law," (D) issue guidance "limiting [the] official access" of WilmerHale employees to "Federal Government buildings" "when such access would threaten the national security of or otherwise be inconsistent with the interests of the United States," (E) issue guidance "limiting Government employees acting in their official capacity from engaging with WilmerHale employees to ensure consistency with the national security and other interests of the United States," and (F) "refrain from hiring employees of WilmerHale" absent special conditions. WilmerHale Order §§ 2-5.

74. The accompanying Fact Sheet accuses WilmerHale of engaging in "activities not aligned with American interests" and calls for WilmerHale to be reviewed for non-compliance "with civil rights laws against racial bias." WilmerHale Fact Sheet. Describing WilmerHale as a "Rogue Law Firm[]" and a "partisan and bad faith actor[]," the Fact Sheet asserts that WilmerHale should "not ... have access to our Nation's secrets." *Id.* The Fact Sheet further accuses WilmerHale of having "abused its pro bono practice" to "undermine justice and the interests of the United States," "pursue[d] partisan goals, support[ed] efforts to discriminate on the basis of race," "back[ed] the obstruction of efforts" to stem illegal immigration, drug trafficking, and the commission of "horrific crimes," and "support[ed] efforts designed to enable noncitizens to vote." *Id.* And it specifically targets retired WilmerHale partner "Robert Mueller and two of his colleagues," accusing all three of "lead[ing] a partisan 'investigation' against the President and others," for which it claims "WilmerHale rewarded" them by "welcoming them to the firm." *Id.*

75. WilmerHale was given no notice that the Order or Fact Sheet were forthcoming. Nor was WilmerHale given the opportunity to respond to the false allegations in the Order or fact sheet or to explain the immediate, ongoing, and wide-ranging harm that the Order and fact sheet would have on WilmerHale, its employees, and its clients. WilmerHale also was not given an

opportunity to contest the claims and punishments detailed in the Order, because the Order establishes no means (and WilmerHale was provided none outside of the Order) for either contesting its directives or for challenging its assertions.

76.     The Order and accompanying Fact Sheet have damaged and will damage WilmerHale's business prospects, have disrupted and will disrupt its relations with current and future clients, and have impeded and will impede its lawyers' ability to zealously advocate as counsel.

77.     First, forcing government contractors to disclose "any business" with WilmerHale and threatening action with respect to those clients' government contracts (even if unrelated to their relationships with WilmerHale) discourages clients from working with WilmerHale. *See* WilmerHale Order § 3. WilmerHale represents many contractors who do business with the federal government, and the fact that WilmerHale provides legal advice to certain clients is often confidential. By creating administrative hurdles for clients seeking to work with both the federal government and with WilmerHale—and by sending the message that this Administration disfavors contractors who are represented by WilmerHale, even in matters having nothing to do with contracting—the Order and Fact Sheet directly discourage current and future clients from working with WilmerHale.

78.     Second, the suspension and threatened revocation of security clearances held by individuals at WilmerHale harms the ability of WilmerHale lawyers to represent clients in cases involving sensitive government information, for example, matters involving national security, cybersecurity, defense contracting, criminal investigations, or practice before the Committee on Foreign Investment in the United States. *See* WilmerHale Order § 2. The withdrawal of

WilmerHale security clearances impairs WilmerHale's relations with clients, its reputation as a zealous and effective advocate, and the Firm's overall business prospects.

79.     Third, limiting the official access of WilmerHale attorneys to federal buildings (such as agencies and courthouses) and restricting engagement by government officials with WilmerHale attorneys (such as advocacy on behalf of clients in investigations and regulatory matters) damages the ability of WilmerHale lawyers to perform basic functions necessary to represent firm clients, including WilmerHale's ability to petition the government on its clients' behalf. *See* WilmerHale Order § 5.

80.     For example, WilmerHale attorneys are scheduled to attend meetings on behalf of clients at the Department of Justice on March 31, 2025 and the SEC on April 1, 2025. The Order makes it uncertain whether the attorneys will be denied access to the Department of Justice, SEC, and other federal buildings or whether the federal employees will refuse to meet with them. Similarly, WilmerHale attorneys are scheduled to meet over videoconference with Department of Justice attorneys on March 28, April 2, April 4, and April 9. The Order makes it uncertain whether the Department of Justice attorneys will refuse to meet with the WilmerHale attorneys.

81.     These specific impacts of the Order are particularly notable in the context of criminal cases. WilmerHale cannot provide effective representation and advocacy for its clients in proceedings against the government or in government fora if it is obstructed from engaging with federal prosecutors and accessing federal buildings.

82.     The Order also impairs WilmerHale personnel's ability to perform their civic duties, including WilmerHale employees who proudly serve our nation in the military Reserves and must access government facilities and interact with government employees when called to serve. Indeed, several WilmerHale attorneys who are employed as reservists (with security clearances)

are scheduled to report for duty in the upcoming days. The Order may prevent these patriots from performing their duties and serving their country. *See* WilmerHale Order §§ 2, 5.

83.     Fourth, by damaging WilmerHale's business prospects, the Order has and will continue to create significant economic loss such that WilmerHale may need to reduce its staff or refrain from hiring new staff, further impairing the operation of the Firm and harming its employees and clients.

84.     Fifth, the Order and Fact Sheet violate WilmerHale's constitutional rights. It is clear on the face of the documents that they were issued because of, and in retaliation for, WilmerHale's advocacy for clients or causes that President Trump dislikes and association with individuals or causes the President perceives as opposed to his Administration. Both the Order and the accompanying Fact Sheet cite WilmerHale's pro bono advocacy on behalf of noncitizens, its defense of voting rights, and its efforts to ensure fair elections as reasons for issuing the Order. *E.g.*, WilmerHale Order § 1; Fact Sheet. The Order also expressly links this punishment to the Firm's decision to "welcome[e]" Mr. Mueller, Mr. Quarles, and Mr. Zebley back "to the firm" after serving in the special counsel's office. WilmerHale Order § 1. If allowed to stand, the Order will likely deter WilmerHale—and its clients and personnel—from exercising their fundamental rights to free speech and association. And by limiting WilmerHale's ability to engage with the federal government—by restricting federal employees from engaging with WilmerHale and by limiting WilmerHale's access to federal buildings—the Order impairs WilmerHale and its personnel's ability to petition the government. WilmerHale Order § 5.

85.     Finally, the Order and accompanying Fact Sheet harm WilmerHale's reputation in the legal market and among its current and prospective clients and employees through false and disparaging characterizations of the Firm and its attorneys. The Order and fact sheet lodge baseless

accusations and create the false impression that WilmerHale and its attorneys have *inter alia* (1) "engage[d] in activities that undermine justice and the interests of the United States," (2) "furthered the degradation of the quality of American elections," and (3) "rewarded" individuals who encouraged the "weaponization of the government." WilmerHale Order § 1; Fact Sheet.

86.     In sum, unless the WilmerHale Order is immediately enjoined, WilmerHale faces exceptional, ongoing, and irreparable harm.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge, information and belief.

Executed on March 28, 2025

_____

Bruce M. Berman