## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

WILMER CUTLER PICKERING HALE
AND DORR LLP,

*Plaintiff*,

v.

EXECUTIVE OFFICE OF THE
PRESIDENT, *et al.*,

*Defendants*.

Case No. 1:25-cv-917

Judge Richard J. Leon

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
## PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................. iii

INTRODUCTION ........................................................................................................... 1

BACKGROUND .............................................................................................................. 5

    A.  The President Issues a Series of Executive Orders Targeting Prominent Law Firms, Including WilmerHale ............................................................................ 5

        1.  The President launches an avowed retaliation campaign against law firms associated with his actual or perceived opponents ........................ 5

        2.  The President issues an Order and "Fact Sheet" targeting WilmerHale .............. 8

        3.  Four prominent law firms avoid the Order's consequences by pledging massive pro bono support for causes the President supports .............. 11

    B.  Courts Immediately Enjoin These Unprecedented Executive Orders ........................ 12

ARGUMENT ................................................................................................................... 14

  I.  WilmerHale Is Entitled To Summary Judgment .................................................... 14

    A.  The Order Violates the First Amendment Several Times Over ................................ 14

        1.  The Order is a textbook example of retaliation for constitutionally protected expression ................................................................................ 14

        2.  The Order openly discriminates against disfavored speakers and viewpoints .................................................................................................. 19

        3.  The Order violates the Petition Clause .................................................... 21

        4.  The Order abridges the freedom of association ........................................ 23

    B.  The Order Exceeds the President's Authority and Violates the Separation of Powers .......................................................................................................... 26

    C.  The Order Violates Due Process and Equal Protection ............................................ 29

    D.  The Order Violates WilmerHale Clients' Fifth and Sixth Amendment Rights to Engage Counsel of Their Choice ............................................................ 34

  II.  WilmerHale Is Entitled To Permanent Relief ........................................................ 36

    A.  This Court Should Declare the Entire Order Unconstitutional ................................ 36

    B.  The Court Should Permanently Enjoin Enforcement of the Order ........................... 41

        1.  The Order inflicts irreparable harm for which there is no adequate remedy at law. .......................................................................................... 42

        2.  The balance of the equities and the public interest overwhelmingly favor a permanent injunction ...................................................................... 44

CONCLUSION ................................................................................................................ 45

## TABLE OF AUTHORITIES

**Cases**

*Air Evac EMS, Inc. v. McVey*,
    37 F.4th 89 (4th Cir. 2022) ........................................................................... 44

*Air Transp. Ass'n of Am. v. Exp.-Imp. Bank of U.S.*,
    840 F.Supp.2d 327 (D.D.C. 2012) ................................................................ 43

*\*Ams. for Prosperity Found. v. Bonta*,
    594 U.S. 595 (2021) ............................................................................... 23, 24

*Anatol Zukerman & Charles Krause Reporting, LLC v. USPS*,
    64 F.4th 1354 (D.C. Cir. 2023) ............................................................... 41, 44

*Aref v. Lynch*,
    833 F.3d 242 (D.C. Cir. 2016) ................................................................ 14, 17

*Baggett v. Bullitt*,
    377 U.S. 360 (1964) ...................................................................................... 32

*Bantam Books, Inc. v. Sullivan*,
    372 U.S. 58 (1963) ........................................................................................ 17

*Bd. of Cnty. Comm'rs v. Umbehr*,
    518 U.S. 668 (1996) ...................................................................................... 29

*Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*,
    457 U.S. 853 (1982) ...................................................................................... 40

*Beacon Assocs. v. Apprio, Inc.*,
    308 F.Supp.3d 277 (D.D.C. 2018) ................................................................ 44

*BellSouth Telecomms., Inc. v. MCIMetro Access Transmission Servs., LLC*,
    425 F.3d 964 (11th Cir. 2005) ...................................................................... 44

*Bill Johnson's Rests., Inc. v. NLRB*,
    461 U.S. 731 (1983) ...................................................................................... 15

*Bolling v. Sharpe*,
    347 U.S. 497 (1954) ...................................................................................... 33

*Borough of Duryea v. Guarnieri*,
    564 U.S. 379 (2011) ...................................................................................... 21

*Brock v. Roadway Express*,
    481 U.S. 252 (1987) ...................................................................................... 31

*Buckley v. Valeo*,
    424 U.S. 1 (1976) .......................................................................................... 23

*Cal. Motor Transp. Co. v. Trucking Unlimited*,
    404 U.S. 508 (1972) ...................................................................................... 21

*Caplin & Drysdale, Chartered v. United States*,
    491 U.S. 617 (1989) ................................................................................ 28, 36

*Chambers v. NASCO, Inc.*,
    501 U.S. 32 (1991) ................................................................................. 27

*Chaplaincy of Full Gospel Churches v. England*,
    454 F.3d 290 (D.C. Cir. 2006) ............................................................. 42

*City of Cleburne v. Cleburne Living Ctr., Inc.*,
    473 U.S. 432 (1985) ............................................................................. 33

*Cohen v. Hurley*,
    366 U.S. 117 (1961) ............................................................................... 1

*Costa v. Bazron*,
    456 F.Supp.3d 126 (D.D.C. 2020) ...................................................... 44

*Denius v. Dunlap*,
    209 F.3d 944 (7th Cir. 2000) ............................................................... 15

*Dep't of Navy v. Egan*,
    484 U.S. 518 (1988) ....................................................................... 38, 40

*Doe v. Gates*,
    981 F.2d 1316 (D.C. Cir. 1993) ........................................................... 39

*DOL v. Triplett*,
    494 U.S. 715 (1990) ....................................................................... 28, 34

*Edwards v. Aguillard*,
    482 U.S. 578 (1987) ......................................................................... 4, 39

*El-Ganayni v. U.S. Dep't of Energy*,
    591 F.3d 176 (3d Cir. 2010) ................................................................ 38

*Elrod v. Burns*,
    427 U.S. 347 (1976) ............................................................................. 22

*Eng v. Cooley*,
    552 F.3d 1062 (9th Cir. 2009) ....................................................... 14, 15

*FCC v. Fox Television Stations, Inc.*,
    567 U.S. 239 (2012) ....................................................................... 30, 32

*FDIC v. Mallen*,
    486 U.S. 230 (1988) ............................................................................. 31

*Fuentes v. Shevin*,
    407 U.S. 67 (1972) ............................................................................... 31

*Gideon v. Wainwright*,
    372 U.S. 335 (1963) ............................................................................. 35

*Gill v. DOJ*,
    875 F.3d 677 (D.C. Cir. 2017) ............................................................. 39

*Goodyear Tire & Rubber Co. v. Haeger*,
    581 U.S. 101 (2017) ....................................................................... 27, 28

*Goss v. Lopez*,
    419 U.S. 565 (1975)..................................................................................... 30

*Heffernan v. City of Paterson*,
    578 U.S. 266 (2016)..................................................................................... 20

*Hous. Cmty. Coll. Sys. v. Wilson*,
    595 U.S. 468 (2022)..................................................................................... 16

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*,
    515 U.S. 557 (1995)..................................................................................... 25

*In re Halkin*,
    598 F.2d 176 (D.C. Cir. 1979)..................................................................... 15

*In re NTE Conn., LLC*,
    26 F.4th 980 (D.C. Cir. 2022)..................................................................... 43

*Joint Anti-Fascist Refugee Comm. v. McGrath*,
    341 U.S. 123 (1951)..................................................................................... 29

*Karem v. Trump*,
    960 F.3d 656 (D.C. Cir. 2020)....................................................................... 4

*Kowalski v. Tesmer*,
    543 U.S. 125 (2004)..................................................................................... 25

*League of Women Voters of U.S. v. Newby*,
    838 F.3d 1 (D.C. Cir. 2016).......................................................................... 45

*Lee v. Garland*,
    120 F.4th 880 (D.C. Cir. 2024)............................................................... 38, 40

*Legal Servs. Corp. v. Velazquez*,
    531 U.S. 533 (2001)............................................................................. *passim*

*Logan v. Zimmerman Brush Co.*,
    455 U.S. 422 (1982)..................................................................................... 29

*Lozman v. City of Riviera Beach*,
    585 U.S. 87 (2018)....................................................................................... 14

*Merrill Lynch, Pierce, Fenner & Smith Inc. v. Wertz*,
    298 F.Supp.2d 27 (D.D.C. 2002)................................................................. 44

*Minnesota v. Mille Lacs Band of Chippewa Indians*,
    526 U.S. 172 (1999)............................................................................... 26, 37

*Moody v. NetChoice, LLC*,
    603 U.S. 707 (2024)............................................................................... 25, 26

*Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*,
    429 U.S. 274 (1977)..................................................................................... 39

*Myers v. United States*,
    272 U.S. 52 (1926)......................................................................................... 2

*NAACP v. Alabama ex rel. Patterson*,
    357 U.S. 449 (1958) ............................................................................ 23

*NAACP v. Button*,
    371 U.S. 415 (1963) ...................................................................... 24, 32

*Nader v. Democratic Nat'l Comm.*,
    567 F.3d 692 (D.C. Cir. 2009) ......................................................... 22

*Nat'l Council of Resistance of Iran v. Dep't of State*,
    251 F.3d 192 (D.C. Cir. 2001) ......................................................... 30

*Nat'l Fed'n of Fed. Emps. v. Greenberg*,
    983 F.2d 286 (D.C. Cir. 1993) ......................................................... 38

*Nat'l Mining Ass'n v. Jackson*,
    768 F.Supp.2d 34 (D.D.C. 2011) ..................................................... 42

*\*Nat'l Rifle Ass'n of Am. v. Vullo*,
    602 U.S. 175 (2024) ................................................................. *passim*

*Nieves v. Bartlett*,
    587 U.S. 391 (2019) ......................................................................... 18

*O'Donnell v. Barry*,
    148 F.3d 1126 (D.C. Cir. 1998) ....................................................... 30

*Patchak v. Jewell*,
    109 F.Supp.3d 152 (D.D.C. 2015) ................................................... 22

*Patriot, Inc. v. HUD*,
    963 F.Supp. 1 (D.D.C. 1997) ........................................................... 44

*Penson v. Ohio*,
    488 U.S. 75 (1988) ........................................................................... 45

*\*Perry v. Sindermann*,
    408 U.S. 593 (1972) ......................................................................... 39

*Ralls Corp. v. Comm. on Foreign Inv. in U.S.*,
    758 F.3d 296 (D.C. Cir. 2014) ......................................................... 31

*Rankin v. McPherson*,
    483 U.S. 378 (1987) ......................................................................... 39

*Rattigan v. Holder*,
    689 F.3d 764 (D.C. Cir. 2012) ......................................................... 38

*Register.com, Inc. v. Verio, Inc.*,
    356 F.3d 393 (2d Cir. 2004) ............................................................ 44

*Roberts v. U.S. Jaycees*,
    468 U.S. 609 (1984) ......................................................................... 15

*Roman Cath. Diocese of Brooklyn v. Cuomo*,
    592 U.S. 14 (2020) ........................................................................... 42

*Rosenberger v. Rector of Univ. of Va.*,
  515 U.S. 819 (1995) .................................................................................. 19

*Rutan v. Republican Party of Ill.*,
  497 U.S. 62 (1990) .................................................................................... 39

*Schware v. Bd. of Bar Exam'rs*,
  353 U.S. 232 (1957) .................................................................................. 30

*Seattle Times Co. v. Rhinehart*,
  467 U.S. 20 (1984) .................................................................................... 15

*SEC v. Jarkesy*,
  603 U.S. 109 (2024) .................................................................................. 28

*Strickland v. Washington*,
  466 U.S. 668 (1984) .................................................................................. 34

*Toxco Inc. v. Chu*,
  724 F.Supp.2d 16 (D.D.C. 2010) .............................................................. 31

*Trump v. United States*,
  603 U.S. 593 (2024) .................................................................................. 38

*UAW Loc. 737 v. Auto Glass Emps. Fed. Credit Union*,
  72 F.3d 1243 (6th Cir. 1996) .................................................................... 31

*Ukrainian-Am. Bar Ass'n v. Baker*,
  893 F.2d 1374 (D.C. Cir. 1990) ................................................................ 15

*United States v. Gonzalez-Lopez*,
  548 U.S. 140 (2006) .............................................................................. 3, 35

