**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

---

WILMER CUTLER PICKERING HALE
AND DORR LLP,

*Plaintiff*,

v.

EXECUTIVE OFFICE OF THE
PRESIDENT, *et al.*,

*Defendants*.

---

Case No. 1:25-cv-917

Judge Richard J. Leon

**STATEMENT OF UNDISPUTED MATERIAL FACTS**

Pursuant to Federal Rule of Civil Procedure 56 and Local Rule 7(h), plaintiff Wilmer Cutler Pickering Hale and Dorr LLP ("WilmerHale" or "the Firm") submits the following statement of undisputed material facts in support of its motion for summary judgment.

## I.    BACKGROUND ON WILMERHALE

1.    WilmerHale is a large international law firm.  Declaration Of Bruce M. Berman In Support Of Plaintiff's Motion For Temporary Restraining Order And Preliminary Injunction ("Berman Decl.") ¶5 (ECF No. 3-2).

2.    WilmerHale was formed by a 2004 merger of Boston-based Hale and Dorr LLP and DC-based Wilmer Cutler Pickering LLP.  It now has twelve offices across the United States and Europe.  Berman Decl. ¶6.

3.    WilmerHale employs approximately 2,000 people, over half of whom are lawyers. Berman Decl. ¶5.  WilmerHale's other employees include paralegals, information technology specialists, mailroom staff, and other professionals who support the Firm's work.  Berman Decl. ¶9.

4.    WilmerHale has been on *The American Lawyer*'s A-List for twenty-one consecutive years, and on the A-List Top 10 for nine consecutive years.  Berman Decl. ¶14.  It has been ranked at the top of additional prestigious legal rankings by which law firms are regularly evaluated, including Chambers USA, Benchmark Litigation, the National Law Journal, and Vault Law.  *Id.*  In 2024, the firm ranked second in *Law360 Pulse*'s Pro Bono ranking and third in *The American Lawyer*'s 2024 Pro Bono Scorecard.  *Id.* ¶16.

5.    WilmerHale has been recognized as a top employer by publications such as *The Washington Post*, *Forbes*, and *The Boston Globe*.  Berman Decl. ¶14.  Over half of its non-lawyer business professionals have been employed with the firm for over 10 years.  *Id.*

6.      The Firm's lawyers represent a range of clients located throughout the United States and the world—including large multinational corporations, colleges and universities, family businesses, start-ups, individuals, government entities and sovereign nations, and non-profit organizations—across a range of industries and endeavors.  Berman Decl. ¶¶8, 17.

7.      As part of their representation of Firm clients, many of WilmerHale's lawyers interact directly with the United States government.  Berman Decl. ¶17.

8.      WilmerHale attorneys practice across a broad span of industries, ranging from work in education to energy and national resources to national security to media and entertainment to artificial intelligence and cryptocurrency to healthcare and financial services and to civil and criminal defense.  Berman Decl. ¶8.

9.      WilmerHale's attorneys and employees come from a variety of backgrounds and cover the full political and ideological spectrum.  Lloyd Cutler, for example, was White House Counsel to Presidents Carter and Clinton, and C. Boyden Gray was White House Counsel to President George H.W. Bush.  Berman Decl. ¶10.  The Firm has recruited lawyers from every administration over the last forty years and has bipartisan leadership of its practice groups.  *Id.* Firm lawyers have also worked (on their own time) for the campaigns of both parties in each presidential election over at least the last twenty years.  *Id.*

10.     Many of WilmerHale's current and former employees and partners have served in the federal government, across all three branches, in agencies ranging from the Federal Reserve Board to the Central Intelligence Agency.  Berman Decl. ¶¶ 11, 35.

11.     Current and past WilmerHale lawyers serve or have served as judicial law clerks, state and federal court judges, White House officials under presidents of both parties, high-ranking

Department of Justice officials and officials of other departments, as well as in the U.S. military. Berman Decl. ¶11.

12.     Recent WilmerHale alumni include two federal judges appointed by President Biden and two federal judges appointed by President Trump, the Special Counsel appointed during the first Trump administration to investigate allegations of foreign interference in the 2016 presidential election, the current Trump-appointed Under Secretary for Industry and Security at the U.S. Department of Commerce, the current Trump-appointed Deputy Attorney General, and the current Trump-appointed Acting Head of the Criminal Division of the Department of Justice. Berman Decl. ¶¶34-36.

13.     Hale and Dorr partner Reginald Heber Smith authored *Justice and the Poor* (1919). Berman Decl. ¶13.  In 1992, Wilmer Cutler & Pickering partner John Pickering led the effort to establish the Pro Bono Institute's Law Firm Pro Bono Challenge, which encourages law firms to commit a minimum of 3-5% of annual total billable hours to legal pro bono services.  *Id.*  Wilmer Cutler & Pickering was its charter signatory.  *Id.*

14.     In 2024, 96.4% of WilmerHale's active U.S. lawyers spent 20 or more hours on over 1,400 pro bono matters, for a total of 148,551 pro bono hours firm-wide.  Berman Decl. ¶15. In total, WilmerHale contributed attorney time equivalent to roughly $120 million on pro bono matters in 2024.  *Id.*

15.     The Firm's pro bono matters range from high-profile, high-impact matters to direct representation of hundreds of low-income individuals, including veterans, survivors of sex trafficking, and criminal defendants.  Berman Decl. ¶15. The Firm's pro bono work has defended the free exercise of religion—including the right to attend church during the COVID-19 shutdowns—and it has represented clients challenging laws restricting access to abortion and

clients challenging laws that restrict speech near facilities that perform abortions. *Id.*; *see also* Supplemental Declaration Of Bruce M. Berman In Support Of Plaintiff's Motion For Summary Judgment And Declaratory And Permanent Injunctive Relief ¶26 ("Supp. Berman Decl.").

## II.    WILMERHALE'S INTERACTIONS WITH THE FEDERAL GOVERNMENT

### A.    The Firm Routinely Interacts With the Federal Government on Behalf of Its Clients.

16.    WilmerHale represents its wide range of clients in litigation, transactional, and regulatory matters. Berman Decl. ¶17.

17.    WilmerHale has five departments: Litigation and Controversy, Regulatory and Government Affairs, Securities and Financial Services, Transactional, and Intellectual Property. Berman Decl. ¶18.

18.    The Firm's Litigation and Controversy Department includes over 500 attorneys. Berman Decl. ¶20. A large proportion of the litigation matters it handles are pending in federal court and require WilmerHale attorneys to enter federal buildings and engage with federal employees. *Id.* These matters also require WilmerHale attorneys to enter federal buildings to make presentations to prosecutors and federal employees on their clients' behalf. *Id.*

19.    For example, within the Litigation and Controversy Department are (1) the Investigations and Criminal Litigation practice group, which focuses on representing clients in criminal prosecutions and investigations in proceedings involving many federal government agencies, and (2) the Government and Regulatory Litigation practice group, which involves representing clients in investigations and litigation involving myriad federal agencies. Berman Decl. ¶20.

