**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| WILMER CUTLER PICKERING HALE AND DORR LLP,<br><br>     *Plaintiff*,<br><br>  v.<br><br>EXECUTIVE OFFICE OF THE PRESIDENT, *et al.*,<br><br>     *Defendants*. | Case No. 1:25-cv-917<br><br>Judge Richard J. Leon |

**SUPPLEMENTAL DECLARATION OF BRUCE M. BERMAN IN SUPPORT OF
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT
AND DECLARATORY AND PERMANENT INJUNCTIVE RELIEF**

  I, Bruce M. Berman, pursuant to 28 U.S.C. § 1746, hereby declare as follows:

  1. I am one of two General Counsel of Wilmer Cutler Pickering Hale and Dorr LLP ("WilmerHale" or "the Firm"). I submit this Supplemental Declaration in support of WilmerHale's Motion for Summary Judgment and Declaratory and Permanent Injunctive Relief ("the Motion"), filed April 8, 2025. I am of the age of majority and competent to make this declaration.

  2. This declaration is intended to supplement my March 28, 2025, declaration, including by advising the Court of events that have occurred since that declaration and by providing additional information regarding the ongoing irreparable harm that WilmerHale and its

employees and clients will face unless the March 27, 2025, executive order ("the Order" or "WilmerHale Order") remains enjoined.[1]

I.     ADDITIONAL INFORMATION REGARDING WILMERHALE'S HARM

3.     On March 28, 2025, mere hours after my original declaration was finalized but before this Court entered its temporary restraining order (the "TRO"), WilmerHale was already beginning to feel the effects of the Order.

4.     For example, two previously-scheduled meetings with an agency that were supposed to take place on March 28, 2025, involving two unrelated matters, were abruptly postponed on March 28, 2025. Both of those meetings were rescheduled after the TRO issued and after the Department of Justice issued notice to federal agencies of the TRO, and they have since taken place.

5.     In addition, although the Order was in effect for just over 24 hours before the Court entered the TRO, I am aware that at least one government contractor received an email on March 28, 2025, from a federal agency contracting officer requesting that it disclose whether it has any business relationship with WilmerHale. I further understand that this request was not rescinded until April 2 (several days after the TRO issued).

6.     The Order continues to harm WilmerHale notwithstanding the Court's TRO. For example, one client, which had retained the Firm for a new matter prior to the issuance of the Order, terminated its retention of the Firm for that matter following the Order, citing the Order's issuance as the reason for terminating the engagement.

---

[1] I also write to correct the reference in Paragraph 28 of my March 28, 2025, declaration to the "Occupational Health and Safety Administration." The relevant agency is the Occupational Safety and Health Administration.

7. As another example, on April 1, federal officials at a component of the Department of Defense indefinitely postponed a planned meeting with WilmerHale attorneys in light of the Order. While government counsel has represented that the Department of Justice has notified affected agencies via email of the TRO, it is impossible for WilmerHale to confirm that all agencies have received the message.

8. As another example, several existing clients have paused WilmerHale's engagements in government-facing matters—or declined to engage WilmerHale for new work—citing the Order. Another has directed that formal correspondence with government representatives be placed on its own letterhead rather than WilmerHale's, and that any direct communications with government representatives be handled by non-WilmerHale individuals. And yet another has directed that WilmerHale cannot represent it publicly in light of the Order.

9. Other existing clients have indicated to WilmerHale partners that they are considering whether to replace WilmerHale—or engage an additional firm on ongoing matters—out of concern that agencies, federal courts, and other actors in the justice system are hostile to the Firm.

10. While the TRO has stemmed some of the harms of the Order, a permanent injunction is necessary to prevent the harms from resuming and intensifying. For instance, a number of existing clients have expressed concerns about continuing to work with WilmerHale if the TRO is lifted and the Order fully takes effect, even though they would otherwise wish to continue working with the Firm. Moreover, if the Order fully takes effect, WilmerHale partners may leave the firm for another firm not subject to the same restrictions on their practice. Clients who need attorneys who can interact with federal government personnel, access federal buildings, and access classified information may well take existing or new business to other firms. And

clients with government contracts may decide to terminate matters and/or not engage WilmerHale for new matters to avoid the Order's reporting requirements.

11. At least one incoming employee has expressed concern about, and is considering revoking an acceptance of an offer of employment due to, the Order's implications for the employee's security clearance.

12. The Order also implicates the ability of WilmerHale's military reservists—all of whom have security clearances—to serve their country. While, to the best of my knowledge, no military reservist has yet been stripped of a clearance or barred from reporting for duty, there is no guarantee that this will remain true unless the entire Order is permanently enjoined.

