**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

WILMER CUTLER PICKERING HALE
AND DORR LLP,

*Plaintiff*,

v.

EXECUTIVE OFFICE OF THE
PRESIDENT, *et al.*,

*Defendants*.

Case No. 1:25-cv-917

Judge Richard J. Leon

---

**DECLARATION OF JOSEPH J. DEMOTT**
**IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

1.       I am an attorney in the law firm of Clement & Murphy, PLLC and a member of the Bar of this Court.  I am one of the counsel of record in the above-captioned action representing Plaintiff, Wilmer Cutler Pickering Hale and Dorr LLP.  I submit this declaration in support of Plaintiff's Motion for Summary Judgment.

2.       I am over the age of 18 and competent to make this declaration.  I have personal knowledge of the facts set forth in this declaration and, if called and sworn as a witness, could and would competently testify to them.

3.       All exhibits to this Declaration were obtained by visiting the URLs listed below within the past four business days.

4.       Attached hereto as **Exhibit 1** is a true and correct copy of a May 17, 2017 Press Release by the U.S. Department of Justice titled "Appointment of Special Counsel," as downloaded from the Department of Justice's website at https://tinyurl.com/2um33wv9.

5.      Attached hereto as **Exhibit 2** is a true and correct copy of an April 19, 2019 post on X by user @realDonaldTrump, which upon information and belief is an account owned by President Donald J. Trump, as downloaded from X's website at https://tinyurl.com/2fp9wua7.

6.      Attached hereto as **Exhibit 3** is a true and correct copy of a July 29, 2018 post on X by user @realDonaldTrump, which upon information and belief is an account owned by President Donald J. Trump, as downloaded from X's website at https://tinyurl.com/yjst9zsw.

7.      Attached hereto as **Exhibit 4** is a true and correct copy of an August 20, 2018 post on X by user @realDonaldTrump, which upon information and belief is an account owned by President Donald J. Trump, as downloaded from X's website at https://tinyurl.com/5n6d5atp.

8.      Attached hereto as **Exhibit 5** is a true and correct copy of a March 25, 2019 article by the Associated Press titled "Trump claims launching Russia probe 'treasonous'" and published by PBS News, as downloaded from PBS News's website at https://tinyurl.com/5b5ej795.

9.      Attached hereto as **Exhibit 6** is a true and correct copy of a September 6, 2023 post on Truth Social by user @realDonaldTrump, which upon information and belief is an account owned by President Donald J. Trump, as downloaded from Truth Social's website at https://tinyurl.com/yneuk8me.

10.      Attached hereto as **Exhibit 7** is a true and correct copy of a September 7, 2024 post on Truth Social by user @realDonaldTrump, which upon information and belief is an account owned by President Donald J. Trump, as downloaded from Truth Social's website at https://tinyurl.com/3ujuyh36.

11.      Attached hereto as **Exhibit 8** is a true and copy of a March 19, 2025 article by Daniel Barnes titled "How Major Law Firms Are Responding To Trump's Attacks" and published by Politico, as downloaded from Politico's website at https://tinyurl.com/e4nzahke.

12.    Attached hereto as **Exhibit 9** is a true and correct copy of a February 25, 2025 Presidential Memorandum issued by President Donald J. Trump titled "Suspension of Security Clearances and Evaluation of Government Contracts," as downloaded from the White House's website at https://tinyurl.com/y83rccby.

13.    Attached hereto as **Exhibit 10** is a true and correct copy of a July 30, 2023, post on Truth Social by user @realDonaldTrump, which upon information and belief is an account owned by President Donald J. Trump, as downloaded from Truth Social's website at https://tinyurl.com/534unn9k.

14.    Attached hereto as **Exhibit 11** is a true and correct copy of a February 25, 2025 article by Joshua Gerstein and Kyle Cheney titled "Trump Targets Washington Law Firm that Aided Smith" and published by Politico, as downloaded from Politico's website at https://tinyurl.com/3yj86d6a.

15.    Attached hereto as **Exhibit 12** is a true and correct copy of a February 25, 2025 article by Kelsey Walsh titled "Trump signs executive action targeting law firm representing former special counsel Jack Smith," and published by ABC News, as downloaded from ABC News's website at https://tinyurl.com/25bxpb58.

16.    Attached hereto as **Exhibit 13** is a true and correct copy of a March 14, 2025 video by the White House titled "President Trump Delivers Remarks at the Department of Justice," as downloaded from YouTube's website at https://tinyurl.com/mwcwxwj9.

17.    Attached hereto as **Exhibit 14** is a true and correct copy of a March 6, 2025 Executive Order Number 14230 issued by President Donald J. Trump titled "Addressing Risks from Perkins Coie LLP," as downloaded from the White House's website at https://tinyurl.com/3fd4mnse.

18.    Attached hereto as **Exhibit 15** is a true and correct copy of a March 6, 2025 White House Fact Sheet titled "Fact Sheet: President Donald J. Trump Addresses Risks from Perkins Coie LLP," as downloaded from the White House's website at https://tinyurl.com/nyfnhuj.

19.    Attached hereto as **Exhibit 16** is a true and correct copy of a May 5, 2024 post on Truth Social by user @realDonaldTrump, which upon information and belief is an account owned by President Donald J. Trump, as downloaded from Truth Social's website at https://tinyurl.com/yc4xv5j6.

20.    Attached hereto as **Exhibit 17** is a true and correct copy of a March 6, 2025 article by Devlin Barrett titled "Trump Ramps Up Attacks on Law Firms with Order Targeting Perkins Coie" and published by the New York Times, as downloaded from the New York Times's website at https://tinyurl.com/mry4aup3.

21.    Attached hereto as **Exhibit 18** is a true and correct copy of a March 6, 2025 by Perry Stein and Michael Birnbaum titled "Trump Expands Retribution Campaign Against Law Firms that Aided His Foes" and published by the Washington Post, as downloaded from the Washington Post's website at https://tinyurl.com/bdh8mad6.

22.    Attached hereto as **Exhibit 19** is a true and correct copy of a March 11, 2025 document filed by Perkins Coie titled "Declaration of David J. Burman in Support of Motion for Temporary Restraining Order" as downloaded from the docket for *Perkins Coie LLP v. U.S. Department of Justice*, No. 25-cv-716, ECF No. 2-2 (D.D.C.).

23.    Attached hereto as **Exhibit 20** is a true and correct copy of an April 2, 2025 document filed by Perkins Coie titled "Declaration of David J. Burman in Support of Motion for Summary Judgment," as downloaded from the docket for *Perkins Coie LLP v. U.S. Department of Justice*, No. 25-cv-716, ECF No. 39-3 (D.D.C.).

24.    Attached hereto as **Exhibit 21** is a true and correct copy of a March 14, 2025 Executive Order Number 14237 issued by President Donald J. Trump titled "Addressing Risks from Paul Weiss," as downloaded from the White House's website at https://tinyurl.com/4kbua5u7.

25.    Attached hereto as **Exhibit 22** is a true and correct copy of a February 9, 2023 post on Truth Social by user @realDonaldTrump, which upon information and belief is an account owned by President Donald J. Trump, as downloaded from Truth Social's website at https://tinyurl.com/5abmyp2s.

26.    Attached hereto as **Exhibit 23** is a true and correct copy of a March 19, 2025 filing by Roberto Finzi and titled "Memorandum in Support of Motion to Withdraw as Counsel for Defendant Steven Schwartz" as downloaded from the docket for *United States v. Coburn*, No. 19-120, ECF No. 1012-1 (D.N.J.).

27.    Attached hereto as **Exhibit 24** is a true and correct copy of a March 20, 2025 post on Truth Social by user @realDonaldTrump, which upon information and belief is an account owned by President Donald J. Trump, as downloaded from Truth Social's website at https://tinyurl.com/3y3edyh9.

28.    Attached hereto as **Exhibit 25** is a true and correct copy of a March 21, 2025 Executive Order 14244 issued by President Donald J. Trump titled "Addressing Remedial Action by Paul Weiss" as downloaded from the White House's website at https://tinyurl.com/2ta2b3tz.

29.    Attached hereto as **Exhibit 26** is a true and correct copy of a March 23, 2025 article by Lauren Edmonds titled "Read the email Paul Weiss Chairman Brad Karp sent to staff after striking a deal with Trump: 'Clients perceived our firm as being persona non grata'" and published by Business Insider, as downloaded from Business Insider's website at https://tinyurl.com/3k3w8phu.

30.    Attached hereto as **Exhibit 27** is a true and correct copy of a March 21, 2025 article by Brett Samuels titled "Trump suggest law firms 'want to make deals' after rescinding Paul, Weiss order" and published by The Hill, as downloaded from the Hill's website at https://tinyurl.com/5mcv9zxh.

31.    Attached hereto as **Exhibit 28** is a true and correct copy of a March 22, 2025 Presidential Memorandum issued by President Donald J. Trump titled "Preventing Abuses of the Legal System and the Federal Court," as downloaded from the White House's website at https://tinyurl.com/2xffvr6c.

32.    Attached hereto as **Exhibit 29** is a true and correct copy of a March 21, 2025 White House Fact Sheet titled "Fact Sheet: President Donald J. Trump Prevents Abuses of the Legal System and the Federal Courts," as downloaded from the White House's website at https://tinyurl.com/48zbufb8.

33.    Attached hereto as **Exhibit 30** is a true and correct copy of a March 25, 2025 Executive Order 14246 issued by President Donald J. Trump titled "Addressing Risks from Jenner & Block," as downloaded from the White House's website at https://tinyurl.com/53v3xcam.

34.    Attached hereto as **Exhibit 31** is a true and correct copy of a March 25, 2025 video titled "Trump Signs Executive Order Taking Aim At Law Firm Jenner & Block, Slams Attorney Andrew Weissmann" and published by Forbes, as downloaded from YouTube's website at https://tinyurl.com/4pr9c2za.

35.    Attached hereto as **Exhibit 32** is a true and correct copy of a September 1, 2018 post on X by user @realDonaldTrump, which upon information and belief is an account owned by President Donald J. Trump, as downloaded from X's website at https://tinyurl.com/m2rtfp6y.

36.     Attached hereto as **Exhibit 33** is a true and correct copy of a March 28, 2025 declaration by Thomas J. Perrelli titled "Declaration Of Thomas J. Perrelli In Support Of Motion For Temporary Restraining Order," as downloaded from the docket for *Jenner & Block LLP v. U.S. Department of Justice*, No. 1:25-cv-916, ECF No. 2-16 (D.D.C.).

37.     Attached hereto as **Exhibit 34** is a true and correct copy of a March 28, 2025 post on Truth Social by user @realDonaldTrump, which upon information and belief is an account owned by President Donald J. Trump, as downloaded from Truth Social's website at https://tinyurl.com/tsfbcbwu.

38.     Attached hereto as **Exhibit 35** is a true and correct copy of a March 28, 2025 article by Daniel Barnes titled "Major law firm strikes preemptive deal with White House" and published in Politico, as downloaded from Politico's website at https://tinyurl.com/mvv9ubmz.

39.     Attached hereto as **Exhibit 36** is a true and correct copy of an April 1, 2025 post on Truth Social by user @realDonaldTrump, which upon information and belief is an account owned by President Donald J. Trump, as downloaded from Truth Social's website at https://tinyurl.com/tuddku4n.

40.     Attached hereto as **Exhibit 37** is a true and correct copy of an April 1, 2025 article by Patrick Smith and Abigail Adcox titled "Willkie Believes It's the Next Target of Trump Executive Order" and published in Law.com, as downloaded from Law.com's website at https://tinyurl.com/3pywbjx8.

41.     Attached hereto as **Exhibit 38** is a true and correct copy of an April 1, 2025 article by ALM Staff titled "Willkie Firm Leadership Addresses the Firm Following Trump Agreement" and published by The American Lawyer, as downloaded from the American Lawyer's website at https://tinyurl.com/mtnwrdya.

42.    Attached hereto as **Exhibit 39** is a true and correct copy of an April 2, 2025 post on Truth Social by user @realDonaldTrump, which upon information and belief is an account owned by President Donald J. Trump, as downloaded from Truth Social's website at https://tinyurl.com/mr3cves4.

43.    Attached hereto as **Exhibit 40** is a true and correct copy of an April 2, 2025 article by ALM Staff titled "Milbank 'Comfortable With All These Provisions,' Chairman Says in Message to Firm" and published in the American Lawyer, as downloaded from the American Lawyer's website at https://tinyurl.com/3k6kk7v7.

44.    Attached hereto as **Exhibit 41** is a true and correct copy of a March 11, 2025 article by Michael Birnbaum titled "Law Firms Refuse To Represent Trump Opponents In The Wake Of His Attacks" and published in the Washington Post, as downloaded from the Washington Post's website at https://tinyurl.com/yn563p6x.

45.    Attached hereto as **Exhibit 42** is a true and correct copy of a March 27, 2025 article by Katelyn Polantz titled "Law Firms Are Scared To Speak Out Amid Trump's Attacks On Their Livelihood" and published by CNN, as downloaded from CNN's website at https://tinyurl.com/2rd8dwem.

46.    Attached hereto as **Exhibit 43** is a true and correct copy of an April 4, 2025 article by Justin Henry titled "Big Law Mostly Sits Out Industry Response To Trump Orders" and published in Bloomberg Law, as downloaded from Bloomberg Law's website at https://tinyurl.com/ycypte4h.

47.    Attached hereto as **Exhibit 44** is a true and correct copy of a March 27, 2025 Executive Order 14250 issued by President Donald J. Trump titled "Addressing Risks from WilmerHale," as downloaded from the White House's website at https://tinyurl.com/mv3kjzmz.

48.     Attached hereto as **Exhibit 45** is a true and correct copy of a March 27, 2025 White House Fact Sheet titled "Fact Sheet: President Donald J. Trump Addresses Risks from WilmerHale," as downloaded from the White House's website at https://tinyurl.com/3t33z9zk.

49.     On March 31, 2025, Deputy Associate Attorney General Richard P. Lawson informed me that at approximately 2:00pm ET that day, he sent an email to all named agency defendants regarding the temporary restraining order issued by this Court three days earlier.  Mr. Lawson forwarded me a copy of that email, which is attached hereto as **Exhibit 46**.

50.     On April 1, 2025, Mr. Lawson sent me a list of federal agencies that he said were notified at approximately 4:20pm ET that day, "in addition to the named defendants who were notified yesterday."  A copy of that list is attached as **Exhibit 47**.

51.     On April 2, 2025, at approximately 10:02am ET, I informed Mr. Lawson that there were still several agencies and sub-agencies subject to the Executive Order that did not appear to have been notified, including the Department of the Navy, the Air Force, the Commodity Futures Trading Commission, the Office of the Comptroller of the Currency, the Farm Credit Administration, the Federal Reserve, the Occupational Safety and Health Administration, the Pension Benefit Guaranty Corporation, and the International Trade Commission.

52.     On April 3, 2025, at approximately 12:11pm ET, Mr. Lawson informed me that he had sent additional emails to federal agencies and provided what he said was "a complete list" of all "agencies that have received notice" of the Court's temporary restraining order.  A copy of that list is attached as **Exhibit 48**.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed on April 8, 2025, in Columbia, South Carolina.

JOSEPH J. DEMOTT
Virginia Bar No. 93981
D.D.C. Bar ID #D00561

# EXHIBIT 1



PRESS RELEASE

# Appointment of Special Counsel

Wednesday, May 17, 2017

**For Immediate Release**

Office of Public Affairs

Deputy Attorney General Rod J. Rosenstein today announced the appointment of former Department of Justice official and FBI Director Robert S. Mueller III to serve as Special Counsel to oversee the previously-confirmed FBI investigation of Russian government efforts to influence the 2016 presidential election and related matters.

"In my capacity as acting Attorney General, I determined that it is in the public interest for me to exercise my authority and appoint a Special Counsel to assume responsibility for this matter," said Deputy Attorney General Rosenstein. "My decision is not a finding that crimes have been committed or that any prosecution is warranted. I have made no such determination. What I have determined is that based upon the unique circumstances, the public interest requires me to place this investigation under the authority of a person who exercises a degree of independence from the normal chain of command."

Deputy Attorney General Rosenstein added, "Each year, the career professionals of the U.S. Department of Justice conduct tens of thousands of criminal investigations and handle countless other matters without regard to partisan political considerations. I have great confidence in the independence and integrity of our people and our processes. Considering the unique circumstances of this matter, however, I determined that a Special Counsel is necessary in order for the American people to have full confidence in the outcome. Our nation is grounded on the rule of law, and the public must be assured that government officials administer the law fairly. Special Counsel Mueller will have all appropriate resources to conduct a thorough and

complete investigation, and I am confident that he will follow the facts, apply the law and reach a just result."

Special Counsel Mueller has agreed to resign from his private law firm in order to avoid any conflicts of interest with firm clients or attorneys.

A copy of the order is attached.

*Updated February 6, 2025*

**Attachment**

[Order 3915-2017 (Special Counsel)](#) [PDF, 265 KB]

**Topic**

**VOTING AND ELECTIONS**

**Component**

[Office of the Deputy Attorney General](#)

Press Release Number: 17-541

---

✉ **Office of Public Affairs**

U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington DC 20530

📞 Office of Public Affairs Direct Line
202-514-2007

Department of Justice Main Switchboard
202-514-2000

# EXHIBIT 2



← Post

Donald J. Trump ✓
@realDonaldTrump

...agreed to testify, it was not necessary for me to respond to statements made in the "Report" about me, some of which are total bullshit & only given to make the other person look good (or me to look bad). This was an Illegally Started Hoax that never should have happened, a...

8:08 AM · Apr 19, 2019

💬 42K          ⇄ 22K          ♡ 100K          🔖 165          ⬆

💬 Read 42.3K replies

# EXHIBIT 3



# EXHIBIT 4



← **Post**

**Donald J. Trump** ✓
@realDonaldTrump

....looking for trouble. They are enjoying ruining people's lives and REFUSE to look at the real corruption on the Democrat side – the lies, the firings, the deleted Emails and soooo much more! Mueller's Angry Dems are looking to impact the election. They are a National Disgrace!

7:38 AM · Aug 20, 2018

💬 14K          🔁 11K          ♡ 47K          🔖 22          ⬆️

💬 Read 14.6K replies

# EXHIBIT 5



# Trump claims launching Russia probe 'treasonous'

**Politics**    Mar 25, 2019 1:27 PM EDT

WASHINGTON — President Donald Trump is accusing those responsible for launching the special counsel investigation of "treason" and says they "will certainly be looked at."

Trump did not specify who he's referring to, but told reporters Monday, that "There are a lot of people out there that have done some very, very evil things, very bad things. I would say treasonous things against our country."

Trump adds that, "Those people will certainly be looked at" and says: "I've been looking at them for a long time."

**READ MORE: How Trump's allies are seizing on the Mueller report for his 2020 campaign**

The comments come a day after the attorney general told Congress that special counsel Robert Mueller found no evidence Trump or his associates conspired with Russia to influence the 2016 election.

Asked about the possibility of **issuing pardons**, Trump also says: I "haven't thought about it."

**READ MORE: 4 things we learned from Barr's summary of the Mueller report**

# Insightful, trustworthy journalism, for everyone.

Your tax-deductible donation directly supports our mission. Support *PBS News Hour* today.

## Donate_ →

*By —* Associated Press

# EXHIBIT 6



← **Truth Details**
1415 replies

 **Donald J. Trump** ✓
@realDonaldTrump

They spied on my Campaign, Impeached me twice, had the Russia, Russia Hoax, the Fake Dossier Hoax, FISA Fraud, Election Fraud, the "No Collusion" Mueller Hoax, and so much more. I was innocent on all counts. If I am elected, they will be brought to JUSTICE, something that Republicans have always been afraid to do.

**7.45k** ReTruths   **25.5k** Likes                         Sep 06, 2023, 3:06 PM

# EXHIBIT 7



← **Truth Details**
6052 replies

⋯

 **Donald J. Trump** ✓
@realDonaldTrump

CEASE & DESIST: I, together with many Attorneys and Legal Scholars, am watching the Sanctity of the 2024 Presidential Election very closely because I know, better than most, the rampant Cheating and Skullduggery that has taken place by the Democrats in the 2020 Presidential Election. It was a Disgrace to our Nation! Therefore, the 2024 Election, where Votes have just started being cast, will be under the closest professional scrutiny and, WHEN I WIN, those people that CHEATED will be prosecuted to the fullest extent of the Law, which will include long term prison sentences so that this Depravity of Justice does not happen again. We cannot let our Country further devolve into a Third World Nation, AND WE WON'T! Please beware that this legal exposure extends to Lawyers, Political Operatives, Donors, Illegal Voters, & Corrupt Election Officials. Those involved in unscrupulous behavior will be sought out, caught, and prosecuted at levels, unfortunately, never seen before in our Country.

**17.5k** ReTruths  **46.8k** Likes                    Sep 07, 2024, 7:01 PM



# EXHIBIT 8

POLITICO

# How major law firms are responding to Trump's attacks

Law firms are torn on how to handle the new Trump administration as the president targets some of their own.



U.S. President Donald Trump speaks after signing executive orders in the Oval Office of the White House on March 06, 2025 in Washington, DC. | Alex Wong/Getty Images

By **DANIEL BARNES**
03/19/2025 05:55 AM EDT



Lawyers at some of the nation's largest law firms are afraid of President Donald Trump. Not just afraid of what his policies might mean for their clients, but now for their own livelihoods, as his attacks on individual firms have left a shocked industry struggling to respond.

When Trump first took office in 2017, attorneys at Big Law firms lent thousands of pro-bono hours to legal efforts to stymie the administration's most controversial policies, including the travel ban that restricted entry to the U.S. from certain Muslim-majority countries.

Advertisement

AD

After his efforts to overturn the results of the 2020 election and the Capitol riot on Jan. 6, 2021, Trump became even more anathema to major firms; several of his criminal defense lawyers had to leave their firms in order to take him on as a client.

Now, as he returns triumphant from the political wilderness, Trump finds a Washington legal community facing a dilemma — keep their heads down and avoid cases that may pit them against the administration, or continue representing clients that might anger a president increasingly willing to use his power to seek vengeance.

"Back then nobody believed that there would be retaliation against the institution or them personally for taking these actions," said a former partner at a major firm granted anonymity to speak candidly. "Nobody was thinking, I've got to worry whether it could really hurt my law firm if I took this on. And that's the huge change we're in now."

POLITICO talked to more than five lawyers for this story and most were granted anonymity in order to speak candidly without fear of Trump's retribution. Much of the trepidation inside big firms comes from Trump's new strategy of signing executive orders seemingly aimed at destroying firms in retaliation for perceived wrongs dating back a decade.

On Friday, Trump signed an order sanctioning the firm Paul Weiss for the work of their former employee Mark Pomerantz, who later investigated Trump's finances and payments to porn star Stormy Daniels for the Manhattan District Attorney's office. Pomerantz resigned from the DA's office in 2022 before Trump was indicted. The order cuts the firm off from government contracts and even restricts their lawyers from entering certain government buildings.

And earlier this month, Trump signed an executive order sanctioning Perkins Coie, punishing the firm for earlier work on behalf of Hillary Clinton.

Trump's grudge against Perkins dates back to the 2016 presidential campaign when now-former Perkins Coie lawyers working for Clinton's campaign hired Fusion GPS, resulting in the infamous Steele dossier that alleged collusion between Trump's campaign and Russia. While the executive order ostensibly targets the firm for national security reasons and racially discriminatory hiring practices, the entire first paragraph is dedicated to Clinton, the dossier and MAGA bogeyman George Soros.

Advertisement

"We have a lot of law firms that we're going to be going after because they were very dishonest people," Trump said in a Fox News interview after signing the Perkins order. "They were very, very dishonest. I could go point after point after point, and it was so bad for our country."

A February order stripped security clearance from an employee at Covington & Burling who provided legal services to former special counsel Jack Smith, who criminally prosecuted Trump for his attempts to overturn the 2020 election and refusal to return classified materials stored at Mar-a-Lago. (Those cases have been dropped.) And on Monday, the acting chair of the U.S. Equal Employment Opportunity Commission sent letters to 20 major firms, suggesting their diversity and inclusion practices may violate civil rights laws and requesting extensive data on their use of race and sex in hiring. Trump has vowed to eliminate the use of DEI practices and previously directed the Justice Department to identify potential targets for civil and criminal investigation.

"Law firms in America shouldn't be fearful of President Trump, they should be fearful of the lawfare being perpetuated by federal judges hellbent on upending the Executive Branch," White House Deputy Press Secretary Harrison Fields said in a statement. "Our justice system and Constitution are under attack and lawyers across the nation should unite behind President Trump in defense of Law and Order."

Perkins, Paul Weiss, and other firms named in this piece did not respond to requests for comment.

Leaders at major firms have so far not made formal statements on these attacks. Discussions between firms on issuing a joint statement criticizing the orders have been ongoing but many firms are loath to speak out first, according to three people.

O MOST READ



1  Trump Tells Inner Circle That Musk Will Leave Soon

2  'This Could Get Much Uglier': The Fatal Flaw in Trump's Trade War

3  Trump's second-term honeymoon might be over

4  'I hope he's right': Markets tumble on tariffs — but Trump isn't flinching

"Firms are afraid that if you're out there and perceived as being anti-administration, that could hurt your firm," a senior lawyer at a large firm said. "The administration is viewed as very punitive and retributive."

"They're just scared of retribution," a senior lawyer at another firm said. "There's a lot of fear in Big Law right now."

The administration hasn't provided any visibility into which additional firms they might target, and going after entire firms for the actions of one or two former partners certainly makes it harder for firm leaders to determine what actions could land them on the blacklist. But perhaps that's the point.

"If you want to put a head on a spike in the city square in order to deter people from crossing the ruler, it really doesn't matter if the person's head is of someone innocent or guilty," the former major firm partner said.

Advertisement

Frustrated by the lack of outcry from leadership, associates at dozens of major firms have begun circulating an open letter criticizing the administration for attempting to "bully corporate law firms out of engaging in any representation that challenges the administration's aims" and calling on their employers to do the same. More than 300 associates have anonymously signed the letter since it went live about a week ago.

Rachel Cohen, an associate at Skadden Arps who helped organize the letter and spoke to POLITICO in her personal capacity, said she wants to see a "critical mass" of large firms in the country put out a statement expressing their commitment to continuing to represent "all sides of the coin" even when one side is opposed to the interests of the administration.

"It is imperative for rule of law in this country that lawyers not be associated with the interests that they represent or not have those imputed to them," she said. "Because if we don't have that and we have a vindictive government at the federal level targeting attorneys for providing representation, then we don't have checks and balances. We don't have the judiciary or the court system in the way that it's intended to function."

Big Law has not been completely absent in fighting Trump since January. Several firms are involved in ongoing litigation against the administration representing a variety of clients. WilmerHale represents a group of fired inspectors general challenging their removal; Hogan Lovells and Jenner & Block are seeking to block executive orders restricting federal funds from hospitals that provide gender-affirming care; Arnold & Porter is working with civil rights groups to challenge potential restrictions on birthright citizenship. But whether there will be a chilling effect as a result of the Perkins and Paul Weiss orders remains to be seen.

Other firms are willing to work with the president directly. New York firm Sullivan and Cromwell accepted Trump as a client earlier this year and will manage the appeal of his criminal hush money conviction after several members of Trump's defense team found new employment within his administration.

There's also the acknowledgement in some corners of the legal community that what's bad for Perkins, Covington or Paul Weiss might be good for their competitors. An exodus of clients from firms in the administration's crosshairs means more business up for grabs, especially if you're a firm who can advertise closer ties to the White House, one lawyer said.

And the business of law is, at the end of the day, a business. Firm leaders have a fiduciary duty to their employees and no one wants to be the one holding the reins when a firm goes under.

Cohen, the Skadden associate who helped organize the open letter, disputes

5    New chaos in White House as top NSC officials sacked

Advertisement

that premise.

"What's crucial for everyone in this industry to remember is that silence is not going to protect you," she said. "And it is a much, much better business decision if the industry as a whole rejects this type of targeting than it is to be silent and hope that the president doesn't pull your name out of the hat next."

*Daniel Lippman contributed*

# EXHIBIT 9

*The* WHITE HOUSE

PRESIDENTIAL ACTIONS

Suspension of Security Clearances and Evaluation of Government Contracts

The White House

February 25, 2025

MEMORANDUM FOR THE SECRETARY OF STATE

> THE SECRETARY OF DEFENSE
>
> THE ATTORNEY GENERAL
>
> THE SECRETARY OF ENERGY
>
> THE DIRECTOR OF THE OFFICE OF MANAGEMENT AND
>  BUDGET
>
> THE DIRECTOR OF NATIONAL INTELLIGENCE
>
> THE DIRECTOR OF THE CENTRAL INTELLIGENCE AGENCY
>
> THE DIRECTOR OF THE OFFICE OF PERSONNEL
>  MANAGEMENT

SUBJECT:    Suspension of Security Clearances and Evaluation
of Government Contracts

I hereby direct the Attorney General and all other relevant heads of executive departments and agencies (agencies) to immediately take steps consistent with applicable law to suspend any active security clearances held by Peter Koski and all members, partners, and employees of Covington & Burling LLP who assisted former Special Counsel Jack Smith during his time as Special Counsel, pending a review and determination of their roles and responsibilities, if any, in the weaponization of the judicial process.  I also direct the Attorney General and heads of agencies to take such

actions as are necessary to terminate any engagement of Covington & Burling LLP by any agency to the maximum extent permitted by law and consistent with the memorandum that shall be issued by the Director of the Office of Management and Budget.

Additionally, if any of the covered Covington & Burling LLP members, partners, and employees referenced in this memorandum obtained a security clearance from an agency not included as an addressee of this memorandum, the Director of the Office of Personnel Management shall provide this memorandum to the appropriate clearance-granting agency to ensure compliance.

I further direct the Director of the Office of Management and Budget to issue a memorandum to all agencies to review all Government contracts with Covington & Burling LLP.  To the extent permitted by applicable law, heads of agencies shall align their agency funding decisions with the interests of the citizens of the United States; with the goals and priorities of my Administration as expressed in executive actions, especially Executive Order 14147 of January 20, 2025 (Ending the Weaponization of the Federal Government); and as heads of agencies deem appropriate.

This memorandum is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

NEWS

ADMINISTRATION

ISSUES

CONTACT

VISIT

GALLERY

EOP



THE WHITE HOUSE

1600 Pennsylvania Ave NW
Washington, DC 20500

WH.GOV

Copyright

Privacy

Style Guide

# EXHIBIT 10



**Truth Details**
1839 replies

**Donald J. Trump** ✓
@realDonaldTrump

The Crooked Election Interference "Thugs" from the DOJ, headed by the worst Thug of them all, Deranged Jack Smith, are now admitting that the Mar-a-Lago Security Tapes were NOT DELETED. That's not what they were illegally leaking to the press. These guys should be prosecuted for MISCONDUCT. Also, whatever happened to Crooked Joe's Documents? Where are the ones he sent and stored in Chinatown? Is Deranged Jack going to Indict him for this and, at the same time, receiving BRIBES FROM CHINA?

**8.65k** ReTruths   **29.1k** Likes                    Jul 30, 2023, 11:50 AM



# EXHIBIT 11



EUROPE    PRO    E&E NEWS

LEGAL

# Trump targets Washington law firm that aided Jack Smith

The president suspended security clearances of lawyers at Covington & Burling over their pro bono work for special counsel Jack Smith.



President Donald Trump holds a signed memorandum regarding revoking security clearances in the Oval Office at the White House in Washington, Tuesday, Feb. 25, 2025. (Pool via AP) | AP

By JOSH GERSTEIN and KYLE CHENEY
02/25/2025 07:27 PM EST

President Donald Trump retaliated Tuesday against a Washington law firm that provided free legal services to special counsel Jack Smith, the federal prosecutor who brought two criminal cases against Trump that were dropped after he won last November's election.

During an Oval Office photo opportunity devoted to a series of executive actions, Trump signed a memorandum suspending the security clearances of lawyers and other personnel at Covington & Burling involved in representing Smith before he resigned from the Justice Department last month.

Advertisement

· AD ·

Trump's directive also calls for ending all contracts Covington has with the federal government, although a federal spending database doesn't show any government contracts with the firm.

The president's move followed a report in POLITICO earlier this month that Smith declared in a financial disclosure that he received a gift of $140,000-worth of legal services from the firm while in government service. Government rules allow federal employees to take pro bono legal services related to their work as long as they get approval from their agency and disclose the gift.

Trump's directive mentioned by name only one Covington lawyer representing Smith, Peter Koski, but says it applies equally to others at the firm "who assisted former Special Counsel Jack Smith during his time as Special Counsel, pending a review and determination of their roles and responsibilities, if any, in the weaponization of the judicial process."

Trump frequently targeted Smith and his team during the special counsel's investigations and threatened to fire him.

In a statement, Covington said the firm "recently agreed" to represent Smith when it "became apparent that he would become the subject of a government investigation" and suggested the relationship began around the time of the 2024 election.

"For more than 100 years, Covington has represented clients facing government investigations, consistent with the best traditions of the legal profession," the firm's statement said. "Covington serves as defense counsel to Jack Smith in his personal, individual capacity. We look forward to defending Mr. Smith's interests and appreciate the trust he has placed in us to do so."

A Covington spokesperson declined to comment on whether Koski or other lawyers there currently have security clearances.

The directive Trump signed Tuesday is just his latest attempt to use his return to the power of the presidency to punish his perceived enemies. He has rescinded security clearances for former intelligence community officials who signed a letter raising concerns — that ultimately turned out to be false — that Hunter Biden's hard drive bore the hallmarks of a foreign influence operation. Trump also pulled the clearance for attorney Mark Zaid, a prominent whistleblower attorney who represented the intelligence official who helped trigger Trump's 2020 impeachment. Trump has also pulled security details for figures who have criticized and publicly opposed him.

Advertisement

Attorney General Pam Bondi has also launched a "Weaponization Working Group" that is assigned to examine the conduct of Smith's team, among other things.

Trump during the Oval appearance Tuesday mocked Smith and tossed the pen used to sign the memo to someone with instructions to deliver it to the former special counsel.

"We're going to call it the deranged Jack Smith signing, or bill," Trump told reporters. "The weaponization of our system by law firms, even pro bono work they're doing in order to clog up government, stop government. And nobody knows about it better than me and, hopefully, that will never happen again."

As a reporter began to ask Trump about the wisdom of the directive, Trump interrupted. "Excuse me, I've been targeted for four years, longer than that," the president said. "You don't tell me about targeting. I was the target of corrupt politicians for four years and then four years after that, so don't tell me about targeting."

Covington counts several prominent Democrats in its ranks including former Attorney General Eric Holder, now a senior counsel at the firm, and former DOJ Criminal Division chief and Clinton White House lawyer Lanny Breuer, who is a partner there. The firm also served as counsel to President Joe Biden's 2020 presidential bid.

FILED UNDER: JUSTICE DEPARTMENT, DONALD TRUMP, PAM BONDI, LEGAL, JACK SMITH

Advertisement

○ MOST READ



**Trump Tells Inner Circle That Musk Will Leave Soon**

'This Could Get Much Uglier': The Fatal Flaw in Trump's Trade War

Trump's second-term honeymoon might be over

'I hope he's right': Markets tumble on tariffs — but Trump isn't flinching

New chaos in White House as top NSC officials sacked

# EXHIBIT 12

Video    Live    Shows ⌄    Shop    Log In    Stream on 

# Trump signs executive action targeting law firm representing former special counsel Jack Smith

The law firm says it's representing Smith in his personal capacity.

By [Kelsey Walsh](#)
February 25, 2025, 10:05 PM

   



**Trump says Musk email is 'somewhat' voluntary, but people could get fired**  During a signing of executive orders, President Donald Trump was asked about the email requests sent out to federal employees and whether or not it's mandatory

President Donald Trump [signed an executive action](#) Tuesday targeting a prominent law firm that represents former special counsel Jack Smith. The memo strips Smith's attorney of his security clearance as well as any other attorneys at the firm who assisted Smith while he was investigating Trump.

Covington and Burling LLP said it is representing Smith in a personal capacity, and a person familiar with the matter said there is no evidence the law firm played any part in Smith's criminal investigations of Trump.

The memo Trump signed Tuesday -- a major escalation in Trump's targeting of those he believes to be his political enemies -- also directs the Office of Management and Budget to review any government contracts held by the law firm.



President Donald Trump speaks to the press in the Oval Office, at the White House in Washington, Feb. 25, 2025.

Evelyn Hockstein/Reuters

**MORE: House Republicans narrowly pass measure to fund Trump's agenda after last-minute drama**    →

"One law firm that provided pro-bono legal services to the special counsel's office under Jack Smith's leadership was Covington and Burling," White House Staff Secretary Will Scharf said about the memo as Trump moved to sign it during a ceremony on Tuesday. "As a result of those actions, we're now going to be suspending and putting under review the security clearances for the attorneys and employees at that firm who worked with

Jack Smith's team. And we're going to continue holding the people who were responsible for the weaponization of government, who supported it, accountable for what they did."

