**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| WILMER CUTLER PICKING HALE AND DORR LLP, *Plaintiff*, v. EXECUTIVE OFFICE OF THE PRESIDENT, *et al.*, *Defendants*. | Case No. 1:25-cv-917-RJL |

## EXPERT REPORT OF J. WILLIAM LEONARD

I, J. WILLIAM LEONARD, declare as follows:

1.     I have agreed to testify *pro bono* as an expert witness in the above matter based upon the expertise I developed during the course of a 34-year career as a Federal public servant in the national security arena and more than 50 continuous years of experience as a cleared individual.

## I.     BACKGROUND AND CREDENTIALS

2.     I was employed by the Department of Defense ("DoD") from 1973 to 2002.  My entire tenure involved the area of Personnel Security.  For the first 23 years of my career, I served in various roles of increasing responsibility at the Defense Investigative Service, which was the precursor to today's Defense Counterintelligence and Security Agency.  *See* https://www.dcsa.mil/. In these roles I had operational responsibilities in the DoD's program providing oversight to private sector entities, to include defense contractors and law firms, and their employees who required access to classified national security information.  From 1992 to 1996, I served as the Assistant Deputy Director at the Defense Investigative Service, where I was responsible for a wide range of policy and operational matters pertaining to the DoD's administration of the National Industrial Security Program ("NISP").  *See* https://www.dcsa.mil/Industrial-Security/National-Industrial-

Security-Program-Oversight.  The NISP is the federal program that manages the access of private industry to classified information.  Among other things, I was responsible in that role for the Field Services Division, the Counterintelligence Office, and all overseas operations of the Defense Investigative Service in Europe, the Middle East, Central and South America, and the Far East. My responsibilities included reviewing submittals to the Office of the Secretary of Defense recommending the suspension of personnel security clearances of private sector individuals when appropriate.

3.      From 1996 to 1998, I served as the Director of Security Programs for the DoD, and from 1999 to 2002, I served at times as the Deputy Assistant Secretary of Defense ("DASD") responsible for security and information operations, and at other times as the Principal Director in that office.   As the DASD, I was the most senior official in the DoD responsible for all security, counterintelligence, computer security, infrastructure protection, and information operations programs within the DoD.   Part of my responsibility at the Pentagon was to develop and oversee policies to ensure the proper protection of classified information within the entirety of the DoD as well as within private sector entities that did business with the DoD.   These policies included the granting, revocation, and suspension of personnel security clearances for military and civilian members of the DoD and for employees of DoD-affiliated private sector entities, to include law firms, that required access to classified national security information.   As DASD, I was the final authority resolving matters relating to security clearance issues.   In 2002, I was a recipient of the Presidential Meritorious Rank, an award that recognizes a select group of career members of the Senior Executive Service ("SES") for exceptional performance over an extended period of time.

4.      From 2002 to January 2008, I served as the Director of the Information Security Oversight Office ("ISOO") during the Administration of President George W. Bush.    ISOO

receives its policy and program guidance from the National Security Council and is an administrative component of the National Archives and Records Administration.   *See* https://www.archives.gov/isoo.    The Director of ISOO is known colloquially as the "Classification Czar" because the Director is responsible for oversight of the government-wide classification system and aspects of the security clearance process.   I was appointed to this position with the approval of President Bush, and in this role I oversaw the entire Executive Branch's classification and handling of classified national security information.

5.    The Director of ISOO has authority to access more classified information than anyone in the government other than the President and Vice President.   As the Director of ISOO, I was the primary official charged with the responsibility to ensure that all Executive Branch agencies properly classified and declassified national security information and appropriately granted and restricted access to classified national security information in accordance with established policy.   To that end, I had a primary role in the drafting, editing, and issuance by President George W. Bush of Executive Order 13292 (2003), which amended Executive Order 12958 (1995), and established the Federal government's policies with respect to classifying, safeguarding, and declassifying national security information.

6.    As the Director of ISOO, I was also the primary official charged with the responsibility to ensure that Executive Branch agencies appropriately implemented the NISP.   The NISP policies that I oversaw included policies around the granting, revocation, and suspension of personnel security clearances for employees of private sector firms that required access to classified national security information in support of Executive Branch agencies or in working with other cleared private sector entities.

7.      In my various capacities with the Federal government, it was my responsibility on a regular basis to recommend and/or determine whether security clearances should be granted, suspended, or revoked, and whether information which an agency sought to classify or keep classified met the appropriate classification criteria.

8.      Between 2008 and 2010, I served as the principal of my own consulting firm advising on security issues related to national defense, homeland security, and counterintelligence. My area of expertise included the investigation and adjudication of personnel security clearances; assessments of the foreign ownership, control, and influence of cleared U.S. defense industry; and the protection of critical infrastructures.  I also served as an adjunct professor of political science at St. Mary's College of Maryland.

