**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

WILMER CUTLER PICKERING HALE AND
DORR LLP,

    Plaintiff,

  v.

EXECUTIVE OFFICE OF THE PRESIDENT,
et al.,

    Defendants.

Civil Action No. 25-917 (RJL)

**BRIEF OF AMICI CURIAE NEW JERSEY, MASSACHUSETTS, ILLINOIS,
WASHINGTON, ARIZONA, CALIFORNIA, COLORADO, CONNECTICUT,
DELAWARE, DISTRICT OF COLUMBIA, HAWAI'I, MAINE, MARYLAND,
MICHIGAN, MINNESOTA, NEVADA, NEW MEXICO, NEW YORK, OREGON,
RHODE ISLAND, AND VERMONT IN SUPPORT OF PLAINTIFF'S MOTION FOR
SUMMARY JUDGMENT**

ANDREA JOY CAMPBELL
 *Attorney General*
 *Commonwealth of*
 *Massachusetts*
One Ashburton Place
Boston, MA 02108

KWAME RAOUL
 *Attorney General*
 *State of Illinois*
115 South LaSalle Street
Chicago, Illinois 60603

NICHOLAS W. BROWN
 *Attorney General*
 *State of Washington*
P.O. Box 40100
Olympia, WA 98504

MATTHEW J. PLATKIN
 *Attorney General*
 *State of New Jersey*

Sundeep Iyer
 *Acting Executive Asst. Attorney General*
Benjamin Notterman
 *Senior Counsel to the Attorney General*
Meghan K. Musso
Elizabeth R. Walsh
 *Deputy Attorneys General*
Office of the Attorney General
25 Market Street
Trenton, NJ 08625
(862) 350-5800
Sundeep.Iyer@njoag.gov

*(Additional counsel on signature page)*

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ..................................................................................................... ii

INTRODUCTION AND INTERESTS OF AMICI CURIAE ....................................................... 1

ARGUMENT ........................................................................................................................... 4

CONCLUSION ...................................................................................................................... 12

## TABLE OF AUTHORITIES

### CASES

Page(s)

*Am. Airways Charters, Inc. v. Regan*,
746 F.2d 865 (D.C. Cir. 1984) ................................................................................. 7

*Ass'n for Accessible Meds. v. Raoul*,
No. 1:24-cv-544 (N.D. Ill.) ....................................................................................... 2

*Borough of Duryea v. Guarnieri*,
564 U.S. 379 (2011) .................................................................................................. 5

*Cooter & Gell v. Hartmarx Corp.*,
496 U.S. 384 (1990) .................................................................................................. 9

*Cousart v. Metro Transit Police Chief*,
101 F. Supp. 3d 27 (D.D.C. 2015) .......................................................................... 10

*eBay Inc. v. MercExchange, L.L.C.*,
547 U.S. 388 (2006) .................................................................................................. 4

*Gentile v. State Bar of Nev.*,
501 U.S. 1030 (1991) ................................................................................................ 2

*Legal Servs. Corp. v. Velazquez*,
531 U.S. 533 (2001) .............................................................................. 2, 3, 4, 5, 7, 10, 11

*Massachusetts v. Nat'l Insts. of Health*,
No. 25-cv-10338, 2025 WL 702163 (D. Mass. Mar. 5, 2025) ................................. 3

*NAACP v. Button*,
371 U.S. 415 (1963) .............................................................................................. 7, 10

*Padilla v. Kentucky*,
559 U.S. 356 (2010) .................................................................................................. 7

*Powell v. Alabama*,
287 U.S. 45 (1932) .................................................................................................... 7

*Sup. Ct. v. Piper*,
470 U.S. 274 (1985) .................................................................................................. 5

*Thomas v. Anderson*,
No. 18-1424 (U.S.) .................................................................................................... 2

*United States v. Gonzalez-Lopez*,
548 U.S. 140 (2006) .................................................................................................. 7

ii

*Watts v. Kidman*,
    42 F.4th 755 (7th Cir. 2022) ................................................................................................10

## RULES

Fed. R. Civ. P. 11 ......................................................................................................................9

