UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

WILMER CUTLER PICKERING
HALE AND DORR LLP,

     Plaintiff,

         v.

EXECUTIVE OFFICE OF THE PRESIDENT,
et al.,

     Defendants

Civil Action No. 1:25-0917 (RJL)

**Amicus Brief of Prof. Aaron H. Caplan Regarding Attainder**

Stephen C. Leckar, D.C. Bar # 281691
Kalbian Hagerty, LLP
888-17th St., NW, Twelfth Floor
Washington, D.C. 20006
Telephone: (202) 223-5600
Facsimile: (202) 223-6625
sleckar@kalbianhagerty.com

Attorney for Amicus
Professor Aaron H. Caplan

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ...............................................................................ii

INTEREST OF AMICUS ...................................................................................1

INTRODUCTION ..............................................................................................1

ARGUMENT .....................................................................................................2

      A.     The Fifth Amendment Due Process Clause Protects Against Executive
           Branch Acts of Attainder. ...............................................................2

           1.     The Framers Knew and Loathed Bills of Attainder.........................2

           2.     Precedents Applying the Attainder Clauses....................................4

           3.     Bills and Acts of Attainder Threaten Bedrock Constitutional
                 Values. ...............................................................................8

           4.     Like the Legislative Branch, the Executive Branch Has No Power
                 to Impose Attainder..........................................................10

      B.     The Executive Order Deprives WilmerHale of Its Liberty Interest Against
           Attainder ................................................................................15

           1.     The Executive Order Specifies Exactly Who Will Be Affected........15

           2.     The Executive Order Imposes Punishment......................................15

           3.     The Executive Order's Punishments Are Imposed Without Trial.....18

      C.     Attainder Theory Perfectly Matches the Facts and Circumstances of This
           Case..........................................................................................18

CONCLUSION ...............................................................................................22

CERTIFICATE OF COMPLIANCE ................................................................23

CERTIFICATE OF SERVICE .........................................................................23

# TABLE OF AUTHORITIES

**Cases**

*Biden v. Knight First Amendment Institute,*
    141 S.Ct. 1220 (2021) .................................................................................12

*Calder v. Bull,*
    3 U.S. 386 (1798) .......................................................................................19

*Campbell v. District of Columbia,*
    894 F.3d 281 (D.C. Cir. 2018) .....................................................................7

*Crandall v. Nevada,*
    73 U.S. 35 (1867) .......................................................................................14

*\*Cummings v. Missouri,*
    71 U.S. 277 (1866) ..............................................................................*passim*

*Dent v. West Virginia,*
    129 U.S. 114 (1889) ............................................................................ 12, 13

*\*Ex Parte Garland,*
    71 U.S. 333 (1866) ..............................................................................*passim*

*Ex Parte Wall,*
    107 U.S. 265 (1883) ...................................................................................13

*Flemming v. Nestor,*
    363 U.S. 603 (1960) ...................................................................................15

*Fletcher v. Peck,*
    10 U.S. 87 (1810) .......................................................................................10

*Hawker v. New York,*
    170 U.S. 189 (1898) ............................................................................12, 13

*Ingraham v. Wright,*
    430 U.S. 651 (1977) ...................................................................................20

*INS v. Chadha,*
    462 U.S. 919 (1983) .....................................................................................9

*Jenkins v. McKeithen,*
    395 U.S. 411 (1969) ............................................................................16, 17

*Joint Anti-Fascist Refugee Committee v. McGrath,*
    341 U.S. 123 (1951) ................................................................*passim*

*Jones v. Brim,*
    165 U.S. 180 (1897)................................................................13

*Kennedy v. Mendoza-Martinez,*
    372 U.S. 144 (1963) ..............................................................15

*Nixon v. Administrator of General Services,*
    433 U.S. 425 (1977) ..............................................................17

*Palko v. Connecticut,*
    302 U.S. 319 (1937)..............................................................12

*Peters v. Hobby,*
    349 U.S. 331 (1955) ...........................................................6, 19

*Pierce v. Carskadon,*
    83 U.S. 234 (1872) ........................................................4, 12, 17

*The Slaughterhouse Cases,*
    83 U.S. 36 (1872)..................................................................14

*Timbs v. Indiana,*
    586 U.S. 146 (2019)..............................................................11

*Trump v. Hawai'i,*
    585 U.S. 667 (2018)..............................................................12

*United States v. Brown,*
    381 U.S. 437 (1965) .............................................................*passim*

*United States v. Lovett,*
    328 U.S. 303 (1946) ............................................................*passim*

*Wisconsin v. Constantineau,*
    400 U.S. 433 (1971) .........................................................7, 18, 19

*Youngstown Sheet & Tube Co. v. Sawyer,*
    343 U.S. 579 (1952) ..............................................................13

## Court Rules

Local Civil Rule 7(o)(5) .......................................................................... 1

FRAP 29(a)(4) ........................................................................................ 1

## Constitutional Provisions

Art. I, §3, cl. 6 (Impeachment Trial Clause) ........................................ 9

Art. I, §9, cl. 3 (Federal Attainder Clause) .................................... 2, 13

Art. I, §10, cl. 1 (State Attainder Clause) ............................................ 2

Art. II, §3 (Take Care Clause) ............................................................ 13

Art. III, § 3, cl. 1 (Treason Clause) ...................................................... 9

Amendment 14, § 1 (Privileges or Immunities Clause) ................. 13, 14

## Other Authorities

Aaron H. Caplan, *Nonattainder as a Liberty Interest*, 2010 Wis. L. Rev. 1203 .......... *passim*