*United States v. Midwest Oil Co.*,
  236 U.S. 459 (1915) .................................................................................. 27

*United States v. Williams*,
  553 U.S. 285 (2008) .................................................................................. 32

*USAID v. All. for Open Soc'y Int'l, Inc.*,
  570 U.S. 205 (2013) ............................................................................ 24, 28

*Vill. of Willowbrook v. Olech*,
  528 U.S. 562 (2000) .................................................................................. 33

*\*W. Va. State Bd. of Educ. v. Barnette*,
  319 U.S. 624 (1943) ............................................................................ 19, 40

*Watkins v. United States*,
  354 U.S. 178 (1957) .................................................................................. 33

*Webster v. Doe*,
  486 U.S. 592 (1988) .................................................................................. 39

*Wheat v. United States*,
  486 U.S. 153, 159 (1988) .......................................................................... 34

*Wisconsin v. Constantineau,*
    400 U.S. 433 (1971)................................................................................. 30, 37

*Wounded Knee Legal Def./Offense Comm. v. FBI,*
    507 F.2d 1281 (8th Cir. 1974) ................................................................ 35, 36

*Xiaomi Corp. v. Dep't of Def.,*
    2021 WL 950144 (D.D.C. Mar. 12, 2021)...................................................... 44

*Youngstown Sheet & Tube Co. v. Sawyer,*
    343 U.S. 579 (1952) ........................................................................................ 26

**Constitutional Provisions**

U.S. Const. art. I, §8.......................................................................................... 28

U.S. Const. art. III, §1........................................................................................ 26

U.S. Const. amend. I .......................................................................................... 21

U.S. Const. amend. V ......................................................................................... 29

U.S. Const. amend. VI ....................................................................................... 34

**Statute**

5 U.S.C. §2302 ................................................................................................... 26

**Rule**

D.C. R. Prof'l Conduct 1.3 cmt. [1]................................................................... 45

**Other Authorities**

Elias Law Group, *About,* https://tinyurl.com/yyutr6h8 (last visited Apr. 7, 2025) ....................... 7

Tr. of TRO Hr'g, *Jenner & Block LLP v. U.S. Dep't of Just.,*
    No. 1:25-cv-916 (D.D.C. Mar. 28, 2025), Dkt.10 .......................................... *passim*

Tr. of TRO Hr'g, *Perkins Coie LLP v. U.S. Dep't of Just.,*
    No. 1:25-cv-716 (D.D.C. Mar. 12, 2025), Dkt.22 .......................................... *passim*

## INTRODUCTION

"When the Founders of this Nation drew up our Constitution, they were uneasily aware of th[e] English practice" of imposing harsh sanctions on "any barrister who refused to 'co-operate' with the King's courts." *Cohen v. Hurley*, 366 U.S. 117, 139-40 (1961) (Black, J., dissenting). "[T]he Founders were singularly unimpressed by the long history of such English practices," so they "fought a revolution and wrote a Constitution to get rid of [them]." *Id.* at 141-42. John Adams embodied the Framers' ideals in his willingness to defend the very agents of the Crown from which we would soon declare our independence. And the Constitution itself embodies these ideals with multiple "safeguards of the lawyer's independence," including "the protections of the First Amendment," "the requirements of due process and equal protection of the laws," and the prohibition on "bills of attainder." *Id.* at 141-44. In short, our justice system depends on an "informed, independent bar," *Legal Servs. Corp. v. Velazquez*, 531 U.S. 533, 545 (2001), and "[g]overnment officials cannot attempt to coerce" lawyers or law firms "in order to punish or suppress views that the government disfavors," *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 180 (2024).

Executive Order 14250 blatantly violates these foundational principles. As this Court explained in granting WilmerHale a temporary restraining order, the First Amendment "[u]ndisputably" prohibits the President from punishing a law firm for its "legal advocacy," particularly when the retaliation is "based on perceived viewpoint." Dkt.10 at 2 ("TRO"). And "[t]he retaliatory nature of the Executive Order at issue here is clear from its face." *Id.* While most litigation requires discovery to unearth retaliatory motive, the President openly proclaims that he is targeting WilmerHale for representing his political opponents in election-related litigation, challenging his immigration-enforcement policies, associating with his perceived

enemies (including a Special Counsel appointed by the President's own Justice Department), and defending a client's race-conscious college admission policies. *See* Ex.44 §1 ("Order"). "There is no doubt this retaliatory action chills speech and legal advocacy, or that it qualifies as a constitutional harm." TRO.2.[1]  Indeed, any doubt about that has been laid to rest by the terms on which the President has agreed to forgo or rescind similar executive orders targeting other law firms. Putting law firms to the choice of suffering punitive sanctions for disfavored representations or agreeing to dedicate tens of millions of dollars to representations favored by the government is viewpoint discrimination pure and simple.  In short, retaliatory animus and viewpoint discrimination infect every aspect of this Order, severely abridging and chilling constitutionally protected speech, association, and petitioning activity.

While these clear First Amendment violations suffice to render the entire Order invalid, they are just the tip of its constitutional infirmities.  The Order also does violence to the "sacred" constitutional principle that "the legislative, executive and judicial powers" must remain separate. *Myers v. United States*, 272 U.S. 52, 116 (1926).  The President's role is to enforce the law—not to enact law or to sanction litigation conduct before the courts.  No statute or constitutional provision empowers the President to unilaterally punish WilmerHale in this manner.  That is unsurprising; any effort to punish lawyers for representing disfavored clients or causes "threatens severe impairment of the judicial function," as courts depend on attorneys to "present all … reasonable and well-grounded arguments" on their clients' behalf.  *Velazquez*, 531 U.S. at 545-46. The Framers thus wisely did not empower either Congress or the Executive Branch to punish disfavored representations or to sit in judgment of lawyer conduct before the Article III courts.

---

[1] *Accord* Tr. of TRO Hr'g 46:23-50:18, *Jenner & Block LLP v. U.S. Dep't of Just.*, No. 1:25-cv-916 (D.D.C. Mar. 28, 2025), Dkt.10 ("*Jenner* Tr."); Tr. of TRO Hr'g 74:22-83:3, *Perkins Coie LLP v. U.S. Dep't of Just.*, No. 1:25-cv-716 (D.D.C. Mar. 12, 2025), Dkt.22 ("*Perkins* Tr.").

Making matters worse, the Order flagrantly violates the constitutional guarantees of due process and equal protection.  It imposes severe consequences—interfering with WilmerHale attorneys' ability to practice law, baselessly branding WilmerHale a "rogue law firm," and unsettling the Firm's contractual relationships with its clients—without *any* notice or opportunity to be heard.  As Judge Howell recently held with respect to a similar order, these are "clear[]" deprivations of the Constitution's "most basic" procedural guarantees. *Perkins* Tr. 88:1-4; *see id.* 83:4-87:25.  The Order uses vague, expansive language—e.g., accusing WilmerHale of "engag[ing] in activities that undermine justice," Order §1—that fails to adequately define what conduct triggered its extraordinary sanctions.  The Order's generic directives invite arbitrary and discriminatory enforcement:  It directs agency heads to prevent Firm employees from accessing government buildings or engaging with government employees whenever doing so would be "inconsistent" with unspecified "interests of the United States." *Id.* §5(a).  And it arbitrarily singles out WilmerHale for punishment, operating "like a bill of attainder," *Perkins* Tr. 89:10-11.

On top of all that, the Order violates the right to counsel protected by the Fifth and Sixth Amendments.  *See Perkins* Tr. 89:23-94:7; *Jenner* Tr. 50:19-51:5.  Its draconian restrictions on WilmerHale employees' ability to engage with government employees and access government buildings, services, and materials would—but for this Court's intervention—severely impair the Firm's ability to represent thousands of current clients.  And the Order interferes with current and prospective clients' constitutional right to select the counsel of their choice. *See United States v. Gonzalez-Lopez*, 548 U.S. 140, 147-48 (2006).

The Order is an indivisible affront to cherished constitutional values and should be declared unconstitutional in toto.  It embodies a single policy that flows from constitutionally impermissible animus, laying bare its retaliatory motive in its §1 "findings" and then imposing harsh punishments

in the remaining sections based on those findings.  While the President undoubtedly has significant power to determine whom the government will employ, with whom it will contract, and to whom it will grant a security clearance, that power "must be exercised in a manner that comports with the transcendent imperatives of the First Amendment." *Edwards v. Aguillard*, 482 U.S. 578, 583 (1987).  Whatever the scope of the President's authority, he may not blacklist WilmerHale or indiscriminately suspend its employees' clearances in retaliation for constitutionally protected advocacy.  Nor may he impose these draconian sanctions without notice and an opportunity to be heard.  The Order's "retaliatory nature," which is "clear from its face," TRO.2, and its imposition of "crippling" penalties without any process whatsoever, TRO.3, render the entire Order invalid.

As this Court held in its temporary restraining order, WilmerHale easily satisfies the remaining requirements for injunctive relief.  For one thing, "violations of [the Firm]'s constitutional rights constitute irreparable harm" for which there is no adequate remedy at law. TRO.2-3.  For another, the Order threatens to grievously harm WilmerHale's "business and reputation"; indeed, the Firm's "very survival is at stake."  TRO.3-4.  As this Court recognized, clients are risk-averse and need certainty that their lawyers are and will remain able to represent them fully, including by engaging with government officials, entering government buildings, and (where needed) holding security clearances. Dkt.11 at 27:2-28:1 ("TRO.Hr'g.Tr.").  The equities and public interest also tilt decisively in favor of permanent relief against the entire Order.  While WilmerHale faces an imminent threat of constitutional, reputational, and economic injuries, neither the government nor the public has any interest in the enforcement of an unconstitutional order.  *See Karem v. Trump*, 960 F.3d 656, 668 (D.C. Cir. 2020).  The public interest, moreover, cuts sharply in favor of permanently enjoining this Order, which poses a grave threat not only to WilmerHale but also to our Nation's constitutional order and "the justice system at large."  TRO.4.

## BACKGROUND

**A.    The President Issues a Series of Executive Orders Targeting Prominent Law Firms, Including WilmerHale.**

      **1.    The President launches an avowed retaliation campaign against law firms associated with his actual or perceived opponents.**

During and after the 2024 presidential election, President Trump repeatedly vowed to use his official authority to "go[] after" not only his political adversaries, but also "Lawyers" and "law firms" connected to them. Statement of Undisputed Material Facts ¶¶66-67 ("SOF"). In recent weeks, the President has followed through on those threats. On February 25, 2025, he targeted Covington & Burling LLP for providing legal advice to Jack Smith, who, as Special Counsel, brought criminal charges against the President. *Id.* ¶68. Specifically, the President issued a memorandum to various intelligence community agency heads directing them "to suspend any active security clearances held by Peter Koski and all members, partners, and employees of Covington & Burling LLP who assisted former Special Counsel Jack Smith during his time as Special Counsel, pending a review … to terminate any engagement of Covington." Ex.9.[2] The President referred to this memorandum as "the deranged Jack Smith signing or bill," and said afterward of the pen he used to sign it, "Why don't you give it to Jack Smith?" SOF ¶70.

On March 6, 2025, the President issued a substantially more expansive executive order targeting Perkins Coie LLP for "representing failed Presidential candidate Hillary Clinton." Ex.14 ("Perkins Order"). That order directs agency heads, *inter alia*, to terminate contracts with Perkins Coie, require all government contractors to disclose any business with Perkins Coie and then review all federal contracts with Perkins Coie's clients, limit Perkins Coie employees' access to federal buildings, and prevent federal officials from engaging in their official capacity with Perkins

---

[2] All numbered exhibits are attached to the Declaration of Joseph J. DeMott, filed herewith.