20.    More specifically, attorneys in the Litigation and Controversy Department engage with the Department of Justice, the Federal Bureau of Investigation, the Office of the Comptroller

of the Currency, the Department of Defense, the Department of Health and Human Services, the Department of Education, the Federal Communications Commission, the Environmental Protection Agency, the Federal Trade Commission, U.S. Attorneys' Offices, the Commodity Futures Trading Commission, the Securities and Exchange Commission, the Department of Labor, the Department of Veterans' Affairs, and the Social Security Administration, among others. Berman Decl. ¶20.

21.    The Firm's Regulatory and Government Affairs Department includes over 100 attorneys.  Berman Decl. ¶22.  This practice involves navigating the intersection of law, public policy, and business, which in turn relies on WilmerHale's expertise in the complex policies and regulations governing its clients' industries—including leveraging the experience and insight of WilmerHale attorneys who have worked in the executive branch and/or on Capitol Hill. *Id.*

22.    Attorneys in the Regulatory and Government Affairs Department regularly interact with the Department of Defense, the Office of the Director of National Intelligence, the National Security Agency, the Federal Bureau of Investigation, the Central Intelligence Agency, the Department of the Interior, the Environmental Protection Agency, and other agencies.  Berman Decl. ¶¶23-24.

23.    Within the Regulatory and Government Affairs Department are the Higher Education and the Energy, Environment, and Natural Resources practice groups, which both involve engaging with numerous federal agencies on behalf of clients.  Berman Decl. ¶24.

24.    The Firm has multiple attorneys with active security clearances, which are necessary to represent clients in cases involving sensitive government information, including in matters involving national security, cybersecurity, defense contracting, criminal investigations, and practice before the Committee on Foreign Investment in the United States.  Berman Decl. ¶¶23, 78.

25.     The Firm's Securities and Financial Services Department includes over 100 attorneys.  Berman Decl. ¶25.  It represents securities firms and banking entities in the full range of regulatory and enforcement matters, which requires routine engagement with regulators on behalf of Firm clients.  *Id.* Attorneys in this department regularly appear before federal agencies such as the Securities and Exchange Commission, the Commodity Futures Trading Commission, the Office of the Comptroller of the Currency, the Treasury Department, and the Federal Reserve.  *Id.*

26.     The Firm's Transactional Department includes approximately 200 attorneys. Berman Decl. ¶26.  That department's matters often involve financings, mergers and acquisitions, collaborations, and other transactions between private entities or persons.  *Id.*  In connection with many of these matters, WilmerHale lawyers interact with federal employees, including staff from the Securities and Exchange Commission, the Federal Trade Commission, the Food and Drug Administration, and other federal agencies.  *Id.*  The Transactional Department also represents private company clients that have contracts with federal agencies.  *Id.*

27.     The Firm's Intellectual Property Department, which includes roughly 50 attorneys, and the Firm's Intellectual Property Litigation practice group, which includes roughly 100 attorneys, depend on access to and interaction with the federal government to represent WilmerHale clients.  Berman Decl. ¶27.  These attorneys frequently represent patent applicants, patent owners, and patent challengers before the U.S. Patent and Trademark Office (USPTO) in patent prosecution and post-grant proceedings, including in administrative trials before the Patent Trial and Appeal Board (PTAB).  *Id.*

28.     At any given moment, WilmerHale attorneys may be working on over 1,000 matters before or involving dozens of federal agencies.  Berman Decl. ¶28.  For example, as of March 26,

2025, WilmerHale was actively engaged with the following thirty-two agencies on behalf of Firm

clients:

- The Securities and Exchange Commission;
- The Department of Justice (including approximately 25 U.S. Attorney's Offices);
- The Federal Trade Commission;
- The Consumer Financial Protection Bureau;
- The Department of Health and Human Services;
- The Environmental Protection Agency;
- The Department of Defense;
- The Department of Homeland Security;
- The Federal Bureau of Investigation;
- The Department of the Navy;
- The Commodity Futures Trading Commission;
- The Department of State;
- The Department of Energy;
- The Department of the Treasury;
- The Department of Labor;
- The Department of Agriculture;
- The Department of Veterans Affairs;
- The Air Force;
- The Department of Education;
- The Office of the Comptroller of the Currency;
- The Internal Revenue Service;
- The Central Intelligence Agency;
- The Office of Management and Budget;
- The Department of Commerce;
- The Agency for International Development;
- The Federal Reserve;
- The Department of Housing and Urban Development;
- The Farm Credit Administration;
- The Occupational Safety and Health Administration;
- The Patent and Trademark Office;
- The Pension Benefit Guaranty Corporation; and
- The International Trade Commission.

*Id.*; Supp. Berman Decl. ¶2 n.1.

29.    WilmerHale attorneys appeared in federal court over 340 times between March 1,

2024 and March 27, 2025.  Berman Decl. ¶17.

30.     WilmerHale lawyers have represented clients in front of government agencies in both Republican and Democratic administrations.  Berman Decl. ¶29.

31.     The United States in both Republican and Democratic administrations has filed an amicus curiae brief in support of WilmerHale clients.  Berman Decl. ¶29.

**B.     Many of WilmerHale's Clients Are Government Contractors.**

32.     At least 21 of WilmerHale's 25 largest clients in 2024 have contracts with federal agencies.  Berman Decl. ¶30.  These 21 clients accounted for more than 30% of the Firm's revenue in 2024—nearly $500 million.  *Id.*  The Firm also has numerous other clients that have federal contracts.  *Id.*

33.     WilmerHale represents clients in connection with disputes regarding government contracts, including handling clients' bid protests and disputes surrounding contract claims.  Berman Decl. ¶31.  The Firm's attorneys are currently handling over 100 open government contracting matters involving various federal agencies.  *Id.*

**C.     WilmerHale's Attorneys Often Serve in the Federal Government.**

34.     Many WilmerHale attorneys work, will work, and/or have worked in the federal government in a variety of roles, for a variety of agencies, and for administrations of both parties.  Berman Decl. ¶33; *see also supra* ¶¶10-12.

35.     Multiple current WilmerHale attorneys serve in the military Reserves.  Berman Decl. ¶82.

**III.    RELEVANT FIRM LITIGATION AND PERSONNEL**

**A.     WilmerHale Performs Public Interest Litigation.**

36.     WilmerHale has represented clients in public interest litigation that spans the ideological spectrum.  Berman Decl. ¶42.

37.    WilmerHale successfully defended the Truth Campaign—the most successful public health campaign in recent memory, dedicated to persuading young people not to take up smoking—against efforts by the tobacco industry to shut it down.  Berman Decl. ¶44.  (At the same time, the Firm has declined to represent tobacco companies in health-related matters.  *Id.*)  And WilmerHale has represented advocates for gun control, such as Everytown for Gun Safety, on a pro bono basis in litigation concerning the constitutionality of gun control laws.  *Id.*

38.    WilmerHale also has participated in lawsuits that advanced civil rights in a wide range of contexts—often pro bono.  Berman Decl. ¶45.  These include challenging laws that prohibited congregants from attending in-person religious services during the COVID-19 pandemic and defending the right of churches to make ecclesiastical hiring and firing decisions free from unconstitutional government interference.