13. In addition, WilmerHale attorneys have numerous upcoming appearances before federal courts and agencies that would be affected by the Order, if it is not permanently enjoined. As just a few examples:

    a. WilmerHale attorneys are scheduled to meet with the Securities and Exchange Commission in a federal building on April 29;

    b. WilmerHale attorneys are scheduled to meet over videoconference or telephone with the Department of Justice on April 9 and May 8 and with the Securities and Exchange Commission on April 16, 17, and 24;

    c. WilmerHale attorneys are scheduled to participate in in-person hearings in front of the Patent Trial and Appeal Board on April 23 and April 29; and

    d. WilmerHale attorneys are currently scheduled to participate in numerous upcoming hearings, trials, and appellate proceedings in the coming days, weeks, and months.

14. Finally, if a permanent injunction is not entered, virtually all of WilmerHale's practice groups will be harmed—either directly or indirectly—in their ability to effectively

represent their clients. My first declaration highlighted some of those harms, but there are many others.

15. For example, in addition to other impacts on the Firm's Transactional Department attorneys discussed in my first declaration, Section 5 of the Order, if enforced, would also prevent those attorneys from interacting with employees of the Internal Revenue Service. WilmerHale attorneys represent clients in audits, in connection with requests for guidance and rulings, and in the creation of corporations, LLCs, and other entities. All of these activities require WilmerHale attorneys to interact with IRS personnel.

## II. ADDITIONAL INFORMATION REGARDING PRESIDENT TRUMP'S ACTIONS AGAINST LAW FIRMS

16. Since my prior declaration, three firms have preemptively entered into agreements with President Trump to avoid the issuance of a targeted executive order.

17. On March 28, President Trump announced on Truth Social that he had reached an agreement with Skadden, Arps, Slate, Meagher & Flom LLP ("Skadden"), under which Skadden committed to provide "at least $100 Million Dollars in pro bono Legal Services, during the Trump Administration and beyond," in areas both parties mutually support, including "Assisting Veterans and other Public Servants," ensuring "fairness in our Justice System," and "Combatting Antisemitism."[2] According to this announcement, Skadden committed to conduct pro bono activities "in the Firm name," establish a committee to make sure its pro bono activities represent "the full political spectrum," and fund "no fewer than five Skadden Fellows each year" for law school graduates who will work specifically on the causes identified in the agreement and who hold a wide range of political viewpoints, including "conservative ideals."[3] Additionally,

---

[2] President Donald J. Trump (@realDonaldTrump), Truth Social (Mar. 28, 2025), https://truthsocial.com/@realDonaldTrump/posts/114241348699704594.
[3] *Id.*

5

President Trump stated that Skadden had committed to "merit-based hiring, promotion, and retention," promised not to engage in "illegal DEI discrimination and preferences," and pledged not to deny representation to "members of politically disenfranchised groups" due to attorneys' "personal political views."[4] The Truth Social post also states that Skadden agreed to hire independent outside counsel to ensure that its employment practices fully comply with anti-discrimination laws.[5]

18. In a message sent to Skadden employees the same day, the firm's executive partner Jeremy London stated that the decision to negotiate a deal was made after firm leadership "learn[ed] that the Trump Administration intended to issue an executive order directed at Skadden."[6] According to London, the firm's leadership ultimately determined "that [the agreement] was the best path to protect our clients, our people and our Firm."[7]

19. Referring to the Skadden agreement, President Trump reportedly stated: "This was essentially a settlement."[8]

20. On April 1, President Trump announced that he had reached an agreement with Willkie Farr & Gallagher LLP ("Willkie") that largely mirrors his agreement with Skadden.[9]

21. According to President Trump's Truth Social post, Willkie committed to providing "at least $100 Million Dollars in pro bono Legal Services" aligned with the same causes identified in the Skadden agreement, as well as to "Gold Star Families."[10] The President stated that Willkie

---

[4] *Id.*
[5] *Id.*
[6] Daniel Barnes, *Major law firm strikes preemptive deal with White House*, Politico (March 28, 2025), https://www.politico.com/news/2025/03/28/skadden-arps-trump-law-deal-028324.
[7] *Id.*
[8] *Id.*
[9] President Donald J. Trump (@realDonaldTrump), Truth Social (Apr. 1, 2025), https://truthsocial.com/@realDonaldTrump/posts/114264667777137553.
[10] President Donald J. Trump (@realDonaldTrump), Truth Social (Apr. 1, 2025).

pledged that its pro bono committee would oversee these matters to ensure that they represent "the full political spectrum, including Conservative ideals.[11] Additionally, Willkie allegedly promised "Fair and Equal consideration" for job candidates regardless of political beliefs or prior administration service and undertook to retain independent counsel to confirm its compliance with anti-discrimination laws.[12] Finally, President Trump stated that Willkie agreed not to deny representation to politically disenfranchised groups or government officials based on the "personal political views" of individual attorneys.[13]

22. Willkie's executive committee communicated to its employees via email that a deal was made after the firm "learned that the President intended to issue an Executive Order similar to the orders issued against multiple firms in the past weeks" that would "threat[en] to imperil [their] clients' rights and those of [the] Firm."[14] The committee further explained that the firm was "invited to contact the Administration," at which point the Administration "outlined a proposed alternative to receiving an Executive Order."[15] The email concluded by acknowledging, "[n]eedless to say, this was an incredibly difficult decision for Firm leadership."[16]