Trump asked Scharf about the plans to do this to other law firms and Scharf said that the administration was looking at a range of options to take against other law firms. Trump tossed the pen to an attendee and joked "Why don't you give it to Jack Smith?" and called him a "deranged" individual.

A reporter asked Trump whether the action to strip the attorneys' security clearances amounted to political targeting, but Trump cut the reporter off and said that he was the target.

"I've been targeted for four years longer than that. So, you don't tell me about targeting?" Trump said. "I was the target of corrupt politicians for four years, and then four years after that. So don't talk to me about targeting."



U.S. Special Counsel Jack Smith makes a statement to reporters about the 37 federal charges returned by a grand jury in an indictment of former U.S. President Donald Trump on charges of unauthorized retention of classified documents and conspiracy to obstruct justice, in Washington, June 9, 2023.

Leah Millis/Reuters, FILE

---

**MORE: Trump 2nd term live updates: Trump floats selling 'gold card' for $5 million for pathway to citizenship**  →

---

A person familiar with Covington's representation of Jack Smith responded to Trump's action saying, "There is no evidence the firm itself played any role in Special Counsel Smith's investigation of Trump -- and no evidence their representation of Smith had anything to do with his official duties. Separately, Covington is not a contractor to the federal government."

A spokesperson for the firm added that they recently agreed to represent Smith in an individual capacity and look forward to defending him.

"For more than 100 years, Covington has represented clients facing government investigations, consistent with the best traditions of the legal profession. We recently agreed to represent Jack Smith when it became apparent that he would become a subject of a government investigation. Covington serves as defense counsel to Jack Smith in his

personal, individual capacity. We look forward to defending Mr. Smith's interests and appreciate the trust he has placed in us to do so."

---

**MORE: Federal judge rules Trump administration has to pay millions in foreign aid to nonprofits**    →

---

As special counsel, Smith led probes into both Trump's handling of classified material and his efforts to overturn the results of the 2020 election.

Both cases were dropped following Trump's reelection in November due to a longstanding Justice Department policy prohibiting the prosecution of a sitting president.

Under Trump's continual personal attacks, Smith defended his conduct as fully lawful, free of partisan influence and vital to the justice system.

In a letter before he stepped down, Smith personally denounced Trump for levying "laughable" and baseless attacks on the federal prosecutors who brought two criminal cases against him.

When Trump was charged with allegedly mishandling the nation's most sensitive secrets, his lawyers and lawyers for Trump's co-defendants were granted security clearances by the Biden administration so they could adequately defend their clients. Those lawyers now work at the top of the Trump administration -- Todd Blanche is the incoming deputy attorney general, and Emil Bove is the acting deputy attorney general.

A third attorney, Stanley Woodward, is now a senior adviser to Trump and was present in the Oval Office on Tuesday to witness Trump signing the executive order.

*ABC News' Katherine Faulders contributed to this report.*

## Related Topics

**President Trump**



Sponsored Content by Taboola

Texas measles outbreak includes multiple cases at a day care in Lubbock

Discover

# EXHIBIT 13

Exhibit 13


March 14, 2025 remarks by President Donald J. Trump
at the Department of Justice


The video is available here:
https://www.youtube.com/watch?v=6i41Av4eYO8


Pursuant to Local Civil Rule 5.4(e)(1), a digital file copy of this
exhibit is being maintained by plaintiff's counsel and will be
provided to the Court and defendants' counsel.

# EXHIBIT 14

*The* WHITE HOUSE

PRESIDENTIAL ACTIONS

Addressing Risks from Perkins Coie LLP

The White House

March 6, 2025

By the authority vested in me as President by the Constitution and the laws of the United States of America, it is hereby ordered:

Section 1. Purpose. The dishonest and dangerous activity of the law firm Perkins Coie LLP ("Perkins Coie") has affected this country for decades. Notably, in 2016 while representing failed Presidential candidate Hillary Clinton, Perkins Coie hired Fusion GPS, which then manufactured a false "dossier" designed to steal an election. This egregious activity is part of a pattern. Perkins Coie has worked with activist donors including George Soros to judicially overturn popular, necessary, and democratically enacted election laws, including those requiring voter identification. In one such case, a court was forced to sanction Perkins Coie attorneys for an unethical lack of candor before the court.

In addition to undermining democratic elections, the integrity of our courts, and honest law enforcement, Perkins Coie racially discriminates against its own attorneys and staff, and against applicants. Perkins Coie publicly announced percentage quotas in 2019 for hiring and promotion on the basis of race and other categories prohibited by civil rights laws. It proudly excluded applicants on the basis of race for its fellowships, and it maintained these discriminatory practices until applicants harmed by them finally sued to enforce change.

My Administration is committed to ending discrimination under "diversity, equity, and inclusion" policies and ensuring that Federal benefits support the laws and policies of the United States, including those laws and policies promoting our national security and respecting the democratic process. Those who engage in blatant race-based and sex-based discrimination, including quotas, but purposefully hide the nature of such discrimination through deceiving language, have engaged in a serious violation of the public trust. Their disrespect for the bedrock principle of equality represents good cause to conclude that they neither have access to our Nation's secrets nor be deemed responsible stewards of any Federal funds.

Sec. 2. Security Clearance Review. (a) The Attorney General, the Director of National Intelligence, and all other relevant heads of executive departments and agencies (agencies) shall immediately take steps consistent with applicable law to suspend any active security clearances held by individuals at Perkins Coie, pending a review of whether such clearances are consistent with the national interest.

(b) The Office of Management and Budget shall identify all Government goods, property, material, and services, including Sensitive Compartmented Information Facilities, provided for the benefit of Perkins Coie. The heads of all agencies providing such material or services shall, to the extent permitted by law, expeditiously cease such provision.

Sec. 3. Contracting. (a) To prevent the transfer of taxpayer dollars to Federal contractors whose earnings subsidize, among other things, racial discrimination, falsified documents designed to weaponize the Government against candidates for office, and anti-democratic election changes that invite fraud and distrust, Government contracting agencies shall, to the extent permissible by law, require Government contractors to disclose any business they do with Perkins Coie and whether that business is related to the subject of the Government contract.

(b) The heads of all agencies shall review all contracts with Perkins Coie or with entities that disclose doing business with Perkins Coie under subsection (a) of this section. To the extent permitted by law, the heads of agencies shall:

(i) take appropriate steps to terminate any contract, to the maximum extent permitted by applicable law, including the Federal Acquisition Regulation, for which Perkins Coie has been hired to perform any service;

(ii) otherwise align their agency funding decisions with the interests of the citizens of the United States; with the goals and priorities of my Administration as expressed in executive actions, especially Executive Order 14147 of January 20, 2025 (Ending the Weaponization of the Federal Government); and as heads of agencies deem appropriate. Within 30 days of the date of this order, all agencies shall submit to the Director of the Office of Management and Budget an assessment of contracts with Perkins Coie or with entities that do business with Perkins Coie effective as of the date of this order and any actions taken with respect to those contracts in accordance with this order.

Sec. 4. Racial Discrimination. (a) The Chair of the Equal Employment Opportunity Commission shall review the practices of representative large, influential, or industry leading law firms for consistency with Title VII of the Civil Rights Act of 1964, including whether large law firms: reserve certain positions, such as summer associate spots, for individuals of preferred races; promote individuals on a discriminatory basis; permit client access on a discriminatory basis; or provide access to events, trainings, or travel on a discriminatory basis.

(b) The Attorney General, in coordination with the Chair of the Equal Employment Opportunity Commission and in consultation with State Attorneys General as appropriate, shall investigate the practices of large law firms as described in subsection (a) of this section who do business with Federal entities for compliance with race-based and sex-based non-discrimination laws and take any additional actions the Attorney General deems appropriate in light of the evidence uncovered.

Sec. 5. Personnel. (a) The heads of all agencies shall, to the extent permitted by law, provide guidance limiting official access from Federal Government buildings to employees of Perkins Coie when such access would threaten the national security of or otherwise be inconsistent with the interests of the United States. In addition, the heads of all agencies shall provide guidance limiting Government employees acting in their

official capacity from engaging with Perkins Coie employees to ensure consistency with the national security and other interests of the United States.

(b) Agency officials shall, to the extent permitted by law, refrain from hiring employees of Perkins Coie, absent a waiver from the head of the agency, made in consultation with the Director of the Office of Personnel Management, that such hire will not threaten the national security of the United States.

Sec. 6. General Provisions. (a) Nothing in this order shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department or agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c) This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

DONALD J. TRUMP

THE WHITE HOUSE,
March 6, 2025.

NEWS

ADMINISTRATION

ISSUES

CONTACT

VISIT

GALLERY

EOP



THE WHITE HOUSE

1600 Pennsylvania Ave NW
Washington, DC 20500

WH.GOV

Copyright

Privacy

Style Guide

# EXHIBIT 15

*The* WHITE HOUSE

FACT SHEETS

Fact Sheet: President Donald J. Trump Addresses Risks from Perkins Coie LLP

The White House

March 6, 2025

**STOPPING ABUSES THAT UNDERMINE THE NATION:** Today, President Donald J. Trump signed an Executive Order to suspend security clearances held by individuals at Perkins Coie LLP, pending a review of whether their access to sensitive information is consistent with the national interest.

- Security clearances held by Perkins Coie LLP employees will be immediately suspended, pending a review of whether their access to sensitive information is consistent with the national interest.
  - The Federal Government will halt all material and services, including sensitive compartmented information facility (SCIF) access provided to Perkins Coie LLP and restrict its employees' access to government buildings.
  - Federal Agencies will also refrain from hiring Perkins Coie LLP employees unless specifically authorized.

- To ensure taxpayer dollars no longer go to contractors whose earnings subsidize partisan lawsuits against the United States, the Federal Government will prohibit funding contractors that use Perkins Coie LLP.
  - All Federal Government contracts with Perkins Coie LLP will undergo rigorous scrutiny, with agency heads directed to terminate engagements to the maximum extent permitted by law.

- The practices of Perkins Coie LLP will be reviewed under Title VII to ensure compliance with civil rights laws against racial bias.

**ENSURING GOVERNMENT SERVES THE AMERICAN PEOPLE:** President Trump's Administration will not tolerate Perkins Coie LLP's unethical and discriminatory actions that threaten our elections, military strength, and national security.

- In 2016, Perkins Coie LLP hired Fusion GPS to manufacture a false "dossier" designed to steal an election while representing failed presidential candidate Hillary Clinton.

- Perkins Coie LLP pushed debunked claims of secret Trump-Russia communications via Alfa Bank, with attorney Michael Sussmann indicted for lying to the FBI about this scheme.

- Perkins Coie LLP has worked with activist donors, including George Soros, to judicially overturn enacted election laws, such as those requiring voter identification.
    - A court was forced to sanction Perkins Coie attorneys for unethical lack of candor before the court.

- Perkins Coie LLP has been accused of racially discriminating against its own attorneys, staff, and applicants.
    - Perkins Coie has publicly announced racial percentage quotas for hiring and promotions, violating civil rights laws, and excluded applicants from fellowships based on race until lawsuits forced change.

- Perkins Coie LLP hosted an FBI workspace, raising concerns about partisan misuse of sensitive data during investigations targeting President Trump.

- Perkins Coie LLP has filed lawsuits against the Trump Administration, including one designed to reduce military readiness.

**A RETURN TO ACCOUNTABILITY:** President Trump is delivering on his promise to end the weaponization of government and protect the nation from partisan actors who exploit their influence.

- President Trump is refocusing government operations to their core mission— serving the citizens of the United States.

- President Trump signed an Executive Order to end the weaponization of the Federal Government on his first day in office after promising to "end forever the weaponization of government and the abuse of law enforcement against political opponents."

- President Trump revoked security clearances held by dozens of intelligence officials who falsely claimed in a 2020 letter, during the height of the U.S.

presidential election season, that Hunter Biden's laptop was tantamount to Russian disinformation.

NEWS

ADMINISTRATION

ISSUES

CONTACT

VISIT

GALLERY

VIDEO LIBRARY

EOP



THE WHITE HOUSE

1600 Pennsylvania Ave NW
Washington, DC 20500

WH.GOV

Copyright

Privacy

Style Guide

# EXHIBIT 16



← **Truth Details**
159 replies

**Donald J. Trump** ✓
@realDonaldTrump

Andrew McCarthy: "HILLARY CLINTON, RECIDIVIST ELECTION-THEFT CONSPIRATOR...Regarding 1992, the Clinton campaign used a law firm as the intermediary for tens of thousands of dollars in payments to a private investigator (Jack Palladino) whose task was to obtain the silence of women who claimed to have had affairs with Bill Clinton...it turns out that this 1992 tactic — booking as legal fees what might euphemistically be called 'research' — was the blueprint for the 2016 Hillary Clinton campaign, in cahoots with the Democratic National Committee. They paid their law firm, Perkins Coie, which retained the research firm Fusion GPS and its contractor, former British spy Christopher Steele, to generate the farcical Steele dossier that was shared with the FBI, the State Department, and the media to smear Trump as a clandestine agent of the Kremlin...

**2.2k** ReTruths  **7.67k** Likes                    May 05, 2024, 3:01 PM



# EXHIBIT 17

# Trump Ramps Up Attacks on Law Firms With Order Targeting Perkins Coie

The order against the firm, which did work for Democrats during the 2016 campaign, represents an escalation of efforts to punish groups the president sees as aiding his enemies.



**By Devlin Barrett**
Reporting from Washington

March 6, 2025

President Trump signed an executive order on Thursday seeking to severely punish the law firm Perkins Coie by stripping its lawyers of security clearances and access to government buildings and officials — a form of payback for its legal work for Democrats during the 2016 presidential campaign.

With the order, Perkins Coie becomes the second such firm to be targeted by the president. Late last month, he signed a similar memorandum attacking Covington & Burling, which has done pro bono legal work for Jack Smith, who as special counsel pursued two separate indictments of Mr. Trump.

While the Covington memorandum sought to strip clearances and contracts from that firm, the Perkins Coie order goes much further, seeking to also limit its lawyers' access to federal buildings, officials and jobs in a way that could cast a chilling effect over the entire legal profession.

The president's animosity toward Perkins Coie dates back eight years, to when two lawyers at the firm, Marc Elias and Michael Sussmann, played roles in what eventually became an F.B.I. investigation to determine if anyone on the 2016 Trump presidential campaign conspired with Russian agents to influence the outcome of that election. Both lawyers left that firm years ago.

The executive order denounces what it calls "dishonest and dangerous activity" at Perkins Coie, singling out its hiring of a research firm that led to the compilation of a dossier of unsubstantiated allegations against Mr. Trump related to possible ties between his campaign and Russia. The executive order accused the firm of "undermining democratic elections, the integrity of our courts and honest law enforcement."

The order instructs federal agencies to suspend any security clearances that Perkins Coie lawyers may have. It also orders government agencies to determine if they have any contracts with the law firm, and then cancel them.

Additionally, the order instructs the heads of all federal agencies to limit Perkins Coie lawyers' access to federal buildings "when such access would threaten the national security of or otherwise be inconsistent with the interests of the United States." It also instructs federal officials to limit their interactions with employees of the firm and seeks to prevent Perkins Coie lawyers from being hired by the federal government.

It is not clear what immediate effect the presidential decree will have on the firm. The president and his supporters have railed against what they call the "weaponization" of the legal system against him, arguing that he was unfairly targeted by prosecutors, judges and private practice lawyers for political purposes, rather than any wrongdoing on his part.

"This is an absolute honor to sign," Mr. Trump said at the White House. "What they've done is just terrible. It's weaponization, you could say weaponization against a political opponent, and it should never be allowed to happen again."

The same executive order also accuses the firm of unfair hiring practices, and calls for a far-reaching review of top law firms to see if they promote diversity, equity or inclusion in a way that the Trump administration dislikes.

The federal review ordered by Mr. Trump will seek to determine "whether large law firms reserve certain positions, such as summer associate spots, for individuals of preferred races; promote individuals on a discriminatory basis;

permit client access on a discriminatory basis; or provide access to events, trainings or travel on a discriminatory basis."

In a written statement, the law firm said the executive order "is patently unlawful, and we intend to challenge it." It was not immediately clear how many lawyers at the firm have security clearances.

Mr. Trump filed a lawsuit against Perkins Coie in 2022, accusing the firm, along with his former rival Hillary Clinton and others, of participating in a left-wing conspiracy to derail his presidential campaign. That lawsuit was quickly tossed by a judge who said it lacked substance and legal support.

Earlier this week, the president of the American Bar Association, William R. Bay, warned that Mr. Trump might take additional punitive measures against law firms he does not like, and said such behavior undermines the nation's legal system.

"Lawyers must be free to represent clients and perform their ethical duty without fear of retribution," Mr. Bay said in a written statement. He added: "We reject the notion that the government can punish lawyers who represent certain clients or punish judges who rule certain ways. We cannot accept government actions that seek to tip the scales of justice in this manner."

Luke Broadwater contributed reporting.

**Devlin Barrett** covers the Justice Department and the F.B.I. for The Times. More about Devlin Barrett

# EXHIBIT 18

*Democracy Dies in Darkness*

# Trump expands retribution campaign against law firms that aided his foes

Trump hit another major law firm that worked for his political rivals with an executive order seeking to limit its ability to work for the U.S. government.

Updated March 6, 2025

By Perry Stein and Michael Birnbaum

President Donald Trump on Thursday targeted another elite law firm that has represented clients he considers his political enemies, sending a forceful message that he is willing to punish firms who work for people or groups that oppose his administration's agenda.

In an Oval Office ceremony, the president signed an executive order hitting the large international law firm Perkins Coie with a sweeping directive that bans the federal government from hiring it, or from using contractors who work with it, except in limited circumstances. The order also bars Perkins Coie employees from entering federal buildings and suspends their security clearances.

The firm represented Hillary Clinton's campaign and the Democratic National Committee during the 2016 presidential race, and it also contracted with the research firm that produced the now-discredited opposition dossier that alleged extensive contacts between Trump and Russia.

The move could have a chilling effect on law firms' willingness to take on clients and cases that run counter to the Trump administration, challenging a fundamental tenet of the rule of law in the United States that everyone should have access to legal representation, experts said.

"This is an absolute honor to sign," Trump said from his Oval Office desk.

A spokesman for Perkins Coie said in a statement that the executive order is "patently unlawful, and we intend to challenge it."

A White House official said the move targeted Perkins Coie because of its track record on Trump.

"The president doesn't believe they should have the privileges afforded to companies of their stature to work and operate with the federal government, since they have made it very clear they are vehemently against the president of the United States, and their work proves that," a senior administration official said, speaking on the condition of anonymity to talk frankly about the sensitive decision-making behind the order.

"If this case was retribution or anti-Democrat, anti-liberal, then we would basically pull the security clearance clearances of every law firm on K Street, because they all hate the president," the official said. "This law firm in particular has shown a level of bias in which their coordination with the federal government was done so in an illegal fashion that was purposely intended on undermining the president of the United States and really locking him up."

Perkins Coie is the second law firm Trump has taken action against or decried as engaging "in the weaponization of the judicial process."

Last week, he ordered the suspension of security clearances of some attorneys at Covington & Burling, which has represented special counsel Jack Smith pro bono. Smith led the federal investigations of Trump for allegedly mishandling classified materials and trying to block the 2020 election results.

Trump's orders targeting the law firms called for limiting their access to federal resources and could have the effect of dissuading other private law firms from battling the Trump administration in court.

The American legal system relies on attorneys representing all sorts of clients, including violent criminals, and the president's appearing to punish firms for their choice of clients could do grave damage to that system, said Mark Zaid, a national security lawyer who often represents whistleblowers.

"By taking these actions against these major law firms, it is effectively sending a message to all the lawyers that you best not challenge this administration, or you, your lawyers and your clients will suffer," Zaid said. "It is the most un-American thing I've ever heard."

Other experts said the order was part of Trump's broader campaign against the legal system.

"He doesn't like judges who rule against him. He doesn't like prosecutors who prosecuted against him. He doesn't like lawyers who've undertaken measures against him," said Thomas Carothers, the director of the Democracy, Conflict, and Governance Program at the Carnegie Endowment for International Peace. "This is part of a broader questioning, and in many cases, an attack on the core institutions of the rule of law."

But Carothers said that he did not think Trump's order would bring the U.S. legal system to a halt.

"I don't think a peer law firm will think, 'Oh, we shouldn't bring this enforcement action against this government entity, because we can no longer challenge the U.S. government.' I think that would be overreading it."

Perkins Coie became embroiled in what Trump and his allies have repeatedly described as the "Russia hoax" when it contracted with a firm that conducted research about Trump's connections to Russia during the 2016 presidential campaign. That contract resulted in the now-famous Steele dossier, a document full of unverified allegations assembled by former British intelligence officer Christopher Steele.

But the two main attorneys involved in that work — Marc E. Elias and Michael Sussmann — are no longer employed by Perkins Coie. Both attorneys are named in a fact sheet explaining Trump's executive order.

Elias retained Fusion GPS, the Washington firm that ultimately produced the Steele dossier.

Years later, special counsel John Durham — who was assigned to look into possible wrongdoing among federal agents who investigated Trump's 2016 campaign — underlined charged Sussmann with lying to a senior FBI official during that investigation.

Sussmann was accused of bringing allegations to the FBI of a secret computer communications channel between the Trump organization and Russia-based Alfa Bank. FBI agents investigated the data but concluded that there was nothing suspicious about it.

In 2022, a jury found Sussmann not guilty.

Perkins Coie is one of eight big law firms involved in lawsuits against Trump, according to an American Bar Association Journal article published last week that cited the law firm's representation of transgender service members who are challenging the administration's ban on joining the military.

Trump also signed a separate order that could make it harder for opponents to seek injunctions against his administration's actions by holding them accountable for legal costs if they lose. The Justice Department will ask judges to require plaintiffs who are seeking injunctions and restraining orders against the Trump administration to post a bond to cover court costs should they fail, raising the bar for legal challenges.

When presenting the Perkins Coie executive order to Trump to sign, White House staff secretary Will Scharf said the firm has engaged in "unlawful DEI practices," referring to diversity, equity and inclusion programs, and accused it of using racial quotas for hiring and promotions.

Scharf said the executive order calls for a "holistic review of unlawful DEI in some of the nation's largest law firms."

Although the Supreme Court has banned affirmative action in college admissions, and federal law prohibits workplace discrimination on the basis of race, sex and certain other criteria, no law bans diversity and equity efforts within private companies.

Scharf did not explain what the government's review would entail, which law firms would be examined and what criteria the federal government would use to determine whether a law firm engaged in wrongdoing.

The Trump administration's move to penalize law firms for their DEI practices when no court has said such programs are illegal "is extraordinary," said Walter Olson, a senior fellow at the Cato Institute, a libertarian think tank.

"There is no legal definition of excessive DEI. The law itself is so unsettled," Olson said. "The administration can take positions, but it's not as if the courts have taken a position and given them a green light and said, 'Yes, you are right.'"

**CORRECTION**

An earlier version of this article misspelled the last name of a former Perkins Coie attorney. He is Michael Sussmann. This article has been corrected.

**What readers are saying**

The comments overwhelmingly criticize the Trump administration's decision to target Perkins Coie, viewing it as an abuse of power and a threat to the rule of law. Many commenters express concern that this action represents authoritarian behavior, likening it to tactics used by... Show more

This summary is AI-generated. AI can make mistakes and this summary is not a replacement for reading the comments.

# EXHIBIT 19

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

PERKINS COIE LLP,

       *Plaintiff*,

v.

U.S. DEPARTMENT OF JUSTICE, *et al.*,

       *Defendants*.

## DECLARATION OF DAVID J. BURMAN IN SUPPORT OF
## MOTION FOR TEMPORARY RESTRAINING ORDER

I, David J. Burman, pursuant to 28 U.S.C. § 1746, hereby declare as follows:

    1.    I am a partner at Perkins Coie LLP ("Perkins Coie"). Perkins Coie is an international law firm that conducts its U.S. operations and activities through a limited liability partnership, Perkins Coie LLP, with seventeen offices around the country. I have been an attorney at Perkins Coie for over 45 years, following two years clerking. I am a member in good standing of the D.C. and Washington bars and have been admitted in many state and federal courts, and I serve on the Advisory Committee on the Federal Rules of Civil Procedure. I am very familiar with the firm's business and operations and was asked as a result to take a lead role in attempting to assess and contain the damage from the March 6 Executive Order. I either have personal knowledge of the facts set forth in this declaration or I know them from business records and my knowledge of the firm's history and operations.

    2.    I currently chair the firm's governance task force, and have long and intense involvement in firm management. I led the commercial litigation practice and first served on the firm's executive committee by the early 1990s. I then served for six years on the four-partner

- 1 -

management committee. Over the years, I have chaired or served on the firm's hiring, compensation, pro bono, technology, and strategic conflicts committees as well as two strategic planning efforts and task forces on practice group structure, total quality management, and role of non-lawyer professionals. I spearheaded the creation of our Intellectual Property Department and the opening of our Chicago office, both of which have become among our most successful initiatives. I have acted as co-lead relationship partner for three of our large institutional clients.

3.      I submit this Declaration in Support of the Complaint and Motion for Temporary Restraining Order filed by Perkins Coie. I am of the age of majority, and I am competent to make this declaration.

## I.      Perkins Coie LLP

4.      Perkins Coie was founded in Seattle by a retiring U.S. District Judge and U.S. Attorney. Since 1912, Perkins Coie has grown to become the largest law firm in the Pacific Northwest, has opened offices throughout the United States and in Asia and in Europe, and has more than 1,200 lawyers. The firm represents a wide range of clients, including Fortune 500 companies, small- and medium-sized businesses, families, individuals, and charitable and public service-oriented organizations. Perkins Coie alumni have been and are presently serving as state and federal court judges, judicial law clerks, and high-ranking government officials, as well as founders, CEOs, and General Counsels of some of the nation's largest and most important companies. Perkins Coie is widely recognized as one of the leading law firms for technology and other innovative companies, and since our founding, Perkins Coie has proudly represented a wide range of industry leaders throughout the world.

5.      Over our 113-year history, Perkins Coie and its lawyers have represented clients in every state, in federal and state courts across the nation, and in tribunals throughout the world

- 2 -

(including the Supreme Court of the United States), and they have helped to establish major precedent in state and federal law. We are committed to providing excellent service to our clients, helping them achieve their goals and standing by them in good and bad times alike.

6.   Perkins Coie has been named as an "Am Law 50" firm on *The American Lawyer 100* list for over a decade. The firm and its lawyers are regularly recognized for excellence in the legal community by *Best Lawyers®*, *Chambers USA*, and other respected organizations, including national and local bar associations.

7.   Perkins Coie has approximately 2,500 employees. Of those, nearly half are attorneys and half are business professionals, including paralegals, patent agents, legal assistants, and other professionals. Our employees are deeply woven into the fabric of their communities. They are Sunday school teachers, Scouts leaders, youth sports coaches, and volunteers serving on hundreds of boards of organizations ranging from art museums and food kitchens to major universities, local schools, and foundations. And they include former members of the armed forces, and current reservists in the U.S. military.

8.   Perkins Coie's attorneys are drawn from all sides of the political spectrum, and most of our attorneys are not politically active. There are attorneys who are liberal and attorneys who are conservative. When Bob Bauer started our small Political Law practice, we were known in Seattle as, if anything, a "Republican firm." Things have become more balanced, but many of our attorneys joined the firm after government service under both Democratic and Republican administrations, or after serving as judges or judicial law clerks to judges appointed by both Democratic and Republican presidents. Reflecting this bipartisan ethos, in recent years, four Perkins Coie partners have been nominated and confirmed to serve as federal judges—two by President Trump in 2019, and two by President Biden in 2021 and 2023.

9. Perkins Coie is dedicated to our clients, our communities, and each other. The firm has a longstanding, firmwide commitment to pro bono service. Since 1989, the firm has provided approximately 1.45 million hours of pro bono service to innumerable clients, including veterans, indigent families, disabled persons, and community-based organizations of all sizes, including the League of Women Voters and other non-partisan organizations, in matters championing human, civil, and electoral rights, housing, education, food, benefits, and economic justice. We have frequently been honored for our efforts. Our pro bono service also extends to representing indigent criminal defendants before federal courts by court appointment and clients on death row in states with limited pro bono resources. In 2024, for example, Perkins Coie lawyers and business professionals spent over 89,000 hours, valued at nearly $70 million, in pro bono service. Much of our pro bono work involves advocating for military and veterans' rights.

10. Perkins Coie is often recognized for fostering a work environment in which all lawyers and business professionals are judged on their merit and can reach their potential. Perkins Coie has been named to *Fortune*'s "100 Best Companies to Work For" list for over 20 consecutive years, and our individual offices are often named to similar local lists.

## II.    Interaction with the Federal Government

11. As a full-service law firm that represents clients in all sectors of the economy in transactional, litigation, and regulatory matters, Perkins Coie lawyers necessarily interact with the federal government on behalf of their clients in innumerable ways. Those interactions are critical to their ability to practice their profession; they are the waters the Perkins Coie attorneys swim in, the air they breathe. If allowed to go into effect, the Order's restrictions would be devastating and irreparable. Most of the firm's litigation practice is in federal court on behalf of their clients in civil and criminal cases, as well as in federal agencies' in-house administrative proceedings. The

firm has nearly a thousand cases currently pending before federal district, bankruptcy, and appellate courts, including the Supreme Court of the United States. Its attorneys have upcoming appearances scheduled before agencies and in courtrooms, including two upcoming arguments before the Supreme Court. Perkins Coie represents clients who have been indicted or are the targets of pending federal criminal investigations.

12.     The firm has nine practice groups, and all of them intersect with the federal government in some way and include clients with business before the federal government. The largest practice groups by headcount are Commercial Litigation, Business, and Intellectual Property, which together account for approximately 75% of the firm's attorneys. The smallest practice group by headcount is Political Law, which includes 8 attorneys (and 19 others affiliated with that practice). I understand the March 6, 2025 Executive Order and Fact Sheet at issue in this proceeding to refer to former members of the Political Law group, albeit not by name. Although the firm's Political Law practice has historically been much smaller than our other practice groups, it also substantially shrank in 2021 when Marc Elias and about 50 other attorneys left Perkins Coie to form the Elias Law Group. This practice group historically has handled a mix of paying and some pro bono cases. It accounts for about 0.5% of the firm's revenue. Perkins Coie attorneys work on these matters because they involve important legal rights and issues affecting our clients.

13.     In the course of their representations, Perkins Coie lawyers frequently meet with federal officials from countless agencies. Although it is difficult to quantify precisely, based on a review of our current client matter list, the vast bulk of our clients have matters that require Perkins Coie lawyers to interact with federal agencies.

14.     For instance, a significant number of Perkins Coie clients are, or have affiliates who are, government contractors and subcontractors—including 100% of its top 15 clients by revenue.

The firm's Government Contracts group handles clients' bid protests and disputes surrounding contract claims, including transactional work and litigation. Perkins Coie represents some of these clients in connection with government contract matters. The approximately 13 attorneys in this group currently are handling approximately 69 government contracting matters involving various federal agencies. But there are many other firm clients that have government contracts and who have engaged Perkins Coie to represent them in matters unrelated to their government contracts.

15.     The firm's Intellectual Property group and its clients also depend heavily on access to and interaction with the federal government. The approximately 236 attorneys in this group frequently represent patent applicants, patent owners, and patent challengers before the U.S. Patent and Trademark Office (USPTO) in patent prosecution and post-grant proceedings, including in administrative trials before the Patent Trial and Appeal Board. Perkins Coie is currently representing approximately 555 clients in approximately 5,415 pending patent applications before the USPTO. Perkins Coie is also representing approximately 20 clients in approximately 56 active post-grant proceedings (i.e., administrative trial proceedings) before the Patent Trial and Appeal Board (PTAB), and approximately 7 clients in approximately 11 active proceedings before the International Trade Commission (ITC). Perkins Coie is also representing clients in trademark and copyright matters before agencies, including approximately 66 matters before the Trademark Trial and Appeal Board (TTAB), approximately 1,960 pending trademark matters before the USPTO, and approximately 145 pending copyright matters before the Copyright Office. Many of those patent and trademark clients also are known to have contracts with the federal government.

16.     Perkins Coie has approximately 343 attorneys in its Business group. That practice group includes subgroups directed to financial regulation, which requires them to engage with federal financial regulatory agencies (such as the Federal Deposit Insurance Corporation, Office

of the Comptroller of the Currency, and the Board of Governors of the Federal Reserve System); international trade, which involves interaction with and practice before the Department of Commerce and the International Trade Commission; and tax, which involves interaction with the Internal Revenue Service. The international trade group also has approximately 17 pending matters before the Department of Labor and approximately 22 pending matters before U.S. Citizenship and Immigration Services. The group's corporate and securities practice regularly represents clients before and in connection with the Securities and Exchange Commission (SEC), including No Action Request Letters, Securities Act registration statements subject to SEC review, and Exchange Act filings. The Business Group also represents clients before or in connection with the Department of Agriculture, the Food and Drug Administration, Department of Transportation, Department of Labor, Department of Justice, Department of Homeland Security, and Department of State.

17.    The firm's White Collar & Investigations practice includes approximately 29 attorneys and is almost exclusively reliant on interacting with the federal government. That practice involves representing clients in investigations and after indictments in numerous proceedings involving many agencies of the federal government, including the Department of Justice, Federal Bureau of Investigation (FBI), U.S. Attorney's Offices, and SEC, among others.

18.    There are many other practice groups and subgroups at Perkins Coie that interact, by necessity, with the federal government on behalf of our clients. These groups include, but are not limited to, Commercial Litigation (with subgroups including Appeals, Issues & Strategy; Construction; and Antitrust); Environment, Energy & Resources; Labor & Employment; Private Client Services; Product Liability; and Real Estate & Land Use. In summary, much of our work on behalf of our clients requires access to federal government buildings, which house both

- 7-

courthouses and agencies. This is true of every practice group at the firm. And many of these practice areas, such as White Collar & Investigations, are almost exclusively reliant on interacting with the federal government. Each of our nine major practice groups relies on clients who have done business with the federal government. Such clients or their corporate affiliates account for a significant fraction of revenue in each practice group, as evidenced by the top 15 clients in each practice group (84% of revenue from top 15 clients in Business from those that have or whose corporate affiliates have government contracts; 90% for Commercial Litigation; 51% for Environment, Energy & Resources; 88% for Intellectual Property; 75% for Labor & Employment; 44% for Political Law; 51% for Private Client Services; 94% for Product Liability; 32% for Real Estate & Land Use).