9.      Between 2010 and 2019, I served as the Chief Operating Officer of the National Endowment for Democracy, a nongovernmental, nonprofit foundation dedicated to the growth and strengthening of democratic institutions around the world.

10.      While I am retired from full-time employment, I currently serve as a member of the board of directors for a company cleared by the DoD under the terms of a special security agreement.   In this capacity, I am required to retain a personnel security clearance, and my responsibilities include ensuring that the cleared firm and its personnel properly safeguard classified information as well as ensuring that the firm's foreign-owned parent is precluded from accessing classified and other sensitive U.S. Government information.   As such, I have remained abreast of all official policy and requirements for the protection of classified national security information, as well as the standards for approving, suspending, denying, or revoking security clearances.   I have been continuously cleared (i.e., have held an active security clearance) at all times between 1973 and the present.

11.     I hold a Master of Arts degree in International Relations from Boston University and a Bachelor of Arts degree in History from Saint John's University.

## II.    RETENTION IN THIS MATTER AND RELATED DISCLOSURES

12.     In April 2025, I was approached by counsel to Wilmer Cutler Pickering Hale and Dorr LLP ("WilmerHale") to discuss this case, which relates to Executive Order 14250 entitled "Addressing Risks from WilmerHale," 90 Fed. Reg. 14549 (March 27, 2025) ("WilmerHale Executive Order").  More specifically, I was asked to address the portions of the WilmerHale Executive Order that purport to direct the immediate suspension and review of any security clearances held by any WilmerHale partner or employee, and the portions of the WilmerHale Executive Order that address "national security."  After reviewing the WilmerHale Executive Order, I agreed to offer the opinions in this report in the capacity of an expert witness based on my experience and credentials above.  I am doing so without compensation, as my sole motivation for involvement in this present matter is my concern for the integrity of the processes around security clearances, a key tool intended to safeguard the security of our nation and the American people.   I have devoted the great majority of my professional career to the protection of our national security through rigorous application of fair criteria determining (1) what information should be classified and (2) which individuals are entitled to access to such information, and on what terms.

13.     In the years since my retirement from public service, I have served as a *pro bono* expert in several prior court proceedings, including in the parallel litigation against Executive Order 14230, entitled "Addressing Risks from Perkins Coie LLP," 90 Fed. Reg. 11781.  *See Perkins Coie LLP v. U.S. Department of Justice*, Dkt. 39-8, No. 1:25-716 (D.D.C.).   In all such instances, as in this case, I have made it clear to the counsel that I would become involved in their case not as an advocate for a party but rather as an advocate for the integrity of the national security classification and clearance systems.

14.     A list of publications that I have authored in the last ten years is attached as Exhibit 1. I have not testified in any case as an expert at trial or by deposition in the last four years.    The facts or data I have considered in forming my opinions are set forth in Section III below.

## III.    SUMMARY OF RELEVANT FACTS

### A.    Executive Order 14250 And The Related Fact Sheet

15.     On March 27, 2025, President Donald Trump issued Executive Order 14250, entitled "Addressing Risks from WilmerHale."  90 Fed. Reg. 14549.  The WilmerHale Executive Order was accompanied by a "Fact Sheet."  *Fact Sheet: President Donald J. Trump Addresses Risks from WilmerHale*, The White House (Mar. 27, 2025), https://www.whitehouse.gov/fact-sheets/2025/03/fact-sheet-president-donald-j-trump-addresses-risks-from-wilmerhale.    The following points in the WilmerHale Executive Order and Fact Sheet are relevant to this report.

16.     ***Section 1 ("Background").***    Section 1 sets out the "Background" of the WilmerHale Executive Order.  The first paragraph of Section 1 does not name WilmerHale, but describes the Trump Administration's general "commit[ment] to addressing the significant risks associated with law firms."  It states that "[m]any firms take actions that threaten public safety and national security," concluding that these law firms "should not have access to our Nation's secrets."

17.     The second paragraph of Section 1 characterizes certain work undertaken by WilmerHale as "engag[ing] in obvious partisan representations to achieve political ends, support[ing] efforts to discriminate on the basis of race, back[ing] the obstruction of efforts to prevent illegal aliens from committing horrific crimes and trafficking deadly drugs within our borders, and further[ing] the degradation of the quality of American elections, including by supporting efforts designed to enable noncitizens to vote."  This paragraph also states that WilmerHale "discriminates against its employees based on race and other categories prohibited by

6

civil rights laws," and uses "race-based 'targets.'"  This paragraph does not mention specific cases or clients of WilmerHale's, nor does it refer to "national security."