LCvR 7(o)(1) ...............................................................................................................................1

## OTHER AUTHORITIES

Addressing Risks from WilmerHale,
    Exec. Order No. 14,250, 90 Fed. Reg. 14,549 (Mar. 27, 2025)......................................1, 8, 10

Addressing Risks from Paul Weiss,
    Exec. Order No. 14,237, 90 Fed. Reg. 13,039 (Mar. 14, 2025)................................................8

Addressing Risks from Perkins Coie LLP,
    Exec. Order No. 14,230, 90 Fed. Reg. 11,781 (Mar. 6, 2025)..................................................8

Addressing Risks from Susman Godfrey,
    2025 WL 1065986 (Apr. 9, 2025) .............................................................................................8

Addressing Risks from Jenner & Block,
    Exec. Order No. 14,246, 90 Fed. Reg. 13,997 (Mar. 25, 2025)................................................8

Presidential Memorandum, Preventing Abuses of the Legal System and the Federal Court,
    2025 WL 893272 (Mar. 22, 2025) ............................................................................................9

Presidential Memorandum, Suspension of Security Clearances and Evaluation of Government
    Contracts, 2025 WL 602619 (Feb. 25, 2025) ...........................................................................8

March 5, 1773, *in The Diary of John Adams*,
    https://founders.archives.gov/documents/Adams/01-02-02-0003-0002-0002 ........................6

David McCullough, *John Adams* (2001) .......................................................................................6

Sarah Abruzzese, *Official Quits After Remark on Lawyers*, N.Y. Times (Feb. 3, 2007),
    https://www.nytimes.com/2007/02/03/washington/03gitmo.html ............................................6

Daniel Barnes, *Major Law Firm Strikes Preemptive Deal with White House*,
    Politico (Mar. 28, 2025), https://www.politico.com/news/2025/03/28/
    skadden-arps-trump-law-deal-028324 ......................................................................................9

Susan DeSantis, *New York State Bar Association Condemns Executive Orders
    Punishing Lawyers for Representing Causes the Trump Administration
    Doesn't Like*, N.Y. State Bar Ass'n (Mar. 10, 2025), https://nysba.org/
    new-york-state-bar-association-condemns-executive-orders-punishing-
    lawyers-for-representing-causes-the-trump-administration-doesnt-like....................................5

Carrie Johnson, *Attorney General Holder Backs Paul Clement on DOMA Defense*, NPR (Apr. 26, 2011), https://www.npr.org/sections/itsallpolitics/2011/04/26/ 135744243/attorney-general-holder-backs-paul-clement-on-doma-defense ...........................7

Ben Protess, *In Trump's Fight with Perkins Coie, the Richest Firms Are Staying Quiet* (Apr. 2, 2025), https://www.nytimes.com/2025/04/02/business/ trump-perkins-coie-amicus-brief.html ........................................................................9

Michael S. Schmidt & Maggie Haberman, *Trump Announces Deal with Doug Emhoff's Law Firm* (Apr. 1, 2025), https://www.nytimes.com/2025/04/01/ us/politics/trump-law-firm-doug-emhoff-wilkie-farr-gallagher.html .......................................9

Cully Stimson, *An Apology to Detainees' Attorneys*, Wash. Post (Jan. 17, 2007), https://www.washingtonpost.com/wp-dyn/content/ article/2007/01/16/AR2007011601383.html ............................................................7

Donald J. Trump (@realDonaldTrump), Truth Soc. (Apr. 1, 2025, 3:47 PM), https://truthsocial.com/@realDonaldTrump/posts/114264667777137553 ...............................9

**INTRODUCTION AND INTERESTS OF AMICI CURIAE**

The amici States of New Jersey, Massachusetts, Illinois, Washington, Arizona, California, Colorado, Connecticut, Delaware, District of Columbia, Hawaiʻi, Maine, Maryland, Michigan, Minnesota, Nevada, New Mexico, New York, Oregon, Rhode Island, and Vermont (collectively, "amici States") respectfully submit this brief in support of Wilmer Cutler Pickering Hale and Dorr LLP's motion for summary judgment.  *See* LCvR 7(o)(1).