Akhil Reed Amar, *Attainder and Amendment 2: Romer's Rightness*,
    95 Mich. L. Rev. 203 (1996)................................................. 9

Note, *Beyond Process: A Substantive Rationale for the Bill of Attainder Clause*,
    70 Va. L. Rev. 475 (1984) ...................................................19

*The Federalist Papers* (1788) ......................................................... 3

Bryan A. Garner, A DICTIONARY OF MODERN LEGAL USAGE 89 (2nd Ed. 1995) ............... 10

Christopher R. Green, *Justice Gorsuch and Moral Reality*,
    70 Alabama L. Rev. 635 (2019) ......................................... 13

David Kairys, *The Bill of Attainder Clauses and Legislative and Administrative
    Suppression of "Subversives,"* 67 Colum. L. Rev. 1490 (1967)............................. 11

Jacob Reynolds, *The Rule of Law and the Origins of the Bill of Attainder Clause*,
    18 St. Thomas L. Rev. 177 (2005) ...............................................2

Joel Feinberg, *The Expressive Function of Punishment*, in DOING AND DESERVING: ESSAYS IN THE THEORY OF RESPONSIBILITY (1970) ................................................16

John Hart Ely, *A Suggested Approach to the Bill of Attainder Clause*, 72 Yale L.J. 330 (1962) ........................................................................ 8

Joseph Story, COMMENTARIES ON THE CONSTITUTION OF THE UNITED STATES (1833)... 3, 10

Laurence Tribe, AMERICAN CONSTITUTIONAL LAW (2nd Ed. 1988) ............................. 10, 11

Matthew Steilen, *Bills of Attainder*, 53 Hous. L. Rev. 767 (2016)..................................... 11

Note, *Beyond Process: A Substantive Rationale for the Bill of Attainder Clause*, 70 Va. L. Rev. 475 (1984) ........................................................................19

Note, *The Supreme Court, 1964 Term,* 79 Harv. L. Rev. 105 (1965) ................................. 11

Thomas Babbington Macaulay, THE HISTORY OF ENGLAND FROM THE ACCESSION OF JAMES II (1855) ...........................................................20

Zechariah Chafee, Jr., THREE HUMAN RIGHTS IN THE CONSTITUTION OF 1787 (1956) ........2

## INTEREST OF AMICUS[1]

Amicus Aaron H. Caplan is a Professor of Law at LMU Loyola Law School in Los Angeles. His teaching includes many subjects germane to this litigation, including Constitutional Law, First Amendment, Professional Responsibility, and Civil Procedure. He is the author of a casebook titled *An Integrated Approach to Constitutional Law* (Foundation Press 3rd Ed. 2023), and has published articles examining the interaction of due process and free speech principles, such as *Free Speech and Civil Harassment Orders*, 64 Hastings L.J. 781 (2013). Of greatest importance to this brief is his article explaining how executive branch blacklisting can violate due process by depriving the liberty interest against acts of attainder. *Nonattainder as a Liberty Interest*, 2010 Wis. L. Rev. 1203 (hereafter, *Nonattainder*). Amicus was also a signatory to the *Amicus Brief of 676 Law Professors*, Docket #32, but this brief regarding attainder does not repeat any arguments from that coalition brief.

## INTRODUCTION

Like the other currently pending cases that challenge Executive Orders against specified law firms, this case asks whether one reason for finding the orders unconstitutional is their close resemblance to bills of attainder. See Docket #1, pp. 46-47 (complaint), Docket #3, pp. 32-33 (motion for TRO & PI), Docket 16, pp. 3, 29 (summary judgment motion). On these facts, attainder is more than just a metaphor. It is an independent basis for judgment, because executive branch acts of attainder are deprivations of liberty without due process of law. Like a

---

[1] Pursuant to Local Civil Rule 7(o)(5) (incorporating FRAP 29(a)(4)), counsel for amicus certifies that no counsel for a party authored this brief in whole or in part, and that no person other than amicus or his counsel made a monetary contribution to the brief's preparation or submission, apart from reimbursement from LMU Loyola Law School for clerical expenses.

constitutionally forbidden *bill* of attainder, the Executive Order is a constitutionally forbidden *act* of attainder.

Given the number of issues in this case, and the relative unfamiliarity of the relevant history and case law, the existing party briefing on the topic has been unavoidably short. This brief explains in greater detail why the Executive Order violates due process by depriving the liberty interest against acts of attainder.

## ARGUMENT

### A.    The Fifth Amendment Due Process Clause Protects Against Executive Branch Acts of Attainder.

#### 1.    The Framers Knew and Loathed Bills of Attainder.

Bills of attainder are "legislative acts, no matter what their form, that apply either to named individuals or to easily ascertainable members of a group in such a way as to inflict punishment on them without a judicial trial." *United States v. Lovett*, 328 U.S. 303, 315-16 (1946). English bills of attainder – first used in the 1400s and last imposed in 1798 – were acts of Parliament that would specify an individual (typically one suspected of disloyalty or unhealthy political ambition), then declare the specified person guilty of some sort of wrongdoing, and finally decree the punishment to be imposed, which typically included death. Famous bills of attainder, such as that against the Earl of Strafford in 1641, were well known in the Founders' generation. See Zechariah Chafee, Jr., THREE HUMAN RIGHTS IN THE CONSTITUTION OF 1787, at 109–13 (1956) (describing the Strafford attainder in the American imagination).