Coie employees. *See id.* The Perkins Order was accompanied by a "fact sheet" stating that the firm has "worked with activist donors, including George Soros, to judicially overturn enacted election laws" and that one of its former partners was "indicted for lying to the FBI" about "claims of secret Trump-Russia communications" (without mentioning that he was subsequently acquitted). Ex.15. The fact sheet also described Perkins Coie "fil[ing] lawsuits against the Trump Administration" as an example of the firm's supposedly "unethical and discriminatory actions" that threaten our Nation's "military strength." *Id.* The fact sheet explained that "President Trump signed [the Perkins] Order to end" what he characterized as "the weaponization of the Federal Government … 'and the abuse of law enforcement against political opponents.'" *Id.*

On March 14, 2025, the President issued a similar executive order targeting another large law firm: Paul, Weiss, Rifkind, Wharton & Garrison LLP ("Paul Weiss"). Ex.21 ("Paul Weiss Order"). The Paul Weiss Order accused former Paul Weiss partner Mark Pomerantz of leaving the firm "to join the Manhattan District Attorney's office solely to manufacture a prosecution against" the President; of "unethically le[ading] witnesses in ways designed to implicate" the President; and of "engag[ing] in a media campaign to gin up support for this unwarranted prosecution." *Id.* §1. The Paul Weiss Order vaguely suggested that "employees of Paul Weiss" may "threaten national security," *id.* §5, and it asserted that they "should not have access to our Nation's secrets," *id.* §1. It proceeded to impose the same basic punishments as the Perkins Order, including stripping all Paul Weiss employees of their security clearances, requiring government contractors to disclose attorney-client relationships with Paul Weiss, and restricting Paul Weiss employees' ability to access federal buildings, engage with federal employees, and obtain federal employment. Although the Paul Weiss Order punished only that firm, its "Background" section stated that "[g]lobal law firms have for years played an outsized role in undermining the judicial

process and in the destruction of bedrock American principles." *Id.* §1. That section singled out representations taken "pro bono, or ostensibly 'for the public good,'" and declared that "[m]y Administration will no longer support taxpayer funds sponsoring such harm." *Id.*

On March 22, 2025, the President issued another directive aimed at law firms and lawyers he disfavors, titled "Preventing Abuses of the Legal System and the Federal Court," Ex.28, accompanied by yet another "fact sheet," Ex.29. This time, the President asserted that "far too many attorneys and law firms have long ignored" the ethical requirements of Federal Rule of Civil Procedure 11 "when litigating against the Federal Government or in pursuing baseless partisan attacks." Ex.28. In particular, the President accused "Marc Elias, founder and chair of Elias Law Group LLP"—which describes itself as "a mission-driven firm committed to helping Democrats win"[3]—of "grossly unethical misconduct" in connection with his 2016 representation of "failed Presidential candidate Hillary Clinton." *Id.*

In light of these purported "concerns," the President "direct[ed] the Attorney General to seek sanctions against attorneys and law firms who engage in frivolous, unreasonable, and vexatious litigation against" the federal government. *Id.* The President also directed the Attorney General "to review conduct by attorneys or their law firms in litigation against the Federal Government over the last 8 years" for potential "misconduct." *Id.* And the President directed the Attorney General to consider whether allegedly improper attorney conduct warrants "reassessment of security clearances held by the attorney or termination of any Federal contract for which the relevant attorney or law firm has been hired to perform services." *Id.*

On March 25, 2025, the President issued an executive order and fact sheet targeting Jenner & Block LLP ("Jenner"). Ex.30 ("Jenner Order"). The Jenner Order lambastes former Jenner

---

[3] Elias Law Group, *About*, https://tinyurl.com/yyutr6h8 (last visited Apr. 7, 2025).

partner Andrew Weissmann for supposedly "engaging in partisan prosecution as part of Robert Mueller's entirely unjustified investigation," which the order calls an "overt demand that the Federal Government pursue a political agenda against me." *Id.* §1. The Jenner Order imposes the same basic punishments as the Perkins and Paul Weiss Orders. *See id.* §§2-5.

>    **2.    The President issues an Order and "Fact Sheet" targeting WilmerHale.**

On March 27, 2025, the President issued the WilmerHale Order. The Order begins by announcing the Administration's "commit[ment] to addressing the significant risks associated with law firms, particularly so-called 'Big Law' firms, that engage in conduct detrimental to critical American interests." Order §1. It asserts that "[m]any firms take actions that threaten public safety and national security, limit constitutional freedoms, degrade the quality of American elections, or undermine bedrock American principles." *Id.* And it criticizes "law firms" for "regularly conduct[ing] this harmful activity through their powerful pro bono practices, earmarking hundreds of millions of their clients' dollars for destructive causes." *Id.*

The Order next turns to WilmerHale, describing it as "yet another law firm that has abandoned the profession's highest ideals and abused its pro bono practice to engage in activities that undermine justice and the interests of the United States." *Id.* As one "example," the Order asserts that WilmerHale "engages in obvious partisan representations to achieve political ends," *id.*, an apparent reference to WilmerHale's representation of President Trump's political opponents—namely, the Democratic National Committee, state-level Democratic Party organizations, and the presidential campaigns of Joe Biden and Kamala Harris. *See* Dkt.3-2 ¶55 ("Berman Decl."). The Order's second "example" of WilmerHale's supposedly "egregious conduct" is "support[ing] efforts to discriminate on the basis of race," Order §1, an apparent reference to WilmerHale's representation of Harvard University in the *Students for Fair Admissions* litigation. The Order next accuses WilmerHale of "back[ing] the obstruction of efforts

to prevent illegal aliens from committing horrific crimes and trafficking deadly drugs within our borders," *id.*, an apparent reference to the Firm's litigation-related pro bono practice and successful challenges to certain immigration-related policies during President Trump's first term. *See* Berman Decl. ¶52. Finally, the Order accuses WilmerHale of "further[ing] the degradation of the quality of American elections, including by supporting efforts designed to enable noncitizens to vote," Order §1, an apparent reference to WilmerHale's involvement in challenges to state voter-identification and voter-registration laws. *See* Berman Decl. ¶¶45, 54.

Like the Perkins, Paul Weiss, and Jenner Orders, the WilmerHale Order singles out for special opprobrium certain current and former Firm partners—in particular, retired partners Robert S. Mueller III and James L. Quarles III and current partner Aaron M. Zebley. Mr. Mueller accepted the appointment as Special Counsel, and was assisted by Mr. Quarles and Mr. Zebley, in the investigation that the Department of Justice initiated during President Trump's first term into allegations of Russian interference in the 2016 presidential election. *See id.* ¶¶36-41. The Order proclaims that Mr. "Mueller's investigation epitomizes the weaponization of government," describing it as "one of the most partisan investigations in American history." Order §1. The Order accuses Mr. Mueller, Mr. Zebley, and Mr. Quarles of "weaponiz[ing] the prosecutorial power to upend the democratic process and distort justice." *Id.* And the Order attacks WilmerHale for "reward[ing]" these former partners by "welcoming them" back "to the firm" after they completed their investigation. *Id.*

The Order directs the Attorney General, the Director of National Intelligence, and all other relevant agency heads to "immediately take steps consistent with applicable law to suspend any active security clearances held by individuals at WilmerHale, pending a review of whether such clearances are consistent with the national interest." *Id.* §2(a). The Order further provides that

agency heads "shall," to the extent permissible by law, "require Government contractors to disclose any business they do with WilmerHale and whether that business is related to the subject of the Government contract." *Id.* §3(a). "The heads of agencies shall review all contracts with WilmerHale or with entities that disclose doing business with WilmerHale…." *Id.* §3(b). The Order then directs agency heads "to terminate any contract" with WilmerHale "to the maximum extent permitted by applicable law." *Id.* §3(b)(i). "Within 30 days of the date of this order, agencies shall submit to the … Office of Management and Budget an assessment of contracts with WilmerHale or with entities that do business with WilmerHale effective as of the date of this order and any actions taken with respect to those contracts in accordance with this order." *Id.* §3(b)(ii).

In addition, the Order directs agencies to issue guidance "limiting official access" to federal government buildings "to employees of WilmerHale when such access would threaten the national security of or otherwise be inconsistent with the interests of the United States." *Id.* §5(a). The Order also directs that "heads of agencies shall provide guidance limiting Government employees acting in their official capacity from engaging with WilmerHale employees to ensure consistency with the national security and other interests of the United States." *Id.* §5(a). And the Order directs agency officials to "refrain from hiring employees of WilmerHale, absent a waiver from the head of the agency, made in consultation with the Director of the Office of Personnel Management, that such hire will not threaten the national security of the United States." *Id.* §5(b).

Like the Perkins, Paul Weiss, and Jenner Orders, the WilmerHale Order vaguely references "the Constitution and the laws of the United States" without citing any particular constitutional or statutory provision purporting to authorize the President's actions. Also like those prior orders, the WilmerHale Order was accompanied by an (even more incendiary) Fact Sheet. *See* Ex.45. The Fact Sheet brands WilmerHale a "rogue law firm[]," summarizes the various retaliatory

actions against WilmerHale, and asserts that the Order will "ensure accountability for past misconduct" and help "to end weaponization of the Federal government." *Id.*

### 3. Four prominent law firms avoid the Order's consequences by pledging massive pro bono support for causes the President supports.

On March 20, 2025, President Trump announced that he had "agreed to withdraw his March 14, 2025 Executive Order" regarding Paul Weiss "in light of a meeting with [the firm's] Chairman, Brad Karp, during which Mr. Karp acknowledged the wrongdoing of former Paul, Weiss partner, Mark Pomerantz, the grave dangers of Weaponization, and the vital need to restore our System of Justice." Ex.24. According to the President's announcement, Paul Weiss agreed that "[l]aw firms should not favor any political party when it comes to choosing their clients," and that it "will not deny representation to clients, including in pro bono matters and in support of non-profits, because of the personal political views of individual lawyers." *Id.*

The President further stated that Paul Weiss had agreed to undertake "pro bono matters that represent the full spectrum of political viewpoints of our society, whether 'conservative' or 'liberal'"; "dedicate the equivalent of $40 million in pro bono legal services over the course of President Trump's term to support the Administration's initiatives"; "not adopt, use, or pursue any DEI policies"; and submit "to … a comprehensive audit of all of its employment practices." *Id.* On March 21, 2025, the President issued an order formally rescinding the Paul Weiss Order, citing the firm's "remarkable change of course" but not otherwise explaining why the "national security" concerns referenced in issuing the March 14 Order had dissipated just one week later. Ex.25.

Following the President's rescission of the Paul Weiss Order, three other large law firms have staved off potential executive orders by entering into similar agreements with the President. On March 28, 2025, the President announced an agreement with Skadden, Arps, Slate, Meagher & Flom LLP ("Skadden") under which the firm pledged (1) to devote "at least $100 Million

Dollars in pro bono Legal Services … to causes that the President and Skadden both support"; (2) to ensure that its "pro bono activities represent the full political spectrum"; (3) to eschew race-conscious employment practices and diversity, equity, and inclusion initiatives; and (4) not to "deny representation to clients," "including in pro bono matters," "because of the personal political views of individual lawyers."  Ex.34.  The President also stated that Skadden had declared its "strong commitment to ending the Weaponization of the Justice System and the Legal Profession." *Id.* at 2.  Just last week, the President announced materially similar agreements with Willkie Farr & Gallagher LLP and Milbank, LLP, with each firm pledging to devote "at least $100 Million Dollars" in pro bono legal services to causes the President "support[s]."  Ex.36; Ex.39.  The latest announcement included a "Statement from the White House" that "[t]he President continues to build an unrivaled network of Lawyers, who will put a stop to Partisan Lawfare in America." Supplemental Decl. of Bruce M. Berman ¶24 ("Suppl. Decl.").

### B.     Courts Immediately Enjoin These Unprecedented Executive Orders.

Rather than capitulate to the President's demands, Perkins Coie, Jenner & Block, and WilmerHale chose to assert their constitutional rights, filing lawsuits challenging the executive orders directed at their respective firms.

The Perkins Order was issued on March 6, 2025, and Perkins Coie filed its complaint and motion for preliminary relief on March 11, 2025.  Judge Howell held a hearing the very next day, after which she concluded that the Perkins Order likely violates "at least" three constitutional provisions:  (1) The First Amendment, as the order "unlawfully retaliates against [the firm] for protected speech" and "constitutes unlawful viewpoint discrimination"; (2) the Fifth Amendment, as Perkins Coie "was not even given the most basic protection of advance notice" or an opportunity to be heard, and the order is likely "void for vagueness"; and (3) the Sixth Amendment, as the order interferes with criminal defendants' right to choose their own counsel and right to receive

effective assistance of counsel. *Perkins* Tr. 74:7-9, 74:22-75:1, 83:4-6, 88:1-15, 89:23-90:7. Judge Howell granted Perkins Coie's motion for a temporary restraining order, concluding that the Perkins Order "threatens to significantly undermine the integrity of our entire legal system and the ability of all people and groups to access justice." *Id.* 103:10-18.