39.    WilmerHale also represented clients in challenging the constitutionality of the Defense of Marriage Act.  Berman Decl. ¶45.  And WilmerHale has filed lawsuits on behalf of clients with disabilities, securing, for example, a favorable settlement ensuring that hearing-impaired prisoners in Massachusetts received essential accommodations such as hearing aids and interpreters.  *Id.*

40.    WilmerHale has also represented criminal defendants and low-income families pro bono.  Berman Decl. ¶46.  For example, WilmerHale secured the release of Dewey Bozella, who was imprisoned for 26 years for a murder he did not commit, and obtained a $7.5 million settlement for Mr. Bozella based on his wrongful conviction.  *Id.*  The Firm also supports the Family Justice Clinic at the WilmerHale Legal Services Center of Harvard Law School, which provides pro bono representation to parents facing Department of Children and Families investigations.  *Id.*

**B.    WilmerHale Litigates Against The Federal Government.**

41.    WilmerHale's litigation practice has included cases against the federal government (across both Democratic and Republican presidential administrations), as well as cases that span the ideological spectrum.  Berman Decl. ¶42.

42.    For decades, WilmerHale has represented clients in litigation against the federal government.  For example, the Firm sued the Clinton Administration at least 28 times, the Bush Administration at least 68 times, the Obama Administration at least 125 times, the first Trump administration at least 45 times, and the Biden administration at least 97 times.  Berman Decl. ¶¶47-50, 52; Supp. Berman Decl. ¶27.

43.    More recently, WilmerHale filed a lawsuit in February 2025 on behalf of the inspectors general of eight federal agencies alleging that President Trump's attempt to fire them violated the procedures set forth in the Inspectors General Act.  Berman Decl. ¶53.  At a public hearing on this matter on March 27, 2025, the district court applauded WilmerHale for pursuing the litigation on behalf of its public servant clients, and for doing so pro bono.  *Id.*

**C.    WilmerHale Handles Election-Related Litigation.**

44.    In 2003, the Firm successfully represented Republican Senator John McCain and Democratic Senator Russ Feingold in defense of the landmark Bipartisan Campaign Reform Act they co-sponsored.  Berman Decl. ¶54.

45.    In 2015, the Firm successfully defended the constitutionality of Arizona's non-partisan redistricting commission.  Berman Decl. ¶54.

46.    And in 2021, WilmerHale filed suit on behalf of voters and community organizations to challenge Georgia's legislative redistricting plans as diluting Black voters' voting strength, in violation of Section 2 of the Voting Rights Act.  Berman Decl. ¶54.

47.     One of WilmerHale's clients is the Democratic National Committee.  The Firm has represented the DNC in matters relating to the rule of law, ballot access, and election integrity. Berman Decl. ¶55.

48.     The Firm also represented the Joe Biden campaign in 2020 and 2024, the Kamala Harris campaign in 2024, the Democratic National Committee in 2020 and 2024, and state-level Democratic Party organizations in 2020 and 2024, in litigation concerning ballot access, voting rights, and election certification.   Berman Decl. ¶55.   In 2020, the Biden campaign and the Democratic National Committee retained the Firm to provide representation in litigation regarding the integrity and certification of the presidential election.  *Id.* The Firm went on to represent the Biden for President campaign, the Democratic National Committee, and state-level Democratic Party organizations in numerous lawsuits regarding the 2020 election in at least six states: Arizona, Georgia, Michigan, New Hampshire, North Carolina, and Pennsylvania.  *Id.*

49.     In the leadup to the 2024 general election, WilmerHale represented Democratic Party entities in numerous cases.  Berman Decl. ¶55.

50.     The Firm has advised many people nominated by President Trump to positions in both of his administrations.  Berman Decl. ¶56.

**D.     In Government Roles, Certain Former and Present WilmerHale Lawyers Investigated President Trump.**

51.     WilmerHale partners have included attorneys who, in government roles unrelated to their work at WilmerHale, investigated President Trump's conduct.  Among these attorneys are Robert S. Mueller III, James L. Quarles III, and Aaron M. Zebley.  Berman Decl. ¶¶38, 41.

52.     Mr. Mueller served for decades in both the Department of Justice and various United States Attorney's offices under Presidents Ronald Reagan, George H.W. Bush, Bill Clinton,

and George W. Bush.  Berman Decl. ¶37.  Mr. Mueller also was appointed Director of the Federal

Bureau of Investigation by George W. Bush.  Berman Decl. ¶36.

53.     Between his stints in public service, Mr. Mueller became a Hale and Dorr partner

who specialized in white-collar criminal defense.  Berman Decl. ¶37.

54.     During President Trump's first administration, Mr. Mueller was appointed to serve

as special counsel by Acting Attorney General Rod Rosenstein on May 17, 2017.  Berman Decl.

¶38; *see also* Ex. 1[1].  He was tasked specifically with investigating allegations of Russian

government efforts to interfere in the 2016 presidential election.  *Id.* at ¶38.  The appointment

required him to investigate and prosecute various actions, including potential obstruction of justice

by President Trump or any of his associates.  Berman Decl. ¶38; *see also* Ex. 1.

55.     WilmerHale had no role in Mr. Mueller's appointment as special counsel.  Berman

Decl. ¶36.

56.     As required by Department of Justice regulations that govern a special counsel, Mr.

Mueller and other lawyers employed by the U.S. government delivered a confidential report on

the investigation to then-Attorney General William Barr.  Berman Decl. ¶39.  The report did not

conclude that members of the Trump campaign conspired or coordinated with the Russian

government.  *Id.*  Nor did the report determine whether President Trump had obstructed justice.

*Id.*  The report also concluded, consistent with longstanding Department of Justice policy, that a

sitting president could not be indicted.  *Id.*

57.     WilmerHale had no role in Mr. Mueller's Report or Mr. Mueller's work as special

counsel.  Berman Decl. ¶40.

---

[1] All numbered exhibits are attached to the Declaration of Joseph J. DeMott in Support of
Plaintiff's Motion for Summary Judgment, filed herewith.

58.     After the conclusion of the special counsel investigation, in 2019, Mr. Mueller rejoined WilmerHale.  Berman Decl. ¶40.  He retired from the Firm in 2021, more than three years ago.  *Id.*

59.     Approximately 54% of WilmerHale's current attorneys joined the Firm after Mr. Mueller's retirement.  Berman Decl. ¶40.

60.     Among the attorneys who left WilmerHale to work in the Special Counsel's Office under Mr. Mueller were Mr. Quarles and Mr. Zebley.  Each returned to the Firm as a partner in 2019.  Berman Decl. ¶41.

61.     Mr. Quarles retired from WilmerHale in 2021.  Berman Decl. ¶41.

62.     Mr. Zebley remains a WilmerHale partner and is based in WilmerHale's Washington D.C. office.  Berman Decl. ¶41.

63.     President Trump repeatedly criticized both the work of the Special Counsel's Office and Mr. Mueller himself.    For example, President Trump referred to the Special Counsel's investigation as a "hoax" and a "witch hunt," Ex. 2; Ex. 3, and to the Special Counsel's team as a "National Disgrace," Ex. 4.