23. On April 2, President Trump announced another agreement, this one with Milbank LLP ("Milbank"), in which Milbank made concessions similar to those made by Skadden and Willkie to avoid punishment by the President.[17]

---

[11] *Id.*
[12] *Id.*
[13] *Id.*
[14] *Willkie Leadership's Address to Firm Following Trump Agreement*, Law.com (Apr. 1, 2025), https://www.law.com/international-edition/2025/04/01/willkie-leaderships-address-to-firm-following-trump-agreement/?slreturn=20250406-44037.
[15] *Id.*
[16] *Id.*
[17] President Donald J. Trump (@realDonaldTrump), Truth Social (Apr. 2, 2025), https://truthsocial.com/@realDonaldTrump/posts/114269692330126501.

24. Like the previous agreements, President Trump's announcement indicated that Milbank pledged at least "$100 Million Dollars in pro bono legal services" toward the same shared causes, and specifically committed to expanding its existing partnership with the "Milbank Exoneration and Resentencing Review Unit at the Perlmutter Center for Legal Justice at Cardozo Law School."[18] Additionally, Milbank promised to include partners with diverse political ideologies on its pro bono committee to ensure that the committee represents "the full political spectrum, including Conservative ideals."[19] Milbank also guaranteed that representation would not be denied based on a client's "political affiliation" or due to opposition from any government official.[20] And it committed to considering candidates from both Republican and Democratic administrations—including the Trump Administration—for employment, and agreed to retain independent outside counsel to ensure compliance with anti-discrimination laws.[21] The announcement included a "Statement from the White House" stating that through these agreements, "The President continues to build an unrivaled network of Lawyers, who will put a stop to Partisan Lawfare in America."[22]

25. In an email to staff, Milbank chairman Scott Edelman stated that the firm was "contacted by representatives of the Trump administration with questions and concerns about [the firm's] approach to pro bono and diversity initiatives," and that "[t]he Trump Administration suggested … that [the firm] enter into an agreement similar to the one recently agreed to by Skadden."[23] He further explained that the firm had determined it was "in [Milbank's] best interest

---

[18] President Donald J. Trump (@realDonaldTrump), Truth Social (Apr. 2, 2025).
[19] *Id.*
[20] *Id.*
[21] *Id.*
[22] *Id.*
[23] Abigail Adcox, *Milbank Becomes Next Big Law Firm to Reach Deal with Trump*, Law.com (Apr. 2, 2025), https://www.law.com/americanlawyer/2025/04/02/milbank-becomes-next-big-law-firm-to-reach-deal-with-trump.

to agree with the administration's suggestion."[24] Edelman also noted that "the Administration's expressed concerns about big law firms, and in some cases its entry of Executive Orders against particular firms, have created uncertainty for law firms like ours," adding that Milbank believes the agreement significantly contributes to "putting these issues behind us."[25]

### III. ADDITIONAL INFORMATION REGARDING WILMERHALE

26. In addition to the relevant litigation I identified in my March 28, 2025, declaration, WilmerHale also successfully represented a pro bono client in challenging a Massachusetts law restricting speech on sidewalks outside reproductive health care clinics that perform abortions. This advocacy resulted in a Supreme Court opinion holding that the Massachusetts law was unconstitutional. *McCullen v. Coakley*, 573 U.S. 464 (2014).

27. In addition to the suits against the federal government I identified in my March 28, 2025, declaration, the Firm was involved in at least 68 lawsuits against the George W. Bush Administration on behalf of clients, including *Boumediene v. Bush*, 553 U.S. 723 (2008).

28. Our records show that at the time the Order issued on March 27, 2025, more than 20 WilmerHale employees held security clearances, and at least 5 of those employees held active security clearances in connection with their service as military reservists.

29. Most of these employees are military veterans or reservists, or are former public civil servants, who were initially entrusted with access to sensitive information by virtue of their prior public service employment.

30. Many security clearance holders received their clearance before being hired by WilmerHale.

31. The clearances of WilmerHale personnel were issued by the Department of Defense,

---

[24] *Id.*
[25] *Id.*

9

Department of Justice, Department of State, Central Intelligence Agency, National Security Agency, and other entities of the Intelligence Community.

32. The majority of WilmerHale personnel holding active security clearances had no involvement in any of the matters referenced in the WilmerHale Order or the Fact Sheet.

33. WilmerHale does not now maintain a Sensitive Compartmented Information Facility (SCIF).

34. Between early March and April 8, 2025, the Firm devoted more than 1,200 hours to analyzing the Covington Memo, Perkins Order, Paul Weiss Order, and Jenner Order; to preparing WilmerHale's strategy for responding should the Firm be targeted by President Trump; and to working on this litigation after President Trump issued the WilmerHale Order.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge, information and belief.

Executed on April 8, 2025

_____
Bruce M. Berman