19.     At present, by way of non-exhaustive example, Perkins Coie has active civil and criminal matters on behalf of its clients involving at least the following federal agencies, which require them either to interact with or appear before federal government officials:

- Administration for Strategic Preparedness and Response
- Advisory Council on Historic Preservation
- Biomedical Advanced Research and Development Authority
- Board of Governors of the Federal Reserve System
- Bonneville Power Administration
- Bureau of the Census
- Bureau of Economic Analysis
- Bureau of Indian Affairs
- Bureau of Industry and Security
- Bureau of Land Management
- Bureau of Ocean Energy Management
- Bureau of Reclamation
- Bureau of Safety and Environmental Enforcement
- CHIPS Program Office
- Committee on Foreign Investment in the United States
- Commodity Futures Trading Commission
- Consumer Financial Protection Bureau
- Defense Contract Audit Agency
- Defense Contract Management Agency

- Defense Logistics Agency
- Department of Agriculture
- Department of the Army
- Department of Commerce
- Department of Defense
- Department of Defense Cyber Crime Center
- Department of Energy (including Oak Ridge National Laboratory)
- Department of Health & Human Services
- Department of Homeland Security
- Department of the Interior
- Department of Justice (including Antitrust, CCIPS, Civil, Fraud)
- Department of Labor
- Department of State
- Department of Transportation
- Department of the Treasury
- Department of Veterans Affairs
- Directorate of Defense Trade Controls
- Drug Enforcement Administration
- Environmental Protection Agency
- Equal Employment Opportunity Commission
- Executive Office of the President (including CEQ, OMB, and OSTP)
- Fannie Mae and Freddie Mac
- Federal Aviation Administration
- Federal Bureau of Investigation
- Federal Bureau of Prisons
- Federal Communications Commission
- Federal Deposit Insurance Corporation
- Food & Drug Administration
- Federal Election Commission
- Federal Emergency Management Agency
- Federal Energy Regulatory Commission
- Federal Highway Administration
- Federal Permitting Improvement Steering Council
- Federal Reserve Bank of San Francisco
- Federal Transit Administration
- Financial Crimes Enforcement Network
- Government Accountability Office
- Grid Deployments Office
- Housing and Urban Development
- Internal Revenue Service
- International Trade Administration
- Loan Programs Office
- National Institutes of Health
- National Labor Relations Board

- National Marine Fisheries Service
- National Oceanic and Atmospheric Administration
- National Park Service
- National Renewable Energy Lab
- Office of Clean Energy Demonstrations
- Office of Federal Contract Compliance Programs
- Office of Foreign Assets Control
- Office of the Comptroller of the Currency
- Office of the U.S. Trade Representative
- Pacific States Marine Fisheries Commission
- Patent Trial & Appeal Board
- Rural Utilities Service
- Securities & Exchange Commission
- Small Business Administration
- Trademark Trial & Appeal Board
- U.S. Army Corps of Engineers
- U.S. Attorney's Offices
- U.S. Copyright Office
- U.S. Citizenship and Immigration Services
- U.S. Customs and Border Protection
- U.S. Fish & Wildlife Service
- U.S. Forest Service
- U.S. Immigration and Customs Enforcement
- U.S. International Trade Commission
- U.S. Patent & Trademark Office
- U.S. Postal Inspection Service
- U.S. Secret Service

20. The firm's pro bono work is frequently before federal agencies or involves interacting with federal government officials. For instance, Perkins Coie attorneys represent veterans in obtaining benefits before the Department of Veterans Affairs and the Department of Defense. Perkins Coie has approximately 41 open veterans matters, the majority of which are related to seeking higher levels of benefits for veterans in connection with their service to this country, such as application for combat-related special compensation (before the Combat-Related Special Compensation Board); discharge upgrade petitions; and appeals to the U.S. Court of Appeals for Veterans Claims. In the past five years, Perkins Coie has handled 90 matters related to veterans' rights. Perkins Coie was honored with the 2023 Veterans Heroes Law Firm Award

CaseCase5-25-009007R6L DDocument213-4 Filed030410725 Page184 of 0297

by the Attorney General of Washington's Office of Military and Veteran Legal Assistance (OMVLA). That award recognizes the law firm that provided the greatest contribution to OMVLA in any given year. The National Veterans Legal Services Program (NVLSP) also selected a Perkins Coie attorney to receive the 2020 NVLSP Lawyers Serving Warriors Excellence Award. The entire veterans-rights practice requires access to federal officials and buildings. Perkins Coie attorneys also represent disaster victims in FEMA applications and appeals. Perkins Coie attorneys represent pro bono clients in social-security matters, including SSI and SSD. Perkins Coie represents some nonprofits pro bono in obtaining federal tax exemptions. And Perkins Coie represents pro bono low-income inventors with patent applications before the USPTO, and assists organizations and small businesses in registering trademarks. Further, Perkins Coie attorneys have represented pro bono religious organizations, including Jewish and Catholic organizations.

## III. Recent Relevant Litigation

21. The firm's clients prevailed in all but one of the challenges brought by the Trump campaign seeking to overturn the results of the 2020 election,[1] and the firm's clients also prevailed in a significant number of voting rights cases, including cases where our clients were successful in upholding existing laws against attacks by lawyers for the other party.

22. On March 24, 2022, Donald Trump sued a host of defendants, including Perkins Coie, Hillary Clinton, the Democratic National Committee, Fusion GPS, and former Perkins Coie partners Michael Sussmann and Marc Elias in the U.S. District Court for the Southern District of Florida alleging that the defendants "maliciously conspired to weave a false narrative" that Mr. Trump was colluding with Russia. *See* 2:22-cv-14102 (S.D. Fla.). Mr. Trump asserted civil RICO

---

[1] The case where Perkins Coie's client did not prevail involved a challenge to the deadline—November 9 versus November 12—to confirm the identities of first-time voters who voted by mail in Pennsylvania.

Case 2:25-cv-00907-BJR   Document 21-4   Filed 08/04/25   Page 285 of 297

claims against Perkins Coie for conspiring with the Clinton campaign and sought to recover damages in excess of $24 million, before trebling, as well as attorney's fees and lost profits. On September 9, 2022, the court dismissed the lawsuit with prejudice. *Trump v. Clinton,* 626 F. Supp. 3d 1264 (S.D. Fla. 2022).

23.     On February 6, 2025, Perkins Coie filed a lawsuit, *Shilling v. Trump,* No. 2:25-cv-421 (W.D. Wash.), on behalf of Commander Emily Shilling, Commander Blake Dremann, Lieutenant Commander Geirid Morgan, Sergeant First Class Cathrine Schmid, Sergeant First Class Jane Doe, Staff Sergeant Videl Leins, Matthew Medina, and the Gender Justice League challenging an executive order by President Trump targeting transgender servicemembers. Perkins Coie represents the plaintiffs on a pro bono basis as co-counsel, along with Lambda Legal and the Human Rights Campaign. Perkins Coie, on behalf of its clients, filed a motion for a preliminary injunction on February 19, 2025, asking the court to bar implementation of the executive order until it could adjudicate the case, and the court ordered the government to immediately notify the court before any changes were made to the status quo while the preliminary injunction motion was being briefed.

## IV.    Irreparable Harm Caused by the Order and Its Enforcement

24.     On March 6, 2025, President Donald J. Trump signed the Executive Order 14230 titled "Addressing Risks from Perkins Coie LLP." *See* https://www.whitehouse.gov/presidential-actions/2025/03/addressing-risks-from-perkins-coie-llp/ (90 Fed. Reg. 11,781) (the "Order"). The Order was accompanied by a "Fact Sheet" issued the same day that purports to explain and support the Order. Perkins Coie was given no opportunity to respond to the false charges in the Order and Fact Sheet or to explain the inevitable impact.

25.    We of course are constrained under Rule 1.6 of the Model Rules of Professional Conduct and attorney-client privilege, but we can report general facts and facts known to the government. The day after the Executive Order, an official of a federal agency informed a client of Perkins Coie that, because of the Order, the client's Perkins Coie lawyers should not attend a scheduled meeting with an office in that agency to discuss a pending matter. The client had engaged Perkins Coie to defend that client in that enforcement action, and Perkins Coie performed substantial work on the matter, totaling over $1 million in fees, and interacted with the agency on this matter in the interim. The client, after expressing great reluctance and regret, said it was forced to hire other law firms to represent it before the federal government and in related litigation.

26.    On March 6, 2025, an attorney in the Fraud Section of the Criminal Division of the U.S. Department of Justice, informed Perkins Coie that the Fraud Section of the Criminal Division could not proceed with a previously set meeting relating to another Perkins Coie client, citing the need to wait for further guidance on whether that meeting could even occur in light of the Order. This postponement threatens the ability of that client to achieve a swift resolution of the matter.

27.    It is inconceivable that the Order could constitutionally ban Perkins Coie's access to federal courthouses, but because it might be interpreted to do so, the firm has already been forced in incur additional costs in securing additional backup personnel to attend impending hearings. Perkins Coie will continue incurring such harm if the Order's enforcement is not enjoined because Perkins Coie attorneys have numerous upcoming appearances before federal courts and agencies. Indeed, Perkins Coie has nearly a thousand active matters before federal courts, and has thousands of matters before agencies that require access to federal government buildings and officials. Continued refusals by federal officials to meet with Perkins Coie lawyers,

or to permit Perkins Coie lawyers to access federal agencies and buildings, would be devastating to both Perkins Coie's legal practice and its clients' interests.

28.     The Order also includes provisions that would require federal agencies to require government contractors to disclose any relationship they have with Perkins Coie, and to terminate government contracts for clients as to which Perkins Coie has been hired to perform any service. Many of Perkins Coie's largest clients (for instance, the top 15 clients, collectively representing over $343 million in revenue in 2024, which represents almost a quarter of the firm's revenue) or their affiliates have contracts or subcontracts with the federal government, or compete for such contracts, and many of those companies are represented by the firm for legal matters completely unrelated to government-contracting matters. For many of the firm's clients, the fact that the firm gives them legal advice is not public information. Accordingly, if enforced, the Order would seek to require many of these clients to divulge confidential information regarding their legal representations to the federal government, in addition to risking the termination of those clients' contracts if Perkins Coie has been hired to perform any service related to the contract.

29.     Due to the restrictions that the Order imposes on Perkins Coie, and the provisions directed to the firm's federal contractor clients, several clients have already terminated, or have communicated that they are considering terminating, their legal engagements with Perkins Coie. We are in frequent contact with many of our clients, and since the Order, have been in contact with at least our larger clients every day. The common message is that they want to keep using us but are reviewing the relationship, their government contracts and other government interactions, and will need to make decisions shortly. This is a rapidly evolving situation, which changes by the hour. Some clients have reported very concerning messages from government officials directing them to report business with Perkins Coie, and others are concerned about that possibility.

- 14-

a.  A client informed Perkins Coie on March 6, within hours of the Order's release, that due to the Order, Perkins Coie cannot represent that client in any litigation or before the relevant federal agency.

b.  A major government contractor that has been a firm client for over 35 years withdrew its work from Perkins Coie in light of the Order as of March 7. Shortly before the Order, the client had added Perkins Coie to its preferred-provider program, and annual billings to the client have often been in the millions of dollars.

c.  A government contractor that has been a firm client since 2018 has also withdrawn all work from Perkins Coie as a result of the Order as of March 7.

d.  A group of four clients has also withdrawn all work from Perkins Coie as of March 7 due to the need of the clients to engage with various federal agencies—including the DEA, DOJ, and HHS—by the nature of their business.

e.  A major government contractor that has been a firm client for over ten years informed the firm on March 7 that it is reconsidering its engagements with Perkins Coie unless something changes in terms of the Order's requirements.

f.  Another client indicated on March 7 that it is now, in view of the Order, considering other firms instead to represent it in connection with a DOJ investigation.

g.  Because of the uncertainty created by the Order, many clients have begun requesting frequent updates relating to the Order in order to assess whether Perkins Coie can continue to represent them.

h.  Earlier today, March 11, a longtime client of the firm that increased its work five-fold over the past three years told us that its CEO intends to disengage from Perkins Coie due to the Order.

30.     Perkins Coie has already lost significant revenue due to the loss of clients who terminated their engagements in the few days since the Order was issued. Like any law firm or business, Perkins Coie has debts, obligations and expenses. If the Order were to continue and thus cause current clients to terminate their engagements, and frighten away prospective new clients, it would put the firm's solvency and very existence at risk. For instance, if we lost our top 15 clients—each of whom is a government contractor or a corporate affiliate of one, each of whom be believe is at risk accordingly—the revenue loss would be devastating because this group alone represented about a quarter of our revenue in 2024. If the Order is allowed to prevent Perkins Coie from interacting with federal agencies or entering federal buildings on behalf of its clients, it would pose an existential risk. The firm is built around representation of clients who interact with the federal government. We take pride in the loyalty of our partners and associates, but lawyers of their quality have other opportunities, including the easy one of following their clients to other firms. Exceptional lawyers are the basis for our reputation and our success. Every passing day increases our risk.

31.     The Order has also had a chilling effect on Perkins Coie attorneys, who are now reconsidering how they approach certain matters that require them to appear in federal buildings.

32.     The Order also threatens Perkins Coie attorneys' right to practice their chosen profession. That threat is not only to revenue-generating practice, but also to the firm's pro bono practice, which frequently requires us to appear in federal court or before federal agencies in criminal, civil, or administrative matters. It is not even clear if TSA officers can process us at airports.

33.     The Order has also impacted Perkins Coie's recruiting and, potentially, retention of our employees. Since the issuance of the Order, we have had business professional candidates

who have been extended offers question the economic health of the firm and if there will be layoffs. One interviewee asked one of the firm's recruiters questions that the recruiter understood to be precipitated by the Order. And the firm has a recruiting event within the next two weeks that is focused on practice before a federal court of appeals, from which the firm historically has hired clerks to practice in areas related to government contracts, international trade, and intellectual property.

34.     The Order also interferes with Perkins Coie's employer–employee relationships because the restrictions are broadly written to include Perkins Coie employees.

## V.     False and Disparaging Statements in the Order

35.     The Order has also harmed Perkins Coie's reputation in the markets for clients, lawyers, and staff through its false and disparaging characterizations of the firm and its attorneys.

36.     The Order says many things that are not only inflammatory but also blatantly false. Most of the allegations were known during the President's first term, and have been (and in many cases were) adjudicated and dismissed long ago. For example, the Order accuses Perkins Coie of working to "steal an election," of "undermining democratic elections, the integrity of our courts, and honest law enforcement," and of "racially discriminat[ing] against its own attorneys and staff, and against applicants," including through "percentage quotas" and "proudly exclud[ing] applicants on the basis of race." And it accuses Perkins Coie of "earnings" that "subsidize, among other things, racial discrimination, falsified documents designed to weaponize the Government against candidates for office, and anti-democratic election changes that invite fraud and distrust." Those accusations are just plain false and most have already been rebutted through the results of prior cases. The Order also references "Fusion GPS" in connection with representation of Hillary

Clinton. No attorney at Perkins Coie for at least the last three years had anything to do with the engagement of Fusion GPS.

37.     The Fact Sheet also lists accusations against Perkins Coie. Those descriptions are inflammatory and baseless. Among other false statements, the Fact Sheet wrongly states:

a. "Perkins Coie LLP pushed debunked claims of secret Trump-Russia communications via Alfa Bank, with attorney Michael Sussmann indicted for lying to the FBI about this scheme." A jury quickly and unanimously acquitted Mr. Sussmann. The Fact Sheet also omits that no one else was involved and that Mr. Sussmann left the firm in 2021.

b. "Perkins Coie LLP has worked with activist donors, including George Soros, to judicially overturn enacted election laws, such as those requiring voter identification." Perkins Coie has historically represented both party-affiliated and non-partisan clients in litigation over election laws. Many law firms have done the same. None of Perkins Coie's election-related litigation was frivolous. Indeed, more than half of the litigation was successful after both sides had full due process. And much of it was *defending* state election procedures and actions taken by state officials.

c. "A court was forced to sanction Perkins Coie attorneys for unethical lack of candor before the court." The Fact Sheet alludes to one minor sanction, collectively, $8,700, connected with a single duplicative motion to supplement the record in a Fifth Circuit appeal in a 2021 voting-rights case. None of the three sanctioned attorneys remains at Perkins Coie. It is extremely rare for any of our lawyers to be sanctioned, and we take such matters very seriously.

d. "Perkins Coie LLP has been accused of racially discriminating against its own attorneys, staff, and applicants." Perkins Coie does have a program to encourage minority and other diverse students to become lawyers in technology practices, but it is not limited to such students and Perkins Coie has previously awarded the fellowship to non-diverse applicants. As the law changed, we adjusted the program accordingly, although an action (later voluntarily dismissed) was filed before we could do so. We remain proud of our efforts, which did not harm any existing employee, and which did not affect our regular program for hiring associates in our technology practices. The American Alliance for Equal Rights brought the lawsuit alluded to in the Order (and similar lawsuits against other law firms). The firm responded by making clear that all were welcome to apply to its fellowship, not just those from historically underrepresented groups, and the American Alliance for Equal Rights then dropped the suit.

e. The Fact Sheet is also wrong that "Perkins Coie has publicly announced racial percentage quotas for hiring and promotions, violating civil rights laws." The Fact Sheet's reference to 2019 suggests that it is talking about our pledge, based on the National Football League's Rooney Rule, to always consider minority candidates for firm leadership positions. That is not a quota, and it does not favor such candidates over more qualified candidates.

f. "Perkins Coie LLP hosted an FBI workspace, raising concerns about partisan misuse of sensitive data during investigations targeting President Trump." The "FBI workspace" rumor was long ago debunked. Perkins Coie did not host an "FBI workspace." Rather, like many law firms who represent clients involved in

national-security issues, the firm wanted to protect national security and thus was permitted to install, at its own expense, a single-room Secure Work Environment (SWE) when it moved to new offices. The FBI's only involvement was examining and approving the security of the space. Mr. Sussmann used that as his office. Perkins Coie no longer has a SWE, and the SWE was never an "FBI workspace."

g. "Perkins Coie LLP has filed lawsuits against the Trump Administration, including one designed to reduce military readiness." This statement impugns Perkins Coie for the political and legal positions taken by some of its clients in lawful litigation. Specifically, this statement refers to *Shilling v. Trump*, a pro bono lawsuit representing plaintiffs challenging an executive order by President Trump affecting transgender servicemembers despite their love of country and equal ability to contribute to military readiness.

\* \* \*

38.  I declare under penalty of perjury, on this 11th day of March, 2025, that the foregoing is true and correct to the best of my knowledge, information and belief.

DAVID J. BURMAN

# EXHIBIT 20

<div align="center">

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

</div>

PERKINS COIE LLP,

          *Plaintiff,*

    v.

U.S. DEPARTMENT OF JUSTICE, *et al.,*

          *Defendants.*

Case No. 1:25-cv-00716 (BAH)

Judge Beryl A. Howell

<div align="center">

**DECLARATION OF DAVID J. BURMAN IN SUPPORT OF**
**MOTION FOR SUMMARY JUDGMENT**

</div>

I, David J. Burman, pursuant to 28 U.S.C. § 1746, hereby declare as follows:[1]

    1.    I am a partner at Perkins Coie LLP ("Perkins Coie"). Perkins Coie is an international law firm that conducts its U.S. operations and activities through a limited liability partnership, Perkins Coie LLP, with seventeen offices around the country. I have been an attorney at Perkins Coie for over 45 years, following two years clerking. I am a member in good standing of the D.C. and Washington bars and have been admitted in many state and federal courts, and I serve on the Advisory Committee on the Federal Rules of Civil Procedure. I am very familiar with the firm's business and operations and was asked as a result to take a lead role in attempting to assess and contain the damage from the March 6 Executive Order. I either have personal knowledge of the facts set forth in this declaration or I know them from business records and my knowledge of the firm's history and operations, and the statements herein are consistent with the

---

[1] This declaration includes the substance of my prior March 12, 2025 declaration in support of Perkins Coie's motion for temporary restraining order (with minor changes where appropriate), along with additional information relevant for summary judgment.

knowledge formed while I was even more directly involved in various aspects of firm management.

2.      I currently chair the firm's governance task force, and have long and intense involvement in firm management. I led the commercial litigation practice and first served on the firm's executive committee by the early 1990s. I then served for six years on the four-partner management committee. Over the years, I have chaired or served on the firm's hiring, compensation, pro bono, technology, and strategic conflicts committees as well as two strategic planning efforts and task forces on practice group structure, total quality management, and role of non-lawyer professionals. I spearheaded the creation of our Intellectual Property Department and the opening of our Chicago office, both of which have become among our most successful initiatives. I have acted as co-lead relationship partner for three of our large institutional clients.

3.      I submit this Declaration in Support of the Statement of Material Facts As To Which There Is No Genuine Dispute and Motion for Summary Judgment filed by Perkins Coie. I am of the age of majority, and I am competent to make this declaration.

## A.     Perkins Coie LLP

4.      Perkins Coie was founded in Seattle by a retiring U.S. District Judge and U.S. Attorney. Since 1912, Perkins Coie has grown to become the largest law firm in the Pacific Northwest, has opened offices throughout the United States and in Asia and in Europe, and has more than 1,200 lawyers.

5.      The firm represents a wide range of clients, including Fortune 500 companies, small- and medium-sized businesses, families, individuals, and charitable and public service-oriented organizations. Perkins Coie alumni have been and are presently serving as state and federal court judges, judicial law clerks, prosecutors, public defenders, and high-ranking

government officials, as well as founders, CEOs, and General Counsels of some of the nation's largest and most important companies. Perkins Coie is widely recognized as one of the leading law firms for technology and other innovative companies, and since our founding, Perkins Coie has proudly represented a wide range of industry leaders throughout the world.

6.     Over our 113-year history, Perkins Coie and its lawyers have represented clients in most if not every state, in federal and state courts across the nation, and in tribunals throughout the world (including the Supreme Court of the United States), and they have helped to establish major precedent in state and federal law. The firm is frequently sought out by leading technology and communications companies who are innovating in areas as varied as artificial intelligence, telecommunications, and the Internet of Things. The firm's lawyers are leaders and members of national, state, and local bar associations around the country. Among other esteemed professional organizations, its lawyers are members of the American Bar Association, state bar associations for nearly every state in the country, and local bar associations in such cities and counties as Chicago, King County, Los Angeles County, Maricopa County, New York City, San Francisco, and Washington, D.C.

7.     Perkins Coie has been named as an "Am Law 50" firm on *The American Lawyer 100* list for over a decade. The firm and its lawyers are regularly recognized for excellence in the legal community by *Best Lawyers*®, *Chambers USA*, and other respected organizations, including national and local bar associations.

8.     Perkins Coie has approximately 2,500 lawyers and business professionals. Of those, nearly half are attorneys—including equity partners, non-equity partners, and associates—and half are business professionals, including paralegals, patent agents, legal assistants, and other professionals. Our employees are deeply woven into the fabric of their communities. They are

Sunday school teachers, Scout leaders, youth sports coaches, and volunteers serving on hundreds of boards of organizations ranging from art museums and food kitchens to major universities, local schools, and foundations. They include former members of the armed forces, and current reservists in the U.S. military.

9.      Perkins Coie's attorneys are drawn from all sides of the political spectrum, and most of our attorneys are not politically active. There are attorneys who are liberal and attorneys who are conservative. When Bob Bauer started our small Political Law practice, we were known in Seattle as, if anything, a "Republican firm." His practice was viewed as an interesting business opportunity, not a cause. While partner politics have become more balanced, it was always important that the political practice be respectful of the firm's diversity. Further, many of our attorneys joined the firm after government service under both Democratic and Republican administrations, or after serving as judges or judicial law clerks to judges appointed by both Democratic and Republican presidents. Reflecting this bipartisan ethos, in the past six years, four current or former Perkins Coie lawyers have been nominated and confirmed to serve as federal judges—two by President Trump in 2019, and two by President Biden in 2021 and 2023. One former partner ran for Congress as a Republican, won, and returned to the firm for a time after he lost re-election. Another partner was elected Washington Attorney General as a Republican.

10.      Perkins Coie is dedicated to our clients, our communities, and each other. The firm has a longstanding, firmwide commitment to pro bono service. Since 1989, the firm has provided approximately 1.45 million hours of pro bono service by attorneys, paralegals, and other business professionals to innumerable clients, including veterans, indigent families, disabled persons, and community-based organizations of all sizes, including the League of Women Voters and other non-partisan organizations, in matters championing human, civil, and electoral rights, housing,

education, food, benefits, and economic justice.  We have frequently been honored for our efforts.

Our pro bono service also extends to representing indigent criminal defendants before federal

courts by court appointment and clients on death row in states with limited pro bono resources.  In

2024, for example, Perkins Coie lawyers, paralegals, and other business professionals spent over

89,000 hours, valued at nearly $70 million, in pro bono service.  Much of our pro bono work

involves advocating for military and veterans' rights.

11.     Perkins Coie has received numerous awards from a wide range of organizations for

its pro bono representation, including state and local bar associations, the U.S. Patent and

Trademark Office 2023 Patent Pro Bono Achievement Certificate, the U.S. District Court for the

District of Arizona 2022 Outstanding Pro Bono Attorney of the Year Award (awarded in 2023),

and the 2023 Veteran Heroes Law Firm Award by the Attorney General of Washington's Office

of Military and Veteran Legal Assistance.

12.     Perkins Coie is often recognized for fostering a work environment in which all

lawyers and business professionals are judged on their merit and can reach their potential.  Perkins

Coie has been named to *Fortune*'s "100 Best Companies to Work For" list for over 20 consecutive

years, and our individual offices are often named to similar local lists.

**B.     The Firm's Diversity and Inclusion Efforts**

13.     In addition to our representation of clients in this area, Perkins Coie itself has a

longstanding and demonstrable commitment to fostering diversity and inclusion (D&I) within the

firm, the legal profession and community.  The firm's commitment is summarized plainly on our

website:

- "We are intentional and consistent in our efforts to increase the diversity of our
  workforce and to advance the values of diversity and inclusion in the legal

profession.  Diversity and inclusion are key to our culture, our values, and our business strategy.  They are fundamental to the way we connect with and serve our clients.";

- "Perkins Coie is committed to advancing diversity and inclusion both within the firm and throughout our collective communities.  We will continue to support and participate in efforts to make the legal profession more diverse and inclusive."

*See* Ex. 1, p. 1, 2.

14.     Like the federal government, Perkins Coie formally recognizes Martin Luther King Jr. Day and Juneteenth as firmwide holidays, reinforcing the Firm's commitment to racial equity through institutionalized reflection, education, and service.  The firm encourages attorneys and staff to engage in volunteer activities on these days, supporting local community organizations dedicated to advancing racial justice.  Perkins Coie also observes many heritage months, including several that have been recognized by Congress, by conducting programming aimed at fostering awareness and appreciation of diverse cultural narratives.  These include, but are not limited to, Black History Month, Asian American and Pacific Islander Heritage Month, Women's History Month, Pride Month, and Hispanic Heritage Month.  These initiatives are complemented by firmwide speakers, panel discussions, and presentations open and available to all Perkins Coie personnel designed to encourage meaningful dialogue on diversity-related topics.  These programs benefit all of the firm's personnel, and we believe they make for a more cohesive and effective working environment.

15.     Perkins Coie's hiring and promotion decisions are merit-based, meaning all candidates are evaluated equally based on the same metrics: qualifications, competencies, personality, and demonstrated excellence.  The firm's hiring committee and interviewers undergo

training on best practices for inclusive hiring, mitigating implicit biases, and fostering fair opportunities.  Perkins Coie does not have "percentage quotas" as part of its hiring practices.

16.     Perkins Coie has a Diversity & Inclusion Fellowship program that is expressly open to all first-year law students.  *See* Ex. 2, p. 3.

17.     Following litigation initiated by the American Alliance for Equal Rights in 2023, the firm explicitly affirmed the inclusive nature of the fellowship to ensure continued adherence to principles of fairness and legal compliance.  After the firm's confirmation that the law student fellowships were open to all, the American Alliance for Equal Rights voluntarily dismissed its lawsuit.

## C.     Interaction with the Federal Government

18.     Perkins Coie is constrained by Rule 1.6 of the Model Rules of Professional Conduct and attorney-client privilege, and thus cannot disclose client engagements without authorization. No client has authorized Perkins Coie to disclose its engagement of the firm in connection with this litigation, and this section therefore contains information about the Firm's practice without revealing confidential details.

19.     As a full-service law firm that represents clients in all sectors of the economy in transactional, litigation, and regulatory matters, Perkins Coie lawyers necessarily interact with the federal government on behalf of their clients in innumerable ways.  Those interactions are critical to their ability to practice their profession; they are the waters the Perkins Coie attorneys swim in, the air they breathe.  If allowed to go into effect, the Order's restrictions would be devastating and irreparable.  Most of the firm's litigation practice is in federal court on behalf of their clients in civil and criminal cases, as well as in federal agencies' in-house administrative proceedings.  As of March 11, 2025, the firm had nearly a thousand cases currently pending before federal district,

bankruptcy, and appellate courts, including the Supreme Court of the United States. Its attorneys have upcoming appearances scheduled before agencies and in courtrooms, including an upcoming argument before the Supreme Court (another one has occurred since March 11).

20.     Perkins Coie represents clients who have been indicted or are the targets of pending federal criminal investigations. Over the past five years, the firm has represented more than 80 individuals and companies who have been criminally investigated, charged, and/or prosecuted by federal authorities at the Department of Justice. This list does not include the firm's work in federal criminal-adjacent areas, such as clemency petitions or other post-conviction relief beyond direct appeals, such as pardons or compassionate release.

21.     The firm has nine main practice groups, and all of them intersect with the federal government in some way and include clients with business before the federal government. The largest practice groups by headcount are Commercial Litigation, Business, and Intellectual Property, which together account for approximately 75% of the firm's attorneys. The smallest practice group by headcount is Political Law. Today, Perkins Coie's Political Law Group includes approximately 8 attorneys, plus approximately 19 attorneys who are members of other practice groups and also affiliated with the practice. I understand the March 6, 2025 Executive Order and Fact Sheet at issue in this proceeding to refer to former members of the Political Law Group, albeit not by name. Although the firm's Political Law practice has historically been much smaller than our other practice groups, it also substantially shrank in 2021 when Marc Elias and about 50 other attorneys left Perkins Coie to form the Elias Law Group. This practice group historically has handled a mix of paying and some pro bono cases, and it is often called on to advise clients (typically corporations and business organizations) on political finance issues. It accounts for

about 0.5% of the firm's revenue. Perkins Coie attorneys work on these matters because they involve important legal rights and issues affecting our clients.

22.     In the course of their representations, Perkins Coie lawyers frequently meet with federal officials from countless agencies. Although it is difficult to quantify precisely, based on a review of our current client matter list, the vast bulk of our clients have matters that require Perkins Coie lawyers to interact with federal agencies.

23.     For instance, a significant number of Perkins Coie clients are, or have affiliates who are, government contractors and subcontractors—including 100% of its top 15 clients by revenue. *See* Ex. 3 (identifying revenue from top 15 clients). I have also reviewed records from the Federal Procurement Data System (FDPS) to confirm that each of these clients, or their affiliates, are government contractors.

24.     The firm's Government Contracts group handles clients' bid protests and disputes surrounding contract claims, including transactional work and litigation. Perkins Coie represents some of these clients in connection with government contract matters. As of March 11, 2025, the approximately nine attorneys in this group were handling approximately 70 government contracting matters involving various federal agencies. But there are many other firm clients that have government contracts and who have engaged Perkins Coie to represent them in matters unrelated to their government contracts.

25.     The firm's Intellectual Property group and its clients also depend heavily on access to and interaction with the federal government. The approximately 236 attorneys in this group frequently represent patent applicants, patent owners, and patent challengers before the U.S. Patent and Trademark Office (USPTO) in patent prosecution and post-grant proceedings, including in administrative trials before the Patent Trial and Appeal Board. As of March 11, 2025, Perkins

Coie was representing clients in approximately 5,415 pending patent applications before the USPTO.  Perkins Coie was also representing clients in approximately 56 active post-grant proceedings (i.e., administrative trial proceedings) before the Patent Trial and Appeal Board (PTAB), and clients in approximately 11 active proceedings before the International Trade Commission (ITC).  Perkins Coie was also representing clients in trademark and copyright matters before agencies, including approximately 66 matters before the Trademark Trial and Appeal Board (TTAB), approximately 1,960 pending trademark matters before the USPTO, and approximately 145 pending copyright matters before the Copyright Office.  Many of those patent and trademark clients also are known to have contracts with the federal government.

26.     Perkins Coie has approximately 340 attorneys in its Business group.  That practice group includes subgroups directed to financial regulation, which requires them to engage with federal financial regulatory agencies and instrumentalities (such as the Federal Deposit Insurance Corporation and the Office of the Comptroller of the Currency); international trade, which involves interaction with and practice before the Department of Commerce and the International Trade Commission; and tax, which involves interaction with the Internal Revenue Service.  As of March 11, 2025, the international trade group also had approximately 17 pending matters before the Department of Labor and approximately 22 pending matters before U.S. Citizenship and Immigration Services.  The group's corporate and securities practice regularly represents clients before and in connection with the Securities and Exchange Commission (SEC), including No Action Request Letters, Securities Act registration statements subject to SEC review, and Exchange Act filings.  The Business Group also represents clients before or in connection with the Department of Agriculture, the Food and Drug Administration, Department of Transportation, Department of Justice, Department of Homeland Security, and Department of State.

27.     The firm's White Collar & Investigations practice (a subgroup of the Commercial Litigation group) includes approximately 29 attorneys and is almost exclusively reliant on interacting with the federal government.  That practice involves representing clients in investigations and after indictments in numerous proceedings involving many agencies of the federal government, including the Department of Justice, Federal Bureau of Investigation (FBI), U.S. Attorney's Offices, and SEC, among others.

28.     There are many other practice groups and subgroups at Perkins Coie that interact, by necessity, with the federal government on behalf of our clients.  These groups include, but are not limited to, Commercial Litigation (with subgroups including Appeals, Issues & Strategy; Construction; and Antitrust); Environment, Energy & Resources; Labor & Employment; Private Client Services; Product Liability; and Real Estate & Land Use.  In summary, much of our work on behalf of our clients requires access to federal government buildings, which house both courthouses and agencies.  This is true of every practice group at the firm.  And certain of these practice areas, such as White Collar & Investigations, are almost exclusively reliant on interacting with the federal government.  Each of our nine major practice groups relies on clients who have done business with the federal government.  Such clients or their corporate affiliates account for a significant fraction of revenue in each practice group, as evidenced by the top 15 clients in each practice group (84% of revenue from top 15 clients in Business from those that have or whose corporate affiliates have government contracts; 90% for Commercial Litigation; 88% for Intellectual Property; 51% for Environment, Energy & Resources; 75% for Labor & Employment; 44% for Political Law; 51% for Private Client Services; 94% for Product Liability; 32% for Real Estate & Land Use).  *See* Ex. 4 (listing revenue from top 15 clients in each practice group).  I have

also reviewed records from the FDPS that confirm the percentage of these clients, or their affiliates, that are government contractors.

29.     As of March 11, 2025, by way of non-exhaustive example, our records show that Perkins Coie has active civil and criminal matters on behalf of its clients involving at least the following federal agencies, which require them either to interact with or appear before federal government officials:

- Administration for Strategic Preparedness and Response
- Advisory Council on Historic Preservation
- Biomedical Advanced Research and Development Authority
- Bonneville Power Administration
- Bureau of the Census
- Bureau of Economic Analysis
- Bureau of Indian Affairs
- Bureau of Industry and Security
- Bureau of Land Management
- Bureau of Ocean Energy Management
- Bureau of Reclamation
- Bureau of Safety and Environmental Enforcement
- CHIPS Program Office
- Committee on Foreign Investment in the United States
- Commodity Futures Trading Commission
- Consumer Financial Protection Bureau
- Defense Contract Audit Agency
- Defense Contract Management Agency
- Defense Logistics Agency
- Department of Agriculture
- Department of the Army
- Department of Commerce
- Department of Defense
- Department of Energy (including Oak Ridge National Laboratory)
- Department of Health & Human Services
- Department of Homeland Security
- Department of the Interior
- Department of Justice (including Antitrust, CCIPS, Civil, Fraud)
- Department of Labor
- Department of State
- Department of Transportation
- Department of Toxic Substance Controls

- Department of the Treasury
- Department of Veterans Affairs
- Directorate of Defense Trade Controls
- Drug Enforcement Administration
- Environmental Protection Agency
- Equal Employment Opportunity Commission
- Executive Office of the President (including CEQ, OMB, and OSTP)
- Fannie Mae and Freddie Mac
- Federal Aviation Administration
- Federal Bureau of Investigation
- Federal Bureau of Prisons
- Federal Communications Commission
- Federal Deposit Insurance Corporation
- Food & Drug Administration
- Federal Election Commission
- Federal Emergency Management Agency
- Federal Energy Regulatory Commission
- Federal Highway Administration
- Federal Permitting Improvement Steering Council
- Federal Transit Administration
- Financial Crimes Enforcement Network
- Financial Industry Regulatory Affairs (FINRA)
- Government Accountability Office
- Grid Deployments Office
- Housing and Urban Development
- Internal Revenue Service
- International Trade Administration
- Loan Programs Office
- National Institutes of Health
- National Labor Relations Board
- National Marine Fisheries Service
- National Oceanic and Atmospheric Administration
- National Park Service
- National Renewable Energy Lab
- Office of Clean Energy Demonstrations
- Office of Federal Contract Compliance Programs
- Office of Foreign Assets Control
- Office of the Comptroller of the Currency
- Office of the U.S. Trade Representative
- Pacific States Marine Fisheries Commission
- Patent Trial & Appeal Board
- Rural Utilities Service
- Securities & Exchange Commission
- Small Business Administration

- Trademark Trial & Appeal Board
- U.S. Army Corps of Engineers
- U.S. Attorney's Offices
- U.S. Copyright Office
- U.S. Citizenship and Immigration Services
- U.S. Customs and Border Protection
- U.S. Fish & Wildlife Service
- U.S. Forest Service
- U.S. Immigration and Customs Enforcement
- U.S. International Trade Commission
- U.S. Patent & Trademark Office
- U.S. Postal Inspection Service
- U.S. Secret Service

30.    The firm's pro bono work is frequently before federal agencies or involves interacting with federal government officials.  For instance, Perkins Coie attorneys represent individual veterans pro bono in obtaining benefits before the Department of Veterans Affairs and the Department of Defense.  As of March 11, 2025, Perkins Coie had approximately 41 open pro bono matters for individual veterans matters, the majority of which are related to seeking higher levels of benefits for veterans in connection with their service to this country, such as application for combat-related special compensation (before the Combat-Related Special Compensation Board); discharge upgrade petitions; and appeals to the U.S. Court of Appeals for Veterans Claims. In the past five years, Perkins Coie has handled 90 matters for individual service members.  Perkins Coie was honored with the 2023 Veterans Heroes Law Firm Award by the Attorney General of Washington's Office of Military and Veteran Legal Assistance (OMVLA).  That award recognizes the law firm that provided the greatest contribution to OMVLA in any given year.  The National Veterans Legal Services Program (NVLSP) also selected a Perkins Coie attorney to receive the 2020 NVLSP Lawyers Serving Warriors Excellence Award.  The entire veterans-rights practice requires access to federal officials and buildings.  Perkins Coie attorneys also represent disaster victims on a pro bono basis in FEMA applications and appeals.  Perkins Coie attorneys represent

pro bono clients in social-security matters, including SSI and SSDI.  Perkins Coie represents several nonprofits pro bono for a range of matters, including obtaining federal tax exemptions, formation, and counseling.  And Perkins Coie represents pro bono low-income inventors with patent applications before the USPTO, and assists organizations and small businesses in registering trademarks.  Further, Perkins Coie attorneys have represented pro bono religious organizations, including Jewish and Catholic organizations.