18.    The third paragraph of Section 1 singles out Robert Mueller, James Quarles, and Aaron Zebley for their Federal government work investigating Russian interference in the 2016 election.  I understand that Messrs. Mueller and Quarles are retired WilmerHale partners, and Mr. Zebley is a current WilmerHale partner.  I understand that their work in the Special Counsel's Office was entirely distinct from and unrelated to WilmerHale.  Robert Mueller was appointed to serve as Special Counsel during President Trump's first term by Acting Attorney General Rod J. Rosenstein.  *See* Order No. 3915-2017, Office of the Deputy Attorney General (May 17, 2017), https://www.justice.gov/archives/opa/press-release/file/967231/dl.    As Special Counsel, Mr. Mueller worked under the appointment, direction, funding, and supervision of the Acting Attorney General and later Attorney General Bill Barr.  Messrs. Quarles and Zebley worked in Special Counsel Mueller's office.    Section 1's third paragraph characterizes the special counsel investigation into Russian interference as "one of the most partisan investigations in American history" that "epitomizes the weaponization of government," specifically the use of "prosecutorial power to upend the democratic process and distort justice."  This paragraph does not mention "national security."

19.    ***Section 2 ("Security Clearance Review").***    Section 2(a) of the WilmerHale Executive Order directs the Attorney General, the Director of National Intelligence, and "all other relevant heads of executive departments and agencies" to "immediately … suspend any active security clearances held by individuals at WilmerHale," to be followed by a "review of whether such clearances are consistent with the national interest."  This last phrase is notable, in that there is no reference in Section 2(a) to "national security," only to "the national interest" (a phrase that

appears in Section 2(a) but nowhere else in the WilmerHale Executive Order).    Also notable in Section 2(a) is the blanket directive to suspend all active security clearances held by any person working at WilmerHale, a firm that I understand employs over 2,000 people, almost 1,200 of whom are attorneys.  I discuss both of these noteworthy features of Section 2(a) below.

20.    Section 2(b), which also falls under the header of "Security Clearance Review," directs the Office of Management and Budget to "identify all Government goods, property, material, and services, including Sensitive Compartmented Information Facilities, provided for the benefit of WilmerHale," and to cease such provision.

21.    **_Sections 3 and 4._**  I do not address Section 3 ("Contracting") or Section 4 ("Racial Discrimination") of the WilmerHale Executive Order in this report, as neither of those sections addresses security clearances nor do they contain any reference to or discussion of "national security" in any respect.

22.    **_Section 5 ("Personnel")._**  Section 5 ("Personnel") contains two subsections.  First Section 5(a) directs all Federal agency heads to limit the access of WilmerHale employees to Federal buildings "when such access would threaten the national security of or otherwise be inconsistent with the interests of the United States."  Section 5(a) also directs Federal agency heads to limit Federal employees in their official capacity "from engaging with WilmerHale employees to ensure consistency with the national security and other interests of the United States."

23.    Second, Section 5(b) directs Federal Officials to refrain from hiring any WilmerHale employee into Federal service unless a waiver is obtained establishing "that such hire will not threaten the national security of the United States."

24.    Section 5 ("Personnel") thus contains three references to "national security," while Section 2 ("Security Clearance Review") contains none.

25.    ***Section 6.***  Lastly, Section 6 of the WilmerHale Executive Order contains various general provisions common in such orders, such as directing that the order be implemented consistent with the law.

26.    ***The Fact Sheet.***  By and large, the Fact Sheet is consistent with the WilmerHale Executive Order.  It begins with a section entitled "Suspending Security Clearances To Protect The National Interest," which restates that "[s]ecurity clearances held by WilmerHale employees will be immediately suspended, pending a review of whether their access to sensitive information is consistent with the national interest."  It includes the notable phrase "the national interest" and the absence of reference to national security, and also addresses aspects of the WilmerHale Executive Order relating to government contracting.

27.    The Fact Sheet's section entitled "Addressing Rogue Law Firms" restates the allegations in Section 1 ("Background") of the WilmerHale Executive Order.  The Fact Sheet's final section, entitled "A Return To Accountability," broadly describes President Trump's "promise to end the weaponization of government and protect the nation from partisan and bad faith actors who exploit their influence."

**B.    Security Clearances Held By WilmerHale Personnel**

28.    Based on representations by counsel, I understand the following to be undisputed facts related to the security clearances currently held by WilmerHale personnel.

a.    At the time the WilmerHale Order was issued, more than 20 WilmerHale personnel held security clearances, and at least 5 of those WilmerHale personnel held active security clearances in connection with their service as military reservists.

b.    Most of these personnel are military veterans or reservists, or are former public civil servants, in either case initially entrusted with access to

sensitive information by virtue of their prior public service employment, as opposed to their work at WilmerHale.

c.    The clearances of WilmerHale personnel were issued by the Department of Defense, Department of Justice, Department of State, Central Intelligence Agency, National Security Agency, and other elements of the Intelligence Community.

d.    The majority of WilmerHale personnel holding active security clearances had no involvement in any of the matters referenced in the WilmerHale Executive Order or the Fact Sheet.

e.    Many security clearance holders received their clearance before being hired by WilmerHale.

f.    WilmerHale does not now maintain a Sensitive Compartmented Information Facility (SCIF).