Over the past six weeks, President Trump has issued an unprecedented series of executive orders imposing severe sanctions on law firms whose advocacy, clients, and personnel he dislikes.  This case involves one such Executive Order targeting WilmerHale.  *See* Addressing Risks from WilmerHale, Exec. Order No. 14,250, 90 Fed. Reg. 14,549 (Mar. 27, 2025) ("Order").  The Order does not hide its retaliatory nature.  As this Court already observed in granting a temporary restraining order, the Order punishes the firm for the clients it represents and the political causes its lawyers support, for employing certain attorneys who President Trump views as political opponents, and for its pro bono advocacy in litigation regarding immigration, election law, and college admission policies.  *See id.* § 1.  In response to this lawful advocacy, the Order requires federal officials to "suspend any active security clearances held by individuals at WilmerHale," to refuse to "engag[e] with" or hire WilmerHale employees, and to deny WilmerHale personnel entry to federal buildings.  *Id.* §§ 2(a), 5.  And it orders federal contractors "to disclose any business they do with WilmerHale" so that agencies can "terminate any contract . . . for which WilmerHale has been hired to perform any service."  *Id.* § 3.

As WilmerHale's motion shows, and as this Court has already preliminarily concluded, the Order is unconstitutional several times over.  *See* Doc. 16-1.  It violates the First Amendment both by retaliating against WilmerHale for its protected speech and association and by

discriminating based on viewpoint. *Id.* at 14-26. It disregards the right to counsel under the Fifth and Sixth Amendments by interfering with the right to effective counsel and to the counsel of one's choice. *Id.* at 34-36. And it offends other basic constitutional principles as well—for example, the separation of powers and the right to due process. *Id.* at 26-34. These defects entitle WilmerHale to declaratory relief and a permanent injunction. *Id.* at 36-45.

Amici States share a significant interest in protecting bedrock rule-of-law principles and free speech. Indeed, as government entities subject to the First Amendment, amici States have uniquely relevant experience applying the free speech principles at stake in this case. The offices of the undersigned state Attorneys General regularly litigate matters against law firms— including WilmerHale—that are adverse to amici States. *See, e.g.*, *Gavatos v. Murphy*, No. 24-2947 (3d Cir.) (WilmerHale adverse to New Jersey); *Connecticut v. Teva Pharmaceuticals USA, Inc.*, No. 3:19-cv-710 (D. Conn.) (same); *Briggs v. Mass. Dept. of Correction*, No. 4:15-cv-40162 (D. Mass.) (WilmerHale adverse to Massachusetts); *Commonwealth of Massachusetts v. Meta Platforms, Inc.*, No. 2384CV02397 (Mass. Super. Ct.) (same); *Campbell v. Uber Techs., Inc.*, No. 2084CV01519 (Mass. Super. Ct.) (same).

 Even so, amici States uniformly recognize the importance of a cardinal First Amendment precept: Advocates who appear in courtrooms must enjoy the right to speak freely on behalf of themselves and their clients without fear of retribution from their government. *See Legal Servs. Corp. v. Velazquez*, 531 U.S. 533, 542-49 (2001). When lawyers criticize or oppose the government, in courtrooms or elsewhere, their speech "lies at the very center of the First Amendment." *Gentile v. State Bar of Nevada*, 501 U.S. 1030, 1034 (1991). Government entities must always respect those basic First Amendment principles—and they must never respond to opposition or criticism with retaliation or intimidation.

Amici States' experience underscores that permanent injunctive relief is strongly in the public interest in this case. Amici States recognize from experience that a just and well-functioning judicial system depends on the willingness of lawyers to take on difficult cases or unpopular clients without retribution by their government. Any attempts to deter lawyers from representing the full spectrum of clients and causes would undermine the judicial systems in amici States, which depend on "an informed, independent bar" to ensure "[a]n informed, independent judiciary." *Velazquez*, 531 U.S. at 545. Indeed, amici States are home to hundreds of thousands of lawyers—including lawyers affiliated with WilmerHale—who must be able to practice without fear of government retribution, and all of amici States' residents are potential clients who may need those lawyers' services to assert their rights, including against the federal government. By attempting to punish effective advocacy for disfavored causes, the Order makes it harder for lawyers to provide the critical legal services on which our courts and residents depend.