Despite the widespread sense that bills of attainder were an aspect of English tyranny that the American colonists sought to reject, some of the newly-independent states passed bills of attainder against British loyalists during the Revolutionary War. These aberrations drew immediate and strenuous criticism. Jacob Reynolds, *The Rule of Law and the Origins of the Bill*

*of Attainder Clause*, 18 St. Thomas L. Rev. 177, 193-200 (2005). Thomas Jefferson himself had a role in enacting a Virginia bill of attainder in 1778, but he later lamented that a political body had "decided rights which should have been left to *judiciary controversy*." *The Federalist* #48 (February 1, 1788) (original emphasis), quoting Thomas Jefferson, *Notes on the State of Virginia* (1787).

After the revolutionary fervor had subsided, and the Articles of Confederation had revealed their shortcomings, delegates gathered in Philadelphia in 1787 to draft our current Constitution. At the federal level, "No bill of attainder … shall be passed." Art. I, §9, cl. 3. The same prohibition was repeated for the states. Art. I, §10, cl. 1 ("No State shall … pass any bill of attainder"). These Attainder Clauses were adopted unanimously and without debate. *United States v. Brown*, 381 U.S. 437, 441 (1965). In *The Federalist* #44 (January 25, 1788), James Madison wrote that bills of attainder "are contrary to the first principles of the social compact, and to every principle of sound legislation." A few decades later, Joseph Story explained that when enacting bills of attainder, the legislature exercises "what may be properly deemed an irresponsible despotic discretion, being governed solely by what it deems political necessity or expediency, and too often under the influence of unreasonable fears, or unfounded suspicions. … The injustice and iniquity of such acts, in general, constitute an irresistible argument against the existence of the power." 3 Joseph Story, COMMENTARIES ON THE CONSTITUTION OF THE UNITED STATES §678 at 484-85 (1833).

2.      **Precedents Applying the Attainder Clauses**

a)      **Decisions Finding Bill of Attainder Violations**

The Supreme Court has invalidated laws under the Attainder Clauses on five occasions.

Each involved enactments that singled out suspected political opponents for punishment during

times of intense political polarization.

Several laws enacted in 1865, in the wake of the Civil War, were aimed at the supporters

of the vanquished Confederacy. These laws denied legal rights to people who could not swear an

oath that they had not supported the Confederacy – a group that could be reduced to a finite list

of named persons. The state law in *Cummings v. Missouri*, 71 U.S. 277 (1866) denied business

and occupational licenses to those who could not take the oath. The Court found it to be an

unconstitutional bill of attainder. It specified the persons to be affected as "a whole class," even

if they were not identified by name, *id.* at 323; the denial of otherwise available licenses

constituted punishment, *id.* at 320; and of course there was no trial, *id.* at 329. The federal law in

the companion case *Ex Parte Garland*, 71 U.S. 333 (1866), prohibited any person who could not

take the oath from acting as an attorney in the federal courts. The Supreme Court also invalidated

that law, because it effectively specified which people would receive punishment for past

disloyalty. *Id.* at 377. A few years later, *Pierce v. Carskadon*, 83 U.S. 234, 239 (1872),

invalidated a West Virginia law that barred former Confederates from collecting debts in that

state's courts. The law's unconstitutionality was so obvious that the Court resolved it in a two-

sentence opinion citing *Cummings* and *Garland*.

The Supreme Court next encountered bills of attainder during the mid-twentieth century's

politically fraught anti-Communist turmoil. *United States v. Lovett*, 328 U.S. 303 (1946),

involved three employees of federal agencies who, along with a few dozen others, had been

denounced on the floor of Congress by Rep. Martin Dies, the chair of the House Committee on

Un-American Activities. Dies denounced the employees as "irresponsible, unrepresentative, crackpot, radical bureaucrats" and affiliates of "communist front organizations." *Id.* at 308-09. The Committee then conducted hearings and determined that the three had engaged in "subversive activity" – a deliberately vague term not defined by statute but invented by the Committee for purposes of the investigation. *Id.* at 311-12 & n.3. Armed with this dubious finding, Congress included a proviso in an appropriations forbidding use of the funds "to pay any part of the salary, or other compensation for the personal services, of Goodwin B. Watson, William E. Dodd, Jr., and Robert Morss Lovett." *Id.* at 305 n.1. The Court held that even though Congress had the power of the purse, it could not use that power to specify persons for punishment without trial. *Id.* at 316-17.

The federal statute in *United States v. Brown*, 381 U.S. 437 (1965), was not as blatant as the *Lovett* statute in naming specific individuals, but it named a group with a finite and identifiable membership: the Communist Party. Specifically, the statute made it a crime for any member of the Communist Party to serve as an officer or employee of a labor union. *Brown* held that this was a specification of targeted individuals, *id.* at 461; that it imposed punishment, *id.* at 457-58; and of course it provided no trial. "The purpose of the statute before us is to purge the governing boards of labor unions of those whom Congress regards as guilty of subversive acts and associations and therefore unfit to fill positions which might affect interstate commerce." *Id.* at 460. The Court accordingly found the statute to be "void as a bill of attainder." *Id.* at 440.

###### b)      Decisions Analogous to Bill of Attainder Violations

Beyond the five cases where a Court majority found a violation of the Attainder Clauses, several other cases struck down blacklisting laws on various grounds, while at least one justice also relied on the Attainder Clauses. *Joint Anti-Fascist Refugee Committee v. McGrath*, 341 U.S.