The Jenner Order was issued on March 25, 2025, and Jenner sued and sought preliminary relief three days later. Judge Bates held a hearing that evening. Like Judge Howell, he found likely violations of the First, Fifth, and Sixth Amendments. *See Jenner* Tr. 48:1-3 (First Amendment retaliation); *id.* 50:16-18 (viewpoint discrimination); *id.* 50:19-51:5 (right to counsel). Judge Bates issued a temporary restraining order, noting that the Jenner Order "threatens the existence of the firm," *id.* 51:18-20, and that the President's "condemn[ation]" of "pro bono practice by Jenner [and] other large firms" is particularly "disturbing." *Id.* 53:22-54:21.

Executive Order 14250, targeting WilmerHale, was issued the evening of March 27, 2025. WilmerHale sued and sought preliminary relief the very next morning. This Court held a hearing at 4:30pm that same day and entered a temporary restraining order that evening. The Court had "no doubt" that the Order is a "retaliatory action" that likely violates the First Amendment, as its "retaliatory nature … is clear from its face." TRO.2. The Court similarly had no difficulty finding irreparable harm; in addition to "constitutional harm," the Court concluded that WilmerHale "faces crippling losses and its very survival is at stake." TRO.2-3. Finally, the Court held that "the balance of the equities and public interest" favored preliminary relief, as WilmerHale faces "severe" injuries to its "business and reputation," which "would spill over to its clients and the justice system at large." TRO.4.

On March 31, 2025, at the parties' joint request, the Court entered an expedited schedule for briefing dispositive motions and extended its temporary restraining order until final judgment.

## ARGUMENT

**I.    WilmerHale Is Entitled To Summary Judgment.**

**A.    The Order Violates the First Amendment Several Times Over.**

**1.    The Order is a textbook example of retaliation for constitutionally protected expression.**

It is bedrock law that "the First Amendment prohibits government officials from retaliating against individuals for engaging in protected speech." *Lozman v. City of Riviera Beach*, 585 U.S. 87, 90 (2018).  That is equally true whether the government does so directly or by "attempt[ing] to coerce private parties in order to punish or suppress views that the government disfavors." *Vullo*, 602 U.S. at 180.  And given the crucial political, social, and expressive purposes that litigation serves, "state action designed to retaliate against and chill an attorney's advocacy for his or her client strikes at the heart of the First Amendment." *Eng v. Cooley*, 552 F.3d 1062, 1069 (9th Cir. 2009) (brackets omitted).  Simply put, blacklisting and sanctioning law firms for representing the President's political opponents, devoting resources to causes the President dislikes, or hiring attorneys who have investigated the President is anathema to our constitutional order.

To prevail on its claim for First Amendment retaliation, WilmerHale must establish (1) that it "engaged in conduct protected under the First Amendment"; (2) that the government "took some retaliatory action sufficient to deter a person of ordinary firmness in [WilmerHale]'s position from speaking again"; and (3) "a causal link between the exercise of a constitutional right and th[at] adverse action." *Aref v. Lynch*, 833 F.3d 242, 258 (D.C. Cir. 2016).  While most litigation requires discovery to unearth retaliatory motive, all three elements are readily established here, as the Order is openly retaliatory.  *See* TRO.2; *Perkins* Tr. 74:22-78:17; *Jenner* Tr. 46:23-48:5.  The Order avowedly—and severely—punishes WilmerHale for its attorneys' advocacy on behalf of clients and causes the President does not like.  And it does so for the avowed purpose of deterring other

14

law firms from engaging in the same constitutionally protected conduct.

*First*, WilmerHale's advocacy on behalf of its clients is unquestionably protected by the First Amendment. The Supreme Court has held that "advocacy by [an] attorney to the courts" is "speech and expression" that enjoys First Amendment protection. *Velazquez*, 531 U.S. at 542-49; *accord* TRO.2. "[G]overnment action seeking to limit an attorney's advocacy 'on behalf of' a client implicates the client's, as well as the attorney's, First Amendment interests—the attorney is, after all, the client's speaker hired to deliver the client's message." *Eng*, 552 F.3d at 1069. In short, WilmerHale "attorneys and [clients] retain their First Amendment rights even as participants in the judicial process," and they may not constitutionally be punished for taking positions in court that the President does not like. *In re Halkin*, 598 F.2d 176, 187 (D.C. Cir. 1979), *overruled in part on other grounds by Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 31-32, 37 (1984).

The Petition Clause also protects "filing a complaint in court," *McDonald v. Smith*, 472 U.S. 479, 484 (1985), and "[t]he right of access to a court" to prosecute a civil case for "redress of alleged wrongs," *Bill Johnson's Rests., Inc. v. NLRB*, 461 U.S. 731, 741 (1983). And freedom of association protects "[t]he right to retain and consult an attorney," *Denius v. Dunlap*, 209 F.3d 944, 953-54 (7th Cir. 2000) (collecting cases), which is "an indispensable means of preserving other individual liberties," *Roberts v. U.S. Jaycees*, 468 U.S. 609, 618 (1984). WilmerHale's advocacy is thus protected by the First Amendment several times over. *See Eng*, 552 F.3d at 1069 ("The First Amendment's prohibition against state retaliation for *hiring* a lawyer would ring hollow if the state could simply retaliate for the lawyer's *advocacy* on behalf of the client."); *Ukrainian-Am. Bar Ass'n v. Baker*, 893 F.2d 1374, 1380 (D.C. Cir. 1990) ("[The First Amendment] is violated if the Government affirmatively interferes with constitutionally protected litigation.").

*Second*, the Order plainly "constitutes a sufficiently adverse action" against WilmerHale to deter an entity of "ordinary firmness" and thus "to give rise to an actionable First Amendment claim." *Hous. Cmty. Coll. Sys. v. Wilson*, 595 U.S. 468, 477 (2022); *accord* TRO.2.  The Order punishes the Firm in myriad ways, including: (1) vilifying it as a bad actor that "engage[s] in conduct detrimental to critical American interests," Order §1; (2) immediately suspending its employees' security clearances, *id.* §2; (3) forcing its clients to disclose their relationships with the Firm, *id.* §3(a); (4) seeking to terminate federal contracts held by Firm clients, *id.*; and (5) restricting Firm employees' access to federal officials, buildings, services, materials, and employment, *id.* §§2(b), 5.

These draconian punishments easily meet the standard for "adverse action."  They not only *could* "deter a person of ordinary firmness"; these exact same sanctions *have* deterred four other firms from engaging in First Amendment activity.  There can be no serious dispute that the Order will—if not declared unconstitutional and permanently enjoined—"damage WilmerHale's business prospects," "disrupt its relations with current and future clients," and "impede its lawyers' ability to zealously advocate as counsel."  Berman Decl. ¶76; *see id.* ¶¶77-81.  Proving the point, on March 19, 2025, Paul Weiss attorneys moved to withdraw from a major criminal case, explaining that the defendant "terminated [the firm]'s representation of him" "[i]n response to the March 14 Executive Order," out of "concern[] that Paul, Weiss's ongoing involvement in the matter could in and of itself prejudice the review of his case."  Ex.23.  And even after this Court entered its temporary restraining order, WilmerHale clients have continued to express concern about the Firm's ability to continue to represent them without government interference.  Suppl. Decl. ¶10.  At least one client terminated an engagement with WilmerHale due to the Order alone.  *Id.* ¶6.  Several other clients have paused WilmerHale's engagements in government-facing

matters or declined to engage the Firm for new work, while others have reduced the Firm's role in a representation.  *Id.* ¶¶8-9.  Those grave harms would "deter a [lawyer] of ordinary firmness" from representing the President's political opponents or advancing positions that are adverse to his interests.  *Cf. Aref*, 833 F.3d at 258.  Indeed, that is the Order's whole point.

The coercive impact of these adverse actions is magnified by the fact that they have been taken by the President himself.  The "objective inquiry" into whether adverse action is sufficiently deterrent takes into account "[t]he power that a government official wields," for the commonsense reason that "the greater and more direct the government official's authority, the less likely a person will feel free to disregard a directive from the official."  *Vullo*, 602 U.S. at 191-92.  It is hard to imagine a "greater and more direct" threat than one personally delivered by the President of the United States to be carried out by all federal agencies.  And the Order cannot be "'reasonably understood'" as anything other than a "threat[ of] adverse action" against those who would follow in WilmerHale's footsteps, *id.* at 189 (citing *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 67-68 (1963)), as it directs agency heads to bar WilmerHale attorneys from doing the day-to-day work necessary to represent their clients, particularly in government-facing practices.  Moreover, the directive for agencies to terminate contracts with any WilmerHale client who does not disassociate from the Firm "violate[s] the First Amendment through coercion of a third party."  *Id.* at 191.  As Judge Howell concluded with respect to the Perkins Order, "the plain language of [the] Executive Order … confirms that … government officials are attempting to … punish and suppress views that the government, or at least the current administration, disfavors."  *Perkins* Tr. 79:15-20.

Finally, the extraordinary capitulations by Paul Weiss, Skadden, Willkie Farr, and Milbank confirm that these efforts are working.  These large and successful firms viewed the threat of similar sanctions as sufficiently dire to agree to a series of demands, including their commitments

to devote a collective $340 million in pro bono resources "to causes that the President … support[s]," Ex.34; *accord* Ex.24; Ex.36; Ex.39, to avoid these same consequences. These actions well illustrate that, given the realities of the legal market, entities of "ordinary firmness" not only could be, but in fact have been deterred by blacklisting and sanctions included in the Order.

*Third*, it is unmistakable from the face of the Order that the President's "retaliatory motive" was "a 'but-for' cause" of the injuries the Order inflicts on WilmerHale—i.e., "that the adverse action against [the Firm] would not have been taken absent the retaliatory motive." *Nieves v. Bartlett*, 587 U.S. 391, 398-99 (2019). The Order admits on its face that it is animated by WilmerHale's alleged "engage[ment] in obvious partisan representations to achieve political ends," its defense of a client's race-conscious college admission policies, its advocacy on behalf of "illegal aliens," its involvement in litigation related to "American elections," and its employment of Mr. Mueller and other lawyers who investigated whether foreign entities interfered in the 2016 presidential election. Order §1. The accompanying Fact Sheet underscores that the Order is designed to punish WilmerHale for representing clients in litigation—in other words, for engaging in First Amendment activity. It asserts, for example, that WilmerHale has "abused its pro bono practice to engage in activities that undermine justice and the interests of the United States." Ex.45. As explained, moreover, the Order is one of several similar orders explicitly targeting law firms because they represented the President's perceived political and personal opponents or employed lawyers who have undertaken public representations adverse to the President—in other words, punishing firms for their First Amendment-protected advocacy and associations. Berman Decl. ¶¶57-72; Compl. ¶¶94-118.

In sum, it is hard to imagine a more blatant example of retaliation against protected speech, association, and petitioning. WilmerHale is entitled to summary judgment on Count I.

### 2.    The Order openly discriminates against disfavored speakers and viewpoints.

The Order violates another core First Amendment principle: the prohibition on viewpoint discrimination.    "[N]o official, high or petty, can prescribe what shall be orthodox in politics, … religion, or other matters of opinion."  *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943).  Needless to say, the higher the official, the more problematic an effort to prescribe orthodoxy and punish disfavored viewpoints becomes.  While the President may "share h[is] views freely and criticize particular beliefs," the First Amendment forbids "us[ing] the power of the State to punish or suppress disfavored expression."  *Vullo*, 602 U.S. at 188.  "The government must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction."  *Rosenberger v. Rector of Univ. of Va.*, 515 U.S. 819, 829 (1995).