64.     President Trump also stated that the investigation was "treason[ous]" and repeatedly warned that those involved "will certainly be looked at."  Ex. 5.

65.     President Trump posted on social media:  "They spied on my Campaign, Impeached me twice, had the Russia, Russia Hoax, the Fake Dossier Hoax, FISA Fraud, Election Fraud, the 'No Collusion' Mueller Hoax, and so much more.  I was innocent on all counts.  If I am elected, they will be brought to JUSTICE."  Ex. 6.

**IV.    PRESIDENT TRUMP'S STATEMENTS AND EXECUTIVE ORDERS REGARDING LAW FIRMS**

66.    During the 2024 presidential campaign, President Trump posted on social media that "WHEN I WIN, those people that CHEATED will be prosecuted to the fullest extent of the Law." Ex. 7.  The post further stated that "this legal exposure extends to Lawyers." *Id.*

67.    In an interview that aired on March 19, 2025, President Trump stated that "[w]e have a lot of law firms that we're going to be going after, because they were very dishonest people." Ex. 8.

**A.    Covington & Burling LLP**

68.    On February 25, 2025, President Trump signed a memorandum titled "Suspension of Security Clearances and Evaluation of Government Contracts," regarding the law firm Covington & Burling LLP ("Covington Memo").  Ex. 9.  The Covington Memo identified a specific partner of Covington & Burling "who assisted former Special Counsel Jack Smith" in criminally investigating President Trump.  *Id.* at 1.  The Covington Memo directed agency heads to "suspend any active security clearances held by" that specific partner and "all members, partners, and employees of Covington & Burling LLP who assisted former Special Counsel Jack Smith during his time as Special Counsel," and "to terminate any engagement of Covington & Burling LLP by any agency." *Id.* at 1-2.

69.    President Trump previously made public comments about Jack Smith.  For example, on July 30, 2023, then-candidate Trump stated on social media: "The Crooked Election Interference 'Thugs' from the DOJ, headed by the worst Thug of them all, Deranged Jack Smith, are now admitting that the Mar-a-Lago Security Tapes were NOT DELETED. … Also, whatever happened to Crooked Joe's Documents?  Where are the ones he sent and stored in Chinatown?  Is Deranged Jack going to Indict him for this and, at the same time, receiving BRIBES FROM CHINA?"  Ex. 10.

70.     Before signing the Covington Memo, President Trump said "We're going to call it the deranged Jack Smith signing or bill."  Ex. 11 at 2.  After signing the memo, the President handed the pen to an attendee and said, "Why don't you give it to Jack Smith"?  Ex. 12.

71.     During a March 14, 2025 speech at the Department of Justice, President Trump stated that his "administration stripped the security clearances of the disgraced intelligence agents who lied about Hunter Biden's laptop from hell.  We revoked the clearances of deranged Jack Smith, Alvin Bragg, Letitia James, and the crooked law firms that aided their partisan persecutions[.]"  Ex. 13.

**B.     Perkins Coie LLP**

72.     On March 6, 2025, President Trump signed Executive Order 14237, titled "Addressing Risks from Perkins Coie LLP" ("Perkins Order").  Ex. 14.  Perkins Coie is a large, global law firm.  Berman Decl. ¶58.

73.     The first section of the Perkins Order, titled "Purpose," described what it called the "dishonest and dangerous activity of the law firm Perkins Coie LLP," including that firm's "representing failed Presidential candidate Hillary Clinton," which the Perkins Order asserted was "part of a pattern" of "egregious activity."  Ex. 14 at 1.  The Perkins Order further stated that "Perkins Coie has worked with activist donors including George Soros to judicially overturn popular, necessary, and democratically enacted election laws, including those requiring voter identification."  *Id.*

74.     The Perkins Order directed federal agencies to "suspend security clearances held by individuals at Perkins Coie" until further notice, "require [g]overnment contractors to disclose any business they do with Perkins Coie," "terminate any contract" with Perkins Coie "to the maximum extent permitted by applicable law," issue guidance "limiting [the] official access" of Perkins Coie employees to federal government buildings "when such access would threaten the

national security of or otherwise be inconsistent with the interests of the United States," issue guidance "limiting Government employees acting in their official capacity from engaging with Perkins Coie employees to ensure consistency with the national security and other interests of the United States," and "refrain from hiring employees of Perkins Coie" absent special conditions. Ex. 14, at 2-4.

75.    The Perkins Order also directed the Chair of the Equal Employment Opportunity Commission to investigate "the practices of representative large, influential, or industry leading law firms" for practices it described as "discrimination under 'diversity, equity, and inclusion' policies." Ex. 14, at 2-4.

76.    The Perkins Order was accompanied by a "fact sheet" stating that the firm has "worked with activist donors, including George Soros, to judicially overturn enacted election laws" and that one of its former partners, Michael Sussman, was "indicted for lying to the FBI" about "claims of secret Trump-Russia communications" (without mentioning that he was subsequently acquitted). Ex. 15.

77.    President Trump previously discussed Perkins Coie publicly.  For example, on May 5, 2024, then-candidate Trump posted on social media: "Andrew McCarthy: 'HILLARY CLINTON, RECIDIVIST ELECTION-THEFT CONSPIRATOR … book[ed] as legal fees what might euphemistically be called 'research'—was the blueprint for the 2016 Hillary Clinton campaign, in cahoots with the Democratic National Committee.  They paid their law firm, Perkins Coie, which retained the research firm Fusion GPS and its contractor, former British spy Christopher Steele, to generate the farcical Steele dossier that was shared with the FBI, the State Department, and the media to smear Trump as a clandestine agent of the Kremlin[.]"  Ex. 16.

78.     President Trump stated at the signing ceremony for the Perkins Order that it was "an absolute honor to sign" the order because Perkins Coie had engaged in "weaponization against a political opponent," which "should never be allowed to happen again."  Ex. 17.

79.     A senior White House official later stated that "[t]he president doesn't believe [Perkins Coie] should have the privileges afforded to companies of their stature to work and operate with the federal government, since they have made it very clear they are vehemently against the president of the United States, and their work proves that."  Ex. 18.

80.     On March 11, 2025, Perkins Coie sued to enjoin the Perkins Order.  In support of its motion for a temporary restraining order, Perkins Coie submitted an affidavit in which one of its attorneys stated that Perkins Coie began experiencing harm from the order "[t]he day after" its issuance, when a federal agency official informed a Perkins Coie client that Perkins Coie lawyers "should not attend a scheduled meeting with an office in that agency."  Ex. 19, at ¶25.  The affidavit described other harms as a result of the Perkins Order, including clients terminating legal engagements with Perkins Coie.  *Id.* at ¶¶25-27, 20-31, 33.