31.     Much of this pro bono work is not "political."  Our analysis indicates that only about 20% of the pro bono matters, and 35% of the pro bono time spent over the past year, were attributable to cases that might be viewed as "political" – *i.e.*, cases involving transgender service members, homelessness, immigration, reproductive rights, the First or Second Amendments, elections, discrimination, or right to die.  By contrast, 80% of Perkins Coie's pro bono matters, and nearly two-thirds of its pro bono hours over the past year, were devoted to non-political matters such as veterans, domestic abuse, Criminal Justice Act appointments to represent indigent defendants, Social Security disability payments, patents and trademarks, business and non-profit tax counseling.

32.     Examples of the type of pro bono work that might be considered "political" include: 1) a challenge to a state law that prevented pregnant individuals from using midwives that employ traditional healing practices for prenatal, maternal, and infant care; 2) assisting a faith-based "crisis" pregnancy resources center in a lease dispute; and 3) assisting a deported veteran—who had lived in the United States as a lawful permanent resident since the age of five—in returning to the United States through humanitarian parole.

**D.       Recent Relevant Litigation**

33.     In 2020, Perkins Coie represented a number of clients opposing then-candidate Trump's challenges to the results of the 2020 Presidential Election.  The firm's clients prevailed in all but one of the challenges brought by the Trump campaign seeking to overturn the results of the 2020 election,[2] and the firm's clients also prevailed in a significant number of voting rights cases, including cases where our clients were successful in upholding existing laws against challenges by lawyers for the other party.  The profession's ethics rules would generally not allow us to represent candidate Trump's interests once we had been retained adverse to those interests.

34.     On March 24, 2022, Donald Trump sued a host of defendants, including Perkins Coie, Hillary Clinton, the Democratic National Committee, Fusion GPS, and former Perkins Coie partners Michael Sussmann and Marc Elias in the U.S. District Court for the Southern District of Florida alleging that the defendants "maliciously conspired to weave a false narrative" that Mr. Trump was colluding with Russia.  *See* 2:22-cv-14102 (S.D. Fla.).  Mr. Trump asserted civil RICO claims against Perkins Coie for conspiring with the Clinton campaign and sought to recover damages in excess of $24 million, before trebling, as well as attorney's fees and lost profits.  On September 9, 2022, the court dismissed the lawsuit with prejudice.  *Trump v. Clinton,* 626 F. Supp. 3d 1264 (S.D. Fla. 2022).

35.     On February 6, 2025, Perkins Coie filed a lawsuit, *Shilling v. Trump*, No. 2:25-cv-241 (W.D. Wash.), on behalf of Commander Emily Shilling, Commander Blake Dremann, Lieutenant Commander Geirid Morgan, Sergeant First Class Cathrine Schmid, Sergeant First Class Jane Doe, Staff Sergeant Videl Leins, Matthew Medina, and the Gender Justice League

---

[2] The case where Perkins Coie's client did not prevail involved a challenge to the deadline—November 9 versus November 12—to confirm the identities of first-time voters who voted by mail in Pennsylvania.

challenging an executive order by President Trump targeting transgender servicemembers.  The lawsuit challenges the Executive Order as a violation of Plaintiffs' First Amendment, due process, and equal protection rights.  Perkins Coie represents the plaintiffs on a pro bono basis as co-counsel, along with Lambda Legal and the Human Rights Campaign.  On February 19, 2025, Perkins Coie, on behalf of its clients, filed a motion for a preliminary injunction asking the court to bar implementation of the executive order until it could adjudicate the case.  The court entered a preliminary injunction on March 27, 2025. *Shilling*, No. 2:25-cv-241, ECF Dkt. No. 103 (W.D. Wash.).  On January 28, 2025, a group of plaintiffs filed an earlier parallel lawsuit challenging Executive Order 14185. *Talbott v. Trump*, No. 25-cv-240, Dkt. 1 (D.D.C.).  Perkins Coie does not represent those individuals and, beyond monitoring, is not otherwise involved in that litigation.

**E.      Security Clearances Held by Perkins Coie Personnel**

36.      At the time of the March 6 Order, our records showed that approximately twenty-four Perkins Coie lawyers and business professionals held security clearances.  These individuals include a dozen persons with former military or other public service backgrounds, granted access to sensitive information by virtue of their commitment to public service.  These individuals also include and overlap with persons whose access to sensitive information has been granted in the context of their fulfilling their obligations as lawyers to represent their clients.

37.      Of the twenty-four security clearance holders, twenty-one received clearance from the Department of Defense and the other three received clearance from the Department of Justice and Federal Bureau of Investigation.

38.      Nine of the security clearance holders received their clearance prior to being hired by Perkins Coie.  Two of those individuals hold clearances in connection with their duties as

military reservists, and wholly unrelated to their work at Perkins Coie. Four of the twenty-four individuals with security clearances are non-attorneys.

39.     One partner received a security clearance on February 12, 2025, after President Trump's inauguration and approximately three weeks before the Executive Order issued. The "Adjudication History" in the Defense Information System for Security (DISS) for the partner reflected "**Top Secret adjudication completed** with a **determination of Favorable by DoD CAS on 2025/02/12**." (emphasis in original). *See* Ex. 5. All of the factual conclusions recited in Section 1 of the Executive Order occurred before that partner received this security clearance.

40.     Ten of the security clearance holders were hired at Perkins Coie after the 2016 election.

41.     Nineteen of the security clearance holders had no involvement in any of the matters referenced in the Order or the Fact Sheet. Of the five that did, the security clearances they held were unrelated to their work on those matters. No security clearance holder had any involvement in the Fusion GPS matter. No security clearance holder has any involvement with the *Shilling* matter. None of the security clearance holders is a primary member of the Political Law Group.

42.     Perkins Coie previously (but no longer) maintained a secure area with a low classification level, namely a secure working environment, but that secure area was closed prior to the issuance of the Order. As described below, Perkins Coie has never maintained a Sensitive Compartmented Information Facility (SCIF) and has no record of FBI agents working out of its offices.

**F.     Irreparable Harm Caused by the Order and Its Enforcement**

43.     On March 6, 2025, President Donald J. Trump signed the Executive Order 14230 titled "Addressing Risks from Perkins Coie LLP." *See* https://www.whitehouse.gov/presidential-

actions/2025/03/addressing-risks-from-perkins-coie-llp/ (90 Fed. Reg. 11,781) (the "Order"). The Order was accompanied by a "Fact Sheet" issued the same day that purports to explain and support the Order. Perkins Coie was given no notice of, nor an opportunity to respond to, the false charges in the Order and Fact Sheet or to explain their inevitable impact on the firm before they were issued, and no effort was made to alter the Order or Fact Sheet after our TRO pleadings pointed out many fundamental (and still unrebutted) errors. Numerous bar groups, law schools, law firms, and lawyers have spoken out against the Executive Order's plain unconstitutionality.

44.     We of course are constrained under Rule 1.6 of the Model Rules of Professional Conduct and attorney-client privilege, but we can report general facts and facts known to the government. The day after the Executive Order, an official of a federal agency informed a client of Perkins Coie that, because of the Order, the client's Perkins Coie lawyers should not attend a scheduled meeting with an office in that agency to discuss a pending matter. The client had engaged Perkins Coie to defend that client in that enforcement action, and Perkins Coie performed substantial work on the matter, totaling over $1 million in fees, and interacted with the agency on this matter in the interim. The client, after expressing great reluctance and regret, said it was forced to hire other law firms to represent it before the federal government and in related litigation.

45.     On March 6, 2025, an attorney in the Fraud Section of the Criminal Division of the U.S. Department of Justice, informed Perkins Coie that the Fraud Section of the Criminal Division could not proceed with a previously set meeting relating to another Perkins Coie client, citing the need to wait for further guidance on whether that meeting could even occur in light of the Order. *See* Ex. 6.

46.     It is inconceivable that the Order could constitutionally ban Perkins Coie's access to federal courthouses, but because it might be interpreted to do so, the firm has already been

forced to incur additional costs in securing backup personnel to attend impending hearings. Perkins Coie will continue incurring such harm if the Order's enforcement is not permanently enjoined because Perkins Coie attorneys have numerous upcoming appearances before federal courts and agencies. Indeed, Perkins Coie has nearly a thousand active matters before federal courts, and has thousands of matters before agencies that require access to federal government buildings and officials. Refusals by federal officials to meet with Perkins Coie lawyers, or to permit Perkins Coie lawyers to access federal agencies and buildings, would be devastating to both Perkins Coie's legal practice and its clients' interests. Even the threat of such lack of access is surely deterring potential new clients and existing clients from retaining the firm for new matters.

47.     Similarly, the Order also includes provisions that would require federal agencies to require government contractors to disclose any relationship they have with Perkins Coie, and to terminate government contracts for clients as to which Perkins Coie has been hired to perform any service. Many of Perkins Coie's largest clients (for instance, the top 15 clients, collectively representing over $343 million in revenue in 2024, which represents almost a quarter of the firm's revenue) or their affiliates have contracts or subcontracts with the federal government, or compete for such contracts, and many of those companies are represented by the firm for legal matters completely unrelated to government-contracting matters. *See supra* ¶ 23. For many of the firm's clients, the fact that the firm gives them legal advice is not public information, and the importance of confidentiality is a reason for attorney-client privilege and Rule 1.6. Accordingly, if enforced, the Order would seek to require many of these clients to divulge confidential information regarding their legal representations to the federal government, in addition to risking the termination of those clients' contracts if Perkins Coie has been hired to perform any service related to the contract.

48.     Due to the restrictions that the Order imposes on Perkins Coie, and the provisions directed to the firm's federal contractor clients, several clients have already terminated, or have communicated that they are considering terminating, their legal engagements with Perkins Coie. We are in frequent contact with many of our clients, and since the Order, have been in contact with at least our larger clients every day.  The common message is that they want to keep using us but are reviewing the relationship, their government contracts and other government interactions, and will need to make decisions shortly.  This is a rapidly evolving situation, which changes by the hour.  Prior to the TRO, for example, some clients have reported very concerning messages from government officials directing them to report business with Perkins Coie, and others are concerned about that possibility, including:

    a.  A seven-year client with seven open matters informed Perkins Coie on March 6, 2025, within hours of the Order's release, that due to the Order, Perkins Coie cannot represent that client in any litigation or before the relevant federal agency.

    b.  A major government contractor that has been a firm client for over 35 years reassigned two matters to other law firms on March 7, 2025.

    c.  A government contractor that has been a firm client since 2018 withdrew all work from Perkins Coie as a result of the Order as of March 7, 2025.

    d.  A coalition of four clients had also withdrawn all coalition work from Perkins Coie as of March 7, 2025 due to the need of the clients to engage with various federal agencies—including the DEA, DOJ, and HHS—by the nature of their business.

    e.  A major government contractor that has been a firm client since 2021 with fifteen open matters informed the firm on March 7, 2025 that it is reconsidering its

engagements with Perkins Coie unless something changes in terms of the Order's requirements.

f.  Another client indicated on March 7, 2025 that it is now, in view of the Order, considering other firms instead to represent it in connection with a DOJ investigation.

g.  On March 11, 2025, a longtime client of the firm that had increased its work five-fold over the past three years and had 30 open matters started to reconsider whether to terminate every engagement with Perkins Coie.

h.  Because of the uncertainty created by the Order, and even after the entry of the TRO, many clients have begun requesting frequent updates relating to the Order in order to assess whether Perkins Coie can continue to represent them.

49.  The abrupt loss of so many longstanding and significant clients across a variety of business types and practice disciplines in a one-week period is exceptional and abnormal.  The common denominator among these clients is that each one terminated or began reconsidering its engagements in the immediate aftermath of the Order's issuance.  While the TRO stemmed some of those consequences, a permanent injunction is necessary to prevent them from resuming and intensifying.

50.  Perkins Coie has already lost significant revenue due to the loss of clients who terminated their engagements in the few days since the Order was issued.  And the firm has lost out on new work from clients who were considering engaging the firm, but chose not to move forward with Perkins Coie after issuance of the Executive Order.  Like any law firm or business, Perkins Coie has debts, obligations and expenses.  If the Order were to continue and thus cause current clients to terminate their engagements, and frighten away prospective new clients, it would

put the firm's solvency and very existence at risk.  For instance, if we lost our top 15 clients—each of whom is a government contractor or a corporate affiliate of one, each of whom we believe is at risk accordingly—the revenue loss would be devastating because this group alone represented about a quarter of our revenue in 2024.  If the Order is allowed to prevent Perkins Coie from interacting with federal agencies or entering federal buildings on behalf of its clients, it would pose an existential risk.  The firm is built around representation of clients who interact with the federal government.  We take pride in the loyalty of our partners and associates, but lawyers of their quality have other opportunities, including the easy one of following their clients to other firms. Exceptional lawyers are the basis for our reputation and our success.

51.     The Order has also had a chilling effect on Perkins Coie attorneys, who are now reconsidering how they approach certain matters that require them to appear in federal buildings.

52.     The Order also threatens Perkins Coie attorneys' right to practice their chosen profession.  That threat is not only to revenue-generating practice, but also to the firm's pro bono practice, which frequently requires us to appear in federal court or before federal agencies in criminal, civil, or administrative matters.  It is not even clear if TSA officers can process us at airports.

53.     The Order has also impacted Perkins Coie's recruiting and, potentially, retention of our personnel.  Since the issuance of the Order, we have had business professional candidates who have been extended offers question the economic health of the firm and ask if there will be layoffs. One interviewee asked one of the firm's recruiters questions that the recruiter understood to be precipitated by the Order.  The threat to the Firm's recruitment efforts poses severe consequences for the health of the firm.  Its potential for growth as a business depends on its ability to draw and retain top talent.

54. The Order increases the potential that Perkins Coie lawyers will leave the firm for other opportunities in order to preserve their relationships with clients that have government contracts.

55. The Order also interferes with Perkins Coie's employer–employee relationships because the restrictions are broadly written to include Perkins Coie business personnel.

56. The firm currently faces considerable uncertainty regarding which aspects of its D&I activities and advocacy will result in adverse consequences, even in the face of injunctive relief. The Executive Order appears to be a command to purge all references to or support of diversity and inclusion in the workplace. The risks and uncertainty stemming from this Order have resulted in pausing or pulling back on certain programs and some statements in support of D&I and the implementation of D&I initiatives. The affected conduct is lawful and consistent with EEOC guidance at the time those actions were taken.

57. For example, press releases and stories more than six months old, including those touting the firm's D&I advocacy, were already removed from the firm's website (but have been preserved). Perkins Coie has reassessed and is reassessing other statements and references to its pro bono and D&I advocacy on its website. The firm similarly has reassessed and is reassessing statements and references to its D&I advocacy in various advertisements and program brochures, including considering removal of the following: (1) the phrase "Diversity is Excellence" in an advertisement; (2) the statement that Perkins Coie is "proud to support" an organization's "commitment to inclusivity and empowerment of diverse communities," in a program brochure for an event the firm is sponsoring; and (3) the phrase "Investing in diversity and inclusion is smart business and helps drive our pursuit of excellence," in a program brochure.

58.     The Order has done more than impact the firm's messaging on D&I.  It has chilled Perkins Coie's diversity-related programs, not because certain measures are required by law, but because of the need to protect the firm from extralegal pressure.  For instance, the Order has interfered with Perkins Coie's ability to offer fellowships to potential new hires, even though those fellowships are open to all applicants.  Perkins Coie has postponed a showing of a movie regarding Lilly Ledbetter, sex discrimination and the Fair Pay Act.  The firm is considering whether and how it can or should respond to questions from clients and prospective clients regarding the demographics of the firm or its lawyers.  The Perkins Coie Women's Forum was concerned that an internal event for first-time attendees to the firm's partner planning conference could be targeted as impermissible, even though it was open to all conference attendees, because a resource group was hosting the event, but decided to proceed with the event notwithstanding the uncertainty.  And firm personnel were even unsure whether they can have a reference to "DE&I" in their email signature block.  In short, Perkins Coie is committed to complying with the law as it evolves over time.  But Section 4 of the Executive Order is both unclear and overbroad, far broader than any change in the law to date.  Consequently, it interferes with speech, and tries to intimidate and distort the firm's advice to clients.

## G.     False and Disparaging Statements in the Order

59.     The Order has also harmed Perkins Coie's reputation in the markets for clients, lawyers, and staff through its false and disparaging characterizations of the firm and its attorneys, such as its statement that Perkins Coie is "dishonest and dangerous."  Such stigma threatens grave, mutually-reinforcing consequences, as the Firm's reputation affects its ability to attract clients, and its ability to attract clients in turn supports its reputation as a top law firm.

60.     The Order says many things that are not only inflammatory but also blatantly false. Most of the allegations were known during the President's first term, and have been (and in many cases were) adjudicated and dismissed long ago.  For example, the Order accuses Perkins Coie of working to "steal an election," of "undermining democratic elections, the integrity of our courts, and honest law enforcement," and of "racially discriminat[ing] against its own attorneys and staff, and against applicants," including through "percentage quotas" and "proudly exclud[ing] applicants on the basis of race."  And it accuses Perkins Coie of "earnings" that "subsidize, among other things, racial discrimination, falsified documents designed to weaponize the Government against candidates for office, and anti-democratic election changes that invite fraud and distrust." Those accusations are just plain false and most have already been rebutted through the results of prior cases.  The Order also references "Fusion GPS" in connection with representation of Hillary Clinton.  Though Marc Elias and others at Perkins Coie represented Hillary Clinton in connection with her presidential campaign, no attorney employed at Perkins Coie for at least the last three years had anything to do with the engagement of Fusion GPS.

61.     The Fact Sheet also lists accusations against Perkins Coie.  Those descriptions are inflammatory and baseless.  Among other false statements, the Fact Sheet wrongly states:

   a.   "Perkins Coie LLP pushed debunked claims of secret Trump-Russia communications via Alfa Bank, with attorney Michael Sussmann indicted for lying to the FBI about this scheme."  A jury unanimously acquitted Mr. Sussmann.  The Fact Sheet also omits that no one else was involved and that Mr. Sussmann left the firm in 2021.

   b.   "Perkins Coie LLP has worked with activist donors, including George Soros, to judicially overturn enacted election laws, such as those requiring voter

identification." Perkins Coie has historically represented both party-affiliated and non-partisan clients in litigation over election laws. Many law firms have done the same. None of Perkins Coie's election-related litigation was frivolous. Indeed, more than half of the litigation was successful after both sides had full due process. And much of it was *defending* state election procedures and actions taken by state officials.

c. "A court was forced to sanction Perkins Coie attorneys for unethical lack of candor before the court." The Fact Sheet alludes to one minor sanction, collectively, $8,700, connected with a single duplicative motion to supplement the record in a Fifth Circuit appeal in a 2021 voting-rights case in violation of a local rule. *See Tex. All. for Retired Ams. v. Hughs*, No. 20-40643 (5th Cir. Jun. 30, 2021), Dkt. No. 127-1. None of the three sanctioned attorneys remains at Perkins Coie. It is extremely rare for any of our lawyers to be sanctioned, and we take such matters very seriously. This was not a lack of candor.

d. "Perkins Coie LLP hosted an FBI workspace, raising concerns about partisan misuse of sensitive data during investigations targeting President Trump." The "FBI workspace" rumor was long ago debunked. Perkins Coie did not host an "FBI workspace." Rather, like many law firms who represent clients involved in national-security issues, the firm wanted to protect national security and thus was permitted to install, at its own expense, a single-room Secure Work Environment (SWE) when it moved to new offices. The FBI's only involvement was examining and approving the security of the space. Perkins Coie no longer has a SWE, and the SWE was never an "FBI workspace."

e. "Perkins Coie LLP has filed lawsuits against the Trump Administration, including one designed to reduce military readiness." This statement impugns Perkins Coie for the political and legal positions taken by some of its clients in lawful litigation. Specifically, this statement refers to *Shilling v. Trump*, the pro bono lawsuit described earlier representing plaintiffs challenging an executive order by President Trump affecting transgender servicemembers despite their love of country and equal ability to contribute to military readiness.

\* \* \*

62. I declare under penalty of perjury, on this 2nd day of April, 2025, that the foregoing is true and correct to the best of my knowledge, information and belief.

DAVID J. BURMAN

# EXHIBIT 1

← IMPACT

# Diversity & Inclusion

Embracing diversity and inclusion allows us to draw from varied perspectives and communities, enabling us to attract the very best talent to our ranks, and in turn provide excellent service to our clients.

**Overview**          Recruitment & Retention          Our Commitment to Racial Equality

# Our Continuing Commitment to Diversity & Inclusion

Perkins Coie is committed to advancing diversity and inclusion both within the firm and throughout our collective communities. We will continue to support and participate in efforts to make the legal profession more diverse and inclusive.



We are intentional and consistent in our efforts to increase the diversity of our workforce and to advance the values of diversity and inclusion in the legal profession. Diversity and inclusion are key to our culture, our values, and our business strategy. They are fundamental to the way we connect with and serve our clients.

As we consider the Supreme Court decision limiting the consideration of race in university admissions, we re-affirm our commitment to building a more diverse and inclusive workplace and legal profession. Our methods for fulfilling that commitment may evolve over time as the legal landscape changes; our commitment will remain steadfast.

## Objectives

– Engaging firm leadership in proactive diversity and inclusion

– Investing in the diversity pipeline

– Developing programs to address internal and external priorities

— Measuring and monitoring our progress and success

## Strategic Diversity & Inclusion Committee

Established in 2006, the **Strategic Diversity & Inclusion Committee** (SDC) develops firmwide diversity strategies and policies which are used to guide the implementation of existing programs and the creation of new strategic diversity initiatives, with a strong focus on recruitment, retention, promotion and community.

## Local Diversity Committees

We have also established **Local Diversity Committees** in each office that work to develop programming and initiatives designed to address the unique needs of their office and communities.

## Resource groups

**Resource groups** are a key to the success of diversity and inclusion at the firm. Our resource groups develop educational programming, assist with business and professional development opportunities, maintain relationships with national minority bar associations and foster community. The resource groups are important sources of support, development and networking for our diverse lawyers. Below is a list of our resource groups.

# Our Structure

Our commitment to diversity and inclusion is a goal shared collectively throughout the firm, which is why we have created a committee structure that allows all stakeholders to participate.



# Resource Groups

African American/Black Lawyers                                    +

Asian Pacific Islander Lawyers                                    +

Latinx Lawyers                                                    +

Lawyers with Disabilities                                         +

Lesbian, Gay, Bisexual and Transgender (LGBTQ+) Lawyers　　+

Native American Lawyers　　+

Parents and Caregivers　　+

South Asian/Middle Eastern Lawyers　　+

Veterans　　+

Women's Forum　　+

Women of Color　　+

# Awards

— Awarded Mansfield 7.0 Certification Plus for Diversity Leadership from Diversity Lab, 2022-2024

— Named among the "Best Law Firms for Women" by *Working Mother/Flex-Time Lawyers,* 2008, 2009, 2011-2022

— Received a score of 100% in the *Corporate Equality Index* and designation as one of the "Best Places to Work" from the Human Rights Campaign Foundation (the educational arm of the nation's largest advocacy group for LGBT Americans), 2009-2025

— Ranked among ChIPs Honor Roll Firms for gender diversity in Intellectual Property practices in the 2021 Inclusion Blueprint Survey, a joint initiative between ChIPs and Diversity Lab

## Partnerships and Sponsorships

- Leadership Council on Legal Diversity

- Corporate Counsel Women of Color

- Charting Your Own Course

- Diversity & Flexibility Alliance

- Hispanic National Bar Association

- Just the Beginning Foundation's Summer Legal Institute

- LAMBDA Legal National Sponsorships

- Minority Corporate Counsel Association

- National Asian Pacific American Bar Association

- National Bar Association

- National Black Law Students Association

- LGBTQ+ Bar Association Lavender Law Conference & Career Fair

- National Native American Law Students Association

- North American South Asian Bar Association

- Out and Equal Workplace Summit

- Practicing Attorneys for Law Students Program, Inc.

**For questions, please contact** Diversity&Inclusion@perkinscoie.com.

---

People

Industries

Services

Locations

Impact

Careers

Job Openings ↗

Perkins Coie Trust Company ↗

Client Advantage

中文网站

Alumni ↗

Blogs

Client Updates

Podcasts

Publications

News Room

California Land Use & Development Law Report

Security Breach Notification Chart

Perkins on Privacy

Public Chatter

The Public Company Handbook

Subscribe to Mailing Lists ↗

AI & Machine Learning

Corporate Law

Energy Infrastructure & Clean Technology

Environment, Energy & Resources Law

Intellectual Property Law

Labor & Employment Law

Litigation

Privacy & Security Law

Private Client Services

Real Estate & Land Use

Technology Transactions & Privacy Law

Pay Invoice ↗

Terms of Use

Privacy Policy

Legal Disclaimer

Transparency in Coverage

UK Legal Notice

Lawyer Advertising

© 2025 Perkins Coie LLP

# EXHIBIT 2

← IMPACT

# Diversity & Inclusion

Embracing diversity and inclusion allows us to draw from varied perspectives and communities, enabling us to attract the very best talent to our ranks, and in turn provide excellent service to our clients.

Overview          **Recruitment & Retention**          Our Commitment to Racial Equality

# Recruitment & Retention

We believe in developing relationships and investing in people. At Perkins Coie, we strive to create a diverse and inclusive community where opportunities to succeed are available to all.



Our firm culture is built on collaboration and mutual respect. Once an attorney becomes part of our community, we want them to feel welcome and prepared to participate at every level of engagement necessary for success. This is why the firm supports inclusive resource groups for women, lesbian, gay, bisexual and transgender attorneys, lawyers with disabilities, veterans, parents, caregivers, and lawyers of color (African American/Black, Latinx, Asian American/Pacific Islander and South Asian/Middle Eastern). In order to increase the diversity of backgrounds, experiences and perspectives within the firm, these resource groups offer opportunities for fellowship, support and networking. In addition, local office diversity committees offer programs and events that respond to the specific and unique needs of their communities, while the firm as a whole also hosts national programs and retreats aimed at providing all attorneys with the information and tools they need to succeed.

## Recruitment Activities & Programs

Our recruitment efforts include building supportive relationships with organizations, hosting job fairs, and offering programs designed to educate and expose students to the legal profession.

# Diversity & Inclusion Fellowship Program

## Overview                                                                                            ✕

At Perkins Coie, we foster a diverse and inclusive community where opportunities to succeed are available to all. Embracing diversity allows us to draw from different backgrounds and experiences, enabling us to attract the best talent to our ranks, and in turn build strong teams that provide excellent service to our clients. We are committed to creating an environment in which all our people thrive because they feel a sense of belonging.

We are proud to offer our **Diversity & Inclusion Fellowship Program** as part of our comprehensive, firmwide commitment to advancing diversity, equity, and inclusion.

Our Diversity & Inclusion Fellows are full participants in our summer associate program and must spend the first 10 weeks of their summer(s) with Perkins Coie. In addition to receiving a summer associate salary, Fellows will also receive a $15,000 stipend at the conclusion of their first-year summer. Fellows who return as 2Ls will receive a $15,000 stipend at the

## Application Process and Criteria                                                                    ✕

All students who are in good standing in their first year at an ABA-accredited law school are eligible to apply for the Diversity & Inclusion Fellowship Program. Perkins Coie is an Equal Opportunity Employer and welcomes applications for the Diversity & Inclusion Fellowship Program from all eligible applicants regardless of race, color, religion, sex, age, national origin, veteran status, sexual orientation, gender identity / gender expression, disability status, or any other identity.

A complete application must include:

- Current resume.

- Cover letter.

- Undergraduate and law school transcripts (unofficial versions are acceptable).

- A legal writing sample (10-page maximum).

- A personal statement (one-page, single-spaced). The personal statement should be a narrative describing your academic, professional, and life experiences and, where relevant, identifying connections between those experiences and the broader goal of advancing diversity, equity, and inclusion in the legal profession.

We evaluate all applications for the fellowship and consider the following factors:

- **Academic Achievement** – A demonstrated record of academic achievement and excellent writing and interpersonal skills, as well as experience that will contribute to a successful career in the legal field.

- **DEI Leadership** – Engagement in efforts to advance diversity, equity, and inclusion within the community and/or legal profession, including during college or law school.

# Retention Programs and Activities

Perkins Coie recognizes the importance of retention in advancing diversity and inclusion, and we work diligently to invest in the success of our lawyers across the firm. Our retreats are an important retention tool that provide our attorneys opportunities to strengthen relationships with one another and our clients in a professional development setting.



## All Women Lawyers Retreat

The retreat serves as an opportunity for participants to network with other attorneys from all levels, offices and practice groups within the firm, and to share best practices on navigating the law firm culture. The presentations and events offered at this two-day retreat provide the participants with various tools to help advance their career.

## Lawyers of Color/LGBTQ+/Lawyers with Disabilities and Veterans Retreats

These retreats bring together many of the firm's attorneys to discuss, embrace, and celebrate diversity and allyship in an inviting environment. Many of the retreat's sessions and presentations are open to attorneys of all levels, with tracks specific to the programming that coincides with where the attorney currently is in their career. This distinction allows for time focused on professional and business development skills particular to the career stage of the attorneys. In addition to the networking opportunities provided at different presentations and mixers, attendees also have the opportunity to meet other lawyers in their specific practice groups and create new and build upon existing relationships.

People

Industries

Services

Locations

Impact

Careers

Job Openings ↗

Perkins Coie Trust Company ↗

Client Advantage

中文网站

Alumni ↗

Blogs

Client Updates

Podcasts

Publications

News Room

California Land Use & Development Law Report

Security Breach Notification Chart

Perkins on Privacy

Public Chatter

The Public Company Handbook

Subscribe to Mailing Lists ↗

AI & Machine Learning

Corporate Law

Energy Infrastructure & Clean Technology

Environment, Energy & Resources Law

Intellectual Property Law

Labor & Employment Law

Litigation

Privacy & Security Law

Private Client Services

Real Estate & Land Use

Technology Transactions & Privacy Law

Pay Invoice ↗

Terms of Use

Privacy Policy

Legal Disclaimer

Transparency in Coverage

UK Legal Notice

Lawyer Advertising

© 2025 Perkins Coie LLP

# EXHIBIT 3

## Total Fees Attributable to Top 15 Firm Clients

| | Fees Collected (collect) |
|---|---|
| Grand Total | $349,859,769 |

# EXHIBIT 4

**Total Fees Attributable to Top 15 Practice Group Clients**

| Practice Group | Fees Collected |
|---|---|
| Commercial Litigation Total | $145,647,380 |
| Intellectual Property Total | $118,496,457 |
| Business Total | $56,227,281 |
| Product Liability Total | $51,279,833 |
| Environment, Energy & Resources Total | $22,752,554 |
| Real Estate & Land Use Total | $17,096,769 |
| Labor & Employment Total | $15,292,812 |
| Private Client Services Total | $14,767,312 |
| Political Law Total | $2,558,821 |

# EXHIBIT 5



# EXHIBIT 6

| | |
|---|---|
| **From:** |  (CRM) Redacted @usdoj.gov> |
| **Sent:** | Thursday, March 6, 2025 10:15 PM |
| **To:** | Redacted (Perkins Coie) |
| **Cc:** | Redacted (Perkins Coie); Redacted (CRM); Redacted (USAVAE) |
| **Subject:** | Tomorrow |

,

Good evening. We are just seeing the newly issued Executive Order relating to your firm, linked here
https://www.whitehouse.gov/presidential-actions/2025/03/addressing-risks-from-perkins-coie-llp/. Consequently, we
need to postpone tomorrow's meeting to get further guidance from our management about how to proceed. We will
reach out once we have this additional clarity. We appreciate your patience.

Best,
Redacted



Redacted
**Trial Attorney**
U.S. Department of Justice | Criminal Division
Fraud Section | Market Integrity & Major Frauds Unit
Redacted (o) | Redacted (c)
Redacted @usdoj.gov

1

# EXHIBIT 21

*The* WHITE HOUSE

PRESIDENTIAL ACTIONS

ADDRESSING RISKS FROM PAUL WEISS

The White House

March 14, 2025

By the authority vested in me as President by the Constitution and the laws of the United States of America, it is hereby ordered:

Section 1. Background. Global law firms have for years played an outsized role in undermining the judicial process and in the destruction of bedrock American principles. Many have engaged in activities that make our communities less safe, increase burdens on local businesses, limit constitutional freedoms, and degrade the quality of American elections. Additionally, they have sometimes done so on behalf of clients, pro bono, or ostensibly "for the public good" — potentially depriving those who cannot otherwise afford the benefit of top legal talent the access to justice deserved by all.

My Administration will no longer support taxpayer funds sponsoring such harm.

My Administration has already taken action to address some of the significant risks and egregious conduct associated with law firms, and I have determined that similar action is necessary to end Government sponsorship of harmful activity by an additional law firm: Paul, Weiss, Rifkind, Wharton & Garrison LLP (Paul Weiss). In 2021, a Paul Weiss partner and former leading prosecutor in the office of Special Counsel Robert Mueller brought a pro bono suit against individuals alleged to have participated in the events that occurred at or near the United States Capitol on January 6, 2021, on behalf of the District of Columbia Attorney General.

In 2022, Paul Weiss hired unethical attorney Mark Pomerantz, who had previously left Paul Weiss to join the Manhattan District Attorney's office solely to manufacture a

prosecution against me and who, according to his co-workers, unethically led witnesses in ways designed to implicate me. After being unable to convince even Manhattan District Attorney Alvin Bragg that a fraud case was feasible, Pomerantz engaged in a media campaign to gin up support for this unwarranted prosecution.

Additionally, Paul Weiss discriminates against its own employees on the basis of race and other categories prohibited by civil rights laws. Paul Weiss, along with nearly every other large, influential, or industry leading law firm, makes decisions around "targets" based on race and sex. My Administration is committed to ending such unlawful discrimination perpetrated in the name of "diversity, equity, and inclusion" policies and ensuring that Federal benefits support the laws and policies of the United States, including those laws and policies promoting our national security and respecting the democratic process. Those who engage in blatant discrimination and other activities inconsistent with the interests of the United States should not have access to our Nation's secrets nor be deemed responsible stewards of any Federal funds.

Sec. 2. Security Clearance Review. (a) The Attorney General, the Director of National Intelligence, and all other relevant heads of executive departments and agencies (agencies) shall immediately take steps consistent with applicable law to suspend any active security clearances held by individuals at Paul Weiss and Mark Pomerantz, pending a review of whether such clearances are consistent with the national interest.

(b) The Office of Management and Budget shall identify all Government goods, property, material, and services, including Sensitive Compartmented Information Facilities, provided for the benefit of Paul Weiss. The heads of all agencies providing such material or services shall, to the extent permitted by law, expeditiously cease such provision.

Sec. 3. Contracting. (a) To prevent the transfer of taxpayer dollars to Federal contractors whose earnings subsidize, among other things, activities that are not aligned with American interests, including racial discrimination, Government contracting agencies shall, to the extent permissible by law, require Government contractors to disclose any business they do with Paul Weiss and whether that business is related to the subject of the Government contract.

(b) The heads of all agencies shall review all contracts with Paul Weiss or with entities that disclose doing business with Paul Weiss under subsection (a) of this section. To the extent permitted by law, the heads of agencies shall:

(i) take appropriate steps to terminate any contract, to the maximum extent permitted

by applicable law, including the Federal Acquisition Regulation, for which Paul Weiss has been hired to perform any service;

(ii)  otherwise align their agency funding decisions with the interests of the citizens of the United States; with the goals and priorities of my Administration as expressed in executive actions, especially Executive Order 14147 of January 20, 2025 (Ending the Weaponization of the Federal Government); and as heads of agencies deem appropriate.  Within 30 days of the date of this order, all agencies shall submit to the Director of the Office of Management and Budget an assessment of contracts with Paul Weiss or with entities that do business with Paul Weiss effective as of the date of this order and any actions taken with respect to those contracts in accordance with this order.