## IV.    BACKGROUND PRINCIPLES ON SECURITY CLEARANCES

### A.    The Rules And Principles Governing The Security Clearance Review Process

29.    Executive Order 12968, which established the protocols governing access to classified information to include provisions for due process, has remained in effect since it was issued nearly thirty years ago by President Bill Clinton.  *Access to Classified Information*, 60 Fed. Reg. 40245 (Aug. 2, 1995).   The protocols in Executive Order 12968 have been subject to minor amendments since then, the most substantive ones being the designation of the Director of National Intelligence as the "Security Executive Agent" by virtue of Executive Order 13467, *Reforming Processes Related to Suitability for Government Employment, Fitness for Contractor Employees, and Eligibility for Access to Classified National Security Information*, which was issued by President George W. Bush on June 30, 2008, and the initiation of continuous vetting procedures

10

through Executive Order 13764 that President Barack Obama signed on January 17, 2017.   None

of the subsequent amendments or policy modifications have impacted the core principles of due

process that were created in Executive Order 12968.

30.     The protocols established by Executive Order 12968 are aimed at ensuring that the

protection of the nation's classified information is consistent with "providing fair and equitable

treatment to those Americans upon whom we rely to guard our national security."   60 Fed. Reg. at

40245.   A hallmark of the process, therefore, is that it is an *individualized* one.   The touchstone of

that individualized review is whether clearance is consistent with the "national security interest"

of the United States.   "National security," meanwhile, is defined both in the United States Code

and in Executive Order 13526, *Classified National Security Information* (Dec. 29, 2009), as "the

national defense and foreign relations of the United States."   10 U.S.C. §801(16); 75 Fed. Reg.

707, 729 (Jan. 5, 2010) (identical definition in Executive Order 13526, except using the disjunctive

"or").[1]

31.     Pursuant to Executive Order 12968, an individual may not access classified

information unless (1) that individual has been "determined to be eligible" for access, (2) that

individual has signed a nondisclosure agreement, and (3) that individual has a "demonstrated need-

to-know" for the information at issue.   60 Fed. Reg. at 40246.   Access to classified information

is generally granted (with limited and defined exceptions) only to individuals "who are United

---

[1] For most of the WilmerHale personnel holding security clearances, particularly those whose clearances are held through their military status or their former civilian public service, their due process rights are derived from Executive Order 12968.   There are other executive orders and subordinate directives and regulations that touch upon personnel vetting that are not discussed here.   While some of these may reference "national interest" instead of "national security interest," the governing executive order (12968) and the national adjudicative guidelines for security clearances, which are discussed in more detail below, explicitly rely upon the term "national security interests."

States citizens for whom an appropriate investigation has been completed and whose personal and professional history affirmatively indicates loyalty to the United States, strength of character, trustworthiness, honesty, reliability, discretion, and sound judgment, as well as freedom from conflicting allegiances and potential for coercion, and willingness and ability to abide by regulations governing the use, handling, and protection of classified information."   *Id.* at 40250. The determination of eligibility for access to such information is to be "based on judgments by appropriately trained adjudicative personnel." *Id.*

32.    The security clearance process is a critical tool in keeping our nation and its citizens safe.  For it to be effective, it is to be implemented in a "fair and equitable" manner and through a "uniform … program."   *Id.* at 40245.

33.    To ensure that this national security tool (i.e., the individualized security clearance process) is implemented in a fair and equitable manner and through a uniform program, the Director of National Intelligence ("DNI"), under the authority of Executive Order 13467 referenced above and in furtherance of Executive Order 12968, issued DNI Security Executive Agent Directive 4 ("SEAD-4"), *National Security Adjudicative Guidelines*, on June 8, 2017, during the prior Administration of President Donald Trump.   This Directive establishes the criteria to be used by all Federal government agencies authorized to render a determination for initial or continued eligibility of an individual to access classified information.   Off. of the Dir. of Nat'l Intel., *Security Executive Agent Directive 4: National Security Adjudicative Guidelines* (2017), [https://www.dni.gov/files/NCSC/documents/Regulations/SEAD-4-Adjudicative-Guidelines-U.pdf](https://www.dni.gov/files/NCSC/documents/Regulations/SEAD-4-Adjudicative-Guidelines-U.pdf).