The Order also directly threatens amici States' government operations. For instance, agencies in some amici States may have contractual relationships with the federal government and so could be subject to the Order's requirements for federal contractors—specifically, to disclose any relationships with WilmerHale, which may in turn result in the potential loss of federal contracts. Similarly, amici States' Attorneys General oversee large law offices that have filed lawsuits challenging unlawful actions by the federal government. *See, e.g.*, *Massachusetts v. Nat'l Insts. of Health*, No. 25-cv-10338, 2025 WL 702163, at *1 (D. Mass. Mar. 5, 2025) (granting multistate coalition preliminary injunction against federal agency action), *appeal docketed*, No. 25-1343 (1st Cir. Apr. 8, 2025). If the Order is allowed to stand, the President

may target other lawyers, including those in amici States, who challenge this Administration's policies in court.

In short, the Order is an affront to the rule of law. Amici States therefore urge the Court to enter judgment in favor of WilmerHale. Amici States do so notwithstanding the fact that, like all government entities, they frequently face legal challenges to their own laws and policies. But the Constitution and the rule of law demand that the government—whether federal or state—respond to such challenges through litigation, not through intimidation, retaliation, or coercion. An independent, accessible legal system is part of the fabric of our democracy. The Order tears at that fabric.

## ARGUMENT

As government entities, amici States have long recognized that the First Amendment protects the advocacy of lawyers and ensures that the government cannot target lawyers based on their advocacy in the courtroom. Indeed, the rule of law requires that lawyers be able to represent clients and causes that may be controversial or adverse to the government. The Order is a dramatic departure from these foundational principles. If allowed to take effect, the Order would gravely harm the public by making it harder for those the President disfavors to retain counsel, interfering with lawyers' practice of law, chilling free speech in and out of courtrooms, and hindering courts' exercise of the judicial power. A permanent injunction to prevent these harms would therefore significantly advance the public interest. *See eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006) (requiring consideration of "public interest" in evaluating request for permanent injunction).

I.    The First Amendment prohibits the government from retaliating against or threatening lawyers based on the clients or causes they represent. In amici States' experience,

4

those protections play a critical role in ensuring that all clients and causes—even those that are controversial, unpopular, or adverse to the government or other powerful interests—can obtain competent, zealous legal representation.

It is black-letter law that the First Amendment broadly prohibits the government from retaliating or engaging in viewpoint-based discrimination against law firms or lawyers who are engaged in legal advocacy on behalf of their clients. *Velazquez*, 531 U.S. at 548-549; *see also Borough of Duryea v. Guarnieri*, 564 U.S. 379, 387 (2011) ("[T]he Petition Clause protects the right of individuals to appeal to courts and other forums established by the government for resolution of legal disputes."). Indeed, the Supreme Court has made clear that attorney advocacy is protected by the First Amendment. *Velazquez*, 531 U.S. at 542-543. Those First Amendment protections plainly prohibit "the suppression of ideas thought inimical to the Government's own interest." *Id.* at 549.

Amici States take seriously their obligation under the First Amendment not to single out for disfavored treatment litigants or lawyers who advocate for unpopular causes or who challenge the government in litigation. That is true for good reason. These First Amendment protections have long been critical so that lawyers can represent the interests of their clients without fearing retribution from the government. If lawyers fear that the government will retaliate against them or subject them to adverse treatment based on the viewpoints they express, they will be far less likely to take on causes disfavored by their government.

The willingness of lawyers to represent such causes is vital for the rule of law, our system of justice, and our democracy. Indeed, the Supreme Court itself has recognized the "import[ance] to the maintenance or well-being of the Union" of "[t]he lawyer who champions unpopular causes." *Sup. Ct. v. Piper*, 470 U.S. 274, 281 (1985) (cleaned up); *see also Velazquez*,

531 U.S. at 545 ("[A]ttorneys should present all the reasonable and well-grounded arguments necessary for proper resolution of the case.").[1]  This precept, which predates the Founding and has been affirmed by presidential administrations of both parties, safeguards several important constitutional rights.  Nor are its benefits limited to lawyers' clients.  Courts also depend on vigorous representation of diverse viewpoints for guidance in interpreting the law.  Such representation thus plays a vital role in our constitutional order.