123 (1951), involved President Truman's Executive Order 9835 of 1947, sometimes known as

"The Loyalty Order." The Loyalty Order directed the U.S. Attorney General to make a list of

organizations deemed "totalitarian, fascist, communist or subversive." The list would be given to

the Loyalty Review Board of the Civil Service Commission, which in turn would encourage

federal agencies to use the list to dismiss employees on grounds of disloyalty. When several

organizations challenged their listing, five Justices issued five separate opinions explaining why

the blacklisting was improper. None received more than two votes. Justice Burton (joined by

Justice Douglas) held that the act was *ultra vires* because "patently arbitrary" decisions on

whether an organization was subversive exceeded Executive Order's scope. *Id.* at 137-38. Justice

Douglas's solo concurrence found a combination of due process violations, including vagueness,

lack of notice, and lack of opportunity to be heard. *Id.* at 176. Justice Jackson found a due

process violation in the lack of a hearing, *id.* at 187, while Justice Frankfurter's wordy

concurrence found a violation "when judged by our whole experience with the Due Process

Clause," *id.* at 165. Justice Black agreed that due process had been violated, along with the First

Amendment – and the Attainder Clause.

> Officially prepared and proclaimed governmental blacklists possess almost every quality of bills of attainder, the use of which was from the beginning forbidden to both national and state governments. It is true that the classic bill of attainder was a condemnation by the legislature following investigation by that body, while in the present case the Attorney General performed the official tasks. But I cannot believe that the authors of the Constitution, who outlawed the bill of attainder, inadvertently endowed the executive with power to engage in the same tyrannical practices that had made the bill such an odious institution.

*Id.* at 143-44 (Black, J., concurring).

The plaintiff in *Peters v. Hobby*, 349 U.S. 331 (1955), lost a federal position under the

same Loyalty Order. He had been cleared of accusations by his own agency, but the Loyalty

Review Board *sua sponte* reopened an investigation that led to his dismissal. Citing doctrines of constitutional avoidance, *id.* at 338, the majority decided the case on *ultra vires* grounds: the Executive Order empowered the Board to review dismissal recommendations, not to initiate them. *Id.* at 339-40. Concurring separately, Justice Douglas found it necessary to reach the constitutional questions, *id.* at 350, which included the right to confront accusers and the lack of even the "rudiments of a fair trial." *Id.* at 351. Justice Douglas also analogized the case to an executive branch act of attainder: "If [plaintiff] were condemned by Congress and made ineligible for government employment, he would suffer a bill of attainder, outlawed by the Constitution. An administrative agency – the creature of Congress – certainly cannot exercise powers that Congress itself is barred from asserting." *Id.* at 352. Justice Black agreed with the Douglas dissent. *Id.* at 349.

Finally, in *Wisconsin v. Constantineau,* 400 U.S. 433 (1971), a local police chief instructed taverns and liquor stores not to sell any alcohol to the plaintiff. In an opinion that became the source of the due process "stigma-plus" doctrine, see e.g., *Campbell v. District of Columbia*, 894 F.3d 281, 284 (D.C. Cir. 2018), the majority found that "when a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him, notice and an opportunity to be heard are essential." 400 U.S. at 437. Justice Black, joined by Justice Blackmun, dissented on jurisdictional grounds, but he agreed that if state law authorized the blacklisting described in plaintiff's complaint, it would be unconstitutional. "The effect of such sweeping powers, if there is nothing else in the State's law to limit them, is practically the same as that of an old common-law bill of attainder. … And here the Wisconsin law purports on its face to place such arbitrary and tyrannical power in the hands of minor officers and others that these modern bills of attainder can be issued *ex parte*, without notice or hearing of any kind or

character. It is impossible for me to believe that the Supreme Court of Wisconsin would uphold any such boundless power over the lives and liberties of its citizens." *Id.* at 444. See *Nonattainder* at 1215-27 & 1263-64 (examining *Constantineau*).

Significantly, no opinion of any justice in these three cases ever rejected the invocations of attainder principles by Justices Black, Douglas, and Blackmun.

### 3. Bills and Acts of Attainder Threaten Bedrock Constitutional Values.

Bills and acts of attainder threaten several constitutional values that are relevant to the present case.

### a) Procedural Fairness

By insisting that punishment for wrongdoing be channeled through the courts, the attainder ban demands procedural fairness. Courts, after all, are governed by the many procedural protections of Article III and of the Fifth and Sixth Amendments. In the political branches, by comparison, anything goes. Punishment could be imposed on the basis of hearsay evidence, knowingly false evidence, or no evidence at all. Punishment could be motivated by whim, jealousy, or cruelty. No method exists for the accused to mount a defense, because unlike courts, political actors are not constrained by the adversarial system and are not required to state reasons for their decisions. See *Nonattainder* at 1232-34.

### b) Separation of Powers

The Attainder Clause has a profound relationship to separation of powers. Prof. John Hart Ely's influential student note, *The Bounds of Legislative Specification: A Suggested Approach to the Bill of Attainder Clause*, 72 Yale L.J. 330 (1962), was among the first to connect the Attainder Clauses to separation of powers. For Ely, the Attainder Clause kept the legislature from invading the province of the judiciary in much the same way that the Article III case or

controversy requirement kept the judiciary from intruding into the role of the legislature. *Id.* at 343. The Attainder Clause prevents any single branch of government from acting simultaneously as lawmaker, prosecutor, judge, jury, and executioner.

Ely's reasoning was endorsed in *Brown*, which confirmed that "the Bill of Attainder Clause was intended not as a narrow, technical (and soon to be outmoded) prohibition [on a specific form of legislation], but rather as an implementation of the separation of powers." 381 U.S. at 442. See also *INS v. Chadha*, 462 U.S. 919, 962 (1983) (Powell, J., concurring).