The Order discriminates based on viewpoint in multiple respects.  First, it attributes to WilmerHale certain viewpoints and then punishes the Firm and all its employees and clients because the President disagrees with those viewpoints.  For example, the Order targets WilmerHale for using "its pro bono practice to engage in activities that"—in the President's view—"undermine justice and the interests of the United States."  Order §1.  The Order criticizes WilmerHale's pro bono work as "partisan" and "political," specifically criticizing its defense of a client's race-conscious college admission policies ("efforts to discriminate on the basis of race"), its alleged "obstruction" of the Administration's immigration-enforcement policies, and its involvement in litigation regarding "American elections," which the Order derides—inaccurately—as "efforts designed to enable noncitizens to vote."  *Id.*  The Order characterizes all these representations as a "weaponization of the justice system."  *Id.*  In short, the Order punishes the Firm for taking on clients and advancing arguments with which the President disagrees.  Indeed, President Trump's

decision to withdraw the Paul Weiss Order after that firm agreed to provide $40 million in pro bono services to support the Administration's initiatives, *see* SOF ¶¶89-91—and the President's acceptance of similar, though even more lavish, offers of pro bono services for favored causes from three other firms—confirms beyond all doubt that the Order is designed to punish disfavored viewpoints unless and until WilmerHale (and others) agree to promote viewpoints the President favors. Tellingly, the President views these agreements as "build[ing] an unrivaled network of Lawyers, who will put a stop to Partisan Lawfare in America." Suppl. Decl. ¶24.

Viewpoint discrimination is particularly evident with respect to the Order's direction to prioritize WilmerHale for investigation of recruiting and advancement policies that the Perkins Order describes as widely shared among large law firms. *See* Perkins Order §4. The evident basis for prioritizing WilmerHale over other firms with materially analogous policies is the viewpoint that the Order attributes to WilmerHale's representations. And as the threats of investigation make clear, that viewpoint discrimination "caus[es] precisely th[e] same harm" regardless of whether WilmerHale or its attorneys actually have the political affiliations or viewpoints that the President attributes to them. *Heffernan v. City of Paterson*, 578 U.S. 266, 273-74 (2016).

The Order also explicitly targets WilmerHale based on the speech and viewpoints of Mr. Mueller and those who assisted him, and based on WilmerHale's association with them and its own speech about their public service. The President has repeatedly expressed the view that Mr. Mueller's federal investigation was a "hoax" and a partisan "witch hunt." SOF ¶¶63-65. The Order likewise asserts that Mr. "Mueller's investigation epitomizes the weaponization of government." Order §1. Moreover, the Order not only specifically criticizes WilmerHale for "welcoming" Mr. Mueller, Mr. Zebley, and Mr. Quarles back "to the [F]irm"—characterizing this as "reward[ing]" them for their part in the investigation—but also faults the Firm for "claim[ing]"

that Mr. Mueller "'embodies the highest value[s] of our firm and profession.'"  *Id.*  While the President is free to disagree with that assessment (or with viewpoints WilmerHale attorneys have advanced personally and/or for clients), invoking that disagreement as the justification for multiple adverse government actions (all of which apparently can be lifted in exchange for a change of viewpoint) is undisguised viewpoint discrimination.

Similarly, while the President may disagree with Mr. Mueller's decision to accept the invitation (by President Trump's own Justice Department) to serve as Special Counsel, the viewpoints expressed in his report, or WilmerHale's decision to welcome him back after his service, the President may not penalize the Firm based on its association with Mr. Mueller and his (real or perceived) viewpoints.  Nor may the President punish WilmerHale attorneys' expressive decisions to represent certain clients or causes and not others, *see infra* pp.25-26—even if he deems certain lawsuits "harmful" or "detrimental to critical American interests" and others more worthy of pursuing, Order §1.  Government action "cannot be aimed at the suppression of ideas thought inimical to the Government's own interest," whether those ideas are expressed in the town square or by "litigants and their attorneys."  *Velazquez*, 531 U.S. at 548-49.  WilmerHale is entitled to summary judgment on Count II.

### 3.    The Order violates the Petition Clause.

The Order also violates the First Amendment right "to petition the Government for a redress of grievances."  U.S. Const. amend. I.  The Supreme Court has held that "the right to petition extends to all departments of the Government," including "administrative agencies" and "courts."  *Cal. Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 510 (1972).  Accordingly, the Court has treated "a lawsuit" as a form of "petition" within the meaning of the Petition Clause. *Borough of Duryea v. Guarnieri*, 564 U.S. 379, 390 (2011); *see id.* at 387 (collecting "precedents confirm[ing] that the Petition Clause protects the right of individuals to appeal to courts and other

forums established by the government for resolution of legal disputes"). The Order violates the Petition Clause in at least three ways.

*First*, the Supreme Court has long accepted "the proposition that when a person petitions the government for redress"—e.g., by filing a lawsuit—"the First Amendment prohibits any sanction on that action … so long as the petition was in good faith." *Nader v. Democratic Nat'l Comm.*, 567 F.3d 692, 696 (D.C. Cir. 2009) (discussing the *Noerr-Pennington* doctrine). The Order violates that rule by sanctioning WilmerHale attorneys for bringing good-faith—and, in many cases, successful—claims on behalf of their clients. *See* Order §1. Simply put, the Petition Clause does not allow the President to punish WilmerHale or its clients for "fil[ing] lawsuits against the Trump Administration," *cf.* Ex.15 (Perkins Fact Sheet), or declining to commit millions of dollars to "causes that President Trump … support[s]," *cf.* Ex.36 ¶1 (Willkie Farr Agreement).

*Second*, the Order's directive to federal agencies to prohibit their employees from engaging with WilmerHale employees precludes the Firm from petitioning the government on its own or its clients' behalf. The Order prohibits WilmerHale's employees from—in many cases—meeting or even speaking with the very government officials who could hear such a petition (e.g., administrative law judges, prosecutors, and regulators).

*Third*, the directive to exclude WilmerHale employees from all federal buildings prevents WilmerHale employees from entering federal buildings that house judicial and administrative proceedings. The Order also arbitrarily withdraws WilmerHale attorneys' access to the sensitive information they need to represent clients in proceedings involving classified subject matter.

Because the Order "significantly impairs" the right to petition, it is subject to "exacting scrutiny." *Patchak v. Jewell*, 109 F.Supp.3d 152, 163 (D.D.C. 2015) (Leon, J.) (brackets omitted) (quoting *Elrod v. Burns*, 427 U.S. 347, 362 (1976)). That is, the government must show that the

Order serves "a sufficiently important interest and employs means closely drawn to avoid unnecessary abridgment" of the right. *E.g.*, *Buckley v. Valeo*, 424 U.S. 1, 25 (1976) (per curiam). The government comes nowhere close to doing so. The lone interest underlying the Order—trying to impede the ability of law firms to represent clients in matters the President does not like—is not even legitimate, much less an "important" governmental interest. Nor is the Order narrowly drawn to achieve that impermissible goal, as it burdens large swathes of petitioning activity that have nothing to do with the narrow set of causes and clients the President disfavors. It is, for example, highly unlikely that WilmerHale's world-class intellectual property practice has done anything to contribute to the grievances in §1 of the Order, yet the Order purports to bar the Firm's intellectual property lawyers from appearing before the Patent and Trademark Office. WilmerHale is entitled to summary judgment on Count III.

### 4.    The Order abridges the freedom of association.

The Order's demand that government contractors "disclose any business they do with WilmerHale" violates WilmerHale's clients' First Amendment freedom of association. "[C]ompelled disclosure of affiliation with groups engaged in advocacy may constitute as effective a restraint on freedom of association as other forms of governmental action." *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 606 (2021) (alterations omitted) (quoting *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 462 (1958)).

The Order subjects WilmerHale clients who have government contracts to risks of economic reprisal and other forms of governmental hostility simply because they have chosen to retain and associate with WilmerHale. The Order is a thinly veiled threat to government contractors who have associated themselves with WilmerHale that they are at risk of losing those contracts as a result. The Order provides that "[w]ithin 30 days of the date of this order, agencies shall submit to the Director of the Office of Management and Budget an assessment of contracts

with WilmerHale or with entities that do business with WilmerHale effective as of the date of this order and any actions taken with respect to those contracts in accordance with this order." Order §3. That is a naked secondary boycott of government contractors who do business with WilmerHale. On any reasonable understanding of the Order, any government contractor who has associated with WilmerHale can expect economic and other repercussions in short order. *See* Suppl. Decl. ¶5. Indeed, the Fact Sheet admits this, stating that "the Federal Government will terminate contracts that involve WilmerHale" in a purported effort to "ensure taxpayer dollars no longer go to contractors whose earnings subsidize activities not aligned with American interests." Ex.45. The obvious and acknowledged goal of the demand for disclosure is thus to chill clients' constitutionally protected activity of choosing to retain and associate with WilmerHale.

This burden on the right of association triggers exacting scrutiny, which the Order abjectly flunks. *See Ams. for Prosperity*, 594 U.S. at 607. Again, the Order's lone interest—penalizing disfavored advocacy—is not even a legitimate one. *See supra* p.23. Nor is it remotely tailored to that (illegitimate) end. "Narrow tailoring is crucial where First Amendment activity is chilled—even if indirectly—'because First Amendment freedoms need breathing space to survive.'" *Ams. for Prosperity*, 594 U.S. at 609 (alterations omitted) (quoting *NAACP v. Button*, 371 U.S. 415, 433 (1963)). Forced disclosure of "any business [clients] do with WilmerHale," Order §3(a), even if not related to a government contract or litigation with which the President takes issue, is not even arguably tailored to any professed interest in avoiding subsidizing particular litigation. *See USAID v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 214-15 (2013). Nor is forced disclosure of "whether that business is related to *the subject of* the Government contract." Order §3(a) (emphasis added). The disclosures are instead designed to leverage the government's control over federal funds to punish WilmerHale. But "Government officials cannot attempt to coerce private parties in order

24

to punish or suppress views that the government disfavors." *Vullo*, 602 U.S. at 180.

WilmerHale has standing to challenge this restriction both on behalf of its clients and in its own right. WilmerHale's clients are hindered from bringing claims themselves because, to do so, they would have to disclose their business with the Firm—the precise First Amendment harm WilmerHale seeks to prevent. *See Kowalski v. Tesmer*, 543 U.S. 125, 130-31 (2004). And WilmerHale has standing in its own right because the First Amendment protects its attorneys' expressive choices about which clients and causes they choose to associate with through representation. "[T]he First Amendment offers protection when an entity engag[es] in … expressive activity, including compiling and curating others' speech." *Moody v. NetChoice, LLC*, 603 U.S. 707, 731 (2024). That principle applies not only to newspapers and social media companies but also to attorneys' decisions about which clients to associate with—particularly when it comes to pro bono matters. WilmerHale attorneys have a First Amendment right to take on pro bono clients such as the eight inspectors general who are challenging their recent termination by the President, the jurisdictions that challenged federal immigration-related policies during the President's first term, and the United Farm Workers that resisted a Department of Labor rule that would have depressed migrant farmworkers' wages. *See* Berman Decl. ¶¶52-53.

To be sure, WilmerHale attorneys have diverse views—political and otherwise—that inform their decisions about what matters to pursue. *See id.* ¶¶10, 15. "But a private speaker does not forfeit constitutional protection simply by combining multifarious voices, or by failing to edit their themes to isolate an exact message as the exclusive subject matter of the speech." *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 569-70 (1995). Simply put, the Order restricts WilmerHale attorneys' constitutionally protected "'discretion in the selection and presentation' of" the cases on which they choose to work, and particularly those they agree to

25

handle pro bono, which itself is a form of "'speech activity.'"  *NetChoice*, 603 U.S. at 731.  The government cannot punish WilmerHale for its attorneys' expressive choices about which clients to represent.  WilmerHale is entitled to summary judgment on Count IV.

**B.    The Order Exceeds the President's Authority and Violates the Separation of Powers.**

In addition to violating the First Amendment, the Order exceeds the President's authority and interferes with federal courts' exercise of "[t]he judicial Power."  U.S. Const. art. III, §1.