81.     On March 12, 2025, Judge Beryl A. Howell of the U.S. District Court for the District of Columbia issued a temporary restraining order enjoining enforcement of the Perkins Order with respect to Perkins Coie's government contracts, Perkins Coie employee engagement with government personnel and access to government buildings, and the ban on hiring Perkins Coie employees for federal government positions.  *Perkins Coie LLP v. Department of Justice*, No. 25-cv-716, ECF No. 21, at 1-2 (D.D.C. Mar. 12, 2025).  The restraining order also enjoined the government "from using the statements laid out in Section 1 [describing the purportedly improper conduct of Perkins Coie] … in any interactions with Plaintiff or Plaintiff's clients, or employee[s] of Plaintiff or Plaintiff's clients."  *Id.* at 1.

82.     On April 2, 2025, Perkins Coie submitted a declaration in support of its motion for summary judgment explaining that the firm continued to experience harm and uncertainty as a result of the Perkins Order even after the court temporarily enjoined portions of it.  Specifically, the declaration stated that:

- "[B]ecause of the uncertainty created by the Order, and even after the entry of the TRO, many clients have begun requesting frequent updates relating to the Order in order to assess whether Perkins Coie can continue to represent them."

- "Perkins Coie has already lost significant revenue due to the loss of clients who terminated their engagements in the few days since the Order was issued.  And the firm has lost out on new work from clients who were considering engaging the firm, but chose not to move forward with Perkins Coie after issuance of the Executive Order."

- "The Order has also had a chilling effect on Perkins Coie attorneys, who are now reconsidering how they approach certain matters that require them to appear in federal buildings."

- "The Order has also impacted Perkins Coie's recruiting and, potentially, retention of our personnel.  Since the issuance of the Order, we have had business professional candidates who have been extended offers question the economic health of the firm and ask if there will be layoffs.  One interviewee asked one of the firm's recruiters questions that the recruiter understood to be precipitated by the Order.  The threat to the Firm's recruitment efforts poses severe consequences for the health of the firm."

- "The Order increases the potential that Perkins Coie lawyers will leave the firm for other opportunities in order to preserve their relationships with clients that have government contracts."

Ex. 20, at ¶¶48, 50-51, 53-54.

**C.      Paul, Weiss, Rifkind, Wharton & Garrison LLP**

83.     On March 14, 2025, President Trump signed Executive Order 14237, titled "Addressing Risks From Paul Weiss" ("Paul Weiss Order").  Ex. 21.

84.     The Paul Weiss Order identified specific partners at Paul, Weiss, Rifkind, Wharton & Garrison LLP ("Paul Weiss") who had played key roles in criminal investigations of President Trump, including a "leading prosecutor in the office of Special Counsel Robert Mueller."  Ex. 21

at 1.   The Paul Weiss Order also identified Paul Weiss partner Mark Pomerantz—who had investigated President Trump for fraud as a special prosecutor in the Manhattan District Attorney's Office—and stated that "Paul Weiss hired unethical attorney Mark Pomerantz, who had previously left Paul Weiss to join the Manhattan District Attorney's office solely to manufacture a prosecution against me and who, according to his co-workers, unethically led witnesses in ways designed to implicate me."  *Id.* at 1-2.   The Paul Weiss Order directed government officials to impose substantially the same sanctions against Paul Weiss and its employes as the Perkins Order attempted to impose on Perkins Coie.  *Id.* at 1-5.

85.     President Trump previously discussed Mark Pomerantz publicly.  For example, on February 9, 2023, then-candidate Trump stated on social media: "This Crazy Pomerantz guy, Hillary Clinton's lawyer, who left his Democrat only Law Firm to join (get this!) the Manhattan D.A.'s Office in order to prosecute 'Trump,' while at the same time writing a book about his exploits, including everything that happened in a secret Grand Jury.  This guy is deranged and should be charged approximately [sic]."  Ex. 22.

86.     The Paul Weiss Order's "Background" provision stated that "[g]lobal law firms have for years played an outsized role in undermining the judicial process and in the destruction of bedrock American principles."  Ex. 21 at 1.  The order further stated that "[g]lobal law firms," among other things, "degrade the quality of American elections," and that their purportedly improper litigation includes not only work done on behalf of paying clients, but also work done "ostensibly 'for the public good,'" i.e., "pro bono."  *Id.*

87.     On March 19, 2025, a Paul Weiss attorney moved to withdraw his representation of a criminal defendant.  The motion stated that the client feared that Paul Weiss's representation could prejudice the Department of Justice's review of his federal bribery case.  Ex. 23.

19

88.    On March 20, 2025, President Trump posted on social media that he had "agreed to withdraw" the Paul Weiss Order after reaching an agreement with Paul Weiss.  Ex. 24.  The President stated that Paul Weiss had agreed that "[l]aw firms should not favor any political party when it comes to choosing their clients," and that it "will not deny representation to clients, including in pro bono matters and in support of non-profits, because of the personal political views of individual lawyers."  *Id.* at 1-2.

89.    On March 21, 2025, President Trump issued Executive Order 14244 officially revoking the Paul Weiss Order.  Ex. 25; Berman Decl. ¶¶65-66.  Executive Order 14244 states that Paul Weiss "acknowledged the wrongdoing of its former partner Mark Pomerantz" and agreed to "adopting a policy of political neutrality with respect to client selection and attorney hiring"; using "merit-based hiring, promotion, and retention" rather than "diversity, equity, and inclusion" policies; and dedicating "$40 million in pro bono legal services" for causes such as "assisting our Nation's veterans, fairness in the justice system, and combating anti-Semitism."  Ex. 25, at 1; Berman Decl. ¶¶65-66.

90.    Executive Order 14244 rescinds the prior order to "suspend any active security clearances held by individuals at Paul Weiss" without any discussion of national security, classified information, or security clearances.  *See* Ex. 25.

91.    In an email to Paul Weiss employees, firm chairman Brad Karp stated that Paul Weiss had taken the deal because it perceived the Paul Weiss Order to be "an unprecedented threat to our firm" that "threatened our clients with the loss of their government contracts" and "the loss of access to the government" and "raised the specter that the government would not hire our employees."  Ex. 26, at 3-4.  Mr. Karp further stated that although the firm initially "prepared to challenge the executive order in court," he believed that even a "successful" lawsuit "would not

solve the fundamental problem, which was that clients perceived our firm as being a persona non grata with the Administration," and "[i]t was very likely that our firm would not be able to survive a protracted dispute with the Administration." *Id.* at 4.

92.    Mr. Karp's email does not reference national security, classified information, or security clearances. *See* Ex. 26.

93.    On March 21, 2025, President Trump stated, "Well, the law firms all want to make deals.  You mean the law firms that we're going after, that went after me for four years ruthlessly, violently, illegally?  … They're not babies.  They're very sophisticated people.  Those law firms did bad things.  Bad things.  They went after me for years." Ex. 27, at 1.