Sec. 4.  Racial Discrimination.  Nothing in this order shall be construed to limit the action authorized by section 4 of Executive Order 14230 of March 6, 2025 (Addressing Risks from Perkins Coie LLP).

Sec. 5.  Personnel.  (a)  The heads of all agencies shall, to the extent permitted by law, provide guidance limiting official access from Federal Government buildings to employees of Paul Weiss when such access would threaten the national security of or otherwise be inconsistent with the interests of the United States.  In addition, the heads of all agencies shall provide guidance limiting Government employees acting in their official capacity from engaging with Paul Weiss employees to ensure consistency with the national security and other interests of the United States.

(b)  Agency officials shall, to the extent permitted by law, refrain from hiring employees of Paul Weiss, absent a waiver from the head of the agency, made in consultation with the Director of the Office of Personnel Management, that such hire will not threaten the national security of the United States.

Sec. 6.  General Provisions.  (a)  Nothing in this order shall be construed to impair or otherwise affect:

(i)  the authority granted by law to an executive department or agency, or the head thereof; or

(ii)  the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b)  This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c)  This order is not intended to, and does not, create any right or benefit, substantive

or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

DONALD J. TRUMP

THE WHITE HOUSE,
    March 14, 2025.

NEWS

ADMINISTRATION

ISSUES

CONTACT

VISIT

GALLERY

EOP



THE WHITE HOUSE

1600 Pennsylvania Ave NW
Washington, DC 20500

WH.GOV

Copyright

Privacy

Style Guide

# EXHIBIT 22

**TRUTH.**



← **Truth Details**
288 replies

Donald J. Trump ✔
@realDonaldTrump

This Crazy Pomerantz guy, Hillary Clinton's lawyer, who left his Democrat only Law Firm to join (get this!) the Manhattan D.A.'s Office in order to prosecute "Trump," while at the same time writing a book about his exploits, including everything that happened in a secret Grand Jury. This guy is deranged and should be charged approximately. Nothing like this has ever happened before. As prosecutor he actually wrote a book in the midst of an ongoing case. It's stone cold prosecutorial misconduct!

**3.55k** ReTruths   **13.8k** Likes                    Feb 09, 2023, 5:04 PM



# EXHIBIT 23

<div align="center">

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

</div>

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> v. <br><br> GORDON J. COBURN and <br> STEVEN SCHWARTZ, <br>             Defendants. | Crim. No. 19-120 (MEF) <br><br><br> **MEMORANDUM IN SUPPORT OF** <br> **MOTION TO WITHDRAW AS** <br> **COUNSEL FOR DEFENDANT** <br> **STEVEN SCHWARTZ** |

Paul, Weiss, Rifkind, Wharton & Garrison LLP ("Paul, Weiss") respectfully submits this motion to withdraw as counsel for Defendant Steven Schwartz. This motion is based on Mr. Schwartz's decision to terminate Paul, Weiss as his counsel, which is in turn based on President Donald J. Trump's issuance of his March 14, 2025 Executive Order titled "Addressing Risks from Paul Weiss." For reasons set forth below, the motion should be granted.

<div align="center">

**FACTUAL BACKGROUND**

</div>

Mr. Schwartz retained Paul, Weiss to represent him in this matter on July 3, 2018. The government filed the Indictment against him in this action approximately seven months later, on February 14, 2019. ECF No. 1. For the last six years, Paul, Weiss has served as lead counsel of record for Mr. Schwartz. ECF No. 9. Bohrer PLLC and Gibbons P.C. entered appearances for Mr. Schwartz on April 22, 2019 and October 8, 2019, respectively. ECF Nos. 25, 51. Throughout, and particularly with respect to the forthcoming trial, Paul, Weiss has acted as lead trial counsel.

On February 10, 2025, the President of the United States issued an Executive Order titled "Pausing Foreign Corrupt Practices Act Enforcement to Further American Economic and National Security." Exec. Order No. 14209, 90 Fed. Reg. 9587 (Feb. 10, 2025) (the "February 10 Executive Order"). The February 10 Executive Order, among other things, directs the Attorney General to "review in detail all existing FCPA investigations or enforcement actions and take

appropriate action with respect to such matters to restore proper bounds on FCPA enforcement." *Id*. § 2(a)(ii).  The February 10 Executive Order also directs the Attorney General to "determine whether additional actions, including remedial measures with respect to inappropriate past FCPA investigations and enforcement actions, are warranted and [to] take any such appropriate actions." *Id.* § 2(d).  The review directed by the Executive Order is currently underway, and counsel for the defendants expect to participate in that process.

On March 14, 2025, the President of the United States issued an Executive Order titled "Addressing Risks from Paul Weiss."  Exec. Order No. __, 90 Fed. Reg. __ (Mar. 14, 2025) (the "March 14 Executive Order").  The March 14 Executive Order provides, among other things, that "[t]he heads of all agencies shall, to the extent permitted by law, provide guidance limiting official access from Federal Government buildings to employees of Paul Weiss when such access would threaten the national security of or otherwise be inconsistent with the interests of the United States.  In addition, the heads of all agencies shall provide guidance limiting Government employees acting in their official capacity from engaging with Paul Weiss employees to ensure consistency with the national security and other interests of the United States."  *Id.* § 5(a).

## **REQUEST TO WITHDRAW**

In response to the March 14 Executive Order, Mr. Schwartz terminated Paul, Weiss's representation of him and instructed Paul, Weiss to file this motion.

The New Jersey Rules of Professional Conduct provide that a lawyer "shall withdraw from the representation of a client if . . . the lawyer is discharged."  N.J. R.P.C. 1.16(a)(3); *see also* U.S. Dist. Ct. for the Dist. of N.J. L. Civ. R. 103.1(a) (providing that federal practitioners in the District of New Jersey are subject to the New Jersey Rules of Professional Conduct), L. Cr. R. 1.1 (applying L. Civ. R. 103.1 to criminal cases).  A lawyer may also withdraw for "other good cause."  N.J. R.P.C. 1.16(b)(7).

Mr. Schwartz's discharge of Paul, Weiss as his counsel requires that Paul, Weiss withdraw pursuant to the New Jersey Rules of Professional Conduct.  N.J. R.P.C. 1.16(a)(3).  In addition, Mr. Schwartz's belief that he may be prejudiced by Paul, Weiss's continued representation of him in this case constitutes "other good cause" for Paul, Weiss's motion to withdraw.

The Court has adjourned this trial until April 7, 2025 in order to allow the Department of Justice to complete its review of this FCPA enforcement action pursuant to the February 10 Executive Order.  ECF Nos. 1003, 1011.  Mr. Schwartz understands that his counsel will have an opportunity to engage in advocacy on his behalf as that process is unfolding, and believes that the March 14 Executive Order affects those efforts.

In particular, Mr. Schwartz is concerned that the firm's continued representation of him may negatively affect his ability to obtain a favorable review of his case, or, due to the Executive Order, otherwise create potential conflicts of interest as between Mr. Schwartz and Paul, Weiss, that Mr. Schwartz is not prepared to waive.  *See* March 14 Executive Order § 5(a) (providing that government attorneys acting in their official capacity may be prevented from engaging with Paul, Weiss attorneys).  Regardless of whether or not the government is permitted to engage with Paul, Weiss in the ongoing review, Mr. Schwartz is concerned that Paul, Weiss's ongoing involvement in the matter could in and of itself prejudice the review of his case.

Mr. Schwartz is actively seeking replacement trial counsel.

## CONCLUSION

For the foregoing reasons, Paul, Weiss respectfully requests that the Court grant this motion to withdraw as counsel for Defendant Steven Schwartz.

Dated: New York, New York
      March 19, 2025

Respectfully submitted,

*/s/ Roberto Finzi*

Roberto Finzi
**PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP**
1285 Avenue of the Americas
New York, New York 10019-6064
(212) 373-3000
rfinzi@paulweiss.com

# EXHIBIT 24

← **Truth Details**
1165 replies

 **Donald J. Trump** ✓
@realDonaldTrump

Today, President Donald J. Trump agreed to withdraw his March 14, 2025 Executive Order regarding the Paul, Weiss, Rifkind, Wharton & Garrison LLP law firm ("Paul, Weiss"), which has entered into the following agreement with the President:

1. Paul, Weiss agrees that the bedrock principle of American Justice is that it must be fair and nonpartisan for all. Our Justice System is betrayed when it is misused to achieve political ends.

Lawyers and law firms play a vital role in ensuring that we live up to that standard as a Nation. Law firms should not favor any political party when it comes to choosing their clients. Firms also should not make decisions on whom to hire based on a person's political affiliation. To do otherwise is to deny some Americans an equal opportunity for our services while favoring others.

Lawyers abandon the profession's highest ideals when they engage in partisan decision-making, and betray the ethical obligation to represent those who are unpopular or disfavored in a particular environment.

2. Paul, Weiss affirms its unwavering commitment to these core ideals and principles, and will not deny representation to clients, including in pro bono matters and in support of non-profits, because of the personal political views of individual lawyers.

3. Paul, Weiss will take on a wide range of pro bono matters that represent the full spectrum of political viewpoints of our society, whether "conservative" or "liberal."

4. Paul, Weiss affirms its commitment to merit-based hiring, promotion, and retention, and will not adopt, use, or pursue any DEI policies. As part of its commitment, it will engage experts, to be mutually agreed upon within 14 days, to conduct a comprehensive audit of all of its employment practices.

5. Paul, Weiss will dedicate the equivalent of $40 million in pro bono legal services over the course of President Trump's term to support the Administration's initiatives, including: assisting our Nation's veterans, fairness in the Justice System, the President's Task Force to Combat Antisemitism, and other mutually agreed projects.

Statement from the White House: "The President is agreeing to this action in light of a meeting with Paul, Weiss Chairman, Brad Karp, during which Mr. Karp acknowledged the wrongdoing of former Paul, Weiss partner, Mark Pomerantz, the grave dangers of Weaponization, and the vital need to restore our System of Justice."

In response to the President's announcement, Paul, Weiss's Chairman Brad Karp said: "We are gratified that the President has agreed to withdraw the Executive Order concerning Paul, Weiss. We look forward to an engaged and constructive relationship with the President and his Administration."

**4.77k** ReTruths  **19k** Likes                    Mar 20, 2025, 6:10 PM



# EXHIBIT 25

*The* WHITE HOUSE

EXECUTIVE ORDER

Addressing Remedial Action by Paul Weiss

Executive Orders

March 21, 2025

By the authority vested in me as President by the Constitution and the laws of the United States of America, it is hereby ordered:

Section 1.  Background.  On March 14, 2025, I signed Executive Order 14237 (Addressing Risks from Paul Weiss) to address certain issues related to Paul, Weiss, Rifkind, Wharton & Garrison LLP (Paul Weiss).  I noted that "[g]lobal law firms have for years played an outsized role in undermining the judicial process and in the destruction of bedrock American principles."  Paul Weiss is one of many law firms that have participated in this harmful activity.

 Earlier this week, though, Paul Weiss indicated that it will engage in a remarkable change of course.  Specifically, Paul Weiss has acknowledged the wrongdoing of its former partner Mark Pomerantz, and it has agreed to a number of policy changes to promote equality, justice, and the principles that keep our Nation strong, including: adopting a policy of political neutrality with respect to client selection and attorney hiring; taking on a wide range of pro bono matters representing the full political spectrum; committing to merit-based hiring, promotion, and retention, instead of "diversity, equity, and inclusion" policies; dedicating the equivalent of $40 million in pro bono legal services during my term in office to support causes including assisting our Nation's veterans, fairness in the justice system, and combating anti-Semitism; and

other similar initiatives.

This development should give Americans hope.  If the legal profession dedicates a fraction of its energy to bringing justice to local communities, unleashing hard-working businesses, strengthening the American family, and unifying our Nation, all Americans will benefit.

Sec. 2.  Revocation.  I hereby revoke Executive Order 14237 of March 14, 2025 (Addressing Risks from Paul Weiss).

Sec. 3.  General Provisions.  (a)  Nothing in this order shall be construed to impair or otherwise affect:
(i)   the authority granted by law to an executive department or agency, or the head thereof; or
(ii)  the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.
(b)  This order shall be implemented consistent with applicable law and subject to the availability of appropriations.
(c)  This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

THE WHITE HOUSE,
   March 21, 2025.


NEWS

ADMINISTRATION

ISSUES

CONTACT

VISIT

GALLERY

EOP



THE WHITE HOUSE

1600 Pennsylvania Ave NW
Washington, DC 20500

WH.GOV

Copyright

Privacy

Style Guide

# EXHIBIT 26

AD

# BUSINESS INSIDER

↗ Subscribe

MSFT ↘ -3.26%    AMZN ↘ -3.03%    META ↘ -4.14%    TSLA ↘ -9.5%    DOW JONES ↘ -5.5%    NASDAQ ↘ -6.07%    S&P 500

POLITICS

## Read the email Paul Weiss Chairman Brad Karp sent to staff after striking a deal with Trump: 'Clients perceived our firm as being persona non grata'

By **Lauren Edmonds**



Jump to

Main content
Search
Account

/Getty Images

Mar 23, 2025, 7:44 PM ET

↱ Share    🔖 Save

Paul Weiss' chairman, Brad Karp, sent an email to employees on Sunday.

**The email addressed the firm's deal with President Donald Trump after an executive order targeted it.**

**Karp acknowledged that "many" employees were "uncomfortable" over the resolution.**

Paul Weiss' chairman, Brad Karp, knows some employees feel uneasy about the law firm's deal with the Trump administration.

AD

So he sent an email.

Paul Weiss is among several major firms that President Donald Trump has targeted this month with executive orders over their diversity, equity, and inclusion policies and political affiliations. The orders revoked the security clearance of lawyers at Paul Weiss and called for the review of the firm's government contracts. The firm is associated with Trump's political rivals, including the lawyer Mark Pomerantz, who left the firm to join the Manhattan district attorney's investigation into Trump's finances.

AD

Jump to

Main content
Search
Account

After the order, uncertainty gripped the law firm, and it began losing clients. Then, Trump announced on Thursday that he'd

reached a <u>resolution with Paul Weiss</u> and withdrew the executive
order. The resolution included specific stipulations, including
providing $40 million in pro bono services to the administration.

The deal shocked some in the <u>legal community</u>, which was
alarmed by what some saw as a capitulation by the powerful firm.
Karp attempted to address those concerns in an email to staffers
on Sunday. The email was first reported by the legal publication
<u>Original Jurisdiction</u>. A Paul Weiss representative confirmed the
contents of the email to Business Insider.

Here is a copy of the full email:

AD

*Subject: Statement to the PW Community*
*Dear Members of the Paul, Weiss Community,*
*I wanted to take this opportunity to speak with all of you more*
*fully about the events of recent days. I know that this has been*
*a profoundly unsettling time for all of you. Information gaps*
*have been filled with speculation, concern, and*
*misinformation, and I wanted to take this opportunity to*
*address your concerns directly. Thank you for taking the time*
*to listen.*
*Late in the evening of Friday, March 14, the President issued*
*an executive order targeting our firm. Since then, we have been*
*facing an unprecedented threat to our firm unlike anything*
*since Samuel Weiss first hung out a shingle in downtown*
*Manhattan on April 1, 1875—almost exactly 150 years ago.*
*Only several days ago, our firm faced an existential crisis. The*
*executive order could easily have destroyed our firm. It*
*brought the full weight of the government down on our firm,*
*our people, and our clients. In particular, it threatened our*
*clients with the loss of their government contracts, and the loss*
*of access to the government, if they continued to use the firm as*
*their lawyers. And in an obvious effort to target all of you as*

Jump to

Main content
Search
Account

well as the firm, it raised the specter that the government
would not hire our employees.

We were hopeful that the legal industry would rally to our side,
even though it had not done so in response to executive orders
targeting other firms. We had tried to persuade other firms to
come out in public support of Covington and Perkins Coie. And
we waited for firms to support us in the wake of the President's
executive order targeting Paul, Weiss. Disappointingly, far
from support, we learned that certain other firms were seeking
to exploit our vulnerabilities by aggressively soliciting our
clients and recruiting our attorneys.

We initially prepared to challenge the executive order in court,
and a team of Paul, Weiss attorneys prepared a lawsuit in the
finest traditions of the firm. But it became clear that, even if we
were successful in initially enjoining the executive order in
litigation, it would not solve the fundamental problem, which
was that clients perceived our firm as being persona non grata
with the Administration. We could prevent the executive order
from taking effect, but we couldn't erase it. Clients had told us
that they were not going to be able to stay with us, even though
they wanted to. It was very likely that our firm would not be
able to survive a protracted dispute with the Administration.
At the same time, we learned that the Administration might be
willing to reach a resolution with us. So, working with our
outside counsel, we did exactly what we advise our clients to do
in "bet the company" litigation every day: we talked with the
Administration to see if we could achieve a lasting settlement
that would not require us to compromise our core values and
fundamental principles.

In a matter of days, we were able to negotiate such a resolution.
That resolution, the terms of which I shared with all of you on
Thursday evening, had three primary components. First, we
reiterated our commitment to viewpoint diversity, including in
recruiting and in the intake of new matters. Second, while
retaining our longstanding commitment to diversity in all of its
forms, we agreed that we would follow the law with respect to
our employment practices. And third, we agreed to commit $10
million per year over the next four years in pro bono time in
three areas in which we are already doing significant work:
assisting our Nation's veterans, countering anti-Semitism, and
promoting the fairness of the justice system.

To be clear, and to clarify misinformation perpetuated from
various media sources, the Administration is not dictating
what matters we take on, approving our matters, or anything
like that. We obviously would not, and could not ethically,
have agreed to that. Instead, we have agreed to commit
substantial pro bono resources, in addition to the $130+
million we already commit annually, in areas of shared

interest. We will continue all of the existing pro bono work we already do and will continue in our longstanding role as a leader of the private bar in the pro bono and public interest sphere.

This existential crisis required the leadership of our law firm to make incredibly difficult decisions under extraordinary time pressure. In making those decisions, we were guided by two fundamental principles. First and foremost, we were guided by our obligation to protect our clients' interests. As I mentioned earlier, we concluded that even a victory in litigation would not be sufficient to do so, because our firm would still be perceived as persona non grata with the Administration. We simply could not practice law in the Paul, Weiss way if we were still subject to the executive order. This resolution was unambiguously in our clients' best interests.

Equally important, we were guided by our fiduciary duty to all of you—by our obligation, as stewards of the firm, to protect the livelihoods of the 2,500 lawyers and non-legal professionals who work at Paul, Weiss. That consideration—the need to ensure, above all, that our firm would survive—weighed extremely heavily on all of us, and especially on me, as the leader of the firm.

In today's political environment, it is unsurprising that the announcement that we have negotiated a resolution with the Administration, rather than fighting it in court, has generated intense feelings across the firm and indeed across the entire legal and broader community. As is often the case in situations like this, the extensive media coverage and social media commentary surrounding recent events has taken on a life of its own, with its own factual narrative and its own momentum. The coverage has been decidedly unhelpful, piecemeal, and incorrect in many fundamental respects. But it is not particularly constructive for any of us involved to debate factual discrepancies. Instead, what is most important is to look to the future. In this regard, I want to provide some clarity and perspective as we move forward.

First, and most important, we have quickly solved a seemingly intractable problem and removed a cloud of uncertainty that was hanging over our law firm. Our clients have been overwhelmingly supportive, expressing relief at the resolution of this situation and the fact that, as the President publicly has acknowledged, our firm now has an engaged and constructive relationship with this Administration. Thousands of clients have reached out directly to express their continued confidence in Paul, Weiss and their appreciation for our unwavering dedication to their matters throughout this period and our ability to quickly secure a resolution that will redound to their benefit. Even those who have expressed personal

<div style="font-size:50%">
<table><tr><td>Jump to</td></tr>
<tr><td>Main content</td></tr>
<tr><td>Search</td></tr>
<tr><td>Account</td></tr></table>
</div>

*disappointment that we didn't fight the Administration have said they fully appreciate what was at stake for our law firm and respect our decision.*

*Second, the resolution we reached with the Administration will have no effect on our work and our shared culture and values. The core of who we are and what we stand for is and will remain unchanged. To that end, we will continue our proud, century-long legacy of courageously standing up for fundamental rights and liberties, for fairness in the justice system, and for our society's most vulnerable individuals. That commitment is woven into our DNA; it was and will never be subject to negotiation or compromise.*

*Third, we will continue to support each of you in your career journey, providing you with the world's best training and opportunities to advance and thrive in your field. Above all, we will continue to be a place where we enjoy working together; where we respect each other; where we can practice law at the highest levels of excellence.*

*I know many of you are uncomfortable that we entered into any sort of resolution at all. That is completely understandable. There was no right answer to the predicament in which we found ourselves. All of us have opinions about what is going on right now in America. This is an incredibly consequential moment for our country. It is very easy for commentators to judge our actions from the sidelines. But no one in the wider world can appreciate how stressful it is to confront an executive order like this until one is directed at you.*

*I want to close by expressing my profound gratitude to each of you. Since March 14, we have seen Paul, Weiss at its very best, supporting each other in the face of an unprecedented threat. You have demonstrated, once again, the extraordinary caliber of our Paul, Weiss community. Your professionalism, your dedication to our clients, your support for one another, and your commitment to our firm have been nothing short of remarkable under these impossibly challenging circumstances. I am confident that, just as we have in past crises, we will get through this together and become even stronger and more resilient as a community.*

*To that end, my door is open to you as we navigate next steps, as are the doors of firm leadership. This has been a deeply painful experience for me and for the other leaders of the firm. I know it has been a profoundly difficult period for many of you. Since March 14, we have been weathering a terrible storm. But I know that we will get through this storm, and that we will continue to uphold the proud traditions that have defined Paul, Weiss for the last 150 years. I am so thankful for each and every one of you, and for all that you do every day for this very special place and for our broader communities.*

Jump to

Main content
Search
Account

> *Brad*
>
> *Brad S. Karp | Chairman*
>
> *Paul, Weiss, Rifkind, Wharton & Garrison LLP*

*Correction: March 24, 2025 — An earlier version of this story misstated when President Donald Trump announced that he'd reached a resolution with Paul Weiss and withdrew the executive order. It was Thursday, not Friday.*

**President Trump**

**Read next**

AD



**Legal & Privacy**

Terms of Service    Terms of Sale    Privacy Policy    Accessibility    Code of Ethics Policy    Reprints & Permissions    Disclaimer

Advertising Policies    Conflict of Interest Policy    Commerce Policy    Coupons Privacy Policy    Coupons Terms    Your Privacy Choices

**Company**

Advertise With Us    Contact Us    Company News    Masthead

Jump to

Main content
Search
Account

...tes by finanzen.net

**International Editions**

AT    DE    ES    JP    NL    PL

Copyright © 2025 Insider Inc. All rights reserved. Registration on or use of this site constitutes acceptance of our Terms of Service and Privacy Policy.

# EXHIBIT 27

# THE HILL

News | Policy | Business | Health | Opinion | Events | Jobs                     Join/Log in | ▶ Video | 🗎 Newsletters | 🔍

TRENDING: TIKTOK EXTENSION    TRUMP TARIFFS    JOBS REPORT    NSA FIRINGS                    SPONSORED:    CONTENT FROM VSP VISION

---

**JUST IN**

Trump to give TikTok another
75-day extension
TECHNOLOGY | 5 MINUTES AGO

OPINION Booker's record-
breaking speech proves
Democrats are stuck in the
past
OPINION | 10 MINUTES AGO

Trump to send Hegseth to
Dover ceremony for remains
of US soldiers
DEFENSE | 10 MINUTES AGO

Thune faces GOP divisions on
critical budget resolution
SENATE | 40 MINUTES AGO

OPINION Don't be misled
about what's driving our
budget deficit
FINANCE | 60 MINUTES AGO

Trump spares drugmakers
from tariffs; costs could still
go up
HEALTH CARE | 45 MINUTES AGO

Here's what to know about
Saturday's 'Hands Off!' anti-
Trump protests
ADMINISTRATION | 1 HOUR AGO

Judge finds FEMA
withholding grants in
violation of court order
COURT BATTLES | 1 HOUR AGO

VIEW ALL

ADMINISTRATION

# Trump suggests law firms 'want to make deals' after rescinding Paul, Weiss order

BY BRETT SAMUELS - 03/21/25 1:17 PM ET

Google News | f |  | ↗ | ✉



 Listen to this Article    Stay in the know with The Hill's newsletters   ✉ Sign Up

President Trump on Friday defended a series of executive actions he's taken to target major law firms associated with individuals he holds grudges against, one day after one of those law firms struck a deal with the administration to avoid any penalties.

Trump was asked in the Oval Office how he would respond to critics who argue his actions amount to coercion.

"Well, the law firms all want to make deals. You mean the law firms that we're going after, that went after me for four years ruthlessly, violently, illegally? Are those the law firms you're talking about?" Trump said.

"They're not babies. They're very sophisticated people. Those law firms did bad things. Bad things. They went after me for years," Trump added.

The president has signed orders in recent weeks that review security clearances and government contracts for three law firms.

One order Trump targeted Covington & Burling, which is providing pro bono services to represent former special counsel Jack Smith in his personal capacity. Smith oversaw two federal criminal cases against Trump involving the alleged mishandling of classified documents and his involvement in the Jan. 6, 2021, riot.



Another targeted Perkins Coie, which worked for the Hillary Clinton campaign in 2016 and worked for a political opposition research company that dug into Trump during his first run for president.


**Sign up for the Morning Report**
The latest in politics and policy. Direct to your inbox.

Email address     **SUBSCRIBE**

By signing up, I agree to the Terms of Use, have reviewed the Privacy Policy, and to receive personalized offers and communications via email, onsite notifications, and targeted advertising using my email address from The Hill, Nexstar Media Inc., and its affiliates

And a third targeted Paul, Weiss, Rifkind, Wharton & Garrison LLP law firm, called Paul, Weiss for short. That firm employs attorney Mark Pomerantz, who was involved in the Manhattan District Attorney's Office investigation into Trump's finances. After Pomerantz resigned from the DA's office, he brought charges against Trump over a hush money payment he made over

---

**Most Popular**

1. GOP senators express
   alarm over scale of
   Trump tariffs

2. House Republicans
   bash Senate's Trump
   agenda blueprint: 'Thi...

3. House cancels rest of
   votes for week after
   GOP floor rebellion

4. Here's what to know
   about Saturday's
   'Hands Off!' anti-Trum...

5. Trump approval slips to
   lowest point in second
   term: Survey

6. Thune faces GOP
   divisions on critical
   budget resolution

   Load more


RISING
PODCAST

DAILY
DEBRIEF
PODCAST

This source of his sexual dalliances.

Trump was ultimately convicted on 34 charges related to falsifying business records to conceal an alleged affair that he denies.

A federal judge temporarily blocked the portion of Trump's order denying Perkins Coie attorneys entry to federal buildings.

Trump announced on Thursday night that he was rescinding the order targeting Paul, Weiss after the firm agreed to a series of stipulations that align it closely with the administration, including by providing the equivalent of $40 million in pro bono legal services to support the Trump administration's initiatives.

TAGS   JACK SMITH

Copyright 2025 Nexstar Media Inc. All rights reserved. This material may not be published, broadcast, rewritten, or redistributed.

  

## SPONSORED CONTENT



**Amazon's Worst Nightmare: Shoppers Canceling Prime for Th...**
Online Shopping Tools | Sponsored



**Amazon is Losing Money As Shoppers Canceling Prime for Th...**
Online Shopping Tools | Sponsored



**Actress Leaks Hollywood Trick For Slim Body: "We all do it"**
Your Healthy News | Sponsored    Learn More



**Seniors Born 1941-1979 Receive 55 Benefits This Month if They Ask**
WalletJump | Sponsored    Learn More



**Neurologists Amazed: These Barefoot Shoes Help Seniors Lose Weight and Live a Life with Less Pain**
Barefoot Vitality | Sponsored    Learn More



**This cute and realistic bunny robot toy is perfect for Easter.**
miracle box | Sponsored



**3 Toxic Foods for Dogs: The One Meat You Should Never Feed You...**
Pet Health Gurus | Sponsored



**Japanese Endocrinologists Warns Reason Behind Glucose Levels in...**
switchhomehub | Sponsored    Learn More

**Hollywood Actress Leaks Weight Loss Trick, Gets Fired!**
Your Healthy News | Sponsored    Learn More



**Sore Knees After 60 Comes Down To 1 Thing (Stop Doing This)**
Anthrozone | Sponsored    Learn More

 

# EXHIBIT 28

*The* WHITE HOUSE

PRESIDENTIAL ACTIONS

Preventing Abuses of the Legal System and the Federal Court

Presidential Memoranda

March 22, 2025

MEMORANDUM FOR THE ATTORNEY GENERAL
THE SECRETARY OF HOMELAND SECURITY

SUBJECT:     Preventing Abuses of the Legal System and the Federal Court

Lawyers and law firms that engage in actions that violate the laws of the United States or rules governing attorney conduct must be efficiently and effectively held accountable. Accountability is especially important when misconduct by lawyers and law firms threatens our national security, homeland security, public safety, or election integrity.

Recent examples of grossly unethical misconduct are far too common. For instance, in 2016, Marc Elias, founder and chair of Elias Law Group LLP, was deeply involved in the creation of a false "dossier" by a foreign national designed to provide a fraudulent basis for Federal law enforcement to investigate a Presidential candidate in order to alter the outcome of the Presidential election. Elias also intentionally sought to conceal the role of his client — failed Presidential candidate Hillary Clinton — in the dossier.

The immigration system — where rampant fraud and meritless claims have supplanted the constitutional and lawful bases upon which the President exercises core powers under Article II of the United States Constitution — is likewise replete with examples of

unscrupulous behavior by attorneys and law firms.  For instance, the immigration bar, and powerful Big Law pro bono practices, frequently coach clients to conceal their past or lie about their circumstances when asserting their asylum claims, all in an attempt to circumvent immigration policies enacted to protect our national security and deceive the immigration authorities and courts into granting them undeserved relief.  Gathering the necessary information to refute these fraudulent claims imposes an enormous burden on the Federal Government.  And this fraud in turn undermines the integrity of our immigration laws and the legal profession more broadly — to say nothing of the undeniable, tragic consequences of the resulting mass illegal immigration, whether in terms of heinous crimes against innocent victims like Laken Riley, Jocelyn Nungaray, or Rachel Morin, or the enormous drain on taxpayer resources intended for Americans.

Federal Rule of Civil Procedure 11 prohibits attorneys from engaging in certain unethical conduct in Federal courts.  Attorneys must not present legal filings "for improper purpose[s]," including "to harass, cause unnecessary delay, or needlessly increase the cost of litigation."  FRCP 11(b)(1).  Attorneys must ensure that legal arguments are "warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law."  FRCP 11(b)(2).  And attorneys must ensure that their statements about facts are "reasonably based" on evidentiary support, or a belief that such evidence actually exists.  FRCP 11(b)(3)–(b)(4).  When these commands are violated, opposing parties are authorized to file a motion for sanctions. FRCP 11(c).  The text of the rule specifically addresses and provides for sanctions for attorneys and their firms as well as for recalcitrant parties given the solemn obligation that attorneys have to respect the rule of law and uphold our Nation's legal system with integrity.  Furthermore, Rule 3.1 of the Model Rules of Professional Conduct provides that, "A lawyer shall not bring or defend a proceeding, or assert or controvert an issue therein, unless there is a basis in law and fact for doing so that is not frivolous, which includes a good faith argument for an extension, modification or reversal of existing law."

Unfortunately, far too many attorneys and law firms have long ignored these requirements when litigating against the Federal Government or in pursuing baseless partisan attacks.  To address these concerns, I hereby direct the Attorney General to seek sanctions against attorneys and law firms who engage in frivolous, unreasonable, and vexatious litigation against the United States or in matters before executive

departments and agencies of the United States.

I further direct the Attorney General and the Secretary of Homeland Security to prioritize enforcement of their respective regulations governing attorney conduct and discipline.  *See, e.g.*, 8 C.F.R. 292.1 *et seq.*; 8 C.F.R. 1003.101 *et seq.*; 8 C.F.R. 1292.19.

I further direct the Attorney General to take all appropriate action to refer for disciplinary action any attorney whose conduct in Federal court or before any component of the Federal Government appears to violate professional conduct rules, including rules governing meritorious claims and contentions, and particularly in cases that implicate national security, homeland security, public safety, or election integrity.  In complying with this directive, the Attorney General shall consider the ethical duties that law partners have when supervising junior attorneys, including imputing the ethical misconduct of junior attorneys to partners or the law firm when appropriate.

I further direct that, when the Attorney General determines that conduct by an attorney or law firm in litigation against the Federal Government warrants seeking sanctions or other disciplinary action, the Attorney General shall, in consultation with any relevant senior executive official, recommend to the President, through the Assistant to the President for Domestic Policy, additional steps that may be taken, including reassessment of security clearances held by the attorney or termination of any Federal contract for which the relevant attorney or law firm has been hired to perform services.

I further direct the Attorney General, in consultation with any relevant senior executive official, to review conduct by attorneys or their law firms in litigation against the Federal Government over the last 8 years.  If the Attorney General identifies misconduct that may warrant additional action, such as filing frivolous litigation or engaging in fraudulent practices, the Attorney General is directed to recommend to the President, through the Assistant to the President for Domestic Policy, additional steps that may be taken, including reassessment of security clearances held by the attorney, termination of any contract for which the relevant attorney or law firm has been hired to perform services, or any other appropriate actions.

Law firms and individual attorneys have a great power, and obligation, to serve the rule of

law, justice, and order.  The Attorney General, alongside the Counsel to the President, shall report to the President periodically on improvements by firms to capture this hopeful vision.

NEWS

ADMINISTRATION

ISSUES

CONTACT

VISIT

GALLERY

EOP



THE WHITE HOUSE

1600 Pennsylvania Ave NW
Washington, DC 20500

WH.GOV

Copyright

Privacy

Style Guide

# EXHIBIT 29

*The* WHITE HOUSE

FACT SHEETS

Fact Sheet: President Donald J. Trump Prevents Abuses of the Legal System and the Federal Courts

The White House

March 21, 2025

**ADDRESSING ATTORNEY MISCONDUCT:** Today, President Donald J. Trump signed a memorandum to hold attorneys and law firms accountable for unethical conduct when litigating against the Federal government or pursuing baseless partisan attacks. The memorandum instructs the Attorney General to:

- Prioritize seeking sanctions against attorneys and law firms that engage in frivolous, unreasonable, or vexatious litigation against the United States.

- Prioritize enforcement of regulations governing attorney conduct and discipline. This directive also applies to the Secretary of Homeland Security.

- Refer attorneys and law firms for disciplinary action when their conduct in Federal court or before any component of the Federal government appears to violate professional conduct rules.

- Recommend additional consequences, including reassessing security clearances or terminating federal contracts, for attorneys and law firms that engage in conduct deserving of sanctions or other disciplinary action.

- Review attorney and law firm conduct over the last eight years in litigation against the Federal government and recommend further actions if misconduct is identified.

**PREVENTING ABUSES OF THE LEGAL SYSTEM AND FEDERAL COURTS:** President Trump believes that lawyers and law firms must be held accountable when they engage in illegal or unethical conduct, especially when their misconduct threatens our national security, homeland security, public safety, or election integrity.

- Examples of egregious unethical conduct, such as Marc Elias' direct involvement in creating a false "dossier" to interfere with the 2016 presidential election, are too

common in the legal profession.

- The immigration system is likewise replete with examples of unscrupulous behavior by attorneys and law firms that undermine immigration enforcement.
  - The immigration bar, and powerful Big Law pro bono practices, frequently coach clients to conceal their past or lie about their circumstances when seeking asylum.
  - Fact-checking these fraudulent claims imposes an enormous burden on the Federal government, and in turn undermines the integrity of our immigration laws.

- Federal Rule of Civil Procedure 11 prohibits attorneys from engaging in certain unethical conduct, such as filing frivolous claims, presenting arguments not grounded in law, or making factual assertions without evidentiary support. Federal regulations establish similar attorney conduct standards, particularly in connection with immigration proceedings.

- Frivolous lawsuits, bad-faith legal arguments, and blatant misrepresentations of fact burden the courts and waste taxpayer resources.

- Lawyers and law firms that engage in unethical conduct often face little to no accountability—this memorandum delivers overdue enforcement.

**A RETURN TO ACCOUNTABILITY:** President Trump is delivering on his promise to end the weaponization of government and protect the nation from partisan and bad faith actors who exploit their influence.