34.    Pursuant to SEAD-4, an individual's eligibility for a security clearance turns on whether that individual's access to classified information is "clearly consistent with the national

security interests" of the United States.  *Id.* at 5.   The adjudicative process is intended to be an examination of the "whole person," meaning an examination of "a sufficient period and careful weighing of a number of variables of an individual's life," in order to make an affirmative determination that the individual is an acceptable security risk.  *Id.* at 6 ("the whole-person concept").   The adjudicative policy states unambiguously that for every individual seeking a security clearance, each such individual "case must be judged on its own merits."  *Id.*   To perform that adjudication, an individual's personal conduct in the following thirteen areas are taken into account:  allegiance to the United States (Guideline A), foreign influence (Guideline B), foreign preference (Guideline C), sexual behavior (Guideline D), personal conduct (Guideline E), financial considerations (Guideline F), alcohol consumption (Guideline G), drug involvement and substance misuse (Guideline H), psychological conditions (Guideline I), criminal conduct (Guideline J), handling protected information (Guideline K), outside activities (Guideline L), and use of information technology (Guideline M).  *Id.*   The guidelines also state that in evaluating the relevance of an individual's conduct with respect to any of the above guidelines, the recency of that conduct is a key element to be taken into account.  *Id.*

35.     In light of the above, the granting, suspending, and revoking of security clearances is a highly individualized process that involves a close and detailed factual analysis of the individual in question and provides any individual subject to this analysis with significant due process protections.  Before any security clearance is granted, denied, or revoked, the appropriate investigative agency must conduct an investigation of the individual to the required scope.   This investigation addresses the factors outlined in the above adjudicative guidelines outlined in Directive 4, pursuant to Executive Order 12968.

36.     Following the appropriate investigation, should an applicant be denied a clearance or should a cleared individual's clearance be revoked, that individual is entitled to the due process considerations set forth in Executive Order 12968.   The standard due process provisions that are followed within the Executive Branch whenever an individual's security clearance is denied or revoked include the following: (1) a comprehensive and detailed written explanation for the denial or revocation; (2) appropriate access to documents, records, and reports upon which the denial or revocation is based; (3) the right to be represented by counsel; (4) the opportunity to respond in writing; (5) a written notice of and the reasons for the results of the review, the identity of the deciding authority, and written notice of the appeal; and (5) the opportunity to appeal in writing and in some instances in person to a higher level of review.   *See* 60 Fed. Reg. at 40252-53 (Part 5—Review of Access Determinations).

**B.     Relevant History Regarding The Security Clearance Review Process**

37.     The above-described security-clearance processes set out by Executive Order 12968 and expanded through SEAD-4, and the due process protections afforded individuals as part of the same, are an outgrowth of an earlier period of our nation's history when such rights were not present and the security clearance process was abused.   As illustrated by the well-known case of Robert Oppenheimer, it was not unusual in the immediate aftermath of World War II for groups of persons to have their security clearances denied, revoked or suspended solely based upon their membership in disfavored organizations or upon their association with other known members of such organizations.

38.     In 1947, then-Attorney General Tom Clark released the "Attorney General's List of Subversive Organizations."   As its name implies, this list was intended to compile organizations deemed to be subversive by the U.S. government.   The list included 50 organizations ranging from Communist Party USA and the Ku Klux Klan to organizations such as the National Negro

Congress and the Washington Book Shop Association.    Many Americans had signed petitions or become members of such groups, often not understanding their true nature or the consequences of affiliation.    The Attorney General's List was eventually incorporated by then-President Harry Truman into Executive Order 9835, which established the first federal employee loyalty program. *See* 12 Fed. Reg. 1935 (Mar. 25, 1947).    Executive Order 9835 was in turn superseded by President Dwight Eisenhower's Executive Order 10450 in 1953, which updated the Attorney General's List and expanded the criteria for determining trustworthiness and reliability for purposes of a security clearance.    Security Requirements for Government Employment, 18 Fed. Reg. 2489 (Apr. 27, 1953).    In 1959, the Supreme Court decided the landmark case *Greene v. McElroy*, holding in relevant part that the revocation of the plaintiff's security clearance as a defense contractor on the grounds of alleged Communist associations and sympathies was unlawful in that the plaintiff "was not afforded the safeguards of confrontation and cross-examination."    360 U.S. 474, 508 (1959).[2]

39.    It was the Supreme Court's decision in *Greene* that led to the establishment of due process provisions for the individualized granting, denial, or revocation of security clearances for contractors, which due process provisions continue to this day.    Due process provisions were first adopted for defense contractors through President Eisenhower's Executive Order 10865 in 1960, and similar due process provisions were codified in 1995 by President Clinton in Executive Order 12968 ("Access to Classified Information") to cover civil servants and military personnel.    These protections have remained unchanged through five successive administrations, including President Trump's prior Administration between 2017 and 2021.    Executive Orders 10865 and 12968 as well