For centuries, lawyers have embraced their responsibility to represent disfavored clients and causes.  In 1770, for example, future President John Adams risked, "in his words, 'incurring a clamor and popular suspicions and prejudices' against him" by defending British soldiers charged with murder following the Boston Massacre.  David McCullough, *John Adams* 66 (2001).  After securing acquittals for most defendants and light sentences for the others, *see id.* at 68, Adams accurately termed his involvement "one of the most gallant, generous, manly and disinterested Actions of [his] whole Life, and one of the best Pieces of Service [he] ever rendered [his] Country."[2]

More recently, members of presidential administrations of both parties have acknowledged the importance of representation for unpopular or controversial clients.  In 2007, a

---

[1]  Numerous statements by bar associations and other professional organizations, many released in response to the Order or other recent executive actions, have expressed similar views.  *See, e.g.*, Susan DeSantis, *New York State Bar Association Condemns Executive Orders Punishing Lawyers for Representing Causes the Trump Administration Doesn't Like*, N.Y. State Bar Ass'n (Mar. 10, 2025), https://nysba.org/new-york-state-bar-association-condemns-executive-orders-punishing-lawyers-for-representing-causes-the-trump-administration-doesnt-like ("Our laws require that even the most deeply despised segments of our society are entitled to representation, and attorneys are expected to put their personal beliefs aside and represent unpopular clients and unpopular causes with the same passion and commitment that they would bring to any other legal matter.").

[2]  March 5, 1773, *in The Diary of John Adams*, https://founders.archives.gov/documents/Adams/01-02-02-0003-0002-0002.

"senior Pentagon official" resigned from the Bush Administration after a public outcry at his criticism of law firms that represented Guantanamo Bay detainees.[3]  In apologizing for his remarks, he recognized that "a foundational principle of our legal system is that the system works best when both sides are represented by competent legal counsel" and that "our justice system requires vigorous representation."[4]  Four years later, Attorney General Eric Holder echoed this sentiment in praising former Solicitor General Paul Clement for resigning from his law firm to continue defending the constitutionality of the Defense of Marriage Act after the firm and the Obama Administration declined to do so.[5]

Unsurprisingly, given its deep historical roots, the existence of an independent, accessible bar facilitates and safeguards the constitutional rights that WilmerHale asserts here.  An entitlement to competent representation undergirds, for example, criminal defendants' Sixth Amendment rights to effective assistance of counsel, *see, e.g.*, *Padilla v. Kentucky*, 559 U.S. 356, 364 (2010), and to counsel of their choice, *see, e.g.*, *United States v. Gonzalez-Lopez*, 548 U.S. 140, 144 (2006).  It also facilitates civil litigants' due process right to retain counsel.  *See Powell v. Alabama*, 287 U.S. 45, 68-69 (1932); *Am. Airways Charters, Inc. v. Regan*, 746 F.2d 865, 873 (D.C. Cir. 1984).  And, more generally, litigation conducted by counsel is often "the sole practicable avenue" for parties to seek to vindicate their other rights, including to freedom of

---

[3] Sarah Abruzzese, *Official Quits After Remark on Lawyers*, N.Y. Times (Feb. 3, 2007), https://www.nytimes.com/2007/02/03/washington/03gitmo.html.

[4] Cully Stimson, *An Apology to Detainees' Attorneys*, Wash. Post (Jan. 17, 2007), https://www.washingtonpost.com/wp-dyn/content/article/2007/01/16/AR2007011601383.html.

[5] Carrie Johnson, *Attorney General Holder Backs Paul Clement on DOMA Defense*, NPR (Apr. 26, 2011), https://www.npr.org/sections/itsallpolitics/2011/04/26/135744243/attorney-general-holder-backs-paul-clement-on-doma-defense.

association and speech under the First Amendment.  *NAACP v. Button*, 371 U.S. 415, 430 (1963).