### c) Equality

Attainder principles are a powerful engine of equality. *Nonattainder* at 1234-36. Prof. Akhil Reed Amar has explored how "the Attainder Clause, in its logic and spirit, is an early forebear of the Equal Protection Clause." *Attainder and Amendment 2: Romer's Rightness*, 95 Mich. L. Rev. 203, 208 (1996) (exploring how anti-gay laws can violate attainder principles). This can be seen in those attainders that specify a class of persons to be punished – Confederates in *Cummings* or Communists in *Brown* – without listing them by name. Legislation harming entire classes of people is typically viewed as an Equal Protection Clause problem, but it is also a concern of the Attainder Clause. When punishment is routed through the judiciary, "a court must treat like cases alike and may apply only the general criminal norms previously laid down by statute or custom, rather than whatever criminal rules the judges might prefer were they legislators. By separating the process of penal lawmaking and penal adjudication, the [Attainder Clause] protects both liberty and equality and promotes the rule of law." *Id.* at 210.

### d) Political Persecution

The Attainder Clauses belong to a cluster of constitutional provisions designed to avoid political persecution. *Nonattainder* at 1236-37. These include a narrow definition of treason in

Art. III, § 3, cl. 1, and an impeachment process that requires Senators to act "on oath or affirmation," Art. I, § 3, cl. 6, which demarcates impeachment from ordinary legislative activity and requires Senators to mentally view themselves as judge and jury, rather than as purely political actors. Along the same lines, the founding generation understood that attainder was a symptom of, and a goad to, unchecked political passion and vindictiveness. Justice Story observed that "in the hands of a reigning faction, [the power of attainder] might be, and probably would be, abused to the ruin and death of the most virtuous citizens. Bills of this sort have been most usually passed in England in times of rebellion, or of gross subserviency to the crown, or of violent political excitements; periods, in which all nations are most liable (as well the free, as the enslaved) to forget their duties, and to trample upon the rights and liberties of others." 3 Joseph Story, COMMENTARIES at 484-85 (1833). Chief Justice John Marshall observed that the ban on attainder helps avoid "the violent acts which might grow out of the feelings of the moment" and "those sudden and strong passions to which men are exposed." *Fletcher v. Peck*, 10 U.S. 87, 137-38 (1810). The fact that attainder has always been a tool for enforcement of political loyalty has even become part of the term's dictionary definition.  Bryan A. Garner, A DICTIONARY OF MODERN LEGAL USAGE 89 (2nd Ed. 1995) (attainder "means the act of extinguishing someone's civil rights by sentencing the person to death or declaring the person to be an outlaw, usu. in punishment for treason …").

####     4.     Like the Legislative Branch, the Executive Branch Has No Power to Impose Attainder.

A legislative branch bill of attainder is tyranny of the majority in its purest form: on majority vote, a person is declared a wrongdoer and punished without trial. An executive branch act of attainder is an even more concentrated form of tyranny. It imposes the same harms to the constitutional values described above as a legislative bill of attainder does.

Application of the Attainder Clauses to executive action has scholarly support. "It would make no sense to view the ban [on attainder] as less applicable to executive officers or administrative agencies than to legislative assemblies." Laurence Tribe, AMERICAN CONSTITUTIONAL LAW §10-6 at 661 (2nd Ed. 1988), citing Note, *The Supreme Court, 1964 Term,* 79 Harv. L. Rev. 105, 121 (1965) (the Attainder Clauses should be understood "not to prohibit trial by a particular *body* but rather to prohibit trial by legislative *method*, that is, to assure a defendant adequate judicial safeguards regardless of what body tries him") (emphasis added by Tribe). See also Matthew Steilen, *Bills of Attainder*, 53 Hous. L. Rev. 767, 891 (2016) ("the primary purpose of the Bill of Attainder Clauses was to prohibit a summary form of *proceeding,* rather than a proceeding in a certain *body*"); David Kairys, *The Bill of Attainder Clauses and Legislative and Administrative Suppression of "Subversives,"* 67 Colum. L. Rev. 1490, 1500-02 (1967) ("no principled distinction can be made, for the purposes of the bill of attainder clauses, between legislatures and administrative agencies").

The Constitution's text contains three paths that extend Art. I bill of attainder principles to the executive branch.

### a)    Due Process

The Due Process Clauses protect against wrongful deprivation of "liberty," a term that incorporates "fundamental" rights. *Timbs v. Indiana*, 586 U.S. 146, 150 (2019). And the Fifth Amendment Due Process Clause binds all branches of the federal government, the executive branch included. This type of incorporation across branches – which we might call "horizontal incorporation" – explains why the President must respect First Amendment rights, even though that Amendment is phrased in terms of the powers of "Congress." See, e.g., *Biden v. Knight First Amendment Institute*, 141 S.Ct. 1220 (2021) (Thomas, J., concurring) (assessing Presidential

11

compliance with the Speech Clause); *Trump v. Hawai'i*, 585 U.S. 667 (2018) (assessing Presidential compliance with the Establishment Clause). Under any possible standard for determining whether a right is fundamental enough to be incorporated, the Attainder Clause qualifies. Given the horrors that flowed from English bills of attainder, it is no exaggeration to say that "neither liberty nor justice would exist" if they were allowed. *Palko v. Connecticut*, 302 U.S. 319, 326 (1937).

Two cases from the late nineteenth century illustrate how the Supreme Court has treated freedom from attainder as a due process liberty interest.