It is "black letter law" that the President's power to issue an executive order "'must stem either from an act of Congress or from the Constitution itself.'"  *Minnesota v. Mille Lacs Band of Chippewa Indians*, 526 U.S. 172, 188-89 (1999); *accord Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952).  The Order identifies no statutory authority that empowers the President to sanction a law firm for representing his political opponents or handling lawsuits that he perceives to be contrary to his interests or those of the United States.[4]  That is unsurprising; no statute confers such authority, and any statute that purported to do so would raise grave constitutional concerns.  *See Youngstown*, 343 U.S. at 588 ("The President's order does not direct that a congressional policy be executed in a manner prescribed by Congress—it [improperly] directs that a *presidential policy* be executed in a manner prescribed by the President." (emphasis added)).  The Order finds no support in the President's inherent Article II powers either.  There is no "executive practice, long pursued to the knowledge of the Congress and never before questioned," of Presidents using the office to punish law firms for taking on representations.  *See id.* at 610-11 (Frankfurter, J., concurring); *accord United States v. Midwest Oil Co.*, 236 U.S. 459,

---

[4] Indeed, the Order's restrictions on hiring WilmerHale employees squarely conflict with a statutory prohibition on "discriminat[ing] for or against" any "applicant for [federal] employment" based on factors—including "political affiliation"—that are not related to the applicant's ability to do the job.  5 U.S.C. §2302(b)(1)(E), (2), (3), (10), (12).

473-74 (1915).  No other President has even tried to claim such a power.

Nor could Article II reserve any such power to the President, as to do so would empower the President to interfere with "the proper exercise of the judicial power." *Velazquez*, 531 U.S. at 545.  In our adversarial system of litigation, "courts must depend" on attorneys to "present all the reasonable and well-grounded arguments necessary for proper resolution of [a] case." *Id.*  The separation of powers thus precludes either Congress or the Executive from attempting to "exclude from litigation those arguments and theories [it] finds unacceptable but which by their nature are within the province of the courts to consider." *Id.* at 546.  And while the legislature has authority to create or eliminate causes of action and to enact rules of professional conduct, courts have "inherent power[]" to determine whether an attorney (or a litigant) has "abuse[d] the judicial process" and "to fashion an appropriate sanction." *Goodyear Tire & Rubber Co. v. Haeger*, 581 U.S. 101, 107 (2017) (quoting *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44-45 (1991)).

The Order flouts these "accepted separation-of-powers principles," "threaten[ing] severe impairment of the judicial function." *Velazquez*, 531 U.S. at 544-46.  The imposition of draconian consequences on law firms that challenge executive action necessarily will deter other firms from doing so.  Indeed, there has been a noticeable dearth of major national law firms willing to challenge actions undertaken by the new Administration.  *See, e.g.*, Ex.41; Ex.42.  And while a great many law firms have signed amicus briefs supporting Perkins Coie, the 25 largest firms in the country—and 92 of the largest 100 firms—have remained silent. Ex.43.  The dearth of top law firms willing to take even paid representations adverse to the new Administration cannot help but impact our adversary system of justice.  The Order thus undermines the rule of law, and the victims include courts, which will receive less zealous advocacy from lawyers who pull their punches for fear of retribution.  That poses a serious threat to the "informed, independent" adversarial

presentation on which an "informed, independent judiciary" depends. *Velazquez*, 531 U.S. at 545.

To make matters worse, the Order attempts to sanction WilmerHale for its legal advocacy without providing the notice, opportunity to be heard, or proper adjudicative fact-finding that is a prerequisite to such sanctions. *See infra* pp.29-32. To the extent the Executive Branch believes a law firm has engaged in improper legal advocacy in a particular case, it may appeal to the judiciary to make appropriate findings and fashion an appropriate sanction. *See Goodyear*, 581 U.S. at 107. Even as to concluded litigation, Rule 60 and courts' inherent powers allow aggrieved parties to alert a court to serious misconduct. But the Executive Branch cannot simply take it upon itself to declare filings directed toward a coordinate branch of government to be so far beyond the pale as to warrant sanction. As the Supreme Court recently reiterated, the Constitution forbids "concentrat[ion] [of] the roles of prosecutor, judge, and jury in the hands of the Executive Branch." *SEC v. Jarkesy*, 603 U.S. 109, 140 (2024). Yet that is precisely what the Order tries to accomplish.

That some of the punishments the Order imposes relate to government contracting, *see* Order §3, does not alter the analysis.[5] To be sure, Congress can authorize the President to impose conditions on the receipt of federal funds. But when Congress funds an activity pursuant to its spending power, *see* U.S. Const. art. I, §8, it cannot "leverage funding to regulate speech outside the contours of the program itself." *USAID*, 570 U.S. at 214-15. And while the government may impose certain restrictions on government contractors, it may not terminate contracts because of a contractor's protected expression "on matters of public concern," or deny or terminate a

---

[5] In light of the "special" relationship between an attorney and his or her client, attorneys have third-party standing to contest government actions that impair their clients' abilities to exercise their constitutional rights—including the "right to obtain legal representation" of ones' choice. *DOL v. Triplett*, 494 U.S. 715, 720 (1990); *see Caplin & Drysdale, Chartered v. United States*, 491 U.S. 617, 623 n.3 (1989). WilmerHale thus has standing to challenge the Order's unconstitutional interference with its clients' rights not to be subject to unconstitutional conditions on federal government contracts.

government contract on a basis that infringes the contractor's constitutional rights. *Bd. of Cnty. Comm'rs v. Umbehr*, 518 U.S. 668, 674-75 (1996). Congress has not even purported to authorize the President to impose such sanctions on law firms that take on disfavored representations, and they are every bit as forbidden to the Executive Branch as they are to the Legislature.

On top of that, the Order—which effectively functions as a "prepared and proclaimed governmental blacklist[]"—"possess[es] almost every quality of [an unlawful] bill[] of attainder." *Joint Anti-Fascist Refugee Comm. v. McGrath*, 341 U.S. 123, 143-44 (1951) (Black, J., concurring). It punishes WilmerHale—and only WilmerHale—"without any formal investigation, trial, or even informal process." *See Perkins* Tr. 89:10-22. From the Founding, such measures have been "forbidden to both national and state governments." *McGrath*, 341 U.S. at 143-44 (Black, J., concurring). The notion "that the authors of the Constitution, who outlawed the bill of attainder, inadvertently endowed the executive with power to engage in the same tyrannical practices that had made the bill such an odious institution" beggars belief. *Id.* WilmerHale is entitled to summary judgment on Counts V and XI of its complaint.

### C.    The Order Violates Due Process and Equal Protection.

The Order also violates several basic safeguards enshrined in the Fifth Amendment.

1. The Fifth Amendment's Due Process Clause guarantees that "[n]o person shall … be deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V. To resolve a due process claim, courts perform a "familiar two-part inquiry," asking (a) whether the plaintiff has been "deprived of a protected interest," and (b) "if so, what process" was due. *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 428 (1982).

The Order deprives WilmerHale of at least three independently cognizable liberty and property interests. *First*, it interferes with the constitutionally protected right of the Firm and its attorneys to pursue their chosen profession, "the practice of law." *Schware v. Bd. of Bar Exam'rs*,

29

353 U.S. 232, 238 (1957).  The government denies the right to pursue one's chosen profession by an act that (1) "formally or automatically exclude[s]" someone from work on government contracts "or from other government employment opportunities," or (2) has "the broad effect of largely precluding" her "from pursuing her chosen career." *O'Donnell v. Barry*, 148 F.3d 1126, 1140-41 (D.C. Cir. 1998).  The Order does both.  It specifically prohibits WilmerHale, its employees, and its clients from working for the government.  Order §§2, 3, 5(b).  And it restricts attorneys' ability to represent clients in court and before government agencies, *id.* §5(a)—provisions that "largely preclud[e]" WilmerHale employees from providing effective legal services, *O'Donnell*, 148 F.3d at 1141.  *See* Berman Decl. ¶¶76-81.  No opportunity "to pursue other kinds of legal work … make[s] up for this loss of huge portions of" a law firm's "practice and the sole purpose of the work of many of" its attorneys and staff.  *Perkins* Tr. 84:19-23.

*Second*, the Order deprives WilmerHale of its "good name, reputation, honor, [and] integrity."  *Wisconsin v. Constantineau*, 400 U.S. 433, 437 (1971); *see also Perkins* Tr. 85:5-9.  The Supreme Court has made clear that Executive Branch "findings of wrongdoing" that "could have an adverse impact on [an entity's] reputation" must be issued in accordance with due process.  *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 256 (2012); *see, e.g.*, *Goss v. Lopez*, 419 U.S. 565, 574-75 (1975); *Nat'l Council of Resistance of Iran v. Dep't of State*, 251 F.3d 192, 204 (D.C. Cir. 2001).  The Order tarnishes the Firm's reputation in no uncertain terms, announcing that all WilmerHale attorneys are unworthy to work on government contracts (or for government contractors); possess national security information; enter government buildings; engage with government employees; receive government funds, property, or services; or be hired by government agencies.  *See* Order §§1, 2, 3, 5.  The Order also contains a long series of assertions about the purportedly "harmful" or "egregious" nature of WilmerHale's actions, stating (for

example) that the Firm "has abandoned the profession's highest ideals," "often … harm[s] [its] own clients," and is "bent on employing lawyers who weaponize the prosecutorial power to upend the democratic process and distort justice." *Id.* §1.

*Third*, the Order deprives WilmerHale of its constitutionally protected property interest in contracts with its clients. *See FDIC v. Mallen*, 486 U.S. 230, 240 (1988); *see also Toxco Inc. v. Chu*, 724 F.Supp.2d 16, 27 (D.D.C. 2010) ("[N]umerous courts have held that contracts between private parties may give rise to property interests sufficient to trigger … due process protections."). As discussed, the Order punishes WilmerHale's clients for contracting with the Firm by, for example, depriving them of government contracts. *Supra* p.10. This interferes with WilmerHale's "private contractual agreements … with its clients," effectively penalizing clients for choosing to follow through on their contractual obligations in their retention of the Firm. *Perkins* Tr. 86:6-8 (citing *UAW Loc. 737 v. Auto Glass Emps. Fed. Credit Union*, 72 F.3d 1243, 1250 (6th Cir. 1996), and *Brock v. Roadway Express*, 481 U.S. 252, 260 (1987) (plurality)); *see* Berman Decl. ¶77.

The President has imposed these crippling sanctions on WilmerHale with exactly zero process. At its core, due process requires "notice of the proposed official action and 'the opportunity to be heard at a meaningful time and in a meaningful manner.'" *Ralls Corp. v. Comm. on Foreign Inv. in U.S.*, 758 F.3d 296, 318 (D.C. Cir. 2014). "Both the Supreme Court and [the D.C. Circuit] have recognized that the right to know the factual basis for the action and the opportunity to rebut the evidence supporting that action are essential components of due process." *Id.* None of that was provided here. The government never notified WilmerHale that it was considering issuing any order against it. Berman Decl. ¶75. Nor has WilmerHale been given any "opportunity to speak up in [its] own defense," *Fuentes v. Shevin*, 407 U.S. 67, 81 (1972), including to refute the President's unfounded accusations or to explain why the sanctions are

unwarranted and unconstitutional.  Berman Decl. ¶75.  That is an open-and-shut due process violation.  WilmerHale is entitled to summary judgment on Count VI.

2. The Due Process Clause also embodies the "fundamental principle … that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required." *Fox*, 567 U.S. at 253.  A law is unconstitutionally vague if it "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." *United States v. Williams*, 553 U.S. 285, 304 (2008). "When speech is involved, rigorous adherence to those requirements is necessary to ensure that ambiguity does not chill protected speech." *Fox*, 567 U.S. at 253-54.  After all, vague laws risk chilling would-be speakers by forcing them "to 'steer far wider of the unlawful zone'" than they otherwise would "if the boundaries of the forbidden areas were clearly marked." *Baggett v. Bullitt*, 377 U.S. 360, 372 (1964).  For that reason, laws touching on speech must themselves speak "with narrow specificity." *Button*, 371 U.S. at 433.

The Order is unconstitutionally vague by any standard, because it gives WilmerHale no (let alone fair) notice of what it prohibits and how the Firm can avoid violating it.  While the Order leaves no doubt that WilmerHale is being punished because it has represented some of the President's political opponents and advanced positions he dislikes, the Order does not specify what aspect of WilmerHale's conduct triggered its massive sanctions.  It instead vaguely accuses the Firm of "tak[ing] actions that threaten public safety and national security, limit constitutional freedoms, degrade the quality of American elections, [and] undermine bedrock American principles"; "earmarking hundreds of millions of their clients' dollars for destructive causes"; and "abus[ing] its pro bono practice to engage in activities that undermine justice and the interests of the United States." Order §1.  Such nebulous allegations of un-American activities do not remotely

provide the notice due process requires.  *Cf. Watkins v. United States*, 354 U.S. 178, 208-15 (1957).