### D.    Presidential Memorandum Regarding Law Firms

94.    In a Presidential Memorandum dated March 22, 2025, President Trump "direct[ed] the Attorney General to seek sanctions against attorneys and law firms who engage in frivolous, unreasonable, and vexatious litigation against the United States or in matters before executive departments and agencies of the United States." Ex. 28, at 1-2.  President Trump "further direct[ed] the Attorney General, in consultation with any relevant senior executive official, to review conduct by attorneys or their law firms in litigation against the Federal Government over the last 8 years." *Id.* at 3.  The Memorandum identifies "reassessment of security clearances held by the attorney" or "termination of any Federal contract for which the relevant attorney or law firm has been hired to perform services" as "additional steps that may be taken" if the Attorney General identifies misconduct. *Id.*

95.    Accompanying the Presidential Memorandum was a "fact sheet" explaining that the President signed the memorandum "to hold attorneys and law firms accountable for unethical conduct when litigating against the Federal government or pursuing baseless partisan attacks." Ex. 29.  The "fact sheet" cited as examples of "egregious" and "unscrupulous" conduct attorney

"Marc Elias' direct involvement in creating a false 'dossier' to interfere with the 2016 presidential election" and "powerful Big Law pro bono practices" that "frequently coach clients to conceal their past or lie about their circumstances when seeking asylum." *Id.* at 1-2.

### E.    Jenner & Block LLP

96.    On March 25, 2025, President Trump signed an executive order titled "Addressing Risks from Jenner & Block" ("Jenner Order"). Ex. 30.

97.    The Jenner Order stated that "so-called 'Big Law' firms" "regularly conduct … harmful activity through their powerful pro bono practices, earmarking hundreds of millions of their clients' dollars for destructive causes, that often directly or indirectly harm their own clients." Ex. 30.   The Jenner Order further stated that Jenner & Block LLP had "abused its pro bono practice" by "engag[ing] in obvious partisan representations to achieve political ends, support[ing] attacks against women and children based on a refusal to accept the biological reality of sex, and back[ing] the obstruction of efforts to prevent illegal aliens from committing horrific crimes and trafficking deadly drugs within our borders." *Id.* at 1.  The Jenner Order also singled out a specific former Jenner partner, Andrew Weissman, based on his role in what the order described as "Robert Mueller's entirely unjustified investigation." *Id.* at 2.    The Jenner Order directed government officials to impose substantially the same sanctions against Jenner that the Perkins and then-withdrawn Paul Weiss Orders purported to impose on those law firms. *Id.* at 2-6.

98.    While signing the Jenner Order, President Trump stated that "Andrew Weissman is the main culprit with respect to this firm" and a "bad man." Ex. 31.

99.    President Trump previously discussed Andrew Weissman publicly.  On September 1, 2018, during his first presidential term, President Trump stated on social media that "If you're connected to Donald Trump, you get people like Robert Mueller & Andrew Weissman, and his team of partisans, coming after you with a vengeance[.]"  Ex. 32.

100.    On March 28, 2025, Jenner sued to enjoin the Jenner Order.  Ex. 33.  Jenner attached a supporting declaration stating that the firm began experiencing harm from the Order "within 24 hours of [its] issuance," when "several clients expressed concerns about [Jenner's] representation because they did not know whether we would be permitted to enter federal buildings and federal courthouses, negotiate with federal government officials, or participate in meetings with the Department of Justice."  *Id.* ¶¶64, 68.

101.    On March 28, 2025, Judge John D. Bates of the U.S. District Court for the District of Columbia issued a temporary restraining order enjoining enforcement of the same provisions of the Jenner Order as Judge Howell enjoined with respect to the Perkins Order.  *See Jenner & Block LLP v. Department of Justice*, No. 25-cv-916, ECF No. 9 (D.D.C. Mar. 28, 2025).

### F.    Skadden, Arps, Slate, Meagher & Flom

102.    On March 28, 2025, President Trump posted on social media that the large law firm Skadden, Arps, Slate, Meagher & Flom ("Skadden") had agreed to "provide a total of at least $100 Million Dollars in pro bono Legal Services … to causes that the President and Skadden both support," to ensure that the firm's Skadden Foundation chooses at least five Skadden Fellows dedicated to a set of agreed-upon causes, and that some Skadden Fellows will represent "conservative ideals," as well as to other terms similar to those agreed upon by Paul Weiss.  Ex. 34.

103.    In an email to Skadden employees, Skadden's executive partner Jeremy London stated that the firm chose to "proactively" seek a deal from President Trump after "learn[ing] that the Trump Administration intended to issue an executive order directed at Skadden," because firm officials believed "that [a deal] was the best path to protect our clients, our people and our Firm." Ex. 35, at 2-3.

### G.    Willkie Farr & Gallagher LLP

104.    On April 1, 2025, President Trump posted on social media that Willkie Farr & Gallagher LLP ("Willkie") had agreed to provide "at least $100 Million Dollars in pro bono Legal Services" to causes shared by the firm and the President, as well as to terms similar to those agreed upon by both Skadden and Paul Weiss.  Ex. 36, at 1.

105.    Willkie employs Doug Emhoff, the husband of former Vice President and 2024 presidential candidate Kamala Harris.  *E.g.*, Ex. 37.

106.    An email sent by Willkie's executive committee to staff stated:  "We learned that the President intended to issue an Executive Order targeting Willkie similar to the orders issued against multiple firms in the past weeks, threatening to imperil our clients' rights and those of our Firm.  We were invited to contact the Administration on Sunday, and they outlined a proposed alternative to receiving an Executive Order."  Ex. 38, at 2.  It concluded by stating, "[n]eedless to say, this was an incredibly difficult decision for Firm leadership."  *Id.* at 3.

### H.    Milbank LLP

107.    On April 2, 2025, Milbank LLP ("Milbank") agreed to a deal with President Trump.  Supp. Berman Decl. ¶23.

108.    President Trump announced over social media that Milbank had agreed to provide "at least $100 Million Dollars in pro bono Legal Services" to causes supported by the President, as well as to terms similar to those agreed upon by Skadden, Paul Weiss, and Wilkie.  Ex. 39.

109.    In an email, Milbank chairman Scott Edelman stated that Milbank had "concluded that it was in [Milbank's] best interest to agree with the Administration's suggestion and enter into [its] own Skadden-type agreement."  Ex. 40, at 2.  It further explained that "[t]he Administration's expressed concerns about big law firms, and in some cases its entry of Executive Orders against

particular firms, have created uncertainty for law firms like ours.  With this agreement, we believe we have gone a long way to putting these issues behind us."  *Id.* at 5-6.

    **I.**    **Other Law Firms**

    110.    On March 25, 2025, the Washington Post reported that major U.S. law firms have "refuse[d] to represent Trump opponents in the wake of his attacks" on Perkins Coie and Paul Weiss.  Ex. 41.  In particular, the article referenced "Biden-era officials sa[ying] they're having trouble finding lawyers to defend them," *id.* at 1, and "major law firms" declining to represent nonprofits adverse to the Trump administration because "they can't risk the cost if [the President] goes after them as a result," *id.* at 3.

    111.    On March 27, 2025, CNN reported that "[m]any firms are afraid that if they are targeted by [President] Trump, it could devastate their business if both clients and partners flee," citing "[i]nterviews with nearly a dozen lawyers and legal industry professionals."  Ex. 42, at 1-2.