- This memorandum aligns with President Trump's priority on refocusing government operations to serve the citizens of the United States.

- It builds on President Trump's previous actions, such as signing an Executive Order on his first day in office to end the weaponization of the Federal government and ensure accountability for past misconduct.

- It follows his revocation of security clearances held by intelligence officials who falsely claimed Hunter Biden's laptop was Russian disinformation during the 2020 election.

- President Trump has also taken action to hold major law firms accountable, including Covington & Burling, Paul Weiss, and Perkins Coie.

NEWS

ADMINISTRATION

ISSUES

CONTACT

VISIT

GALLERY

EOP



THE WHITE HOUSE

1600 Pennsylvania Ave NW
Washington, DC 20500

WH.GOV

Copyright

Privacy

Style Guide

# EXHIBIT 30

*The* WHITE HOUSE

PRESIDENTIAL ACTIONS

Addressing Risks from Jenner & Block

Executive Orders

March 25, 2025

By the authority vested in me as President by the Constitution and the laws of the United States of America, it is hereby ordered:

Section 1.  Background.  My Administration is committed to addressing the significant risks associated with law firms, particularly so-called "Big Law" firms, that engage in conduct detrimental to critical American interests.  Many firms take actions that threaten public safety and national security, limit constitutional freedoms, degrade the quality of American elections, or undermine bedrock American principles.  Moreover, law firms regularly conduct this harmful activity through their powerful pro bono practices, earmarking hundreds of millions of their clients' dollars for destructive causes, that often directly or indirectly harm their own clients.  Lawyers and law firms that engage in such egregious conduct should not have access to our Nation's secrets, nor should such conduct be subsidized by Federal taxpayer funds or contracts.

Jenner & Block LLP (Jenner) is yet another law firm that has abandoned the profession's highest ideals, condoned partisan "lawfare," and abused its pro bono practice to engage in activities that undermine justice and the interests of the United States.  For example, Jenner engages in obvious partisan representations to achieve political ends, supports attacks against women and children based on a refusal to accept the biological reality of sex, and backs the obstruction of efforts to prevent illegal aliens from committing horrific crimes and trafficking deadly drugs within our borders.  Moreover, Jenner

discriminates against its employees based on race and other categories prohibited by civil rights laws, including through the use of race–based "targets."

In addition, Jenner was "thrilled" to re-hire the unethical Andrew Weissmann after his time engaging in partisan prosecution as part of Robert Mueller's entirely unjustified investigation.  Andrew Weissmann's career has been rooted in weaponized government and abuse of power, including devastating tens of thousands of American families who worked for the now defunct Arthur Andersen LLP, only to have his unlawfully aggressive prosecution overturned by the Supreme Court.  The numerous reports of Weissmann's dishonesty, including pursuit of nonexistent crimes, bribery to foreign nationals, and overt demand that the Federal Government pursue a political agenda against me, is a concerning indictment of Jenner's values and priorities.

Sec. 2.  Security Clearance Review.  (a)  The Attorney General, the Director of National Intelligence, and all other relevant heads of executive departments and agencies (agencies) shall immediately take steps consistent with applicable law to suspend any active security clearances held by individuals at Jenner pending a review of whether such clearances are consistent with the national interest.

(b)  The Office of Management and Budget shall identify all Government goods, property, material, and services, including Sensitive Compartmented Information Facilities, provided for the benefit of Jenner.  The heads of agencies providing such material or services shall, to the extent permitted by law, expeditiously cease such provision.

Sec. 3.  Contracting.  (a)  To prevent the transfer of taxpayer dollars to Federal contractors whose earnings subsidize, among other things, activities that are not aligned with American interests, including racial discrimination, Government contracting agencies shall, to the extent permissible by law, require Government contractors to disclose any business they do with Jenner and whether that business is related to the subject of the Government contract.

(b)  The heads of agencies shall review all contracts with Jenner or with entities that disclose doing business with Jenner under subsection (a) of this section.  To the extent permitted by law, the heads of agencies shall:

(i) take appropriate steps to terminate any contract, to the maximum extent permitted by applicable law, including the Federal Acquisition Regulation, for which Jenner has been hired to perform any service; and

(ii)  otherwise align their agency funding decisions with the interests of the citizens of the United States; with the goals and priorities of my Administration as expressed in executive actions, especially Executive Order 14147 of January 20, 2025 (Ending the Weaponization of the Federal Government); and as heads of agencies deem appropriate.  Within 30 days of the date of this order, agencies shall submit to the Director of the Office of Management and Budget an assessment of contracts with Jenner or with entities that do business with Jenner effective as of the date of this order and any actions taken with respect to those contracts in accordance with this order.

Sec. 4.  Racial Discrimination.  Nothing in this order shall be construed to limit the action authorized by section 4 of Executive Order 14230 of March 6, 2025 (Addressing Risks from Perkins Coie LLP).

Sec. 5.  Personnel.  (a)  The heads of agencies shall, to the extent permitted by law, provide guidance limiting official access from Federal Government buildings to employees of Jenner when such access would threaten the national security of or otherwise be inconsistent with the interests of the United States.  In addition, the heads of agencies shall provide guidance limiting Government employees acting in their official capacity from engaging with Jenner employees, including but not limited to Andrew Weissmann, to ensure consistency with the national security and other interests of the United States.

   (b)  Agency officials shall, to the extent permitted by law, refrain from hiring employees of Jenner, including but not limited to Andrew Weissmann, absent a waiver from the head of the agency, made in consultation with the Director of the Office of Personnel Management, that such hire will not threaten the national security of the United States.

Sec. 6.  General Provisions.  (a)  Nothing in this order shall be construed to impair or otherwise affect:

(i)  the authority granted by law to an executive department or agency, or the head thereof; or

(ii)  the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b)  This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c)  This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States,

its departments, agencies, or entities, its officers, employees, or agents, or any other person.

THE WHITE HOUSE,

March 25, 2025.

NEWS

ADMINISTRATION

ISSUES

CONTACT

VISIT

GALLERY

EOP



THE WHITE HOUSE

1600 Pennsylvania Ave NW
Washington, DC 20500

WH.GOV

Copyright

Privacy

Style Guide

# EXHIBIT 31

<u>Exhibit 31</u>

March 26, 2025 remarks by President Donald J. Trump
upon signing an executive order titled
"Addressing Risks from Jenner & Block"


The video is available here:
https://www.youtube.com/watch?v=7LsV-l0xWh4


Pursuant to Local Civil Rule 5.4(e)(1), a digital file copy of this
exhibit is being maintained by plaintiff's counsel and will be
provided to the Court and defendants' counsel.

# EXHIBIT 32



# EXHIBIT 33

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

JENNER & BLOCK LLP,

        *Plaintiff*,

v.

                                 Case No. 1:25-cv-00916

U.S. DEPARTMENT OF JUSTICE, et al.,

        *Defendants*.

## DECLARATION OF THOMAS J. PERRELLI IN SUPPORT OF MOTION FOR TEMPORARY RESTRAINING ORDER

I, Thomas J. Perrelli, pursuant to 28 U.S.C. § 1746, hereby declare as follows:

    1.      I am Firm Chair and a partner at Jenner & Block LLP ("Jenner"). Jenner is an international law firm that conducts its U.S. operations and activities through a limited liability partnership, Jenner & Block LLP, with six offices in the United States and one in the United Kingdom. I have been an attorney at Jenner for more than 25 years. I am a member in good standing of the District of Columbia bar and have been admitted in many federal courts, including the U.S. Supreme Court, and the Supreme Court of Virginia. I am very familiar with the firm's business and operations and provide this declaration in response to the March 25, 2025 Executive Order entitled "Addressing Risks From Jenner & Block." *See* Executive Order, "Addressing Risks From Jenner & Block" (March 25, 2025), available at https://www.whitehouse.gov/presidential-actions/2025/03/addressing-risks-from-jenner-block/ (the "Order"). I either have personal knowledge of the facts set forth in this declaration or I know them from business records and my knowledge of the firm's history and operations.

    2.      I initially began to work at Jenner as a summer associate in 1990. After graduating

1

from law school and beginning my legal career as a judicial law clerk, I worked as an associate at Jenner from 1992 to 1997. I thereafter served as a partner at the firm from 2001 through 2009. During that time period, I was the managing partner of the Washington D.C. office and co-chair of the firm's Creative Content practice (now known as Content, Media, and Entertainment).

3.      I left the firm in 2009 to serve as Associate Attorney General of the United States, supervising the Department's Civil, Antitrust, Civil Rights, Environment and Natural Resources, and Tax Divisions. The U.S. Senate confirmed my nomination to serve as Associate Attorney General by a vote of 72 to 20. In that role, I served as lead federal negotiator on some of the largest settlements in history and oversaw the United States' civil litigation.

4.      I returned to the firm in 2012. That year, I founded the firm's Government Controversies and Public Policy Litigation Practice to build a multi-disciplinary approach to our clients' most complex problems. I continue to serve as co-chair of that practice. The practice helps businesses and large organizations navigate and resolve highly complex crises that require a mix of litigation, regulatory, public policy, legislative and communications skills. I have also served on the firm's Policy Committee since 2013, and as Firm Chair since early 2020.

5.      I submit this declaration in Support of the Motion for Temporary Restraining Order filed by Jenner. I am of the age of majority, and I am competent to make this declaration.

**I.      Jenner & Block LLP**

6.      Jenner was founded in Chicago in 1914. Jenner currently has six offices in the United States—Chicago, Washington, D.C., New York, Los Angeles, Century City, San Francisco—and an office in London. The firm has over 500 lawyers and more than 900 total personnel.

7.      Jenner is known for its prominent and successful litigation practice, global investigations practice, regulatory and government controversies work, and experience handling

sophisticated, high-profile corporate transactions. Its clients include Fortune 100 companies, technology companies, large privately held corporations, colleges and universities, emerging companies, Native American tribes, and venture capital and private equity investors. Jenner serves clients across a variety of industries, including aerospace and defense, energy, food and beverage, telecommunications, technology, hospitality and real estate, finance, transportation, education, and media and entertainment, among others. Jenner alumni have been and are serving as state and federal court judges, judicial law clerks, and high-ranking government officials, as well as founders, CEOs, and general counsels of some of the nation's largest and most important companies. We serve clients across a variety of industries, with particular expertise representing clients in highly-regulated industries, including aerospace and defense, agriculture, education, energy, food and beverage, healthcare and life sciences, hospitality, telecommunications, technology, transportation, and media and entertainment, among others.

8.      Over our 111-year history, Jenner and its lawyers have represented clients in federal and state courts across the nation, and in tribunals throughout the world. We have presented dozens of arguments in the Supreme Court of the United States, helping to establish major precedent in federal and constitutional law. We are committed to providing excellent service to our clients, helping them achieve their goals and standing by them in good times and bad.

9.      Jenner has been named as an "Am Law 100" firm on The American Lawyer 100 list in every year since that list began in 1987. The firm and its lawyers are regularly recognized for excellence in the legal community by Chambers USA and other respected organizations, including national and local bar associations. 76 Jenner partners have been recognized as "America's Leading Lawyers" in more than 35 practice areas ranked by Chambers USA 2024. Consistent with our litigation prowess, Jenner boasts nine Fellows of the prestigious American College of Trial Lawyers ("ACTL"), one of the highest percentages of partners in the ACTL

among AmLaw 100 firms. Six Jenner lawyers are members of the American Law Institute, a leading independent organization producing scholarly work designed to clarify, modernize, and improve the law.

10.     Jenner has more than 900 personnel. Of those, approximately 500 are attorneys and 400 are business professionals, including paralegals, legal assistants, and other professionals. Our employees participate in the communities in which they live. Our partners have included two former Presidents of the Chicago Bar Association and a former President of the New York City Bar Association. They serve on countless boards of legal services, community, and arts organizations. They include former members of the armed forces and a current reservist in the U.S. military.

11.     Jenner's attorneys are drawn from all sides of the political spectrum. Many of our attorneys joined the firm after service in Democratic or Republican administrations. Our Chair Emeritus Anton Valukas, who served as Chairman of the firm for a decade until 2017, has been a leading Jenner partner for more than three decades, returning to the firm after being appointed by President Reagan to serve as United States Attorney for the Northern District of Illinois. Other current attorneys include:

- A senior adviser for Congressional Republicans with 14 years of experience at key investigative committees in U.S. Congress;

- the leader of the Office of the Special Inspector General for the Troubled Asset Relief Program (SIGTARP), appointed by President George W. Bush to head a law enforcement agency that helped protect taxpayers from fraud-related losses;

- the Acting Solicitor General of the United States during the Obama administration;

- a Commissioner of the Federal Energy Regulatory Commission appointed by President George W. Bush;

- a Deputy Associate Director of Cabinet Affairs at the White House during the administration of President George W. Bush;

- the U.S. Ambassador to Hungary during the Biden administration;

- the U.S. Ambassador and Permanent Representative to the United Nations Human Rights Council during the Obama administration;

- A Special Counsel to the Judiciary Committee of the U.S. House of Representatives in connection with the impeachment proceedings of federal district judge Harry Claiborne, leading to the conviction and ultimately the removal of a President Carter appointee; and

- Fifteen former Assistant United States Attorneys with experience in eight U.S. Attorney's Offices around the country, who were appointed by the Attorney General in both Republican and Democratic administrations.

12.     In addition, our attorneys have served in federal government agencies as varied as the Department of Justice, Securities and Exchange Commission, Federal Communications Commission, Federal Trade Commission, Department of the Treasury, Department of State, National Security Council, Environmental Protection Agency, Secret Service, U.S. Air Force, U.S. Navy, the Internal Revenue Service, Department of Health and Human Services, and numerous Committees of the U.S. Senate and U.S. House of Representatives. Some of our attorneys served in these federal government agencies during the first Trump administration.

13.     Many of our attorneys joined the firm after serving as judicial law clerks to judges appointed by both Democratic and Republican Presidents. Thirteen of our attorneys served as law clerks for Justices of the Supreme Court, including Justice Scalia, Justice Kennedy, Justice Souter, and Justice Kagan. In recent years, five Jenner partners or alumni have been nominated to serve as Article III federal judges—two by President Trump, and three by President Biden. Former U.S. Supreme Court Justice John Paul Stevens, appointed by President Gerald Ford, was a Jenner alumnus. President Nixon appointed Jenner partner Philip Tone first to the U.S. District Court for the Northern District of Illinois and thereafter to the Seventh Circuit Court of Appeals; Judge Tone was a partner at Jenner both before and after his service to the federal judiciary. President Nixon also appointed Jenner partner Prentice Marshall to the U.S. District Court for the Northern District

5

of Illinois, where he served for more than two decades.  Former Governor Rick Snyder (R-Mich.) appointed a Jenner alumnus to the Michigan Supreme Court.

14.     Jenner has a longstanding, industry-leading commitment to pro bono service. Jenner was one of the first law firms nationwide to create a pro bono program, establishing it in the 1950's to represent indigent criminal defendants in Chicago. Those origins launched a culture of public service that has only grown stronger over seven decades. The American Lawyer has ranked the firm its number one pro bono firm 12 times in the past 15 years. In January 2021, the firm launched a five-year pro bono pledge, setting a goal of contributing $250 million in free legal services. The firm exceeded that commitment more than one year early, contributing the equivalent of $305 million in pro bono legal services by the end of 2024. In 2024 alone, the firm dedicated 90,993 hours of attorney time to pro bono work, valued at $103 million. Among other things, this includes defending individuals in our criminal justice system, governments and society; assisting individuals denied social security benefits; advocating for veterans; protecting constitutional rights; assisting victims of domestic violence and sex trafficking; pursuing religious liberty while fighting religious discrimination; and counseling community organizations on issues such as governance, real estate, and intellectual property.

15.     We were early champions for sometimes-controversial issues like prisoners' rights, criminal defense, and LGBTQ equality, and we continue forging the path, year after year, to provide legal representation to those who cannot afford it. We pursue impact litigation on important constitutional issues such as voting rights and reproductive rights. We pursue pro bono litigation on behalf of Medicaid recipients, challenging onerous policies that threaten their health care. We also do significant pro bono work advocating for military and veterans' rights. In partnership with the Veterans Legal Services Clinic at Yale Law School, we represent military veterans seeking veterans benefits and honorable status. We currently represent Black veterans

6

who served in the Vietnam War and who were improperly denied veterans benefits for more than fifty years, as acknowledged by the Department of Veterans Affairs. We also represent Navy and Marine Corps veterans who received less-than-honorable discharges while suffering from post-traumatic stress disorder (PTSD) after service in Iraq and Afghanistan. We also represent adults who were brought to the United States as children, helping them to apply for deferred action status and obtain work authorization.

16.    Jenner attorneys pursue matters of public importance, from a variety of perspectives. We represent our clients on their most significant matters, and we fight for them even in the face of intense public pressure. Named partner Albert Jenner challenged the constitutionality of the House Committee on Un-American Activities ("HUAC"), on behalf of his client, a prominent scientist who had received a subpoena from HUAC. He also served as counsel for Republicans on the House Judiciary Committee during the impeachment proceedings against President Richard Nixon. Later, the firm represented Theodore B. Olson—then President Reagan's Assistant Attorney General for the Office of Legal Counsel—in his challenge to the Independent Counsel statute.

17.    The firm represented MCI in the historic case that led to the break-up of AT&T. The firm represented the examiner in the bankruptcy proceedings of Lehman Brothers Holdings, Inc., the largest bankruptcy in U.S. history. More recently, Jenner represents American victims of terrorist attacks, including 9/11 and October 7 victims, in civil actions against Iran, the Taliban, Russian banks, and other malign foreign actors. Jenner represented a major corporation, a university, and a Deferred Action for Childhood Arrivals ("DACA") recipient in successfully challenging the rescission of DACA. A Jenner partner served last year as Special Counsel to Chairman Mike Kelly (R-PA) and House Republicans on the Task Force on the Attempted Assassination of Donald J. Trump.

7

18.     In short, we are lawyers, and we serve our clients. We are driven by our clients' needs and the firm's values.

19.     Beyond the legal matters we pursue, the firm is often recognized for fostering a work environment in which all lawyers and business professionals can flourish. A 2024 Vault survey ranked Jenner as the #18 Best Law Firm in America to Work For and #14 in Firm Culture. American Lawyer surveys of associate satisfaction consistently rank Jenner among the top firms nationwide.

**II.     The March 25, 2025 Executive Order**

20.     On March 25, 2025, the President signed the Executive Order titled "Addressing Risks From Jenner & Block." The Order was accompanied by a "Fact Sheet" issued the same day that purports to explain and support the Order. *See* White House, "Fact Sheet: President Donald J. Trump Addresses Risks from Jenner & Block" (March 25, 2025), available at https://www.whitehouse.gov/fact-sheets/2025/03/fact-sheet-president-donald-j-trump-addresses-risks-from-jenner-block/ ("Fact Sheet"). Jenner was given no opportunity to respond to the false charges in the Order or to explain the inevitable impact. Jenner learned of the Order only after it was issued.

21.     The Order directs the heads of all agencies to (1) "limit[]" Jenner's employees' "official access" to federal buildings "when such access would threaten the national security of or otherwise be inconsistent with the interests of the United States" and "engage[ment]" between government employees acting in their official capacity and Jenner employees to "ensure consistency with the national security and other interests of the United States," , Order § 5; (2) require government contractors to "disclose any business they do with Jenner and whether that business is related to the subject of the Government contract" and to "take appropriate steps to terminate any contract[] … for which Jenner has been hired to perform any service," *id.* § 3; and

(3) create a new security-clearance review procedure, applicable only to Jenner and other law firms whose activities are deemed disfavored, "suspend[ing] any active security clearances held by individuals at Jenner" and threatening arbitrary revocation, *id.* § 2.

### III.    Jenner's Interaction with the Federal Government

22.    As a full-service law firm that represents clients in all sectors of the economy in transactional, litigation, and regulatory matters, Jenner lawyers necessarily interact with the federal government on behalf of their clients in countless ways. Those interactions are critical to our ability to practice our profession, and our clients retain us and rely on us in their most sensitive matters to be able to interact with the federal government.

23.    If allowed to go into effect, the Order's restrictions on Jenner's interactions with the federal government would be devastating and irreparable. Our litigators carry forward more than a century of principled and effective advocacy that continues to serve as the hallmark of our firm. Driven by a commitment to integrity and professionalism, our credibility is our currency, and clients trust Jenner to skillfully defend and pursue their interests in their most contentious matters. Described by The National Law Journal as "the Army's Special Forces: highly trained and ready to deploy anywhere at any time," Jenner has been widely recognized for our prowess in high-profile trials and reputation as a "go-to" litigation firm for major corporate clients facing bet-the-company stakes. These trials and litigations require access to the federal courts. Unlike many other large law firms, the vast majority (nearly 90%) of the firm's attorneys focus on litigation, white collar/investigations, and regulatory practices, and the bulk of the firm's revenue derives from those practices. Many of these lawyers practice in federal court on behalf of our clients in civil and criminal cases, as well as in federal agencies' in-house administrative proceedings.

24.    We estimate that the firm has 540 cases pending before federal district, appellate, and bankruptcy courts, including the Supreme Court of the United States and the Court of Federal

Claims. This includes three cases pending before the Supreme Court, and approximately 140 cases pending before federal appellate courts, 340 cases pending before federal district courts, 40 matters in bankruptcy court, and 15 matters in the Court of Federal Claims. These matters require regular appearances in federal court. For example, the firm has at least 28 scheduled in-person appearances in federal court in April and May 2025 alone, including trials and pre-trial conferences, oral arguments, and motion hearings.

25.      We estimate that the firm has more than 500 active matters pending before or adverse to federal administrative agencies, including (using approximate numbers) 100 matters involving the Department of Justice; 40 matters involving the Federal Communications Commission; 35 matters involving U.S. Citizenship and Immigration Services; 30 matters involving the Navy; 25 matters involving each of Immigration and Customs Enforcement and the Securities and Exchange Commission; 20 matters involving each of the Department of State and the Department of Homeland Security; 15 matters involving each of the Army, Department of Defense, Department of Health and Human Services, Environmental Protection Agency, Federal Bureau of Investigation, and Federal Energy Regulatory Commission; and 10 matters involving each of the Air Force, Consumer Financial Protection Bureau, Federal Bureau of Prisons, Federal Trade Commission, and Internal Revenue Service.

26.      Jenner also represents many clients who are the targets of pending federal criminal investigations or have been indicted. Many of these clients retain us to interact with the Department of Justice, the Securities and Exchange Commission, or other federal agencies.  For example, the firm currently is engaging with the Department of Justice as to at least five antitrust investigations.

27.      The firm has 17 practice groups, and all of them intersect with the federal government in some way and include clients with business before the federal government. The largest practice groups by headcount are Investigations, Compliance, and Defense (67 attorneys);

Corporate (52 attorneys); Funds, Investment, and Financial Litigation (44 attorneys); Business Litigation (32 attorneys); and Government Controversies and Public Policy Litigation (28 attorneys).

28.     In the course of their representations, Jenner lawyers frequently meet with federal officials from a range of federal government agencies. Based on a review of our current client list, hundreds of our clients have matters that require Jenner lawyers to interact with federal agencies.

29.     Jenner boasts one of the best Appellate & Supreme Court practices in the country. It has been regularly recognized on *The National Law Journal*'s Appellate Hot List and rated a top practice by *Chambers USA*. Six different Jenner lawyers have argued before the Supreme Court of the United States in the last four Terms alone, addressing issues of criminal law, tribal sovereignty, social security, and the tax code. Jenner has won important Supreme Court precedents in cases such as *Haaland v. Brackeen*, 599 U.S. 255 (2023) (upholding the constitutionality of the Indian Child Welfare Act); *Kokesh v. SEC*, 581 U.S. 455 (2017) (holding that a five-year statute of limitations applies to the SEC's disgorgement penalty); *Puerto Rico v. Sanchez Valle*, 579 U.S. 59 (2016) (holding that the federal government and Puerto Rican government are the same sovereign for the purpose of the Double Jeopardy Clause); *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913 (2005) (holding that companies that distribute and promote software to infringe copyrights are liable for the resulting acts of infringement); *Lawrence v. Texas*, 539 U.S. 558 (2003) (holding unconstitutional a Texas law criminalizing consensual, sexual conduct between individuals of the same sex); *Wiggins v. Smith*, 539 U.S. 510 (2003) (holding that defense counsel's failure to conduct a reasonable investigation of mitigating facts violated a defendant's Sixth Amendment right to effective assistance of counsel); and *Witherspoon v. Illinois*, 391 U.S. 510 (1968) (holding death sentence unconstitutional where jurors who opposed the death penalty were dismissed in violation of the Sixth and Fourteenth Amendments). Its clients have included (on the

one hand) major corporations, state governments, and Indian tribes, and (on the other) targets of
government enforcement actions, criminal defendants, and civil rights plaintiffs, among many
others. In the Court's current term, Jenner has already argued and won *Williams v. Reed*, 145 S.
Ct. 465 (2025), wherein the Court held in an opinion by Justice Kavanaugh that Alabama may not
enforce a state exhaustion requirement that would effectively immunize state officials from federal
Section 1983 claims.

30.     Representing clients before the Supreme Court requires Jenner lawyers to access
federal buildings not only on the day of the argument itself but also for meetings with the Office
of the Solicitor General in the Department of Justice, a critical strategic moment in many Supreme
Court cases where the parties have an opportunity to discuss the matter with key stakeholders in
the federal government and attempt to persuade the United States to take particular positions in the
case.

31.     Jenner also features a strong Government Controversies and Public Policy
Litigation practice, which I founded and co-chair. We guide businesses and other large
organizations through highly complex crises presenting a mix of litigation, regulatory, public
policy, legislative and communications challenges. These challenges can include Congressional
hearings, federal law enforcement investigations, and management of regulatory scrutiny.
Examples of the types of matters handled by these lawyers include representing major companies
in congressional investigations, preparing senior executives for their testimony in Congress, and
representing companies in litigation brought by federal agencies including the Department of
Justice, Consumer Financial Protection Bureau and the Federal Trade Commission. I also serve as
mediator and settlement master in cases, including having been asked by the Department of Justice
to mediate cases on multiple occasions. I am currently serving as a court-appointed Settlement
Master in complex litigation involving veterans exposed to contaminated water at Camp LeJeune.

32.     Matters handled by the Government Controversies and Public Policy Litigation group frequently require regular interaction with the federal government and entrance into federal buildings for important meetings, interviews, and negotiations. Many of these meetings are only offered in person where parties can speak candidly with federal officials about sensitive matters.

33.     Jenner also offers clients one of the top Investigations, Compliance, and Defense ("ICD") practices in the country. Featuring 16 former federal prosecutors, this team helps clients navigate highly sensitive investigative and compliance challenges. When appropriate, they can quickly facilitate productive, dispositive interactions with authorities including the Department of Justice, Securities and Exchange Commission, the Commodity Futures Trading Commission, the Consumer Financial Protection Bureau, and the Financial Crimes Enforcement Network, among other government agencies. Jenner's ICD team have led hundreds of jury and bench trials, drawing on decades of first-chair experience to fight for their clients.

34.     Jenner's ICD team is currently representing large corporate clients and former employees in, among others, criminal and civil investigations carried out by the Department of Justice; ongoing dialogue with the Securities & Exchange Commission; and investigations conducted by the U.S. Postal Service Inspector General. The ICD team also partners with Jenner's Antitrust and Competition law team, which is currently representing clients in five separate antitrust investigations pursued by the Department of Justice.

35.     Matters handled by the ICD team require regular interaction with the federal government and entrance into federal buildings for important meetings, interviews, and negotiations. Many of these meetings are only offered in person where parties can speak candidly with federal officials about sensitive matters. Some of these matters also involve classified information that can only be viewed, discussed, or electronically processed in a Sensitive Compartmented Information Facility ("SCIF").

13

36.     Jenner includes a Government Contracts and Grants practice featuring Chambers-rated lawyers. Many of the nation's leading government contractors turn to Jenner for sophisticated legal advice as they navigate the complex government contracting landscape. Jenner lawyers draw on a wealth of industry, government, and litigation experience to help companies successfully avoid or resolve contract disputes with the U.S. Government. They also leverage the leadership and unique experience of former government officials, representing the Air Force General Counsel's Office and Government Accountability Office, to help develop effective solutions for clients as they face potential or proactive investigations, seek an experienced approach to combat bid protests, or navigate subcontractor issues.

37.     By definition, nearly every matter handled by Jenner's Government Contracts and Grants practice involves work with government contractors. These matters likewise involve frequent interaction with the federal government, entrance into federal buildings, litigation in the Court of Federal Claims, and handling of classified information—all of which is threatened by the Executive Order.

38.     Jenner has a nationally recognized Litigation Department. The firm litigates on behalf of clients in their most important matters, regularly appearing in federal courts. Thus far in every week of 2025, Jenner lawyers have appeared for hearings or oral argument in federal court at least once, and often multiple times each week. Jenner lawyers appear in federal court for all kinds of matters for all kinds of clients. Some prominent examples from the last few years include: a trial win in the Northern District of Illinois holding the nation's largest egg producers and industry groups liable for conspiring to inflate egg prices; a groundbreaking win in the Second Circuit Court of Appeals on behalf of the family of an American citizen killed when Malaysia Airlines Flight 17 was shot down over eastern Ukraine in 2014; a trial win in a trademark infringement suit against a European company that unlawfully pirated the products of its former

business partner; and a successful interlocutory appeal in the Fourth Circuit reversing a class certification order on behalf of a major hospitality company.

39.    Jenner features a number of high-caliber regulatory practices, with particularly strong practices in Energy, Communications, and Native American law. Jenner's Energy practice brings creative and collaborative thinking to cutting-edge issues in which the law is still developing, as the electric and natural gas industries face transformative opportunities as well as daunting challenges. The Energy group litigates cases at trial and appeal for energy companies at every level of the federal and state court systems, including before the U.S. Supreme Court. They handle cases at the Federal Energy Regulatory Commission ("FERC") and at state commissions, and represent clients in regulatory enforcement matters. They also represent and counsel clients engaged in energy transactions and many of the nation's largest electric and gas utilities, which service tens of millions of Americans, and the nation's largest nuclear power generator.

40.    Jenner's Communications, Internet and Technology ("CIT") practice represents cable/broadband, wireless, Internet, satellite, and technology companies, as well as private equity investors. The CIT group has negotiated industry-leading transactions and prevailed in wide-ranging litigation, regulatory proceedings, and agency enforcement actions, helping their clients pursue large mergers and other transactions, enter new industries, navigate new regulations and government enforcement, and create new products and services. Jenner's CIT group is known for tackling particularly difficult problems and bet-the-company matters that require a unique combination of top legal skills, hands-on Federal Communications Commission ("FCC") experience, and commitment to work wherever and whenever needed to achieve clients' goals. As a result, the team has achieved major successes for clients on some of the most significant communications matters before the FCC, Department of Justice, other agencies, and courts. Jenner's CIT practice is currently representing numerous clients in enforcement, regulatory, and

transactional matters before the FCC. Each matter requires the ability to interact with FCC lawyers and professional staff.

41.     Jenner's nationally recognized Native American Law practice, led by and primarily composed of enrolled members and descendants of federally recognized tribes, is consistently at the forefront of the most significant issues facing Indian Country. The team draws on its deep legal and government experience to provide unparalleled service to Native American tribes navigating the complex government-to-government relationship that Indian Country holds with the United States.

42.     Each of these regulatory practices—Energy, CIT, and Native American Law— requires near-constant communication with federal regulators about clients' most important matters. Jenner's electrical utility clients own or operate facilities used in transmission or wholesale of electric energy in interstate commerce, making them subject to FERC's exclusive jurisdiction. Jenner's CIT clients in telecommunications and media call on Jenner lawyers to secure regulatory approval for their transactions, to advocate for their interests in rulemaking and policymaking, to handle spectrum allocation, assignment, auctions, licensing, and relocation, and to defend against FCC enforcement actions. Jenner's Native American law clients value Jenner for its ability to advocate for tribal interests before a variety of federal regulators, including the Department of the Interior, FERC, and the FCC, among others. The Executive Order threatens clients' ability to select Jenner for all of these types of matters and many others as well.

43.     At present, by way of non-exhaustive example, Jenner has active civil and criminal matters on behalf of its clients involving at least the following federal agencies, which often require them either to interact with or appear before federal government officials:

- Air Force
- Army

16

- Commodity Futures Trading Commission

- Consumer Financial Protection Bureau

- Consumer Product Safety Commission

- Department of Agriculture

- Department of Commerce

- Department of Defense

- Department of Education

- Department of Energy

- Department of Health and Human Services

- Department of Homeland Security

- Department of the Interior

- Department of Justice

- Department of Labor

- Department of State

- Department of Treasury

- Drug Enforcement Administration

- Environmental Protection Agency

- Equal Employment Opportunity Commission

- Federal Aviation Administration

- Federal Bureau of Investigation

- Federal Bureau of Prisons

- Federal Communications Commission

- Federal Deposit Insurance Corporation

- Federal Energy Regulatory Commission

- Federal Railroad Administration

- Federal Trade Commission

- Internal Revenue Service

- John F. Kennedy Center for the Performing Arts

- Marine Corps

- Marshals Service

- National Aeronautics and Space Administration

- National Highway Traffic Safety Administration

- National Labor Relations Board

- Navy

- Office of Management and Budget

- Office of the U.S. Trade Representative

- Postal Service

- Securities and Exchange Commission

- Social Security Administration

- Special Operations Command

44.     The firm's pro bono service frequently involves work in federal court, before federal agencies, or interacting with federal government officials. For example, our pro bono work for current clients frequently requires interaction with the Department of Veterans Affairs, U.S. Citizenship and Immigration Services, the Department of Justice, the Federal Bureau of Prisons, and the Internal Revenue Service, among many others.

**IV.     Recent Relevant Litigation**

45.     Attorneys at the firm frequently file litigation on behalf of their clients challenging federal government action.

46.     Just as it has done during previous Democratic and Republican administrations, Jenner has continued to file litigation challenging federal government action subsequent to the January 20, 2025 inauguration of the President.

47.     Working with co-counsel, the Firm is representing a large number of associations and colleges and universities in litigation against the National Institutes of Health ("NIH") challenging guidance that attempted to impose a cap on payments for indirect costs necessary for research conducted pursuant to NIH grants. *See Ass'n of Am. Univs. v. Dep't of Health & Human Servs.*, No. 25-cv-10346 (D. Mass. filed Feb. 10, 2025). The lawsuit challenged this guidance as contrary to a statute expressly prohibiting this result; as contrary to the governing regulations; and as arbitrary and capricious pursuant to the Administrative Procedure Act. On March 5, 2025, the district court issued a preliminary injunction enjoining NIH from implementing the guidance.

48.     On February 11, 2025, in response to a post on X about an injunction issued by a judge in the NIH litigation handled by Jenner, Special Government Employee Elon Musk posted on X: "Which law firms are pushing these anti-democratic cases to impede the will of the people?"[1]

49.     Jenner also represents Climate United Fund in a suit against Citibank and the Environmental Protection Agency ("EPA"), seeking to enjoin the termination of its $7 billion grant as part of the Greenhouse Gas Reduction Fund. *Climate United Fund v. Citibank et al.*, No. 25-cv-00698 (D.D.C. filed Mar. 8, 2025). On March 18, 2025, the district court granted, in part, a temporary restraining order and held that the plaintiffs had shown a substantial likelihood of success on the merits of their Administrative Procedure Act and due process claims.

---

[1] Elon Musk (@elonmusk), X.COM (Feb. 11, 2025, 10:24 AM), https://perma.cc/EB6G-UUUP.

50. The firm has represented several nonprofits and individual noncitizens challenging the Executive Order entitled *Guaranteeing the States Protection Against Invasion*, which invokes Section 212(f) of the Immigration and Nationality Act ("INA") and the President's constitutional powers to abrogate the protections from removal that Congress created by statute, including the asylum statute. Proclamation 10888, 90 Fed. Reg. 8333 (Jan. 20, 2025); *see Refugee & Immigrant Ctr. for Educ. & Legal Servs. v. Noem*, No. 25-cv-306 (D.D.C. filed Feb. 3, 2025). In 1984, then-Assistant Attorney General for the Office of Legal Counsel, Theodore B. Olson, rejected the argument that Section 212(f) permitted the President to "eliminate the asylum rights of noncitizens" in the United States. 89 Fed. Reg. 81156, 81163 n.53 (Oct. 7, 2024). In 2018, during the President's first term, his Administration recognized that a proclamation under Section 212(f) did not affect asylum rights. 83 Fed. Reg. 55934, 55940 (Nov. 9, 2018). Jenner's representation of clients challenging this Executive Order is part a long tradition of advocacy for noncitizens' asylum rights. Representing several of the same clients, Jenner also challenged an Executive Order and rulemaking by the Biden-Harris Administration that sought to impose lesser restrictions on asylum and other forms of protection. *Las Americas Immigrant Advocacy Center v. U.S. Dep't of Homeland Security*, 1:24-cv-01702 (D.D.C.).