---

[2] *Greene* stands for the proposition that due process applies to security clearances.    360 U.S. 474. There, neither Congress nor the President authorized the constitutionally deficient procedures.    *Id.* at 508.    The Court declined to opine on the constitutionality of those procedures had they been set out in legislation or an executive order.    *Id.*

15

as SEAD-4 remain the current governing policy for granting, denying, and revoking personnel security clearances.[3]   There is no language within the WilmerHale Executive Order that indicates it is superseding, revoking or modifying the protections set forth in any of the prior Executive Orders or governing due process requirements.

### C.     The Process For Suspending Or Revoking A Security Clearance

40.     Existing policy recognizes that emergency situations may arise where an individual security clearance must be suspended before the completion of all of the due process provisions outlined above.  60 Fed. Reg. at 40252-53 (Part 5—Review of Access Determinations); *see also* SEAD-4 at 7.   Specifically, an individual's security clearance can be suspended for cause when information relative to any of the adjudicative guidelines exists and raises a serious question as to the *individual's* ability or intent to protect national security information.

41.     Throughout my career I have frequently either recommended or approved the suspension of an individual's clearance.   In every case, as well as every other suspension I am aware of (whether or not personally involved in the related recommendation or approval), any such suspension was based upon the individual's conduct.   I am not aware of any instance when an individual's security clearance has been suspended for reasons *other* than the individual's own conduct.   Furthermore, in every case in which I was personally involved or am otherwise aware of, there existed a reasonable basis for concluding that the individual's continued access to classified information posed an imminent threat.   For example, if a person with a security clearance

---

[3] Executive Order 12968 allows for narrow instances when due process may be limited because the required procedure cannot occur "without damaging the national security interests of the United States by revealing classified information."  60 Fed. Reg. at 40252.   This provision might be invoked, for example, when a government employee or contractor is charged with espionage for a foreign power.   But this limited due process section is inapplicable here, including because the required certification has not been made and because there has been no determination that full due process would itself compromise national security by revealing classified information.

is arrested for a serious crime that calls into question the individual's honesty or trustworthiness, such that a new investigation is needed, an emergency suspension of a security clearance may be issued pending final result of the new investigation.    In the vast majority of cleared defense contractor cases where the government is seeking to revoke an individual's security clearance for conduct issues, that individual maintains their access and eligibility throughout the process, which could take years.

42.    Importantly, whenever an individual's security clearance is suspended, the government entity that granted the clearance is obligated to notify the individual in writing and to provide that individual with a statement of reasons as to why access to classified information has been suspended.

43.    The suspension process is followed, as appropriate, either with reinstatement of access to classified information or with a revocation process that affords the established processes and due process protections outlined above.

V.    **OPINIONS**

A.    **Opinion 1: The Blanket Approach Of The WilmerHale Executive Order Is Inconsistent With Governing Policy Requiring Individualized Assessments.**

44.    As described above in Section IV, in order to ensure that clearance procedures "provid[e] fair and equitable treatment to those Americans upon whom we rely to guard our national security," 60 Fed. Reg. at 40245,  the process is always based upon the personal conduct of the relevant individual.    That is one of the fundamental hallmarks of the security-clearance review process; Person A is never held accountable for the conduct of Person B, let alone are Persons 1 through 2,000 held accountable for the conduct of formerly-associated Person 2,001.

45.    The WilmerHale Executive Order violates these bedrock principles of the security-clearance review process because it provides no individualized assessment of personal conduct in

the suspension of clearances.  The WilmerHale Executive Order contains no mention of, let alone any individualized assessment of the WilmerHale personnel who currently hold security clearances. The only common feature as to those individuals is that they all currently work at WilmerHale, yet the WilmerHale Executive Order directs the immediate suspension of all clearances regardless of whether that clearance derived from work related to WilmerHale, regardless of whether that clearance had anything to do with any factual finding in the WilmerHale Executive Order, and regardless of when that individual was hired at WilmerHale.

46.     Simply put, a blanket suspension of all security clearances at a law firm of over 2,000 employees, including approximately 1,200 attorneys, was—prior to March 2025— unprecedented in its scope and fundamentally inconsistent with existing authority addressing the processing, granting, and revocation of security clearances.   The *ad hoc* directive in this case harkens back to the repudiated and discredited programs that existed before *Greene v. McElroy*, including during the Red Scare.   The arbitrary directive of immediate suspension of security clearances not for any personal conduct by any clearance holder but rather simply for that individual's association with a law firm is no different analytically than if a directive were issued to immediately suspend the security clearances of all Jews or Muslims, all members of the LGBTQ+ community, all women, or all registered Democrats or Republicans.