This advocacy benefits not only clients but also the courts.  In our adversarial system, courts depend on lawyers to "present all the reasonable and well-grounded arguments necessary for proper resolution of the case."  *Velazquez*, 531 U.S. at 545.  A willingness to represent an unpopular client or cause thus helps courts carry out "the judicial function," *id.* at 546, even when that representation is ultimately unsuccessful.  For this reason, too, such fearless advocacy is integral to the rule of law.

II.     The Order is an abrupt departure from this venerable tradition.  Indeed, amici States are not aware of any historical analogue for an executive order that punishes a law firm based on its representation or employment of a political or legal adversary.  That is no surprise. For centuries, governments have litigated against parties and law firms whose goals do not align with the government's policies.  Indeed, the amici States themselves must regularly defend against constitutional and statutory challenges brought by lawyers and law firms in response to the policies their governments enact.  But amici States do not use the levers of government to retaliate against those parties or target them based on their viewpoints.

The Order discards this longstanding practice. Its retaliatory nature breaks with centuries of precedent by explicitly punishing WilmerHale for representing certain disfavored groups, including immigrants and political opponents of the President.  *See* Order § 1.  And it warns that the President "is committed" to imposing similar sanctions on other firms that undertake representations he deems "detrimental to critical American interests."  *Id.*  The threat—and intended chilling effect—is clear:  lawyers and firms that fail to toe the President's line may be next.

The chilling effect is exacerbated by the fact that the Order is just one of several recent executive actions targeting law firms for their advocacy. The President has now issued five executive orders punishing high-profile firms for their choices of clients.[6] Several other firms have preemptively agreed with the President to alter their client bases and pro bono programs to avoid similar orders.[7] And the President has separately directed the Attorney General "to seek sanctions against attorneys and law firms who engage in frivolous, unreasonable, and vexatious litigation against the United States,"[8] in an apparent effort to "chill vigorous advocacy" against his Administration. *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 393 (1990) (noting risk of chilling effect from overenforcement of Federal Rule of Civil Procedure 11). The net result is a powerful disincentive for lawyers to champion controversial causes or causes disfavored by the Administration.

---

[6] In addition to the Order, see Addressing Risks from Perkins Coie LLP, Exec. Order No. 14,230, 90 Fed. Reg. 11,781 (Mar. 6, 2025); Addressing Risks from Paul Weiss, Exec. Order No. 14,237, 90 Fed. Reg. 13,039 (Mar. 14, 2025); Addressing Risks from Jenner & Block, Exec. Order No. 14,246, 90 Fed. Reg. 13,997 (Mar. 25, 2025); Addressing Risks from Susman Godfrey, 2025 WL 1065986 (Apr. 9, 2025). The President has also released a memorandum sanctioning "all members, partners, and employees of Covington & Burling LLP who assisted former Special Counsel Jack Smith during his time as Special Counsel." Presidential Memorandum, Suspension of Security Clearances and Evaluation of Government Contracts, 2025 WL 602619 (Feb. 25, 2025).

[7] *See, e.g.*, Donald J. Trump (@realDonaldTrump), Truth Soc. (Apr. 1, 2025, 3:47 PM), https://truthsocial.com/@realDonaldTrump/posts/114264667777137553 (describing agreement with Willkie Farr & Gallagher LLP in which firm will provide "at least $100 [m]illion [d]ollars in pro bono [l]egal [s]ervices . . . to causes that President Trump and Wilkie both support"); Michael S. Schmidt & Maggie Haberman, *Trump Announces Deal with Doug Emhoff's Law Firm* (Apr. 1, 2025), https://www.nytimes.com/2025/04/01/us/politics/trump-law-firm-doug-emhoff-wilkie-farr-gallagher.html; Daniel Barnes, *Major Law Firm Strikes Preemptive Deal with White House*, Politico (Mar. 28, 2025), https://www.politico.com/news/2025/03/28/skadden-arps-trump-law-deal-028324.