The law in *Dent v. West Virginia,* 129 U.S. 114 (1889), denied medical licenses to persons who had not attended medical school. The case was framed as a due process challenge. The word "attainder" appears nowhere in the opinion, but the result turned entirely on Attainder Clause precedents. The opinion included a string cite to five cases for the proposition that the "great purpose" of the Due Process Clause "is to exclude everything that is arbitrary and capricious in legislation affecting the rights of the citizen." *Id.* at 124. But to resolve the case, the opinion gave close discussion of only three precedents: *Cummings*, *Garland*, and *Pierce*. *Id* at 125-28. The majority correctly concluded that these cases were distinguishable, and that the West Virginia law was not a forbidden bill of attainder.

The law in *Hawker v. New York*, 170 U.S. 189 (1898), denied medical licenses to convicted felons. This time, the challenge was framed purely in terms of the Attainder Clause, and the defendant relied largely on *Cummings* and *Garland*. *Id.* at 198. In upholding the law, the Court relied extensively on the due process decision in *Dent*, while also citing other due process precedents like *Jones v. Brim,* 165 U.S. 180 (1897), and *Ex Parte Wall*, 107 U.S. 265 (1883).

Together, *Dent* and *Hawker* show that freedom from attainder has long been viewed as a liberty protected by the Due Process Clauses.

### b)    Legislative Supremacy and the Take Care Clause

From the founding until sometime after the Civil War, legislative supremacy was the dominant constitutional paradigm. This meant, among other things, that Congress must take the lead in initiating federal policy. Once Congress spoke, the President's role was to "take care that the laws be faithfully executed." Art. II, §3. Not until later in our history did it become accepted that a President could ever initiate wholly new governmental policy in the absence of legislation or an executive power enumerated or implied in Art. II. *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637 (1952) (Jackson, J., concurring) (describing a "zone of twilight" that might allow Presidential action where Congress is silent). The framing-era understanding of legislative supremacy meant that if Congress could make no law on certain subjects – such as freedom of speech and religion in the First Amendment – the executive would necessarily lack power to act in those arenas. See Christopher R. Green, *Justice Gorsuch and Moral Reality*, 70 Alabama L. Rev. 635, 659-661 (2019). For this reason, the Framers would have felt no need to specify in Art. II that the President could not independently impose attainders. The President may only faithfully execute laws that are allowed to exist, so he may not duplicate or unilaterally impose through executive action any type of law forbidden by Art. I, § 9, be it attainder, ex post facto punishment, suspending habeas corpus in peacetime, granting titles of nobility, or establishing preferences among ports of different states.

### c)    Privileges or Immunities of Citizens of the United States

The Fourteenth Amendment directs that no State shall "make or enforce any law which shall abridge the privileges or immunities of citizens of the United States." No directly parallel

language expressly states that the *federal* government may not make or enforce laws that abridge privileges or immunities of citizens of the United States, but it is a necessary inference. A privilege or immunity that the federal government is free to abridge could not possibly be a privilege or immunity of a citizen of the United States.

One purpose of the new language in the Fourteenth Amendment's Privileges or Immunities Clause was to ensure that the States could not do what the United States was already forbidden from doing. The words "make or enforce" in the new amendment reflected the existing understanding that the federal legislature could not "make," and the federal executive branch could not "enforce," any decree with the force of law that would abridge federal privileges or immunities.

Admittedly, the much-criticized decision in *The Slaughterhouse Cases*, 83 U.S. 36 (1872), narrowly defined "the privileges or immunities of citizens of the United States." But even under that decision, the protected privileges or immunities include those rights that "owe their existence to the Federal government, its national character, its Constitution, or its laws," *Id.* at 79. Freedom from federal-level attainder is undoubtedly a right that owes its existence to the federal government and its Constitution.[2]

---

[2] As it happens, sections 2(b) and 5(a) of the Executive Order implicate one the few unenumerated rights that *Slaughterhouse* expressly acknowledged to be a privilege or immunity of US citizens. *Crandall v. Nevada*, 73 U.S. 35, 44 (1867), held that US citizenship includes "the right to come to the seat of [the federal] government to assert any claim he may have upon that government, to transact any business he may have with it. To seek its protection, to share its offices, to engage in administering its functions. He has a right to free access to its … sub-treasuries, land offices, and courts of justice." See *Slaughterhouse*, 83 U.S. at 79, quoting *Crandall*.

**B.    The Executive Order Deprives WilmerHale of Its Liberty Interest Against Attainder**

Once it has been established that the executive branch may not specify people for punishment without trial, the remaining question is whether the Executive Order does so. The answer is yes, and the issue may be resolved on summary judgment.

**1.    The Executive Order Specifies Exactly Who Will Be Affected.**

The Executive Order on its face targets a specified entity: WilmerHale. This is specification by name, as seen in the English bills of attainder and *Lovett*.

Defendants may argue that the order is part of a broader effort to reform legal practice, so is generally applicable lawmaking rather than an act of attainder. For starters, this is simply not true. WilmerHale (along with the firms Perkins Coie and Jenner and Block) are covered by punitive executive orders, but firms that have agreed to give the President things of value – such as pro bono services for his preferred causes – are subject to no such orders, or had such orders revoked. Even if the stray mentions of "other firms" in the executive order are meant seriously, there is still specification, because the orders apply "either to named individuals or to easily ascertainable members of a group." *Lovett*, 328 U.S. at 315. In light of the President's unilateral decision-making, firms like Paul Weiss are not attainted, while firms like WilmerHale are.

**2.    The Executive Order Imposes Punishment.**

Several constitutional provisions come into play only when punishment is threatened, including the Attainder Clauses, the Ex Post Facto Clauses, the Double Jeopardy Clause, the Self-Incrimination Clause, and the Cruel and Unusual Punishment Clause. See *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 168 (1963) (listing factors that help identify punishment); *Flemming v. Nestor*, 363 U.S. 603, 616 (1960) ("Each case [defining punishment] has turned on its own highly particularized context"); *Nonattainder* at 1246. Under any definition of

15

punishment, the Executive Order qualifies. It is harsh retaliatory treatment imposed as a response to perceived wrongdoing, for intertwined purposes of retribution and deterrence. *Id.* at 1245-59 (exploring the meaning of punishment under the Attainder Clauses).