The Order is similarly vague about when, and to what extent, WilmerHale employees must be prevented from entering federal government buildings, "engaging with" federal employees, and being hired by the federal government.  Order §5.  It just directs agencies to impose these restrictions consistent with "national security" and "the interests of the United States," without offering any specificity about the content of those expansive terms.  *Id.*  Tellingly, in *Perkins*, government counsel "concede[d] that we don't know exactly what [a materially identical provision] means."  *Perkins* Tr. 88:21-23.  These standards are so amorphous as to invite arbitrary and discriminatory enforcement between and within agencies.  And they leave WilmerHale employees unable to ascertain when (let alone why) they may be prevented from entering government buildings, engaging with federal employees, or being hired by the federal government—and what, if anything, they could do to avoid such extraordinary sanctions. WilmerHale is entitled to summary judgment on Count VII.

3. The Equal Protection Clause of the Fourteenth Amendment, as incorporated against the federal government through the Fifth Amendment, protects all individuals and entities from unjust discrimination by the federal government.  *Bolling v. Sharpe*, 347 U.S. 497, 499 (1954).  When the government singles out particular private entities for adverse treatment, it must articulate a constitutionally legitimate justification for treating them differently from similarly situated entities.  *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (per curiam).  The justification cannot be arbitrary, irrational, or pretextual.  And "a bare desire to harm a politically unpopular group" is not a "legitimate state interest[]."  *City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 446-47 (1985) (ellipsis omitted).

The Order cannot be squared with these principles, as there is no rational justification for singling out WilmerHale. The Order's avowed goal is an impermissible one: collective punishment of WilmerHale—lawyers and non-lawyers alike—because of the constitutionally protected actions of a handful of its current and former attorneys. *See* Order §1. The government has no legitimate justification for singling out WilmerHale for extraordinary and punitive measures, particularly when the President himself has complained that certain practices are widespread among large law firms. *See id.*; *see also* Perkins Order §4. This singling out demonstrates that the Order was motivated by a bare intent to punish WilmerHale, which is reinforced by the President's public statements reflecting his deep-seated animus toward WilmerHale and desire to pursue a "personal vendetta" against it. *See Perkins* Tr. 101:24. That is a blatant equal protection violation. WilmerHale is entitled to summary judgment on Count VIII.

### D. The Order Violates WilmerHale Clients' Fifth and Sixth Amendment Rights to Engage Counsel of Their Choice.

On top of all that, the Order violates WilmerHale's clients' constitutional rights to establish and maintain attorney-client relationships. The Fifth Amendment protects the client's right to choose counsel and the lawyer's corresponding right to maintain that representation free from arbitrary or unjustified governmental interference. *See Triplett*, 494 U.S. at 720-21. The Order eviscerates this basic right by penalizing attorney and client alike for bringing potentially meritorious civil suits that the President views as "harmful." Order §1. In addition, the Sixth Amendment guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right … to have the Assistance of Counsel." U.S. Const. amend. VI. That guarantee includes both "the right to the effective assistance of counsel," *Strickland v. Washington*, 466 U.S. 668, 686 (1984), and the "right to choose one's own counsel," *Wheat v. United States*, 486 U.S. 153, 159 (1988). The Order deprives WilmerHale's clients of both—threatening a "fundamental" aspect of our country's

criminal justice system and the rule of law. *See Gideon v. Wainwright*, 372 U.S. 335, 344 (1963).

*First*, WilmerHale cannot effectively represent its clients if its employees are restricted from engaging with government employees and accessing government buildings, services, and materials. By attempting to "interfere[] with [WilmerHale's] professional obligation[s]" to its clients, the Order infringes upon clients' rights to effective counsel. *Wounded Knee Legal Def./Offense Comm. v. FBI*, 507 F.2d 1281, 1284 (8th Cir. 1974). Specifically, the Order directs "[t]he heads of agencies"—including the Department of Justice—to "limit[] Government employees acting in their official capacity from engaging with WilmerHale employees" and "limit[] official access from Federal Government buildings to employees of WilmerHale." Order §5(a). These restrictions impede WilmerHale attorneys from performing a huge range of tasks required of counsel, from conferring on discovery requests to negotiating plea agreements (and assisting clients in cooperating once plea agreements are struck) to interfacing with all manner of administrative and regulatory agencies. Because the Order threatens to block the Firm's attorneys from engaging in just such discussions on behalf of its clients, it threatens those clients' constitutional rights and the Firm's ability to effectively and zealously represent them. *See, e.g.*, *Perkins* Tr. 24:15-25:3, 92:5-14, 98:13-17; *Jenner* Tr. 50:19-60:5.

*Second*, the Order denies WilmerHale's clients the right to counsel of their choice. "The right to select counsel of one's choice … has been regarded as the root meaning of the constitutional guarantee." *Gonzalez-Lopez*, 548 U.S. at 147-48. The Order impinges on this right in several ways: It handicaps the Firm's ability to provide effective assistance, and it forces clients to choose between continuing their relationship with WilmerHale and complying with the Order's compelled disclosure of any relationship with the Firm—which would put them at risk of losing their government contracts. It is immaterial that the Order does not expressly bar clients from

hiring the Firm.  The Order is plainly designed to achieve that goal indirectly, and "a government official cannot do indirectly what []he is barred from doing directly."  *Vullo*, 602 U.S. at 190.

WilmerHale has standing to challenge these violations of the right to counsel.  WilmerHale itself has suffered an Article III injury-in-fact because the Order inflicts severe reputational and economic harm that can be redressed by a ruling enjoining the Order.  *See* Berman Decl. ¶83.  And WilmerHale has third-party standing to challenge infringements of the right to counsel on behalf of its clients given the "special consequence" of the attorney-client relationship and the obvious "obstacle[]" that the threat of further retaliation poses to the clients' ability to protect their own interests.  *Caplin & Drysdale*, 491 U.S. at 623 n.3; *see also Wounded Knee*, 507 F.2d at 1284 ("[A] lawyer has standing to challenge any act which interferes with his professional obligation to his client and thereby, through the lawyer, invades the client's constitutional right to counsel."); *Perkins* Tr. 91:1-92:23 (Perkins Coie had standing to challenge Sixth Amendment violations on behalf of its clients).  WilmerHale is entitled to summary judgment on Counts IX and X.

## II.    WilmerHale Is Entitled To Permanent Relief.

### A.    This Court Should Declare the Entire Order Unconstitutional.

1. While this Court's temporary restraining order is limited to §3 and §5, the constitutional infirmities identified above pervade the whole Order.  The Order makes crystal clear that all the adverse actions against WilmerHale—including the suspension of security clearances, *see* Order §2(a), embargo on "Government goods, property, material, and services," *id.* §2(b), and EEOC investigation into the Firm's hiring practices, *see id.* §4 (citing Perkins Order §4)—stem from the President's disagreement with certain causes for which WilmerHale has advocated and his dislike of attorneys WilmerHale has employed.  Section 1 of the Order expressly states that "[l]awyers and law firms" that represent (supposedly) "destructive causes" through their "pro bono practices" "should not have access to our Nation's secrets, nor should [their] conduct be subsidized by Federal

36

taxpayer funds or contracts."  Section 1 likewise makes clear that the punishments imposed by the other parts of the Order are part of an integrated effort to punish WilmerHale for associating with "Robert Mueller and his colleagues" and commending Mr. Mueller for his service as Special Counsel.  In short, the Order was designed to work as an integrated whole, and its retaliatory and viewpoint-discriminatory motivations, which are "clear from its face," TRO.2, permeate the entire Order.  Lest there be any doubt about that, the unified nature of the Order is underscored by the President's treatment of Paul Weiss.  While the March 14 Paul Weiss Order alluded to similar (albeit vague) concerns about "national security" and weaponization, the March 21 Order vitiated the earlier Order in toto, without retaining the suspension of security clearances or any other specific sanction.  These Orders are being imposed *and revoked* as a single unified package.

The entire Order is likewise fatally flawed because it was issued with no notice or opportunity to be heard.  The requirements of due process plainly apply to the Order "as a whole"; far from operating independently, its provisions "embod[y] a single, coherent policy, the predominant purpose of which [i]s" to punish WilmerHale for disfavored advocacy and associations. *Cf. Mille Lacs Band*, 526 U.S. at 191 (concluding that an Executive Order removing the Chippewa Tribe from certain lands and revoking their usufructuary rights must "stand or fall as a whole").  Moreover, every part of the Order implicates WilmerHale's "good name," "reputation," and "integrity."  *Constantineau*, 400 U.S. at 437.  For example, the Order brands WilmerHale as a firm that "engage[s] in activities that undermine justice and the interests of the United States," Order §1; announces that WilmerHale attorneys "should not have access to our Nation's secrets" or to "Federal taxpayer funds or contracts," *id.*; *see id.* §§2, 3; summarily concludes that the Firm engages in "racial discrimination," *see id.* §§1, 3, 4; and suggests that even allowing WilmerHale employees to enter government buildings, engage with government officials,

or obtain federal employment could somehow "threaten the national security of the United States," *id.* §5.  On top of that, the Order interferes with WilmerHale attorneys' ability to practice law by severely restricting their access to government information, resources, contracts, facilities, and employment.  *See id.* §2, 3, 5.  The *entire* Order thus triggers—and abjectly fails to comply with— the Due Process Clause, and it violates the separation of powers and the right to counsel to boot.

2. Given the indivisible nature of the Executive Order and that all its sanctions are justified by the retaliatory motives laid bare in §1, there is no basis for severing §2 from the balance of the Order.  While courts have been reluctant to intrude on the executive's discretion to revoke individual security clearances based on national security considerations, *see, e.g.*, *Dep't of Navy v. Egan*, 484 U.S. 518 (1988); *Lee v. Garland*, 120 F.4th 880 (D.C. Cir. 2024), no court has suggested that the entire subject of security clearances is among the narrow set of "exclusive" executive powers that "may not be regulated by Congress or reviewed by the courts" at all.  *Cf. Trump v. United States*, 603 U.S. 593, 621 (2024).  To the contrary, *Lee* expressly recognized that Congress may "restrict executive discretion in this area."  120 F.4th at 891.  And the D.C. Circuit has specifically rejected the notion "that all security-clearance decisions are immune from judicial review."  *Nat'l Fed'n of Fed. Emps. v. Greenberg*, 983 F.2d 286, 290 (D.C. Cir. 1993) (courts may review "the constitutionality of the methods used" to make security-clearance decisions); *see also Rattigan v. Holder*, 689 F.3d 764, 770-71 (D.C. Cir. 2012) (Title VII claim alleging that revocation of individual's clearance was based on colleagues' "knowingly false reports" was justiciable); *El-Ganayni v. U.S. Dep't of Energy*, 591 F.3d 176, 183 (3d Cir. 2010) (claim that clearance was revoked "in retaliation for the exercise of [plaintiff's] First Amendment rights" was justiciable).

Moreover, *Egan* and *Lee* involved challenges to the denial "of security clearance to a particular employee."  *Lee*, 120 F.4th at 892-93 (quoting *Egan*, 484 U.S. at 527).  Neither case

speaks to reviewability of an effort to suspend security clearances of *an entire group of unidentified individuals* in overt retaliation for disfavored speech, representations, and associations. Both the Supreme Court and the D.C. Circuit have signaled that plaintiffs may challenge the constitutionality of policies that restrict an entire group from maintaining security clearances. *See Webster v. Doe*, 486 U.S. 592, 603-04 & n.8 (1988) (a plaintiff could challenge a "general CIA policy against employing homosexuals"); *Doe v. Gates*, 981 F.2d 1316, 1322 (D.C. Cir. 1993) (same); *Gill v. DOJ*, 875 F.3d 677, 685 (D.C. Cir. 2017) (Tatel, J., concurring) (claim alleging "policy or practice of treating Muslims or naturalized citizens differently" with respect to security clearances "would not be barred" from judicial review). As those cases illustrate, even in areas where the Executive Branch enjoys "considerable discretion," the Constitution prohibits it from wielding those powers to punish disfavored speakers and viewpoints or otherwise violating "the transcendent imperatives of the First Amendment." *Edwards*, 482 U.S. at 583.