    112.    None of country's 25 largest firms—and just eight of its largest 100 firms—joined an amicus brief filed on behalf of law firms in support of Perkins Coie's motion for summary judgment in No. 1:25-cv-716 (D.D.C.).  Ex. 43, at 1.

**V.**    **THE WILMERHALE EXECUTIVE ORDER AND FACT SHEET**

    113.    On March 27, 2025, President Trump issued an executive order entitled "Addressing Risks from WilmerHale."  Ex. 44 ("Order").

    114.    Section 1 of the Order states:"My Administration is committed to addressing the significant risks associated with law firms, particularly so-called 'Big Law' firms, that engage in conduct detrimental to critical American interests."  Ex. 44, at 1.

    115.    Section 1 of the Order further states that "[m]any firms take actions that threaten public safety and national security, limit constitutional freedoms, degrade the quality of American elections, or undermine bedrock American principles."  Ex. 44, at 1.  It also states that "law firms

regularly conduct this harmful activity through their powerful pro bono practices, earmarking hundreds of millions of their clients' dollars for destructive causes, that often directly or indirectly harm their own clients." *Id.*

116.    Section 1 of the Order describes WilmerHale as "yet another law firm that has … abused its pro bono practice to engage in activities that undermine justice and the interests of the United States." Ex. 44, at 1.  Section 1 provides "example[s]," which include that WilmerHale supposedly (1) "engages in obvious partisan representations to achieve political ends," (2) "supports efforts to discriminate on the basis of race," (3) "backs the obstruction of efforts to prevent illegal aliens from committing horrific crimes and trafficking deadly drugs within our borders," and (4) "furthers the degradation of the quality of American elections, including by supporting efforts designed to enable noncitizens to vote." *Id.* at 1-2.

117.    In addition, Section 1 of the Order claims that WilmerHale "is also bent on employing lawyers who weaponize the prosecutorial power to upend the democratic process and distort justice." Ex. 44, at 2.  As an example, Section 1 states that "WilmerHale rewarded Robert Mueller and his colleagues — Aaron Zebley, Mueller's 'top aide' and 'closest associate,' and James Quarles — by welcoming them to the firm after they wielded the power of the Federal Government to lead one of the most partisan investigations in American history." *Id.*

118.    Section 2 of the Order directs that the Attorney General, Director of National Intelligence, and "all other relevant heads of executive departments and agencies … shall immediately take steps consistent with applicable law to suspend any active security clearances held by individuals at WilmerHale, pending a review of whether such clearances are consistent with the national interest." Ex. 44, at 2.

119.    Section 2 of the Order also provides that "[t]he Office of Management and Budget shall identify all Government goods, property, material, and services, including Sensitive Compartmented Information Facilities, provided for the benefit of WilmerHale." Ex. 44, at 2.  It further directs that the "heads of agencies providing such material or services shall, to the extent permitted by law, expeditiously cease such provision." *Id.*

120.    Section 3 of the Order states: "To prevent the transfer of taxpayer dollars to Federal contractors whose earnings subsidize, among other things, activities that are not aligned with American interests, including racial discrimination, Government contracting agencies shall, to the extent permissible by law, require Government contractors to disclose any business they do with WilmerHale and whether that business is related to the subject of the Government contract."  Ex. 44, at 2.

121.    Section 3 of the Order also provides that "[t]he heads of agencies shall review all contracts with WilmerHale or with entities that disclose doing business with WilmerHale," and "to the extent permit by law, the heads of agencies shall … take appropriate steps to terminate any contract, to the maximum extent permitted by applicable law, … for which WilmerHale has been hired to perform any service" and "otherwise align their agency funding decisions with," among other things, "the goals and priorities of my Administration as expressed in executive actions" and "as heads of agencies deem appropriate."  Ex. 44, at 2-3.

122.    Section 3 of the Order also provides that, within 30 days of the date of the order, "agencies shall submit to the Director of the Office of Management and Budget an assessment of contracts with WilmerHale or with entities that do business with WilmerHale effective as of the date of this order and any actions taken with respect to those contracts in accordance with this order." Ex. 44, at 3.

123.    Section 4 of the Order provides that "[n]othing in this order shall be construed to limit the action authorized by section 4" of the Perkins Order.  Ex. 44, at 3.

124.    Section 5 of the Order directs that "[t]he heads of agencies shall, to the extent permitted by law, provide guidance limiting official access from Federal Government buildings to employees of WilmerHale when such access would threaten the national security of or otherwise be inconsistent with the interests of the United States."  Ex. 44, at 3.

125.    Section 5 of the Order further provides that "[i]n addition, the heads of agencies shall provide guidance limiting Government employees acting in their official capacity from engaging with WilmerHale employees to ensure consistency with the national security and other interests of the United States."  Ex. 44, at 3.

126.    Finally, Section 5 of the Order directs that "[a]gency officials shall, to the extent permitted by law, refrain from hiring employees of WilmerHale, absent a waiver from the head of the agency, made in consultation with the Director of the Office of Personnel Management, that such hire will not threaten the national security of the United States."  Ex. 44, at 3.

127.    Also on March 27, 2025, President Trump issued a "fact sheet" entitled "President Donald J. Trump Addresses Risks from WilmerHale."  Ex. 45 ("Fact Sheet").

128.    The Fact Sheet states that "[s]ecurity clearances held by WilmerHale employees will be immediately suspended, pending a review of whether their access to sensitive information is consistent with the national interest."  Ex. 45, at 1.  It further states that "Federal Agencies will also refrain from hiring WilmerHale employees unless specifically authorized."  *Id.*  And it states that "the Federal Government will terminate contracts that involve WilmerHale."  *Id.*

129.    The Fact Sheet also states that WilmerHale has "abus[ed] its pro bono practice to engage in activities that undermine justice and the interests of the United States" and that

28

"WilmerHale pursues partisan goals, supports efforts to discriminate on the basis of race, and backs the obstruction of efforts to prevent illegal aliens from committing horrific crimes and trafficking deadly drugs within our borders." Ex. 45, at 1-2.

130.    It additionally states that "WilmerHale has furthered the degradation of the quality of American elections by supporting efforts designed to enable noncitizens to vote." Ex. 45, at 2. And it states that "WilmerHale has been accused of discriminating against its own employees on the basis of race and other categories prohibited by civil rights laws, including through the use of race-based 'targets.'" *Id.* Finally, the Fact Sheet states that "WilmerHale rewarded Robert Mueller and two of his colleagues by welcoming them to the firm after they wielded the power of the Federal government to lead a partisan 'investigation' against the President and others." *Id.*

131.    WilmerHale was given no notice that the Order or Fact Sheet was forthcoming. Berman Decl. ¶75. WilmerHale was not given the opportunity to respond to the allegations in the Order or Fact Sheet. *Id.*

132.    WilmerHale was not given an opportunity to contest the provisions of the Order. Berman Decl. ¶75.

**VI.    THE WILMERHALE EXECUTIVE ORDER HAS HARMED AND WILL HARM THE FIRM AND ITS CLIENTS UNLESS THE ENTIRE ORDER IS PERMANENTLY ENJOINED.**

133.    On March 28, 2025, mere hours after WilmerHale filed its motion for a temporary restraining order but before this Court entered its temporary restraining order (the "TRO"), two meetings with a federal agency, involving two distinct matters, were canceled in light of the Order. Both of those meetings had been scheduled for March 28, 2025. Both of those meetings were rescheduled after the TRO issued and after the Department of Justice issued notice to federal agencies of the TRO, and they have since taken place. Supp. Berman Decl. ¶4.