51. Working with co-counsel, the Firm has represented two advocacy groups, six transgender people under nineteen, and four parents of minor Plaintiffs, who brought suit on February 4, 2025 against the President, the Secretary of the Department of Health and Human Services ("HHS"), HHS, and various HHS subagencies to enjoin enforcement of a January 28, 2025 Executive Order, "*Protecting Children from Chemical and Surgical Mutilation*." That Executive Order directs all federal agencies to "immediately" withhold federal funds from healthcare institutions and entities that provide gender-affirming care to people under age nineteen. Exec. Order No. 14,187, 90 Fed. Reg. 8771. *See PFLAG, Inc. v. Trump*, 8:25-cv-00337-BAH (D.

Md.). After expedited briefing, the district court issued a temporary restraining order restraining Defendants "from conditioning or withholding federal funding based on the fact that a healthcare entity or health professional provides gender affirming medical care to a patient under the age of nineteen." *See PFLAG*, 2025 WL 510050, at *1 (D. Md. Feb. 14, 2025) (opinion memorializing TRO). Plaintiffs then moved for a nationwide preliminary injunction on February 18, 2025, which the district court granted on March 4, 2025. *See PFLAG*, 2025 WL 685124, at *2 (D. Md. Mar. 4, 2025).

## V.      Former Jenner Partner Andrew Weissmann

52.     Andrew Weissmann served as a Partner at Jenner from March 27, 2006 to October 24, 2011 and again from June 7, 2020 to July 16, 2021. Mr. Weissmann worked in the Firm's investigations and financial services practices.

53.     Prior to coming to Jenner in 2006, Mr. Weissmann had significant experience as a federal prosecutor. He had successfully tried more than 25 cases, including many against notorious New York organized crime families. During the administration of President George W. Bush, he was appointed to serve as Deputy Director and then Director of the Department of Justice's Enron Task Force.

54.     After completing his first stint at Jenner, Mr. Weissmann served as the General Counsel at the Federal Bureau of Investigation, the chief of the Criminal Fraud Section of the U.S. Department of Justice, and as a member of the team led by Special Counsel Robert S. Mueller, III, who was appointed by Rod Rosenstein, the President's Deputy Attorney General, to investigate Russian interference in the 2016 election.

55.     Following his work with Special Counsel Mueller, Mr. Weissmann authored a non-fiction book, *Where Law Ends: Inside the Mueller Investigation*, published by Random House on

September 29, 2020. The book was highly critical of the President.

56.    Mr. Weissmann also became a legal analyst for MSNBC after his work for Special Counsel Mueller.

57.    As a result of Mr. Weissmann's participation in the Special Counsel team, the publication of his book, and his political commentary, Mr. Weissmann has become a frequent political target of the President.

58.    In a Truth Social Post in 2022, the President reposted a comment describing Mr. Weissmann as "the Scum of the Earth!!!"[2]

59.    On March 14, 2025, during a speech at the Department of Justice, the President accused Mr. Weissmann and others, including Jack Smith, of participating in a "coordinated … campaign" against him, referring to Mr. Weissmann and others as "horrible people" and "scum."  He also accused "crooked law firms," referring to "violent, vicious lawyers that we have all over."[3]

60.    Mr. Weissmann has likewise been a frequent target of the President's senior advisers. For example, on March 17, 2025, Stephen Miller called Mr. Weissmann "an absolute moron… a fool and a degenerate."

61.    On March 21, 2025, the President issued a memorandum revoking any active security clearances held by Mr. Weissmann and other individuals.

62.    Although the Order and Fact Sheet falsely imply that Mr. Weissmann is a "Jenner employee[]," Order § 5(a), Mr. Weissmann has not worked at and has not performed legal work

---

[2]    Donald J. Trump (@realDonaldTrump), Truth Social (Sept. 5, 2022, 6:07 PM), https://truthsocial.com/@realDonaldTrump/posts/108948071458149558.
[3]    *Id.*; *Speech: Donald Trump Addresses the Staff at the Department of Justice—March 14, 2025*, Roll Call,        https://rollcall.com/factbase/trump/transcript/donald-trump-speech-department-of-justice-march-14-2025 (last visited Mar. 28, 2025)

for Jenner since his departure on July 16, 2021. All payments associated with his time at Jenner have been completed. The firm has no current financial obligations to Mr. Weissmann.

## VI.   Irreparable Harm Caused by the Order and its Enforcement

63.    Federal government agencies and personnel have already changed their approach to Jenner, causing irreparable harm to Jenner and its clients. Although we are constrained by the attorney-client privilege and Rule 1.6 of the Model Rules of Professional Conduct, we can report general facts and facts known to the federal government. For example, one client has informed us that the Department of Justice notified the client on March 26, 2025 that the client may not bring their counsel from Jenner & Block to a meeting with the Department of Justice that is scheduled for April 3. That client therefore will either need to attend the meeting without outside counsel or would need to retain new outside counsel before April 3.

64.    Because the Order could be interpreted to ban Jenner's access to federal courthouses and other buildings, some of our clients are concerned that we cannot represent them in federal court or enter federal buildings to engage with regulatory agencies or senior government officials. For example, within 24 hours of the issuance of the Order, several clients expressed concerns about our representation because they did not know whether we would be permitted to enter federal buildings and federal courthouses, negotiate with federal government officials, or participate in meetings with the Department of Justice. One of these clients has engaged us to represent them in a trial scheduled in June and expressed concern that we would be prohibited from appearing on their behalf. Jenner will continue incurring such harm if the Order's enforcement is not enjoined because Jenner attorneys have numerous upcoming appearances. Indeed, Jenner has around 540 active matters pending before federal courts, and numerous matters before agencies that require access to federal government buildings and officials. Continued refusals by federal officials to meet with Jenner lawyers, or denying Jenner lawyers access to

23

federal agencies and buildings, would harm Jenner's legal practice and its clients.

65.     Because of our flourishing ICD, regulatory, and Government Controversies practices, clients rely on us to engage with federal government agencies and officials, a previously routine activity of the firm's attorneys that is now at risk. Clients have expressed concern about whether the Order could impair the firm's ability to attend upcoming meetings with government agencies.

66.     The Order also required Jenner attorneys to expend significant time to discuss the impacts with our clients and develop a plan to work together to mitigate and address any impacts in the days and weeks ahead, an evolving situation requiring frequent communications that burdens both the firm and our clients.  Many of our partners with responsibility for client relationships have spent a significant amount of time since the Order was issued communicating with clients about the Order and its impacts and developing plans for the path ahead.

67.     The Order also includes provisions that would require federal agencies to require government contractors to disclose any relationship they have with Jenner, and to terminate government contracts for clients as to which Jenner has been hired to perform any service. Eight of Jenner's top 15 clients by revenue in 2024—and 23 of Jenner's top 50 clients by revenue in 2024—have contracts or subcontracts with the federal government, either directly or through an affiliate. Many of those companies are represented by the firm for legal matters completely unrelated to government-contracting matters. For many of the firm's clients, the fact that the firm gives them legal advice is not public information. If enforced, the Order would seek to require many of these clients to divulge confidential information regarding their legal representations to the federal government, with whom they may be adverse on the very same matter. In addition, the Order threatens the termination of those clients' contracts if Jenner has been hired to perform any service related to the contract.

68.     Due to the restrictions that the Order imposes on Jenner, and the disclosure and termination provisions directed to the firm's federal contractor clients, numerous government contractor clients of the firm have expressed concerns to us about government-mandated disclosure of their relationship with us to federal agencies and the impact that may have on the contractor's own relationships with the federal government. In general, we would describe our government contractor clients as nervous about their relationship with us and closely monitoring the evolving situation.

69.     The Order targets our clients with government contracts. In 2024, we estimate that more than 40% of the firm's revenue came from clients who are government contractors or subcontractors. We estimate the same percentage is true over the last five years. If we lost that business, or even a portion of it, it would be a serious threat to the firm's financial health.

70.     The Order also threatens Jenner attorneys' right to practice their chosen profession. That threat is not only to revenue-generating practice, but also to the firm's pro bono practice, which frequently requires us to appear in federal court or before federal agencies in criminal, civil or administrative matters. Our pro bono work for current clients frequently requires interaction with the Department of Veterans Affairs, U.S. Citizenship and Immigration Services, the Department of Justice, the Federal Bureau of Prisons, and the Internal Revenue Service, among many others. Many of our pro bono clients are also government contractors and fear that a continued relationship with us could jeopardize their own organization. One day after the Order was issued, a non-profit organization that has been enthusiastic about the quality of our work terminated our engagement because of concerns that its own government contracts could be placed at risk.

71.     The Order also interferes with Jenner's employer-employee relationships because the restrictions are broadly written to include Jenner employees.

## VII.    False and Disparaging Statements in the Order

72.    The Order has also harmed Jenner's reputation in the market for clients, lawyers, and staff through its false and disparaging characterization of the firm and its attorneys.

73.    The Order and Fact Sheet contain numerous false and inflammatory statements about Jenner, its clients, and its work. For example, the Order implies that Jenner has "earmark[ed] hundreds of millions of [its] clients' dollars" for pro bono work, but the Firm does not spend its clients' money on pro bono matters. Instead, it has committed its own resources and its own attorney time to assisting clients in a wide range of legal areas.

74.    The Order characterizes former partner Andrew Weissmann as a current employee of Jenner. *See* Order §§ 5(a), 5(b). But as discussed above, Mr. Weissmann has not worked at nor performed legal work for Jenner since 2021.

75.    The Order and Fact Sheet further distort Jenner's work on behalf of its clients. For example, the Order and Fact Sheet asserts that "Jenner engages in obvious partisan representations to achieve political ends," Order § 1, and "pursues partisan goals," *see* Fact Sheet. Rather, Jenner represents its clients, whatever their interests, and has challenged unlawful or unconstitutional governmental actions on behalf of its clients regardless of which major political party is in the White House. *See supra* ¶¶ 16-18.

76.    The Order and Fact Sheet baselessly claim that the firm "supports attacks against women and children based on a refusal to accept the biological reality of sex." Order § 1; *see also* Fact Sheet. This statement grossly misrepresents Jenner's long and proud history of protecting the rights of LGBTQ+ communities, from winning the landmark *Lawrence v. Texas* case more than 20 years ago to more recent litigation to protect transgender individuals. In 2023, Jenner filed a lawsuit challenging an Oklahoma law that bans gender-affirming medical care to transgender adolescents and threatens providers who violate the law with a felony conviction. And this year,

the firm helped obtain a preliminary injunction preventing the administration from conditioning or withholding federal funding based on the provision of gender-affirming medical care to a patient under the age of nineteen.

77.     The Order and Fact Sheet also distort Jenner's advocacy for noncitizens' rights, falsely asserting that the firm "backs the obstruction of efforts to prevent illegal aliens from committing horrific crimes and trafficking deadly drugs within our borders." Order § 1. This, too, baselessly distorts the firm's longstanding pro bono work to help those eager to contribute to our country. The firm has a long tradition of representing individuals seeking immigration relief, both in individual representations and impact litigation. We regularly partner with organizations such as Kids in Need of Defense and the National Immigrant Justice Center to protect and preserve American values, such as ensuring that visas are not awarded based on impermissible religious criteria, uncovering the abuses of solitary confinement in immigrant detention centers, and representing families torn apart by broken border policies, in addition to innumerable asylum cases for individuals fleeing human rights abuses abroad. As noted above, Jenner also currently represents clients in a challenge to the President's executive order invoking Section 212(f) of the INA to abrogate protections from removal that Congress created by statute; our clients' position in that litigation is consistent with the positions taken by the Reagan and first Trump administrations. *See supra* ¶ 50.

* * *

I declare under penalty of perjury, on this 28th day of March, 2025, that the foregoing is true and correct, to the best of my knowledge, information and belief.

Thomas J. Perrelli

# EXHIBIT 34



← **Truth Details**
1694 replies

 **Donald J. Trump** ✓
@realDonaldTrump

Today, President Donald J. Trump and Skadden, Arps, Slate, Meagher & Flom LLP announce the following agreement regarding a series of actions to be taken by Skadden:

1. Skadden will provide a total of at least $100 Million Dollars in pro bono Legal Services, during the Trump Administration and beyond, to causes that the President and Skadden both support, in relation to the following areas: Assisting Veterans and other Public Servants, including members of the Military, Law Enforcement, First Responders, and Federal, State, and Local Government Officials; ensuring fairness in our Justice System; and combatting Antisemitism. Skadden will change its pro bono policy so that all pro bono moving forward will be done in the Firm name. A pro bono Committee will be constituted to ensure that pro bono matters are consistent with the objectives of the program, and that pro bono activities represent the full political spectrum.

2. The Skadden Foundation will commit to the mission of providing pro bono Legal Services to a wide variety of deserving organizations and individuals. Skadden is committed to funding no fewer than five Skadden Fellows each year dedicated to the following projects: Assisting Veterans; ensuring fairness in our Justice System; combatting Antisemitism, and other similar types of projects. Law Graduates that receive Skadden Fellowships will represent a wide range of political views, including conservative ideals.

3. Skadden affirms its commitment to merit-based hiring, promotion, and retention. Accordingly, the Firm will not engage in illegal DEI discrimination and preferences. Skadden will engage independent outside counsel to advise the Firm to ensure employment practices are fully compliant with Law, including, but not limited to, anti-discrimination Laws.

4. Skadden will not deny representation to clients, such as members of politically disenfranchised groups, who have not historically received legal representation from major National Law Firms, including in pro bono matters, and in support of non-profits, because of the personal political views of individual lawyers.

Statement From the White House: "Skadden, Arps, Slate, Meagher & Flom LLP approached President Trump and his Administration, and declared the Firm's strong commitment to ending the Weaponization of the Justice System and the Legal Profession. The President will never stop fighting to deliver on his promises of eradicating partisan Lawfare in America, and restoring Liberty & Justice for ALL."

Statement From Skadden Executive Partner, Jeremy London: "Skadden is pleased to have achieved a successful agreement with President Trump and his Administration. We engaged proactively with the President and his team in working together constructively to reach this agreement. The Firm looks forward to continuing our productive relationship with President Trump and his Admin. We firmly believe that this outcome is in the best interests of our clients, our people, and our Firm."

**7.96k** ReTruths  **33.4k** Likes                                    Mar 28, 2025, 1:57 PM

# EXHIBIT 35



## Major law firm strikes preemptive deal with White House

Skadden Arps, one of the largest law firms in the world, reached an agreement with Trump despite not being targeted by the White House like other firms.



President Donald Trump announced that his administration has reached a deal with an elite law firm during a swearing-in ceremony in the Oval Office at the White House on March 28, 2025, in Washington, D.C. | Andrew Harnik/Getty Images

By **DANIEL BARNES**
03/28/2025 02:47 PM EDT
Updated: 03/28/2025 04:33 PM EDT

   

The White House has reached a deal with one of the largest law firms in the world to provide the equivalent of $100 million in free legal work to causes supported by the administration, President Donald Trump announced Friday afternoon.

The law firm, Skadden, Arps, Slate, Meagher & Flom LLP, will also fund fellowships for law school graduates to work on causes in line with the administration's priorities. The fellows "will represent a wide range of political views, including conservative ideals," the president said in a statement.

Advertisement

AD

Skadden will also commit to "merit based hiring, promotion and retention," and will not deny representation to "politically disenfranchised groups," the president said during a swearing in event for Alina Habba, one of his personal attorneys and his pick to be the acting U.S. Attorney for New Jersey.

"This was essentially a settlement," Trump said of the deal.

The president has signed a number of executive orders in recent weeks targeting individual law firms for their prior associations with his political enemies. No such order had been signed targeting Skadden, however, the fifth-highest grossing law firm in the world according to Law.com, making this the first time a law firm has preemptively gone to the White House to negotiate with the administration.

Skadden's executive partner Jeremy London shared details of the negotiation in a firm-wide email sent Friday and obtained by POLITICO.

"Over the past few days, we learned that the Trump Administration intended to issue an executive order directed at Skadden," London wrote. "We believed it would focus on DEI initiatives and our pro bono activities."

"With that in mind, we chose to engage proactively and constructively with the Administration to align on a productive path forward without the issuance of an executive order," he wrote. "We entered into the agreement the President announced today because, when faced with the alternatives, it became clear that it was the best path to protect our clients, our people and our Firm."

"Not everyone will agree with the decision we made today, and I have great respect for the different views that make us stronger as a Firm," he wrote. "But I firmly believe that an agreement centered around our pro bono work and complying with the law was an acceptable outcome to ensure Skadden will continue to thrive long into the future. This agreement does not change who we are."

Advertisement

The deal echoes an earlier agreement between the administration and the law firm Paul, Weiss, which agreed to donate $40 million in pro bono work towards causes supported by the administration. Paul, Weiss similarly committed to reviewing their hiring practices and ending use of diversity, equity and inclusion policies.

That settlement was reached after the president signed an executive order punishing Paul, Weiss for the work of a former partner by revoking security clearances for certain attorneys and restricting the firm's ability to represent clients that interface with the government.

"We appreciate Skadden's coming to the table," Trump said Friday. "As you know other law firms have likewise settled the case. It's a shame, you know,

what's gone on is a shame but we very much appreciate their coming to the table."

Though Skadden had not yet been targeted by an executive order, it recently drew negative attention from Elon Musk, who posted about the firm on X.

"Skadden, this needs to stop now," Musk posted in response to a post from 2020 election denier Dinesh D'Souza who said the firm was engaged in "systematic lawfare" against his film 2000 Mules.

Earlier Friday, major law firms Jenner & Block and WilmerHale filed two lawsuits challenging Trump's executive orders cutting those firms off from government contracts, suspending security clearances held by lawyers at the firm and restricting firm employees from entering government buildings.

A federal judge previously ruled that a similar executive order targeting the firm Perkins Coie is likely unconstitutional.

**FILED UNDER:** WHITE HOUSE, DONALD TRUMP, LAW, LEGAL

---

## West Wing Playbook: Remaking Government

Your guide to Donald Trump's unprecedented overhaul of the federal government.

**EMAIL**

Your Email

**EMPLOYER**

Employer

**JOB TITLE**

Job Title

By signing up, you acknowledge and agree to our Privacy Policy and Terms of Service. You may unsubscribe at any time by following the directions at the bottom of the email or by contacting us here. This site is protected by reCAPTCHA and the Google Privacy Policy and Terms of Service apply.

SIGN UP

SPONSORED CONTENT











### Donald Trump has begun a…

But the new rules do not suit...

The Economist

### The Worst Thing You…

Use this LLLT device daily for 1…

Okita Nail Fungus…

### The Super Rich Read A…

Thousands swear by this Apple-…

The Super Rich R…

### Why you should neve…

Pleasure cruises, golf and tracing...

The Economist

### New Retirement…

TopSearchesNow …

About Us

Advertising

Breaking News Alerts

Careers

Credit Card Payments

Digital Edition

FAQ

Feedback

Headlines

Photos

Press

Print Subscriptions

Request A Correction

Write For Us

RSS

Site Map

Terms of Service

Privacy Policy

© 2025 POLITICO LLC

# EXHIBIT 36



← **Truth Details**
614 replies

**Donald J. Trump** ✔
@realDonaldTrump

Today, President Donald J. Trump and Willkie Farr & Gallagher LLP ("Willkie") announce the following agreement regarding a series of actions to be taken by Willkie:

1. Willkie will provide a total of at least $100 Million Dollars in pro bono Legal Services, during the Trump Administration, and beyond, to causes that President Trump and Willkie both support, in relation to the following areas: Assisting Veterans and other Public Servants including, among others, members of the Military, Gold Star families, Law Enforcement, and First Responders; Ensuring fairness in our Justice System; and Combatting Antisemitism. Willkie's pro bono Committee will ensure that new pro bono matters are consistent with these objectives, and that pro bono activities represent the full political spectrum, including Conservative ideals.

2. Willkie affirms its commitment to Merit-Based Hiring, Promotion, and Retention. Accordingly, the Firm will not engage in illegal DEI discrimination and preferences. Willkie affirms that it is Willkie's policy to give Fair and Equal consideration to Job Candidates, irrespective of their political beliefs, including Candidates who have served in the Trump Administration, and any other Republican or Democrat Administration. Willkie will engage independent outside counsel to advise the Firm in confirming that employment practices are fully compliant with Law, including, but not limited to, anti-discrimination Laws.

3. Willkie affirms that it will not deny representation to clients, such as members of politically disenfranchised groups and Government Officials, employees, and advisors, who have not historically received Legal representation from major National Law Firms, including in pro bono matters and in support of non-profits, because of the personal political views of individual lawyers.

Statement from the White House: "Willkie Farr & Gallagher LLP proactively reached out to President Trump and his Administration, offering their decisive commitment to ending the Weaponization of the Justice System and the Legal Profession. The President is delivering on his promises of eradicating Partisan Lawfare in America, and restoring Liberty and Justice FOR ALL."

Statement from Thomas M. Cerabino, Chairman of Willkie Farr & Gallagher LLP: "We reached an agreement with President Trump and his Administration on matters of great importance to our Firm. The substance of that agreement is consistent with our Firm's views on access to Legal representation by clients, including pro bono clients, our commitment to complying with the Law as it relates to our employment practices, and our history of working with clients across a wide spectrum of political viewpoints. The Firm looks forward to having a constructive relationship with the Trump Administration, and remains committed to serving the needs of our clients, our employees, and the communities of which we are a part."

**4.24k** ReTruths  **18.3k** Likes                                        Apr 01, 2025, 4:47 PM



# EXHIBIT 37

# THE AMERICAN LAWYER



Willkie Farr & Gallagher offices in Washington, D.C. Photo: Diego M. Radzinschi/ALM

NEWS

# Willkie Believes It's the Next Target of Trump Executive Order

The New York law firm has "started to make preparations" and take necessary steps, said one of the sources, declining to elaborate on those steps.

April 01, 2025 at 09:15 AM

🕐 3 minute read

Government

 **By Patrick Smith**

 **By Abigail Adcox**

---

*After this article published, President Trump on Tuesday afternoon announced a deal with Willkie, allowing the firm to avoid an executive order. Read about <u>the deal here.</u>*

As law firms brace for more executive orders targeting them, another New York law firm, Willkie, Farr & Gallagher, is preparing to get hit.

Sources close to the firm say Willkie believes it is one of the next likely targets of the Trump administration's executive order blitz on Big Law. A firm representative did not reply to multiple requests for comment regarding the matter.

The New York firm has "started to make preparations" and take necessary steps, said one of the sources, declining to elaborate on those steps.

The firm hired former Second Gentleman Douglas Emhoff in January. Emhoff's wife, former Vice President Kamala Harris, lost the last U.S. presidential election to President Donald Trump.

The firm also employs two former investigators for the congressional committee that investigated Trump's role in the Jan. 6, 2021, attack on the U.S. Capitol. Tim Heaphy, who served as the chief investigative

counsel for the House select committee, and Soumya Dayananda, who was a senior investigative counsel for the committee, both joined the firm as partners in 2023.

Willkie also represented two former Georgia poll workers, Ruby Freeman and Wandrea "Shaye" Moss, pro bono in a lawsuit accusing former New York City Mayor Rudy Giuliani of defaming by falsely stating that they had engaged in fraud while counting ballots at State Farm Arena in Atlanta during the 2020 election.

Giuliani reached a settlement agreement with Freeman and Moss earlier this year, owing almost $150 million to the two after he failed to appear in federal court in New York in January.

Several webpages detailing the firm's work on the defamation case appeared to be down from the firm's website on Tuesday.

So far, the legal industry has diverged on its approach to Trump's executive orders.

Two other New York law firms, Paul, Weiss, Rifkind, Wharton & Garrison and Skadden, Arps, Slate, Meagher & Flom, made a deal with Trump to stop executive orders, with Skadden appearing to preempt one. Both deals included the promise of millions of dollars in pro bono efforts to support causes important to the Trump administration, as well as capitulations that the firms will not engage in DEI "discrimination and preferences" and will hire an independent outside counsel to examine its employment practices.

Sources previously indicated to Law.com that other firms were in talks with the administration as well in hopes of avoiding executive orders targeting their businesses.

Meanwhile, three other law firms are suing the administration to block Trump's executive orders against them, including Perkins Coie; Jenner & Block; and Wilmer Cutler Pickering Hale and Dorr. Each of the three has obtained a temporary restraining order to block parts of Trump's orders.

These firms have been scrutinized and punished by Trump for former matters involving Democratic politics or civil rights, investigations of Trump himself, DEI, and "racial discrimination" on the part of firms that favor minority groups.

---

**NOT FOR REPRINT**

© 2025 ALM Global, LLC, All Rights Reserved. Request academic re-use from www.copyright.com. All other uses, submit a request to asset-and-logo-licensing@alm.com. For more information visit Asset & Logo Licensing.

## You Might Like



# EXHIBIT 38

THE AMERICAN LAWYER



Willkie Farr & Gallagher offices in Washington, D.C. March 30, 2017.

NEWS

# Willkie Firm Leadership Addresses the Firm Following Trump Agreement

This communication, obtained by Law.com, was transmitted from Willkie's executive committee Tuesday afternoon shortly after the firm's deal with the Trump administration.

April 01, 2025 at 04:36 PM

🕐 3 minute read

Government

**By ALM Staff**

---

The below communication, obtained by law.com, was transmitted from Willkie Farr & Gallagher's executive committee Tuesday afternoon shortly after the firm's <u>agreement with the Trump administration</u>, to avoid an executive action against the firm, was announced. President Donald Trump announced the deal Tuesday, with the firm "proactively reaching out" to the administration in a manner similar to Skadden to avoid an executive order.

*Dear All Colleagues,*

*We learned that the President intended to issue an Executive Order targeting Willkie similar to the orders issued against multiple firms in the past weeks, threatening to imperil our clients' rights and those of our Firm.*

*We were invited to contact the Administration on Sunday, and they outlined a proposed alternative to receiving an Executive Order. After determining that the three principles on which an agreement would be based are consistent with our Firm's longstanding practices, we engaged in discussions to see if an acceptable resolution could be reached.*

*While the agreement ultimately reached with the Administration focuses on activities that are already in place at our Firm, similar agreements at peer firms have been publicly criticized, and there is heightened*

*conversation across our industry as law firms grapple with the consequences of potential Executive Orders and the impact for their clients, their employees and their businesses. In making this difficult decision, we concluded, after due consideration of the implications of each possible course of action, that accepting the Administration's final proposal was the path that best serves our clients' needs and protects the Firm's various stakeholders, avoiding potentially grave consequences.*

*As mentioned above, the agreement has three principles. First, we will continue to follow the law related to our employment practices. Second, we will continue to represent clients on both sides of the aisle and with a wide range of ideological views. Third, we will continue to represent underrepresented individuals and groups that are not only important to the Administration, but to Willkie—this includes veterans, Gold Star families and victims of religious discrimination. These are all longstanding practices at Willkie, so the agreement does not require us to change course.*

*We know this news is not welcomed by some of you and you would have urged a different course of action. Needless to say, this was an incredibly difficult decision for Firm leadership.*

*If you receive questions from clients, please direct them to the appropriate relationship partner. Should you receive an inquiry from the media or another third party, please do not respond and send the information to* [the firm's chief marketing officer].

*Thank you for your continued hard work and dedication to the Firm and our clients.*

*The Executive Committee*

---

**NOT FOR REPRINT**

© 2025 ALM Global, LLC, All Rights Reserved. Request academic re-use from www.copyright.com. All other uses, submit a request to asset-and-logo-licensing@alm.com.

# EXHIBIT 39

← **Truth Details**                                                        •••
710 replies

 **Donald J. Trump** ✔
@realDonaldTrump

Today, President Donald J. Trump and Milbank LLP ("Milbank") announce the following commitments regarding a series of actions to be taken by Milbank:

1. Milbank will perform a total of at least $100 Million Dollars in pro bono legal services during the Trump Administration, and beyond, on initiatives supported by both the President and Milbank, such as: Assisting Veterans and other Public Servants, including members of the Military, Law Enforcement, and First Responders; Ensuring fairness in our Justice System; and Combatting Antisemitism. In furtherance of, and as part of, these activities, Milbank will continue to grow its work with the Milbank Exoneration and Resentencing Review Unit at the Perlmutter Center for Legal Justice at Cardozo Law School.

2. Our pro bono Committee will include Partners at the Firm with diverse political ideologies to ensure that pro bono matters are consistent with the objectives of the Firm, and that our pro bono practices represent the full political spectrum, including Conservative ideals.

3. Milbank will not deny representation to clients, such as members of politically disenfranchised groups and Government Officials, employees, and advisors, who have not historically received Legal representation from major National Law Firms, including in pro bono matters, and in support of non-profits, because of the personal political views of individual lawyers. Milbank shall not deny representation to any clients on the basis of the political affiliation of the prospective client, or because of the opposition of any Government Official.

4. Milbank acknowledges and affirms its commitment to Merit-Based Hiring, Promotion, and Retention. Accordingly, the Firm will not engage in illegal DEI discrimination and preferences. Milbank will continue to give Fair and Equal consideration to Job Candidates who have served in both Republican and Democrat Administrations, including the Trump Administration. Milbank will continue to work with independent outside counsel to advise the Firm to ensure employment practices are fully compliant with Law, including, but not limited to, anti-discrimination laws.

Statement from the White House: "Milbank LLP approached President Donald J. Trump and his Administration, stating their resolve to help end the Weaponization of the Justice System and the Legal Profession. The President continues to build an unrivaled network of Lawyers, who will put a stop to Partisan Lawfare in America, and restore Liberty and Justice FOR ALL."

Statement from Scott A. Edelman, Chairman of Milbank LLP: "After a constructive dialogue with President Trump's Administration, Milbank is pleased that we were so quickly able to find common ground. Our agreement is consistent with Milbank's core values. We are pleased to affirm a commitment to continue to engage in significant pro bono services in areas that are mutually supported by Milbank and the President. Milbank looks forward to continuing its working relationship with President Trump and his Administration."

**4.18k** ReTruths  **16.6k** Likes                              Apr 02, 2025, 2:05 PM

                

# EXHIBIT 40

# THE AMERICAN LAWYER



Milbank

NEWS

# Milbank 'Comfortable With All These Provisions,' Chairman Says in Message to Firm

Leadership "concluded that it was in the Firm's best interest to agree with the Administration's suggestion and enter into our own Skadden-type agreement," chairman Scott Edelman wrote.

April 02, 2025 at 01:56 PM

🕐 7 minute read

| Government |

**By ALM Staff**

---

The below communication from Milbank chairman Scott Edelman, obtained by Law.com, was distributed to firm employees Wednesday after the firm's <u>agreement with the Trump administration</u>, to avoid an executive action against the firm, was announced.

*To the Milbank Community:*

*As many of you know, in recent weeks, the President has raised a number of issues about the practices of big law firms. In some cases, the President has issued executive orders against particular firms.*

*And many of you surely read that, on March 17, 2025, the Acting Chair of the EEOC sent letters requesting information about DEI in employment practices to twenty of the country's largest law firms, including Milbank.*

*Late last week, we were contacted by representatives of the Trump Administration with questions and concerns about our approach to pro bono and diversity initiatives. The Trump Administration suggested to us that we enter into an agreement similar to one recently agreed to by Skadden. Having reviewed the Skadden agreement, we concluded that it was in the Firm's best interest to agree with the Administration's suggestion and enter into our own Skadden-type agreement. We did so for the following reasons:*

*First, our review of Skadden's agreement convinced us that the terms agreed to by Skadden were not unreasonable. In reviewing the Skadden agreement, it became apparent that our present practices are consistent with the agreements that the Administration had required of Skadden. We therefore concluded that an agreement would not entail any significant changes to our current practices, and the new commitments are things that we are happy to do anyway.*

*Second, as a large law firm that does a majority of its work on transactional matters, we are dependent on our ability to navigate client issues in all parts of the Executive Branch. We believed that it was in the best interests of the Firm and its clients to resolve the Trump Administration's concerns in a way that would foster our working relationship and avoid what could have been an unnecessary confrontation.*

*Third, the only commitments that we have made to the Government are those that we are happy to make. We are extremely comfortable providing the requested levels of pro bono activities to clients facing challenges that fall within the wide range of the agreed-upon initiatives.*

*The only commitment that I consider to be "new" is something that we were actively considering anyway, and that is to agree that we would ensure that we have lawyers with diverse political ideologies on our existing pro bono committee to ensure that pro bono matters are both consistent with the objectives of the Firm and represent the full political spectrum. Again, we think this is the right thing to do.*

*Milbank is a Firm that has always attracted lawyers with a diversity of viewpoints. Two of our partners served in the Executive Branch during the first Trump Administration. We believe that those differences of views and opinions are a strength that makes Milbank a better and more successful institution. This change to our committee will formalize our consideration of those different viewpoints in making decisions about pro bono.*

*With that background, we made the decision to provide the Administration with the following commitments that the President announced today:*

*1. Milbank will perform a total of at least $100 million in pro bono legal services during the Trump Administration and beyond on initiatives supported by both the President and Milbank, such as: assisting veterans and other public servants, including members of the military, law enforcement, and first responders; ensuring fairness in our justice system; and combatting antisemitism. In furtherance and as part of these activities, Milbank will continue to grow its work with the Milbank Exoneration and Resentencing Review Unit at the Perlmutter Center for Legal Justice at Cardozo Law School.*

*2. Our pro bono committee will include partners at the Firm with diverse political ideologies to ensure that pro bono matters are consistent with the objectives of the Firm, and that our pro bono practices represent the full political spectrum, including conservative ideals.*

*3. Milbank will not deny representation to clients, such as members of politically disenfranchised groups and government officials, employees, and advisors, who have not historically received legal representation from major national law firms, including in pro bono matters, and in support of non-profits, because of the personal political views of individual lawyers. Milbank shall not deny representation to any clients on the basis of the political affiliation of the prospective client or because of the opposition of any government official.*

*4. Milbank acknowledges and affirms its commitment to merit-based hiring, promotion, and retention. Accordingly, the Firm will not engage in illegal DEI discrimination and preferences. Milbank will continue to give fair and equal consideration to job candidates who have served in both Republican and Democrat Administrations, including the Trump Administration. Milbank will continue to work with independent outside*

counsel to advise the Firm to ensure employment practices are fully compliant with law, including, but not limited to, anti-discrimination laws. We are comfortable with all of these provisions. By reaffirming our commitments on a number of these issues, we set a path for the Firm to continue its working relationship with the Executive Branch while at the same time zealously representing our clients.

Our pro bono activities have always represented a broad spectrum of clients and causes.

Of note, in 2024, we proudly announced our new partnership with the Perlmutter Center for Legal Justice at Cardozo Law, championed and sponsored by Laurie and Ike Perlmutter, to combat historical wrongs in the US criminal justice system with a focus on wrongful conviction, excessive sentencing and clemency. We established the Milbank Exoneration and Resentencing Review Unit at the Perlmutter Center, which has enabled the Center to grow its staff and expand its ability to review the high volume of requests it receives. As part of this commitment, we also pledged to provide pro bono legal services as a close partner with the Perlmutter Center at every stage of its work, from screening clients and writing case recommendation memos to litigating cases. The agreement we entered into with the Administration specifies that our work at the Perlmutter Center is one example of work that we are committing to do as part of our overall pro bono commitment.

There is nothing in our agreement that gives the Administration the right to dictate or approve the matters we take on. Nor have we restricted our pro bono activities or limited positions we could take on behalf of our clients. And, of course, no Milbank lawyer will be required to work on any pro bono matter that they do not support. That goes for more conservative lawyers and liberal causes, just as it goes for more liberal lawyers and conservative causes.

We believe that our agreement is very much in Milbank's interest. The Administration's expressed concerns about big law firms, and in some

*cases its entry of Executive Orders against particular firms, have created uncertainty for law firms like ours. With this agreement, we believe we have gone a long way to putting these issues behind us. But we have done so in a way that allows us to continue to focus on the Firm's values and missions, including with respect to pro bono and our hope to foster an inclusive, non-discriminatory community where all of our members have an equal opportunity to succeed. Having now reached an agreement with the Administration, we can continue to do what we do best—focus on providing the best possible advice, counseling and service to our clients.*

*As I often end my talks to you, I want to end by expressing my gratitude to all of you. Milbank continues to accomplish so much as a Firm and for its clients. All of those accomplishments are a reflection of you, our people. I want to thank all of you for everything that you do for the Firm. And I also want to thank you for what I am sure will be our shared commitment to fostering an environment that continues to allow and encourage inclusion of diverse viewpoints among all the members of our community.*

*Respectfully,*

*Scott*

---

**NOT FOR REPRINT**

© 2025 ALM Global, LLC, All Rights Reserved. Request academic re-use from www.copyright.com. All other uses, submit a request to asset-and-logo-licensing@alm.com. For more information visit Asset & Logo Licensing.