47.     These types of non-individualized, mass suspensions of security clearances targeted at groups of individuals threaten to harm our national security efforts.   Should individuals who otherwise meet the standards be summarily denied or stripped of their security clearance through these types of sweeping, blanket decrees addressed at entire classes of thousands of persons or more at once, the resulting uncertainty that would spread throughout the system may severely

impact the effectiveness of our military, intelligence and diplomatic capabilities to deter or otherwise respond to our nation's adversaries.

B.    **Opinion 2: The WilmerHale Executive Order Is Unprecedented In Its Invocation of Facially Stale Information And Conduct Unrelated To National Security.**

48.    The WilmerHale Executive Order is also contrary to the foundational principles surrounding the granting, suspension, denial, or revocation of security clearances, as set forth in existing and operative policy documentation that have existed for decades, in that the stated reasons for the suspension of the security clearances do not have any apparent nexus to national security concerns.    As I explained in Section IV, the touchstone of the individualized security-clearance review is whether clearance is consistent with the "national security interest" of the United States, which is defined as "the national defense and foreign relations of the United States."

49.    Here, however, the WilmerHale Executive Order—and in particular Section 2 of the WilmerHale Executive Order related to security clearances—makes clear it has nothing to do with national security.  For example, the WilmerHale Executive Order faults WilmerHale for its "degradation of the quality of American elections."   By this characterization, I understand the WilmerHale Executive Order to refer to the fact that WilmerHale represented a number of clients opposing then-candidate Trump's challenges to the result of the 2020 Presidential Election (in almost all instances, I am told, with successful outcomes).  In my more than three decades of service culminating as the most senior public servant focused professionally on the protection of United States classified information, I have never seen any security clearance determination that was based on the fact that an attorney represented clients in election-related litigation (or other litigation challenging the policies of an administration), and I can see no reasonable construction of such activity as being a matter of "national security" as that term is defined and understood.  As another example, the WilmerHale Executive Order states that WilmerHale "supports efforts to

discriminate on the basis of race," in what I am told is an apparent reference to WilmerHale's representation of Harvard University in *Students for Fair Admissions, Inc. v. President & Fellows of Harvard College*, No. 20-1199 (U.S.).  Again, in my decades of experience I have never seen a security clearance determination based on an attorney representing clients in litigation, and I can see no reasonable construction of "national security" that would encompass such activity. Tellingly, Section 2 of the WilmerHale Executive Order never uses the term "national security," and instead only mentions the "national interest," a term that is markedly broader than the "national security interest" that serves as the touchstone of a security-clearance review.    On the face of the WilmerHale Executive Order, it therefore appears apparent and acknowledged that the directive in Section 2 to suspend security clearances is *not* based on "national security."   I am aware of no practice, examples, or guidance that permits the suspension, revocation, or denial of a security clearance on any grounds other than national security grounds.

50.    Neither is the WilmerHale Executive Order's reference to Robert Mueller, James Quarles, and Aaron Zebley remotely related to any "national security" risk supposedly posed by WilmerHale.  I understand that Mr. Mueller was appointed by the Department of Justice in the first Trump Administration as special counsel to investigate allegations of foreign interference in the 2016 presidential election, and that WilmerHale had no role in his appointment or work as Special Counsel.  I understand that Mr. Zebley and Mr. Quarles worked with Mr. Mueller on this investigation.  I further understand that Messrs. Mueller, Quarles, and Zebley had no WilmerHale affiliation whatsoever when they served in the Office of Special Counsel.  There was no effort of which I am aware to suspend, revoke, or deny any security clearance held by any WilmerHale personnel for reasons related to Mr. Mueller's work and report at the time that Messrs. Mueller, Quarles, and Zebley were employed by the special counsel's office, nor does the WilmerHale Order

identify any newly discovered basis for doing so.  If Mr. Mueller's and his colleagues' work was not viewed as detrimental to "national security" during President Trump's first term in office, it is impossible to understand how that same activity could now serve as a "national security" justification for immediate suspension of security clearances.  In my experience, immediate suspensions of security clearances based on a "national security" justification were based on newly identified imminent threats that required delaying due process, as described above.

51.    More fundamentally, the behavior that the WilmerHale Executive Order deems problematic—attorneys representing clients in court—is not of the type that has ever in my experience been deemed conduct relating to a "national security" interest.