[8] Presidential Memorandum, Preventing Abuses of the Legal System and the Federal Court [sic], 2025 WL 893272 (Mar. 22, 2025).

III.    The Order, if it is not permanently enjoined, would severely harm the public interest.  For one thing, it would make it more difficult for many potential clients—especially those who currently rely on pro bono representation—to obtain legal services and vindicate their rights.  Most obviously, parties seeking to challenge Administration policies or who belong to groups the President is perceived to dislike—for instance, his political opponents—would have difficulty obtaining representation as lawyers seek to avoid presidential sanctions.  Indeed, public reporting indicates that fear of retribution has prevented many major firms from supporting Perkins Coie's challenge to the President's executive order targeting that firm.[9]  Deprived of competent counsel, parties will often be unable to vindicate their rights.  *Cf. Button*, 371 U.S. at 430 ("[U]nder the conditions of modern government, litigation may well be the sole practicable avenue open to a minority to petition for redress of grievances.").

This burden would fall particularly heavily on members of vulnerable groups in amici States, who are disproportionately reliant on firms' pro bono programs for representation.  Such pro bono services are a scarce resource at the best of times, with demand often "far outpac[ing]" supply.  *Watts v. Kidman*, 42 F.4th 755, 764 (7th Cir. 2022); *see, e.g.*, *Cousart v. Metro Transit Police Chief*, 101 F. Supp. 3d 27, 28 n.3 (D.D.C. 2015) (noting "limited" availability of pro bono services).  But the Order's specific disapproval of firms that "regularly conduct . . . [purportedly] harmful activity through their powerful pro bono practices," Order § 1, would likely make firms especially reluctant to provide pro bono services to clients or causes that the President disfavors.  Thus, the populations that rely on pro bono programs would face heightened barriers to obtaining representation.

---

[9]  Ben Protess, *In Trump's Fight with Perkins Coie, the Richest Firms Are Staying Quiet* (Apr. 2, 2025), https://www.nytimes.com/2025/04/02/business/trump-perkins-coie-amicus-brief.html.

Even parties that do obtain counsel might find the quality of the representation diminished.  In *Velazquez*, the Supreme Court concluded that a statute forbidding legal-aid lawyers from challenging the validity of certain state laws created an unacceptable risk that those lawyers would, "either consciously to comply with this [restriction] or unconsciously to continue the representation despite the [restriction], avoid[] all reference to questions of statutory validity," "distort[ing] the legal system by altering the traditional role of the attorney[]" as a zealous advocate.  531 U.S. at 544, 546.  The Order presents the same concern:  lawyers may seek to avoid presidential sanctions or similar consequences by failing to raise all relevant claims or arguments or by moderating their presentation of clients' cases.  Either outcome would compromise the quality of legal representation provided.

Finally, these orders will result in significant harm to lawyers in amici States.  By pressuring firms not to engage with disfavored parties and causes, the Order, if allowed to become effective, will interfere both with firms' prerogative to choose their clients and their responsibility to help ensure that all parties can access legal services.  Firms that resist this chilling effect would operate under the threat of punitive executive orders and face a risk that existing clients might choose to move to competitors less likely to attract the President's disapproval.  And it is not just large law firms that will face these consequences; smaller firms would run the same risks with smaller margins of error.

All of these consequences would "threaten[] severe impairment of the judicial function." *Id.* at 546.  Like the restrictive statute in *Velazquez*, the Order "is an attempt to draw lines around [firms' activities] to exclude from litigation those argument and theories [the President] finds unacceptable but which by their nature are within the province of the courts to consider."  *Id.* The Order's chilling effect would prevent courts from fulfilling their constitutional role—in

some instances by dissuading firms from taking on particular matters, and in others by creating "lingering doubt whether the truncated representation had resulted in complete analysis . . . and proper presentation." *Id.* By thus compromising lawyers' ability to "present all the reasonable and well-grounded arguments necessary for proper resolution of the case," *id.* at 545, the Order would interfere with the separation of powers.

In sum, the Order's breach of the First Amendment and disavowal of the principle that all clients and causes deserve competent, zealous representation would harm potential clients, lawyers, and the judiciary. Accordingly, an injunction preventing these injuries serves the public interest.