It is no coincidence that the Executive Order thwarts the ability of WilmerHale employees to pursue a trade: this is a routine feature of American attainders, as seen in *Cummings*, *Garland*, *Lovett*, and *Brown*. "Disqualification from the pursuits of a lawful avocation, or from positions of trust, or from the privilege of appearing in the courts, or acting as an executor, administrator, or guardian, may also [be], and often has been, imposed as punishment." *Cummings*, 71 U.S. at 320.

It is also no coincidence that the Executive Order is deliberately crafted to impose stigma, from section 1's pejorative language to section 5's demands that government agencies remind private clients that WilmerHale is a disfavored firm. Some criminal law theorists propose that stigma is an indispensable feature of punishment. "Punishment is a conventional device for the expression of attitudes of resentment and indignation, and of judgments of disapproval and reprobation … Punishment, in short, has a symbolic significance largely missing from other kinds of penalties." Joel Feinberg, *The Expressive Function of Punishment*, in DOING AND DESERVING: ESSAYS IN THE THEORY OF RESPONSIBILITY 98 (1970). Amicus does not believe that stigma is a necessary feature of every punishment, but stigmatization is one way that a forbidden attainder does its punitive work. *Nonattainder* at 1256. The Executive Order would brand WilmerHale with a metaphorical mark of Cain, so that clients will know to shun it.

An apt authority for treating official pronouncements of wrongdoing (without more) as a form of punishment is *Jenkins v. McKeithen*, 395 U.S. 411 (1969), another splintered opinion about blacklisting. The case involved Louisiana's Labor-Management Commission of Inquiry,

which had no law enforcement power, but could hold one-sided hearings and issue findings that named individuals had committed crimes in the course of labor union activity. The plurality observed that the Commission "very clearly exercises an accusatory function" and it "is used to find named individuals guilty of violating the criminal laws of Louisiana and the United States and to brand them as criminals in public." *Id.* at 427-28. Where such accusations are a government agency's sole function, the Due Process Clauses require it to provide trial-like procedures such as a right to call witnesses and confront accusers. Indeed, "the rigorous protections relevant to criminal prosecutions might well be the controlling starting point." *Id.* at 428 (internal citation omitted). In his concurrence, Justice Black came close to analyzing *Jenkins* as an Attainder Clause case. He said the law was "nothing more nor less than a scheme for a nonjudicial tribunal to charge, try, convict, and punish people without courts, without juries, without lawyers, without witnesses – in short, without any of the procedural protections that the Bill of Rights provides." *Id.* at 432-33.

Finally, defendants may argue that the Attainder Clauses are limited to burdens that resemble criminal punishment. To the contrary, the Attainder Clauses have long been understood to forbid both bills of attainder (connoting the death penalty) and "bills of pains and penalties" (connoting any less severe punishment). *Cummings*, 71 U.S. at 323. "The deprivation of any rights, civil or political, previously enjoyed, may be punishment, the circumstances attending and the causes of the deprivation determining this fact." *Id.* at 320. The Supreme Court "often has looked beyond mere historical experience" of the forms of punishment "traditionally judged to be prohibited," and instead recognized that "new burdens and deprivations might be legislatively fashioned that are inconsistent with the bill of attainder guarantee." *Nixon v. Administrator of General Services,* 433 U.S. 425, 475 (1977). For an example, one need go no further than *Pierce*

17

*v. Carskadon*, 83 U.S. 234, 239 (1872), which creatively deprived former Confederates of the ability to enforce their debts in state court, a civil disability that was forbidden punishment.

### 3. The Executive Order's Punishments Are Imposed Without Trial.

The Executive Order was issued without notice, opportunity to be heard, or any kind of process, let alone process that resembles a judicial trial. This fact supports two relevant conclusions: that the Order is an act of attainder, and that it deprives liberty without due process.

### C. Attainder Theory Perfectly Matches the Facts and Circumstances of This Case.

As exemplified by the splintered opinions in *McGrath*, government actions that raise attainder objections are likely to implicate multiple legal theories. This is because bills and acts of attainder are so noxious that they inevitably offend numerous constitutional principles.

In this case, strong arguments exist that the Executive Order violates the speech and petition clauses, the right to counsel, equal protection, the unconstitutional conditions doctrine, many flavors of separation of powers, and many varieties of due process. These due process concerns include both vagueness and deprivations of discrete liberty interests including reputation under the stigma-plus doctrine, the right to pursue a profession, and the right to conduct business in federal buildings. Freedom from attainder belongs on the list of liberty interests deprived by the Executive Order. Highlighting the attainder argument has two additional benefits as a basis for decision: (a) it allows reference to pertinent cases whose facts are alarmingly on point; and (b) it brings into focus what is most corrosive about the Executive Order.