For example, even when "a person has no 'right' to a valuable governmental benefit," and "the government may deny him the benefit for any number of reasons"—or for no reason at all— "there are some reasons upon which the government may not rely." *Perry v. Sindermann*, 408 U.S. 593, 597 (1972); *see Rankin v. McPherson*, 483 U.S. 378, 383-84 (1987). "It may not deny a benefit to a person on a basis that infringes his constitutionally protected interests—especially, his interest in freedom of speech." *Perry*, 408 U.S. at 597; *accord Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 283-84 (1977). The Supreme Court has applied this rule in a variety of contexts, including government employment, tax exemptions, and unemployment benefits. *See Rutan v. Republican Party of Ill.*, 497 U.S. 62, 72, 77-78 (1990). Similarly, while "local school boards have broad discretion in the management of school affairs," they "may not remove books from school library shelves" in an effort to "'prescribe what shall be orthodox in politics … religion,

or other matters of opinion.'" *Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S. 853, 863, 869-72 (1982) (plurality) (quoting *Barnette*, 319 U.S. at 642).

Here, too, while the President may have considerable power to suspend security clearances for many reasons, or perhaps without proffering any reason at all, that does not mean that courts are powerless to act if the President unapologetically admits to suspending security clearances on an unconstitutional ground—particularly when (as here) he does so *en masse*. After all, the animating concern of *Lee* is not that the Executive Branch's power over security clearances must be absolute; it is that courts are ill-equipped "to make nuanced judgments about" the "motivation" for a security-clearance determination, or to second-guess "an assessment of intangible qualities such as an individual's 'loyalty to the United States, strength of character, trustworthiness, honesty, reliability, discretion, and sound judgment." 120 F.4th at 893-94. All of that makes eminent sense in the context of a "[p]redictive judgment[]" about a particular individual's suitability for a security clearance, "made by [an official] with the necessary expertise" in protecting classified information. *Id.* at 886 (quoting *Egan*, 484 U.S. at 529); *see also* Expert Report of J. William Leonard ¶¶32-36 ("Leonard Rpt.") (describing process by which such judgments are ordinarily made). But those justiciability concerns do not arise when the President does not even purport to have made any such individualized determination, but rather suspends the security clearances of an entire group of unidentified individuals in avowed retaliation for First Amendment-protected activity.

And there can be no mistaking that the President has done just that here. In fact, the Order does not even purport to make any national security determination. Section 2's directives regarding security clearances do not involve any assessment or finding related to national security; rather, they are expressly in service of the unconstitutional retaliation that animates the entire Order. Indeed, §2 does not even utter the phrase "national security," instead referring to the "national

interest," a phrase that has no meaning in the context of security-clearance determinations. Leonard Rpt. ¶49. And the vague references to "national security" in §1 and §5 do not reflect the type of individualized national security determination to which *Egan* and *Lee* counsel judicial deference. *See id.* ¶¶49-53. Again, the President's rescission of the Paul Weiss Order confirms as much. As noted, the Paul Weiss Order of March 14 vaguely alluded to potential "threat[s]" to "national security" and suspended security clearances *en masse*, yet the President rescinded the order its entirety on March 21 without any explanation as to how changes to pro bono and employment policies could obviate professed national security concerns. *Id.* ¶53.

In short, having recognized the "retaliatory nature of the Executive Order," TRO.2, this Court need not blind itself to the reality that §2 is the product of that same unconstitutional retaliation. The President's powers in the national-security realm are considerable, but they are not so absolute that courts must stand idly by in the rare instance when a President proudly admits to exercising them not for national security reasons, but in retaliation for constitutionally protected activity. Indeed, counsel is not aware of *any case* explicitly concluding that a government action was taken in unconstitutional retaliation for First Amendment activity but nevertheless permitting the action to stand in whole or in part. This case should not be the first.

### B.    The Court Should Permanently Enjoin Enforcement of the Order.

WilmerHale is also entitled to a permanent injunction against the entire Order, as it has amply demonstrated "(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *Anatol Zukerman & Charles Krause Reporting, LLC v. USPS*, 64 F.4th 1354, 1364 (D.C. Cir. 2023).

1.    **The Order inflicts irreparable harm for which there is no adequate remedy at law.**

As this Court explained in its temporary restraining order, implementation of the Order would expose WilmerHale to multiple forms of irreparable injury, including "violations of [its] constitutional rights" and "crippling" harms to its "business and reputation." TRO.2-3. There plainly is no adequate remedy at law for such injuries. Injunctive relief is thus imperative; as this Court observed, "[the Firm's] very survival is at stake." TRO.3.

*Constitutional Injuries*. "The loss of First Amendment freedoms"—particularly the rights to engage in political speech and to petition the government for redress—"for even minimal periods of time, unquestionably constitutes irreparable injury." *Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 19 (2020) (per curiam); *accord* TRO.2-3; *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 301-03 (D.C. Cir. 2006). WilmerHale and its employees have experienced and will continue to experience violations of their First Amendment speech, association, and petitioning rights, as well as their Fifth Amendment due process rights. And the Firm's clients are experiencing violations of their rights to expression, association, and counsel. On any given day, WilmerHale attorneys appear before administrative bodies such as the Patent Trial and Appeal Board, negotiate with federal employees (e.g., prosecutors), and handle sensitive government-facing matters for clients. SOF ¶¶18-28. Being blacklisted immediately and irreparably harms those ongoing representations. Indeed, that seems to be the Order's chief aim.

*Economic injuries.* While economic injury can usually be remedied by money damages, "economic loss that threatens the survival of the movant's business can amount to irreparable harm." *Nat'l Mining Ass'n v. Jackson*, 768 F.Supp.2d 34, 50 (D.D.C. 2011). Moreover, significant economic injuries are irreparable, even if they do not threaten to destroy the entire business, if "no 'adequate compensatory or other corrective relief will be available at a later date.'" *In re NTE*

42

*Conn., LLC*, 26 F.4th 980, 990-91 (D.C. Cir. 2022); *see Air Transp. Ass'n of Am. v. Exp.-Imp. Bank of U.S.*, 840 F.Supp.2d 327, 335 (D.D.C. 2012) ("significant" economic harm constitutes irreparable injury "where it is irretrievable because a defendant has sovereign immunity").

Both forms of irreparable economic injury are present here. Sovereign immunity bars WilmerHale from recovering money damages for the Order's impact on the Firm's business directly from the President or agency heads. And absent a permanent injunction, the Order will almost certainly cause clients to terminate longstanding and substantial business relationships with WilmerHale due to fear of losing government contracts or otherwise incurring the President's ire. Berman Decl. ¶77; Suppl. Decl. ¶¶6, 8-10. As this Court observed, clients are risk-averse and have a wide choice of law firms, including some who have cut deals to avoid similar orders. TRO.Hr'g.Tr.27:2-28:1. And 21 of WilmerHale's 25 largest clients—accounting for 30% of WilmerHale's annual revenues—are government contractors. Berman Decl. ¶30. Moreover, a large proportion of the Firm's practice requires engagement with the federal government. *Id.* ¶¶19-28. If such engagement is barred for any meaningful period of time, WilmerHale's very existence (and the livelihood of its employees) would be under threat. *Id.* ¶83. Indeed, WilmerHale has already experienced irreparable harm, as some clients have confined the Firm's role and/or declined to engage it for new work because of the Order. Suppl. Decl. ¶8. For example, one client that had retained the Firm for a new matter before the issuance of the Order terminated its retention of the Firm for that matter after the Order, citing the Order as the reason for the termination. SOF ¶135; Suppl. Decl. ¶6.

**Reputational and client-relationship injuries.** Because reputational harms, damages to existing client relationships, and the loss of goodwill are "not easily measurable in monetary terms," they, too, generally constitute irreparable harm. *Xiaomi Corp. v. Dep't of Def.*, 2021 WL 950144,

at *9 (D.D.C. Mar. 12, 2021); *see, e.g.*, *Perkins* Tr. 85:10-14, 90:21-24, 100:12-101:1; *Beacon Assocs. v. Apprio, Inc.*, 308 F.Supp.3d 277, 288 (D.D.C. 2018); *Patriot, Inc. v. HUD*, 963 F.Supp. 1, 5 (D.D.C. 1997). By using the prestige of his office to brand WilmerHale as a "rogue law firm[]," Ex.45, the President has irreparably tarnished WilmerHale's reputation and corporate goodwill. Berman Decl. ¶¶85-86. And if Defendants are permitted to enforce the Order against the Firm and its clients, such as by threatening to terminate government contracts with clients who decline to disassociate from the Firm, WilmerHale's relationships with existing clients will be irretrievably damaged. As this Court has recognized, "the loss of customer goodwill and trust that has been established through the dealings of [WilmerHale clients] with their [attorneys] is a concrete harm that cannot be compensated with money damages." *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Wertz*, 298 F.Supp.2d 27, 34 (D.D.C. 2002) (Leon, J.). Courts routinely hold "that injunctive relief is appropriate where it would be very difficult to calculate monetary damages that would successfully redress the loss of a relationship with a client that would produce an indeterminate amount of business in years to come." *Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 404 (2d Cir. 2004); *see also, e.g.*, *Air Evac EMS, Inc. v. McVey*, 37 F.4th 89, 103 (4th Cir. 2022) (same); *BellSouth Telecomms., Inc. v. MCIMetro Access Transmission Servs., LLC*, 425 F.3d 964, 970 (11th Cir. 2005) (same).

> **2.      The balance of the equities and the public interest overwhelmingly favor a permanent injunction.**

"When the defendant is the government," the equities and the public-interest factors "merge." *Anatol Zukerman*, 64 F.4th at 1364. Here, these factors tilt decisively in favor of granting a permanent injunction. Of course, "[i]t is always in the public interest to prevent the violation of a party's constitutional rights." *Costa v. Bazron*, 456 F.Supp.3d 126, 137 (D.D.C. 2020) (brackets in original). But there is far more than that at stake here. The President has used

the trappings of his office to punish WilmerHale because of the Firm's representation of and connections to his perceived adversaries. And the Order lays bare his willingness to impose harsh sanctions on those who do not share his viewpoints. The Order thus not only irreparably harms WilmerHale, but also threatens to deter attorneys across the Nation from taking on disfavored clients or causes, for fear of drawing the ire of the President. Indeed, that is the whole point. Making matters worse, this chilling effect will make it difficult for lawyers to fulfill their duty to provide "zealous[]" and "vigorous representation" "within the bounds of the law"—a responsibility of "paramount importance" to our "system of justice" and to the public interest. D.C. R. Prof'l Conduct 1.3 cmt. [1]; *Penson v. Ohio*, 488 U.S. 75, 84 (1988). It will also deter potential litigants from challenging the Administration's policies. In short, the "adverse impact" on the public interest "cannot be [over]stated," *Perkins* Tr.102:11-14, as it imperils the "informed, independent bar" on which our judicial system depends, *Velazquez*, 531 U.S. at 545.

On the other side of the ledger, Defendants will experience no cognizable harm from a permanent injunction. "There is generally no public interest in the perpetuation of unlawful [government] action." *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016). And Defendants cannot claim any valid interest in implementing and enforcing a nakedly retaliatory and unconstitutional order. The Executive Branch has gotten along just fine for over two hundred years without this kind of unprecedented and unconstitutional attack on the legal profession. The balance of equities and public interest thus weigh decisively in favor of permanently enjoining implementation of the Order.

## CONCLUSION

Plaintiff's motion for summary judgment should be granted; the Order should be declared invalid; and the government should be permanently enjoined from enforcing it.

April 8, 2025

Respectfully submitted,

/s/ Paul D. Clement

PAUL D. CLEMENT (D.C. Bar. No. 433215)
ERIN E. MURPHY (D.C. Bar No. 995953)
MATTHEW D. ROWEN (D.C. Bar No. 176865)
JOSEPH J. DEMOTT (Virginia Bar No. 93981,
    D.D.C. Bar ID #D00561)
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
paul.clement@clementmurphy.com

*Attorneys for Plaintiff Wilmer Cutler
Pickering Hale and Dorr LLP*