134.    At least one government contractor received an email from a federal agency

contracting officer on March 28, 2025 requesting that it disclose whether it has any business relationship with WilmerHale. This request was not rescinded until April 2, several days after the TRO issued. Supp. Berman Decl. ¶5.

135.    One client, which had retained the Firm for a new matter prior to the issuance of the Order, terminated its retention of the Firm for that matter following the Order, citing the Order's issuance as the reason for terminating the engagement. Supp. Berman Decl. ¶6.

136.    On April 1, federal officials at a component of the Department of Defense indefinitely postponed a planned meeting with a WilmerHale attorney in light of the Order. Supp. Berman Decl. ¶7.

137.    While government counsel has represented that the Department of Justice has notified affected agencies via email of the TRO, WilmerHale has no way to confirm that all relevant federal officials have received the message. Supp. Berman Decl. ¶7.

138.    Several existing clients have paused WilmerHale's engagements in government-facing matters—or declined to engage WilmerHale for new work—as a direct result of the Order. Supp. Berman Decl. ¶8.

139.    Another client has directed that formal correspondence with government representatives be placed on its own letterhead rather than WilmerHale's, and that any other direct communications be handled by non-WilmerHale individuals. Supp. Berman Decl. ¶8.

140.    Another client has directed that WilmerHale cannot represent it publicly in light of the Order. Supp. Berman Decl. ¶8.

141.    Other existing clients are considering whether to replace WilmerHale—or engage an additional firm on ongoing matters—out of concern that agencies, federal courts, and other actors in the justice system are hostile to the Firm. Supp. Berman Decl. ¶9.

142.    A number of existing clients have expressed concerns about continuing to work with WilmerHale if the TRO is lifted and the Order fully takes effect, even though they would otherwise wish to continue working with the Firm.  Supp. Berman Decl. ¶10.

143.    If the Order fully takes effect, WilmerHale partners may leave the firm for another firm not subject to the same restrictions on their practice.  Clients who need attorneys who can interact with federal government personnel, access federal buildings, and access classified information may take existing or new business to other firms.  And clients with government contracts may decide to terminate matters and/or not engage WilmerHale for new matters to avoid the Order's reporting requirements.  Supp. Berman Decl. ¶10.

144.    The Order implicates the ability of at least 5 WilmerHale employees who are military reservists—all of whom have security clearances—to serve their country.  Berman Supp. Decl. ¶12.

145.    At least one incoming employee has expressed concern about, and is considering revoking an acceptance of an offer of employment, due to the Order's implications for the employee's security clearance.  Berman Supp. Decl. ¶11.

146.    WilmerHale represents many contractors who do business with the federal government.  Berman Decl. ¶77.  The fact that WilmerHale provides legal advice to certain clients is often confidential.  *Id.*

147.    The Order's requirement that government contractors disclose "any business" with WilmerHale creates administrative burdens for clients seeking to work with both the federal government and with WilmerHale.  Berman Decl. ¶77.

148.    More than 20 WilmerHale employees held security clearances at the time the Order issued on March 27, 2025.  Supp. Berman Decl. ¶28.  Most of these employees are military

veterans or reservists, or are former public civil servants, who were initially entrusted with access to sensitive information by virtue of their prior public service employment.  Supp. Berman Decl. ¶29.

149.    Suspension and revocation of security clearances held by individuals at WilmerHale impairs the ability of WilmerHale lawyers to represent clients in cases involving national security, cybersecurity, defense contracting, criminal investigations, or practice before the Committee on Foreign Investment in the United States.  Berman Decl. ¶78.

150.    WilmerHale attorneys have numerous upcoming appearances before federal courts and agencies.  Supp. Berman Decl. ¶13.  For example: (a) WilmerHale attorneys are scheduled to meet with the Securities and Exchange Commission in a federal building on April 29; (b) WilmerHale attorneys are scheduled to meet over videoconference or telephone with the Department of Justice on April 9 and May 8 and with the Securities and Exchange Commission on April 16, 17, and 24; (c) WilmerHale attorneys are scheduled to participate in in-person hearings in front of the Patent Trial and Appeal Board on April 23 and April 29; and (d) WilmerHale attorneys are scheduled to participate in numerous upcoming hearings, trials, and appellate proceedings in the coming days, weeks, and months.  *Id.*

151.    WilmerHale cannot provide effective representation and advocacy for its clients in proceedings against the government or in government fora if it is obstructed from engaging with federal prosecutors and accessing federal buildings.  Berman Decl. ¶81; *see also* Supp. Berman Decl. ¶¶13-15.

152.    Section 5 of the Order, if enforced, would prevent the Firm's Transactional Department attorneys from interacting with the staff of the Securities and Exchange Commission. *See* Supp. Berman Decl. ¶13.

153.    Section 5 would also prevent those attorneys from interacting with employees of the Internal Revenue Service.  WilmerHale attorneys represent clients in audits, in connection with requests for guidance and rulings, and in the creation of corporations, LLCs, and other entities. All of these activities require WilmerHale attorneys to interact with IRS personnel.  Supp. Berman Decl. ¶15.

154.    Restricting federal employees from engaging with WilmerHale and limiting WilmerHale's access to federal buildings impairs WilmerHale's and its personnel's and clients' ability to petition the government.  Berman Decl. ¶84.

155.    The assertions in the Order and Fact Sheet have harmed and continue to harm WilmerHale's reputation in the legal market and among its current and prospective clients and employees.  Berman Decl. ¶85; Supp. Berman Decl. ¶¶3-15.

156.    WilmerHale has been forced to expend significant resources to address the risk that it would be targeted by an executive order.  Berman Decl. ¶72.  Between early March and April 8, 2025, the Firm devoted more than 1,200 hours to analyzing the Covington Memo, Perkins Order, Paul Weiss Order, and Jenner Order; to preparing WilmerHale's strategy for responding should the Firm be targeted by President Trump; and to working on this litigation after President Trump issued the Order.  Supp. Berman Decl. ¶34.

April 8, 2025

Respectfully submitted,

*/s/ Paul D. Clement*

Paul D. Clement (D.C. Bar. No. 433215)
Erin E. Murphy (D.C. Bar No. 995953)
Matthew D. Rowen (D.C. Bar No. 176865)
Joseph J. DeMott (Virginia Bar. No. 93981,
    D.D.C. Bar ID #D00561)
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
paul.clement@clementmurphy.com