# You Might Like

# EXHIBIT 41

*Democracy Dies in Darkness*

# Law firms refuse to represent Trump opponents in the wake of his attacks

The president issued a new order Tuesday sanctioning yet another law firm, Jenner & Block. The result overall has been called an extraordinary threat to the constitutional rights of due process and legal representation, as well as a far weaker effort to challenge Trump's actions in court than during his first term.

Updated March 25, 2025

 By <u>Michael Birnbaum</u>

President Donald Trump's crackdown on lawyers is having a chilling effect on his opponents' ability to defend themselves or challenge his actions in court, according to people who say they are struggling to find legal representation as a result of his challenges.

Biden-era officials said they're having trouble finding lawyers willing to defend them. The volunteers and small nonprofits forming the ground troops of the legal resistance to Trump administration actions say that the well-resourced law firms that once would have backed them are now steering clear. The result is an extraordinary threat to the fundamental constitutional rights of due process and legal representation, they said — and a far weaker effort to challenge Trump's actions in court than during his first term.

Legal scholars say no previous U.S. administration has taken such concerted action against the legal establishment, with Trump's predecessors in both parties typically respecting the constitutionally enshrined tenet that everyone deserves effective representation in court and that lawyers cannot be targeted simply for the cases and clients they take on.

Trump has used executive orders to target powerful law firms that have challenged him. The latest came Tuesday against Jenner & Block, which employed attorney Andrew Weissmann after he worked as a prosecutor in Robert S. Mueller III's special counsel investigation of Trump in his first term.

The firm "has participated in the weaponization of the legal system against American principles and values. And we believe that the measures in this executive order will help correct that," White House staff secretary Will Scharf said as he handed Trump the order to sign, calling out Weissmann by name.

The orders have sought to strip law firms of their business by banning their lawyers from government buildings and barring companies that have federal contracts from employing the firms.

In a statement, Jenner & Block noted the similarity to an order that "has already been declared unconstitutional by a federal court" and that they "will pursue all appropriate remedies."

Trump on Friday ordered Attorney General Pam Bondi to <u>expand the campaign</u> beyond individual law firms by sanctioning lawyers who "engage in frivolous, unreasonable, and vexatious litigation" against his administration.

Legal scholars say there is little precedent in modern U.S. history for Trump's actions. But the president is following a playbook from other countries whose leaders have sought to undermine democratic systems and the rule of law, including Russia, Turkey and Hungary. Leaders in those countries have similarly attacked lawyers with the effect of hollowing out a pillar of justice systems to expand their power without violating existing laws. They have successfully used the strategy to blast away their political opposition and any effort to counter their actions through courts.

"The law firms have to behave themselves," Trump said at a Cabinet meeting Monday. "They behave very badly, very wrongly."

Trump's targets say they are feeling the heat.

"It's scary," said a former official in the administration of Joe Biden who has been pulled into Trump-era litigation and needed a lawyer as a result. The former official had lined up a pro bono lawyer from a major law firm that, the day after an executive order this month against the heavyweight law firm Perkins Coie, said that it had discovered a conflict of interest and dropped the person as a client.

Five other firms said they had conflicts, the former official said, including one where "the partner called me livid, furious, saying that he's not sure how much longer he's going to stay there," the former official said, "because the leadership didn't want to take the risk."

The person spoke on the condition of anonymity to avoid further difficulties obtaining a lawyer.

"I don't know how many people are going to end up having to pay a significant amount of money out of pocket to defend themselves for faithfully and ethically executing their public service jobs," the person said. "It's really a wild situation to be in."

The sweeping campaign is targeting the livelihoods of the people best qualified to contest the legality of Trump's agenda. Lawyers must now contend with the possibility they could face lawsuits, fines and other punishment aimed at them and even their other clients should they contest Trump administration efforts in court.

"You need the legitimacy of law on your side at some level," said Scott Cummings, a law professor at the UCLA School of Law who has studied challenges to the legal establishment. "This is the autocratic legal idea of claiming a democratic mandate to attack the rule of law by using law to really erode institutional pillars that are supposed to check executive power."

Trump's actions toward lawyers, Cummings said, have been "about disabling effective representation of anyone that Trump doesn't like, and that is the beginning of the end of the adversarial system," in which both sides of a legal case have equal access to present their views in front of a judge.

The first White House action against lawyers came late last month, when Trump stripped the security clearances of lawyers at a prominent firm, Covington & Burling, who represented former special counsel Jack Smith after he investigated the president's role in the Jan. 6, 2021, attack on the U.S. Capitol.

The following week, he took far harsher action against Perkins Coie, a law firm that had ties to a dossier of opposition research against Trump that circulated during the 2016 campaign. The executive order barred the firm's lawyers from federal buildings and directed the federal government to halt any financial relationship with the firm and its clients. That effectively forced Perkins Coie's clients to pick between their lawyers or any federal government business they might have.

The move could cost Perkins 25 percent of its revenue, the firm said in a court filing contesting the executive order. It said that several clients have already departed the firm, others have said they are thinking about it, and federal agencies were excluding it from key meetings with its clients.

"It sends little chills down my spine," U.S. District Judge Beryl A. Howell said in court as she granted Perkins Coie a temporary restraining order this month and suggested the executive order might have been unconstitutional. Another major law firm, Williams & Connolly, one of the most skillful and aggressive federal litigators, agreed to take the Perkins Coie case.

Howell said she had "enormous respect for them taking this case when not every law firm would."

In a filing last week, the Justice Department sought to remove Howell from the case, accusing her and her court of being "insufficiently impartial."

And even after Howell's ruling, Trump's campaign against lawyers broadened when he issued a nearly identical executive order targeting Paul Weiss, a law firm that employed lawyer Mark Pomerantz for two decades before he joined the Manhattan district attorney's office to help prosecute Trump for hush money payments to a porn star.

Rather than fighting, Paul Weiss cut a deal with the president, even though it had a long track record of aggressive legal action against Trump's agenda during his first term. Paul Weiss Chairman Brad Karp met for three hours with Trump at the White House, then agreed to devote $40 million worth of pro bono work "to support the administration's initiatives," Trump said in a post on Truth Social, including work for veterans and combating antisemitism.

The president rescinded the order against the firm Thursday.

Paul Weiss has faced significant blowback for its decision to back down, including from some lawyers who said that its settlement emboldened Trump to proceed Friday with the directive for Bondi to pursue the far vaster campaign against all lawyers who might challenge him in federal court.

"Paul Weiss's deal emboldened him to ratchet up his attack on one of the strongest checks on his power: lawyers and the rule of law," Perkins Coie partner David Perez wrote on LinkedIn.

The chilling effect has been quick. Some nonprofits say that major law firms that in Trump's first term would have been quick to assist them with pro bono work now say that they can't risk the cost if Trump goes after them as a result. Many of those same groups are worried that the administration will soon go after their nonprofit tax status — and that they won't be able to find high-powered lawyers to contest it.

Although not every lawyer is likely to be cowed by Trump's actions, the major corporate law firms that the president has targeted have a core role in the U.S. legal system. Complex litigation can require vast resources: experienced lawyers versed in the arcana of case law, platoons of paralegals doing research across thousands of pages of evidence, and the stamina to go toe-to-toe with the unparalleled legal resources of the federal government.

Big law firms, best known for deep-pocketed corporate clients, often lend their assistance free to small nonprofits shepherding public interest cases through the courts. They have also been willing, historically, to take on clients who are facing prosecution that they charge is politically motivated. Much of the litigation against Trump's actions in the first term was driven by the big law firms that he is now targeting.

"If somebody's been deported to Guantánamo, it used to be law firms would support us and work on it," said the director of one nonprofit organization that works on different legal challenges to Trump's agenda. "And now it's a slower process of getting those approvals, versus just doing what would be done before, which is, 'This is wrong, and we're going to represent it.'"

That person and others spoke on the condition of anonymity for fear of retaliation from the administration.

Trump's campaign against the law firms could deprive his opponents of top legal talent, weakening their ability to push back on him, analysts say. And individuals and groups that are taking risks by working against the administration's agenda may also be deeply vulnerable, forcing them to make difficult choices about when to take a stand against him and when to stay silent.

"We're telling [small nongovernmental organizations] with three people on the border to stand strong, and they are standing strong, and then these law firms are folding," said one lawyer at a nonprofit who works on immigration cases.

Trump on Friday said in a memorandum that lawyers aren't supposed to file lawsuits or engage in court action unless there is "a basis in law" that is not "frivolous," suggesting that he and Bondi, not courts, would be in charge of determining what that is.

"Far too many attorneys and law firms have long ignored these requirements when litigating against the Federal Government or in pursuing baseless partisan attacks," Trump said. "To address these concerns, I hereby direct the Attorney General to seek sanctions against attorneys and law firms who engage in frivolous, unreasonable, and vexatious litigation against the United States or in matters before executive departments and agencies of the United States."

Trump's allies have continued to challenge law firms by name: "Skadden, this needs to stop now," Elon Musk posted over the weekend, taking aim at the law firm Skadden, Arps in response to right-wing commentator Dinesh D'Souza's complaint that lawyers with the firm had worked pro bono to target him.

Skadden lawyers worked pro bono on behalf of plaintiffs who said D'Souza defamed them in a documentary that falsely accused them of ballot fraud in the 2020 election. D'Souza has previously admitted that the movie was "flawed" and apologized to one of the plaintiffs.

Legal experts said Trump's actions amounted to a broad-based assault on the profession.

"This is the livelihood of these lawyers, and the Trump administration is basically saying we're going to dictate the terms under which you are going to be able to practice your profession," said Claire Finkelstein, a law professor and the director of the Center for Ethics and the Rule of Law at the University of Pennsylvania.

*Beth Reinhard contributed to this report.*

**CORRECTION**

An earlier version of this story incorrectly described the law firm Covington & Burling's relationship with former special counsel Jack Smith. The firm represented Smith in the wake of his investigations of Donald Trump. The article has been corrected.

**What readers are saying**

The comments express deep concern over Donald Trump's actions against law firms, viewing them as a significant threat to the rule of law and democracy. Many commenters liken Trump's tactics to those of authoritarian regimes, suggesting that his intimidation of legal professionals... Show more

This summary is AI-generated. AI can make mistakes and this summary is not a replacement for reading the comments.

# EXHIBIT 42

# Law firms are scared to speak out amid Trump's attacks on their livelihood

By <u>Katelyn Polantz</u>, CNN

🕐 6 minute read · Published 5:00 AM EDT, Thu March 27, 2025

 Politics

Subscribe      Sign in



President Donald Trump looks on as he holds a pen in the Oval Office at the White House in Washington, DC on February 4. Elizabeth Frantz/Reuters

**(CNN)** — The fear and loathing among lawyers in Washington, DC, has never been greater.

After a series of White House executive orders threatening their business and hiring practices, several powerful Washington law firms face a defining choice: push back publicly in defense of their industry or quietly hope to avoid President Donald Trump's wrath.

Many firms are afraid that if they are targeted by Trump, it could devastate their business if both clients and partners flee, reconfiguring <u>the centers of power</u> in Washington's most influential private industry.

 **RELATED ARTICLE**
Trump's assault on elites encompasses almost every aspect of American life

"We could see a shakeup like we've never seen before," Ivan Adler, a headhunter for lobbyists who regularly works with Washington's law firms. "This is the talk of the town. Firms are just waiting for the other shoe to drop."

Interviews with nearly a dozen lawyers and legal industry professionals shed light on the quiet fear gripping many law firms with decades of history doing business in Washington.

A number of major firms are strategizing behind the scenes on how to react without attracting attention in wider political conversations, according to several people in Washington's legal community. Firm leaders, sources tell CNN, want to quell fears among their lawyers, especially younger associates who may be more likely to want the firms to take a stand politically against Trump.

So far, Trump's executive orders have targeted four large law firms – Perkins Coie; Jenner & Block; Covington & Burling; and Paul, Weiss, Wharton, Rifkin & Garrison. Among other things, lawyers at those firms have had their national security clearances suspended – a core piece of some legal defense work.

Several lawyers who spoke to CNN expressed disappointment with the general lack of response from the legal industry and in Paul Weiss' situation, the capitulation to Trump's targeting with the firm leader's choice to cut a deal.

Trump suggested Wednesday that universities and law firms are "bending" to his administration's will as he's targeted top legal firms that have represented his perceived political enemies.

"You see what we're doing with the colleges, and they're all bending and saying, 'Sir, thank you very much. We appreciate it,'" Trump said at a White House event marking Women's History Month. "Nobody can believe it, including law firms that have been so horrible, law firms that, nobody would believe this, just saying, 'Where do I sign? Where do I sign?' … And there's more coming, but we really are in the 'Golden age of America.'"

Rather than fight an executive order, the New York dealmaking powerhouse law firm Paul Weiss agreed to provide $40 million in legal work to causes backed by the White House, including veterans' assistance and countering antisemitism, according to an email chairman Brad Karp sent firmwide on Sunday that was obtained by CNN.

Several lawyers in Washington privately griped about Karp backing down from a fight against Trump. Several dozen alumni of Paul Weiss this week also published an open letter "to protest the firm's recent decision to surrender to the Trump administration," the letter said.

But some legal industry insiders weren't surprised nor were they outraged by Paul Weiss' move.

It's not unusual for lawyers to "look at all of your options," Cari Brunelle, a legal industry consultant, told CNN. "Sometimes you choose to litigate, and sometimes you choose to settle. It's what you do for your clients every day."

**Anderson Cooper on 'chilling message' Trump is sending to law firms**

03:09

For instance, an amicus brief being drafted in support of Perkins Coie has gotten few signatures from leaders at other firms, several people familiar with it say.

The White House is drafting more executive orders that would target more firms, according to two people familiar with what is in the works.

At the same time, the federal Equal Employment Opportunity Commission has sent letters to another handful of law firms announcing a "review" of their diversity, equity and inclusion practices. Retaliation for DEI initiatives has been part of the White House executive orders against law firms, making those firms contacted by the EEOC especially concerned.

If law firms don't stand together, the president would be able to "wipe out any potential legal opposition," Elliot Peters of the West Coast-centric litigation firm Keker, Van Nest & Peters.

Peters said he believed Trump's actions so far add to a reality where Congress no longer

pushes back against the president, and as Trump also tries to silence the press.

"We're well on our road to an authoritarian government here," he said.

Keker has been one of the few major US law firms willing to make a public statement criticizing the executive orders against law firms.

## Perkins Coie faces major challenges

Though a number of firms are potentially at risk, the situation is particularly dire for Perkins Coie, according to a number of people familiar with the matter, who agreed to speak on condition of anonymity.

The White House announced it was blacklisting a number of its lawyers from federal buildings and potentially punishing its clients if they contract with the government, sending an immediate chill across the firm's everyday operations, sources said and according to a court case the firm has brought against the administration.

Agencies have pulled back from working with the law firm, and one recent meeting was canceled for the firm at the Justice Department related to an ongoing client matter, sources and the firm's lawyer have said.

Dane Butswinkas, an attorney representing Perkins Coie in its challenge to the executive order, told a judge recently that the White House's approach would "spell the end of the law firm."

District Judge Beryl Howell this month ordered the administration to stop many of the ways agencies could restrict Perkins Coie lawyers, deeming much of that executive order unconstitutional.

The American Bar Association along with dozens of other voluntary lawyer groups across the country have pushed back against the reticence across the profession to speak out.

"We will not stay silent in the face of efforts to remake the legal profession into something that rewards those who agree with the government and punishes those who do not," a statement on Wednesday said. "We call upon the entire profession, including lawyers in private practice from Main Street to Wall Street, as well as those in corporations and who serve in elected positions, to speak out against intimidation."



**RELATED ARTICLE**
It's still Antonin Scalia's Supreme Court

Even so, the White House continued its campaign against law firms on Tuesday, announcing more restrictions.

Jenner & Block was targeted with another executive order partly because one of its former well-known partners, Andrew Weissmann, had been a top prosecutor on the Russia investigation around Trump's 2016 presidential campaign, according to the White House. Jenner & Block is also working on several lawsuits challenging Trump's policies.

A Jenner & Block spokesman, in a statement, acknowledged the firm had been named in Tuesday's executive order but didn't indicate how the firm would respond.

"We remain focused on serving and safeguarding our clients' interests with the dedication, integrity, and expertise that has defined our firm for more than one hundred years and will pursue all appropriate remedies," the statement said.

*CNN's Kit Maher and Evan Perez contributed to this report.*

# Up next

Doug Emhoff publicly criticizes his law firm for coming to agreement with Trump administration

2 minute read



Judge rips DOJ for attempting to remove her from case challenging Trump's executive order on law firm

3 minute read



Lawyer for Trump co-defendant and alleged US Capitol rioters picked for major role at DOJ

1 minute read



The extremely flawed logic behind Trump's chaotic trade war

4 minute read





Trump's crackdown on university protests is casting a long shadow. Activists hope he's also providing a spark

9 minute read



## Most read

**1**    Rally in US stocks wavers as White House doubles down on tariffs on China

**2**    Scientists say they have resurrected the dire wolf

**3**    China lashes out at JD Vance for comments about 'Chinese peasants'

**4**    Trump's refusal to blink on tariffs raises the risks of an ugly endgame

**5**    'Amazing' reduction in Alzheimer's risk verified by blood markers, study says

**6**    'I want to reclaim my skin': Why these people are removing their tattoos

**7**    Billionaires are turning on Trump

**8**    Supreme Court allows Trump to enforce Alien Enemies Act for rapid deportations for now

**9**    The markets just gave Trump an off-ramp. Your move, Mr. President

**10**    China calls Trump's new tariff threat 'a mistake upon a mistake' and looks for opportunity in global trade war

## ▌MORE FROM CNN

 Doug Emhoff publicly criticizes his law firm for coming to agreement with ...

 Judge rips DOJ for attempting to remove her from case challenging Trump's ...

 Lawyer for Trump co-defendant and alleged US Capitol rioters picked for

# EXHIBIT 43

All ▾        Ask a question or search by keyword                    Advanced    ⓘ

Home    Workspaces    |    Federal    State    International    Payroll    Financial Accounting    Daily Tax Report

Business & Practice
April 4, 2025, 2:28 PM EDT; Updated: April 4, 2025, 2:48 PM EDT
**Big Law Mostly Sits Out Industry Response to Trump Orders (2)**

- **Some 500 firms back Munger Tolles effort on brief**
- **None of the country's largest 25 law firms join**

Few large law firms joined an amicus brief backing Perkins Coie in its lawsuit against President Donald Trump over an executive order targeting the firm.

None of country's 25 largest firms signed the friend-of-the-court brief, filed in federal court Friday. A total of eight of the 100 largest players joined the more than 500 firms on the brief, which was organized by Munger Tolles & Olson.

The brief had been billed as a response to Trump's series of directives targeting firms for their ties to the president's perceived enemies and work on causes he opposes. Big Law firms have largely remained on the sideline, with a few striking deals with the White House to stay out of the bull's eye.

"No one wants to put a target on their backs to be the next firm subject to an executive order, and that's exactly what the office of the president is counting on," said David Neff, a retired Perkins Coie partner. "If you saw many firms, particularly in the major markets, rise up against these types of orders and give great pushback, I think that would go a long way toward stopping the madness."



Chart by Phil Kuntz/Bloomberg

Arnold & Porter, Freshfields, Fenwick & West, Susman Godfrey, Crowell & Moring, and Davis Wright Tremaine were among the large firms signing the brief.

"Davis Wright Tremaine believes in the constitutional right of clients to choose their counsel and the independence of the legal profession," the firm said on its LinkedIn page.

Most of the big firms wouldn't sign unless a critical mass of peers did so as well.

**'Grave Threat'**

The brief, authored by Munger Tolles partner and former solicitor general Donald Verrilli, was filed Friday in US District Court for the District of Columbia.

Trump's orders "pose a grave threat to our system of constitutional governance and to the rule of law itself," the firms said. The judiciary should "act with resolve" to stop the president's overreach of executive authority, they said.

Law firms that signed onto the brief include others that are suing over Trump orders against them—WilmerHale and Jenner & Block. Covington & Burling, whose partner Peter Koski was the subject of a Trump memorandum for his representation of former special counsel Jack Smith, also signed.

"Any controversial representation challenging actions of the current administration (or even causes it disfavors) now brings with it the risk of devastating retaliation," the firms' said. "Whatever short term advantage an administration may gain from exercising power in this way, the rule of law cannot long endure in the climate of fear that such actions create."

The executive order against Perkins Coie was the second in a string of five actions aimed at punishing law firms with ties to past cases against Trump that the president has referred to as "weaponization" of the legal system. The orders that restrict security clearances, limit access to federal buildings and cut federal contracts for firm clients have also hit firms including Paul Weiss, Jenner & Block and WilmerHale.

Perkins Coie sued in response to the Trump order on March 11, represented by a team at Williams & Connolly. Perkins won a temporary restraining order that halted parts of the order.

Some firms—Paul Weiss, Skadden, Willkie and Milbank—hatched deals with Trump to evade the impacts of his orders in exchange for $340 million in pro bono legal services to Trump-supported causes.

California's Hanson Bridgett also signed the brief. Managing partner Kristina Lawson said signing the brief was the "right thing to do."

"It's really very simple," Lawson said in a statement. "Our oath as attorneys demands we defend the rule of law, protect judicial independence, and ensure all lawyers can fulfill their duties without interference or intimidation."

In a statement Friday, Munger Tolles said, "The executive orders recently issued against prominent law firms raise important issues for our courts to decide. We are honored to participate together with so many of our colleagues in the legal profession in the submission of this brief."

The case is: Perkins Coie v. U.S. Department of Justice, D.D.C., 1:25-cv-00716, 4/4/25

(Adds number of firms, other details starting in first paragraph.)

To contact the reporter on this story: Justin Henry in Washington DC at jhenry@bloombergindustry.com

To contact the editors responsible for this story: John Hughes at jhughes@bloombergindustry.com

© 2025 Bloomberg Industry Group, Inc.   All Rights Reserved

# EXHIBIT 44

*The* WHITE HOUSE

PRESIDENTIAL ACTIONS

ADDRESSING RISKS FROM WILMERHALE

Executive Orders

March 27, 2025

By the authority vested in me as President by the Constitution and the laws of the United States of America, it is hereby ordered:

Section 1.  Background.  My Administration is committed to addressing the significant risks associated with law firms, particularly so-called "Big Law" firms, that engage in conduct detrimental to critical American interests.  Many firms take actions that threaten public safety and national security, limit constitutional freedoms, degrade the quality of American elections, or undermine bedrock American principles.  Moreover, law firms regularly conduct this harmful activity through their powerful pro bono practices, earmarking hundreds of millions of their clients' dollars for destructive causes, that often directly or indirectly harm their own clients.  Lawyers and law firms that engage in such egregious conduct should not have access to our Nation's secrets, nor should such conduct be subsidized by Federal taxpayer funds or contracts.

Wilmer Cutler Pickering Hale and Dorr LLP (WilmerHale) is yet another law firm that has abandoned the profession's highest ideals and abused its pro bono practice to engage in activities that undermine justice and the interests of the United States.  For example, WilmerHale engages in obvious partisan representations to achieve political ends, supports efforts to discriminate on the basis of race, backs the obstruction of efforts to prevent illegal aliens from committing horrific crimes and trafficking deadly drugs within our borders, and furthers the degradation of the quality of American elections, including

by supporting efforts designed to enable noncitizens to vote. Moreover, WilmerHale itself discriminates against its employees based on race and other categories prohibited by civil rights laws, including through the use of race–based "targets."

WilmerHale is also bent on employing lawyers who weaponize the prosecutorial power to upend the democratic process and distort justice. For example, WilmerHale rewarded Robert Mueller and his colleagues — Aaron Zebley, Mueller's "top aide" and "closest associate," and James Quarles — by welcoming them to the firm after they wielded the power of the Federal Government to lead one of the most partisan investigations in American history. Mueller's investigation epitomizes the weaponization of government, yet WilmerHale claimed he "embodies the highest value of our firm and profession." Mueller's "investigation" upended the lives of public servants in my Administration who were summoned before "prosecutors" with the effect of interfering in their ability to fulfill the mandates of my first term agenda. This weaponization of the justice system must not be rewarded, let alone condoned.

Sec. 2. Security Clearance Review. (a) The Attorney General, the Director of National Intelligence, and all other relevant heads of executive departments and agencies (agencies) shall immediately take steps consistent with applicable law to suspend any active security clearances held by individuals at WilmerHale, pending a review of whether such clearances are consistent with the national interest.

(b) The Office of Management and Budget shall identify all Government goods, property, material, and services, including Sensitive Compartmented Information Facilities, provided for the benefit of WilmerHale. The heads of agencies providing such material or services shall, to the extent permitted by law, expeditiously cease such provision.

Sec. 3. Contracting. (a) To prevent the transfer of taxpayer dollars to Federal contractors whose earnings subsidize, among other things, activities that are not aligned with American interests, including racial discrimination, Government contracting agencies shall, to the extent permissible by law, require Government contractors to disclose any business they do with WilmerHale and whether that business is related to the subject of the Government contract.

(b) The heads of agencies shall review all contracts with WilmerHale or with entities that disclose doing business with WilmerHale under subsection (a) of this section. To the

extent permitted by law, the heads of agencies shall:

(i)   take appropriate steps to terminate any contract, to the maximum extent permitted by applicable law, including the Federal Acquisition Regulation, for which WilmerHale has been hired to perform any service; and

(ii)  otherwise align their agency funding decisions with the interests of the citizens of the United States; with the goals and priorities of my Administration as expressed in executive actions, especially Executive Order 14147 of January 20, 2025 (Ending the Weaponization of the Federal Government); and as heads of agencies deem appropriate.  Within 30 days of the date of this order, agencies shall submit to the Director of the Office of Management and Budget an assessment of contracts with WilmerHale or with entities that do business with WilmerHale effective as of the date of this order and any actions taken with respect to those contracts in accordance with this order.

Sec. 4.  Racial Discrimination.  Nothing in this order shall be construed to limit the action authorized by section 4 of Executive Order 14230 of March 6, 2025 (Addressing Risks from Perkins Coie LLP).

Sec. 5.  Personnel.  (a)  The heads of agencies shall, to the extent permitted by law, provide guidance limiting official access from Federal Government buildings to employees of WilmerHale when such access would threaten the national security of or otherwise be inconsistent with the interests of the United States.  In addition, the heads of agencies shall provide guidance limiting Government employees acting in their official capacity from engaging with WilmerHale employees to ensure consistency with the national security and other interests of the United States.

(b)  Agency officials shall, to the extent permitted by law, refrain from hiring employees of WilmerHale, absent a waiver from the head of the agency, made in consultation with the Director of the Office of Personnel Management, that such hire will not threaten the national security of the United States.

Sec. 6.  General Provisions.  (a)  Nothing in this order shall be construed to impair or otherwise affect:

(i)   the authority granted by law to an executive department or agency, or the head thereof; or

(ii)  the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b)  This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c)  This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

DONALD J. TRUMP

THE WHITE HOUSE,
   March 27, 2025.

NEWS

ADMINISTRATION

ISSUES

CONTACT

VISIT

GALLERY

EOP



THE WHITE HOUSE

1600 Pennsylvania Ave NW
Washington, DC 20500

WH.GOV

Copyright

Privacy

Style Guide

# EXHIBIT 45

*The* WHITE HOUSE

FACT SHEETS

Fact Sheet: President Donald J. Trump Addresses Risks from WilmerHale

The White House

March 27, 2025

**SUSPENDING SECURITY CLEARANCES TO PROTECT THE NATIONAL INTEREST:**
Today, President Donald J. Trump signed an Executive Order to suspend security clearances held by individuals at Wilmer Cutler Pickering Hale and Dorr LLP (WilmerHale) pending a review of whether such clearances are consistent with the national interest.

- Security clearances held by WilmerHale employees will be immediately suspended, pending a review of whether their access to sensitive information is consistent with the national interest.
  - The Federal Government will halt all material and services, including sensitive compartmented information facility (SCIF) access provided to WilmerHale and restrict its employees' access to government buildings.
  - Federal Agencies will also refrain from hiring WilmerHale employees unless specifically authorized.

- To ensure taxpayer dollars no longer go to contractors whose earnings subsidize activities not aligned with American interests, the Federal Government will terminate contracts that involve WilmerHale.

- The practices of WilmerHale will be reviewed under Title VII to ensure compliance with civil rights laws against racial bias.

**ADDRESSING ROGUE LAW FIRMS:** President Trump believes that lawyers and law firms that engage in conduct detrimental to critical American interests should not be subsidized by American taxpayers or have access to our Nation's secrets.

- WilmerHale has abandoned the legal profession's highest ideals and abused its pro bono practice to engage in activities that undermine justice and the interests of

the United States.

- WilmerHale pursues partisan goals, supports efforts to discriminate on the basis of race, and backs the obstruction of efforts to prevent illegal aliens from committing horrific crimes and trafficking deadly drugs within our borders.

- WilmerHale has furthered the degradation of the quality of American elections by supporting efforts designed to enable noncitizens to vote.

- WilmerHale has been accused of discriminating against its own employees on the basis of race and other categories prohibited by civil rights laws, including through the use of race-based "targets."

- WilmerHale rewarded Robert Mueller and two of his colleagues by welcoming them to the firm after they wielded the power of the Federal government to lead a partisan "investigation" against the President and others.   Mueller's investigation epitomizes the weaponization of government.

**A RETURN TO ACCOUNTABILITY:** President Trump is delivering on his promise to end the weaponization of government and protect the nation from partisan and bad faith actors who exploit their influence.

- In addition to WilmerHale, President Trump has also taken action to hold other major law firms accountable.

- This Executive Order aligns with President Trump's priority on refocusing government operations to serve the citizens of the United States.

- It builds on President Trump's previous actions, such as signing an Executive Order on his first day in office to end the weaponization of the Federal government and ensure accountability for past misconduct.

- It follows his revocation of security clearances held by intelligence officials who falsely claimed Hunter Biden's laptop was Russian disinformation during the 2020 election.

NEWS

ADMINISTRATION

ISSUES

CONTACT

VISIT

GALLERY

EOP



THE WHITE HOUSE

1600 Pennsylvania Ave NW
Washington, DC 20500

WH.GOV

Copyright

Privacy

Style Guide

# EXHIBIT 46

To: Agencies Subject to the Executive Order "Addressing Risks from Wilmer Hale" as addressed in *Wilmer Cutler Pickering Hale & Dorr LLP v. Executive Office of the President, et al.*, No. 25-cv-917, Dist. of Columbia District Court

From: Deputy Associate Attorney General Richard P. Lawson

Date: 3/31/25

Subject: Temporary Restraining Order / Notification Requirement

---

I am writing to inform you of an Order entered on Friday, March 28, 2025, by the federal District Court for the District of Columbia which requires government agencies, as explained further below, to cease implementation and, if necessary, rescind all guidance or other direction or action, if any, to implement or enforce Sections 3 and 5 of the Executive Order of March 25, 2025, entitled, "Addressing Risks from WilmerHale" (EO). **Your immediate attention to this matter is necessary.**  Copies of the court Order and the EO are attached.

In the EO, the President undertook efforts to protect the interests of the United States.  The EO made certain findings regarding the activity of the law firm Wilmer Cutler Pickering Hale and Dorr LLP ("WilmerHale"), *see* EO § 1, and, among other things, required Government contracting agencies to "require Government contractors to disclose any business that they do with WilmerHale and whether that business is related to the subject of the Government contract," *id.*  § 3(a).  The EO also imposes certain requirements related to limiting access of employees of WilmerHale to Federal buildings and engaging with or hiring WilmerHale employees, *id.*  § 5.  After a hearing in a lawsuit brought by WilmerHale, the Court entered a temporary restraining order.  Pursuant to that Order, defendants, including your agency, are:

- Enjoined from implementing or enforcing Sections 3 and 5 of the EO;

- Directed to suspend and rescind any implementation or enforcement of Sections 3 and 5 of the EO; and

- Directed to take any additional steps necessary to prevent implementation or enforcement of Sections 3 and 5 of the EO.

Bottom line, implementation of Sections 3 and 5 of the EO is prohibited and any prior steps taken, or guidance or directions issued, to implement or enforce those sections of the EO must be walked back or rescinded.  To be clear, however, actions or activity your agency may be involved

in with respect to WilmerHale or agency contractors that are not based or founded on reliance on the EO or on implementation of the EO are not affected by the Court's Order.

Please take **immediate** steps to carry out the injunctions and directions of the Court Order.

As it remains the Executive Branch's position that the EO was lawfully issued and that the grant of the temporary restraining order was in error, the government will pursue a fuller review of the Executive Order before the Court and reserves the right to take all necessary and legal actions regarding "lawfare," national security concerns, and discriminatory practices involving WilmerHale.

Do not hesitate to contact me at 202-445-8042 or via email at Richard.lawson3@usdoj.gov with any questions regarding carrying out and complying with the Court Order.  Your cooperation is appreciated.

# EXHIBIT 47

Administration for Children and Families

American Red Cross

AmeriCorps

Centers for Disease Control and Prevention

Centers for Medicare and Medicaid Services

Consumer Financial Protection Bureau

Defense intelligence Agency

Equal Employment Opportunity Commission

Export-Import Bank of the United States

Federal Deposit Insurance Corporation

Federal Emergency Management Agency

Federal Energy Regulatory Commission

Federal Railroad Administration

Federal Trade Commission

Food and Drug Administration

General Services Administration

Health Resources and Services Administration

Housing and Urban Development

Internal Revenue Services

Joint Chiefs of Staff

Millennium Challenge Corporation

National Aeronautics and Space Administration

National Archives and Records Administration

National Counterterrorism Center

National Institutes of Health

National Nuclear Security Administration

National Oceanic and Atmospheric Administration

National Science Foundation

National Security Agency

National Security Council

National Transportation Safety Board

Nuclear Regulatory Commission

Occupational Safety and Health Review Commission

Office of Homeland Security Situational Awareness

Office of Inspector General

Office of Personnel Management

Office of the Director of National Intelligence

Peace Corps

Science and Technology Directorate

Securities and Exchange Commission

Social Security Administration

U. S. Department of State

U.S. Agency for International Development

U.S. Citizenship and Immigration Services

U.S. Department of Commerce

U.S. Department of Defense

U.S. Department of Education

U.S. Department of Energy

U.S. Department of Health and Human Services

U.S. Department of Homeland Security

U.S. Department of Labor

U.S. Department of the Interior

U. S. Department of State

U.S. Department of Transportation

U.S. Department of Veterans Affairs

U.S. Environmental Protection Agency

U.S. Small Business Administration

# EXHIBIT 48

Administration for Children and Families

American Red Cross

AmeriCorps

Centers for Disease Control and Prevention

Centers for Medicare and Medicaid Services

Central Intelligence Agency

Commodity Future Trading Commission

Consumer Financial Protection Bureau

Defense Intelligence Agency

Equal Employment Opportunity Commission

Export-Import Bank of the United States

Executive Office of the President

Federal Deposit Insurance Corporation

Federal Emergency Management Agency

Federal Energy Regulatory Commission

Federal Railroad Administration

Federal Reserve

Federal Trade Commission

Food and Drug Administration

General Services Administration

Health Resources and Services Administration

Housing and Urban Development

Internal Revenue Service

International Trade Commission

Joint Chiefs of Staff

Millennium Challenge Corporation

National Aeronautics and Space Administration

National Archives and Records Administration

National Counterterrorism Center

National Institutes of Health

National Nuclear Security Administration

National Oceanic and Atmospheric Administration

National Science Foundation

National Security Agency

National Security Council

National Transportation Safety Board

Nuclear Regulatory Commission

Occupational Safety and Health Review Commission

Office of the Comptroller of the Currency

Office of the Director of National Intelligence

Office of Homeland Security Situational Awareness

Office of Management and Budget

Office of National Drug Control Policy

Office of Personnel Management

Office of the Director of National Intelligence

Office of the Inspector General

Peace Corps

Pension Benefit Guaranty Corporation

Science and Technology Directorate

Securities and Exchange

Social Security Administration

U.S. Agency for International Development

U.S. Citizenship and Immigration Services

U.S. Department of Agriculture

U.S. Department of Commerce

U.S. Department of Defense

U.S. Department of Education

U.S. Department of Energy

U.S. Department of Health and Human Services

U.S. Department of Homeland Security

U.S. Department of Housing and Urban Development

U.S. Department of Interior

U.S. Department of Labor

U.S. Department of State

U.S. Department of Transportation

U.S. Department of Treasury

U.S. Department of Veteran Affairs

U.S. Environmental Protection Agency

U.S. Patent and Trademark Office

U.S. Small Business Administration

U.S. Trade Representative