52.    It is further apparent that the WilmerHale Executive Order is not grounded in a "national security" determination because Jeffrey Kessler, a recently departed WilmerHale partner, was appointed and confirmed to serve as U.S. Commerce Under Secretary for Industry and Security on March 13, 2025.  *See WilmerHale Congratulates Partner Jeffrey Kessler on His Senate Confirmation as US Commerce Under Secretary for Industry and Security*, WilmerHale (Mar. 14, 2025),        https://www.wilmerhale.com/en/insights/news/20250314-wilmerhale-congratulates-partner-jeffrey-kessler-on-his-senate-confirmation-as-us-commerce-under-secretary-for-industry-and-security.  There cannot reasonably have been a national security emergency that justified the immediate suspension of WilmerHale security clearances when a recently departed firm partner was just entrusted to serve in the highest levels of government.

53.    The lack of any national-security concerns here is still further underscored by the fact that, as I understand from public reports, an Executive Order was issued on March 14, 2025 against another law firm (Paul Weiss) that similarly directed the immediate suspension of all security clearances held by any firm employee, *see Addressing Risks from Paul Weiss*, The White

House (Mar. 14 2025), https://www.whitehouse.gov/presidential-actions/2025/03/addressing-risks-from-paul-weiss, only to be withdrawn within days following an agreement that provides for the provision of *pro bono* services by Paul Weiss and certain other steps by that firm with no mention of national security or national interest. There cannot reasonably have been a national security emergency that justified the immediate suspension of security clearances but that was remedied by Paul Weiss's agreement to provide *pro bono* services.

### C.    Opinion 3: The WilmerHale Executive Order's Directive Amounts To A Preordained Revocation Of Security Clearances Without Due Process.

54.    While the WilmerHale Executive Order purports only to suspend clearances pending review, the WilmerHale Executive Order and Fact Sheet together amount to a preordained blanket revocation of security clearances without any of the required due process protections associated with such revocation. That is, the WilmerHale Executive Order functionally plays the role of judge, jury, and executioner.

55.    In Section 2, the WilmerHale Executive Order directs all Federal agency heads to "immediately … suspend any active security clearances held by individuals at WilmerHale" and to "review … whether such clearances are consistent with the national interest." It might therefore seem, at first blush, that the WilmerHale Executive Order merely calls for an emergency suspension, to be followed by appropriate due process, although there is no indication of what that might look like, when it would occur, or when it must be concluded. In any event, Section 1 of the WilmerHale Executive Order contains express findings that any reviewing agency necessarily must take as fact in conducting that review. Those findings include a statement that WilmerHale has "abandoned the profession's highest ideals and abused its pro bono practice to engage in activities that undermine justice and the interests of the United States" and "employ[s] lawyers who weaponize the prosecutorial power to upend the democratic process and distort justice." The

findings in Section 1 functionally predetermine the outcome, meaning that no good-faith and impartial investigation could ever take place.

56.    In light of the above directives in the **WilmerHale** Executive Order, the outcome of any security clearance review is preordained.    For these suspensions to be reversed and the affected individuals' access to classified national security information to be reinstated would require a professional adjudicator to make findings expressly contradictory to the findings in Section 1 of the **WilmerHale** Executive Order.    The approach of the **WilmerHale** Executive Order is unprecedented and inconsistent with governing guidance and policy documentation.

I declare under penalty of perjury that the foregoing is true and correct.


Date: April 7, 2025

J. William Leonard

# EXHIBIT 1

Authored Publications in Past Ten Years

J. William Leonard, *Congress Must Stop the Weaponization of Personnel Security Clearances*, Just Sec. (Mar. 11, 2025), https://www.justsecurity.org/108657/congress-stop-weaponization- security-clearances/.

J. William Leonard, *Vice Presidents and Rules Governing Classified National Security Information*, Just Sec. (Jan. 17, 2023), https://www.justsecurity.org/84774/vice-presidents-and- rules-governing-classified-national-security-information/.

J. William Leonard, *Myths and Misunderstandings Relating to Mar-a-Lago Documents Investigation*, Just Sec. (Mar. 16, 2022), https://www.justsecurity.org/82706/myths-misunderstandings-relating-to-mar-a-lago-documents-investigation/.

J. William Leonard, *Why Joe Biden Should Pardon Reality Winner*, Wash. Post (Dec. 20, 2019), https://www.washingtonpost.com/opinions/why-joe-biden-should-pardon-reality-winner/2020/12/21/9e6f4094-4162-11eb-8db8-395dedaaa036_story.html.

J. William Leonard, *Barr's Personal Ad Hoc Declassification Authority and the Role of Congress*, Just Sec. (Dec. 9, 2019), https://www.justsecurity.org/67663/barrs-personal-ad-hoc- declassification-authority-and-the-role-of-congress/.

J. William Leonard, *Trump Repudiates a Century of U.S. Policy*, Just Sec. (Nov. 15, 2019), https://www.justsecurity.org/67255/trump-repudiates-a-century-of-u-s-policy/.