## CONCLUSION

For these reasons, amici States respectfully request that the Court grant judgment in favor of Wilmer Cutler Pickering Hale and Dorr LLP.

Respectfully submitted,

ANDREA JOY CAMPBELL
*Attorney General*
*Commonwealth of*
*   Massachusetts*
One Ashburton Place
Boston, MA 02108

KWAME RAOUL
*Attorney General*
*State of Illinois*
115 South LaSalle Street
Chicago, IL 60603

NICHOLAS W. BROWN
*Attorney General*
*State of Washington*
P.O. Box 40100
Olympia, WA 98504

MATTHEW J. PLATKIN
*Attorney General*
*State of New Jersey*

/s/ Sundeep Iyer
Sundeep Iyer
  *Acting Executive Asst. Attorney General*
Benjamin Notterman
  *Senior Counsel to the Attorney General*
Meghan K. Musso
Elizabeth R. Walsh
  *Deputy Attorneys General*
Office of the Attorney General
25 Market Street
Trenton, NJ 08625
(862) 350-5800
Sundeep.Iyer@njoag.gov

KRIS MAYES
  *Attorney General*
  *State of Arizona*
2005 N. Central Avenue
Phoenix, AZ 85004

PHILIP J. WEISER
  *Attorney General*
  *State of Colorado*
1300 Broadway
Denver, CO 80203

KATHLEEN JENNINGS
  *Attorney General*
  *State of Delaware*
820 N. French Street
Wilmington, DE 19801

ANNE E. LOPEZ
  *Attorney General*
  *State of Hawaiʻi*
425 Queen Street
Honolulu, HI 96813

ANTHONY G. BROWN
  *Attorney General*
  *State of Maryland*
200 Saint Paul Place
Baltimore, MD 21202

KEITH ELLISON
  *Attorney General*
  *State of Minnesota*
445 Minnesota Street, Ste. 600
St. Paul, Minnesota 55101

RAÚL TORREZ
  *Attorney General*
  *State of New Mexico*
201 3rd Street NW
Albuquerque, NM 87109

ROB BONTA
  *Attorney General*
  *State of California*
1300 I Street
Sacramento, CA 95814

WILLIAM TONG
  *Attorney General*
  *State of Connecticut*
165 Capitol Avenue
Hartford, CT 06106

BRIAN L. SCHWALB
  *Attorney General*
  *District of Columbia*
400 6th Street NW, Suite 8100
Washington, DC 20001

AARON M. FREY
  *Attorney General*
  *State of Maine*
6 State House Station
Augusta, ME 04333

DANA NESSEL
  *Attorney General*
  *State of Michigan*
P.O. Box 30212
Lansing, MI 48909

AARON D. FORD
  *Attorney General*
  *State of Nevada*
100 North Carson Street
Carson City, NV 89701

LETITIA JAMES
  *Attorney General*
  *State of New York*
28 Liberty Street
New York, NY 10005

DAN RAYFIELD
  *Attorney General*
  *State of Oregon*
1162 Court Street NE
Salem, OR 97301

CHARITY R. CLARK
  *Attorney General*
  *State of Vermont*
109 State Street
Montpelier, VT 05609

PETER F. NERONHA
  *Attorney General*
  *State of Rhode Island*
150 South Maine Street
Providence, RI 02903

April 11, 2025

## CERTIFICATE OF COMPLIANCE

Pursuant to LCvR 7(o), I hereby certify that this brief conforms to the requirements of LCvR 5.4, complies with the requirements set forth in Fed. R. App. P. 29(a)(4), and does not exceed 25 pages in length.

/s/ Sundeep Iyer
Sundeep Iyer

April 11, 2025

**CERTIFICATE OF SERVICE**

I hereby certify that on April 11, 2025, I electronically filed the original of this brief with

the Clerk of the Court using the CM/ECF system.  Notice of this filing will be sent to all

attorneys of record by operation of the Court's electronic filing system.

/s/ Sundeep Iyer
SUNDEEP IYER