Like *Cummings, Garland, Lovett, Brown,* and *McGrath*, the Executive Order employs nonjudicial processes to punish perceived political opponents. Like *Lovett, McGrath,* and *Constantineau*, the Executive Order identifies the disfavored party by name. Like *Lovett,* the

Executive Order's deprivation of rights was connected to a public denunciation that was intended to stigmatize and deter others from associating with the denounced party or adopting its disfavored political views. Like *Cummings* and *Lovett*, the Executive Order builds upon powers that are capable of being used in a non-punitive manner but twists them into unmistakably punitive forms. Like *Lovett,* the Executive Order seeks to withhold lawfully obtained financial benefits. Like *Cummings, Garland, Lovett, Brown, McGrath,* and *Peters*, the Executive Order attacks the ability to maintain employment. Like *Garland*, the Executive Order specifically targets lawyers and cripples their ability to perform their constitutionally significant duties. Like *Lovett*, the Executive Order depicts lawful past conduct as somehow wrongful, according to vague standards newly concocted for the occasion. Like *McGrath* and *Peters*, sections 3(b) and 4(b) of the Executive Order assign to federal agencies the task of identifying additional individuals to be specified for future punishment. And like all these cases save *Constantineau*, the Executive Order punishes those who are believed to hold, or express, beliefs the party in power considers politically threatening. See Note, *Beyond Process: A Substantive Rationale for the Bill of Attainder Clause*, 70 Va. L. Rev. 475, 500–01 (1984) (attainders are especially dangerous when used to punish political activity protected by the First Amendment).

The uncanny similarities between this case and the earlier attainder cases make perfect sense once one considers the circumstances that surround the Executive Order. Attainder is often imposed in times of political polarization by those who have recently taken power and seek to cement it. As Justice Iredell observed in *Calder v. Bull*, 3 U.S. 386, 399-400 (1798), "attainders, on the principle of retaliation and proscription, have marked all the vicissitudes of party triumph." An instructive example is the Great Act of Attainder instigated by the now-disgraced King James II of England. In his *McGrath* dissent, Justice Black referred to the incident,

19

including as an appendix a description from Thomas Babbington Macaulay, THE HISTORY OF ENGLAND FROM THE ACCESSION OF JAMES II (1855).

In brief, James II took the throne in 1685, aware that he faced strong internal opponents who had tried to prevent him from becoming King. Before the year was over, James sought to squelch the opposition through notoriously cruel means, including the "Bloody Assizes" of 1685, a set of harsh and unfair treason trials. James soon squandered whatever remained of his good will, and he was ultimately ousted and replaced by William and Mary of Orange in the "Glorious Revolution" of November 1688. Memories of his misconduct led to the creation of a Cruel and Unusual Punishment Clause in the English Bill of Rights of 1689 – which was later imported into our Eighth Amendment. See *Ingraham v. Wright*, 430 U.S. 651, 664 (1977).

By fall 1688, James realized that Parliament was poised to throw its support to William and Mary. He fled to Ireland where he retained a base of support. In anticipation of this exile, James had already replaced the highest officers and virtually all the judges in Ireland with his chosen supporters. He convened an Irish parliament in the summer of 1689 and convinced it to pass the Great Act of Attainder. It specified thousands of political enemies by name, typically without any clear evidence that they had engaged in any wrongdoing; it was enough if parliament "heard the King say some hard things of that lord." *McGrath*, 341 U.S. at 147 (quoting Macaulay). James initially retained the power to negotiate pardons on a case-by-case basis, which he did on terms of his own choosing.

James was defeated by English forces in the Battle of the Boyne in 1690. He fled to France and lived out his days as a penitent. In hindsight, the Great Act of Attainder appears to be one of James's last gasps, a desperate measure from a rejected, despised, and unprincipled monarch.

Today, we have a President first elected with a minority of the popular vote, who faced considerable legislative opposition during his first term, and who was rejected by voters when he first sought re-election. He regained the office with one of the narrowest popular vote margins in recent history. He took office with extremely narrow and not always unified majorities in both houses of Congress. Among his responses to his uncertain grip on power in a polarized era were to purge the government to make room for his supporters and to attack his perceived enemies – including WilmerHale. A wave of other law firm attainders followed, but with latitude for him to negotiate reprieves for those who offered him enough in return.

As the saying goes, history might not repeat itself, but it sometimes rhymes.

The President's executive orders against law firms are acts of personal vengeance, but they are also more. They form part of an integrated attempt to concentrate power, to usurp the functions of other organs of government, and to extort subservience from civil society by instilling fear that arbitrary and cruel punishment could hit as unpredictably as a stroke of lightning. Of all the theories in this litigation, the due process attainder theory best highlights these lamentable facts.

## CONCLUSION

In addition to other grounds that may justify it, summary judgment should be granted for plaintiff because the Executive Order deprives it of the liberty interest against attainder, without due process of law. At the very least, defendants' motion to dismiss should be denied, and plaintiff should be allowed to demonstrate at trial that its due process rights were violated as a result of being specified for punishment without trial.

ated: April 14, 2025                                    Respectfully submitted,


                                                        KALBIAN HAGERTY, LLP

                                                        By:    /s/ Stephen C. Leckar
                                                               Stephen C. Leckar
                                                                  (Bar No. 281691)
                                                               888 17th Street, N.W.
                                                               Suite 1200
                                                               Washington, D.C. 20006
                                                               Telephone: (202) 223-5600
                                                               Facsimile: (202) 223-6625
                                                               sleckar@kalbianhagerty.com

                                                        Attorney for Professor Amicus
                                                        Aaron H. Caplan

**CERTIFICATE OF COMPLIANCE**

Pursuant to Local Rule 7(o), I hereby certify that this brief conforms to the requirements of Local Rule 5.4, complies with the requirements set forth in FRAP 29(a)(4), and does not exceed 25 pages in length.

**CERTIFICATE OF SERVICE**

I hereby certify on April 14, 2025 that I have electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will then send a notification of such filing (NEF) to all counsel of record.

By:   /s/ Stephen C. Leckar
      Stephen C. Leckar