**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| WILMER CUTLER PICKERING HALE AND DORR LLP, | |
| Plaintiff, | |
| v. | Civil Action No. 1:25-0917 (RJL) |
| EXECUTIVE OFFICE OF THE PRESIDENT, *et* al., | |
| Defendants. | |

<u>**DECLARATION OF RICHARD LAWSON**</u>

1.  I serve as Deputy Associate Attorney General in the United States Department of Justice and am counsel of record for Defendants in the above-captioned case.  The facts provided herein are based on my personal knowledge or on information provided me in my official capacity.

2.  All exhibits attached to this Declaration were obtained by visiting the URLs or other cites noted below within the last seven days.

3.  Attached as Exhibit 1 is a true and correct copy of a March 19, 2025 joint Department of Justice and Equal Employment Opportunity Commission (EEOC) press release, *EEOC and Justice Department Warn Against Unlawful DEI-Related Discrimination* (available at https://www.eeoc.gov/newsroom/eeoc-and-justice-department-warn-against-unlawful-dei-related-discrimination).

4.   Attached as Exhibit 2 is a true and correct copy of a WilmerHale 2023 Vault Law Firm Diversity Survey Response (available at

https://media2.vault.com/14349354/wilmerhale-with-ad.pdf ).

5.   Attached as Exhibit 3 is a true and correct copy of a WilmerHale 2024 Vault Law Firm Diversity Survey Response (available at

https://media2.vault.com/14351581/wilmerhale.pdf ).

6.   Attached as Exhibit 4 is a true and correct copy of a June 17, 2022 article, J. Iino, J. Sandman, C.U. Stacy, *Diversifying Leadership: How the Mansfield Rule Is Driving Change* (available at https://news.bloomberglaw.com/us-law-week/diversifying-leadership-how-the-mansfield-rule-is-helping).

7.   Attached as Exhibit 5 is a true and correct copy of a May 8, 2023 commentary article from American Lawyer Online: A. Boydstun, C. Zorn, *Data Shows Mansfield Firms Are Adding Diverse Leaders Much Faster* (available through Lexis/Nexis via https://www.law.com/americanlawyer/2023/05/08/data-shows-mansfield-firms-are-adding-diverse-leaders-much-faster/?slreturn=20250415110314).

8.   Attached as Exhibit 6 is a true and correct copy of a October 2, 2024 Diversity Lab press release, *More than 360 Law Firms Achieve Mansfield Certification for 2023– 24, Marking a Double-Digit Increase in the Push for Leadership Diversity* (available at https://www.diversitylab.com/wp-content/uploads/2024/09/Mansfield-2023-24-Mansfield-Certified-Firms-Press-Release-September-2024-.pdf).

9.   Attached as Exhibit 7 is a true and correct copy of a September 2023 *Report and Recommendation of the New York State Bar Association Task Force on Advancing*

*Diversity* (available at https://nysba.org/wp-content/uploads/2023/09/NYSBA-Report-on-Advancing-Diversity-9.20.23-FINAL-with-cover.pdf).

10. Attached as Exhibit 8 is a true and correct copy of a January 21, 2025 EEOC press release, *President Appoints Andrea R. Lucas EEOC Acting Chair* (available at https://www.eeoc.gov/newsroom/president-appoints-andrea-r-lucas-eeoc-acting-chair).

11. Attached as Exhibit 9 is a true and correct copy of a February 5, 2025 Memorandum from the Attorney General to Department of Justice employees, *Subject: Ending Illegal DEI and DEIA Discrimination and Preferences* (available at https://www.justice.gov/ag/media/1388501/dl?inline).

I hereby declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed this 17th day of April, 2025.

RICHARD LAWSON
Deputy Associate Attorney General
950 Pennsylvania Avenue, NW
Washington, DC 20530

# Exhibit 1

**U.S. Equal Employment Opportunity Commission**

---

**Press Release**

03-19-2025

# EEOC and Justice Department Warn Against Unlawful DEI–Related Discrimination

Employers' DEI Policies, Programs, and Practices Can Violate Title VII of the Civil Rights Act of 1964

WASHINGTON -- Today, the U.S. Equal Employment Opportunity Commission (EEOC) and the U.S. Department of Justice (DOJ) released two technical assistance documents focused on educating the public about unlawful discrimination related to "diversity, equity, and inclusion" (DEI) in the workplace.

DEI is a broad term that is not defined in **Title VII of the Civil Rights Act of 1964 (https://www.eeoc.gov/statutes/title-vii-civil-rights-act-1964)**. Title VII prohibits employment discrimination based on protected characteristics such as race and sex. Under Title VII, DEI initiatives, policies, programs, or practices may be unlawful if they involve an employer or other covered entity taking an employment action motivated—in whole or in part—by an employee's or applicant's race, sex, or another protected characteristic.

In the past five years, DEI policies, programs, and practices have become increasingly prevalent in many of our nation's largest and most prominent businesses, universities, and cultural institutions. The widespread adoption of DEI,

however, does not change longstanding legal prohibitions against the use of race, sex, and other protected characteristics in employment.

To help educate the public about how well-established civil rights rules apply to employment policies, programs, and practices—including those labeled or framed as "DEI"—the EEOC and the DOJ today released a joint one-page technical assistance document, "**What To Do If You Experience Discrimination Related to DEI at Work (https://www.eeoc.gov/what-do-if-you-experience-discrimination-related-dei-work)** ." The EEOC also released a longer question-and-answer technical assistance document, "**What You Should Know About DEI-Related Discrimination at Work (https://www.eeoc.gov/wysk/what-you-should-know-about-dei-related-discrimination-work)** ." Both documents are based on Title VII, existing EEOC policy guidance and technical assistance documents and Supreme Court precedent.

"Far too many employers defend certain types of race or sex preferences as good, provided they are motivated by business interests in 'diversity, equity, or inclusion.' But no matter an employer's motive, there is no 'good,' or even acceptable, race or sex discrimination," said EEOC Acting Chair Andrea Lucas. "In the words of Justice Clarence Thomas in his concurrence in *Students for Fair Admissions*, 'two discriminatory wrongs cannot make a right.'"

Lucas emphasized, "While the public may be confused about what rules apply to DEI, the law itself is clear. And there are some serious implications for some very popular types of DEI programs. These technical assistance documents will help employees know their rights and help employers take action to avoid unlawful DEI-related discrimination."

"The Department of Justice is committed to ending illegal DEI initiatives, policies, and programs," said Deputy Attorney General Todd Blanche. "The technical assistance document provides clear information for employees on how to act should they experience unlawful discrimination based on DEI practices."

The EEOC investigates and litigates against businesses and other private sector employers for violations of federal laws prohibiting employment discrimination. For public sector employers, the EEOC shares jurisdiction with the Department of Justice's Civil Rights Division; the EEOC is responsible for investigating charges against state and local government employers before referring them to DOJ for potential litigation. The EEOC also is responsible for coordinating the federal

4/14/25, 5:40 PM    EEOC and Justice Department Warn Against Unlawful DEI-Related Discrimination | U.S. Equal Employment Opportunity Commission

Case 1:25-cv-00917-RJL    Document 109-2    Filed 04/17/25    Page 7 of 221

government's employment antidiscrimination effort. More information about the EEOC is available at **www.eeoc.gov (http://www.eeoc.gov)** . Stay connected with the latest EEOC news by subscribing to our **email updates (https://public.govdelivery.com/accounts/USEEOC/subscriber/new)** .

# Exhibit 2



WilmerHale proudly supports Vault Law and its work to promote diversity, equity and inclusion in the legal profession.

**wilmerhale.com**



© 2023 Wilmer Cutler Pickering Hale and Dorr LLP

**WilmerHale**

## 2023 Vault Law Firm Diversity Survey



### LEADERSHIP

**Head of Firm**

| Name and Title | Race/Ethnicity | Gender | Add'l Demo |
|---|---|---|---|
| Susan Murley, Co-Managing Partner | White | Female | |
| Robert Novick, Co-Managing Partner | White | Male | |

**Executive Committee**

Total Number of Attorneys on Committee: **18**

| Demographics | Men | Women | Nonbinary | Unknown |
|---|---|---|---|---|
| **Race / Ethnicity** | **10** | **8** | **0** | **0** |
| American Indian or Alaska Native | 0 | 0 | 0 | 0 |
| Asian | 1 | 1 | 0 | 0 |
| Black or African-American | 3 | 0 | 0 | 0 |
| Hispanic or Latinx | 0 | 0 | 0 | 0 |
| Native Hawaiian or Other Pacific Islander | 0 | 0 | 0 | 0 |
| White | 6 | 7 | 0 | 0 |
| Two or More Races | 0 | 0 | 0 | 0 |
| Other or Unknown | 0 | 0 | 0 | 0 |
| **Additional Demographics** | **0** | **0** | **0** | **0** |
| LGBTQ+ Individuals | 0 | 0 | 0 | 0 |
| Individuals with Disabilities | 0 | 0 | 0 | 0 |

Response to Spring 2023 Vault Law Firm Diversity Survey. Copyright © 2023 Vault and Infobase Holdings, Inc. All rights reserved.



**WilmerHale**

## 2023 Vault Law Firm Diversity Survey

**DEI Professional**

Does the firm have a chief diversity officer, director of diversity, or other professional(s) leading the firm's diversity, equity, and inclusion initiatives?

Yes

| Name and Title |
| --- |
| Monya Bunch, Director, Diversity, Equity and Inclusion |
| Talik Watson, Diversity, Equity and Inclusion Manager |
| Nicole Hill, Diversity, Equity and Inclusion Manager |
| Karla Aguayo-Ramirez, Firmwide Diversity, Equity and Inclusion Specialist |

**DEI Committee**

Does the firm have a diversity, equity, and inclusion committee or the equivalent?          Yes

In what year was the committee formed?

**Office-specific diversity committees emerged in the early 2000s. In 2019, the firm established the Firmwide Executive Diversity and Inclusion Committeeâ€¯(EDIC)â€¯to develop goals and driveâ€¯programmingâ€¯within the firm with a focusâ€¯on:â€¯1. Leadership Commitment; 2. Professional Development and Inclusive Workplaces; 3. Recruitment and Diversity Pipeline; and 4. External Engagement/Client Partnership Opportunities.**

Total Number of Attorneys on DEI Committee:          **87**

| Demographics | Men | Women | Nonbinary | Unknown |
| --- | --- | --- | --- | --- |
| **Race / Ethnicity** | **40** | **45** | **2** | **0** |
| American Indian or Alaska Native | 0 | 1 | 0 | 0 |
| Asian | 7 | 14 | 0 | 0 |
| Black or African-American | 4 | 8 | 0 | 0 |
| Hispanic or Latinx | 2 | 2 | 0 | 0 |
| Native Hawaiian or Other Pacific Islander | 0 | 0 | 0 | 0 |
| White | 25 | 15 | 0 | 0 |
| Two or More Races | 2 | 5 | 0 | 0 |
| Other or Unknown | 0 | 0 | 2 | 0 |
| **Additional Demographics** | **4** | **4** | **0** | **0** |
| LGBTQ+ Individuals | 4 | 4 | 0 | 0 |
| Individuals with Disabilities | 0 | 0 | 0 | 0 |

Is the firm women-owned, minority-owned, and/or LGBTQ+-owned?          **N/A**

Does the firm have a non-discrimination policy in the employee handbook or elsewhere in firm materials?          **Yes**

Response to Spring 2023 Vault Law Firm Diversity Survey. Copyright © 2023 Vault and Infobase Holdings, Inc. All rights reserved.



**WilmerHale**

## 2023 Vault Law Firm Diversity Survey

### ATTORNEY DEMOGRAPHICS

**Attorney Headcount**

**1,048**  Total attorneys in U.S. offices

**1,146**  Total attorneys worldwide (including all U.S. and global offices)

**U.S. Associates**

**651**  Total number of U.S.-based associates

| Demographics | Men | Women | Nonbinary | Unknown |
|---|---|---|---|---|
| **Race / Ethnicity** | **299** | **351** | **1** | **0** |
| American Indian or Alaska Native | 0 | 1 | 0 | 0 |
| Asian | 43 | 63 | 0 | 0 |
| Black or African-American | 12 | 28 | 0 | 0 |
| Hispanic or Latinx | 12 | 16 | 0 | 0 |
| Native Hawaiian or Other Pacific Islander | 0 | 0 | 0 | 0 |
| White | 206 | 207 | 1 | 0 |
| Two or More Races | 26 | 36 | 0 | 0 |
| Other or Unknown | 0 | 0 | 0 | 0 |
| **Additional Demographics** | **24** | **29** | **1** | **0** |
| LGBTQ+ Individuals | 24 | 29 | 1 | 0 |
| Individuals with Disabilities | 0 | 0 | 0 | 0 |

Response to Spring 2023 Vault Law Firm Diversity Survey. Copyright © 2023 Vault and Infobase Holdings, Inc. All rights reserved.



**WilmerHale**

## 2023 Vault Law Firm Diversity Survey

**U.S. Equity Partners**

**247** Total Equity Partners

| Demographics | Men | Women | Nonbinary | Unknown |
|---|---|---|---|---|
| **Race / Ethnicity** | **175** | **72** | **0** | **0** |
| American Indian or Alaska Native | 0 | 0 | 0 | 0 |
| Asian | 7 | 7 | 0 | 0 |
| Black or African-American | 5 | 7 | 0 | 0 |
| Hispanic or Latinx | 0 | 0 | 0 | 0 |
| Native Hawaiian or Other Pacific Islander | 0 | 0 | 0 | 0 |
| White | 155 | 55 | 0 | 0 |
| Two or More Races | 8 | 3 | 0 | 0 |
| Other or Unknown | 0 | 0 | 0 | 0 |
| **Additional Demographics** | **2** | **2** | **0** | **0** |
| LGBTQ+ Individuals | 2 | 2 | 0 | 0 |
| Individuals with Disabilities | 0 | 0 | 0 | 0 |

**U.S. Non-Equity Partners**

**0** Total Non-Equity Partners

| Demographics | Men | Women | Nonbinary | Unknown |
|---|---|---|---|---|
| **Race / Ethnicity** | **0** | **0** | **0** | **0** |
| American Indian or Alaska Native | 0 | 0 | 0 | 0 |
| Asian | 0 | 0 | 0 | 0 |
| Black or African-American | 0 | 0 | 0 | 0 |
| Hispanic or Latinx | 0 | 0 | 0 | 0 |
| Native Hawaiian or Other Pacific Islander | 0 | 0 | 0 | 0 |
| White | 0 | 0 | 0 | 0 |
| Two or More Races | 0 | 0 | 0 | 0 |
| Other or Unknown | 0 | 0 | 0 | 0 |
| **Additional Demographics** | **0** | **0** | **0** | **0** |
| LGBTQ+ Individuals | 0 | 0 | 0 | 0 |
| Individuals with Disabilities | 0 | 0 | 0 | 0 |

Response to Spring 2023 Vault Law Firm Diversity Survey. Copyright © 2023 Vault and Infobase Holdings, Inc. All rights reserved.



**WilmerHale**

## 2023 Vault Law Firm Diversity Survey

### U.S. Counsel / Of Counsel

**53** Total Counsel / Of Counsel

| Demographics | Men | Women | Nonbinary | Unknown |
|---|---|---|---|---|
| **Race / Ethnicity** | **35** | **18** | **0** | **0** |
| American Indian or Alaska Native | 0 | 0 | 0 | 0 |
| Asian | 1 | 1 | 0 | 0 |
| Black or African-American | 0 | 0 | 0 | 0 |
| Hispanic or Latinx | 1 | 0 | 0 | 0 |
| Native Hawaiian or Other Pacific Islander | 0 | 0 | 0 | 0 |
| White | 33 | 16 | 0 | 0 |
| Two or More Races | 0 | 1 | 0 | 0 |
| Other or Unknown | 0 | 0 | 0 | 0 |
| **Additional Demographics** | **1** | **0** | **0** | **0** |
| LGBTQ+ Individuals | 1 | 0 | 0 | 0 |
| Individuals with Disabilities | 0 | 0 | 0 | 0 |

### U.S. Non-Partner-Track Attorneys

**97** Total Non-Partner-Track Attorneys

| Demographics | Men | Women | Nonbinary | Unknown |
|---|---|---|---|---|
| **Race / Ethnicity** | **46** | **51** | **0** | **0** |
| American Indian or Alaska Native | 1 | 0 | 0 | 0 |
| Asian | 1 | 5 | 0 | 0 |
| Black or African-American | 0 | 2 | 0 | 0 |
| Hispanic or Latinx | 2 | 2 | 0 | 0 |
| Native Hawaiian or Other Pacific Islander | 0 | 0 | 0 | 0 |
| White | 40 | 40 | 0 | 0 |
| Two or More Races | 2 | 2 | 0 | 0 |
| Other or Unknown | 0 | 0 | 0 | 0 |
| **Additional Demographics** | **2** | **5** | **0** | **0** |
| LGBTQ+ Individuals | 2 | 5 | 0 | 0 |
| Individuals with Disabilities | 0 | 0 | 0 | 0 |

Response to Spring 2023 Vault Law Firm Diversity Survey. Copyright © 2023 Vault and Infobase Holdings, Inc. All rights reserved.



**WilmerHale**

## 2023 Vault Law Firm Diversity Survey

**U.S. Law Clerks**

**0** Total Law Clerks

| Demographics | Men | Women | Nonbinary | Unknown |
|---|---|---|---|---|
| **Race / Ethnicity** | **0** | **0** | **0** | **0** |
| American Indian or Alaska Native | 0 | 0 | 0 | 0 |
| Asian | 0 | 0 | 0 | 0 |
| Black or African-American | 0 | 0 | 0 | 0 |
| Hispanic or Latinx | 0 | 0 | 0 | 0 |
| Native Hawaiian or Other Pacific Islander | 0 | 0 | 0 | 0 |
| White | 0 | 0 | 0 | 0 |
| Two or More Races | 0 | 0 | 0 | 0 |
| Other or Unknown | 0 | 0 | 0 | 0 |
| **Additional Demographics** | **0** | **0** | **0** | **0** |
| LGBTQ+ Individuals | 0 | 0 | 0 | 0 |
| Individuals with Disabilities | 0 | 0 | 0 | 0 |

**U.S. Office Managing Partners**

**7** Total U.S. Office Managing Partners

| Demographics | Men | Women | Nonbinary | Unknown |
|---|---|---|---|---|
| **Race / Ethnicity** | **5** | **2** | **0** | **0** |
| American Indian or Alaska Native | 0 | 0 | 0 | 0 |
| Asian | 1 | 0 | 0 | 0 |
| Black or African-American | 0 | 0 | 0 | 0 |
| Hispanic or Latinx | 0 | 0 | 0 | 0 |
| Native Hawaiian or Other Pacific Islander | 0 | 0 | 0 | 0 |
| White | 2 | 2 | 0 | 0 |
| Two or More Races | 2 | 0 | 0 | 0 |
| Other or Unknown | 0 | 0 | 0 | 0 |
| **Additional Demographics** | **0** | **0** | **0** | **0** |
| LGBTQ+ Individuals | 0 | 0 | 0 | 0 |
| Individuals with Disabilities | 0 | 0 | 0 | 0 |

Response to Spring 2023 Vault Law Firm Diversity Survey. Copyright © 2023 Vault and Infobase Holdings, Inc. All rights reserved.



**WilmerHale**

## 2023 Vault Law Firm Diversity Survey
### U.S. Hiring Committee
**85** Total U.S. Hiring Committee Attorneys

| Demographics | Men | Women | Nonbinary | Unknown |
|---|---|---|---|---|
| **Race / Ethnicity** | **50** | **35** | **0** | **0** |
| American Indian or Alaska Native | 0 | 0 | 0 | 0 |
| Asian | 3 | 5 | 0 | 0 |
| Black or African-American | 4 | 3 | 0 | 0 |
| Hispanic or Latinx | 1 | 0 | 0 | 0 |
| Native Hawaiian or Other Pacific Islander | 0 | 0 | 0 | 0 |
| White | 39 | 23 | 0 | 0 |
| Two or More Races | 3 | 4 | 0 | 0 |
| Other or Unknown | 0 | 0 | 0 | 0 |
| **Additional Demographics** | **3** | **1** | **0** | **0** |
| LGBTQ+ Individuals | 3 | 1 | 0 | 0 |
| Individuals with Disabilities | 0 | 0 | 0 | 0 |

## FORMAL PROCESSES AND GOALS

### Metrics
Does the firm provide a formal means for attorneys to voluntarily disclose any of the following?

**Yes**    Racial/ethnic identity

**Yes**    Gender identity and gender expression

**Yes**    Sexual orientation

**Yes**    Disability

### Measurement
Has the firm set formal, measurable targets for increasing diversity in recruitment, retention, promotion, and/or leadership?

**Yes**    If yes, describe the firm's targets:

WilmerHale is a pioneering member of the Mansfield Rule, which seeks to ensure 30 percent of candidates are women or attorneys of color for lateral hiring, promotions to equity partner, and firm leadership. We first received Mansfield Certification status in 2018 after successfully completing a one-year pilot program in which participating firms agreed to have their diversity efforts measured against ambitious targets for the percentages of women and attorneys of color in leadership and other important roles. Underscoring WilmerHale's continued commitment to diversity, equity and inclusion, the firm has achieved Mansfield Certification Plus status since its inception, including most recently, Mansfield Certified Plus Status for 5.0 (2021-2023).  Certification Plus status indicates that the firm has affirmatively considered at least 30 percent women, lawyers of color, LGBTQ+ lawyers, and lawyers with disabilities for leadership and governance roles, equity partner promotions, formal client pitch opportunities, and senior lateral positions. Our participation in Mansfield 6.0 is currently underway.  WilmerHale has a long record of championing diversity, equity and inclusion (DEI), our participation in the Mansfield Rule initiative has helped provide a valuable framework for our efforts and more thoroughly documented our progress.

Response to Spring 2023 Vault Law Firm Diversity Survey. Copyright © 2023 Vault and Infobase Holdings, Inc. All rights reserved.



**WilmerHale**

## 2023 Vault Law Firm Diversity Survey

**Accountability**

Has the firm set formal, measurable targets for increasing diversity in recruitment, retention, promotion, and/or leadership?

**Yes**

If yes, explain how the firm holds partners accountable for DEI achievements?

WilmerHale formalized the requirement that partner compensation be tied to substantiated efforts to advance DEI, a significant step that underscores the partnership's bottom-line commitment to our DEI goals. In the Individual Partner Plan, partners are asked to report on how they have worked to advance the Firm's DEI objectives through recruiting, mentoring (formal and informal), training, staffing and business development.

Response to Spring 2023 Vault Law Firm Diversity Survey. Copyright © 2023 Vault and Infobase Holdings, Inc. All rights reserved.



**WilmerHale**

## 2023 Vault Law Firm Diversity Survey

**DEI Training**

Which of the following steps has the firm undertaken to bolster diversity, equity, and inclusion awareness among attorneys and staf

**Yes**   Provides annual DEI training that addresses implicit bias for all attorneys

**Yes**   Provides annual DEI training that addresses implicit bias for all attorneys and staff

**Yes**   Provides DEI training specifically for firm leadership/managers/department chairs

**Yes**   Includes DEI training in on-boarding process for new associates and/or summer associates

**Yes**   Retained a DEI consultant to conduct a cultural assessment or review firm processes

If applicable, descibe any other initiatives taken:

Response to Spring 2023 Vault Law Firm Diversity Survey. Copyright © 2023 Vault and Infobase Holdings, Inc. All rights reserved.



**WilmerHale**

**2023 Vault Law Firm Diversity Survey**

## RECRUITMENT AND HIRING

**HBCUs**

Does the firm recruit at law schools of Historically Black Colleges and Universities (HBCUs)?

**Yes**

If yes, which HBCUs does the firm hire from?

Howard University School of Law

**Law Schools**

Does the firm recruit at any other law schools specifically for diversity purposes, such as institutions with significant populations of students of color? (Note that we are looking for intentional recruiting efforts to broaden the pool of applicants and extend more opportunities to diverse students.)

**Yes**

If yes, which law schools does the firm recruit at specifically for diversity purposes?

Vanderbilt Law School, Washington University in St. Louis School of Law Cardozo School of Law, Fordham University School of Law, Northeastern University School of Law, Loyola Law School, Los Angeles, New England Law School, Santa Clara University School of Law, SMU Dedman School of Law, Suffolk University Law School, University of California, Irvine School of Law, University of Denver, Sturm College of Law, University of Colorado Law School, University of Texas at Austin School of Law, University of Southern California Gould School of Law

Response to Spring 2023 Vault Law Firm Diversity Survey. Copyright © 2023 Vault and Infobase Holdings, Inc. All rights reserved.



**WilmerHale**

## 2023 Vault Law Firm Diversity Survey

### Scholarships

Does the firm offer scholarships, internships, or fellowships to diverse law students?

**Yes**

If yes, provide the following:

| Description, opportunities available, and link | Number awarded in 2021 |
|---|---|
| **Scholarships** | |
| 1 -- Law Preview Scholarship Link: https://lawpreview.barbri.com/sponsor/wilmerhale-llp/ | 50 |
| **Internships** | |
| 3 -- Boston Lawyer's Group (BLG) Diverse 1L program; Colorado Pledge to Diversity program; Leadership Council on Legal Diversity (LCLD) 1L Scholars Program.   Link: http://thebostonlawyersgroup.com/programs/, *https://coloradopledge.org/, *https://www.lcldnet.org/programs/1l-scholars/ | 3 -- 1 (BLG), 1 (LCLD), 1 (Colorado Pledge) |
| **Fellowships** | |
| 2 -- Sponsors for Educational Opportunity's (SEO) Fellowship Law Program; John A. Payton Summer Associate Fellowship Link: https://www.seo-usa.org/law/our-program/fellowship/, https://www.wilmerhale.com/en/about/diversity-and-inclusion/fellowship-scholarship, https://www.wilmerhale.com/en/careers/law-students/fellowships-scholarships | 6 (SEO Fellows) |

Response to Spring 2023 Vault Law Firm Diversity Survey. Copyright © 2023 Vault and Infobase Holdings, Inc. All rights reserved.    11    

**WilmerHale**

## 2023 Vault Law Firm Diversity Survey

**Career Fairs**

Does the firm participate in legal diversity career fairs?

**Yes**

If yes, list the diversity career fairs in which the firm participates

Bay Area Diversity Career Fair, Boston Lawyer's Group Boston Job Fair, Lavender Law Conference & Career Fair, The Rocky Mountain Diversity Legal Career Fair

**Combating Implicit Bias**

What steps has the firm taken to combat implicit bias in recruiting (e.g., interview training, behavioral interview questions, blind resume review, etc.)?

We develop formal training for our recruiting teams to ensure that interviews are conducted in a culturally relevant and inclusive manner. Additionally, discussing the possibility of introducing more uniform processes, such as having a core set of interview questions and panel interviews, among other items.

Response to Spring 2023 Vault Law Firm Diversity Survey. Copyright © 2023 Vault and Infobase Holdings, Inc. All rights reserved.



**WilmerHale**

## 2023 Vault Law Firm Diversity Survey

**Summer Associates**

In what ways does the firm support diverse summer associates (e.g., mentoring, training, events, etc.)?

The firm supports diverse summer associates in a variety of different ways, including:
- We participate in the Leadership Council on Legal Diversity (LCLD) 1L Scholars Program, which offers diverse first year law students an opportunity to participate in the firm's summer program and also work side-by-side with a firm client, to provide students joint summer experiences and enhanced professional development opportunities.
- We provide each diverse summer associate with a diverse attorney mentor, also known as a "Diversity Buddy."The buddy serves as a resource during their time at the firm.
- We host office based and firmwide programs to help build relationships including welcome events, panel discussions and participation in the affinity group meetings to help introduce diverse attorneys to one another across offices and seniority.
- We have a firmwide diversity, equity and inclusion team dedicated to help facilitate and coordinate a wide range of programs and initiatives throughout the firm as well as provide support to attorneys.



**WilmerHale**

## 2023 Vault Law Firm Diversity Survey

**1L Summer Associates**
Does the firm hire 1L summer associates?
**Yes**

**12** Total 1L summer associates at the firm in 2022

| Demographics | Men | Women | Nonbinary | Unknown |
|---|---|---|---|---|
| **Race / Ethnicity** | **3** | **9** | **0** | **0** |
| American Indian or Alaska Native | 0 | 0 | 0 | 0 |
| Asian | 0 | 2 | 0 | 0 |
| Black or African-American | 1 | 2 | 0 | 0 |
| Hispanic or Latinx | 0 | 2 | 0 | 0 |
| Native Hawaiian or Other Pacific Islander | 0 | 0 | 0 | 0 |
| White | 2 | 1 | 0 | 0 |
| Two or More Races | 0 | 2 | 0 | 0 |
| Other or Unknown | 0 | 0 | 0 | 0 |
| **Additional Demographics** | **0** | **0** | **0** | **0** |
| LGBTQ+ Individuals | 0 | 0 | 0 | 0 |
| Individuals with Disabilities | 0 | 0 | 0 | 0 |

**Diversity Program Participants**
If applicable, how many of the law students who participated in the firm's 1L summer associate program in 2021 (2 years ago) were hired through the firm's diversity scholarship/internship/fellowship program?

5

Response to Spring 2023 Vault Law Firm Diversity Survey. Copyright © 2023 Vault and Infobase Holdings, Inc. All rights reserved.



**WilmerHale**

## 2023 Vault Law Firm Diversity Survey

### 2L Summer Associates

Did the firm hold a 2L summer program in 2022?    **Yes**

**92** Total 2L Summer Associates at the Firm in 2022

| Demographics | Men | Women | Nonbinary | Unknown |
|---|---|---|---|---|
| **Race / Ethnicity** | **38** | **54** | **0** | **0** |
| American Indian or Alaska Native | 0 | 1 | 0 | 0 |
| Asian | 4 | 11 | 0 | 0 |
| Black or African-American | 1 | 1 | 0 | 0 |
| Hispanic or Latinx | 4 | 2 | 0 | 0 |
| Native Hawaiian or Other Pacific Islander | 0 | 0 | 0 | 0 |
| White | 28 | 33 | 0 | 0 |
| Two or More Races | 1 | 6 | 0 | 0 |
| Other or Unknown | 0 | 0 | 0 | 0 |
| **Additional Demographics** | **8** | **8** | **0** | **0** |
| LGBTQ+ Individuals | 8 | 8 | 0 | 0 |
| Individuals with Disabilities | 0 | 0 | 0 | 0 |

### 2L Summer Associates Who Received Offers

**92** Total 2L Summer Associates Received Offers

| Demographics | Men | Women | Nonbinary | Unknown |
|---|---|---|---|---|
| **Race / Ethnicity** | **38** | **54** | **0** | **0** |
| American Indian or Alaska Native | 0 | 1 | 0 | 0 |
| Asian | 4 | 11 | 0 | 0 |
| Black or African-American | 1 | 1 | 0 | 0 |
| Hispanic or Latinx | 4 | 2 | 0 | 0 |
| Native Hawaiian or Other Pacific Islander | 0 | 0 | 0 | 0 |
| White | 28 | 33 | 0 | 0 |
| Two or More Races | 1 | 6 | 0 | 0 |
| Other or Unknown | 0 | 0 | 0 | 0 |
| **Additional Demographics** | **8** | **8** | **0** | **0** |
| LGBTQ+ Individuals | 8 | 8 | 0 | 0 |
| Individuals with Disabilities | 0 | 0 | 0 | 0 |

### 2L Summer Associates Who Accepted Offers

**68** Total 2L Summer Associates Received Offers

| Demographics | Men | Women | Nonbinary | Unknown |
|---|---|---|---|---|
| **Race / Ethnicity** | **25** | **43** | **0** | **0** |
| American Indian or Alaska Native | 0 | 0 | 0 | 0 |
| Asian | 2 | 10 | 0 | 0 |
| Black or African-American | 1 | 0 | 0 | 0 |
| Hispanic or Latinx | 3 | 0 | 0 | 0 |
| Native Hawaiian or Other Pacific Islander | 0 | 0 | 0 | 0 |
| White | 19 | 28 | 0 | 0 |
| Two or More Races | 0 | 5 | 0 | 0 |
| Other or Unknown | 0 | 0 | 0 | 0 |
| **Additional Demographics** | **7** | **7** | **0** | **0** |
| LGBTQ+ Individuals | 7 | 7 | 0 | 0 |
| Individuals with Disabilities | 0 | 0 | 0 | 0 |

0

Response to Spring 2023 Vault Law Firm Diversity Survey. Copyright © 2023 Vault and Infobase Holdings, Inc. All rights reserved.



**WilmerHale**

## 2023 Vault Law Firm Diversity Survey

**Diversity Program Participants**

How many of the law students who participated in the firm's 2L summer associate program in 2022 were hired through the firm's diversity scholarship/internship/fellowship program?

0

**New Attorneys Hired**

**197**    Total 2L Summer Associates Received Offers

| Demographics | Men | Women | Nonbinary | Unknown |
|---|---|---|---|---|
| **Race / Ethnicity** | **102** | **94** | **1** | **0** |
| American Indian or Alaska Native | 0 | 0 | 0 | 0 |
| Asian | 16 | 17 | 0 | 0 |
| Black or African-American | 4 | 15 | 0 | 0 |
| Hispanic or Latinx | 5 | 5 | 0 | 0 |
| Native Hawaiian or Other Pacific Islander | 0 | 0 | 0 | 0 |
| White | 65 | 48 | 1 | 0 |
| Two or More Races | 12 | 9 | 0 | 0 |
| Other or Unknown | 0 | 0 | 0 | 0 |
| **Additional Demographics** | **10** | **6** | **1** | **0** |
| LGBTQ+ Individuals | 10 | 6 | 1 | 0 |
| Individuals with Disabilities | 0 | 0 | 0 | 0 |

**Mandatory Arbitration**

**No**    Does the firm require associates to agree to mandatory arbitration as a condition of employment?

**N/A**    Does the requirement also apply to summer associates?

If yes to mandatory arbitration, elaborate ot mandatory arbitration provisions:

Response to Spring 2023 Vault Law Firm Diversity Survey. Copyright © 2023 Vault and Infobase Holdings, Inc. All rights reserved.



**WilmerHale**

**2023 Vault Law Firm Diversity Survey**

## CULTURE AND COMMUNITY

**Affinity Groups**

Does the firm have internal affinity groups or networks?

**Yes**

If yes, list the firm's affinity groups:

Asian American Affinity Group, Black/African American Affinity Group, Latino Affinity Group, LGBTQ Affinity Group, Middle Eastern Affinity Group, Women Leadership Initiative, Veterans Group, South Asian Group.



**WilmerHale**

## 2023 Vault Law Firm Diversity Survey

**Affinity Groups Cont'd**

What kind of support does the firm provide for its affinity groups or networks?

WilmerHale has multiple firmwide and office-based affinity groups for our diverse and LGBTQ attorneys. The office-based and firmwide affinity groups meet on a monthly basis and are supported with firm resources. The affinity groups bring together diverse attorneys to help build relationships and community and to share resources.  To provide further support to our diverse attorneys, we implemented Diversity Mentoring Circles to provide attorneys with opportunities to develop informal mentoring relationships within the firm. The Diversity Mentoring Circles are designed to introduce senior attorneys to junior attorneys to build relationships that may carry over into substantive work and to build sponsorship and mentorship relationships for diverse attorneys.



**WilmerHale**

**2023 Vault Law Firm Diversity Survey**

**DEI Events**

Does the firm host DE&I retreats or conferences?    **Yes**

Does firm leadership attend these events?    **Yes**

If applicable, provide more detail on the firms DE&I events:

In November, over 260 diverse lawyers from all corners of the firm gathered in Washington DC to take part in WilmerHale's second Diversity Summit. The two-day event was an important opportunity for firm leaders and diverse attorneys to gather, reflect and reunite around the ongoing mission to make diversity, equity and inclusion part of the essential fabric of the firm and participate in professional development and networking programs.

Response to Spring 2023 Vault Law Firm Diversity Survey. Copyright © 2023 Vault and Infobase Holdings, Inc. All rights reserved.



**WilmerHale**

### 2023 Vault Law Firm Diversity Survey
#### Reverse Mentoring

Does the firm offer reverse mentoring, pairing senior attorneys with junior attorneys to help bridge generational or cultural gaps, share perspectives and skills, and foster a more inclusive culture?

**No**

If applicable, elaborate on the firm's reverse mentoring program:

Response to Spring 2023 Vault Law Firm Diversity Survey. Copyright © 2023 Vault and Infobase Holdings, Inc. All rights reserved.



**WilmerHale**

### 2023 Vault Law Firm Diversity Survey

**Associate Committee**

Does the firm have an associate committee that consults with the partnership?

**Yes**

If applicable, describe how the associate committee engages with the partnership:

The Associates Communication Task Force (ACTF) includes Associates from each class, Office Partners In-Charge, Chairs of the Associate and Counsel Evaluation Committees and the Director of Legal Personnel.  The ACTF groups meet regularly and relay key take-aways with fellow associates.  The ACTF serves as a liaison to Management regarding issues and concerns of the associates.

Response to Spring 2023 Vault Law Firm Diversity Survey. Copyright © 2023 Vault and Infobase Holdings, Inc. All rights reserved.



**WilmerHale**

## 2023 Vault Law Firm Diversity Survey

**Combating Structural Racism**

Is the firm a member of the Law Firm Antiracism Alliance (LFAA)?          **Yes**

**Cultural Awareness**

How does the firm commemorate important dates honoring diversity?

WilmerHale hosts firmwide heritage month programs to celebrate the contributions of diverse groups and to foster greater cultural awareness to our firm community. These celebrations are open to the entire firm.  The celebrations include fireside chats with guest speakers, panels and movie screenings followed by discussions. We also host celebrations within each applicable affinity group. In addition to the programs listed above, our co-managing partners circulate a communication recognizing the heritage month and share details on how the firm plans to celebrate or honor it. In addition, we encourage the firm community to share their experiences and photos related to their history and culture, such as their life experiences, literature, art and cultural traditions. The stories and photos are posted to our internal website.



**WilmerHale**

**2023 Vault Law Firm Diversity Survey**

## NETWORKING, MENTORING, AND PROFESSIONAL DEVELOPMENT

**Mentoring & Sponsorship**

Does the firm offer a mentorship or sponsorship program that connects diverse attorneys with senior leadership?

**Yes**

If applicable, describe the mentoring or sponsorship program

We have implemented Diversity Mentoring Circles to provide attorneys with opportunities to develop informal mentoring relationships within the firm. The mentoring circles are designed to introduce senior attorneys to junior attorneys and build relationships that carry over into substantive work and build sponsorship and mentorship relationships for diverse attorneys.

The mentoring circles are comprised of a mix of partners, counsel, and associates. Each circle, diversified in terms of seniority, race/ethnicity, and gender, is led by 2-3 partners. The partners are selected based on their commitment to the development of diverse junior attorneys and include allies in addition to diverse partners. The mentoring circles are encouraged to meet regularly.

The Diversity Mentoring Circles are in addition to our firmwide Career Advancement Program which includes a formal mentoring program through which each non-partner lawyer receives a partner-mentor who is responsible for, among other things, helping mentees navigate their careers and assisting to promote lawyer development on an individualized basis.

Response to Spring 2023 Vault Law Firm Diversity Survey. Copyright © 2023 Vault and Infobase Holdings, Inc. All rights reserved.



**WilmerHale**

## 2023 Vault Law Firm Diversity Survey

**Professional Development**

Does the firm offer professional development programs specifically for diverse attorneys?

**Yes**

If applicable, elaborate on the professional development programs available to diverse attorneys:

Diversity Committee Co–Chairs, the Director of Diversity, Equity and Inclusion, the Diversity, Equity and Inclusion Managers and other key staff work with department and practice leaders to ensure that work assignments, training, professional development, mentoring and client engagement processes further the firm's goal of developing and advancing all our outstanding lawyers. WilmerHale is a member of the Leadership Council on Legal Diversity (LCLD).  Since 2020, we have sponsored twelve diverse lawyers, including ten diverse women, to participate in the LCLD Fellow and Pathfinder Programs, as part of our ongoing commitment to promote opportunities that advance both the internal and external visibility, and our dedication to retaining and promoting diverse and women lawyers by providing the professional development and relationship building skills critical to enhancing their roles as leaders in the law. We have expanded our firm's lawyers' participation in outside programs geared toward the professional development of diverse lawyers-- including the Charting Your Own Course Conference, the Hispanic National Bar Association Intellectual Property Institute, programs run by the Minority Corporate Counsel Association, the National Asian Pacific American Bar Association Convention, the Corporate Counsel Men of Color Conference and the Corporate Counsel Women of Color Conference.

Additionally, in collaboration with a renowned expert, launched an ongoing, firm-wide customized Implicit Bias Initiative to raise awareness of and interrupt bias, as well as customized interventions into existing firm practices related to work assignments, evaluations, promotions, and elevations. In addition to our implicit bias programming for attorneys we rolled out implicit bias programs for our summer associates and non-attorney employees as well.  We have added additional content to our firm-wide diversity programming, including training programs around racial justice and allyship, cultural awareness and intercultural competency, and the impact of racism, trauma, stress and anxiety on the Black attorney and professional community -- addressing the importance of attending to the mental and emotional health of our firm community.

Response to Spring 2023 Vault Law Firm Diversity Survey. Copyright © 2023 Vault and Infobase Holdings, Inc. All rights reserved.



**WilmerHale**

**2023 Vault Law Firm Diversity Survey**

**Work Allocation**

Does the firm monitor work distribution to ensure that diverse attorneys have equal access to quality assignments and significant client matters?

**Yes**

Describe how the firm monitors work distribution

WilmerHale has a centralized staffing model that is executed at the practice group and department level and supported by a team of practice managers to assist in assigning work and building client teams that reflect the range of perspectives, backgrounds, and talents of our lawyers.

In order to ensure our historically underrepresented attorneys receive opportunities for staffing on significant matters that expand their development and leadership options, as well as access to office and firm-wide leadership roles, WilmerHale has expanded our designated internal resources to support our commitment to their success, early on in their professional careers such as having one process point that assists this goal is the utilization of practice managers, who oversee staffing of all matters. Additionally, there are also regularly scheduled meetings between our DEI team, practice managers and practice group/department leaders, where professional development and advancement opportunities are frequently reviewed.

Response to Spring 2023 Vault Law Firm Diversity Survey. Copyright © 2023 Vault and Infobase Holdings, Inc. All rights reserved.



**WilmerHale**

**2023 Vault Law Firm Diversity Survey**

**External Professional & Business Development Opportunities**

Does the firm support associate involvement in external activities related to diversity, equity, and inclusion, such as the following?

**Yes**   Pays for associate membership in diversity bar associations or other affinity organizations

**Yes**   Sponsors associate participation in diversity, equity, and inclusion conferences

**Yes**   Supports associate participation in other external DEI-related activities, events, or organizations (please describe):

Response to Spring 2023 Vault Law Firm Diversity Survey. Copyright © 2023 Vault and Infobase Holdings, Inc. All rights reserved.



**WilmerHale**

**2023 Vault Law Firm Diversity Survey**

## PROMOTION AND ADVANCEMENT

### Countering Implicit Bias

Has the firm implemented processes to mitigate implicit bias in work allocation, performance reviews, and/or promotions?

**Yes**

If applicable, describe the firm's initiatives to mitigate implicit bias

WilmerHale provides ongoing, firm-wide customized Implicit Bias trainings to raise awareness of and interrupt bias, as well as customized interventions into existing firm practices related to work assignments, evaluations, promotions, and elevations. In addition to our implicit bias programming for attorneys, summer associates and non-attorney employees as well.  We have added additional content to our firmwide diversity programming, including training programs around racial justice and allyship, cultural awareness and intercultural competency. Most recently, organizational diversity and inclusion expert Michelle Silverthorn, who first visited WilmerHale in 2020 to speak about unconscious bias and allyship, returned to the firm and presented on allyship and belonging, prompting reflection on how one moves from good intentions to real action when confronting bias in the workplace and providing practical tips.

### Upward Reviews

Does the performance review process include the opportunity for associates to provide anonymous upward reviews?

**Yes**

If applicable, describe the firm's initiatives to mitigate implicit bias

 The Upward Evaluation Process, an opportunity for our lawyers and technology specialists to provide more senior lawyers with feedback on their managerial and leadership skills. This process is highly valued by our senior lawyers because it allows them to continue to develop, make positive improvements to our work environment, and enhance the training and development of our junior lawyers. The feedback is used by partners, special counsel, and counsel to improve their leadership and mentoring skills. It is also used by department and practice group leaders to work with individuals on their professional development and individual partner plans.

Response to Spring 2023 Vault Law Firm Diversity Survey. Copyright © 2023 Vault and Infobase Holdings, Inc. All rights reserved.



**WilmerHale**

## 2023 Vault Law Firm Diversity Survey

**Diverse Slate of Candidates**

Does the firm employ any of the following measures to ensure that a diverse slate of candidates is considered for promotions, leadership roles, or hiring?

**Yes**   The firm is Mansfield Certified

**Yes**   The firm is Mansfield Certified Plus

**Yes**   The firm is currently participating in the Mansfield Rule certification process administered by Diversity Lab

**No**    The firm has instituted other formal processes (please describe):

**Multi-tier Partnership**

Does the firm have a multi-tiered partnership?     **No**

**Alternatives to Partnership**

Does the firm have a multi-tiered partnership?     **No**

If applicable, describe the alternatives to partnership:

Response to Spring 2023 Vault Law Firm Diversity Survey. Copyright © 2023 Vault and Infobase Holdings, Inc. All rights reserved.



**WilmerHale**

## 2023 Vault Law Firm Diversity Survey

### Homegrown Partners
Please provide the percentage of equity partners at the firm as of December 31, 2022 who started as associates at the firm.
**74%**

### Promotions to Partnership

**12** Total Number of Attorneys Promoted to Partner in 2022 (includes promotions effective in 2022, not announced in 2022)

| Demographics | Men | Women | Nonbinary | Unknown |
|---|---|---|---|---|
| **Race / Ethnicity** | **6** | **6** | **0** | **0** |
| American Indian or Alaska Native | 0 | 0 | 0 | 0 |
| Asian | 1 | 0 | 0 | 0 |
| Black or African-American | 0 | 1 | 0 | 0 |
| Hispanic or Latinx | 0 | 0 | 0 | 0 |
| Native Hawaiian or Other Pacific Islander | 0 | 0 | 0 | 0 |
| White | 5 | 5 | 0 | 0 |
| Two or More Races | 0 | 0 | 0 | 0 |
| Other or Unknown | 0 | 0 | 0 | 0 |
| **Additional Demographics** | **0** | **0** | **0** | **0** |
| LGBTQ+ Individuals | 0 | 0 | 0 | 0 |
| Individuals with Disabilities | 0 | 0 | 0 | 0 |

## BILLABLE HOURS AND COMPENSATION

### Credit for DEI Work
Does the firm provide billable credit for work contributing to diversity, equity, and inclusion efforts (e.g., with respect to recruiting or business development)? Note that this does not include pro bono projects.
**Yes**

If so, how many hours can be applied to the firm's billable hour target?
Attorneys can include up to 50 hours of firm time spent on activities related to diversity, equity and inclusion programming in recognition of the commitment from our attorneys to spend time on a variety of activities both to support our recruiting efforts and to build a culture of inclusion within the firm.

### Compensation
Are associate salaries lockstep or discretionary?
**Lockstep**

Response to Spring 2023 Vault Law Firm Diversity Survey. Copyright © 2023 Vault and Infobase Holdings, Inc. All rights reserved.



**WilmerHale**

## 2023 Vault Law Firm Diversity Survey

**Bonuses**

Are associate bonuses lockstep or discretionary?

**Hybrid**

If salaries and/or bonuses are discretionary or hybrid: Does the firm publish compensation ranges or actual compensation for each associate?

Yes. The Firm circulates internal communications detailing salary and bonus levels.

**Flex-time Policy**

Does the firm have a formal flex-time policy?

**Yes**

**Reduced-hours Policy**

Does the firm have a formal reduced-hours policy?

**Yes**

**Partnership Eligibility**

Do attorneys who take advantage of the firm's reduced-hours or flex-time options remain eligible for partnership?

**Yes**

Please explain how working an alternative schedule may affect an associate's path to partnership:

An alternative workload arrangement (including a part-time schedule) does not affect the timing of a lawyer's promotion to counsel or partner. The firm offers a flexible career path structure-associate, senior associate counsel, special counsel, and partner-that promotes lawyer development on a more individualized basis. In order to enhance retention, and to avoid any stigma relating to the pace of promotion, we have a flexible timeline for promotion from senior associate to counsel and from counsel to partner. After three and a half years, associates are eligible for promotion to senior associate. Senior associates are then eligible for promotion to counsel after three years, but depending upon individual circumstances, that track may be extended up to five years. Counsel are eligible for election to partner after two years, but that track may be extended up to four years. Special Counsel is a position at the firm intended for lawyers with specialized expertise and skills.

Response to Spring 2023 Vault Law Firm Diversity Survey. Copyright © 2023 Vault and Infobase Holdings, Inc. All rights reserved.



**WilmerHale**

## 2023 Vault Law Firm Diversity Survey
**Attorneys Working Reduced Hours**

**57** Total Number of Attorneys Working Reduced Hours

| Attorneys with Reduced-Hours Schedules | Men | Women | Nonbinary | Unknown |
|---|---|---|---|---|
| Associates | 5 | 19 | 0 | 0 |
| Equity Partners | 2 | 9 | 0 | 0 |
| Non-equity Partners | 0 | 0 | 0 | 0 |
| Counsel / Of Counsel | 8 | 4 | 0 | 0 |
| Non-Partner-Track Attorneys | 2 | 8 | 0 | 0 |

## WORKING PARENTS

**Family-planning Resources**

Does the firm offer any fertility or family-planning benefits, such as in-vitro fertilization, egg freezing, adoption or surrogacy support?
**Yes**

If applicable, describe the family-planning resources available:
The WIN Fertility Benefits include a Fertility Preservation Program (egg, embryo and sperm freezing cycles), Adoption & Surrogacy Benefits through a reimbursement program and a Fertility Support Program that provides advocacy and support for members undergoing fertility treatment. Fertility treatment benefits continue to be available through the firm's BCBS medical plans without a medical diagnosis of infertility.



**WilmerHale**

## 2023 Vault Law Firm Diversity Survey

**Parental Leave for Adoption**
Does the firm offer parental leave for adoption?
**Yes**

If yes, is the adoption leave gender neutral?
**Yes**

**Primary & Secondary Caregivers**
Does the firm's parental leave policy distinguish between primary and secondary caregivers?
**Yes**

If yes: In what way does the firm's policy distinguish between primary and secondary caregivers?
While our policy does distinguish between primary and secondary caregivers -- a primary caregiver is defined as the parent or adoptive parent (either father or mother) of a child who has the primary responsibility of caring for that child during a specific period of time; and a secondary caregiver may take a paid leave of absence up to four consecutive weeks to care for his or her newborn (or newly adopted) child -- the vast majority of our leave takers use the 18-week paid leave.

If yes: How much paid leave is available to primary caregivers?
18 weeks

If yes: How much paid leave is available to secondary caregivers?
4 weeks

If no: How much paid leave is available to those taking parental leave?
N/A

Response to Spring 2023 Vault Law Firm Diversity Survey. Copyright © 2023 Vault and Infobase Holdings, Inc. All rights reserved.



**WilmerHale**

## 2023 Vault Law Firm Diversity Survey

**Parental Leave Policy**

Describe the firm's parental leave policy.

Any attorney who expects to return to the firm may take a leave of absence to care for his or her newborn (or newly adopted) child as either the child's primary or secondary caregiver ("parental leave").

Response to Spring 2023 Vault Law Firm Diversity Survey. Copyright © 2023 Vault and Infobase Holdings, Inc. All rights reserved.



**WilmerHale**

## 2023 Vault Law Firm Diversity Survey

### Support for Parents

What steps has the firm taken to support parents and ensure that their parental status does not adversely affect their opportunities for career advancement?

**Yes**    Pro rates billable requirements / credit / bonus targets for parents who take leave

**Yes**    Provides resources for nursing mothers, such as private nursing rooms, breast milk storage, or breast milk shipping

**Yes**    Offers child care resources, such as onsite day care, back-up child care, etc.

**Yes**    Provides programs to assist new parents transitioning to leave and/or returning to work after leave (e.g., ramp up/ramp down, flexible hours, Mindful Return)

Feel free to elaborate on the nature of programs and resources the firm makes available to parents.

oWilmerHale offers Milk Stork which combines breast milk shipping with a flock of practical, family benefits to support working parents.
oOffice-specific designated wellness/lactation rooms for use by nursing mothers.
oInfant Transition Program through Bright Horizons provides up to 60 days of transition care at a daycare center close to the office.
oEmergency back-up childcare benefit available to employees when regular arrangements fall through.
oNew parents have access to 60 additional days of back-up care during the first 12 months following the baby's birth.
oThe firm has hybrid and part-time work policies and considers all requests for alternative workload arrangements to address family, personal, or professional circumstances or goals. In all instances, alternative workload arrangements that are distinct from the firm's formal hybrid work policy are considered on a case-by-case basis and discussed with department leadership. The firm, however, is quite liberal in approving such requests. The purpose of addressing these requests on a case-by-case basis is to ensure that alternative workload arrangements are the product of a meaningful discussion between the lawyer and departmental leadership. It is often through these discussions that lawyers and department leadership can better understand each other's needs. Notwithstanding a formalized flex-time policy, we have a culture of flexibility, not of face time (i.e., time spent in the office).

Response to Spring 2023 Vault Law Firm Diversity Survey. Copyright © 2023 Vault and Infobase Holdings, Inc. All rights reserved.



**WilmerHale**

## 2023 Vault Law Firm Diversity Survey

### INCLUSIVENESS AND ACCESSIBILTY

**Equity in Benefits**

Do the firm's health care benefits, family leave, and bereavement leave include same-sex spouses and domestic partners?
**Yes**

**LGBTQ+ Inclusivity**

What steps has the firm taken to create an inclusive environment for transgender and gender non-conforming individuals?

**Yes**    Provides gender-neutral restrooms/facilities
**Yes**    Offers health insurance plans that provide equitable benefits for transgender employees and dependents
**Yes**    Provides an opportunity for employees to share preferred pronouns
**Yes**    Uses gender-neutral pronouns in its policies and materials
**Yes**    Non-discrimination policy explicitly includes gender identity and expression as a protected category
**No**     Other (please elaborate):

**Accessibility**

What steps has the firm taken to create an inclusive environment for attorneys with disabilities?

**Yes**    Has evaluated and addressed issues of accessibility in firm buildings, workspaces, and parking facilities
**Yes**    Has a clear and well-communicated process for attorneys to request accommodations or raise other workplace concerns
**Yes**    Non-discrimination policy explicitly includes disability as a protected category
**No**     Other (please elaborate):



**WilmerHale**

## 2023 Vault Law Firm Diversity Survey

### ATTRITION

#### Departures among U.S. Associates

**101** Total Number of Departures among Associates in 2022:

| Demographics | Men | Women | Nonbinary | Unknown |
|---|---|---|---|---|
| **Race / Ethnicity** | **47** | **54** | **0** | **0** |
| American Indian or Alaska Native | 0 | 0 | 0 | 0 |
| Asian | 4 | 4 | 0 | 0 |
| Black or African-American | 4 | 3 | 0 | 0 |
| Hispanic or Latinx | 1 | 5 | 0 | 0 |
| Native Hawaiian or Other Pacific Islander | 0 | 0 | 0 | 0 |
| White | 36 | 36 | 0 | 0 |
| Two or More Races | 2 | 6 | 0 | 0 |
| Other or Unknown | 0 | 0 | 0 | 0 |
| **Additional Demographics** | **5** | **4** | **0** | **0** |
| LGBTQ+ Individuals | 5 | 4 | 0 | 0 |
| Individuals with Disabilities | 0 | 0 | 0 | 0 |

#### Departures among U.S. Partners

**8** Total Number of Departures among U.S. Partners in 2022:

| Demographics | Men | Women | Nonbinary | Unknown |
|---|---|---|---|---|
| **Race / Ethnicity** | **6** | **2** | **0** | **0** |
| American Indian or Alaska Native | 0 | 0 | 0 | 0 |
| Asian | 1 | 0 | 0 | 0 |
| Black or African-American | 0 | 0 | 0 | 0 |
| Hispanic or Latinx | 1 | 0 | 0 | 0 |
| Native Hawaiian or Other Pacific Islander | 0 | 0 | 0 | 0 |
| White | 4 | 2 | 0 | 0 |
| Two or More Races | 0 | 0 | 0 | 0 |
| Other or Unknown | 0 | 0 | 0 | 0 |
| **Additional Demographics** | **0** | **0** | **0** | **0** |
| LGBTQ+ Individuals | 0 | 0 | 0 | 0 |
| Individuals with Disabilities | 0 | 0 | 0 | 0 |

0

Response to Spring 2023 Vault Law Firm Diversity Survey. Copyright © 2023 Vault and Infobase Holdings, Inc. All rights reserved.



**WilmerHale**

## 2023 Vault Law Firm Diversity Survey

**Departures among U.S. Counsel / Of Counsel and Non-Partner-Track Attorneys**

**30** Total Number of Departures among U.S. Counsel and Non-Partner-Track Attorneys in 2022

| Demographics | Men | Women | Nonbinary | Unknown |
|---|---|---|---|---|
| **Race / Ethnicity** | **17** | **13** | **0** | **0** |
| American Indian or Alaska Native | 0 | 0 | 0 | 0 |
| Asian | 2 | 1 | 0 | 0 |
| Black or African-American | 1 | 2 | 0 | 0 |
| Hispanic or Latinx | 0 | 0 | 0 | 0 |
| Native Hawaiian or Other Pacific Islander | 0 | 0 | 0 | 0 |
| White | 14 | 10 | 0 | 0 |
| Two or More Races | 0 | 0 | 0 | 0 |
| Other or Unknown | 0 | 0 | 0 | 0 |
| **Additional Demographics** | **0** | **0** | **0** | **0** |
| LGBTQ+ Individuals | 0 | 0 | 0 | 0 |
| Individuals with Disabilities | 0 | 0 | 0 | 0 |

Response to Spring 2023 Vault Law Firm Diversity Survey. Copyright © 2023 Vault and Infobase Holdings, Inc. All rights reserved.



**WilmerHale**

**2023 Vault Law Firm Diversity Survey**

## SUCCESSES AND PRIORITIES

### Top Three Accomplishments

What are the firm's top three accomplishments or areas in which the firm has had its greatest success with respect to fostering diversity, equity, and inclusion within the firm?

**#1**

Diversity, equity and inclusion (DEI) are guiding principles of WilmerHale and key drivers of the value the firm provides to our clients. Our commitment to diversity, equity and inclusion starts at the top and cascades throughout the firm to create a more diverse an inclusive culture at the firm. While our DEI journey is one of continuous assessment, progress and partnership with others committed to advancing these principles in the legal profession, we are particularly proud of the following three programs:

1)The Executive Diversity and Inclusion Committee (EDIC) represents the establishment of a chain of accountability that starts at the top and sets goals that extend to all members of our firm, covering objectives relating to recruiting, developing and retaining diverse lawyers; strengthening our culture of inclusion; tying partner compensation to demonstrated diversity efforts; revisiting our evaluation, mentoring and benchmarking programs; and revamping our work assignment process.â€¯ The EDIC is chaired by the firm's co-managing partners Susan Murley and Robert Novick and includes department chairs, practice group leaders and works with our DEI professionals and regional Diversity Committee Chairs to implement DEI programs. These actions help us ensure that diversity, equity and inclusion are a part ofâ€¯ WilmerHale' s culture, as this also helps to strengthen our internal diversity pipeline.

Response to Spring 2023 Vault Law Firm Diversity Survey. Copyright © 2023 Vault and Infobase Holdings, Inc. All rights reserved.



**WilmerHale**

## 2023 Vault Law Firm Diversity Survey

**Top Three Accomplishments**

What are the firm's top three accomplishments or areas in which the firm has had its greatest success with respect to fostering diversity, equity, and inclusion within the firm?

**#2**

2)In furtherance of our leadership commitment to DEI, the firm implemented a Bonus Eligible Time policy to include up to 50 hours of firm time spent on activities related to DEI programming in recognition of the commitment from our attorneys, especially diverse attorneys, to spend time on a variety of activities both to support our recruiting/pipeline initiatives and to build a culture of inclusion within the firm.

Response to Spring 2023 Vault Law Firm Diversity Survey. Copyright © 2023 Vault and Infobase Holdings, Inc. All rights reserved.



**WilmerHale**

## 2023 Vault Law Firm Diversity Survey

### Top Three Accomplishments

What are the firm's top three accomplishments or areas in which the firm has had its greatest success with respect to fostering diversity, equity, and inclusion within the firm?

**#3**

3)We further recognize that in order to sustain long term and meaningful progress toward a more inclusive and equitable organization, inclusive leadership must be infused at all levels. As such we have developed inclusive leadership education and have tied partner compensation to demonstrated diversity efforts.

Response to Spring 2023 Vault Law Firm Diversity Survey. Copyright © 2023 Vault and Infobase Holdings, Inc. All rights reserved.



**WilmerHale**

**2023 Vault Law Firm Diversity Survey**
**Top Three Priorities**
What are the firm's top three priorities for advancing diversity, equity, and inclusion within the firm moving forward?

**#1**
Continue furthering our diversity, equity and inclusion progress in connection with our retention efforts by continuing the DEI team's periodic review of diverse and women attorneys with chairs and practice group leaders for each firm department.

Response to Spring 2023 Vault Law Firm Diversity Survey. Copyright © 2023 Vault and Infobase Holdings, Inc. All rights reserved.



**WilmerHale**

## 2023 Vault Law Firm Diversity Survey
### Top Three Priorities
What are the firm's top three priorities for advancing diversity, equity, and inclusion within the firm moving forward?

**#2**

In light of the recent affirmative action supreme court decision, continue to support the collaboration of our EDIC, DEI professionals and recruiting teams to determine new approaches to recruiting and retaining top diverse talent--including exploring recruiting opportunities outside the "high-yield"schools and geographies that are our traditional focus-- to broaden our applicant pool including expanding our support of pipeline programs. Such pipeline initiatives include, among others, (a) Law Preview, an initiative designed to prepare accepted law students for the rigors of the 1L experience; (b) our 1L Diversity Public Interest Fellowship Program in which recipients are awarded a stipend to work in a public interest legal position or a judicial internship the summer after their first year of law school, and (c) our 2L Diversity Scholarship Program in which recipients will be awarded a stipend while spending their 2L summer at our firm and participating in diversity related work and/or programming while summer associates.

Response to Spring 2023 Vault Law Firm Diversity Survey. Copyright © 2023 Vault and Infobase Holdings, Inc. All rights reserved.



**WilmerHale**

**2023 Vault Law Firm Diversity Survey**
**Top Three Priorities**
What are the firm's top three priorities for advancing diversity, equity, and inclusion within the firm moving forward?

**#3**
Continue to partner with clients and alumni to foster connections and to support a culture of inclusion, equity and belonging.

Response to Spring 2023 Vault Law Firm Diversity Survey. Copyright © 2023 Vault and Infobase Holdings, Inc. All rights reserved.



**WilmerHale**

**2023 Vault Law Firm Diversity Survey**

## ADVICE TO CANDIDATES

**Advice**

What advice do you have for candidates who are looking for a diverse and inclusive work environment? What questions should they ask when interviewing to help them assess the extent of a firm's commitment to diversity, equity, and inclusion?

*Ask questions about DEI initiatives to both diverse attorneys and non-diverse attorneys.
*What programs are presently in place, to support historically underrepresented attorneys at their firm?
*How long have such programs been in place?
*How do they measure success of such initiatives?
*What does the firm consider the most challenging aspects of their DEI strategy? Why?
*Inquire about diversity among equity partner population and firm leadership.

Response to Spring 2023 Vault Law Firm Diversity Survey. Copyright © 2023 Vault and Infobase Holdings, Inc. All rights reserved.



# Exhibit 3



*Shared vision.*
*Endless possibilities.*

WilmerHale proudly supports Vault Law and its work to promote diversity, equity and inclusion in the legal profession.

wilmerhale.com



© 2023 Wilmer Cutler Pickering Hale and Dorr LLP

# WilmerHale

## 2024 Vault Law Firm Diversity Survey



### LEADERSHIP

**Head of Firm**

| Name and Title | Race/Ethnicity | Gender | Add'l Demo |
|---|---|---|---|
| Anjan Sahni, Managing Partner | Asian | Male | |

**Executive Committee**

Total Number of Attorneys on Committee:

| Demographics | Men | Women | Nonbinary | Unknown |
|---|---|---|---|---|
| **Race / Ethnicity** | **10** | **8** | **0** | **0** |
| American Indian or Alaska Native | 0 | 0 | 0 | 0 |
| Asian | 1 | 1 | 0 | 0 |
| Black or African-American | 3 | 0 | 0 | 0 |
| Hispanic or Latinx | 0 | 0 | 0 | 0 |
| Native Hawaiian or Other Pacific Islander | 0 | 0 | 0 | 0 |
| White | 6 | 7 | 0 | 0 |
| Two or More Races | 0 | 0 | 0 | 0 |
| Other or Unknown | 0 | 0 | 0 | 0 |
| **Additional Demographics** | **0** | **0** | **0** | **0** |
| LGBTQ+ Individuals | 0 | 0 | 0 | 0 |
| Individuals with Disabilities | 0 | 0 | 0 | 0 |

Response to Spring 2024 Vault Law Firm Diversity Survey. Copyright © 2024 Vault and Infobase Holdings, Inc. All rights reserved.



**WilmerHale**

## 2024 Vault Law Firm Diversity Survey

### DEI Professional

Does the firm have a chief diversity officer, director of diversity, or other professional(s) leading the firm's diversity, equity, and inclusion initiatives?

Yes

| Name and Title |
| --- |
| Monya Bunch, Director, Diversity, Equity and Inclusion |
| Talik Watson, Diversity, Equity and Inclusion Manager |
| Nicole Hill, Diversity, Equity and Inclusion Manager |
| Karla Aguayo-Ramirez, Firmwide Diversity, Equity and Inclusion Specialist |

### DEI Committee

Does the firm have a diversity, equity, and inclusion committee or the equivalent?     Yes
In what year was the committee formed?

**Office-specific diversity committees emerged in the early 2000s. In 2019, the firm established the Firmwide Executive Diversity and Inclusion Committee (EDIC) to develop goals and drive programming within the firm with a focus on: 1. Leadership Commitment; 2. Professional Development and Inclusive Workplaces; 3. Recruitment and Diversity Pipeline; and 4. External Engagement/Client Partnership Opportunities.**

Total Number of Attorneys on DEI Committee:     **76**

| Demographics | Men | Women | Nonbinary | Unknown |
| --- | --- | --- | --- | --- |
| **Race / Ethnicity** | **33** | **43** | **0** | **0** |
| American Indian or Alaska Native | 0 | 0 | 0 | 0 |
| Asian | 7 | 12 | 0 | 0 |
| Black or African-American | 5 | 7 | 0 | 0 |
| Hispanic or Latinx | 0 | 6 | 0 | 0 |
| Native Hawaiian or Other Pacific Islander | 0 | 0 | 0 | 0 |
| White | 19 | 15 | 0 | 0 |
| Two or More Races | 2 | 3 | 0 | 0 |
| Other or Unknown | 0 | 0 | 0 | 0 |
| **Additional Demographics** | **3** | **1** | **0** | **0** |
| LGBTQ+ Individuals | 3 | 1 | 0 | 0 |
| Individuals with Disabilities | 0 | 0 | 0 | 0 |

Is the firm women-owned, minority-owned, and/or LGBTQ+-owned?     **N/A**

Does the firm have a non-discrimination policy in the employee handbook or elsewhere in firm materials?     **Yes**

Response to Spring 2024 Vault Law Firm Diversity Survey. Copyright © 2024 Vault and Infobase Holdings, Inc. All rights reserved.



**WilmerHale**

## 2024 Vault Law Firm Diversity Survey

### ATTORNEY DEMOGRAPHICS

**Attorney Headcount**

**1,090**  Total attorneys in U.S. offices

**1,197**  Total attorneys worldwide (including all U.S. and global offices)

**U.S. Associates**

**686**  Total number of U.S.-based associates

| Demographics | Men | Women | Nonbinary | Unknown |
|---|---|---|---|---|
| **Race / Ethnicity** | **316** | **368** | **2** | **0** |
| American Indian or Alaska Native | 0 | 1 | 0 | 0 |
| Asian | 41 | 67 | 0 | 0 |
| Black or African-American | 12 | 27 | 0 | 0 |
| Hispanic or Latinx | 14 | 21 | 0 | 0 |
| Native Hawaiian or Other Pacific Islander | 0 | 0 | 0 | 0 |
| White | 224 | 213 | 1 | 0 |
| Two or More Races | 25 | 39 | 1 | 0 |
| Other or Unknown | 0 | 0 | 0 | 0 |
| **Additional Demographics** | **39** | **28** | **2** | **0** |
| LGBTQ+ Individuals | 39 | 28 | 2 | 0 |
| Individuals with Disabilities | 0 | 0 | 0 | 0 |

Response to Spring 2024 Vault Law Firm Diversity Survey. Copyright © 2024 Vault and Infobase Holdings, Inc. All rights reserved.



**WilmerHale**

## 2024 Vault Law Firm Diversity Survey

**U.S. Equity Partners**

253 Total Equity Partners

| Demographics | Men | Women | Nonbinary | Unknown |
|---|---|---|---|---|
| **Race / Ethnicity** | **177** | **76** | **0** | **0** |
| American Indian or Alaska Native | 0 | 0 | 0 | 0 |
| Asian | 7 | 8 | 0 | 0 |
| Black or African-American | 5 | 8 | 0 | 0 |
| Hispanic or Latinx | 0 | 0 | 0 | 0 |
| Native Hawaiian or Other Pacific Islander | 0 | 0 | 0 | 0 |
| White | 156 | 56 | 0 | 0 |
| Two or More Races | 9 | 4 | 0 | 0 |
| Other or Unknown | 0 | 0 | 0 | 0 |
| **Additional Demographics** | **4** | **2** | **0** | **0** |
| LGBTQ+ Individuals | 4 | 2 | 0 | 0 |
| Individuals with Disabilities | 0 | 0 | 0 | 0 |

**U.S. Non-Equity Partners**

0 Total Non-Equity Partners

| Demographics | Men | Women | Nonbinary | Unknown |
|---|---|---|---|---|
| **Race / Ethnicity** | **0** | **0** | **0** | **0** |
| American Indian or Alaska Native | 0 | 0 | 0 | 0 |
| Asian | 0 | 0 | 0 | 0 |
| Black or African-American | 0 | 0 | 0 | 0 |
| Hispanic or Latinx | 0 | 0 | 0 | 0 |
| Native Hawaiian or Other Pacific Islander | 0 | 0 | 0 | 0 |
| White | 0 | 0 | 0 | 0 |
| Two or More Races | 0 | 0 | 0 | 0 |
| Other or Unknown | 0 | 0 | 0 | 0 |
| **Additional Demographics** | **0** | **0** | **0** | **0** |
| LGBTQ+ Individuals | 0 | 0 | 0 | 0 |
| Individuals with Disabilities | 0 | 0 | 0 | 0 |

Response to Spring 2024 Vault Law Firm Diversity Survey. Copyright © 2024 Vault and Infobase Holdings, Inc. All rights reserved.



**WilmerHale**

## 2024 Vault Law Firm Diversity Survey

**U.S. Counsel / Of Counsel**

**55** Total Counsel / Of Counsel

| Demographics | Men | Women | Nonbinary | Unknown |
|---|---|---|---|---|
| **Race / Ethnicity** | **36** | **19** | **0** | **0** |
| American Indian or Alaska Native | 0 | 0 | 0 | 0 |
| Asian | 1 | 1 | 0 | 0 |
| Black or African-American | 0 | 0 | 0 | 0 |
| Hispanic or Latinx | 1 | 1 | 0 | 0 |
| Native Hawaiian or Other Pacific Islander | 0 | 0 | 0 | 0 |
| White | 34 | 17 | 0 | 0 |
| Two or More Races | 0 | 0 | 0 | 0 |
| Other or Unknown | 0 | 0 | 0 | 0 |
| **Additional Demographics** | **1** | **0** | **0** | **0** |
| LGBTQ+ Individuals | 1 | 0 | 0 | 0 |
| Individuals with Disabilities | 0 | 0 | 0 | 0 |

**U.S. Non-Partner-Track Attorneys**

**96** Total Non-Partner-Track Attorneys

| Demographics | Men | Women | Nonbinary | Unknown |
|---|---|---|---|---|
| **Race / Ethnicity** | **48** | **48** | **0** | **0** |
| American Indian or Alaska Native | 0 | 0 | 0 | 0 |
| Asian | 1 | 4 | 0 | 0 |
| Black or African-American | 1 | 1 | 0 | 0 |
| Hispanic or Latinx | 2 | 1 | 0 | 0 |
| Native Hawaiian or Other Pacific Islander | 0 | 0 | 0 | 0 |
| White | 41 | 40 | 0 | 0 |
| Two or More Races | 3 | 2 | 0 | 0 |
| Other or Unknown | 0 | 0 | 0 | 0 |
| **Additional Demographics** | **4** | **5** | **0** | **0** |
| LGBTQ+ Individuals | 4 | 5 | 0 | 0 |
| Individuals with Disabilities | 0 | 0 | 0 | 0 |

Response to Spring 2024 Vault Law Firm Diversity Survey. Copyright © 2024 Vault and Infobase Holdings, Inc. All rights reserved.



**WilmerHale**

## 2024 Vault Law Firm Diversity Survey

**U.S. Law Clerks**

**0** Total Law Clerks

| Demographics | Men | Women | Nonbinary | Unknown |
|---|---|---|---|---|
| **Race / Ethnicity** | **0** | **0** | **0** | **0** |
| American Indian or Alaska Native | 0 | 0 | 0 | 0 |
| Asian | 0 | 0 | 0 | 0 |
| Black or African-American | 0 | 0 | 0 | 0 |
| Hispanic or Latinx | 0 | 0 | 0 | 0 |
| Native Hawaiian or Other Pacific Islander | 0 | 0 | 0 | 0 |
| White | 0 | 0 | 0 | 0 |
| Two or More Races | 0 | 0 | 0 | 0 |
| Other or Unknown | 0 | 0 | 0 | 0 |
| **Additional Demographics** | **0** | **0** | **0** | **0** |
| LGBTQ+ Individuals | 0 | 0 | 0 | 0 |
| Individuals with Disabilities | 0 | 0 | 0 | 0 |

**U.S. Office Managing Partners**

**7** Total U.S. Office Managing Partners

| Demographics | Men | Women | Nonbinary | Unknown |
|---|---|---|---|---|
| **Race / Ethnicity** | **3** | **4** | **0** | **0** |
| American Indian or Alaska Native | 0 | 0 | 0 | 0 |
| Asian | 0 | 1 | 0 | 0 |
| Black or African-American | 0 | 0 | 0 | 0 |
| Hispanic or Latinx | 0 | 0 | 0 | 0 |
| Native Hawaiian or Other Pacific Islander | 0 | 0 | 0 | 0 |
| White | 2 | 3 | 0 | 0 |
| Two or More Races | 1 | 0 | 0 | 0 |
| Other or Unknown | 0 | 0 | 0 | 0 |
| **Additional Demographics** | **0** | **0** | **0** | **0** |
| LGBTQ+ Individuals | 0 | 0 | 0 | 0 |
| Individuals with Disabilities | 0 | 0 | 0 | 0 |

Response to Spring 2024 Vault Law Firm Diversity Survey. Copyright © 2024 Vault and Infobase Holdings, Inc. All rights reserved.



**WilmerHale**

## 2024 Vault Law Firm Diversity Survey
### U.S. Hiring Committee

**85** Total U.S. Hiring Committee Attorneys

| Demographics | Men | Women | Nonbinary | Unknown |
|---|---|---|---|---|
| **Race / Ethnicity** | **50** | **35** | **0** | **0** |
| American Indian or Alaska Native | 0 | 0 | 0 | 0 |
| Asian | 4 | 4 | 0 | 0 |
| Black or African-American | 4 | 3 | 0 | 0 |
| Hispanic or Latinx | 2 | 1 | 0 | 0 |
| Native Hawaiian or Other Pacific Islander | 0 | 0 | 0 | 0 |
| White | 37 | 23 | 0 | 0 |
| Two or More Races | 3 | 4 | 0 | 0 |
| Other or Unknown | 0 | 0 | 0 | 0 |
| **Additional Demographics** | **1** | **0** | **0** | **0** |
| LGBTQ+ Individuals | 1 | 0 | 0 | 0 |
| Individuals with Disabilities | 0 | 0 | 0 | 0 |

## FORMAL PROCESSES AND GOALS

### Metrics

Does the firm provide a formal means for attorneys to voluntarily disclose any of the following?

**Yes**   Racial/ethnic identity

**Yes**   Gender identity and gender expression

**Yes**   Sexual orientation

**Yes**   Disability

### Measurement

Has the firm set formal, measurable targets for increasing diversity in recruitment, retention, promotion, and/or leadership?

**Yes**   If yes, describe the firm's targets:

WilmerHale is a pioneering member of the Mansfield Rule, which seeks to broaden the pool of candidates for lateral hiring, promotions to equity partner, and firm leadership. The firm first received Mansfield Certification Plus status in 2018 after successfully completing a one-year pilot program. Underscoring WilmerHale's commitment to DEI, the firm has achieved Mansfield Certification Plus status since its inception, including most recently, Mansfield Certified Plus Status for 6.0 (2022-2023). Certification Plus status indicates that the firm has affirmatively considered at least 30 percent women, lawyers of color, LGBTQ+ lawyers, and lawyers with disabilities for leadership and governance roles, equity partner promotions, formal client pitch opportunities, and senior lateral positions. Our participation in Mansfield 7.0 is underway. WilmerHale has a long record of championing DEI, our participation in the Mansfield Rule initiative has helped provide a valuable framework for our efforts and more thoroughly documented and assessing our progress.

Response to Spring 2024 Vault Law Firm Diversity Survey. Copyright © 2024 Vault and Infobase Holdings, Inc. All rights reserved.



**WilmerHale**

## 2024 Vault Law Firm Diversity Survey

**Accountability**

Does the firm include achievement with respect to diversity, equity, and inclusion as a component of partner compensation?

**Yes**

If yes, explain how the firm holds partners accountable for DEI achievements?

WilmerHale formalized the requirement that partner compensation be tied to substantiated efforts to advance DEI, a significant step that underscores the partnership's bottom-line commitment to our DEI goals. In the Individual Partner Plan, partners are asked to report on how they have worked to advance the Firm's DEI objectives through recruiting, mentoring (formal and informal), training, staffing and business development.

Response to Spring 2024 Vault Law Firm Diversity Survey. Copyright © 2024 Vault and Infobase Holdings, Inc. All rights reserved.



**WilmerHale**

**2024 Vault Law Firm Diversity Survey**

**DEI Training**

Which of the following steps has the firm undertaken to bolster diversity, equity, and inclusion awareness among attorneys and staff?

**Yes**    Provides annual DEI training that addresses implicit bias for all attorneys

**Yes**    Provides annual DEI training that addresses implicit bias for all attorneys and staff

**Yes**    Provides DEI training specifically for firm leadership/managers/department chairs

**Yes**    Includes DEI training in on-boarding process for new associates and/or summer associates

**Yes**    Retained a DEI consultant to conduct a cultural assessment or review firm processes

If applicable, describe any other initiatives taken:

Response to Spring 2024 Vault Law Firm Diversity Survey. Copyright © 2024 Vault and Infobase Holdings, Inc. All rights reserved.



**WilmerHale**

**2024 Vault Law Firm Diversity Survey**

## RECRUITMENT AND HIRING

**HBCUs**

Does the firm recruit at law schools of Historically Black Colleges and Universities (HBCUs)?
**Yes**

If yes, which HBCUs does the firm hire from?
Howard University School of Law

Response to Spring 2023 Vault Law Firm Diversity Survey. Copyright © 2023 Vault and Infobase Holdings, Inc. All rights reserved.



**WilmerHale**

**2024 Vault Law Firm Diversity Survey**

### Scholarships

Does the firm offer scholarships, internships, or fellowships to diverse law students?

**Yes**

If yes, provide the following:

| Description, opportunities available, and link | Number awarded in 2023 |
| --- | --- |
| **Scholarships** | |
| 1 — Law Preview Scholarship, 2- 1L Diversity Public Interest Fellowship Program, 3- 2L Diversity Scholarship, 4- Practice Pro Scholar Link: *WilmerHale LLP - Law Preview (barbri.com) *https://www.wilmerhale.com/en/about/diversity-and-inclusion *https://www.practicepro.cc/diversity-sponsors/ | 63- 50 Law Preview, 6 1L Fellowships, 6 2L Scholarships, 1L Practice Pro Scholar |
| **Internships** | |
| 4 — Boston Lawyer's Group (BLG) Diverse 1L program; Colorado Pledge to Diversity program; Leadership Council on Legal Diversity (LCLD) 1L Scholars Program.; Law in Tech and Diversity (LiTD) Link: *http://thebostonlawyersgroup.com/programs/ *https://coloradopledge.org/ *https://www.lcldnet.org/programs/1l-scholars/ *http://www.lawintechdiversity.com/participating-companies.html | 8 -- 1 (BLG), 3 (LCLD), 1 (Colorado Pledge),3 LiTD |
| **Fellowships** | |
| 1 — Sponsors for Educational Opportunity's (SEO), 2- Fellowship Law Program; John A. Payton Summer Associate Fellowship Link: *https://www.seo-usa.org/law/our-program/fellowship/ *Fellowship/Scholarship | WilmerHale *https://www.wilmerhale.com/en/careers/law-students/fellowships-scholarships | 9- 6 (SEO Fellows), 3 Fellows |



**WilmerHale**

## 2024 Vault Law Firm Diversity Survey

**Career Fairs**

Does the firm participate in legal diversity career fairs?

**Yes**

If yes, list the diversity career fairs in which the firm participates

Bay Area Diversity Career Fair, Boston Lawyer's Group Boston Job Fair, Lavender Law Conference & Career Fair, The Rocky Mountain Diversity Legal Career Fair

**Combating Implicit Bias**

What steps has the firm taken to combat implicit bias in recruiting (e.g., interview training, behavioral interview questions, blind resume review, etc.)?

We develop formal training for our recruiting teams to ensure that interviews are conducted in a culturally relevant and inclusive manner. Additionally, discussing the possibility of introducing more uniform processes, such as having a core set of interview questions and panel interviews, among other items.

Response to Spring 2024 Vault Law Firm Diversity Survey. Copyright © 2024 Vault and Infobase Holdings, Inc. All rights reserved.



**WilmerHale**

## 2024 Vault Law Firm Diversity Survey

**Summer Associates**

In what ways does the firm support diverse summer associates (e.g., mentoring, training, events, etc.)?

oThe firm supports diverse summer associates in a variety of different ways, including:

*We participate in the Leadership Council on Legal Diversity (LCLD) 1L Scholars Program, which offers diverse first year law students an opportunity to participate in the firm's summer program and also work side-by-side with a firm client, to provide students joint summer experiences and enhanced professional development opportunities.

*We provide each diverse summer associate with a diverse attorney mentor, also known as a "Diversity Buddy." The buddy serves as a resource during their time at the firm.

*We host office based and firmwide programs to help build relationships including welcome events, panel discussions and participation in the affinity group meetings to help introduce diverse attorneys to one another across offices and seniority.

*We have a firmwide diversity, equity and inclusion team dedicated to help facilitate and coordinate a wide range of programs and initiatives throughout the firm as well as provide support to attorneys.

Response to Spring 2024 Vault Law Firm Diversity Survey. Copyright © 2024 Vault and Infobase Holdings, Inc. All rights reserved.



**WilmerHale**

## 2024 Vault Law Firm Diversity Survey

**1L Summer Associates**
Does the firm hire 1L summer associates?
**Yes**

**8** Total 1L summer associates at the firm in 2023

| Demographics | Men | Women | Nonbinary | Unknown |
|---|---|---|---|---|
| **Race / Ethnicity** | **3** | **5** | **0** | **0** |
| American Indian or Alaska Native | 0 | 0 | 0 | 0 |
| Asian | 0 | 2 | 0 | 0 |
| Black or African-American | 2 | 0 | 0 | 0 |
| Hispanic or Latinx | 1 | 0 | 0 | 0 |
| Native Hawaiian or Other Pacific Islander | 0 | 0 | 0 | 0 |
| White | 0 | 1 | 0 | 0 |
| Two or More Races | 0 | 2 | 0 | 0 |
| Other or Unknown | 0 | 0 | 0 | 0 |
| **Additional Demographics** | **2** | **1** | **0** | **0** |
| LGBTQ+ Individuals | 2 | 1 | 0 | 0 |
| Individuals with Disabilities | 0 | 0 | 0 | 0 |

**Diversity Program Participants**
If applicable, how many of the law students who participated in the firm's 1L summer associate program in 2022 (2 years ago) were hired through the firm's diversity scholarship/internship/fellowship program?

3

Response to Spring 2024 Vault Law Firm Diversity Survey. Copyright © 2024 Vault and Infobase Holdings, Inc. All rights reserved.



**WilmerHale**

## 2024 Vault Law Firm Diversity Survey
### 2L Summer Associates

Did the firm hold a 2L summer program in 2023?    **Yes**

**128** Total 2L Summer Associates at the Firm in 2023

| Demographics | Men | Women | Nonbinary | Unknown |
|---|---|---|---|---|
| Race / Ethnicity | 54 | 72 | 0 | 0 |
| American Indian or Alaska Native | 2 | 0 | 0 | 0 |
| Asian | 8 | 13 | 0 | 0 |
| Black or African-American | 5 | 7 | 0 | 0 |
| Hispanic or Latinx | 3 | 6 | 0 | 0 |
| Native Hawaiian or Other Pacific Islander | 0 | 0 | 0 | 0 |
| White | 29 | 37 | 0 | 0 |
| Two or More Races | 7 | 9 | 0 | 0 |
| Other or Unknown | 0 | 0 | 0 | 0 |
| Additional Demographics | 10 | 10 | 2 | 0 |
| LGBTQ+ Individuals | 10 | 10 | 2 | 0 |
| Individuals with Disabilities | 0 | 0 | 0 | 0 |

### 2L Summer Associates Who Received Offers

**128** Total 2L Summer Associates Received Offers

| Demographics | Men | Women | Nonbinary | Unknown |
|---|---|---|---|---|
| Race / Ethnicity | 54 | 72 | 1 | 0 |
| American Indian or Alaska Native | 2 | 0 | 0 | 0 |
| Asian | 8 | 13 | 0 | 0 |
| Black or African-American | 5 | 7 | 0 | 0 |
| Hispanic or Latinx | 3 | 6 | 0 | 0 |
| Native Hawaiian or Other Pacific Islander | 0 | 0 | 0 | 0 |
| White | 29 | 37 | 0 | 0 |
| Two or More Races | 7 | 9 | 1 | 0 |
| Other or Unknown | 0 | 0 | 0 | 0 |
| Additional Demographics | 10 | 10 | 2 | 0 |
| LGBTQ+ Individuals | 10 | 10 | 2 | 0 |
| Individuals with Disabilities | 0 | 0 | 0 | 0 |

### 2L Summer Associates Who Accepted Offers

**103** Total 2L Summer Associates Received Offers

| Demographics | Men | Women | Nonbinary | Unknown |
|---|---|---|---|---|
| Race / Ethnicity | 44 | 57 | 2 | 0 |
| American Indian or Alaska Native | 2 | 0 | 0 | 0 |
| Asian | 7 | 10 | 1 | 0 |
| Black or African-American | 4 | 4 | 0 | 0 |
| Hispanic or Latinx | 3 | 5 | 0 | 0 |
| Native Hawaiian or Other Pacific Islander | 0 | 0 | 0 | 0 |
| White | 23 | 34 | 0 | 0 |
| Two or More Races | 5 | 4 | 1 | 0 |
| Other or Unknown | 0 | 0 | 0 | 0 |
| Additional Demographics | 10 | 6 | 2 | 0 |
| LGBTQ+ Individuals | 10 | 6 | 2 | 0 |
| Individuals with Disabilities | 0 | 0 | 0 | 0 |

0

Response to Spring 2024 Vault Law Firm Diversity Survey. Copyright © 2024 Vault and Infobase Holdings, Inc. All rights reserved.



**WilmerHale**

## 2024 Vault Law Firm Diversity Survey

**Diversity Program Participants**

How many of the law students who participated in the firm's 2L summer associate program in 2023 were hired through the firm's diversity scholarship/internship/fellowship program?

21

### New Attorneys Hired

**179**   Total 2L Summer Associates Received Offers

| Demographics | Men | Women | Nonbinary | Unknown |
|---|---|---|---|---|
| **Race / Ethnicity** | **82** | **97** | **0** | **0** |
| American Indian or Alaska Native | 0 | 1 | 0 | 0 |
| Asian | 7 | 19 | 0 | 0 |
| Black or African-American | 3 | 9 | 0 | 0 |
| Hispanic or Latinx | 3 | 6 | 0 | 0 |
| Native Hawaiian or Other Pacific Islander | 0 | 0 | 0 | 0 |
| White | 63 | 50 | 0 | 0 |
| Two or More Races | 6 | 12 | 0 | 0 |
| Other or Unknown | 0 | 0 | 0 | 0 |
| **Additional Demographics** | **17** | **11** | **0** | **0** |
| LGBTQ+ Individuals | 17 | 11 | 0 | 0 |
| Individuals with Disabilities | 0 | 0 | 0 | 0 |

**Mandatory Arbitration**

**No**   Does the firm require associates to agree to mandatory arbitration as a condition of employment?

**N/A**   Does the requirement also apply to summer associates?

If yes to mandatory arbitration, elaborate ot mandatory arbitration provisions:

Response to Spring 2024 Vault Law Firm Diversity Survey. Copyright © 2024 Vault and Infobase Holdings, Inc. All rights reserved.



**WilmerHale**

**2024 Vault Law Firm Diversity Survey**

## CULTURE AND COMMUNITY

**Affinity Groups**

Does the firm have internal affinity groups or networks?

**Yes**

If yes, list the firm's affinity groups:

Asian American Affinity Group, Black/African American Affinity Group, Latino Affinity Group, LGBTQ Affinity Group, Middle Eastern Affinity Group, Women Leadership Initiative, Veterans Group, South Asian Group, Muslim Affinity Group, Jewish Affinity Group.



**WilmerHale**

**2024 Vault Law Firm Diversity Survey**

**Affinity Groups Cont'd**
What kind of support does the firm provide for its affinity groups or networks?

WilmerHale has multiple firmwide and office-based affinity groups for our diverse and LGBTQ attorneys. The office-based and firmwide affinity groups meet on a monthly basis and are supported with firm resources. The affinity groups bring together diverse attorneys to help build relationships and community and to share resources.  To provide further support to our diverse attorneys, we implemented Diversity Mentoring Circles to provide attorneys with opportunities to develop informal mentoring relationships within the firm. The Diversity Mentoring Circles are designed to introduce senior attorneys to junior attorneys to build relationships that may carry over into substantive work and to build sponsorship and mentorship relationships for diverse attorneys

Response to Spring 2024 Vault Law Firm Diversity Survey. Copyright © 2024 Vault and Infobase Holdings, Inc. All rights reserved.



**WilmerHale**

## 2024 Vault Law Firm Diversity Survey

**DEI Events**

Does the firm host DE&I retreats or conferences?   **Yes**

Does firm leadership attend these events?   **Yes**

If applicable, provide more detail on the firms DE&I events:

Over 260 diverse lawyers from all corners of the firm gathered in Washington DC to take part in WilmerHale's second Diversity Summit. The two-day event was an important opportunity for firm leaders and diverse attorneys to gather, reflect and reunite around the ongoing mission to make diversity, equity and inclusion part of the essential fabric of the firm and participate in professional development and networking programs. We are planning to organize another DEI summit in 2025.



**WilmerHale**

**2024 Vault Law Firm Diversity Survey**
**Reverse Mentoring**
Does the firm offer reverse mentoring, pairing senior attorneys with junior attorneys to help bridge generational or cultural gaps, share perspectives and skills, and foster a more inclusive culture?
**No**

If applicable, elaborate on the firm's reverse mentoring program:

Response to Spring 2024 Vault Law Firm Diversity Survey. Copyright © 2024 Vault and Infobase Holdings, Inc. All rights reserved.



**WilmerHale**

## 2024 Vault Law Firm Diversity Survey

### Associate Committee

Does the firm have an associate committee that consults with the partnership?

**Yes**

If applicable, describe how the associate committee engages with the partnership:

The Associates Communication Task Force (ACTF) includes Associates from each class, Office Partners In-Charge, Chairs of the Associate and Counsel Evaluation Committees and the Director of Legal Personnel. The ACTF groups meet regularly and relay key take-aways with fellow associates. The ACTF serves as a liaison to Management regarding issues and concerns of the associates.

Response to Spring 2024 Vault Law Firm Diversity Survey. Copyright © 2024 Vault and Infobase Holdings, Inc. All rights reserved.



**WilmerHale**

### 2024 Vault Law Firm Diversity Survey

**Combating Structural Racism**

Is the firm a member of the Law Firm Antiracism Alliance (LFAA)?        **Yes**

**Cultural Awareness**

How does the firm commemorate important dates honoring diversity?

WilmerHale hosts firmwide heritage month programs to celebrate the contributions of diverse groups and to foster greater cultural awareness to our firm community. These celebrations are open to the entire firm.  The celebrations include fireside chats with guest speakers, panels and movie screenings followed by discussions. We also host celebrations within each applicable affinity group. In addition to the programs listed above, our co-managing partners circulate a communication recognizing the heritage month and share details on how the firm plans to celebrate or honor it. In addition, we encourage the firm community to share their experiences and photos related to their history and culture, such as their life experiences, literature, art and cultural traditions. The stories and photos are posted to our internal website.

Response to Spring 2024 Vault Law Firm Diversity Survey. Copyright © 2024 Vault and Infobase Holdings, Inc. All rights reserved.



**WilmerHale**

**2024 Vault Law Firm Diversity Survey**

### NETWORKING, MENTORING, AND PROFESSIONAL DEVELOPMENT

**Mentoring & Sponsorship**

Does the firm offer a mentorship or sponsorship program that connects diverse attorneys with senior leadership?

**Yes**

If applicable, describe the mentoring or sponsorship program

We have implemented Diversity Mentoring Circles to provide attorneys with opportunities to develop informal mentoring relationships within the firm. The mentoring circles are designed to introduce senior attorneys to junior attorneys and build relationships that carry over into substantive work and build sponsorship and mentorship relationships for diverse attorneys.

The mentoring circles are comprised of a mix of partners, counsel, and associates. Each circle, diversified in terms of seniority, race/ethnicity, and gender, is led by 2-3 partners. The partners are selected based on their commitment to the development of diverse junior attorneys and include allies in addition to diverse partners. The mentoring circles are encouraged to meet regularly.

The Diversity Mentoring Circles are in addition to our firmwide Career Advancement Program which includes a formal mentoring program through which each non-partner lawyer receives a partner-mentor who is responsible for, among other things, helping mentees navigate their careers and assisting to promote lawyer development on an individualized basis.



**WilmerHale**

**2024 Vault Law Firm Diversity Survey**

**Professional Development**

Does the firm offer professional development programs specifically for diverse attorneys?

**Yes**

If applicable, elaborate on the professional development programs available to diverse attorneys:

Diversity Committee Co"Chairs, the Director of Diversity, Equity and Inclusion, the Diversity, Equity and Inclusion Managers and other key staff work with department and practice leaders to ensure that work assignments, training, professional development, mentoring and client engagement processes further the firm's goal of developing and advancing all our outstanding lawyers. WilmerHale is a member of the Leadership Council on Legal Diversity (LCLD).  Since 2020, we have sponsored twelve diverse lawyers, including ten diverse women, to participate in the LCLD Fellow and Pathfinder Programs, as part of our ongoing commitment to promote opportunities that advance both the internal and external visibility, and our dedication to retaining and promoting diverse and women lawyers by providing the professional development and relationship building skills critical to enhancing their roles as leaders in the law. We have expanded our firm's lawyers' participation in outside programs geared toward the professional development of diverse lawyers— including the Charting Your Own Course Conference, the Hispanic National Bar Association Intellectual Property Institute, programs run by the Minority Corporate Counsel Association, the National Asian Pacific American Bar Association Convention, the Corporate Counsel Men of Color Conference and the Corporate Counsel Women of Color Conference.

Additionally, in collaboration with a renowned expert, launched an ongoing, firm-wide customized Implicit Bias Initiative to raise awareness of and interrupt bias, as well as customized interventions into existing firm practices related to work assignments, evaluations, promotions, and elevations. In addition to our implicit bias programming for attorneys we rolled out implicit bias programs for our summer associates and non-attorney employees as well.  We have added additional content to our firm-wide diversity programming, including training programs around racial justice and allyship, cultural awareness and intercultural competency, and the impact of racism, trauma, stress and anxiety on the Black attorney and professional community — addressing the importance of attending to the mental and emotional health of our firm community.

Response to Spring 2024 Vault Law Firm Diversity Survey. Copyright © 2024 Vault and Infobase Holdings, Inc. All rights reserved.



**WilmerHale**

**2024 Vault Law Firm Diversity Survey**

**Work Allocation**

Does the firm monitor work distribution to ensure that diverse attorneys have equal access to quality assignments and significant client matters?

**Yes**

Describe how the firm monitors work distribution

To ensure our historically underrepresented attorneys are staffed on significant matters that expand their developmental and leadership opportunities, as well as increase their access to office and firm-wide leadership roles, WilmerHale has expanded our designated internal resources to support our commitment to their success, earlier in their professional careers. WilmerHale has a centralized staffing model that is executed at the practice group and department level and supported by a team of practice managers to assist in assigning work and building client teams that reflect the range of perspectives, backgrounds and talents of our lawyers which helps us develop creative and effective solutions for our clients' most complex and challenging legal issues. There are regularly scheduled meetings between our Diversity team, practice  managers and practice group/department leaders,  where  professional development, retention efforts and career goals are frequently reviewed.

Diversity Committee Co"Chairs, the Director and Managers  of Diversity, Equity and Inclusion and other key staff work with department and practice leaders to ensure that work assignments, training, professional development, mentoring and client engagement processes further the firm's goal of developing and advancing all of our outstanding lawyers.

Response to Spring 2024 Vault Law Firm Diversity Survey. Copyright © 2024 Vault and Infobase Holdings, Inc. All rights reserved.



**WilmerHale**

**2024 Vault Law Firm Diversity Survey**

**External Professional & Business Development Opportunities**

Does the firm support associate involvement in external activities related to diversity, equity, and inclusion, such as the following?

**Yes**   Pays for associate membership in diversity bar associations or other affinity organizations

**Yes**   Sponsors associate participation in diversity, equity, and inclusion conferences

**No**   Supports associate participation in other external DEI-related activities, events, or organizations (please describe):



**WilmerHale**

**2024 Vault Law Firm Diversity Survey**

## PROMOTION AND ADVANCEMENT

**Countering Implicit Bias**

Has the firm implemented processes to mitigate implicit bias in work allocation, performance reviews, and/or promotions?

**Yes**

If applicable, describe the firm's initiatives to mitigate implicit bias

WilmerHale, in collaboration with a renowned expert, launched an ongoing, firm-wide customized Implicit Bias Initiative to raise awareness of and interrupt unconscious bias, as well as customized interventions into existing firm practices related to work assignments, evaluations, promotions and elevations. In addition to our unconscious bias programming for attorneys we rolled out unconscious bias programming for our summer associates and non-attorney employees as well. We have added additional content to our firmwide programming, including learning experiences around racial justice and allyship, cultural awareness and intercultural competency, and the impact of racism, trauma, stress and anxiety on attorneys and business professionals from underrepresented groups— addressing the importance of attending to the mental and emotional health of our firm community. The firm has also partnered with DEI consultant, keynote speaker and facilitator Marguerite Fletcher to deliver programs for our business professionals and attorneys, including learning experiences focused on communicating across differences. We have also partnered again with organizational DEI expert Michelle Silverthorn, who first visited WilmerHale in 2020 to deliver programming on unconscious bias and allyship, to facilitate a firmwide learning experience on allyship and belonging, prompting reflection and providing practical tips on how one moves from good intentions to real action when addressing unconscious bias in the workplace.

**Upward Reviews**

Does the performance review process include the opportunity for associates to provide anonymous upward reviews?

**Yes**

If applicable, describe the firm's initiatives to mitigate implicit bias

The Upward Evaluation Process, an opportunity for our lawyers and technology specialists to provide more senior lawyers with feedback on their managerial and leadership skills. This process is highly valued by our senior lawyers because it allows them to continue to develop, make positive improvements to our work environment, and enhance the training and development of our junior lawyers. The feedback is used by partners, special counsel, and counsel to improve their leadership and mentoring skills. It is also used by department and practice group leaders to work with individuals on their professional development and individual partner plans.

Response to Spring 2024 Vault Law Firm Diversity Survey. Copyright © 2024 Vault and Infobase Holdings, Inc. All rights reserved.



**WilmerHale**

## 2024 Vault Law Firm Diversity Survey

**Diverse Slate of Candidates**

Does the firm employ any of the following measures to ensure that a diverse slate of candidates is considered for promotions, leadership roles, or hiring?

| | |
|---|---|
| **Yes** | The firm is Mansfield Certified |
| **Yes** | The firm is Mansfield Certified Plus |
| **Yes** | The firm is currently participating in the Mansfield Rule certification process administered by Diversity Lab |
| **No** | The firm has instituted other formal processes (please describe): |

**Multi-tier Partnership**

Does the firm have a multi-tiered partnership?          **No**

**Alternatives to Partnership**

Does the firm have a multi-tiered partnership?          **No**

If applicable, describe the alternatives to partnership:

Response to Spring 2024 Vault Law Firm Diversity Survey. Copyright © 2024 Vault and Infobase Holdings, Inc. All rights reserved.



**WilmerHale**

## 2024 Vault Law Firm Diversity Survey

### Homegrown Partners
Please provide the percentage of equity partners at the firm as of December 31, 2023 who started as associates at the firm.
**72%**

### Promotions to Partnership

**13** Total Number of Attorneys Promoted to Partner in 2023 (includes promotions effective in 2023, not announced in 2023)

| Demographics | Men | Women | Nonbinary | Unknown |
|---|---|---|---|---|
| **Race / Ethnicity** | **5** | **8** | **0** | **0** |
| American Indian or Alaska Native | 0 | 0 | 0 | 0 |
| Asian | 0 | 0 | 0 | 0 |
| Black or African-American | 0 | 1 | 0 | 0 |
| Hispanic or Latinx | 0 | 0 | 0 | 0 |
| Native Hawaiian or Other Pacific Islander | 0 | 0 | 0 | 0 |
| White | 4 | 6 | 0 | 0 |
| Two or More Races | 1 | 1 | 0 | 0 |
| Other or Unknown | 0 | 0 | 0 | 0 |
| **Additional Demographics** | **1** | **0** | **0** | **0** |
| LGBTQ+ Individuals | 1 | 0 | 0 | 0 |
| Individuals with Disabilities | 0 | 0 | 0 | 0 |

## BILLABLE HOURS AND COMPENSATION

### Credit for DEI Work

Does the firm provide billable credit for work contributing to diversity, equity, and inclusion efforts (e.g., with respect to recruiting or business development)? Note that this does not include pro bono projects.
**Yes**

If so, how many hours can be applied to the firm's billable hour target?
Attorneys can include up to 50 hours of firm time spent on activities related to diversity, equity and inclusion programming in recognition of the commitment from our attorneys to spend time on a variety of activities both to support our recruiting efforts and to build a culture of inclusion within the firm.

### Compensation
Are associate salaries lockstep or discretionary?
**Lockstep**

Response to Spring 2024 Vault Law Firm Diversity Survey. Copyright © 2024 Vault and Infobase Holdings, Inc. All rights reserved.



**WilmerHale**

## 2024 Vault Law Firm Diversity Survey

**Bonuses**

Are associate bonuses lockstep or discretionary?

**Hybrid**

If salaries and/or bonuses are discretionary or hybrid: Does the firm publish compensation ranges or actual compensation for each associate?

**N/A**

**Flex-time Policy**

Does the firm have a formal flex-time policy?

**Yes**

**Reduced-hours Policy**

Does the firm have a formal reduced-hours policy?

**Yes**

**Partnership Eligibility**

Do attorneys who take advantage of the firm's reduced-hours or flex-time options remain eligible for partnership?

**Yes**

Please explain how working an alternative schedule may affect an associate's path to partnership:

An alternative workload arrangement (including a part-time schedule) does not affect the timing of a lawyer's promotion to counsel or partner. The firm offers a flexible career path structure-associate, senior associate counsel, special counsel, and partner-that promotes lawyer development on a more individualized basis. In order to enhance retention, and to avoid any stigma relating to the pace of promotion, we have a flexible timeline for promotion from senior associate to counsel and from counsel to partner. After three and a half years, associates are eligible for promotion to senior associate. Senior associates are then eligible for promotion to counsel after three years, but depending upon individual circumstances, that track may be extended up to five years. Counsel are eligible for election to partner after two years, but that track may be extended up to four years. Special Counsel is a position at the firm intended for lawyers with specialized expertise and skills.

Response to Spring 2024 Vault Law Firm Diversity Survey. Copyright © 2024 Vault and Infobase Holdings, Inc. All rights reserved.



**WilmerHale**

## 2024 Vault Law Firm Diversity Survey
### Attorneys Working Reduced Hours

**63** Total Number of Attorneys Working Reduced Hours

| Attorneys with Reduced-Hours Schedules | Men | Women | Nonbinary | Unknown |
|---|---|---|---|---|
| Associates | 6 | 23 | 0 | 0 |
| Equity Partners | 5 | 7 | 0 | 0 |
| Non-equity Partners | 0 | 0 | 0 | 0 |
| Counsel / Of Counsel | 7 | 6 | 0 | 0 |
| Non-Partner-Track Attorneys | 1 | 8 | 0 | 0 |

### WORKING PARENTS

**Family-planning Resources**

Does the firm offer any fertility or family-planning benefits, such as in-vitro fertilization, egg freezing, adoption or surrogacy support?

**Yes**

If applicable, describe the family-planning resources available:

The WIN Fertility Benefits include a Fertility Preservation Program (egg, embryo and sperm freezing cycles), Adoption & Surrogacy Benefits through a reimbursement program and a Fertility Support Program that provides advocacy and support for members undergoing fertility treatment. Fertility treatment benefits continue to be available through the firm's BCBS medical plans without a medical diagnosis of infertility.



**WilmerHale**

## 2024 Vault Law Firm Diversity Survey

**Parental Leave for Adoption**
Does the firm offer parental leave for adoption?
**Yes**

If yes, is the adoption leave gender neutral?
**Yes**

**Primary & Secondary Caregivers**
Does the firm's parental leave policy distinguish between primary and secondary caregivers?
**Yes**

If yes: In what way does the firm's policy distinguish between primary and secondary caregivers?
While our policy does distinguish between primary and secondary caregivers — a primary caregiver is defined as the parent or adoptive parent (either father or mother) of a child who has the primary responsibility of caring for that child during a specific period of time; and a secondary caregiver may take a paid leave of absence up to four consecutive weeks to care for his or her newborn (or newly adopted) child — the vast majority of our leave takers use the 18-week paid leave.

If yes: How much paid leave is available to primary caregivers?
18 weeks

If yes: How much paid leave is available to secondary caregivers?
4 weeks

If no: How much paid leave is available to those taking parental leave?
N/A

Response to Spring 2024 Vault Law Firm Diversity Survey. Copyright © 2024 Vault and Infobase Holdings, Inc. All rights reserved.



**WilmerHale**

**2024 Vault Law Firm Diversity Survey**

**Parental Leave Policy**

Describe the firm's parental leave policy.

Any attorney who expects to return to the firm may take a leave of absence to care for his or her newborn (or newly adopted) child as either the child's primary or secondary caregiver ("parental leave").

Response to Spring 2024 Vault Law Firm Diversity Survey. Copyright © 2024 Vault and Infobase Holdings, Inc. All rights reserved.



**WilmerHale**

**2024 Vault Law Firm Diversity Survey**

**Support for Parents**

What steps has the firm taken to support parents and ensure that their parental status does not adversely affect their opportunities for career advancement?

**Yes**    Pro rates billable requirements / credit / bonus targets for parents who take leave

**Yes**    Provides resources for nursing mothers, such as private nursing rooms, breast milk storage, or breast milk shipping

**Yes**    Offers child care resources, such as onsite day care, back-up child care, etc.

**Yes**    Provides programs to assist new parents transitioning to leave and/or returning to work after leave (e.g., ramp up/ramp down, flexible hours, Mindful Return)

Feel free to elaborate on the nature of programs and resources the firm makes available to parents.

oWilmerHale offers Milk Stork which combines breast milk shipping with a flock of practical, family benefits to support working parents.
oOffice-specific designated wellness/lactation rooms for use by nursing mothers.
oInfant Transition Program through Bright Horizons provides up to 60 days of transition care at a daycare center close to the office.
oEmergency back-up childcare benefit available to employees when regular arrangements fall through.
oNew parents have access to 60 additional days of back-up care during the first 12 months following the baby's birth.
oThe firm has in-office and part-time work policies and considers all requests for alternative workload arrangements to address family, personal, or professional circumstances or goals. In all instances, alternative workload arrangements that are distinct from the firm's formal hybrid work policy are considered on a case-by-case basis and discussed with department leadership. The firm, however, is quite liberal in approving such requests. The purpose of addressing these requests on a case-by-case basis is to ensure that alternative workload arrangements are the product of a meaningful discussion between the lawyer and departmental leadership. It is often through these discussions that lawyers and department leadership can better understand each other's needs.

Response to Spring 2024 Vault Law Firm Diversity Survey. Copyright © 2024 Vault and Infobase Holdings, Inc. All rights reserved.



**WilmerHale**

## 2024 Vault Law Firm Diversity Survey

### INCLUSIVENESS AND ACCESSIBILTY

**Equity in Benefits**

Do the firm's health care benefits, family leave, and bereavement leave include same-sex spouses and domestic partners?

**Yes**

**LGBTQ+ Inclusivity**

What steps has the firm taken to create an inclusive environment for transgender and gender non-conforming individuals?

| | |
|---|---|
| **Yes** | Provides gender-neutral restrooms/facilities |
| **Yes** | Offers health insurance plans that provide equitable benefits for transgender employees and dependents |
| **Yes** | Provides an opportunity for employees to share preferred pronouns |
| **Yes** | Uses gender-neutral pronouns in its policies and materials |
| **Yes** | Non-discrimination policy explicitly includes gender identity and expression as a protected category |
| **No** | Other (please elaborate): |

**Accessibility**

What steps has the firm taken to create an inclusive environment for attorneys with disabilities?

| | |
|---|---|
| **Yes** | Has evaluated and addressed issues of accessibility in firm buildings, workspaces, and parking facilities |
| **Yes** | Has a clear and well-communicated process for attorneys to request accommodations or raise other workplace concerns |
| **Yes** | Non-discrimination policy explicitly includes disability as a protected category |
| **No** | Other (please elaborate): |

Response to Spring 2024 Vault Law Firm Diversity Survey. Copyright © 2024 Vault and Infobase Holdings, Inc. All rights reserved.



**WilmerHale**

**2024 Vault Law Firm Diversity Survey**

## ATTRITION

### Departures among U.S. Associates

**111** Total Number of Departures among Associates in 2023:

| Demographics | Men | Women | Nonbinary | Unknown |
|---|---|---|---|---|
| **Race / Ethnicity** | **46** | **65** | **0** | **0** |
| American Indian or Alaska Native | 0 | 1 | 0 | 0 |
| Asian | 10 | 14 | 0 | 0 |
| Black or African-American | 3 | 9 | 0 | 0 |
| Hispanic or Latinx | 1 | 0 | 0 | 0 |
| Native Hawaiian or Other Pacific Islander | 0 | 0 | 0 | 0 |
| White | 29 | 31 | 0 | 0 |
| Two or More Races | 3 | 10 | 0 | 0 |
| Other or Unknown | 0 | 0 | 0 | 0 |
| **Additional Demographics** | **4** | **5** | **0** | **0** |
| LGBTQ+ Individuals | 4 | 5 | 0 | 0 |
| Individuals with Disabilities | 0 | 0 | 0 | 0 |

### Departures among U.S. Partners

**3** Total Number of Departures among U.S. Partners in 2023:

| Demographics | Men | Women | Nonbinary | Unknown |
|---|---|---|---|---|
| **Race / Ethnicity** | **3** | **0** | **0** | **0** |
| American Indian or Alaska Native | 0 | 0 | 0 | 0 |
| Asian | 0 | 0 | 0 | 0 |
| Black or African-American | 0 | 0 | 0 | 0 |
| Hispanic or Latinx | 0 | 0 | 0 | 0 |
| Native Hawaiian or Other Pacific Islander | 0 | 0 | 0 | 0 |
| White | 3 | 0 | 0 | 0 |
| Two or More Races | 0 | 0 | 0 | 0 |
| Other or Unknown | 0 | 0 | 0 | 0 |
| **Additional Demographics** | **0** | **0** | **0** | **0** |
| LGBTQ+ Individuals | 0 | 0 | 0 | 0 |
| Individuals with Disabilities | 0 | 0 | 0 | 0 |

0

Response to Spring 2024 Vault Law Firm Diversity Survey. Copyright © 2024 Vault and Infobase Holdings, Inc. All rights reserved.



**WilmerHale**

## 2024 Vault Law Firm Diversity Survey

### Departures among U.S. Counsel / Of Counsel and Non-Partner-Track Attorneys

**13** Total Number of Departures among U.S. Counsel and Non-Partner-Track Attorneys in 2023

| Demographics | Men | Women | Nonbinary | Unknown |
|---|---|---|---|---|
| **Race / Ethnicity** | **6** | **7** | **0** | **0** |
| American Indian or Alaska Native | 1 | 0 | 0 | 0 |
| Asian | 0 | 1 | 0 | 0 |
| Black or African-American | 0 | 0 | 0 | 0 |
| Hispanic or Latinx | 0 | 1 | 0 | 0 |
| Native Hawaiian or Other Pacific Islander | 0 | 0 | 0 | 0 |
| White | 4 | 5 | 0 | 0 |
| Two or More Races | 1 | 0 | 0 | 0 |
| Other or Unknown | 0 | 0 | 0 | 0 |
| **Additional Demographics** | **0** | **0** | **0** | **0** |
| LGBTQ+ Individuals | 0 | 0 | 0 | 0 |
| Individuals with Disabilities | 0 | 0 | 0 | 0 |

Response to Spring 2024 Vault Law Firm Diversity Survey. Copyright © 2024 Vault and Infobase Holdings, Inc. All rights reserved.



**WilmerHale**

**2024 Vault Law Firm Diversity Survey**

## SUCCESSES AND PRIORITIES

**Top Three Accomplishments**

What are the firm's top three accomplishments or areas in which the firm has had its greatest success with respect to fostering diversity, equity, and inclusion within the firm?

**#1**

1.The Executive Diversity and Inclusion Committee (EDIC) represents the establishment of a chain of accountability that starts at the top and sets goals that extend to all members of our firm, covering objectives relating to recruiting, developing and retaining diverse lawyers; strengthening our culture of inclusion; tying partner compensation to demonstrated diversity efforts; revisiting our evaluation, mentoring and benchmarking programs; and revamping our work assignment process. The EDIC is chaired by the firm's managing partner Anjan Sahni and includes department chairs, practice group leaders and works with our DEI professionals and regional Diversity Committee Chairs to implement DEI programs. These actions help us ensure that diversity, equity and inclusion are a part of WilmerHale's culture, as this also helps to strengthen our internal diversity pipeline.

Response to Spring 2024 Vault Law Firm Diversity Survey. Copyright © 2024 Vault and Infobase Holdings, Inc. All rights reserved.



**WilmerHale**

## 2024 Vault Law Firm Diversity Survey

**Top Three Accomplishments**

What are the firm's top three accomplishments or areas in which the firm has had its greatest success with respect to fostering diversity, equity, and inclusion within the firm?

**#2**

2.In furtherance of our leadership commitment to DEI, the firm implemented a Bonus Eligible Time policy to include up to 50 hours of firm time spent on activities related to DEI programming in recognition of the commitment from our attorneys, especially diverse attorneys, to spend time on a variety of activities both to support our recruiting/pipeline initiatives and to build a culture of inclusion within the firm.

Response to Spring 2024 Vault Law Firm Diversity Survey. Copyright © 2024 Vault and Infobase Holdings, Inc. All rights reserved.



**WilmerHale**

## 2024 Vault Law Firm Diversity Survey

### Top Three Accomplishments

What are the firm's top three accomplishments or areas in which the firm has had its greatest success with respect to fostering diversity, equity, and inclusion within the firm?

**#3**

3. We further recognize that in order to sustain long term and meaningful progress toward a more inclusive and equitable organization, inclusive leadership must be infused at all levels. As such we have developed inclusive leadership education and have tied partner compensation to demonstrated diversity efforts.

Response to Spring 2024 Vault Law Firm Diversity Survey. Copyright © 2024 Vault and Infobase Holdings, Inc. All rights reserved.



**WilmerHale**

**2024 Vault Law Firm Diversity Survey**
**Top Three Priorities**
What are the firm's top three priorities for advancing diversity, equity, and inclusion within the firm moving forward?

**#1**
1.Continue furthering our diversity, equity and inclusion progress in connection with our retention efforts by continuing the DEI team's periodic review of diverse and women attorneys with chairs and practice group leaders for each firm department.

Response to Spring 2024 Vault Law Firm Diversity Survey. Copyright © 2024 Vault and Infobase Holdings, Inc. All rights reserved.



**WilmerHale**

## 2024 Vault Law Firm Diversity Survey
### Top Three Priorities

What are the firm's top three priorities for advancing diversity, equity, and inclusion within the firm moving forward?

### #2

2.In light of the recent affirmative action Supreme Court decision, continue to support the collaboration of our EDIC, DEI professionals and recruiting teams to determine new approaches to recruiting and retaining top diverse talent—including exploring recruiting opportunities outside the "high-yield" schools and geographies that are our traditional focus— to broaden our applicant pool including expanding our support of pipeline programs. Such pipeline initiatives include, among others, (a) Law Preview, an initiative designed to prepare accepted law students for the rigors of the 1L experience; (b) our 1L Diversity Public Interest Fellowship Program in which recipients are awarded a stipend to work in a public interest legal position or a judicial internship the summer after their first year of law school, and (c) our 2L Diversity Scholarship Program in which recipients will be awarded a stipend while spending their 2L summer at our firm and participating in diversity related work and/or programming while summer associates.

Response to Spring 2024 Vault Law Firm Diversity Survey. Copyright © 2024 Vault and Infobase Holdings, Inc. All rights reserved.



**WilmerHale**

**2024 Vault Law Firm Diversity Survey**
**Top Three Priorities**
What are the firm's top three priorities for advancing diversity, equity, and inclusion within the firm moving forward?

**#3**
3.Continue to partner with clients and alumni to foster connections and to support a culture of inclusion, equity and belonging.

Response to Spring 2024 Vault Law Firm Diversity Survey. Copyright © 2024 Vault and Infobase Holdings, Inc. All rights reserved.



**WilmerHale**

**2024 Vault Law Firm Diversity Survey**

## ADVICE TO CANDIDATES

### Advice

What advice do you have for candidates who are looking for a diverse and inclusive work environment? What questions should they ask when interviewing to help them assess the extent of a firm's commitment to diversity, equity, and inclusion?

*Ask questions about DEI initiatives to both diverse attorneys and non-diverse attorneys.
*What programs are presently in place, to support historically underrepresented attorneys at their firm?
*How long have such programs been in place?
*How do they measure success of such initiatives?
*What does the firm consider the most challenging aspects of their DEI strategy? Why?
*Inquire about diversity among equity partner population and firm leadership.

Response to Spring 2024 Vault Law Firm Diversity Survey. Copyright © 2024 Vault and Infobase Holdings, Inc. All rights reserved.



# Exhibit 4

Case 1:25-cv-00917-RJL    Document 103-2    Filed 04/17/25    Page 101 of 221

US Law Week
June 17, 2022, 4:00 AM EDT

# Diversifying Leadership: How the Mansfield Rule Is Driving Change

The Mansfield Rule certification launched in 2017 to diversify the power structure of law firms and legal departments through appointments, elections, and promotions to influential leadership committees and roles. Reed Smith DEI leader John Iino, Penn Law's Jim Sandman, and Diversity Lab CEO Caren Ulrich Stacy share recent data on promising progress.

The Mansfield Rule is driving positive culture and structure changes to boost diversity in law firm and corporate legal department leadership. It is making progress where the NFL's Rooney Rule has not for three reasons.

Mansfield is built on decades of science and data. Transparency and accountability are baked into the structured certification process, with the requirements evolving and getting tougher every year. And, unlike the stagnating Rooney Rule, it's not focused simply on hiring, or one or two top roles.

The goal of Mansfield is to diversify the entire power structure by broadening who is considered—through appointments, elections, promotions, and other critical activities that impact the pipeline—for dozens of influential leadership committees and roles. Law firms and legal departments that adhere to the rigorous annual certification process and report their verified data to Diversity Lab are awarded certification. And to drive long-term results, there is also a "certification plus" category that evaluates whether they have achieved diversity in leadership, and not only considered it.

## Mansfield Is Driving Change

The 30+ early adopter law firms—those that have achieved certification year-over-year since the rule's launch in 2017—have made progress above and beyond the typical rate of change pre-Mansfield. In several instances, Mansfield firms have significantly increased the racial and ethnic diversity of their leadership and outpaced non-Mansfield firms' progress.



**Racial & Ethnic Lawyers on Executive/Management Committees**
🚀 Mansfield Rule Adopted    ⚓ No Rule Implemented

Source: Mansfield Project (Public Data From the Minority Corporate Counsel Association)    **Bloomberg Law**

Two years of preliminary aggregate data for the 30+ Mansfield early adopter firms show promise. Highlights include:

- Since the launch, non-Mansfield firms increased the racial and ethnic diversity of their management committees by a tenth of one percent (.13%), while Mansfield firms increased by 4.4%—more than 30 times the rate of non-Mansfield firms (See chart above).
- The racial and ethnic diversity of non-Mansfield firms' partner nomination committees declined by nearly 1.0% between 2017 and 2019, while Mansfield firms increased by nearly 4% (See chart below).
- Non-Mansfield firms increased the racial and ethnic diversity of their equity partnership by 0.6% between 2017 and 2019, while Mansfield firms more than doubled with an increase of 1.5%.

Even more important are the participating firms' individual outcomes. Prior to Mansfield, only 12% tracked the diversity of their leadership pipeline; now 100% do so. This allows firms to focus on who is in the pipeline now and in the future, and to document and measure progress. This unsung but critically vital work is the first of many steps required for more inclusive leadership.

Participating in Mansfield is much more than an exercise in ticking the box. And the benefits are broader than current leadership. The commitment to re-certifying annually keeps firms from backsliding when new management takes over.



### Racial & Ethnic Lawyers on Partner Nomination Committees

Mansfield Rule Adopted    No Rule Implemented

Source: Mansfield Project (Public Data From the Minority Corporate Counsel Association)    **Bloomberg Law**

Mansfield also supports up-and-coming leaders. At the annual Mansfield Client Forums, more than 2,000 newly promoted diverse partners at certified firms have had the opportunity to build relationships with influential in-house lawyers, resulting in about $3 million to $5 million in business credited to these partners.

**Annual Certification Is Tough**

In the last two years, over 200 firms and 100 legal departments have adopted Mansfield in hopes of certifying and experiencing similar results. The annual certification is tough and not all participants achieve it. The process includes the tracking and measuring of more than a dozen leadership-related talent practices and activities. The processes must be written and transparent to all lawyers. There are monthly knowledge-sharing calls among all participants. There are numerous data-collection and reporting milestones. And it changes every year to drive even greater change.

When the certification launched initially in 2017, participating firms were asked to consider 30% women and historically underrepresented racial and ethnic lawyers for all high-level leadership committees and roles. More recently, it was expanded to include LGBTQ+ lawyers and lawyers with disabilities for leadership roles as well as critical activities that impact the pipeline to leadership such as pitch teams, senior-level lateral hiring, and promotions to equity partner. A new version was also recently created and launched for legal departments that requires 50% consideration of all historically underrepresented lawyers for internal leadership and outside counsel roles.

Applying the Mansfield Rule is hard. It's time consuming. But it's working at its intended purpose to diversify leadership.

**Law Firm Power Lies in Leadership**

In law firms, power lies in the collective leadership structure. Firms are governed by influential committees—the management committee, partner-nominating committee, compensation committee, and more—as well as top roles, such as the managing partner and practice group leaders. Together, they determine who gets promoted to partner, how much lawyers are paid, and which partners get credit for new clients.

If the leadership teams are diverse, then the policies and processes related to hiring, promoting, and rewarding talent will be more inclusive and equitable. Management decisions will more fully reflect and represent the needs of diverse workforces. It takes time to change the entrenched leadership practices and structure, and benefit from the ripple effect in the broader workplace.

**Reed Smith's Experience**

Reed Smith is one example. Since the inception of the Mansfield Rule, Reed Smith has achieved "Mansfield Certified Plus" status, which is awarded to firms that have not only considered, but reached at least 30 percent diversity in a notable number of current leadership roles and committees. The firm has reported material increases across four Mansfield metrics: diversity among department chairs and practice group leadership, diversity among office managing partners, diverse lateral recruitment, and diversity among lawyers who are on client pitch teams.

But it's not just about the numbers, Mansfield is shifting conversations and cultures. Diverse representation has become a key consideration in every discussion when selecting leadership at Reed Smith. The outcomes speak volumes. A woman leads the firm's transactional practices and a Black man heads the litigation and disputes department. Recently, the firm appointed two women to office managing partners, one of whom is Black—resulting in six women in these US leadership roles. There are also racial and gender diverse leaders in disputes, financial services, labor and employment, and life sciences.

**Long-Term Change Requires Strong, Steady Effort**

Despite this initial progress, there are occasional naysayers who denounce Mansfield and the hard work of the firm and corporate leaders working to implement it. An academic recently published a paper suggesting that Mansfield is ineffective because the early-adopter firms are not light years ahead of all other firms in diversity representation or retention across all levels. Not only did the academic measure the wrong data—including areas not addressed by Mansfield and firms that did not certify consistently—she completely missed Mansfield's premise and purpose.

Mansfield was not built to improve diversity across all levels overnight. It was built to diversify a narrow but incredibly important aspect of firms and legal departments—the leadership structure.

Premature and careless criticism of Mansfield for not having cured the diversity crisis in law in the few years since it was first launched does harm. It discourages the very innovation, experimentation, and long-term thinking that the crisis demands. And it discounts the lived experiences of the leaders and underrepresented lawyers who have benefited from the discipline and accountability provided by the Mansfield certification.

There is no magic wand that will fix the lack of diversity in leadership, but Mansfield is making progress in law.

Hundreds of diversity directors and other leaders are doing the hard work to implement and measure Mansfield's impact. It is one tool in their larger toolkit to drive systemic change in leadership. But this novel, change-management initiative requires time, intentionality, and iteration. There is more work to be done by building on the early progress, not tearing it down.

*This article does not necessarily reflect the opinion of The Bureau of National Affairs, Inc., the publisher of Bloomberg Law and Bloomberg Tax, or its owners.*

*Write for Us: Author Guidelines*

**Author Information**

*John Iino is Reed Smith's chief diversity officer, leading the firm's efforts to sponsor and achieve diversity and inclusion in the legal community. He helps individuals and organizations achieve excellence through his experience as a global law firm leader, diversity professional, and executive coach.*

*Jim Sandman is distinguished lecturer at the University of Pennsylvania Carey Law School, president emeritus of the Legal Services Corp., former managing partner of Arnold & Porter, and an adviser to Diversity Lab.*

*Caren Ulrich Stacy is CEO of Diversity Lab. She is a 30-year veteran of law firm talent management, having served as the head of recruiting, development, and diversity for several top firms, including Arnold & Porter, Weil Gotshal, and Cooley. At Diversity Lab, she works with a team to create more inclusive and equitable workplaces.*

Case 1:25-cv-00917-RJL    Document 103-2    Filed 04/17/25    Page 106 of 221

© 2025 Bloomberg Industry Group, Inc.   All Rights Reserved

# Exhibit 5

## *Data Shows Mansfield Firms Are Adding Diverse Leaders Much Faster*

The American Lawyer Online

May 8, 2023 Monday

Copyright 2023 Copyright Holder for ALM Media Properties, LLC

# THE AMERICAN LAWYER

**Length:** 1273 words

## Body

We are two data science professors who have long been interested in how best to measure the effectiveness of diversity efforts in the legal industry. (That's right: we're legal data nerds.) After crunching some recently-released data, our findings show that the legal industry as a whole has made slow but significant progress in leadership diversity. Our statistical analyses also show that when looking at the gender and racial diversity of firms' equity partnerships, and the racial diversity of firms' executive committees, diverse representation at Mansfield early-adopter firms is getting better faster than at non-Mansfield firms. The practical effect of being a Mansfield early-adopter firm in these areas was to roughly double the rate at which gender and racial representation is improving.

Since joining Mansfield in 2017, early-adopter firms have embedded practices to consider at least 30% women lawyers and underrepresented racial/ethnic (URE) lawyers for leadership and governance roles and committees, equity partner promotions, client pitch opportunities, senior lateral positions, and more. The requirements and categories have evolved year-over-year, including adding LGBTQ+ lawyers and lawyers with disabilities in recent iterations. And firms are required to report on their tracking and documentation efforts and their progress to Diversity Lab to ensure accountability.

Mansfield began as an experiment: maybe it would work, maybe it wouldn't. Anecdotally, based on *feedback from the participating firm leaders*, the resounding answer to the question of whether Mansfield is working is "yes." Yet as legal data nerds, we want more than feel-good stories; we want to test the effectiveness of experiments using cold, hard data. Empirically, the correct way to evaluate whether Mansfield is working is to conduct a statistical analysis comparing yearly representation levels between Mansfield and non-Mansfield firms. And importantly, we need to examine as many years of data as possible, since the measures that Mansfield firms adopt are hard, slow-burn changes that can take years to yield a measurable impact. Recently-released data from the Minority Corporate Counsel Association (MCCA) enable an unprecedented test of whether the hard work that Mansfield firms have been doing is paying off.

Specifically, our statistical models treat Mansfield as an "intervention" that early adopters (firms consistently certified since 2017) received and that non-Mansfield firms did not. We control for variation between firms (to account for measurable phenomena such as firm size, as well as for differences that exist unrelated to Mansfield) and explicitly model change over time (to account for the possibility that diverse representation is generally improving). Models that neglect to address these factors can yield spurious, misleading results. The MCCA data include measures of four different phenomena that correspond to leadership areas potentially impacted by Mansfield: gender and underrepresented racial and ethnic representation (1) on executive committees, (2) on partner review/nominating committees, (3) within partner promotions, and (4) within the equity partnership as a whole. The MCCA data include other measures that are of interest as well, but these four measures are the ones that speak directly to whether Mansfield has been effective in its goals of diversifying firm leadership. Our analysis thus targets two questions: first, whether the representation of women and URE lawyers in each of these categories

Data Shows Mansfield Firms Are Adding Diverse Leaders Much Faster

is generally improving across the legal industry over time and, second, whether joining Mansfield in 2017 helped accelerate representation levels in early adopter firms as compared to non-Mansfield firms.

The results reflect what many in the legal industry already know to be true: *representation of women and URE lawyers is improving*. *Not fast enough*, to be sure. But there is a positive and statistically significant upward trend in representation across the legal industry, at Mansfield and non-Mansfield firms alike, in the gender and racial diversity of every one of the four leadership categories we examined.

Our analyses also show that the direction and steepness for several of the trends are different for Mansfield firms than for non-Mansfield firms. Firms that have been consistently Mansfield certified for 5+ years (from when Mansfield launched) have diversified their executive committees and equity partnerships at statistically significantly faster rates. To illustrate those differences, consider two otherwise-identical hypothetical firms, one of which was Mansfield-certified since 2017 and the other never adopted Mansfield. For the non-Mansfield firm, our models indicate that between 2017 and 2021 the expected number of URE lawyers on the firm's executive committee grew by roughly 45%; for the Mansfield firm, the expected growth was nearly 130%.

We find similar differences in change rates with respect to equity partners. For non-Mansfield firms, the rate of growth in female equity partners between 2017 and 2021 was 7%, while for Mansfield firms the rate was 20%- nearly triple. For URE equity partners, the respective predicted growth rates were 16% and 41%, with Mansfield firms again charting a growth rate more than double that of non-Mansfield firms.

In all three of these cases, as the corresponding graphs show, the Mansfield "intervention" resulted in a much steeper rate of change for early adopters since they joined Mansfield in 2017. Mansfield firms' hard work is paying off at the most impactful levels, and at the most consequential decision points of a lawyer's career.

Although there is measured progress in all leadership categories we modeled, the positive effects of Mansfield aren't evident across the board. For example, our models show that both Mansfield and non-Mansfield firms are making statistically significant strides in increasing the representation of women lawyers on executive committees, but there isn't a statistically significant difference between Mansfield and non-Mansfield firms. This high-level governance committee, similar to a corporate board of directors, is an important focal point. Just because historically underrepresented lawyers are increasingly represented at the associate level and even in partnership doesn't mean they've achieved equal power at the top without significant representation on this and other management committees.

To diversify the leadership of the legal industry, law firms of all stripes need not only to keep up the good work but to double down on diversity initiatives, including experimenting with programs that might take years to show effects. Firms that are already doing the hard work of Mansfield should keep pushing forward, confident in the knowledge that Mansfield is helping them get better faster, and emboldened to embark on more experimentation that might also pay off. Some initiatives will work, others won't. But progress requires the willingness to take risks and to be transparent about both successes and failures, as well as best practices in data science to evaluate the evidence accurately. Take it from us legal data nerds, experiments like Mansfield are worth betting on. The proof is in the data.

Amber E. Boydstun is a professor of political science and an affiliate professor of communications at the University of California, Davis. Amber received her Ph.D. from Penn State University.

Christopher Zorn is a professor of political science and sociology and an affiliate professor of law at Penn State University. Chris received his Ph.D. from Ohio State University.

# Classification

**Language:** ENGLISH

Data Shows Mansfield Firms Are Adding Diverse Leaders Much Faster

**Publication-Type:** Magazine

**Subject:** DATA SCIENCE (90%); DIVERSITY & INCLUSION (90%); LAW & LEGAL SYSTEM (90%); RACE & ETHNICITY (90%); STATISTICAL METHOD (89%); COPYRIGHT (78%); MINORITY GROUPS (78%); STATISTICS (78%); CORPORATE COUNSEL (73%); LGBTQ+ PERSONS (70%)

**Industry:** DATA SCIENCE (90%); CORPORATE COUNSEL (73%)

**Load-Date:** May 9, 2023

---

End of Document

# Exhibit 6

Powered by **DIVERSITY**LAB

Media Contact:
Alyssa Jarvis
alyssa@diversitylab.com

## Mansfield Rule
Boosting Diversity in Leadership

**More than 360 Law Firms Achieve Mansfield Certification for 2023–24, Marking a Double-Digit Increase in the Push for Leadership Diversity**

*As other industries backtrack or remain quiet, a record number of newly Mansfield Certified law firms continue to proudly advance inclusive practices and report measurable progress.*

**SAN FRANCISCO (October 2, 2024)** — Over 360 law firms earned Mansfield Certification for the 2023–24 period, marking a 13% increase from the nearly 320 firms certified the previous year. This accomplishment, along with their public celebration of it, underscores these firms' steadfast dedication to promoting inclusive and equitable workplaces. Additionally, the majority of these firms, along with 19 others, are already pursuing certification for 2024–25.

Mansfield is a year-long structured certification process designed to ensure all qualified talent at participating law firms have a fair and equal opportunity to be considered for advancement into leadership roles. The focus is on "opening the door wider" and ensuring that opportunities for advancement are transparent and inclusive for everyone. Mansfield expands opportunities, fostering growth without imposing limitations.

As Mansfield's certification criteria grow increasingly challenging each year, firms have consistently recommitted to the core principles of transparency, accountability, and knowledge sharing, including:

- Contributing to monthly group knowledge-sharing meetings and attending expert-led legal workshops to ensure the lawful implementation of Mansfield's principles.
- Drafting and making advancement processes and leadership role descriptions transparent and accessible to all lawyers.
- Broadening the pool of talent considered for dozens of leadership roles and activities, with at least 30% of the lawyers considered consisting of underrepresented lawyers across 75% of opportunities.
- Engaging in individual firm check-ins at the six-month mark (even more frequently for new firms) to support the adoption of legal and effective processes.
- Submitting certification data, transparent processes, and a signed affirmation from the managing partner at the end of each certification year.

In addition, more than half of the 360+ law firms opted into "Mansfield Certification Plus" this year, a designation reserved for firms that voluntarily report the outcomes of their inclusive processes.

This data-driven process has transformed how many participating firms operate. Before Mansfield, fewer than half had transparent leadership job descriptions or advancement processes and less than a quarter tracked the diversity of their leadership pipelines. Mansfield's framework has introduced greater transparency and accountability, which has produced striking results:

- Over 75% of the firms have significantly increased diversity in client pitch teams, lateral partner hires, and equity partner promotions.

© 2024 Diversity Lab

- Firms with five or more years of Mansfield Certification have doubled the racial and ethnic diversity in their management committees.
- Mansfield Certified firms lead the way with a 41% growth rate in underrepresented racial and ethnic equity partners, compared to just 16% at non-Mansfield firms.
- The number of women equity partners at Mansfield Certified firms is growing at nearly three times the rate of non-Mansfield firms (20% vs. 7% growth rate).

Recent studies, including the data analysis published in *The American Lawyer* and the New York State Bar Association Task Force on Advancing Diversity Report, praise Mansfield for its effective and lawful method for enhancing transparency and diversity in leadership.

"Our firm has participated in Mansfield Rule Certification since its inception, and we have made significant strides over the past seven years to create positive change through our internal initiatives and industry partnerships. At Nixon Peabody, we believe that diversity of people, backgrounds, and experience leads to exceptional client service and stronger results for our clients and our firm. We are proud of the progress we have made, and remain committed to our continued efforts to build a more diverse, equitable, and inclusive legal profession." – *Stephen D. Zubiago, CEO & Managing Partner, Nixon Peabody*

Listed below are the US, Canada, and UK large and midsize law firms that achieved Mansfield Certification in 2023–24. Firms marked with an asterisk also earned the "Certified Plus" designation. Renewing and additional firms that joined for the 2024–25 period can be found here.

**True Trailblazers – Firms That Have Achieved Certification & Remained Committed for 7–8 Years**
*(Adopted Mansfield in 2017–2018 and 2018–2019; Initial Launch with Large Firms in 2017)*

| | | |
|---|---|---|
| ArentFox Schiff* | Faegre Drinker Biddle & Reath* | Morris, Manning & Martin* |
| Arnold & Porter* | Fasken* | Morrison Foerster* |
| Baker Botts* | Fenwick & West* | Munger, Tolles & Olson* |
| Baker McKenzie* | Finnegan, Henderson, Farabow, Garrett & Dunner* | Neal Gerber Eisenberg |
| BCLP (US)* | Fish & Richardson* | Nixon Peabody* |
| Beveridge & Diamond* | Goodwin Procter* | Norton Rose Fulbright* |
| Blank Rome* | Goulston & Storrs | Orrick, Herrington & Sutcliffe* |
| Brownstein Hyatt Farber Schreck* | Hogan Lovells* | Reed Smith* |
| Buchanan Ingersoll & Rooney* | Holland & Hart* | Saul Ewing* |
| Clifford Chance (US) | Holland & Knight | Seyfarth Shaw* |
| Cooley | Husch Blackwell* | Sheppard Mullin* |
| Covington & Burling* | Jenner & Block* | Stoel Rives* |
| Crowell & Moring* | Katten Muchin Rosenman* | Troutman Pepper Hamilton Sanders* |
| Day Pitney | Kaufman Dolowich | White & Case* |
| Dechert* | Latham & Watkins* | WilmerHale* |
| Dentons US | Littler* | Wilson Sonsini* |

© 2024 Diversity Lab

| DLA Piper* | McDermott Will & Emery* | Winston & Strawn* |
| Dorsey & Whitney* | Miller, Canfield, Paddock and Stone* | Womble Bond Dickinson US* |
| Eversheds Sutherland* | Morgan, Lewis & Bockius* | |

**Early Adopters – Firms That Have Achieved Certification & Remained Committed for 5–6 Years**
*(Adopted Mansfield in 2019–2020 and 2020–2021; Initial Launch with Midsize Firms in 2020)*

| A&O Shearman* | Hanson Bridgett* | Paul Hastings* |
| Akin* | Hausfeld* | Perkins Coie* |
| Archer & Greiner | Haynes Boone* | Pillsbury* |
| Bailey & Glasser | Hunton Andrews Kurth | Polsinelli* |
| Baker, Donelson, Bearman, Caldwell & Berkowitz* | Ice Miller | Porter Wright Morris & Arthur* |
| Ballard Spahr* | Ivins, Phillips & Barker* | Procopio, Cory, Hargreaves & Savitch* |
| Boies Schiller Flexner | Jackson Lewis* | Robins Kaplan |
| Bricker Graydon* | K&L Gates* | Robinson+Cole* |
| Brooks Kushman* | Kean Miller | Severson & Werson* |
| Brown Rudnick | Koley Jessen* | Shipman & Goodwin* |
| Chapman and Cutler* | Lane Powell* | Skadden, Arps, Slate, Meagher & Flom* |
| Clyde & Co* | Locke Lord | Stinson* |
| Cozen O'Connor* | Marshall, Gerstein & Borun* | Stoll Keenon Ogden |
| Davis Wright Tremaine* | Mayer Brown | Stradley Ronon Stevens & Young |
| Dentons Canada | McAndrews, Held & Malloy* | Summit Law Group* |
| Dinsmore & Shohl* | McDowell Hetherington | Taft* |
| Drew Eckl & Farnham* | McGuireWoods* | The Cook Group* |
| Duane Morris* | Merchant & Gould* | Thompson Coburn* |
| Fisher Phillips* | Meunier Carlin & Curfman* | Thompson Hine |
| Foley Hoag* | MG+M The Law Firm* | Tucker Ellis* |
| Fredrikson & Byron | Miller Nash* | Vinson & Elkins |
| Freshfields US* | Much Shelist* | Vorys, Sater, Seymour and Pease |
| Frost Brown Todd* | Nutter McClennen & Fish* | Wilkinson Barker Knauer* |
| Goldberg Kohn | Patterson + Sheridan | Williams & Connolly* |
| Greenberg Traurig* | Patterson Belknap Webb & Tyler | ZwillGen* |

© 2024 Diversity Lab

**Trendsetters – Firms That Have Achieved Certification & Remained Committed for 2–4 Years**
*(Adopted Mansfield in 2021–2022 and 2022–2023; Initial Launch with UK Firms in 2021)*

| | | |
|---|---|---|
| A&O Shearman (UK)* | Grant & Eisenhofer | Miller & Chevalier |
| Adams and Reese | Greenspoon Marder | Mintz |
| Alston & Bird | Hahn Loeser & Parks* | Morrison Cohen |
| Armstrong Teasdale | Hall Render | Nelson Mullins Riley & Scarborough |
| Aronberg Goldgehn | Hancock Daniel & Johnson* | O'Hagan Meyer |
| Baird Holm* | Harness IP | Ogletree Deakins* |
| BakerHostetler | Harter Secrest & Emery | Parker Poe Adams & Bernstein |
| Barack Ferrazzano Kirschbaum & Nagelberg* | Hartline Barger* | Parker, Hudson, Rainer & Dobbs* |
| Barnes & Thornburg* | Haug Partners* | Paul, Weiss, Rifkind, Wharton & Garrison |
| Bass, Berry & Sims | Hawkins Parnell & Young | Pearne & Gordon |
| BCLP (UK)* | Higgs, Fletcher & Mack | Phelps Dunbar |
| Benesch | Hillis Clark Martin & Peterson | Phillips Murrah |
| Bird & Bird (UK) | Hinckley Allen | Phillips Nizer* |
| Bodman* | Hinshaw & Culbertson | Plunkett Cooney* |
| Bradley Arant Boult Cummings | Hirschler* | Porter Hedges* |
| Bressler Amery & Ross | Hoagland, Longo, Moran, Dunst & Doukas | Porzio, Bromberg & Newman |
| Brown & Connery | Hogan Lovells (UK)* | Prince Lobel |
| Brown & James | Honigman | Pryor Cashman* |
| Buchalter | Hooper, Lundy & Bookman | Quarles & Brady |
| Burke, Williams & Sorensen* | Hurwitz Fine* | Reed Smith (UK)* |
| Burr & Forman | HWG* | Reichman Jorgensen Lehman & Feldberg* |
| Butler Snow* | Jackson Kelly | Reinhart Boerner Van Deuren |
| Calfee, Halter & Griswold | Jackson Walker* | Robbins Schwartz* |
| Cassels Brock & Blackwell* | Jones Walker | Robinson Bradshaw |
| CDF Labor Law* | Keating Muething & Klekamp* | Roetzel & Andress |
| Chamberlain Hrdlicka* | Kegler Brown Hill + Ritter* | Roig Lawyers* |

© 2024 Diversity Lab

| | | |
|---|---|---|
| Clark Hill* | Keker, Van Nest & Peters* | Rutan & Tucker |
| Cleary Gottlieb Steen & Hamilton | Keller and Heckman | Sandberg Phoenix & von Gontard |
| Clifford Chance (UK)* | Kennedys (US and UK) | Sands Anderson* |
| Clyde & Co (UK)* | Kitch Attorneys & Counselors | Saxe Doernberger & Vita |
| Coblentz Patch Duffy & Bass | Klarquist Sparkman* | Schwabe, Williamson & Wyatt* |
| Collins + Collins* | Klinedinst | Sherman & Howard |
| Connell Foley | Kramer Levin Naftalis & Frankel | Shook, Hardy & Bacon* |
| Constangy, Brooks, Smith & Prophete* | Lathrop GPM* | Skarzynski Marick & Black* |
| Cooley (UK) | Levenfeld Pearlstein* | Smith Anderson* |
| Cowan, Liebowitz & Latman* | Lewis Brisbois Bisgaard & Smith* | Squire Patton Boggs* |
| Cox, Castle & Nicholson* | Lewis Roca* | Stark & Stark |
| Davis Polk & Wardwell | Lewis Thomason* | Steptoe & Johnson PLLC |
| Davis+Gilbert* | Lightfoot, Franklin & White* | Steptoe LLP* |
| Debevoise & Plimpton | Linklaters (US)* | Sterne, Kessler, Goldstein & Fox |
| Dechert (UK)* | Liskow* | Sullivan & Cromwell |
| Degan, Blanchard & Nash* | Loeb & Loeb | Sullivan & Worcester |
| DLA Piper (UK)* | Loopstra Nixon* | Swift, Currie, McGhee & Hiers* |
| Dority & Manning | Manatt, Phelps & Phillips | Taylor Wessing (UK)* |
| Dykema Gossett* | Martin Clearwater & Bell* | Thompsons Solicitors (UK)* |
| Epstein Becker & Green* | Maslon* | Tiber Hudson* |
| Erise IP | Mayer Brown (UK) | UB Greensfelder |
| Farella Braun + Martel* | Maynard Nexsen | Varnum |
| Finn Dixon & Herling | McBrayer | Vedder Price |
| Fitch, Even, Tabin & Flannery* | McDermott Will & Emery (UK) | Venable* |
| Foley Mansfield* | McDonnell Boehnen Hulbert & Berghoff* | Waldon Adelman Castilla McNamara & Prout |
| Foster Swift Collins & Smith* | McGinnis Lochridge | Walsworth* |
| Fox Rothschild | McGivney, Kluger, Clark & Intoccia | Weil, Gotshal & Manges |
| Frantz Ward | McGlinchey Stafford | Wiggin and Dana* |
| Freshfields (UK)* | McGrath North Mullin & Kratz* | Willkie Farr & Gallagher* |
| Fried Frank | McKool Smith | Wilson Elser* |

| | | |
|---|---|---|
| Friedman Kaplan Seiler Adelman & Robbins* | McLane Middleton | Winget, Spadafora & Schwartzberg |
| Gibbons | Meagher + Geer | Wolf, Greenfield & Sacks* |
| Gibson, Dunn & Crutcher | Messner Reeves* | Womble Bond Dickinson (UK) |
| Gould & Ratner | Milbank | Wyrick Robbins* |
| Gowling WLG (UK) | | |

**Recent Innovators – Firms That Have Achieved Certification Most Recently**
*(Adopted Mansfield in 2023–2024)*

| | | |
|---|---|---|
| Atheria Law* | Fox Swibel Levin & Carroll | Moore & Van Allen* |
| Axinn, Veltrop & Harkrider | Franklin & Prokopik* | Munsch Hardt Kopf & Harr |
| Blue Williams | Gilbert | Nossaman* |
| Cadwalader, Wickersham & Taft | Glenn Agre Bergman & Fuentes* | Reilly, McDevitt and Henrich |
| Caplin & Drysdale | Goldberg Segalla | Segal McCambridge Singer and Mahoney |
| Carter Ledyard & Milburn | Goodwin Procter (UK) | Shumaker, Loop & Kendrick |
| Chartwell Law | Gordon Rees Scully Mansukhani | Spilman Thomas & Battle |
| Chiesa Shahinian & Giantomasi | Gowling WLG (Canada)* | Stites & Harbison |
| Christian & Small* | Groombridge, Wu, Baughman & Stone* | Stradling Yocca Carlson & Rauth |
| Cohen & Gresser | Hill Wallack* | Swanson, Martin & Bell |
| Cole Schotz P.C. | Lee & Hayes | Tyson & Mendes |
| F3 Law | Linklaters (UK)* | Warner Norcross + Judd |
| Fahey Schultz Burzych Rhodes | Maron Marvel | Winthrop & Weinstine |
| Fennemore | McCalla Raymer Leibert Pierce | Wise Carter Child & Caraway |
| Fletcher Yoder | McCarter & English | Withersworldwide (US & UK)* |

### ###

**About Diversity Lab:** We envision a world where the leaders are as diverse as the workforces and communities they represent. For more details, visit [www.diversitylab.com](www.diversitylab.com).

**Our Work:** Diversity Lab designs, tests, and measures the outcomes of science-based and data-driven talent practices that allow for fair and equal access to advancement opportunities.

**Our Impact:** Inclusion is the goal, greater diversity — in leadership and beyond — is the outcome.

# Exhibit 7



NEW YORK STATE
BAR ASSOCIATION



Report and Recommendations of the
New York State Bar Association
**Task Force on Advancing Diversity**

September 2023

Adopted by the Executive Committee on September 20, 2023.

*August 31, 2023*

**REPORT OF THE NEW YORK STATE BAR ASSOCIATION
TASK FORCE ON ADVANCING DIVERSITY**

**TABLE OF CONTENTS**

I.    **EXECUTIVE SUMMARY** ................................................................... 3

II.    **THE IMPORTANCE OF DIVERSITY** ........................................... 7

    A.    Diversity in Law Schools and Other Higher Education Institutions ............... 7

    B.    Diversity in Corporations and Law Firms ............................................ 14

    C.    Diversity in the Judiciary ................................................................. 20

III.    **IMPLICATIONS OF THE *SFFA* DECISION FOR LAW SCHOOLS AND OTHER HIGHER EDUCATION INSTITUTIONS** ................................ 24

    A.    Institutional Goals and Values .......................................................... 24

    B.    Permissible Processes Following the *SFFA* Decision ............................ 25

    C.    Policy Barriers in Admissions Processes ............................................ 28

        1.    Standardized Testing Requirements .............................................. 29

        2.    Legacy, Athlete and Donor Preferences ........................................ 31

        3.    Tuition and Educational Resource Costs ........................................ 32

        4.    Outreach, Enrollment and Student Success Barriers .......................... 35

    D.    Broad Educational Institution Strategy ............................................. 36

IV.    **IMPLICATIONS OF THE *SFFA* DECISION FOR PRIVATE EMPLOYERS: CORPORATIONS AND LAW FIRMS** ........................................... 40

    A.    Legal Framework and Current Landscape .......................................... 40

    B.    Legal Risks of Dialing Back DEI Initiatives ....................................... 52

    C.    Guidance for Private Employers ...................................................... 56

V.    **IMPLICATIONS OF THE *SFFA* DECISION FOR THE JUDICIARY** ......... 75

    A.    Strategy and Leadership Communication ........................................... 75

    B.    Bias Training and Educational Outreach ............................................ 80

    C.    Engage with the Community and Local Organizations ........................... 81

    D.    Data Collection and Analysis .......................................................... 83

    **CONCLUSION** ............................................................................. 85

**Members of the Task Force on Advancing Diversity**

**Task Force Co-Chairs**

Jeh C. Johnson

Brad S. Karp

Loretta E. Lynch

**Academia Working Group**

**Co-chairs**:  Dean Gillian Lester & Dean Alicia Ouellette

Dean Matthew Diller
Lara Ann Flath
Eric Jonathan Friedman
David J. Greenwald
Marvin Krislov
Kapil Longani
Dean Troy A. McKenzie

**Business Working Group**

**Co-chairs**:  Michael Delikat & Julie Swidler

Barbara Lynn Becker
Roger Blissett
T. Andrew Brown
Anne L. Clark
Deneen Donnley
Lissette Duran
Stacey Friedman
Jose Ramon Gonzalez
Eric Grossman
Kimberley D. Harris
Adam Klein
Sandra Leung
Anthony V. Lupo
Zakiyyah Salim-Williams
Deirdre Stanley
Liza M. Velazquez
Alex Dumas
Chiara Genovese
Richard Katz

**Members of the Task Force on Advancing Diversity**

**Law Firm Working Group**

**Co-chairs**: Jonathan Katz & Jill Rosenberg

Bradley J. Butwin
Peter A. Furci
Michael Gerstenzang
Julie H. Jones
Adam T. Klein
Kim Koopersmith
Alden Millard
Jesse Solomon
Kathleen M. Sweet
Caren Ulrich Stacy
Barry M. Wolf

**Judiciary Working Group**

**Co-chairs**: Hon. Cheryl E. Chambers & Hon. Edwina G. Richardson-Mendelson

Vincent Ted Chang
Hon. Richard Rivera
Hon. Lillian Wan
Hon. Troy Webber
Steven Zaorski

**NYSBA President**

Richard C. Lewis

## ACKNOWLEDGEMENTS

This past June Richard Lewis, president of the New York State Bar Association, approached the three of us to co-chair a "Task Force on Advancing Diversity," to address the then-imminent decision of the Supreme Court in the affirmative action cases pending before it. Dick recognized then that the Court would likely rule against Harvard and UNC in those cases and wanted to promptly provide guidance on a post-decision path forward for law firms, clients, academia and the state judiciary. We commend Dick for his leadership and foresight.

The three of us accepted Dick's request and immediately put out a call to the New York State bar to recruit members of the Task Force. The response was gratifyingly swift and vast. Many in our legal community recognize the compelling benefits of diversity in the legal profession and in higher education, which is the training ground for the legal profession.

While every member of the Task Force contributed to the this report, a special thanks goes to the following co-chairs of working groups of the Task Force, for their expertise and work in bringing this report to completion: Dean Gillian Lester, Dean Alicia Ouellette, Michael Delikat, Julie Swidler, Jonathan Katz, Jill Rosenberg, the Honorable Cheryl Chambers and the Honorable Edwina Richardson-Mendelson. We also thank the Appellate Division, Second Department of the state Supreme Court, the Office for Justice Initiatives, the Franklin H. Williams Judicial Commission, and the New York State Unified Court System's Department of Human Resources. We thank the law firms of Ropes & Gray LLP, and Wollmuth Maher & Deutsch, LLP. We offer special thanks to Professor Rachel Godsil of Rutgers Law School, who is also the Director of Research and Co-Founder of the Perception Institute.

Additionally, the staff of the NYSBA have been invaluable in their support of the Task Force and the production of this report. We recognize in particular Pamela McDevitt and Melissa O'Clair, our NYSBA liaisons.

Last but far from least, we thank our own Paul Weiss colleagues Lissette Duran and Liza Velazquez for spearheading the work of the Task Force and assembling this report.[1]

Jeh Charles Johnson
Brad Karp
Loretta E. Lynch

---

[1] This report is a continuation of NYSBA's work of addressing issues of diversity, equity, and inclusion. *See e.g.*, Report and Recommendations of the Task Force on Racial Injustice and Police Reform; Report and Recommendations of the New York State Bar Association Task Force on Racism, Social Equity, and the Law.

## I.    EXECUTIVE SUMMARY

On June 29, 2023, the Supreme Court issued its decisions in *Students for Fair Admissions, Inc. v. President & Fellows of Harvard College* and *Students for Fair Admissions, Inc. v. University of North Carolina* (collectively, the "*SFFA* decision").[2] The Court held that Harvard University and the University of North Carolina at Chapel Hill violated the Equal Protection Clause of the Fourteenth Amendment of the Constitution and Title VI of the Civil Rights Act of 1964 by impermissibly using race-conscious admissions processes.

Specifically, in the majority opinion authored by Chief Justice Roberts, the Court ruled that the race-conscious admissions systems used by Harvard and UNC lacked sufficiently focused and measurable objectives, and thus failed strict scrutiny, which applies when considering whether the use of a racial classification is permissible under the Equal Protection Clause. Chief Justice Roberts noted that the application of strict scrutiny requires an examination of whether the racial classification is used to "further compelling governmental interests," and is narrowly tailored to achieve that interest.[3] But, the Court found that the educational benefits (*i.e.*, compelling interests) proffered by Harvard and UNC could not "be subjected to meaningful judicial review" or measured sufficiently to satisfy strict scrutiny.[4]

The majority also found that Harvard and UNC's race-conscious admissions programs were not narrowly tailored, as they impermissibly used race as a negative and an illegitimate stereotype and had no logical endpoint.[5] The majority stated that college admissions are "zero-sum" and thus a benefit provided to some applicants "necessarily advantages the former group at the expense of the latter."[6]

Justice Thomas filed a concurring opinion providing what he called an "originalist defense of the colorblind Constitution."[7] Justice Gorsuch filed a concurring opinion, joined by Justice Thomas, concluding that Harvard's and UNC's systems violated Title VI. Justice Gorsuch further noted that the statutory language of Title VI is similar to that of Title VII in that "[b]oth Title VI and Title VII codify a categorical rule of individual equality, without regard to race."[8] In a separate concurring opinion, Justice Kavanaugh addressed the Court's precedents and the importance of an end point for race-based programs.[9]

Justices Sotomayor and Jackson each filed dissenting opinions. Justice Sotomayor—whose dissent was joined by Justices Kagan and Jackson—concluded that the schools' admissions policies satisfied strict scrutiny because the "compelling interest in student body diversity is grounded not only in the Court's equal protection jurisprudence

---

[2] 143 S. Ct. 2141 (2023).
[3] *Id.* at 2166.
[4] *Id.*, n.4.
[5] *Id.* at 2170, 2172.
[6] *Id.* at 2169.
[7] *Id.* at 2177 (Thomas, J., concurring).
[8] *Id.* at 2209 (Gorsuch, J., concurring).
[9] *Id.* at 2221–25.

4

but also in principles of 'academic freedom,' which 'long [have] been viewed as a special concern of the First Amendment.'" [10] Similarly, Justice Jackson emphasized that "although formal race-linked legal barriers are gone, race still matters to the lived experiences of all Americans in innumerable ways . . . and it will take longer for racism to leave us. And ultimately ignoring race, just makes it matter more." [11]

Let no one doubt that the *SFFA* decision is a setback to efforts to achieve diversity throughout all echelons of American life. Regrettably, in the year 2023, we are still in many respects a segregated society—where we live, where we worship, and with whom we socialize. For recent generations of American teenagers, encountering a diverse student body on a college or university campus was and is the first opportunity to broaden their horizons by living, socializing and learning with those different from themselves.

Furthermore, diversity in higher education has fed diverse professions. Today, the legal profession is more reflective of America. Today, our state court judiciary is more reflective of the diversity in New York State. [12] A generation of Black graduates from the nation's top law schools have gone on to become Cabinet secretaries, deputy secretaries, members of the U.S. House and Senate, a House minority leader, a U.S. Attorney General, a U.S. Supreme Court Justice, a Governor of Massachusetts, a Vice President, and a President. [13]

Studies also reveal that the increased diversity in the nation's medical schools has strengthened the medical profession and alleviated racial disparities in the quality of healthcare. [14]

Nevertheless, the *SFFA* decision is today the law of the land, and must be followed. The question now is where do those in higher education, business, the legal profession, and the judiciary go from here? For those of us in these fields with a continued commitment to diversity, what lawful course can we chart given the *SFFA* decision? Courts and legal analysts will no doubt spend years wrestling with these questions. At the request of the NYSBA, this Task Force report undertakes an initial assessment in the immediate aftermath of the *SFFA* decision.

A few preliminary observations:

*First*, it is important to note that the *SFFA* decision was rendered in the unique context of higher education admissions—and the admissions practices at Harvard and UNC

---

[10] *Id.* at 2233–34 (Sotomayor, J., dissenting), (quoting *Regents of Univ. of Col. v. Bakke*, 438 U.S. 265, 312 (1978)).

[11] *Id.* at 2277 (Jackson, J., dissenting).

[12] *Report from Jeh C. Johnson, Special Adviser on Equal Justice in the New York State Courts*, Oct. 1, 2020, 32–33.

[13] This growth is in part due to the Supreme Court's decision in *Regents of the University of California v. Bakke,* 438 U.S. 265 (1978) approving affirmative action in higher education.

[14] Douglas Grbic & Franc Slapar, *Changes in Medical Student's Intentions to Serve the Underserved: Matriculation to Graduation,* 9 Analysis in Brief No. 8 at 2 (AAMC July 2010); s*ee also* Brief for Amici Curiae Association of American Medical Colleges et al. in Support of Respondents, filed in the *Harvard* and *UNC* cases on July 28, 2022, at 11–12.

in particular. Though the concurring opinions would appear to prefer to outlaw affirmative action categorically, the majority opinion authored by Chief Justice Roberts focuses at great length on the perceived shortcomings in the Harvard and UNC admissions programs specifically. The majority opinion does not claim to overrule *Bakke, Fisher* or *Grutter*— in contrast to the Court's 2022 decision on abortion in *Dobbs* which expressly overruled *Roe v. Wade.*[15] Notably, the majority opinion also stated explicitly that it was not purporting to rule on admission practices at the nation's military academies.[16] Nor does the majority opinion purport to rule on the employment practices of private employers, governed principally by Title VII of the Civil Rights Act and 42 U.S.C. § 1981. Nevertheless, we must recognize that the *SFFA* decision reflects an evolving legal landscape and a very different attitude at the Supreme Court toward affirmative action.

*Second*, we note also the following key passage in Chief Justice Roberts' majority opinion:

> Nothing in this opinion should be construed as prohibiting universities from considering an applicant's discussion of how race affected his or her life, be it through discrimination, inspiration or otherwise.[17]

Thus, the majority leaves open the possibility that a college or university may consider, as a matter of personal characteristics, the way in which an applicant has faced the challenge of race discrimination in his or her life. In America today, personal challenges still encompass discrimination on the basis of race.

To conduct the assessment documented in the pages that follow, the Task Force was divided into four working groups: (1) academia, (2) corporations, (3) law firms, and (4) the New York State judiciary. The report that follows is structured accordingly. In what we hope are useful, concrete terms, we set forth guidance and recommendations here for educational institutions, corporations, law firms and the state court system. The report proceeds in four sections. The first section outlines the benefits and importance of diversity (pp. 7–23).[18] The second section, authored by law school deans and others in academia, discusses the implication of the *SFFA* decision on law schools and other educational institutions and provides guidance on how to lawfully enhance admissions practices to

---

[15] *Roe v. Wade*, 410 U.S. 113 (1973).

[16] *Id.* at 2166, n. 4 ("The United States as amicus curiae contends that race-based admissions programs further compelling interests at our Nation's military academies. No military academy is a party to these cases, however, and none of the courts below addressed the propriety of race-based admissions systems in that context. This opinion also does not address the issue, in light of the potentially distinct interests that military academies may present.").

[17] *Id.* at 2176.

[18] The focus of this report is racial and ethnic diversity, including, among others, the representation and inclusion of Black, Latinx/Hispanic, Asian and Pacific Islander (API) and Native Americans. Additionally, this report uses the terms "historically underrepresented" or "underrepresented" groups. For the purposes of this report, we mean to include Black, Latinx/Hispanic, Asian and Native Americans, recognizing that Asians as a racial group may be over-represented in certain industries, the API community in the United States is broad and diverse, with individuals representing over fifty ethnic groups. Moreover, many of these ethnic groups have experienced a long history of discrimination in education, employment, and other areas.

advance diversity goals (pp. 24–39). The third section, authored by lawyers in firms and in-house corporate counsel, discusses the decision's indirect impacts on private employers, including corporations and law firms, and provides practical steps on how to assess and update DEI initiatives to mitigate potential legal and reputational risks (pp 40–74). The fourth and last section, authored by judicial personnel, summarizes the *SFFA* decision's potential impact on courts, the continued importance of diversity on the bench and among non-judicial personnel, and the judiciary's responsibility to foster an inclusive environment for all those who enter its courthouses (pp. 75–84).

This report is not intended to provide legal advice, and no legal or business decision should be based on its content.

## II.     THE IMPORTANCE OF DIVERSITY

It is well established by social science research that diversity is correlated with wide-ranging and far-reaching benefits to organizations. Diverse student bodies and educators are essential to the success of our education system and a diverse workforce—at all levels—is essential to the success of America's businesses and civic institutions like our court system. While the Court did not explicitly acknowledge the benefits of diversity in its majority opinion, it did find Harvard and UNC's goals of, among other things, "training future leaders in the public and private sectors," "preparing graduates to 'adapt to an increasingly pluralistic society,'" "better educating its students through diversity," "producing new knowledge stemming from diverse outlooks," and "enhancing appreciation, respect, and empathy, cross-racial understanding, and breaking down of stereotypes" to be "commendable,"[19] "plainly worthy"[20] goals, though not sufficiently measurable for purposes of conducting a judicial strict scrutiny analysis. In this section, we provide documented evidence of the importance and benefits of diversity in academia, corporations, law firms and the judiciary.

### A.     Diversity in Law Schools and Other Higher Education Institutions

For decades, researchers have recognized the positive impact of student body diversity on the academic experience.[21] That research has found that "prejudice on college campuses and the underrepresentation of racial minority groups in student bodies impose significant educational obstacles for both minority and nonminority students"[22] and that "campus diversity is an effective response, mitigating these educational deficiencies and improving the academic experience for all students."[23] Indeed, campus diversity relieves many of the negative educational impacts of discrimination and prejudice.[24] Measures that reduce discrimination and prejudice mitigate the psychological phenomena that inhibits academic and later workplace success for minority students.[25] The American College

---

[19] *SFFA*, 143 S. Ct. at 2166.

[20] *Id.* at 2167.

[21] Brief for the American Psychological Association ("APA") et al. as Amicus Curiae in Support of Respondents, *SFFA*, 143 S. Ct. 2141 (2023); cites a number of these studies; *see also* Brief for the American Educational Research Association ("AERA") et al. as Amicus Curiae in Support of Respondents at 8, *SFFA*, 143 S. Ct. 2141 (2023) ("The leading meta-analysis published in 2006 by Pettigrew and Tropp remains highly relevant. The study analyzed over 500 studies from a range of educational, workplace, and informal settings, including college campuses, and reached the clear conclusion that positive intergroup contact reduces prejudice and that greater intergroup contact is associated with lower levels of prejudice.").

[22] Brief for the APA et al. as Amicus Curiae in Support of Respondents at 3, *SFFA*, 143 S. Ct. 2141 (2023).

[23] *Id.*

[24] *See* Mitchell R. Campbell & Markus Brauer, *Is Discrimination Widespread? Testing Assumptions About Bias on a University Campus*, 150 J. Experimental Psychol: General 759 (2021); *see also* Brief for the APA et al. as Amicus Curiae in Support of Respondents at 19, *SFFA*, 143 S. Ct. 2141 (2023) (citing same and Julie J. Park, *Asian Americans and the Benefits of Campus Diversity: What the Research Says* 2, Nat'l Comm'n on Asian American and Pacific Islander Research in Education, http://care.gseis.ucla.edu/wpcontent/uploads/2015/08/CARE-asian_am_diversity_D4.pdf (a 2012 study finding that Black and Latinx students who interacted with students of different races "had more favorable attitudes toward Asian Americans as college seniors").

[25] Brief for the APA et al. as Amicus Curiae in Support of Respondents at 16, *SFFA*, 143 S. Ct. 2141 (2023) (citing Nicholas A. Bowman et al., *Institutional Racial Representation and Equity Gaps in College*

Health Association's recent report confirms that "the perception of one's environment is an important factor in determining emotional wellbeing" and "institutional support for diversity is a strong predictor of emotional well-being among students, faculty and staff within the campus community."[26]

Certain of the benefits of diversity are particularly relevant to the skill sets and values that law schools seek to promote in developing the next generation of lawyers. One study that analyzed data from over 4,400 students at nine public universities concluded that student interaction with diverse peers contributed to improvements in cognitive abilities (*e.g.*, analytical problem-solving skills and complex thinking skills), socio-cognitive skills (*e.g.*, cultural awareness and leadership) and democracy-related skills (*e.g.*, dealing with pluralistic settings and valuing civic contributions).[27] Likewise, national longitudinal studies indicate that negative interactions, including racial isolation, tokenism and stereotype threat, are often associated with unfavorable outcomes, including reductions in civic engagement, self-confidence and moral reasoning skills.[28]

Despite these findings, those opposed to race-conscious admission practices often claim that (1) race-conscious practices make underrepresented students admitted as a result of such practices feel stigmatized and (2) the use of race-neutral alternatives will result in equal, if not more, racial and ethnic diversity in schools. As discussed further below, recent studies and applications of race-neutral alternatives indicate the contrary.

Professor Richard Sander and other opponents of race-conscious admissions have long claimed that it imposes costs on underrepresented students by stigmatizing their qualifications and calling into question whether they are a "mismatch" for the school. Many of those same critics have further argued that beneficiaries of affirmative action who are admitted to more competitive institutions may do worse academically than if they had

---

*Graduation*, 93 J. Higher Educ. 399 (2022); Ivuoma N. Onyeador et al., T*he Value of Interracial Contact for Reducing Anti-Black Bias Among Non-Black Physicians: A Cognitive Habits and Growth Evaluation (CHANGE) Study Report*, 31 Psychol. Sci. 18 (2020); Thomas F. Pettigrew & Linda R. Tropp, *A Meta-Analytic Test of Intergroup Contact Theory*, 90 J. Pers. & Soc. Psychol. 751, 766–67 (2006)).

[26] American College Health Association, *ACHA's Statement of the Recent Affirmative Action Decision by the U.S Supreme Court*, July 19, 2023, https://www.acha.org/ACHA/About/ACHA_News/Statement_on_SCOTUS_Decison_Ending_Affirmative_Action.aspx; *see also* American College Health Association, *The Influence of Environmental Factors, Including Diversity, Equity, and Inclusion, on the Emotional Well-Being of Students, Staff, and Faculty*, https://www.acha.org/documents/ACHF/Influence_of_Environmental_Factors_on_the_Emotional_Well-Being_on_Students_Staff_and_Faculty.pdf.

[27] Sylvia Hurtado, *The Next Generation of Diversity and Intergroup Relations Research*, 61 J. Soc. Issues 595, 600–06 (2005).

[28] *See* Matthew Mayhew & Mark E. Engberg, *Diversity and Moral Reasoning: How Negative Diverse Peer Interactions Affect the Development of Moral Reasoning in Undergraduate Students*, 81 J. of Higher Edu. 459–88 (2010); Nida Denson & Mitchell Chang, *Do Curricular and Cocurricular Diversity Activities Influence Racial Bias? A Meta-Analysis*, 79 Rev. Educ. Res. 805 (2009); Mark Engberg, *Educating the Workforce for the 21st Century: A Cross-Disciplinary Analysis of the Impact of the Undergraduate Experience on Students' Development of a Pluralistic Orientation*, 48 Research in Higher Education 283 (2007).

instead attended a less competitive school.[29] With respect to law schools, one of the most prolific advocates of this theory is Richard Sander, who in a 2004 law review article purported to pursue a comprehensive assessment of the relative costs and benefits of affirmative action in legal education and focused on the "largest class of intended beneficiaries: Black applicants to law schools."[30] Based on his analysis, Sander claimed that law school presented a large mismatch effect for Black law students as measured by their bar passage rate and posited that eliminating race-conscious admissions would "not have severe effects on the production of [B]lack lawyers."[31] This article generated considerable criticism, including of Sander's empirical analysis.[32] Yet Sander has continued to advocate for the consideration of socioeconomic status ("SES") over race in admissions.[33]

Empirical research has since largely debunked Sander's and similar arguments. For instance, a 2010 study comparing students enrolled in universities with race-conscious admissions policies with students enrolled in universities in states that had barred race-conscious admissions posed several questions focusing on both "internal stigma" (minority students' own feelings of doubt or inferiority) and "external stigma" (non-minority students' questioning of minority students' abilities and qualifications).[34] The study found that internal stigma was lower among students in schools with race-conscious admissions.[35] The study also found that only about one-quarter of the students at schools with race-conscious admissions reported that non-minority students had questioned their qualifications, compared to nearly one half of the students who were enrolled in states with bans on race-conscious admissions.[36] And a separate 2008 study examining stigma among students at seven public law schools, four of which (University of Cincinnati, the University of Iowa, the University of Michigan and the University of Virginia) employed race-conscious admissions and three of which (University of California ("UC") Berkeley, UC Davis and the University of Washington) did not, found minimal differences in multiple forms of stigma at those schools.[37]

---

[29] *Brief for Richard Sander as Amicus Curiae in Support of Petitioner*, *SFFA*, 143 S. Ct. 2141 (2023) spends significant time on mismatch.

[30] Richard H. Sander, *A Systematic Analysis of Affirmative Action in American Law Schools*, 57 Stan. L. Rev. 367 (2004).

[31] *Id*. at 374.

[32] *See, e.g.*, David L. Chambers et al., *The Real Impact of Ending Affirmative Action in American Law Schools: An Empirical Critique of Richard Sander's Study*, 57 Stan. L. Rev. 1855 (2005); Ian Ayres & Richard Brooks, *Does Affirmative Action Reduce the Numbers of Black Lawyers?*, 57 Stan. L. Rev. 1807 (2005); Daniel E. Ho, Scholarship Comment, *Why Affirmative Action Does Not Cause Black Students to Fail the Bar*, 114 Yale L.J. (2005).

[33] Richard H. Sander, *Class in American Legal Education*, 88 Denver U. L. Rev. 631 (2011).

[34] *See* Brief for the AERA et al. as Amicus Curiae in Support of Respondents at 22, *SFFA*, 143 S. Ct. 2141 (2023) (citing Deirdre M. Bowen, *Brilliant Disguise: An Empirical Analysis of a Social Experiment Banning Affirmative Action,* 85 Ind. LJ. 1197 (2010)).

[35] Bowen at 1223–24.

[36] *Id.* at 1224–25.

[37] *See* Angela Onwuachi-Willig, Emily Houh & Mary Campbell, *Cracking the Egg: Which Came First—Stigma or Affirmative Action?*, 96 Calif. L. Rev. 1299 (2008) (examining stigma among students at seven public law schools, four of which (University of Cincinnati, the University of Iowa, the University of Michigan, and the University of Virginia) employed race-conscious admissions and three of which (UC

Likewise, the so-called "mismatch" hypothesis remains unproven and contested by many scholars. For example, "a national study focusing on minority students who entered selective public institutions in 1999 found that '[B]lack male students who went to more selective institutions graduated at higher, not lower rates than [B]lack students in the same GPA interval who went to less selective institutions.'"[38] And a similar study examining educational outcomes for a cohort of college freshmen attending 28 selective institutions nationwide found no evidence supporting the mismatch hypothesis with respect to first-year grades or dropout rates.[39] Instead, the effect of diversity admissions on first-semester grades "was positive, precisely opposite the direction predicted by the mismatch hypothesis" and, with respect to dropouts, "the degree of an individual's likely benefit from affirmative action is negatively related to the likelihood of leaving school."[40]

Although studies relating specifically to the impact of eliminating the consideration of race in law and graduate schools are limited, the available research suggests that "race neutral" admissions will in fact reduce racial diversity at the graduate school level.[41]

Past experience with respect to undergraduate admissions suggests that without taking other actions to increase diversity within the applicant pool, elimination of the ability to consider race as one factor in the admissions process will likely decrease racial diversity. To illustrate: Arizona, California, Florida, Michigan, Nebraska, New Hampshire, Oklahoma[42] and Washington have enacted legal bans against any consideration of race in university admissions processes. Extensive research on the impact of these laws on student body diversity finds that racial diversity has significantly decreased in the wake of the enactments and that attempts to enhance diversity by other means have not made up the difference.[43] The authors of a nationwide analysis of minority enrollment trends at selective colleges found that "banning affirmative action at a public university in the top 50 of the U.S. News rankings is associated with a decrease in Black enrollment of roughly 1.74 percent, a decrease in Hispanic enrollment of roughly 2.03 percent, and a decrease in

---

Berkeley, UC Davis, and the University of Washington) did not, and finding minimal differences in multiple forms of stigma at the law schools).

[38] *Id*. (quoting William G. Bowen, Matthew W. Chingos & Michael S. McPherson, *Crossing the Finish Line: Completing College at America's Public Universities* 209 (2009) (emphasis in original)).

[39] *See* Brief for the AERA as Amicus Curiae in Support of Respondents at 24, *SFFA*, 143 S. Ct. 2141 (citing Mary J. Fischer & Douglas S. Massey, *The Effects of Affirmative Action in Higher Education*, 36 Soc. Sci. Res. 531 (2007)).

[40] Fischer at 539, 541, respectively (emphasis in original).

[41] Liliana M. Garces, *Understanding the Impact of Affirmative Action Bans in Different Graduate Fields of Study*, 50 Am. Educ. Res. J. 251 (2013)

[42] In an amicus brief submitted in *SFFA*, Oklahoma claims no "long-term severe decline in minority admissions." But as other amici noted, Black and Native American enrollment has dropped sharply at the Norman campus—Oklahoma's flagship and most selective campus. By 2019, enrollment of Black freshmen at the Norman campus dropped from 5.1% to 3.7% and enrollment of Native American freshmen dropped from 3.8% to 3.0%. *See* University of Oklahoma Institutional Research & Reporting, *First-Time Freshman Analysis Fall 2013*, at 2, Table 1: University of Oklahoma – Norman Campus (Oct. 2013). University of Oklahoma Institutional Research & Reporting, *First-Time Freshman Analysis Fall 2019*, at 2, Table 1 University of Oklahoma – Norman Campus (Sept. 2019).

[43] *See, e.g.*, Prabhdeep Singh Kehal et al., *When Affirmative Action Disappears: Unexpected Patterns in Student Enrollments at Selective U.S. Institutions*, 1990–2016, 7 Socio. of Race & Ethnicity 543 (2021).

Native American enrollment of roughly .47 percent ."[44] Another study found similar impacts across a sample of 19 public universities.[45] Likewise, a study examining national data found comparable declines in minority enrollments in highly selective colleges in states banning race-conscious admissions and found that the decline in the use of race-conscious admissions in states with bans also negatively affected students who live in adjacent states that lack highly selective colleges, such as Nevada, Arizona and Idaho.[46]

California is perhaps the best known example of the impact of the end of race-conscious admissions on diversity, as the passage of Proposition 209 in 1996 ended race-conscious affirmative action in California's public universities.[47] In the years immediately following, UC's more selective campuses experienced a more than 50 to 60 percent drop in the number of Black applicants accepted and a 40 to 50 percent reduction in the number of Latinx high school seniors accepted for admission.[48] At UC, Los Angeles, the reductions in acceptances were similar: 43 percent for Black applicants and 33 percent for Latinx applicants.[49] Of note, the API community continues to be overrepresented within the UC system even after the removal of Proposition 209.[50] However, disaggregation analyses show that the underrepresentation of many ethnically distinct subgroups within the API community persists within the UC system. Such less represented communities include Sri Lankan, Hmong, Laotian, Bangladeshi, Malaysian, Tongan and Fijian students.[51]

A recent study on the California ban found even broader, more adverse effects in which underrepresented minorities (URM)[52] "cascaded" into less competitive institutions,

---

[44] Peter Hinrichs, *The Effects of Affirmative Action Bans on College Enrollment, Educational Attainment, and the Demographic Composition of Universities*, 94 Rev. Econ. & Stat. 712, 717 (2012).

[45] Mark Long & Nicole Bateman, *Long-Run Changes in Underrepresentation After Affirmative Action Bans in Public Universities*, 42 Educ. Evaluation & Pol'y Analysis 188 (2020).

[46] Grant H. Blume & Mark C. Long, *Changes in Levels of Affirmative Action in College Admissions in Response to Statewide Bans and Judicial Rulings*, 36 Educ. Eval. & Pol'y Analysis 228 (2014).

[47] Proposition 209 was preceded by the enactment of SP-1 in 1995 by the University of California Board of Regents, which barred the use of "race, religion, sex, color, ethnicity, or national origin as criteria for admission to the University or to any program of study." The November 1996 vote to authorize Proposition 209 as an amendment to the state constitution provided backing for SP-1. Applicants for admissions to spring quarter 1998 were the first to feel the effects of the new admissions policy.

[48] *See Underrepresented Groups (URG) as a Percentage of California Public High School Graduates and UC Applicants, Admits, and New Freshmen, Systemwide, Fall 1989 to Fall 2016*, https://www.ucop.edu/academic-affairs/_files/prop209-gap-analysis-chart.pdf.

[49] Steven A. Holmes, *Re-Rethinking Affirmative Action*, N.Y. Times, Apr. 5, 1998, https://www.nytimes.com/1998/04/05/weekinreview/the-nation-re-rethinking-affirmative-action.html; *Prop. 209 Lands on UC*, L.A. Times, Apr. 1, 1998, https://www.latimes.com/archives/la-xpm-1998-apr-01-me-34867-story.html (reporting that the number of Black and Latinx students admitted to UC Berkeley, as a part of the first freshman class since Proposition 209 went into effect, dropped by 66% and 53%, respectively, compared to the previous year).

[50] Teresa Watanbe and Jennifer Lu, *Affirmative Action Divides Asian Americans, UC's Largest Overrepresented Student Group*, L.A. Times, Nov. 1, 2020, https://www.latimes.com/california/story/2020-11-01/affirmative-action-divides-asian-americans-ucs-largest-overrepresented-student-group.

[51] University of California, *Disaggregated Data*, Jul. 12, 2023, https://www.universityofcalifornia.edu/about-us/information-center/disaggregated-data.

[52] Zachary Bleemer, *Affirmative Action, Mismatch and Economic Mobility After California's Proposition 209*, Ctr. for Studies in Higher Education (2020), https://cshe.berkeley.edu/sites/default/files/publications/rops.cshe.10.2020.bleemer.prop209.8.20.2020

attainment of undergraduate and graduate degrees declined, and the average annual income of underrepresented minority graduates' wages dropped by five percent.[53] In response to the dramatic decline in enrollments by racially diverse students following the passage of Proposition 209, California adopted a percentage plan through which top-performing students graduating from most high schools in the state were guaranteed admission to most of the eight UC undergraduate campuses. In addition, UC, in its amicus brief submitted in the *SFFA* decision, stated:

> UC has implemented numerous and wide-ranging race-neutral measures designed to increase diversity of all sorts, including racial diversity. Those measures run the gamut from outreach programs directed at low-income students and students from families with little college experience, to programs designed to increase UC's geographic reach, to holistic admissions policies. Those programs have enabled UC to make significant gains in its system-wide diversity. Yet despite its extensive efforts, UC struggles to enroll a student body that is sufficiently racially diverse to attain the educational benefits of diversity.[54]

And even though the UC system as a whole admitted its most diverse class ever in 2021, that achievement is "tempered by two important concerns. First, UC's diversity gains have not been shared equally among all campuses." And "[s]econd, UC's student population at many of its campuses is now starkly different, demographically speaking, from the population of California high school graduates."[55]

Texas and Michigan corroborate that, without other actions to mitigate the effect, racial diversity is likely to decline without the consideration of race in admissions. In 1996, the Fifth Circuit of the United States Court of Appeals, in *Hopwood* v. *University of Texas Law School,*[56] prohibited the use of race in admissions in Texas, Louisiana and Mississippi. Texas later introduced a percentage plan the following academic year, but the first post-*Hopwood* class at the University of Texas had a much smaller minority enrollment.[57]

_2.pdf (In this study, URM includes African-American (Black), Chicano and Latino (Hispanic), and Native American students.).

[53] Bleemer found that: (1) Ending affirmative action caused UC Berkeley's 10,000 annual URM freshman applicants to cascade into lower-quality public and private universities; (2) URM applicants' undergraduate and graduate degree attainment declined overall and in STEM fields, especially among lower-testing applicants; and (3) as a result, the average URM UC applicant's wages declined by five percent annually between ages 24 and 34, almost wholly driven by declines among Hispanic applicants.

[54] *See* Brief for the President and Chancellors of the University of California as Amicus Curiae Supporting Respondents at 4, *SFFA*, 143 S. Ct. 2141 (2023).

[55] *Id.* at 9.

[56] *Hopwood* v. *University of Texas Law School* (78 F.3d 932 (5th Cir. 1996).

[57] Sue Anne Pressley, *Texas Campus Attracts Fewer Minorities*, Washington Post, Aug. 28, 1997, https://www.washingtonpost.com/archive/politics/1997/08/28/texas-campus-attracts-fewer-minorities/03b40410-276f-461c-b7a2-8d54a6c80e34/; Gary M. Lavergne & Bruce Walker, *Implementation and results of the Texas automatic admissions law (HB 588) at UT-Austin: Demographic analysis*, *Fall 2002*, Admissions Research, The University of Texas at Austin (2003); *see also* Marta Tienda, Kevin Leicht, Teresa Sullivan, Michael Maltese & Kim Lloyd, *Closing the gap?: Admissions and enrollments at the Texas public flagships before and after affirmative action*, Texas Top 10% Project (2003) (studying enrollment trends at Texas A&M and finding 74.4 percent whites in the admitted

Similarly, Black and Native American student enrollment at the University of Michigan also dropped significantly after race-conscious admissions ended.[58]

Two major categories of race-neutral alternatives for achieving diversity in undergraduate admissions have been advocated: (1) preferences for applicants from disadvantaged backgrounds (e.g., SES plans) and (2) place-based admissions plans. But empirical studies suggest that neither alternative is likely to replicate current levels of diversity on campus, especially at highly selective institutions.[59]

Since students from racial and ethnic minority groups are more likely to be from low-income and under-served or under-resourced geographic regions due to longstanding societal inequities, targeted financial aid and scholarships based on such eligibility criteria have the potential to increase racial diversity and economic diversity at selective institutions. Targeting first-generation students, who are more likely to come from racial or ethnically diverse or low income backgrounds, also has the potential to increase racial diversity on campus. Indeed, even before the *SFFA* decision, some institutions were already incorporating family income and status into their admissions criteria.[60] Empirical studies of those admissions programs, however, suggest that these preferences fail to foster racial diversity as effectively as race-conscious admissions.[61]

For example, studies have demonstrated that employing race-neutral economic or SES models does not necessarily yield racially diverse student bodies comparable to those

---

classes between 1992 and 1996). By 1998, this percentage had grown to 80.5 percent. *See* Catherine L. Horn & Stella M. Flores, *Percent Plans in College Admissions: A Comparative Analysis of Three States' Experiences (2003)*, Charles T. Clotfelter, The Civil Rights Project at Harvard University (2011).

[58] William C. Kidder, UCLA C.R. Project, *Restructuring Higher Education Opportunity?:African American Degree Attainment After Michigan's Ban on Affirmative Action* 3 (2013); Nick Assendelft, *Investing in Diversity*, Alumni Ass'n of the Univ. of Mich. (Spring 2017), https://alumni.umich.edu/michigan-alum/investing-in-diversity/ ("Since the passage of Proposal 2, the number of underrepresented minority undergraduate students attending U-M has dropped nearly 11 percent."). From 2006 to 2015, the underrepresented minority population at the University of Michigan decreased by 12% at the undergraduate school, despite attempts to use race-conscious alternatives, *see* Br. for the University of Michigan as Amicus Curiae, *Fisher* v. *Univ. of Texas at Austin*.

[59] Research has documented that low-income and first-generation students are underrepresented at selective institutions. Richard D. Kahlenberg, *Achieving Better Diversity: Reforming Affirmative Action in Higher Education*, The Century Foundation (Dec. 3, 2015), https://tcf.org/content/report/achieving-better-diversity.

[60] Halley Potter, *Transitioning to Race-Neutral Admissions: An Overview of Experiences in States Where Affirmative Action has been Banned*, https://production-tcf.imgix.net/assets/downloads/6_Transitioning-to-Race-Neutral-Admissions.pdf. While Potter describes several universities that have started to include more socioeconomic-based factors in admissions after eliminating the consideration of race, she notes that the institutions also made other major changes to their admissions practices, such as introducing a percentage plan (*e.g.*, Texas, California, Florida) or greatly expanding financial aid and recruitment and eliminating legacy preferences (*e.g.*, Georgia).

[61] Using data from 2004, one study estimates that the preference given to low-income students is equivalent to the additional preference given to an applicant with a slightly better academic record (a 0.15 standard deviation difference). Sean F. Reardon, Rachel Baker, Matt Kasman, Daniel Klasic & Joseph B. Townsend, *What Levels of Racial Diversity Can Be Achieved with Socioeconomic-Based Affirmative Action? Evidence from a Simulation Model*, 37 J. Pol'y Analysis & Mgmt. 630 (2018)).

produced by explicitly race-conscious models.[62] As one study noted, "the presence of minorities among all low-income students in the United States, and especially among those graduating from high school with sufficient grades and test scores to be admitted to college, would be too small to generate a level of minority representation anywhere close to its current level."[63] This analysis included multiple simulations looking at variables such as family income, wealth and assets and parental education level, and compared these simulations to results produced by race-conscious admissions policies. The study found that, in replacing race-based policies with SES policies, the share of minority students fell dramatically, declining "nearly one-third, from 16 percent to around 10 percent."[64] The study concluded that "no race-neutral model of preferential treatment can match the level of racial and ethnic diversity achieved by race-based affirmative action."[65]

A more recent study using agent-based modeling drew on data that could incorporate family income, parental education and parental occupation into simulated admissions processes to compare SES-based admissions with race-conscious admissions.[66] The study found, among other things, that reasonable SES-based admissions policies do not replicate the effects of race-based policies on diversity and produce lower levels of racial diversity. Although it noted that SES policies could be used together with race-conscious admissions policies, the study concluded that such efforts would likely be prohibitively expensive as a strong preference and increased financial aid would need to be directed towards low-income students, if the goal is to attempt to come close to the racial diversity levels attained through race-conscious admissions alone.[67]

## B.    Diversity in Corporations and Law Firms

The benefits that result from fostering diverse academic environments continue— and are amplified—in the workplace. These benefits include (1) enhancing cognitive and financial performance; (2) being better positioned to handle an increasingly diversified consumer and client base; and (3) attracting the next generation of employees.

Decades of social science has found that diversity significantly and positively impacts corporate spaces. In particular, a 2018 Boston Consulting Group study suggested that increasing the diversity of leadership teams leads to more and better innovation and, as a result, improved financial performance.[68] Companies that reported above-average diversity on their management teams also reported innovation-related revenue that was 19 percent higher than that of companies with below-average leadership diversity—45 percent

---

[62] Sigal Alon, *Race, Class and Affirmative Action* 160–87 (2015); *see also* Brief for the AERA et al. as Amicus Curiae in Support of Respondents at 33–34, *SFFA*, 143 S. Ct. 2141 (2023) discussing same.

[63] Harry J. Holzer and David Neumark, *Affirmative Action: What Do We Know?*, 25 J. Pol'y Analysis & Mgmt. 463, 476 (2006).

[64] Alon, *supra* note 62, at 174.

[65] *Id.* at 249. *See also*, Alan Krueger et al., *Race, Income and College in 25 Years: Evaluating Justice O'Connor's Conjecture*, 8 Am. L & Econ. Rev. 282, 309 (2006).

[66] *See* Reardon et al., *supra* note 61.

[67] *Id.*

[68] Rocío Lorenzo et al., *How Diverse Leadership Teams Boost Innovation*, BCG (Jan. 13, 2018) https://bcg.com/publications/2018/how-diverse-leadership-teams-boost-innovation.

of total revenue versus just 26 percent.[69] Nearly half the revenue of companies with more diverse leadership comes from products and services launched in the past three years. These organizations also reported better overall financial performance with Earnings Before Interest and Taxes (EBIT) margins that were nine percent higher than those of companies with below-average diversity on their management teams.[70]

Diverse companies are also more likely to outperform their non-diverse peers financially.[71] A 2020 McKinsey & Company study examined proprietary data sets for over 1,000 public companies across a range of industries in 15 countries.[72] Companies in the top quartile for racial and ethnic diversity were 36 percent more likely to have financial returns above their respective national industry medians.[73] In contrast, companies with low levels of diversity were 40 percent more likely to underperform relative to their national industry standards in profitability.[74] Similarly, a survey of the S&P 500 conducted by *The Wall Street Journal* in 2019 found that the 20 most diverse companies "not only have better operating results on average than the lowest-scoring firms, but their shares generally outperform those of the least-diverse firms."[75]

A 2017 study showed that companies with a diverse workforce enjoy greater sales revenue, market share and relative profits than their more homogenous competitors.[76] Nearly two-thirds of American companies with high levels of racial and ethnic diversity saw above-average profitability.[77] Notably, high-diversity companies outpaced those with low levels of diversity by over $750 million in average sales revenue.[78] In fact, diversity "is among the most important predictors" of a company's sales revenue—even when controlling for alternative explanations of revenue variance like company size, type, industrial sector, region and age.[79] A study of venture capital firms found similar results.[80] Further, ethnically homogenous investment partnerships had 26 to 32 percent lower rates of success on their investments, and "diverse collaborators were better equipped to deliver" the kind of creative thinking required to thrive in highly competitive environments.[81]

---

[69] *Id.*

[70] *Id.*

[71] McKinsey & Company, *Diversity Wins: How Inclusion Matters* (May 2020), https://www.mckinsey.com/~/media/mckinsey/featured%20insights/diversity%20and%20inclusion/diversity%20wins%20how%20inclusion%20matters/diversity-wins-how-inclusion-matters-vf.pdf.

[72] Id. at 1.

[73] *Id.* at 4.

[74] *Id.* at 5.

[75] Dieter Holger, *The Business Case for More Diversity*, Wall Street J., Oct. 26, 2019, https://www.wsj.com/articles/the-business-case-for-more-diversity-11572091200.

[76] Cedric Herring, *Is Diversity Still a Good Thing?,* 82 Am. Socio. Rev. 868, 876 (2017).

[77] *Id.* at 870.

[78] *Id.*

[79] *Id.* at 873–76.

[80] Paul Gompers & Silpa Kovvali, *The Other Diversity Dividend*, Harvard Bus. Rev., July–Aug. 2018, https://hbr.org/2018/07/the-other-diversity-dividend%20 ("Diversity significantly improves financial performance on measures such as profitable investments . . . and overall fund returns. . . . Along all dimensions measured, the more similar the investment partners, the lower their investments' performance.").

[81] *Id.*

In the law firm context, research indicates that diversity within law firms improves the services that firms provide to their clients, leading clients to seek out those services more often. Both the client and the firm benefit from this symbiotic relationship.[82] According to the ABA, "a diverse group of people working together to identify, analyze, and resolve issues ensures that those collective perspectives, perceptions and beliefs are voiced, considered, and represented as part of any proposed solution . . . building confidence within the legal community that diverse opinions, thoughts, and proposals are respected, appreciated, and desired."[83]

A study of law firms from 2015 to 2017 found that, all else being equal, firms with higher diversity were more profitable than firms with lower diversity.[84]

Within the legal profession, research also shows that having cultural and cognitive diversity leads to more "just, productive and intelligent" lawyers because it results in "better questions, analyses, solutions, and processes."[85] Law firm diversity is especially significant given the pipeline from law firms to senior societal leadership, both in government and in the corporate world. Law firm lawyers "often acquire a unique currency—a blend of high-level training, access to elite networks, and knowledge of the inner workings of influential institutions accumulated through their work advising on transactions and lawsuits. These credentials translate into the top tiers of influence across many sectors of our markets, government, and culture."[86]

Indeed, data confirms that law firm lawyers disproportionately go on to substantial leadership roles in government, academia and business. And lawyers who stay within their law firms often play pivotal roles in consequential Wall Street deals, public investigations and local, state and national lawsuits that define the daily rights of individuals and organizations. Even though lawyers make up only 0.8 percent of the workforce, they disproportionately influence other sectors of society, such as big business (16 percent of Fortune 100 chief executive officers ("CEOs")), media, sports (three of four major commissioners are lawyers) and academia (over 10 percent of university presidents).[87] Most lawyers start their careers in firms, and whether they stay or move on, society benefits when law firm populations reflect the diverse makeup of those they serve.

---

[82] Dev Stahlkopf, *Why Diversity Matters in the Selection and Engagement of Outside Counsel: An In-House Counsel's Perspective*, Am. Bar Ass'n, May 6, 2020, https://www.americanbar.org/groups/litigation/publications/litigation_journal/2019-20/spring/why-diversity-matters-the-selection-and-engagement-outside-counsel-inhouse-counsels-perspective.

[83] *Id.*

[84] Evan Parker, *Missing in Action: Data-Driven Approaches to Improve Diversity (074)*, Legal Evolution, Nov. 25, 2018, https://www.legalevolution.org/2018/11/missing-action-data-driven-approaches-improve-diversity-074/; Bryan Anderson, *The Business Case for Diversity – What Does the Evidence Show?*, Palm Beach County Bar Ass'n, Jan. 3, 2023, https://www.palmbeachbar.org/the-business-case-for-diversity-what-does-the-evidence-show.

[85] American Bar Association Presidential Diversity Initiative, *Diversity in the Legal Profession: The Next Steps* (April 2010), https://law.lclark.edu/live/files/8835-aba-next-steps.

[86] Lisa Kirby, *Why Diversifying the Legal Industry is the Key to a More Equitable World*, The American Lawyer, March 29, 2022.

[87] *Id.*

Importantly, as the United States becomes more diverse,[88] and as businesses increasingly cater to a global and culturally diverse market, diverse workforces are better equipped to handle the realities of modern business. Increased diversity bolsters revenue by improving a company's orientation toward the market and alignment with customers.[89] A company that considers and reflects its customer base is better equipped to understand market dimensions and develop products and services that most of the population, and not merely a small sector, wants to buy.[90] That correlation helps to explain why workforce diversity is one of the best predictors of a company's number of customers.[91]

Using data from sources like the U.S Census Bureau and the U.S Bureau of Economic Analysis, the University of Georgia's Selig Center for Economic Growth reported that the buying power of Asian American, Black American and Native American consumers "has exploded over the past 30 years."[92] Since 1990, the buying power of these groups has risen from $458 million to over $3 trillion annually, accounting for 17.2 percent of the nation's total buying power.[93] Today, success in American business requires understanding and communicating effectively with a racially diverse consumer population.[94] Diversity of both inherent traits, such as ethnicity, and acquired experiences, such as a facility and comfort interacting with people of different backgrounds, across a company's workforce improves business outcomes.[95] For example, a team with a member who shares a client's ethnicity is 152 percent more likely than another team to understand that client.[96] As a result, diversity helps teams better serve consumers and clients.

At the same time, diversity has become essential for recruitment and retention at all levels and in all industries. For example, in a survey of over 20,000 high school seniors graduating in 2023, diversity was the top item that students wanted in their campus community. "A diverse student body was appealing to 42% of respondents and an

---

[88] Nicholas Jones et al., *2020 Census Illuminates Racial and Ethnic Composition of the Country*, U.S. Census Bureau, Aug. 12, 2021, https://www.census.gov/library/stories/2021/08/improved-race-ethnicity-measures-reveal-united-states-population-much-more-multiracial.html (explaining that between 2010 and 2020, the proportion of people who identified as white alone decreased from 72.4 to 61.6 percent of all people living in the U.S., and the U.S. population became more multiracial and diverse).

[89] Maryam Imam, *Economics of Diversity*, Haley Guiliano LLP, March 1, 2019, https://www.hglaw.com/news-insights/economics-diversity .

[90] *Id*.

[91] Herring, *supra* note 76, at 876 (explaining that "the relationship between racial diversity and number of customers . . . is stronger than the impact of company size, establishment size, and organization age," suggesting diversity is "one of the most important predictors of number of customers.").

[92] Julianne Akers, *UGA's Selig Center for Economic Growth: Consumer buying power grows*, WUGA, June 21, 2023, https://www.wuga.org/local-news/2023-06-21/ugas-selig-center-for-economic-growth-consumer-buying-power-grows.

[93] J. Merritt Melancon, *Consumer Buying Power Is More Diverse Than Ever*, UGA Today, Aug. 11, 2021, https://news.uga.edu/selig-multicultural-economy-report-2021.

[94] Brief for Major American Business Enterprises et al. as Amici Curiae Supporting Respondents at 15, *SFFA*, 143 S. Ct. 2141 (2023).

[95] *Id.*; *see also* Randall Kiser, Beyond Right and Wrong: The Power of Effective Decision Making for Attorneys and Clients 81–83 (2010).

[96] Sylvia Ann Hewlett et al., *How Diversity Can Drive Innovation*, Harvard Bus. Rev., Dec. 2013, https://hbr.org/2013/12/how-diversity-can-drive-innovation?registration=success.

additional 37% said that it was a must-have in their college experience."[97] Similarly, many jobseekers—particularly Millennials and Gen Zers—now prioritize a "diverse and inclusive organization" and a significant portion "have turned down or decided not to pursue job opportunities because of a perceived lack of inclusion."[98] A 2018 Deloitte Millennial Survey showed that Millennials and Gen Zers correlate diversity with "a forward-thinking mindset" and "a tool for boosting both business and professional performance."[99] According to a 2020 survey from Glassdoor, 76 percent of employees and job seekers said a diverse workforce was important to them in evaluating companies and job offers.[100] Nearly half of Black and Hispanic employees and job seekers said they had quit a job after witnessing or experiencing discrimination at work and 37 percent of employees and job seekers said they would not apply to a company that had negative satisfaction ratings among people of color.[101] The September 2022 survey from Glassdoor and Indeed showed similar results; 72 percent of workers between the ages of 18 and 34 said "they would consider turning down a job offer or leaving a company if they did not think their manager (or potential manager) supported DEI initiatives."[102] Notably, Gen Z, which comprises one of the largest segments of the workforce, is also one of its most diverse, with about 48 percent of Gen Z individuals identifying as racial or ethnic minorities.[103]

Over the last decade, much of the driving force for diverse legal teams has come from law firm clients. Clients have recognized that strong talent generates value. Clients often depend on the advice of outside counsel at law firms to make strategic decisions, and good strategic decisions lead to success. "The only way you can flesh out an idea is with diversity of opinion and that needs to be reflected in the diversity of people giving us the opinion," noted Kristin Sverchek, Current President and former General Counsel at Lyft.[104]

---

[97] Will Patch, *Class of 2023 Fall Senior Survey*, Niche, Nov. 1, 2022, https://www.niche.com/about/enrollment-insights/class-of-2023-fall-senior-survey.

[98] *See, e.g.*, *Understanding Organizational Barriers to a More Inclusive Workplace*, McKinsey & Company (June 2020), https://www.mckinsey.com/~/media/mckinsey/business%20functions/people%20and%20organizational%20performance/our%20insights/understanding%20organizational%20barriers%20to%20a%20more%20inclusive%20workplace/understanding-organizational-barriers-to-a-more-inclusive-workplace.pdf?shouldIndex=false; Ed O'Boyle, *4 Things Gen Z and Millennials Expect from Their Workplace*, Gallup, March 30, 2021, https://www.gallup.com/workplace/336275/things-gen-millennials-expect-workplace.aspx.

[99] *2018 Deloitte Millennial Survey*, Deloitte, https://www2.deloitte.com/content/dam/Deloitte/global/Documents/About-Deloitte/gx-2018-millennial-survey-report.pdf.

[100] Glassdoor Team, *Diversity & Inclusion Workplace Survey*, Glassdoor, Sept. 30, 2020, https://www.glassdoor.com/employers/blog/diversity-inclusion-workplace-survey.

[101] *Id.*

[102] *Indeed & Glassdoor's Hiring and Workplace Trends Report 2023*, https://www.glassdoor.com/research/app/uploads/sites/2/2022/11/Indeed-Glassdoors-2023-Hiring-Workplace-Trends-Report-Glassdoor-Blog.pdf.

[103] Kim Parker & Ruth Igielnik, *On the Cusp of Adulthood and Facing an Uncertain Future: What We Know About Gen Z So Far*, Pew Research, May 14, 2020, https://www.pewresearch.org/social-trends/2020/05/14/on-the-cusp-of-adulthood-and-facing-an-uncertain-future-what-we-know-about-gen-z-so-far-2.

[104] Kristin Sverchek, former Current President and former General Counsel at Lyft, quoted in Christine Simmons, *170 GCs Pen Open Letter to Law Firms: Improve on Diversity or Lose Our Business*, The

When clients can draw upon advice from an outside counsel talent base that includes all aspects of diversity, clients receive superior legal services.[105] Therefore, both the law firm and its clients benefit financially and culturally from hiring teams that reflect the diversity of the marketplace.[106]

Today, in-house legal departments frequently invest in programs and initiatives to encourage partner law firms to foster and increase diversity.[107] Clients are leveraging their substantial purchasing power to promote diversity by considering key diversity efforts and metrics, among other factors, in selecting outside counsel.[108] In addition, clients gather extensive information from their existing partner firms, tracking not only the numbers of diverse attorneys at the firm, but also whether those attorneys are doing meaningful work and receiving credit for it.[109] Certain in-house legal teams have also used incentive-based or diversity criteria-based fee structures to reward firms that make advancements in diversity and penalize those that do not.[110]

Clients are also increasingly taking an interest in the career development and progression of diverse attorneys to attract a strong talent base. In-house legal departments

---

American Lawyer, Jan. 27, 2019, https://www.law.com/americanlawyer/2019/01/27/170-gcs-pen-open-letter-to-law-firms-improve-on-diversity-or-lose-our-business/?slreturn=20230701195016.

[105] *Diversity in Law: Who Cares?*, Am. Bar Ass'n, Apr. 30, 2016, https://www.americanbar.org/groups/litigation/committees/diversity-inclusion/articles/2016/spring2016-0416-diversity-in-law-who-cares.

[106] Dev Stahlkopf, *Why Diversity Matters in the Selection and Engagement of Outside Counsel: An In-House Counsel's Perspective*, Am. Bar Ass'n, May 6, 2020, https://www.americanbar.org/groups/litigation/publications/litigation_journal/2019-20/spring/why-diversity-matters-the-selection-and-engagement-outside-counsel-inhouse-counsels-perspective; *Diversity in Law: Who Cares?*, Am. Bar Ass'n, Apr. 30, 2016, https://www.americanbar.org/groups/litigation/committees/diversity-inclusion/articles/2016/spring2016-0416-diversity-in-law-who-cares.

[107] Christine Simmons, *170 GCs Pen Open Letter to Law Firms: Improve on Diversity or Lose Our Business*, The American Lawyer, Jan. 27, 2019, https://www.law.com/americanlawyer/2019/01/27/170-gcs-pen-open-letter-to-law-firms-improve-on-diversity-or-lose-our-business/?slreturn=20230701195016; Dev Stahlkopf, *Why Diversity Matters in the Selection and Engagement of Outside Counsel: An In-House Counsel's Perspective*, Am. Bar Ass'n, May 6, 2020, https://www.americanbar.org/groups/litigation/publications/litigation_journal/2019-20/spring/why-diversity-matters-the-selection-and-engagement-outside-counsel-inhouse-counsels-perspective.

[108] Brian P. Seaman, *How client surveys are moving the DEI needle at law firms*, Reuters, Feb. 23, 2022, https://www.reuters.com/legal/legalindustry/how-client-surveys-are-moving-dei-needle-law-firms-2022-02-23. For a comprehensive list of client efforts to drive outside counsel diversity, please visit *Legal Department (AKA Clients) Efforts Designed to Drive Outside Counsel Diversity*, Diversity Lab, July 8, 2017, https://www.diversitylab.com/knowledge-sharing/clients-push-for-diversity; Dev Stahlkopf, *Why Diversity Matters in the Selection and Engagement of Outside Counsel: An In-House Counsel's Perspective*, Am. Bar Ass'n, May 6, 2020, https://www.americanbar.org/groups/litigation/publications/litigation_journal/2019-20/spring/why-diversity-matters-the-selection-and-engagement-outside-counsel-inhouse-counsels-perspective.

[109] Roy S. Ginsburg et al., *Diversity Makes Cents: The Business Case for Diversity*, ABA Section of Litigation Annual Conference (Apr. 2014), https://www.americanbar.org/content/dam/aba/publications/landslide/diversity-makes-cents.pdf.

[110] Dev Stahlkopf, *Why Diversity Matters in the Selection and Engagement of Outside Counsel: An In-House Counsel's Perspective*, Am. Bar Ass'n, May 6, 2020, https://www.americanbar.org/groups/litigation/publications/litigation_journal/2019-20/spring/why-diversity-matters-the-selection-and-engagement-outside-counsel-inhouse-counsels-perspective.

are growing faster than law firms, and many lawyers who start their careers at firms will work in-house either through a secondment or as in-house counsel later in their careers.[111] Clients understand the value of increasing opportunities for diverse attorneys to do meaningful work and form ongoing client relationships. For these reasons, in-house legal teams have been intentional in seeking to include diverse outside counsel in recruiting and training opportunities, understanding the career trajectory of key talent, including diverse attorneys, discussing origination credit opportunities and exploring opportunities for diverse attorneys to have lead or key roles in transactional and litigation matters (e.g., arguing a motion and first-chairing depositions).[112] By supporting diversity and inclusion among outside counsel and in-house teams, clients can increase the pipeline of diverse people going on to pursue legal careers and attracting others in their network to the profession. This broadens the talent pool. And when clients facilitate opportunities for development, advancement and recognition of diverse attorneys, it ensures that both companies and law firms attract and retain the best legal professionals.[113]

However, the full achievement of diverse representation within corporations and law firms remains elusive. While at the entry levels, many corporations have been able to diversify their workforce, "the top ranks are still predominantly white and male."[114] "Today there are only eight Black CEOs of Fortune 500 companies, and there have only been 25 throughout our history and just 3.3% of all executive or leadership positions in the largest companies are held by Black people." [115] According to a study published by the United States Government Accountability Office, Hispanic women are "underrepresented by eightfold [in management jobs] when compared to their share of the workforce."[116] Similarly, representation of certain racial and ethnic groups within the legal profession continues to lag demographics in law schools and in the larger workforce population.

### C.    Diversity in the Judiciary

---

[111]  Bill Henderson, *In-house is bigger than BigLaw (262)*, Legal Evolution, Sept. 30, 2021, https://www.legalevolution.org/2021/09/in-house-is-bigger-than-biglaw-262; *The Evolution of In-house Legal Departments and the Catalysts Behind Corporate Law as a Discipline*, JDSupra, Sept. 14, 2022, https://www.jdsupra.com/legalnews/the-evolution-of-in-house-legal-1800425.

[112]  Brian P. Seaman, *How client surveys are moving the DEI needle at law firms*, Reuters, Feb. 23, 2022, https://www.reuters.com/legal/legalindustry/how-client-surveys-are-moving-dei-needle-law-firms-2022-02-23.

[113]  *Diversity Begets Diversity: General Counsel Perspectives on DEI Initiatives in Law Firms* (Baker Donelson Panel Discussion), JDSupra, Oct. 10, 2022, https://www.jdsupra.com/legalnews/diversity-begets-diversity-general-2802018.

[114]  Jessica Guynn and Jayme Fraser, *Corporate Diversity Database: A USA Today Investigative Series Inside the Nation's Most Powerful Companies*, USA Today, Feb. 16, 2023, https://www.usatoday.com/in-depth/news/investigations/2023/02/16/corporate-company-diversity-in-america-exclusive-searchable-database/7484640001.

[115]  Michael Posner, *Why Companies Need To Defend Their Diversity Policies*, Forbes, Jul. 19, 2023, https://www.forbes.com/sites/michaelposner/2023/07/19/why-companies-need-to-defend-their-diversity-policies/?sh=298f9ae61379.

[116]  *Id.*; U.S. Government Accountability Office, *Women in Management: Women Remain Underrepresented in Management Positions and Continue to Earn Less than Male Managers* (Mar. 2022), https://www.gao.gov/products/gao-22-105796.

The judiciary serves a unique and critical role in society and the value of diversity in the court system has been widely documented. "Diversity and inclusion are not just abstract concepts that warrant lip service in the legal profession; they are at the heart of promoting justice and respect for democratic institutions and the rule of law."[117] Further, diversity brings richness of thought and of experience to the judiciary. These enhanced viewpoints and expansion of ideas help courts to: (1) increase public trust; (2) improve decision-making; (3) provide symbolic and practical role models; and (4) root out overt discrimination.

When our nation was founded, Alexander Hamilton recognized that "[t]he judiciary . . . has no influence over either the sword or the purse; . . . neither force nor will, but merely judgment."[118] It follows, then, that "[t]he judiciary's authority depends in large measure on the public's willingness to respect and follow its decisions."[119]

A core value of the federal judiciary, as expressed by the Judicial Conference of the United States, is to create and maintain "a workforce of judges and employees that reflects the diversity of the public it serves."[120] This goal is predicated in part upon the dual recognition that "[t]he ability of courts to fulfill their mission and perform their functions is based on the public's trust and confidence in the judiciary,"[121] and that the "judiciary can retain public trust and confidence . . . only if it is comprised of a diverse complement of highly competent judges, employees, and . . . attorneys."[122] Therefore, "[p]ublic trust and confidence are enhanced when the judiciary's workforce – judges, employees, and . . . attorneys – broadly reflects the diversity of the public it serves."[123]

This recognition at the federal level of the importance of judicial diversity in maintaining public trust is no less true at the state level, where most of this nation's legal disputes are heard.[124] Evidence shows that more diverse courts have the potential to "engender greater goodwill from the population they serve."[125] A diverse judiciary signals to those before the court that the judiciary is less likely to be inherently biased against any particular group.[126]

---

[117] Hon. Rolando T. Acosta (Ret.), *The State of Diversity in New York's Judiciary*, New York State Bar Ass'n Journal (May 2020) at 24.

[118] Federalist Papers No. 78 (Alexander Hamilton) (capitalization altered).

[119] *Williams-Yuke* v. *Florida Bar*, 433 US 445, 446 (2015).

[120] Judicial Conference of the United States, *Strategic Plan for the Federal Judiciary*, at 2 (Sept. 2020), https://www.uscourts.gov/sites/default/files/federaljudiciary_strategicplan2020.pdf.

[121] *Id*. at 9.

[122] *Id*. at 15.

[123] *Id*.

[124] Ciara Torres-Spelliscy et al., Brennan Center for Justice, *Improving Judicial Diversity* (2010), https://www.brennancenter.org/sites/default/files/legacy/Improving_Judicial_Diversity_2010.pdf.

[125] Stacy Hawkins, The Importance of a Diverse Federal Judiciary Hearing Testimony 5–6 (March 25, 2021), https://docs.house.gov/meetings/JU/JU03/20210325/111405/HHRG-117-JU03-Wstate-HawkinsS-20210325-U1.pdf; Maya Sen, Written Testimony on the Importance of Judicial Diversity 6 (March 25, 2001), https://scholar.harvard.edu/files/msen/files/sen-written-testimony.pdf.

[126] Nancy Scherer, *Diversifying the Federal Bench: Is Universal Legitimacy for the U.S. Justice System Possible?*, 105 Northwestern U. L. Rev. 587, 594 (2011).

Judges from various courts and common law systems have expressed the view that judicial diversity enhances the ability to "see more angles" to a case,[127] and that "the more people you get from various backgrounds and experiences the more fair your judging is going to be."[128] Justice Ruth Bader Ginsburg noted that, while judges may ultimately reach the same decision, "it is also true that women, like persons of different racial groups and ethnic origins, contribute to the United States judiciary what . . . [is] fittingly called 'a distinctive medley of views influenced by differences in biology, cultural impact, and life experience.'"[129] Justice Thurgood Marshall observed that his arrival on the Supreme Court in 1968 as the first Black justice led his colleagues to obtain new information and a new perspective.[130] As Former Chief Judge Harry Edwards of the D.C. Circuit Court of Appeals has stated, "[i]ncreased demographic diversity often fosters the informational diversity that promotes improved appellate decision making."[131]

Heterogenous decision-making groups are more likely to engage in greater informational exchange and prepare more thoroughly for discussions.[132] Indeed, studies show that deliberative procedures themselves become more robust when a decision-making body is heterogenous.[133] For example, in a mock jury experiment, White jury members made fewer inaccurate statements and contributed more information when deliberating in a diverse setting, suggesting that participants "processed the trial information more systematically when they expected to deliberate with a more heterogenous group."[134] As articulated by retired Judge Richard Posner of the United States Seventh Circuit Court of Appeals, "[t]he nation contains such a diversity of moral and political thinking that the judiciary, if it is to retain its effectiveness, its legitimacy, has to be heterogeneous."[135] A critical mass of members from underrepresented groups also "helps to alleviate the misconception that members of sparsely represented groups are all alike, usually in a pejorative sense."[136] The result of a more diverse decision-making body is very often a "more lively, rich, and thorough" deliberative process.[137]

Diversity within the judiciary likewise ensures that the full range of perspectives of the community is reflected in the development of case law. Professor Sherrilyn A. Ifill has used the term "structural impartiality" to refer to an ideal in which the judiciary as a whole is "comprised of judges from diverse backgrounds and viewpoints," thereby "diminishing

---

[127] Jonathan K. Stubbs, *A Demographic History of Federal Judicial Appointments by Gender and Race: 1789-2016*, 26 Berkeley La Raza L.J. 92, 124 (2016).

[128] Rosemary Hunter, *More Than Just a Different Face? Judicial Diversity and Decision-making,* 68 Current Legal Problems 119, 137 (2015).

[129] Angela Onwuachi-Willig, *Representative Government, Representative Court? The Supreme Court as a Representative Body*, 90 Minn. L. Rev. 1261, 1261–62 (2006) (quoting Justice Ginsburg).

[130] Adam Liptak, *The Waves Minority Judges Always Make*, N.Y. Times, May 31, 2009, https://www.nytimes.com/2009/05/31/weekinreview/31liptak.html.

[131] Harry T. Edwards, *The Effects of Collegiality on Judicial Decision Making*, 151 U Pa. L. Rev. 1639, 1670 (2003).

[132] K. Phillips, *How Diversity Makes Us Smarter*, 311 Sci. Am. 42 (2014).

[133] *See* Sen, *supra* note 125, at 6.

[134] S. Sommers, *On Racial Diversity and Group Decision Making: Identifying Multiple Effects of Racial Composition on Jury Deliberations,* 90 J. of Personality and Soc. Psychol. 597, 606–07 (2006).

[135] Stubbs, *supra* note 127, at 119, quoting Richard Posner, *Law, Pragmatism and Democracy* 94 (2003).

[136] *Id.* at 123.

[137] Edwards, *supra* note 131, at 1668.

the possibility that one perspective dominates adjudication."[138] As President James Madison noted, "[i]t is essential to [a republican form of] government that it be derived from the great body of the society, not from . . . a favored class of it."[139] In short, a more diverse bench helps to ensure that traditionally excluded perspectives are not systemically omitted from the values reflected in court judgments.[140]

Discussions about the value of judicial diversity also routinely acknowledge the role that members of the judiciary play in serving as role models to the community, both symbolically and practically.[141] Inclusion of historically marginalized groups in the judiciary indicates to members of those groups that opportunities are available to them in the judicial space.[142] It further indicates that potential participants will not be excluded due to race, sex or gender.[143] These symbolic benefits translate to concrete advantages to the community through mentorship of younger generations.[144]

The history of members of the judiciary making overtly discriminatory and racist statements and presuppositions toward court users has been well documented. Contemporary anecdotes reflect that such instances still occur far too often in the courts.[145] But the presence of a diverse judiciary and court staff can reduce the likelihood that overtly sexist, racist or other discriminatory conduct will be tolerated.[146]

\* \* \*

The data shows that the benefits of building diverse environments are profound, and access to the most qualified and diverse talent is essential for educational institutions, companies, law firms and the judiciary to fully appreciate, respond to and solve the challenges ahead.

---

[138] Sherrilyn A. Ifill, *Judging the Judges: Racial Diversity, Impartiality and Representation on State Trial Courts*, 39 B.C. L. Rev. 95, 99 (1997).

[139] Federalist Papers No. 39 (James Madison) (capitalization altered).

[140] Sherrilyn A. Ifill, *Racial Diversity on the Bench: Beyond Role Models and Public Confidence*, 57 Wash & Lee L. Rev. 405, 410–11 (2000).

[141] *Id.* at 409; *see, e.g.*, Hunter, *supra* note 128, at 123.

[142] Hunter, *supra* note 128, at 123.

[143] Theresa M. Beiner, *White Male Heterosexist Norms in the Confirmation Process*, 32 Women's Rts. L. Rep. 105, 117–18 (2011).

[144] Hunter, *supra* note 128, at 123.

[145] *Report from the Special Advisor on Equal Justice in the New York State Courts* 59–64 (Oct. 1, 2020), https://www.nycourts.gov/whatsnew/pdf/SpecialAdviserEqualJusticeReport.pdf (hereinafter Equal Justice Report); *see* Fla. Standing Comm. on Fairness & Diversity, Fla. Supreme Court, *Final Report: Perceptions of Fairness and Diversity in the Florida Courts* 9, 23–24 (2008), https://www.flcourts.gov/content/download/218224/file/FairnessDiversityReport.pdf.

[146] Hunter, *supra* note 128, at 123-24.

### III.    IMPLICATIONS OF THE *SFFA* DECISION FOR LAW SCHOOLS AND OTHER HIGHER EDUCATION INSTITUTIONS[147]

Without question, the most direct effects of the *SFFA* decision will be felt by academic institutions. The institutions that have historically used race-conscious admissions policies may now have to reframe their practices while at the same time ensuring alignment with their DEI goals.

In response to these changes, the Academic Working Group of the Task Force has provided below an explanation of the practical implications of the *SFFA* decision on academic institutions and guidance on how these institutions can continue to advance DEI efforts through their admissions process. Note that although the focus of this section is on legal education and the legal profession, it draws on research from settings beyond law schools, and also offers considerations and recommendations, the applicability of which can be extended to a broader range of higher educational settings and stakeholders.

This section proceeds in four parts. *First*, it discusses why academic institutions should establish clear goals and values with respect to diversity in light of the analysis in the *SFFA* decision. *Second*, it outlines the permissible admissions practices following the decision. *Third*, it provides potential steps for eliminating policy barriers to achieving a diverse applicant pool. *Lastly,* this section discusses how implementing a broad educational institution strategy can help academic institutions foster inclusive learning environments for their students.

#### A.    Institutional Goals and Values

The *SFFA* decision highlights the importance of developing well-articulated goals and values before making decisions—especially admissions decisions—that shape academic institutions. In striking down the race-conscious admissions programs at Harvard and UNC, the Court criticized the universities for relying on justifications deemed insufficiently "coherent"[148] and for "fail[ing] to articulate a meaningful connection between the means they employ and the goals they pursue."[149] In this regard, the Court explained that "[b]oth [Harvard's and UNC's] programs lack sufficiently focused and measurable objectives warranting the use of race."[150] The Court's reasoning therefore explicitly links the question of whether a particular consideration of race is legitimate to the question of whether there are defined institutional goals and values closely connected to that consideration.

The Court, while criticizing the schools' admissions practices, made clear that the task of identifying those goals and values properly remains in the hands of universities.

---

[147] This section draws on EducationCounsel, *Preliminary Guidance Regarding the U.S. Supreme Court's Decision in* SFFA v. Harvard *and* SFFA v. UNC, July 6, 2023, https://educationcounsel.com/our_work/publications/higher-ed/educationcounsel-s-preliminary-guidance-regarding-the-u-s-supreme-court-s-decision-in-sffa-v-harvard-and-sffa-v-unc_3.

[148] *SFFA*, 143 S. Ct. 2141, 2166.

[149] *Id.* at 2167.

[150] *Id.* at 2175.

Although unwilling to grant great deference to universities when evaluating the lawfulness of the use of race, the Court made plain the high degree of freedom available to institutions of higher learning when defining their mission: "Universities may define their missions *as they see fit*."[151] As discussed below, the Court's emphasis on the mission of the university—and its critical assessment of how values and goals associated with that mission are articulated and pursued—should be kept at the forefront of any effort to advance diversity in law schools. Accordingly, having and articulating important institutional goals, including diversity in legal education, remain permissible. The means of achieving those goals will be subject to strict scrutiny when race is used as a factor, but the Court's decision does not forbid the pursuit of those goals.

Meanwhile, the *SFFA* decision also notes that military academies present distinct interests from colleges and universities, suggesting that there are potentially distinct considerations in the admissions process for graduate and professional programs. The Court expressly declined to address arguments by the United States, as *amicus curiae*, about the importance of race-based admissions programs at the military academies. The opinion noted, "No military academy is a party to these cases, . . . and none of the courts below addressed the propriety of race-based admissions systems in that context."[152] The Court therefore would not "address the issue, in light of the potentially distinct interests that military academies may present." This cautious approach indicates the need for sensitivity to the facts and circumstances associated with different institutional settings.[153]

Therefore, although different in important ways, law schools may be viewed as similar to military academies (and distinct from undergraduate institutions) because they train students to enter a profession where education in a diverse environment, as well as the diversity of the profession itself, supports a unique compelling interest. The extent to which there are "distinct interests" presented by law schools would require careful attention to facts and circumstances that were not considered in the undergraduate cases before the *SFFA* decision.

### B.    Permissible Processes Following the *SFFA* Decision

Because the majority opinion hewed closely to the record in each case and focused on the specifics of the Harvard and UNC admissions programs, the Court has spoken much more clearly about what is improper than what remains permissible. Nevertheless, the decision addresses important aspects of the admissions process including the consideration of: (1) the life experiences and the impact of race on an individual applicant; (2) values, perspectives and mission alignment; (3) SES, geography, employment and first-generation status; and (4) collection of demographic information during and after the admissions process.

---

[151] *Id.* at 2168 (emphasis added).

[152] *Id.* at 2166, n.4.

[153] Opponents of affirmative action appear to be preparing to litigate against military academies. See Anemona Hartocollis, *The Next Affirmative Action Battle May Be at West Point*, N.Y. Times, Aug. 3, 2023, https://www.nytimes.com/2023/08/03/us/affirmative-action-military-academies.html.

It is important to note that the Court did not forbid colleges and universities from being aware of an applicant's race or from considering how race affected their lived experience. Specifically, the majority opinion, in summarizing its analysis, permitted consideration of how race has impacted a specific applicant's life in making admissions decisions so long as that impact was considered in close connection to a non-racial goal or value being pursued by the university. When discussing the evaluation of race in admissions essays, the Court observed:

> At the same time, as all parties agree, nothing in this opinion should be construed as prohibiting universities from considering an applicant's discussion of how race affected his or her life, be it through discrimination, inspiration, or otherwise. But, despite the dissent's assertion to the contrary, universities may not simply establish through application essays or other means the regime we hold unlawful today. . . . "[W]hat cannot be done directly cannot be done indirectly. The Constitution deals with substance, not shadows," and the prohibition against racial discrimination is "levelled at the thing, not the name."[154]

In fact, on August 14, 2023, the Department of Justice and the Department of Education issued Questions and Answers that reiterated this point, stating that "universities may continue to embrace appropriate considerations though holistic application-review processes and (for example) provide opportunities to assess how applicants' individual backgrounds and attributes—including those related to their race . . . position them to contribute to campus in unique ways."[155]

This presents a delicate task for law schools during the admissions process. As the majority opinion states, the use of an admissions essay to glean a candidate's race for the purpose of granting or denying admission solely because of race would be an impermissible end run around the limits imposed by the Court—an attempt to do indirectly what cannot be done directly. At the same time, an institution that has articulated certain goals and values, and that seeks to identify how specific candidates for admission fit with those goals and values, does not need to blind itself to an applicant's race or the importance of an applicant's experiences with race in assessing how an applicant might contribute to the school.

Schools that have articulated the desire to pursue certain values, perspectives, skills or other attributes will therefore be able to continue to be aware of an applicant's race and consider an applicant's experiences with race in the admissions process when the applicant discusses how race informs the assessment of those attributes. Considering applicants' discussion of how race affected their lives or influenced their development of desired skills

---

[154] *SFFA*, 143 S. Ct. at 2176 (quoting *Cummings* v. *Missouri*, 71 U.S. 277, 325 (1867)).

[155] Department of Justice and Department of Education, *Questions and Answers Regarding the Supreme Court's Decision in* Students for Fair Admissions, Inc. v. Harvard College and University of North Carolina, Nov. 14, 2023, https://s3.documentcloud.org/documents/23908763/post-sffa-resource-faq_final_508.pdf.

or other qualities, remains permissible, so long as *race itself* is not the factor driving an admissions decision. The Court provided several examples to demonstrate the distinction:

> A benefit to a student who overcame racial discrimination, for example, must be tied to that student's courage and determination. Or a benefit to a student whose heritage or culture motivated him or her to assume a leadership role or attain a particular goal must be tied to that student's unique ability to contribute to the university. In other words, the student must be treated based on his or her experiences as an individual—not on the basis of race.[156]

In each of the Court's examples, the "why" and "how" of the consideration of race are key. In each example, the institution has articulated beforehand the values, perspectives, skills or other nonracial attributes sought in the admissions process (courage and determination in one example, and leadership ability in the other). The university can then permissibly consider race when an applicant, in turn, shows how race informs his or her own experiences that demonstrate a fit with the goals of the institution in the admissions process. To state the point directly, the Court does not require an institution to be race blind, so long as race is relevant to nonracial considerations in the institution's decision-making as to that specific applicant.

A corollary to the role of an institution's values and goals is that they are in fact concretely articulated. Law schools will be on firmer ground if the attributes given weight in the admissions process have been defined in advance and connected to the mission identified by the institution.

Although the Court did not expressly address issues relating to race-neutral strategies, the Court's ruling elevates the importance of comprehensively considering viable race-neutral strategies to advance broader institutional diversity and equity goals, including SES, place-based and other potential admissions policies. Unlike race-conscious policies, which are subject to strict scrutiny, race-neutral policies have been subject to less exacting scrutiny,[157] leaving institutions more latitude to consider SES, first generation status, geographic diversity and percentage plans.

Importantly, however, the ruling suggests that institutions would be wise to ensure that even race-neutral strategies reflect alignment with authentic institutional aims.[158] "In assessing authenticity, institutions should document their commitment and actions in pursuit of the interest reflected in the relevant factors (*e.g.*, socio-economic diversity) to help demonstrate that they would pursue the interest with comparable effort based on broad

---

[156] *Id.*

[157] *SFFA*, 143 S. Ct. at 2225 (Kavanaugh, J., concurring) ("[G]overnments and universities still 'can, of course, act to undo the effects of past discrimination in many permissible ways that do not involve classification by race.'"), quoting Justice Scalia's concurrence in *Richmond* v. *J. A. Croson Co.*, 488 U.S. 469, 526 (1989) (Scalia, J., concurring in judgment).

[158] EducationCounsel, *Preliminary Guidance*, *supra* note 147.

interests in diversity and equity, as well as to help evaluate and develop potential—not based on interests in racial diversity alone."[159]

The design of application materials to collect demographic data will need to conform to the Court's guidance on the permissible role of race in the admissions process. Nothing in the Court's decision bars the collection of data about race and ethnicity. Collection of disaggregated data may be important for research and evaluation purposes. Indeed, a law school's ability to assess data about race and ethnicity may be of increased importance in light of the Court's emphasis on the need for careful attention to the facts and circumstances of different institutional settings when evaluating the use of race.

Much turns, however, on when demographic information is collected and how it is used. A law school could ask matriculating students—after the admissions process is closed—to disclose their race and ethnicity in order to capture a complete picture of the entering class. Gathering that information would not cross into prohibited territory under the Court's reasoning. If demographic information is collected during the admissions process, the lines drawn by the Court's decision will shape the manner of collecting and using the data. Seeking demographic information on an application through a checkbox would not violate the Court's decision, so long as the admissions process does not extract that information in pursuit of race-based decision-making. But if such information is solicited during the application process, schools as a prudential matter should consider ways of designing application materials so that decision-makers in the admissions process do not see the checkbox information while assessing a particular candidate's file. By contrast, if an application invites candidates to speak in an essay about factors that have affected their lives or that demonstrate other important qualities (such as courage, determination, leadership or the ability to overcome hardship), the disclosure of race—and the consideration of race as relevant to those qualities—would not be impermissible.

## C.    Policy Barriers in Admissions Processes

A 2015 study by the Bureau of Labor Statistics found that the legal profession was one of the least racially diverse professions in the country; nearly a decade later, this remains true.[160] While leaders in the legal profession continue to consider racial and ethnic diversity "necessary to demonstrate that our laws are being made and administered for the benefit of all persons" since "the public's perception of the legal profession often informs impressions of the legal system . . . and create[s] greater trust in the rule of law," those efforts will become more challenging in the wake of the *SFFA* decision.[161]

---

[159] *Id.*

[160] *Labor Force Statistics from the Current Population Survey*, U.S. Bureau of Labor Stats. (2022), https://www.bls.gov/cps/cpsaat11.htm (In 2022, legal occupations, which included lawyers, judicial law clerks, judges/magistrates/other judicial workers, paralegals and legal assistants, title examiners/abstracters/searchers, and legal support workers/other, 84.1 percent of the population being Caucasian, 8.5 percent Black or African American, 4.9 percent Asian, and 10.9 percent Hispanic/Latinx).

[161] *Diversity in Law: Who Cares?: Why Justice John Robert's Implications Were Wrong*, Am. Bar Ass'n Apr. 30, 2016, https://www.americanbar.org/groups/litigation/committees/diversity-inclusion/articles/2016/spring2016-0416-diversity-in-law-who-cares.

With the Court's restriction on race-conscious admissions, colleges and universities committed to values of access and inclusion must re-examine their existing admissions policies and practices to address barriers to equitable educational access.[162] As we discuss below, schools should consider reevaluating the criteria for assessing merit, including (1) using standardized tests; (2) legacy, athlete and donor preferences; (3) providing resources to alleviate the financial burden on law school applicants; and (4) developing methods for recruitment that can help diminish the pervasive disparities in law student enrollment and graduation among students of varying generational, racial or ethnic, and socio-economic backgrounds.[163] Additionally, the *SFFA* decision's restrictions on considerations of race-conscious admissions may well reduce the racial diversity of students graduating from selective undergraduate institutions, so law schools may wish to ensure that their recruitment and outreach strategies extend beyond schools from which they have traditionally recruited to also encompass less-well-represented institutions and achieve a broadly diverse applicant pool.

### 1.    Standardized Testing Requirements

Standardized admission tests have been criticized as inherently racially biased.[164] Performance on a standardized test is treated as a main indicator of success in higher education. However, there are many—and more accurate—indicators and qualities contributing to academic success, not to mention the capabilities required for the successful practice of law. In light of this, some undergraduate and graduate institutions have embraced test-optional policies, which have resulted in an increase in applications—in particular from racially diverse students—as well as increased admission of racially diverse students.[165] A recent study showed that, while underrepresented minority students were more likely than others to opt out, "non-submitters" still graduated at equivalent or slightly

---

[162] EducationCounsel, *Preliminary Guidance*, *supra* note 147; *see also* Simon Marginson, *Unequal Opportunity The Dream Is Over: The Crisis of Clark Kerr's California Idea of Higher Education*, 152–67 (Univ. of California Press 2016), http://www.jstor.org/stable/10.1525/j.ctt1kc6k1p.24 (accessed Aug. 1, 2023); *see also* Shane LaGesse, *Legacy Admissions: What It Is and Why Colleges Are Reconsidering It*, U.S. News & World Report, July 21, 2023, https://www.usnews.com/higher-education/articles/legacy-admissions-what-it-is-and-why-colleges-are-reconsidering-it; Liam Knox, *Affirmative Action for the Rich*, Inside Higher Ed., July 26, 2023, https://www.insidehighered.com/news/admissions/traditional-age/2023/07/26/would-ending-legacy-admissions-improve-elite-college; *see* Jennifer Medina, Kate Benner, & Kate Taylor, *Actresses, Business Leaders and Other Wealthy Parents Charged in U.S. College Entry Fraud*, N.Y. Times, March 12, 2019, https://www.nytimes.com/2019/03/12/us/college-admissions-cheating-scandal.html.

[163] Karen Bussey et al., *"The Most Important Door That Will Ever Open": Realizing the Mission of Higher Education through Equitable Admissions Policies*, Inst. for Higher Educ. Pol'y (June 2021), https://www.ihep.org/wp-content/uploads/2021/06/IHEP_JOYCE_full_rd3b-2.pdf; Marisa Manzi & Nina Totenberg, *'Already Behind': Diversifying The Legal Profession Starts Before The LSAT*, Na'tl Pub. Radio, Dec. 22, 2020, https://www.npr.org/2020/12/22/944434661/already-behind-diversifying-the-legal-profession-starts-before-the-lsat; Georgetown Pub. Pol'y Inst., *Separate and Unequal: How Higher Education Reinforces the Intergenerational Reproduction of White Racial Privilege*, Georgetown Univ. Ctr. on Educ. & the Workforce (July 2013), https://cew.georgetown.edu/wp-content/uploads/SeparateUnequal.FR_.pdf.

[164] *See* John Rosales & Tim Walker, *The Racist Beginnings of Standardized Testing*, Nat'l Educ. Ass'n, March 20, 2021, https://www.nea.org/advocating-for-change/new-from-nea/racist-beginnings-standardized-testing.

[165] *Id.*

higher rates than those of prospective candidates who submitted test scores.[166] Though accredited professional programs generally require standardized entry exams (*e.g.*, MCAT, LSAT, GRE, GMAT), some programs provide candidates the option to choose from specified standardized exams or offer standardized exam waivers for students participating in Early Admission Programs and/or Guaranteed Admission Programs.[167] In addition to standardized testing options, some higher education institutions, such as the UC Davis School of Medicine, have incorporated adversity scoring[168] within their evaluative processes.[169]

At the time of the writing of this report, the debate over standardized test requirements in law schools is playing out dramatically. In November 2022, the accreditation council of the American Bar Association voted to amend its accreditation requirements so as to eliminate Standard 503's mandate of a "valid and reliable admission test," instead making such a test optional. The ABA House of Delegates rejected the proposal, and the matter remains "paused."[170]

Proponents of the amendment argue that the requirement of a standardized test operates as a barrier to entry into law school for students from some ethnic and racial groups, particularly Black, Hispanic and Native American students, who perform systematically worse on the LSAT and other standardized tests than others.[171] Although the LSAT may be considered a strong predictor of success in the first year of law school, these detractors point out that this is not the same as predicting long-term success in the profession.[172] Opponents, including a large consortium of law school deans, argue that without standardized tests, racial, socioeconomic and other forms of diversity in law schools will backslide, not because standardized tests are free from bias but because in their absence, other, *more* biased, factors such as GPAs, letters of recommendation and

---

[166] *Id.*

[167] *See* Jack Westin, *Medical Schools That Don't Require MCAT: All You Need to Know*, June 21, 2023, https://jackwestin.com/resources/blog/medical-schools-that-dont-require-mcat-all-you-need-to-know.

[168] Matthew N. Gaertner & Melissa Hart, *Considering Class: College Access and Diversity*, 7 Harvard Law and Pol'y Rev. 367, 379–83 (2013) (assessing the design and utility of a "disadvantage index") https://harvardlpr.com/wp-content/uploads/sites/20/2013/09/Gaertner-and-Hart.pdf; https://scholar.law.colorado.edu/cgi/viewcontent.cgi?article=1103&context=faculty-articles.

[169] *See* Anemona Hartocollis, *SAT 'Adversity Score' Is Abandoned in Wake of Criticism*, N.Y. Times, Aug. 27, 2019, https://www.nytimes.com/2019/08/27/us/sat-adversity-score-college-board.html. *But see* Stephanie Sohl, *With End of Affirmative Action, a Push for a New Tool: Adversity Scores*, N.Y. Times, July 3, 2023, https://www.nytimes.com/2023/07/02/us/affirmative-action-university-of-california-davis.html.

[170] *Midyear 2023: ABA House of Delegates Rejects Changing Law School Admissions Standards*, Am. Bar Ass'n, Feb. 6, 2023, https://www.americanbar.org/news/abanews/aba-news-archives/2023/02/hod-resolution-300-debate. *But see* Michael T. Nietzel, *Most University of California at Berkeley Graduate Programs Will Not Require The GRE This Year*, Forbes, Sept. 30, 2021, https://www.forbes.com/sites/michaeltnietzel/2021/09/30/most-graduate-programs-at-the-university-of-california-berkeley-will-not-require-the-gre-this-year/?sh=5d7e7ddd122c; Michael T. Nietzel, *University of Michigan to Drop GRE for Ph.D. Admissions*, Forbes, Feb. 25, 2022, https://www.forbes.com/sites/michaeltnietzel/2022/02/25/university-of-michigan-to-drop-gre-for-phd-admissions/?sh=6dd5359443f5.

[171] Aaron N. Taylor, *The Marginalization of Black Aspiring Lawyers*, 13 FIU L. Rev. 489, 496–97 (2019).

[172] *Id.* at 490.

reputations of undergraduate institution will come to dominate admissions decisions.[173] At a minimum, advocates for retaining the admission testing requirement believe abandoning it is premature until more rigorous research has been conducted on the possibility of a superior alternative to the existing testing instruments for evaluating potential for success in law school.

## 2.    Legacy, Athlete and Donor Preferences

Following the *SFFA* decision, the question of whether educational institutions should continue to give preferential admissions treatment to athletes, children and relatives of donors and legacy (children of alumni) candidates has been the subject of increased scrutiny. Although the "Operation Varsity Blues" scandal focused nationwide media attention on wealthy parents "funding" enrollment opportunities for their children,[174] athletes and legacy admits also come disproportionately from high-income families.[175]

A recently published study focuses on the impact of family wealth on admissions outcomes in undergraduate admissions.[176] Using college attendance and parental income data from 1999 to 2015 and standardized test scores from 2001 to 2015, the authors found that applicants from the top one percent of American families are more than twice as likely

---

[173]    *Letter to Leo Martinez*, Council Chair, Am. Bar Ass'n, Sept. 1, 2002, https://taxprof.typepad.com/files/deans-letter-to-aba.pdf.

[174] On "Operation Varsity Blues," *see* Jennifer Medina, Kate Benner & Kate Taylor *Actresses, Business Leaders and Other Wealthy Parents Charged in U.S. College Entry Fraud*, N.Y. Times, Mar. 12, 2019, https://www.nytimes.com/2019/03/12/us/college-admissions-cheating-scandal.html.    Children of important or potential donors receive a substantial advantage in the admissions process, greater than legacy candidates, that may be equivalent to 400 or 500 points out of 1600 on the SAT. The advantage therefore would help a student with a score of 1100 out of 1600 get into a top university. According to media reports, the threshold for preferential treatment for admission to Stanford University is $500,000. *See* Justine Moore, *Connections to University Can Affect Admissions Decision*, The Stanford Daily, March 12, 2013, https://stanforddaily.com/2013/03/12/connections-to-university-can-affect-admissions-decision; Gabrielle Wilson, *The Legal College Admissions Scandal: How the Wealthy Purchase College Admission to the Nation's Elite, Private Universities Through Donations*, BYU Educ. & L.J., (2021), https://scholarsarchive.byu.edu/byu_elj/vol2021/iss1/5.

[175] Admissions data is seldom open to the public. The Students for Fair Admissions lawsuit against Harvard College revealed how preferences operate in Harvard's admissions decisions for different applicant groups, including recruited athletes, legacies, those on the dean's interest list, and children of faculty and staff (ALDCs). The acronym ALDC serves as a helpful marker of admission-specific barriers. *See generally SFFA, Inc.* v. *President & Fellows of Harvard Coll.*, 600 U.S. __ (2023). *See also* Peter Arcidiacono, Josh Kinsler & Tyler Ransom, *Legacy and Athlete Preferences at Harvard*, 40 J. of Labor Econ. 133, 133–56 (2022), https://gwern.net/doc/sociology/2021-arcidiacono.pdf("On average, LDC applicants (i.e., excluding athletes) are stronger than typical applicants. However, the average LDC admit is weaker than the average typical admit. . . . The admissions advantage for recruited athletes appears to be even stronger. Admitted athletes have significantly worse credentials than typical admits and, in some cases, typical applicants. . . . We find that a white typical applicant with a 10% chance of admission would see a fivefold increase in admissions likelihood if they were a legacy and more than a sevenfold increase if they were on the dean's interest list; we also find that they would be admitted with near certainty if they were a recruited athlete."); Saahil Desai, *College Sports Are Affirmative Action for Rich White Students*, The Atlantic, Oct. 23, 2018, https://www.theatlantic.com/education/archive/2018/10/college-sports-benefits-white-students/573688.

[176] Raj Chetty, David J. Deming & John N. Friedman, *Diversifying Society's Leaders? The Determinants and Causal Effects of Admission to Highly Selective Private Colleges* (2023).

to attend the nation's most elite private colleges as applicants from middle-class families with similar standardized test scores. The study concluded that among students with the same test scores, the colleges gave preference to alumni and recruited athletes and provided applicants from private schools higher non-academic ratings. If legacy, athlete and private applicant preferences were removed, the study suggests that applicants from the top one percent would have made up 10 percent of an admitted class rather than 16 percent.

Contending that such preferences have a discriminatory impact, advocacy groups recently filed a civil rights complaint against Harvard challenging its legacy admissions practices.[177] Furthermore, since the *SFFA* decision, several academic institutions nationwide such as Occidental College[178] and Wesleyan University[179] have moved to eliminate legacy admissions, concerned that they not only favor students from higher income households but inherently disqualify first-generation applicants from such preference.[180] Early decision (ED) options, though more indirectly associated with preferential admission eligibility, also tend to favor applicants from higher socioeconomic backgrounds because ED applicants typically have no information about what, if any, financial aid packages are available to them at the time they are required to make enrollment decisions.[181]

### 3. Tuition and Educational Resource Costs

Educational costs are also significant barriers to educational access.[182] These begin at the pre-application stage (*e.g.*, through standardized test preparation costs and pre-

---

[177]    Complaint, *Chica Project v. President & Fellows of Harvard Coll.*, https://assets.bwbx.io/documents/users/iqjWHBFdfxIU/rKHUM_KThEyQ/v0.

[178]    *Formally Ending Legacy Admission & Next Steps*, Occidental College, https://www.oxy.edu/about-oxy/college-leadership/presidents-office/community-messages/formally-ending-legacy-admission.

[179]    Vimal Patel, *Wesleyan University Ends Legacy Admissions*, N.Y. Times, Jul. 19, 2023, https://www.nytimes.com/2023/07/19/us/wesleyan-university-ends-legacy-admissions.html.

[180]    Since the *SFFA* decision, Wesleyan University, Carnegie Mellon University, Virginia Tech, and the University of Virginia eliminated legacy admissions, joining other institutions that had eliminated them previously, including Johns Hopkins, Amherst, the University of California system, MIT, CalTech, and University of Washington. John Hopkins ended its legacy admissions in 2020, although since 2013, it has decreased the percentage of incoming students with a family connection to university from 8.5% to 1.7% and increased the percentage of first-generation or limited income students from 16.7% to 30.8%. The percentage of Pell Grant–eligible students rose from 12.8% in 2013 to 20.1% in 2021. Ronald J. Daniels, *Abolish Legacy Admissions Now*, The Chronicle of Higher Educ., Oct. 7, 2021, https://www.chronicle.com/article/abolish-legacy-admissions-now; Nick Anderson, *University of Virginia to Limit 'Legacy' Factor in Admissions*, Wash. Post, Aug. 1, 2023, https://www.washingtonpost.com/education/2023/08/01/uva-legacy-admissions-college-application; Mark Owczarski, *Virginia Tech Implements Changes to Undergraduate Admissions Process for 2023-24 Admissions Cycle*, Virginia Tech News, July 28, 2023, https://news.vt.edu/articles/2023/07/cm-admissions-cycle.html (also announcing the end of its Early Decision option).

[181]    *Eliminating Early Decision Policies*, IHEP 29-35, Aug. 1, 2023, https://www.ihep.org/wp-content/uploads/2021/06/IHEP_JOYCE_Ch3-1.pdf (because financial aid packages may play an important role in students' enrollment decisions, especially for those from low-income backgrounds, applying early decision is sometimes not a realistic option. Research also shows that students applying from affluent families tend to apply for early decision about twice as often as those from lower-income families, even if they have identical academic credentials.).

[182]    This was first addressed by universities following the Civil Rights Act of 1964 and Voting Rights Act of 1965 when institutions of higher education realized that without restructuring financial aid policies to be

admission application fees and deposits)[183] and then continue through a student's enrollment to post-graduation, including but not limited to tuition, administrative fees, books, supplies (including technological requirements), room and board and health insurance coverage. Although the cost burden of education is often attributed to tuition and other costs of attendance post-enrollment, the opportunity cost of lost wages while attending professional programs, such as law school, due to workload and policy restrictions also affects low-income, first-generation and other students from non-traditional backgrounds.[184] Student advisors often discourage students from working during law school, unless such employment opportunities are paid, practical, legal experiences—which often do not provide sufficient financial resources to meet personal and/or family financial needs.[185] The debilitating nature of these costs was brought into keen focus by the student debt statistics outlined in the recent Supreme Court case addressing comprehensive student loan forgiveness.[186]

Merit and need-based scholarships are the two primary forms of financial aid utilized in higher education, though institutions recognize that traditional merit-based considerations typically favor students from high-income and/or well-resourced backgrounds and communities.[187] Nonetheless, diversity- and race-conscious awards have

more conscious of the financial needs of minority students, these students would likely be unable to matriculate even if admitted. *See* Alexander S. Elson, Note, *Disappearing Without a Case – The Constitutionality of Race-Conscious Scholarships in Higher Education*, 86 Wash. U. L. Rev. 975, 978 (2009).

[183] *Cf.* Marisa Manzi & Nina Totenberg, *'Already Behind': Diversifying The Legal Profession Starts Before The LSAT*, Nat'l Pub. Radio, Dec. 22, 2020, https://www.npr.org/2020/12/22/944434661/already-behind-diversifying-the-legal-profession-starts-before-the-lsat ("Collectively, with the average applicant applying to six schools, fees can add up to $1,000 or more. And this number does not even include paying for an LSAT prep course, which most applicants routinely rely on to up their scores. The average LSAT prep course costs between $600 and $1,800. Although expensive, they can significantly improve LSAT scores. For example, the Princeton Review's "LSAT 165+" essentially guarantees an improvement of at least seven points. It costs $1,700. Bottom line: Though courses like these are a critical piece of success, they are financially out of reach for many minority students. While some organizations offer free LSAT prep courses online, there is often a hitch. Khan Academy, for example, does not have live programming and does not guarantee an increase in the LSAT score.").

[184] *Frequently Asked Questions*, Am. Bar Ass'n, https://www.americanbar.org/groups/legal_education/resources/frequently_asked_questions (last accessed Aug. 2, 2023) (Student Employment: Standard 304(f), which restricted student employment to 20 hours per week, was eliminated in 2014. ABA-approved law schools may continue to retain a student employment rule even though it is no longer required by the Standards.); *see also BRIEF: Do Scholarships Improve Retention Among Top UB Undergraduates?* 3, SUNY Buffalo Office of Institutional Analysis, Oct. 17, 2006, https://www.buffalo.edu/content/dam/www/provost/files/oia/Survey%20Briefs/Freshmen/scholarships andretention.pdf ("An increment of $1,000 in scholarship dollars typically produces a 26% greater retention rate, while the same increase in other grant dollars yields only an 11% gain in retention. Changes in loan amounts did not influence second-year retention.").

[185] *Pros and Cons of Working During Law School*, JD Advising, https://jdadvising.com/pros-and-cons-of-working-during-law-school/ (last accessed Aug. 2, 2023).

[186] *See generally Biden* v. *Nebraska*, 600 U.S. __ (2023); *Dep't of Educ.* v. *Brown*, 600 U.S. __ (2023).

[187] Law schools are attempting to use need-based scholarships to address the differences between the country's demographics and those of the legal profession. A 2021 report from the American Bar Association noted that lawyers of color make up 14.6% of the legal profession. For example, at Yale Law School, the Hurst Horizon Scholarship covers tuition, fees, and health insurance for students whose

been invaluable assets for supporting underrepresented minority students and building racially and ethnically diverse student bodies. Financial aid and scholarships of this nature have been legally funded for decades through government programs, nonprofits organizations and private donors. The parameters for provision of such aid have narrowed over time to ensure that institutions can offer it without running afoul of federal antidiscrimination law.[188]

Law schools should consider directly engaging with legislatures to advocate for new or expanded financial aid funding. States might consider broadening financial eligibility standards for tuition and related educational cost assistance. This, coupled with restrictions on government funding for schools that consider legacy and/or donor status as admission factors, would benefit a broad base of economically disadvantaged law school applicants and students.[189]

Though industry and legal experts agree that future challenges to race-conscious financial aid are inevitable, there is also consensus that these challenges will take years to wind their way through the courts to conclusion and that the claims asserted to require departure from existing legal precedent. Nonetheless, institutions should proactively consider race-neutral alternatives and strategies, while remaining cautious not to over-correct prematurely in a manner that may be detrimental to the campus community, in terms of diversity and inclusion of students from differing backgrounds.[190]

---

family assets are less than $150,000 and whose family income is below the federal poverty guidelines. Beatrice Peterson, *Why Yale Law's Dean Says Eliminating Tuition for Students in Need Benefits the Legal Profession*, ABC News, July 29, 2022, https://abcnews.go.com/US/yale-laws-dean-eliminating-tuition-students-benefits-legal/story?id=86892182.

[188] Office of Civil Rights, *Nondiscrimination in Federally Assisted Programs*, U.S Dep't of Educ., https://www2.ed.gov/about/offices/list/ocr/docs/racefa.html (last accessed Aug. 2, 2023).

[189] *See, e.g.*, Lexi Lonas, *Attention Turns to Legacy Admissions After Affirmative Action Ruling*, The Hill, July 8, 2023, https://thehill.com/homenews/education/4084026-attention-turns-to-legacy-admissions-after-affirmative-action-ruling (Colorado is the only state in the U.S. to ban state universities from considering legacy status in the application process); Capital Tonight Staff – New York State, *Lawmakers Propose Bill to End 'Legacy' Admissions in N.Y.*, Spectrum News, July 7, 2023, https://spectrumlocalnews.com/nys/central-ny/capital-tonight/2023/07/07/lawmakers-propose-bill-to-end--legacy--admissions-in-n-y- ("legislation has been proposed by Sen. Andrew Gounardes and Assembly Member Latrice Walker that would end the practice of 'legacy admissions' in New York").

[190] EducationCounsel, *Preliminary Guidance*, *supra* note 147; Simon Marginson, *Unequal Opportunity* in *The Dream Is Over: The Crisis of Clark Kerr's California Idea of Higher Education* 152–67 (Univ. of California Press, 2016), http://www.jstor.org/stable/10.1525/j.ctt1kc6k1p.24 (accessed Aug. 1 2023). Even prior to *SFFA*, diversity scholarships have faced pressure to cease altogether or be re-structured. For example, the State University of New York ("SUNY") once operated the Underrepresented Graduate Fellowship Program, which distributed $6.2 million in financial aid to 500 students, and the Empire State Minority Honors Scholarship Program, which distributed $649,000 a year to 898 students. Prior to 2006, both programs—designed to recruit, enroll and retain students who were historically underrepresented at SUNY—were open only to Black, Hispanic and American Indian students. In January 2006, however, the SUNY Board of Trustees "voted unanimously to expand the eligibility criteria" by opening the programs to all races. Also, in states that banned affirmative action in admissions prior to SFFA, institutions of higher education saw a decline in scholarships that were deemed "race-conscious." Elson, *supra* note 182, at 981–89.

### 4.    Outreach, Enrollment and Student Success Barriers

Notwithstanding empirical literature noting how challenging it will be for race-neutral alternatives to foster diversity as effectively as race-conscious programs, particularly at highly selective institutions, recruiting practices that are both strategically targeted and inclusive have been, and continue to be, invaluable mechanisms for achieving and enhancing diverse campus communities nationwide.[191]

Law schools can mitigate the impact of academic, personal and financial challenges students face by increasing their outreach to, investment in and collaboration with prospective students and affiliative partners. For example, some states and institutions have implemented programs in which students may qualify for guaranteed admission and/or dual enrollment options based on academic criteria or participation in specialized programs.[192] Furthermore, broad-based support programs (e.g., the Equal Opportunity Programs in New York) can help address students' ancillary and complementary admissions needs, such as test preparation, financial assistance, academic and mentorship support, and related resources.[193] In designing and implementing these programs, institutions should ensure that additional requirements do not inadvertently disadvantage participating students compared to the rest of the student body.[194]

Institutions should also consider explicitly referencing eligible student groups that may otherwise be underrepresented in all marketing materials, programming and related eligibility descriptions to signal to prospective diverse candidates that their applications for admission are truly welcome. Such language may be framed to convey, for example, that, "students from underserved communities are eligible, including but not limited to low-income and first-generation students." Furthermore, institutions may use testimonials from diverse scholarship recipients, in addition to specialized program participants, to convey to potential applicants, and the broader community, the demographic scope of awardees, while also inherently conveying eligibility standards.

Though law schools must individually assess and tailor their recruitment and outreach strategies—e.g., marketing materials and tools, designated human and financial

---

[191] Aaron N. Taylor, *The Marginalization of Black Aspiring Lawyers*, 13 FIU L. REV. 489. For law school applicants, "AccessLex does provide an extensive directory of diversity pipeline programs, and the programs on its list do tremendous work." Manzi & Totenberg, *supra* note 183. However, for these programs to work and for prospective students to apply to them, individuals need to be made aware that they exist in the first place. *Id.*

[192] Potter, *supra* note 60.

[193] "The State University of New York's Arthur O. Eve Educational Opportunity Program provides access, academic support and financial aid to students who show promise for succeeding in college but who may not have otherwise been admitted. Available primarily to full-time, matriculated students, the program supports students throughout their college careers within the University." *See Arthur O. Eve Educational Opportunity Program (EOP)*, State Univ. of NY, https://www.suny.edu/attend/academics/eop/.

[194] These programs may impose a "tax" on students that require them to satisfy separate requirements than typically imposed on the rest of the student body. Most importantly, these programs, as effective as they may be, have not resulted in a significant increase in diversity in the legal profession. Deseriee A. Kennedy, *Access Law Schools & Diversifying the Profession*, 92 Temple L. Rev. 799, 808 (2020).

resources and targeted locations and events—to ensure inclusivity and equity, the race-neutral considerations and strategies discussed can mitigate risk.

### D.    Broad Educational Institution Strategy

Public and private higher education institutions and their respective communities are uniquely designed to attract, train and enrich the vibrant diversity that exists in society and to foster individual and communal growth for the betterment of society.[195] Recognizing the value of diversity in the legal profession, the ABA has advised law schools to implement diversity plans that require the collaboration of diverse persons and voices, including institutional leader engagement.[196]

Fostering inclusive learning environments, both inside and outside the classroom, will be especially important to attracting and retaining a broad range of students in light of the *SFFA* decision. As the number of racially and ethnically diverse students enrolled in institutions that previously used race-conscious admissions tools likely decreases, supporting matriculated students from underrepresented backgrounds will be crucial to meeting institutional diversity and equity goals. Creating a sense of belonging and support for historically underrepresented students is essential for their academic success, particularly in law schools.[197] In addition, these efforts are essential to cultivating a next generation in the profession that is attuned to the norms and values of institutional inclusiveness.

Even so, institutions have struggled to reflect the breadth of societal diversity in their campus communities adequately and consistently.[198] Though such challenges often result from the barriers previously referenced, institutions have also leaned too heavily on diversity officers, and their respective offices, to implement, sustain and enhance campus diversity with very little support.[199] This phenomenon extends beyond higher education into private, non-profit and government sectors and across industries, resulting in short-

---

[195] Michael R. Bloomberg, *Supreme Court Ruling Requires New Diversity Efforts*, Wash. Post, Jun. 29, 2023, 'https://www.washingtonpost.com/business/2023/06/29/supreme-court-affirmative-action-ruling-isn-t-end-of-diversity/a882b83a-168b-11ee-9de3-ba1fa29e9bec_story.html.

[196] *Diversity in Law: Who Cares?: Why Justice Roberts's Implications Were Wrong*, Am. Bar Ass'n, Apr. 30, 2016, https://www.americanbar.org/groups/litigation/committees/diversity-inclusion/articles/2016/spring2016-0416-diversity-in-law-who-cares/.

[197] LSSSE, *2020 Diversity and Exclusion*, LSSSE (2020), https://lssse.indiana.edu/wp-content/uploads/2020/09/Diversity-and-Exclusion-Final-9.29.20.pdf; Laura Bagby, *Law Schools Can Create More Inclusive Environments, New Study Finds*, 2Civility, Oct. 8, 2020, https://www.2civility.org/law-schools-can-create-more-inclusive-environments-new-study-finds.

[198] *How Diverse Are Student Populations on College Campuses in the U.S.?*, The Chronicle of Higher Education, May 10, 2023, https://www.chronicle.com/article/student-diversity; *see also Race, Ethnicity, and Gender of Full-Time Faculty Members at More Than 3,300 Institutions*, The Chronicle of Higher Education, May 31, 2023, https://www.chronicle.com/article/race-ethnicity-and-gender-of-full-time-faculty.

[199] Drew Goldstein, Manveer Grewal, Ruth Imose, and Monne Williams, *Unlocking the potential of chief diversity officers*, McKinsey & Company, Nov. 18, 2022, https://www.mckinsey.com/capabilities/people-and-organizational-performance/our-insights/unlocking-the-potential-of-chief-diversity-officers.

term—if any—success and very high turnover in Chief Diversity Officer related roles.[200] For institutions to effectuate inclusive learning environments, campus-wide and community-wide outreach, collaboration and specialized training must be at the foundation of any established diversity plan.[201] Therefore, diversity plan–related initiatives should include alumni, foundation representatives, donors, law firms, legal clients and government. Active engagement of key stakeholders facilitates consistent messaging about core values, including the elimination of bias, as well as guidance on implementing new policies and practices. This will lead to increased buy-in and trust throughout the community.

Institutions should consider specialized campus-wide training as part of their diversity initiatives to address critical changes in policy and practice from both operational and philosophical standpoints. These trainings should address cultural competence as well as identifying, eliminating and disrupting bias to ensure that students of all backgrounds experience a respectful climate in which they can thrive. Institutions should develop and promote—and possibly require—faculty trainings on inclusive teaching.[202] This might include training on democratizing discussion, anonymizing participation, guided reading questions and other tools.[203] In addition, key personnel and stakeholders in admissions, financial aid, enrollment, diversity equity and inclusion, institutional advancement and student success should be trained to ensure a holistic effort and response campus-wide. While developing and operationalizing training, campuses should also design assessment and audit procedures to ensure that the resources and support necessary for compliance are accessible, especially where race-neutral considerations are at issue.

Students from diverse backgrounds often lack diverse advisors and mentors, despite studies showing the positive effects of diverse faculty on students' graduation rates.[204] Therefore, institutions of higher learning should commit to purposeful, lawful strategies to improve representation of faculty from diverse backgrounds and culturally competent leadership.[205] In addition, educational opportunities and coursework grounded in racial

---

[200] *Id.*

[201] Dan Roe, *"The End of Affirmative Action Warrants More Collaboration Between Law Firms, Clients, and Schools, DEI Leaders Say,* The Am. Lawyer, June 30, 2023, https://www.law.com/americanlawyer/2023/06/30/the-end-of-affirmative-action-warrants-more-collaboration-between-law-firms-clients-and-schools-dei-leaders-say/.

[202] UC Davis School of Law, *Exploring Diversity in Legal Education*, Mar. 29, 2023, https://law.ucdavis.edu/deans-blog/exploring-diversity-legal-education; CJ Libassi, *The Neglected College Race Gap: Racial Disparities Among College Completers*, Ctr. For Am. Progress, May 23, 2018, https://www.americanprogress.org/article/neglected-college-race-gap-racial-disparities-among-college-completers ("[I]nclusive teaching, which seeks to level the playing field, equalizing the opportunity for students from all backgrounds to participate and succeed. Inclusive teaching has two main components: putting more structure into a course, giving clear instructions so that all students know what to do before, during, and after class; and thoughtfully facilitating class discussion, so that everyone can participate.").

[203] *See, e.g.*, Beckie Supiano, *Traditional Teaching May Deepen Inequality. Can a Different Approach Fix It?*, The Chronicle of Higher Educ., May 6, 2018, https://www.chronicle.com/article/traditional-teaching-may-deepen-inequality-can-a-different-approach-fix-it.

[204] *Characteristics of Postsecondary Faculty: The Condition of Education* 3, Nat'l Ctr. for Educ. Stats., https://nces.ed.gov/programs/coe/pdf/2022/csc_508.pdf (last updated May 2022).

[205] *See generally* Rebecca Stout et al., *The Relationship Between Faculty Diversity and Graduation Rates in Higher Education*, 29 Intercultural Educ. 399 (2018) (Studies of the relationship between faculty

justice have been at the forefront of social dialogue in recent years.[206] In 2020, 150 deans of schools petitioned the ABA's Section of Legal Education and Admissions to the Bar to consider requiring all accredited law schools to offer anti-racism training and education.[207] The Student Affairs Administrators in Higher Education (NASPA), in collaboration with the National Association of Diversity Officers in Higher Education (NADOHE), published a report on the various campuses that have undertaken, beyond public statements, to enact institutional changes, including but not limited to listening sessions, workgroups, trainings, professional development opportunities, and funding new initiatives based on community feedback.[208] Moreover, strategic efforts to facilitate ongoing professional development must also be interwoven methodically throughout campus community efforts and not left to chance.[209]

It also is important to recognize the emotional impact that public dialogue around diversity, the *SFFA* decision and race generally may have on campus stakeholders. Institutions must provide support to ensure the mental health and well-being of not only students, but also campus faculty and staff across the learning community, as they navigate

---

racial/ethnic diversity and graduation rates of undergraduate students from underrepresented racial and ethnic minority populations have found that U.S. faculty diversity is lower than in the U.S. national population, and that overall graduation rates for underrepresented minority students of all races/ethnicities are positively affected by increased diversity of their faculty.). For the benefits of diverse faculty more generally, *see* Jeffrey F. Milem, "The Educational Benefits of Diversity: Evidence From Multiple Sectors," in Compelling Interest: Examining the Evidence on Racial Dynamics in Colleges and Universities, ed. Chang, Mitchell J. et al. (The Rev. of Higher Educ., 2004).

[206] Keeshea Turner Roberts, *Law Schools Push to Require Anti-Racism Training and Courses*, Am. Bar Ass'n, Dec. 13, 2020, https://www.americanbar.org/groups/crsj/publications/human_rights_magazine_home/rbgs-impact-on-civil-rights/law-schools-push/.

[207] Alicia Ouellette et al., *Letter to the Members of the American Bar Association, Section of Legal Education and Admissions to the Bar*, Aug. 20, 2020, https://taxprof.typepad.com/files/aba-bias-cultural-awareness-and-anti-racist-practices-education-and-training-letter-7.30.20-final.pdf; https://nadohe.memberclicks.net/assets/2021/Framework/National%20Association%20of%20Diversity%20Officers%20in%20Higher%20Education%20-%20Framework%20for%20Advancing%20Ant-Racism%20on%20Campus%20-%20first%20edition.pdf.

[208] NASPA, *NASPA and NADOHE Releases Research Report on Racial Justice Statements from 2020*, https://www.naspa.org/press/naspa-and-nadohe-releases-research-report-on-racial-justice-statements-from-2020; *see also* Alexa Wesley Chamberlain, Jill Dunlap, Paulette Granberry Russell, *Moving from Words to Action: The Influence of Racial Justice Statements on Campus Equity Efforts*, NASPA, July 26, 2021, http://apps.naspa.org/pubs/Moving_From_Words_to_Action_FINAL.pdf. The Law Deans Antiracist Clearinghouse Project tracks progress and provides resources for law schools committed to racial equality and the eradication of racism in the United States. https://www.aals.org/antiracist-clearinghouse.

[209] CJ Libassi, *The Neglected College Race Gap: Racial Disparities Among College Completers*, Ctr. For Am. Progress, May 23, 2018, https://www.americanprogress.org/article/neglected-college-race-gap-racial-disparities-among-college-completers/. "The law school can attract the brightest stars from racialized communities by offering a diverse and welcoming environment, a sampling of prospective courses with attractive titles, and a system of professional counseling and supported access to the competitive job market. However, while the law school is the forum in which students are typically first introduced to law firms, it is the firms and members of the profession, not the school, that determine the students' access to professional training, entry to professional culture, and opportunities for employment. The schools deliver graduates to the profession but have no authority over student job placement or firm hiring decisions." Faisal Bhabha, *Towards a Pedagogy of Diversity in Legal Education*, 52 Osgoode Hall L. J. 59, 90 (2014).

a shifting and contested landscape regarding racial diversity in legal education.[210] For decades, research has shown that campus faculty and staff are instrumental contributors to the academic, professional and personal outcomes of students, including student mental health and wellbeing.[211] Wellness, and social, cultural and academic programming should be purposefully designed to show all students, especially underrepresented and first-generation students, that they are valued, that they belong and that they have a place in the legal profession.[212]

---

[210] Julian Roberts-Grmela, *Students Say Mental-Health Breaks From Class Help Them Succeed. Here's How Colleges Are Responding*, The Chronicle of Higher Educ., Feb. 2, 2023, https://www.chronicle.com/article/students-say-mental-health-breaks-from-class-help-them-succeed-heres-how-colleges-are-responding ("Seventy-two percent of student-affairs officials reported that mental-health concerns on campus worsened over the last year, according to a recent survey by Naspa: Student Affairs Administrators in Higher Education. A new Center for Collegiate Mental Health report found that levels of trauma and social anxiety have increased among students over the last decade, and that academic distress has increased compared to pre-pandemic.").

[211] Mary Christie Foundation, *The Role of Faculty in Student Mental Health*, https://marychristieinstitute.org/wp-content/uploads/2021/04/The-Role-of-Faculty-in-Student-Mental-Health.pdf.

[212] Adrienne Lu, *This Simple 30-Minute Belonging Exercise Could Boost Student Retention*, The Chronicle of Higher Education, May 4, 2023, https://www.chronicle.com/article/this-simple-30-minute-belonging-exercise-could-boost-student-retention, citing Gregory M. Walton et al., *Where and with whom does a brief social-belonging intervention promote progress in college?* 380 Science 499–505, May 4, 2023. https://www.science.org/doi/10.1126/science.ade4420 (randomized controlled experiment with 26,911 students at 22 diverse institutions showing that a "social-belonging" intervention, administered online before college (in under 30 minutes), increased the rate at which students completed the first year as full-time students, especially among students in groups that had historically progressed at lower rates. The college context also mattered: The intervention was effective only when students' groups were afforded opportunities to belong).

## IV.    IMPLICATIONS OF THE *SFFA* DECISION FOR PRIVATE EMPLOYERS: CORPORATIONS AND LAW FIRMS

While the *SFFA* decision does not directly apply to private employers like corporations and law firms, the Court's ruling may still create heightened risks for organizations seeking to advance their DEI goals. These concerns have already begun to play out with several firms having been sued in relation to fellowship programs that they offered. In anticipation of these challenges, the Business and Law Firm Working Groups of the Task Force set forth below guidelines and recommendations to help organizations identify and mitigate potential legal and reputational risks and bolster their current DEI initiatives.

This section proceeds in two parts. *First*, it discusses the legal framework and current landscape of federal anti-discrimination laws applicable to private employers, including Titles VI and Title VII of the Civil Rights Act, and Section 1981.[213] It also discusses the need to balance the real and anticipated backlash against DEI efforts against the risks associated with private employers reducing or abandoning publicly disclosed DEI initiatives. *Second*, this section provides practical steps that organizations can consider taking to effectively communicate and document their DEI efforts, and to mitigate certain potential legal risks. It also provides examples of current strategies that may help organizations as they pursue workforce DEI goals focused on the recruitment, retention and advancement of underrepresented groups.

### A.    Legal Framework and Current Landscape

Corporate DEI initiatives continue to be lawful following the *SFFA* decision so long as they do not run afoul of federal anti-discrimination statutes such as Title VI and Title VII of the Civil Rights Act and 42 U.S.C. § 1981. However, even prior to the *SFFA* decision, DEI programs have received scrutiny in the form of (1) shareholder challenges; (2) reverse discrimination litigation; and (3) government enforcement actions. These challenges—and new ones such as antitrust considerations—will likely continue to surface following the *SFFA* decision. However, these risks should be balanced against the significant risks associated with retreating from publicly committed DEI efforts. Companies that abandon their public commitments may be subject to (1) Securities and Exchange Commission (SEC) investigations and shareholder derivative suits; (2) disparate treatment and disparate impact actions; and (3) additional negative impacts like loss of top talent or reduced financial performance.

Title VI of the Civil Rights Act prohibits "intentional discrimination based on race in any program that receives federal funding,"[214] including a "pattern or practice" of treating one race less favorably than others.[215] A private organization is not subject to Title VI liability unless one of the following thresholds is satisfied: (1) the organization "as a whole" receives federal funds, in which case all operations of the organization are subject to Title VI; (2) the organization is "principally engaged in the business of providing

---

[213] 42 U.S.C. § 1981.
[214] *Bridges* v. *Scranton Sch. Dist.,* 644 F. App'x 172 (3d Cir. 2016).
[215] *Blunt* v. *Lower Merion Sch. Dist.,* 767 F.3d 247, 299–300 (3d Cir. 2014).

education, health care, housing, social services, or parks and recreation," in which case all operations of the organization are subject to Title VI; or (3) the organization receives federal funds designated for a specific activity, in which case the organization may be sued under Title VI for engaging in discrimination with respect to that specific program.[216] In order to bring a successful challenge under Title VI, a plaintiff (either a natural person or a corporation) must show that the organization's program receives federal funds and that the plaintiff has been either (1) excluded from participation in such program; (2) denied the benefits of such program; or (3) subjected to discrimination under such program.[217]

Although the Supreme Court in the *SFFA* decision did not explicitly analyze the race-conscious admissions systems at Harvard and UNC under Title VI, the majority stated, in a footnote, that "discrimination that violates the Equal Protection Clause of the Fourteenth Amendment committed by an institution that accepts federal funds also constitutes a violation of Title VI."[218] Justice Thomas's and Justice Gorsuch's concurrences also reference the applicability of the majority opinion to Title VI, with Justice Thomas writing that the language of Title VI "makes no allowance for racial considerations" and "reinforces the colorblind view of the Fourteenth Amendment."[219] Thus, opponents of diversity programs may rely on the reasoning of the *SFFA* decision to bring future legal challenges under Title VI seeking to argue that those programs involving federal funding confer or deny benefits on the basis of race.

Meanwhile, Title VII of the Civil Rights Act of 1964 prohibits employment discrimination based on race, color, religion, sex (including pregnancy) and national origin.[220] Under Title VII, for example, it is unlawful for an employer to make hiring, compensation, promotion and termination decisions on the basis of race or ethnicity. However, historically, employers may make race-conscious employment decisions in specific circumstances pursuant to appropriately tailored voluntary affirmative action plans. Employers may also institute DEI initiatives to increase opportunity outside of a valid affirmative action plan.

Title VII guidelines explicitly state that employers "should take voluntary action to correct the effects of past discrimination and to prevent present and future discrimination."[221] Affirmative action allows employers to make race-conscious employment decisions in order to remedy the effects of such discrimination. By contrast, DEI programs generally do not involve deciding who to hire, promote, or fire based on race and can be used by employers to increase opportunity outside of an affirmative action plan context.

Prior to the *SFFA* decision, the Supreme Court set out the framework for "evaluating the compliance of an affirmative action plan with the Title VII prohibition on

---

[216] 42 U.S.C. § 2000d-4a(3)(A).

[217] 42 U.S.C. § 2000d.

[218] *SFFA*, 143 S. Ct. at 2157, n.2 (citing *Gratz* v. *Bollinger*, 539 U. S. 244, 276, n. 23 (2003)).

[219] *Id.* at 2188, n.4 (Thomas, J. dissenting).

[220] 7 C.F.R. § 1901.203.

[221] 29 C.F.R. § 1608.1(c) (1979).

discrimination" in two cases: *United Steelworkers of Am.* v. *Weber*[222] and *Johnson* v. *Transp. Agency, Santa Clara Cnty.*[223] These decisions have not been overruled, and presumably remain good law for now. *Weber* noted that "Congress chose not to forbid all voluntary race-conscious affirmative action" under Title VII due to its overarching objective of "break[ing] down old patterns of racial segregation and hierarchy."[224]

Although not the subject of focus in recent years, an employer can implement a voluntary affirmative action plan in compliance with Title VII in at least three circumstances. *First*, the employer can do so to remedy prior discrimination or "correct the effects" of such practices.[225] As the Supreme Court observed, "it would be ironic indeed if a law triggered by a Nation's concern over centuries of racial injustice" could not remedy prior discrimination under that law.[226] *Second*, it is permissible to use affirmative action to eliminate manifest imbalance in traditionally segregated job categories.[227] *Third*, affirmative action may be used to eliminate manifest imbalances in the workforce.[228] To achieve these goals, these plans can incorporate both race-conscious employment decisions and DEI measures, such as recruitment programs.

If an employer's voluntary affirmative action plan has been effectuated to realize one of these three goals, courts then look to a variety of factors to determine its validity. First, an affirmative action plan "must contain specific goals and objectives, numerical or otherwise."[229] In addition, "[n]umerous factors [must] be taken into account in making hiring decisions, including the actual qualifications of [minority] applicants for particular jobs."[230] Affirmative action plans also should not "unnecessarily trammel the interests" of non-minorities, which in *Weber* meant that the employer could not discharge workers for the purpose of replacing them with those recruited through affirmative action.[231] Indeed, employers must design affirmative action plans that require diverse applicants to compete "with all other qualified applicants."[232] In addition, an affirmative action plan should avoid creating an absolute bar to the advancement of those falling outside of its goals.[233] Finally,

---

[222] *United Steelworkers of Am.* v. *Weber*, 443 U.S. 193, 194 (1979).

[223] *Johnson* v. *Transp. Agency, Santa Clara Cnty.*, 480 U.S. 616, 640 (1987).

[224] *Weber*, 443 U.S. at 206, 208.

[225] 29 C.F.R. § 1608.3(b) (1979); *see also Weber*, 443 U.S. at 204.

[226] *Weber*, 443 U.S. at 204.

[227] *Id.* at 201 ("[T]o eliminate traditional patterns of racial segregation"); *Johnson*, 480 U.S. at 620–21 ("[I]n making promotions to positions within a traditionally segregated job classification . . . the [employer] is authorized to consider as one factor the sex of the applicant").

[228] *Weber*, 443 U.S. at 208; *Johnson*, 480 U.S. at 631–32; *see also Shea* v. *Kerry*, 796 F.3d 42, 57 (D.C. Cir. 2015) (a manifest imbalance can be shown through "statistical disparities between the racial makeup of the employer's workforce and that of a comparator population").

[229] EEOC, *CM-607 Affirmative Action*, https://www.eeoc.gov/laws/guidance/cm-607-affirmative-action.

[230] *Johnson*, 480 U.S. at 637.

[231] *Weber*, 443 U.S. at 208.

[232] *Johnson*, 480 U.S. at 638.

[233] *Weber*, 443 U.S. at 208; *see also Johnson*, 480 U.S. at 637–38 (noting that the plan does not set aside a number of positions for women only); *Shea*, 796 F.3d at 62 (describing how non-minority applicants can still gain promotion from entry-level positions even if not included in the affirmative action program).

the plan should be a temporary measure and race-conscious decision-making should last only until the employer is close to reaching its goal.[234]

An affirmative action plan is invalid if: (1) it relies on quotas to achieve its goals or (2) it is used to maintain, rather than attain, a balanced workforce. An affirmative action plan must contain specific goals and objectives, numerical or otherwise."[235] For example, a "plan might include increasing the number of women in the employers workforce from . . . 10% . . . to 20% next year, 30% the following year, and so on" in order to address past discrimination.[236] However, if a plan is only in place to maintain balance after goals have been achieved, it is no longer valid.[237] The plan cannot require employers to hire employees based on rigid numerical quotas, regardless of whether the prospective employees are qualified, because "numerous factors [must] be taken into account in making hiring decisions, including the actual qualifications of applicants for particular jobs."[238]

The Supreme Court held in *Ricci* v. *DeStefano* that employers cannot change the practices that they use to make employment decisions—in this case, changing their promotion practices—based on race unless they can show that they had a strong basis in evidence to believe that their existing practices violated Title VII because of the practices' disparate impact.[239] In *Ricci*, the employer used an exam to determine promotions.[240] An analysis of exam results revealed that white applicants performed better than minority applicants. Fearing a disparate impact suit under Title VII, the employer decided to abandon the use of the exam results in promotions altogether.[241] In this case, such decision violated Title VII as the Supreme Court ruled that the employer, with limited exceptions, may not implement a race-based solution to address a disparate impact issue unless it could "demonstrate a strong basis in evidence that, had it not taken the action, it would have been liable" for discrimination under a disparate impact theory.[242] An employer could show this by demonstrating that the challenged practice was not "job related" and "consistent with business necessity" or that it had failed to adopt an "equally valid, less-discriminatory alternative."[243] The employer must objectively believe that "the beneficiaries of the [affirmative] action were victims of disparate impact and the action puts them roughly where they would have been in the absence of discrimination."[244]

---

[234] *Weber*, 443 U.S. at 208–09 (describing how the affirmative action plan was only in place until the number of Black employees was close to the percentage of those in the local labor force); *Shea*, 796 F.3d at 61 (stating that the plan "sought to attain more proportional representation" and ended after the goal was reached); *see also United States* v. *City of Cincinnati*, No. 1:80-cv-369, 2021 WL 4193211, at *1, *6 (S.D. Ohio Sept. 15, 2021) (invalidating an affirmative action plan that successfully remedied past discrimination and thus no longer had a valid purpose).

[235] EEOC, *CM-607 Affirmative Action*, https://www.eeoc.gov/laws/guidance/cm-607-affirmative-action.

[236] *Id.*

[237] *Cincinnati*, 2021 WL 4193211, at *6; *see also Johnson*, 480 U.S. at 640 (stating that an employer cannot seek to "use its plan to maintain a permanent racial and sexual balance").

[238] *Johnson*, 480 U.S. at 637.

[239] *See Ricci* v. *DeStefano*, 557 U.S. 557, 563 (2009).

[240] *Id.* at 561–62.

[241] *Id.* at 562–63; *see also* 42 U.S.C. § 2000e-2(k)(1)(A).

[242] *Id.* at 563.

[243] *Id.* at 587 (citing 42 U.S.C. § 2000e-2(k)(1)(A)).

[244] *United States* v. *Brennan*, 650 F.3d 65, 114 (2d Cir. 2011).

Today, many companies and organizations have developed DEI programs outside of the voluntary affirmative action framework to aid in achieving their diversity goals. These efforts include, among others, pipeline programs, affinity or employee resource groups (ERGs), trainings, fellowships and scholarships, and mentorship and sponsorship programs. DEI efforts, which are targeted at increasing the number of diverse applicants and retaining diverse employees, but do not involve the consideration of race in hiring, promotion, and other employment decisions, have also traditionally been considered lawful under Title VII. For example, the EEOC has highlighted increased recruiting efforts at HCBUs as an example of a permissible method of increasing workplace diversity.[245] Similarly, corporations and other organizations have developed practices, such as the National Football League's Rooney Rule,[246] requiring teams to interview candidates from racial or ethnic minorities for coaching and front-office positions. These efforts have been upheld under Title VII because they do not involve making hiring or promotion decisions *on the basis of* race or another legally protected characteristic.[247] Rooney Rule–like initiatives aim to counteract the effect of systemic challenges and barriers that make it more difficult for underrepresented populations to reach the first round of interviews.[248] These efforts ensure that *before* a hiring decision is made, an employer is considering a diverse and inclusive pool of candidates for the position.

Enacted shortly after the Civil War, Section 1981 of the Civil Rights Act of 1866 prohibits racial discrimination in the making and enforcement of contracts,[249] and requires plaintiffs to prove that their race was the "but for" cause of the denial of their rights.[250] It differs from Title VII in two important ways. *First*, Section 1981 applies only to intentional discrimination on the basis of race and citizenship, whereas Title VII applies to both intentional discrimination and disparate impact discrimination on the basis of race, color, national origin, sex or religion. *Second*, Section 1981 allows for uncapped damages and applies to employers of any size.[251]

To establish a prima facie Section 1981 claim, a plaintiff must demonstrate: (1) their membership in a protected class; (2) the defendant's intent to discriminate on the basis

---

[245] U.S. Equal Employment Opportunity Commission, *2022 Annual Performance Report ("APR")* (March 2023), https://www.eeoc.gov/2022-annual-performance-report-apr.

[246] Jason Reid, *NFL's Rooney Rule Should Be Strengthened*, Wash. Post, Feb. 19, 2011, https://www.washingtonpost.com/wp-dyn/content/article/2011/02/19/AR2011021903268.html.

[247] *See, e.g., Mlynczak* v. *Bodman*, 442 F.3d 1050 (7th Cir. 2006) (finding a plan designed to promote workplace diversity through efforts to expand the pool of candidates for hiring or promotion, and expressly prohibiting decisionmakers from basing hiring or promotion decisions on race, ethnicity or gender, was lawful under Title VII).

[248] *See, e.g.,* John Simons, *For Black Applicants, the Hiring Market Hasn't Changed Much in 25 Years*, Wall Street J., Oct. 3, 2017, https://www.wsj.com/articles/for-blacks-the-hiring-market-hasnt-changed-much-in-25-years-1507039200 (finding that "white applicants receive more invitations of first-round interviews than similarly qualified African-Americans").

[249] Cornell Law School, *Section 1981*, Legal Information Institute, https://www.law.cornell.edu/wex/section_1981#:~:text=Section%201981%20is%20a%20shorthand,by%20nongovernment%20and%20state%20discrimination.

[250] *Comcast Corp.* v. *Nat'l Ass'n of African-American Owned Media*, 589 U.S. ___ at *13 (2020).

[251] Cornell Law School, *Section 1981*, Legal Information Institute, https://www.law.cornell.edu/wex/section_1981#:~:text=Section%201981%20is%20a%20shorthand,by%20nongovernment%20and%20state%20discrimination.

of race or citizenship; and (3) discrimination interfering with a protected activity (*i.e.*, the making and enforcement of contracts).[252] Specifically, to show discriminatory intent, a plaintiff must demonstrate that the "decisionmaker . . . selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects on an identifiable group."[253] Importantly, the burden is on the plaintiff to show that race or citizenship was a "but-for" cause of his or her injury.[254] Unlike Title VII, it is not enough for a plaintiff to show that race or citizenship was a "motivating factor" in the challenged decision.[255]

In *McDonald* v. *Santa Fe Trail Transp. Co.*, 427 U.S. 273 (1976), the Supreme Court held that persons of any race may bring discrimination claims under Section 1981. Since then, numerous plaintiffs have used Section 1981 to bring reverse discrimination claims challenging corporate DEI initiatives aimed at, for example, increasing supplier diversity.

In the *SFFA* decision, the Supreme Court did not address diversity-focused contracting or funding under Section 1981. However, given that courts look to the Equal Protection Clause case law for guidance in analyzing claims under Section 1981, future challengers may ask courts to apply the Supreme Court's reasoning in the context of corporate commitments to contract with diverse suppliers or outside contractors or in other contexts involving race-conscious initiatives that are governed by contracts.

Legal challenges to DEI initiatives are not new. Even before the *SFFA* decision, a wave of reverse discrimination litigation and legislation seeking to limit or prohibit DEI programs had already begun. In response to the overwhelming support for racial justice initiatives following the murder of George Floyd and the Stop Asian Hate movement, we have seen an increase in voluntary DEI-related disclosures and the implementation of DEI initiatives. Progressive activist shareholder groups and public campaigns have advocated for an increased focus on environmental, social and governance (ESG) and human capital management disclosures by public companies, which has, in turn, resulted in increased attention by government enforcement agencies, including the SEC, Federal Trade Commission, Equal Employment Opportunity Commission (EEOC) and Office of Federal Contract Compliance Programs (OFCCP). As pressure to move the needle forward on DEI goals and public disclosures concerning DEI efforts has increased, so too have efforts challenging such initiatives.

Companies today are facing backlash on numerous fronts, including, as discussed further below: (1) shareholder proposals and demands to retract DEI policies and programs; (2) threats of reverse discrimination lawsuits; (3) government investigations and enforcement actions; and (4) potential antitrust risks.

Activist shareholders have challenged companies' DEI initiatives through a combination of proposals, including requests for audits of corporate DEI practices and

---

[252] *Daniels* v. *Dillard's, Inc.*, 373 F.3d 885 (8th Cir. 2004).

[253] *Equal Emp't Opportunity Comm'n* v. *Joe's Stone Crab, Inc.*, 220 F.3d 1263 (11th Cir. 2000).

[254] *Comcast Corp.* v. *National Association of African-American Owned Media*, 589 U.S. ___ (2020).

[255] *Id.*

retraction demands requesting companies eliminate certain DEI policies or programs. The initial wave of racial equity audit requests were made by shareholders looking to increase the transparency of companies' DEI efforts. These requests called for companies to evaluate the impact of their DEI initiatives and programs in order to ensure that they had their intended impact and that employees and communities of color were indeed benefiting from such efforts.[256]

In 2022, there was a major increase in (anti) DEI-focused proposals,[257] and these efforts have continued into 2023. As of June 1, 2023, one activist shareholder who opposes DEI had filed at least 42 proposals,[258] and another group had filed at least 18 proposals.[259] Various other activists and entities have similarly filed proposals advocating against DEI and ESG efforts, including by arguing that companies have a fiduciary duty to focus only on financial returns, not what they claim to be the amorphous benefits of DEI.[260]

To date, such proposals have rarely been successful at requiring companies to undertake audits. For example, a proposal to Apple this year lost with 98.5 percent of shareholders voting against it.[261] Other proposals similarly garnered minimal support.[262] Nevertheless, the proposals put pressure on company boards to re-examine their DEI initiatives and have the potential to chill further efforts to advance diversity.

---

[256] *See* Ron S. Berenblat and Elizabeth R. Gonzalez-Sussman, Olshan Frome Wolosky LLP, *Racial Equity Audits: A New ESG Initiative*, Harvard Law School Forum of Corporate Governance, Oct. 30, 2021, https://corpgov.law.harvard.edu/2021/10/30/racial-equity-audits-a-new-esg-initiative/.

[257] The companies putting the NCPPR's proposals to shareholder vote include: Walmart, Lowe's, Meta, Twitter, AT&T, Johnson & Johnson, Bank of America, and Levi Strauss & Co. *See* Michael Delikat, J.T. Ho, and Hong Tran, *DEI Initiatives under Attack by Activist*, Harvard Law School Forum on Corporate Governance, Oct. 7, 2022, https://corpgov.law.harvard.edu/2022/10/07/dei-initiatives-under-attack-by-activists/. In line with its other proposals, the NCPPR recently filed proposals with Apple and Caterpillar Inc. seeking to impose audits analyzing the impacts of DEI policies on civil rights and non-discrimination on the companies' business. *See* Caterpillar Inc., 2023 Proxy Statement 84 (2023); Apple Inc., Notice of 2023 Annual Meeting of Shareholders and Proxy Statement 79 (2023). More generally, ESG shareholder proposals have been increasing for the last several years. *See* Robert Stilson, *To Understand ESG Activism, Look to Shareholder Resolutions*, RealClear Markets, July 26, 2023, https://www.realclearmarkets.com/articles/2023/07/26/to_understand_esg_activism_look_to_shareholder_resolutions_968451.html ("[T]he number of ESG shareholder proposals filed at Russell 3000 companies has been increasing for four straight years, up from 754 in the 2020 proxy season to at least 951 in the 2023 season.").

[258] *See* Heidi Welsh, *Anti-ESG Shareholder Proposals in 2023*, Harvard Law School Forum on Corporate Governance, June 1, 2023, https://corpgov.law.harvard.edu/2023/06/01/anti-esg-shareholder-proposals-in-2023/.

[259] *See id.*

[260] *See id.*

[261] *See* Stephen Nellis, *Apple Shareholders Reject Proposals from Conservative Groups*, Reuters, March 10, 2023, https://www.reuters.com/technology/apple-shareholders-reject-proposals-conservative-groups-2023-03-10/.

[262] Other companies that received the NCPPR's proposals included The Walt Disney Company, CVS, Citigroup, and Comcast. *See* Michael Delikat, J.T. Ho, and Hong Tran, *supra* note 257. In each case, the shareholder votes were less than 5% in favor of the NCPPR's proposal. *See id.*

Activist shareholders have also sent retraction demand letters to companies on behalf of shareholders demanding that they eliminate various DEI-related policies, arguing that the companies' disclosed DEI policies violate Title VII, Section 1981, state or local antidiscrimination laws. Such demands often threaten litigation if companies fail to comply. One organization has sent at least 10 such letters since 2021.[263] That organization followed through with its threat of litigation against Starbucks after Starbucks rejected the demand stating that it "determined that it is not in the best interest of Starbucks to accept the Demand and retract the Policies." However, the court dismissed the organization's complaint as frivolous, noting that the complaint did not represent the interests of Starbucks' shareholders and that it raised policy questions for lawmakers and corporations, not courts, to decide.[264]

While "reverse discrimination" claims under Title VII, Section 1981, and state and other antidiscrimination laws are not new, the *SFFA* decision may embolden such claims and threats of litigation by activist shareholders and employees. The mere existence of DEI initiatives—however structured—does not in and of itself give rise to liability,[265] but some recent litigants have been successful at demonstrating a direct nexus between DEI policies or initiatives and the employment decision made against them. For example, in *Duvall* v. *Novant Health Inc.*, which was decided before the *SFFA* decision, a jury found in favor of a white male plaintiff who alleged that he was fired without cause from his management position because of his race and sex.[266] To support his claim, the plaintiff pointed to evidence that the employer maintained a "goal of remaking the workforce to look like the community it served," and "to promote diversity during the D&I Program implementation," including at the management level. The plaintiff argued that his firing fit a pattern of similar actions by Novant, which eliminated all seven other white male managers who reported to the plaintiff's supervisor within one year.[267] The plaintiff won following a jury trial. More litigation is pending. American Express Co. faces a class action suit brought last year on behalf of a group of employees who claim that the company's implementation of certain DEI initiatives violates Title VII;[268] McDonald's Corporation is defending itself against an EEOC charge of discrimination challenging the company's

---

[263] These companies include American Airlines, Levi Strauss & Co., Pfizer, Inc., Dropbox, JP Morgan Chase & Co., Starbucks Co., McDonald's Co., Novartis, Lowe's (twice), and Coca Cola. *See* Michael Delikat, J.T. Ho, and Hong Tran, *supra* note 257.

[264] Jody Godoy, *Conservative Starbucks Investor Loses Diversity Challenge*, Reuters, Aug. 11, 2023, https://www.investing.com/news/stock-market-news/starbucks-board-wins-dismissal-of-shareholder-lawsuit-over-diversity-policies-3152804.

[265] *See, e.g.*, *Jones* v. *Bernanke*, 493 F. Supp. 2d 18, 29 (D.D.C. 2007) ("[T]he mere existence of a diversity policy, without more, is insufficient to make out a [] case of reverse discrimination").

[266] *Duvall* v. *Novant Health Inc.*, No. 3:19-CV-00624-DSC, 2022 WL 3331263, at *5 (W.D.N.C. Aug. 11, 2022), *amended on reconsideration in part*, No. 3:19-CV-00624-DSC, 2022 WL 11271199 (W.D.N.C. Oct. 19, 2022).

[267] *Former Novant Health Executive Wins $10 Million in Discrimination Case,* Assoc. Press, Oct. 27, 2021, https://www.wsoctv.com/news/local/former-novant-health-executive-wins-10m-discrimination-case/JPCOKEDK4BBYHHNBU6GNUPWZ2E.

[268] *Netzel* v. *American Express Company et al.*, No. 2:22-cv-01423 (D. Az.). A motion to compel arbitration is currently pending before the court.

"Global Diversity, Equity and Inclusion Strategy;"[269] and Amazon is defending a class action lawsuit challenging several of its DEI initiatives.[270] Most recently, two law firms, Perkins Coie and Morrison & Foerster, face lawsuits filed in federal courts in Texas and Florida, respectively, challenging the consideration of race when selecting law students for fellowship programs.[271] The lawsuits allege that the fellowship programs discriminate against white law students because the programs only permit applicants who are of color, who identify as LGBTQ+ or who have disabilities.[272] Although only two firms are included in the lawsuits, diversity fellowship programs are commonplace among large law firms.[273] Notably, these lawsuits were filed by an organization financed by Edward Blum—the conservative advocate who initiated the *SFFA* case.[274] Another Blum-financed organization also recently launched a lawsuit in Georgia targeting a venture capitalist firm, Fearless Fund, alleging that the fund operates program which discriminates against non-Black individuals.[275]

Moreover, the types of employment decisions and workplace policies covered by Title VII appear to be expanding. Although Title VII has long been interpreted to apply only to "ultimate employment decisions" such as hiring, firing, promotion and pay, the law appears to be moving in the other direction. The *en banc* Fifth Circuit ruled in August of 2023 that other changes to the "terms, conditions, or privileges of employment," such as "[t]he days and hours that one works," may constitute prohibited discrimination that is actionable under Title VII.[276] And the Supreme Court in June 2023 granted certiorari on this very issue in another case, to be decided next term.[277] The expansion of the meaning of actionable employment actions or practices is a two-edge sword in terms of how it impacts DEI. On the one hand employees may be able to bring claims for lower-level adverse actions that previously would not have been actionable under the "ultimate employment decisions" standard. On the other hand, DEI programs may be at greater risk of legal challenge even though the individual challenging the program may not be able to show actual damages.

---

[269] *America First Legal Files Federal Civil Rights Complaint Against McDonald's for Unlawful and Racist Hiring Practices*, Am. First Legal, Apr. 5, 2023, https://aflegal.org/america-first-legal-files-federal-civil-rights-complaint-against-mcdonalds-for-unlawful-and-racist-hiring-practices.

[270] *See Crystal Bolduc* v. *Amazon.com Inc.*, No. 4:22-cv-615-ALM (E.D. Tex. July 20, 2022); *see also Nat'l Ctr. for Pub. Policy Rsch.* v. *Howard Schultz*, No. 2:22-CV-00267-SAB (E.D. Wash., May 19, 2023).

[271] *See* Douglas Belkin, *Activist Behind Supreme Court Affirmative-Action Cases Is Now Suing Law Firms*, Wall Street J., Aug. 22, 2023, https://www.wsj.com/us-news/edward-blum-lawsuits-affirmativeaction-law-firms-b8871ab1.

[272] *See id.*

[273] *See id.*

[274] *See id.* Blum made clear that it is his desire for his organization, the American Alliance for Equal Rights, to continue such advocacy efforts in the courts moving forward. *See id.* ("Blum said he hopes his organization will generate at least two more Supreme Court cases over the next five years that will shore up the legal limits of how race and ethnicity is used in employment, contracting and internships.").

[275] *See* Kiara Alfonseca, *Group Behind Affirmative Action Case Sues Black Venture Fund For Alleged Racial Bias*, ABC News, Aug. 10, 2023, https://abcnews.go.com/Business/group-affirmative-action-case-sues-black-venture-fund/story?id=102165527.

[276] *Hamilton* v. *Dallas County*, No. 21-10133 (5th Cir. Aug. 18, 2023) (*en banc*).

[277] *See Muldrow v. City of St. Louis*, No. 22-193 (cert. granted June 30, 2022), https://www.supremecourt.gov/qp/22-00193qp.pdf.

Recent shareholder demands threaten further litigation along these lines. One organization recently sent letters to CEOs threatening litigation if the relevant corporations do not audit and disclose their DEI initiatives and cease and desist from certain DEI practices.[278] While the *SFFA* decision may inspire further reverse discrimination claims based on DEI initiatives, these efforts have been largely unsuccessful. In contrast, private litigation focusing on whether companies have been meeting their obligations under federal and state anti-discrimination laws is on the rise.

Government enforcement of anti-discrimination laws will continue. However, we can also expect increased government action, including investigations and enforcement actions, motivated by the *SFFA* decision. Some of this attention may be initiated by government officials acting on their own, but actions may also be requested or demanded via activists, employees or members of the public. For example, one activist shareholder has sent letters requesting that the EEOC investigate "woke corporations," including Lyft, DICK'S Sporting Goods, Kontoor Brands and Yum! Brands for their human resources practices and DEI initiatives.[279]

The EEOC Commissioners themselves are split across party lines on this issue. EEOC Chair Charlotte Burrows, a Democratic appointee, tried to reassure employers after the *SFFA* decision:

> The [SFFA] decision . . . does not address employer efforts to foster diverse and inclusive workforces or to engage the talents of all qualified workers, regardless of their background. It remains lawful for employers to implement DEI and accessibility programs that seek to ensure workers of all backgrounds are afforded equal opportunity in the workplace.[280]

But Commissioner Andrea Lucas, a Republican appointee noted that Title VII has always prohibited using race as a factor in employment decisions, and that the *SFFA* decision should prompt employers to "take a hard look" at their corporate diversity programs, especially those that "explicitly or implicitly tak[e] race into decision-making for employment decisions," such as through "race-restricted internships, race-restricted mentoring, [and] race-focused promotion decisions," which may already be "violating the law."[281]

Additionally, several Republican attorneys general have threatened to take enforcement actions challenging DEI initiatives. Following the *SFFA* decision, Republican attorneys general for 13 states wrote to Fortune 100 CEOs condemning DEI initiatives, and stating that companies would be held accountable for "illegal[] . . . preferences in

---

[278] *See* Michael Delikat, J.T. Ho, and Hong Tran, *supra* note 257.

[279] *See Woke Corporations*, Am. First Legal, https://aflegal.org/woke-corporations/.

[280] *Statement from EEOC Chair Charlotte A. Burrows on Supreme Court Ruling on College Affirmative Action Programs*, U.S. Equal Emp't Opportunity Comm'n, June 29, 2023, https://www.eeoc.gov/newsroom/statement-eeoc-chair-charlotte-burrows-supreme-court-ruling-college-affirmative-action.

[281] *EEOC Commissioner Responds to Supreme Court Ruling Against Race-Based College Admissions*, Fox News, June 29, 2023, https://www.foxnews.com/video/6330307060112.

employment and contracting practices and threatened investigations and litigation."[282] That was followed days later by a letter from 21 Democratic attorneys general, stating "[w]e write to reassure you that corporate efforts to recruit diverse workforces and create inclusive work environments are legal and reduce corporate risk for claims of discrimination."[283] Then, on July 17, 2023, Senator Tom Cotton (R- Arkansas), sent a letter to over 50 large law firm chairs threatening congressional oversight "to scrutinize the proliferation of race-based employment practices," both to the extent such firms "advise clients regarding DEI programs or operate one of [their] own" and warning those firms and their clients to "take care to preserve relevant documents in anticipation of investigations and litigation."[284]

Further, at the state level, there has been a flood of legislation by Republican-led governments that seeks to curtail efforts to further DEI goals. For example, Florida Senate Bill 266, signed into law in May 2023, prohibits spending on activities that promote DEI in higher education throughout the state.[285] Such legislation seeks to replace particular areas of study, such as gender studies and critical race theory, with more "classical education."[286] Much of S.B. 266 overlaps with Florida's Stop-WOKE Act which, although it did not pertain to DEI specifically, prohibited what conservatives label as "divisive concepts," or legislation in opposition to considering race as a nexus of American life and racism as being perpetuated by the nation's institutions.[287] [288] Still, Florida Governor Ron DeSantis continues to sign bills barring state officials from investing public funds to promote ESG-related goals,[289] and banning public universities in Florida from using funds on DEI initiatives.[290] Dozens of similar bills have been introduced in over 20 other states, several of which have passed as of July 2023, including bills in North Carolina, Tennessee

---

[282] *Letter to Fortune 100 CEOs from 13 Attorneys General*, July 13, 2023, https://www.tn.gov/content/dam/tn/attorneygeneral/documents/pr/2023/pr23-27-letter.pdf.

[283] *Letter to Fortune 100 CEOs from 20 Attorneys General*, July 19, 2023, https://illinoisattorneygeneral.gov/News-Room/Current-News/Fortune%20100%20Letter%20-%20FINAL.pdf.

[284] *See, e.g.*, Caroline Tabler and James Arnold, *Cotton Warns Top Law Firms About Race-Based Hiring Practices*, Tom Cotton, Senator for Arkansas, July 17, 2023, https://www.cotton.senate.gov/news/press-releases/cotton-warns-top-law-firms-about-race-based-hiring-practices.

[285] *H.B. 999/S.B. 266 – Higher Education Censorship and Government Control Bill*, https://www.aclufl.org/en/legislation/hb-999sb-266-higher-education-censorship-and-government-control-bill.

[286] Editorial Board, *In Defense of "Niche Subjects": Ron DeSantis Got It Wrong*, The Daily Californian, May 24, 2023, https://dailycal.org/2023/05/24/in-defense-of-niche-majors-ron-desantis-got-it-wrong.

[287] *Honeyfund.com, Inc.* v. *DeSantis*, 622 F. Supp. 3d 1159, 1175 (N.D. Fla. 2022); *Pernell* v. *Fla. Bd. of Governors of State Univ. Sys.*, No. 4:22CV304-MW/MAF, 2022 WL 16985720, at *2 (N.D. Fla. Nov. 17, 2022).

[288] *Honeyfund.com, Inc.* v. *DeSantis*, 622 F. Supp. 3d 1159, 1175 (N.D. Fla. 2022); *Pernell* v. *Fla. Bd. of Governors of State Univ. Sys.*, No. 4:22CV304-MW/MAF, 2022 WL 16985720, at *2 (N.D. Fla. Nov. 17, 2022).

[289] *See* Isla Binnie and Ross Kerber, *DeSantis Signs Sweeping Anti-ESG Legislation in Florida*, Reuters, May 3, 2023, https://www.reuters.com/business/sustainable-business/desantis-signs-sweeping-anti-esg-legislation-florida-2023-05-02/.

[290] *See* Nicholas Nehamas, *DeSantis Signs Bill Defunding Diversity Spending in State Schools*, N.Y. Times, May 15, 2023, https://www.nytimes.com/2023/05/15/us/politics/ron-desantis-dei-bill.html.

and Texas, aimed at DEI initiatives in higher education.[291] These efforts began during the Trump Administration and are likely to continue in earnest following the *SFFA* decision.

Finally, prior to the *SFFA* decision, in October 2022, 19 Republican state attorneys general served subpoenas on six United States banks seeking information regarding their involvement in the United Nation's Net-Zero Banking Alliance.[292] A month later, in November 2022, several Republican United States senators led by Tom Cotton (R-Arkansas) sent letters to 51 law firms warning them to advise their clients of potential risks related to their participation in ESG initiatives and that Congress would "increasingly use its oversight powers to scrutinize the institutionalized antitrust violations being committed in the name of ESG."[293] In March 2023, 21 Republican state attorneys general sent a letter to 53 asset managers raising concerns about how asset managers were voting proxies on certain key ESG issues. The letter stated "we will continue to evaluate activity in this area in line with our ongoing investigations into potential unlawful coordination and other violations that may stem from the commitments you and others have made . . . ."

While this correspondence has largely been focused on "E" (Environmental) efforts (*e.g.*, reduced investments in fossil fuels and net-zero pledges), similar challenges to "S" (Social) efforts (*e.g.*, DEI initiatives) have already followed on employment discrimination challenges, and may also become a part of antitrust or consumer protection laws challenges. It is thus important to understand how antitrust laws may impose constraints on how employers within an industry can communicate and coordinate with one another on DEI efforts.

The relevant antitrust laws forbid entities (including law firms, lawyers, and companies) from: (1) coordinating competitive conduct with competitors[294] and (2) providing or receiving "competitively sensitive" information about go-to-market

---

[291] *See* DEI Legislation Tracker, The Chronicle of Higher Education, https://www.chronicle.com/article/here-are-the-states-where-lawmakers-are-seeking-to-ban-colleges-dei-efforts (last updated July 14, 2023); *see also* Laurent Belsie, *Corporate Diversity Push: How it's Shaken as Affirmative Action Ends*, Christian Science Monitor, July 26, 2023, , https://www.csmonitor.com/Business/2023/0726/Corporate-diversity-push-How-it-s-shaken-as-affirmative-action-ends ("Following the [*SFFA*] decision, the House of Representatives passed a defense policy bill with several social policy amendments tacked on, including the elimination of the Pentagon's programs for diversity, equity, and inclusion (DEI)."); Mark Segal, *Republicans Propose New Series of Anti-ESG Reporting and Investing Laws*, ESG Today, July 26, 2023, https://www.esgtoday.com/republicans-introduce-series-of-anti-esg-reporting-and-investing-laws ("Republicans on the House Financial Services Committee in the U.S. Congress announced on Tuesday the introduction of a series of bills aimed at pushing back on the influence of ESG initiatives in capital and financial markets including proposals to derail efforts to implement ESG and climate-related disclosure requirements on companies, and to reduce the ability of investors to engage with companies on sustainability issues.").

[292] Alex Swayer, *19 states subpoena six major banks for ESG records, say 'woke, climate agenda' hurts U.S. firms*, Wash. Times, Oct. 20, 2022, https://www.washingtontimes.com/news/2022/oct/20/19-states-subpoena-six-major-banks-for-esgrecords.

[293] *ESG Letters to Law Firms*, U.S. Senators Tom Cotton, Michael S. Lee, Charles E. Grassley, Marsha Blackburn, Marco Rubio, Nov. 3, 2022, https://www.grassley.senate.gov/imo/media/doc/cotton_grassley_et_altolawfirmsesgcollusion.pdf.

[294] 15 U.S.C. § 1.

strategies.[295] Such "competitively sensitive" information includes non-public data on pricing, margins and employee compensation, but it also encompasses non-public data that, in the hands of a rival, could give the rival a competitive advantage in the marketplace.[296] The agencies interpret "competitive conduct" broadly to include any metrics used to compete for business or talent—including DEI commitments.

## B.    Legal Risks of Dialing Back DEI Initiatives

While the recent anti-ESG backlash may have prompted some companies to pull back from or reduce resources committed to their DEI commitments,[297] experience demonstrates that abandoning DEI initiatives can pose significant risk. Public companies that dial back or eliminate DEI efforts could face SEC investigations and shareholder derivative suits. Employers could face pay equity and disparate impact enforcement and class actions, discrimination litigation and other negative repercussions, including to personnel, morale and their bottom line.

For public companies that have made DEI commitments to investors or other stakeholders, withdrawing from DEI initiatives or otherwise failing to meet these commitments may result in allegations that they misled investors about their commitment to DEI, not unlike allegations of "greenwashing," where companies are accused of overstating their environmental efforts.[298] Such allegations may form the basis for actions such as SEC investigations or shareholder derivative suits. In recent years, the SEC has shown an increased interest in regulating the disclosure of human capital management matters and requiring companies to disclose on their Form 10-K a description of their human capital resources that are material to their business, potentially opening the door to claims, investigations and lawsuits alleging failure to disclose or false or misleading statements related to such disclosures.[299]

---

[295] *See, e.g.*, Dept. of Justice & Fed. Trade Comm'n, *Antitrust Guidance for Human Resource Professionals* 4–6 (Oct. 2016), https://www.justice.gov/atr/file/903511/download.

[296] *See* ABA Section of Antitrust Law, *Frequently Asked Antitrust Questions*, 2d ed., at 87–91; ABA Section of Antitrust Law, *Premerger Coordination: The Emerging Law of Gun-Jumping and Information Exchange* (William R. Vigdor ed. 2006); *Insilco Corp.*, No. C-3783 (F.T.C. Jan. 30, 1998), https://www.ftc.gov/sites/default/files/documents/cases/1998/01/insilcocmp.pdf; *cf. OmniCare, Inc.* v. *UnitedHealth Grp.*, 629 F.3d 697 (7th Cir. 2011).

[297] *See* Te-Ping Chen and Lauren Weber, *The Rise and Fall of the Chief Diversity Officer*, Wall Street J., July 21, 2023, https://www.wsj.com/articles/chief-diversity-officer-cdo-business-corporations-e110a82f ("[C]hief diversity officers have been more vulnerable to layoffs than their human resources counterparts, experiencing 40% higher turnover.").

[298] Dieter Holger, *Vodafone and Nestle Created Panels to Avoid 'Greenwashing' Allegations*, Wall Street J., May 23, 2023, https://www.wsj.com/articles/vodafone-and-nestle-created-panels-to-avoid-greenwashing-allegations-63fff965.

[299] 17 C.F.R. §§ 229, 239, and 240; Press Release, Sec. & Exch. Comm'n, *SEC Adopts Rule Amendments to Modernize Disclosures of Business, Legal Proceedings, and Risk Factors Under Regulation S-K*, Aug. 26, 2020, https://www.sec.gov/news/press-release/2020-192; Erin M. Connell, Jessica R.L. James, Necia Hobbes, *Achieving Workplace Equity in the New World of Pay Transparency and DEI Disclosures*, Practicing Law Institute, April 24, 2023, https://plus.pli.edu/Details/Details?fq=id:(373726-ATL5)#FID0EZG.

According to research by Bloomberg, over 40 lawsuits have been filed against companies in the last three years alleging that they have made false or misleading statements about DEI commitments.[300] For example, a 2020 shareholder derivative suit against Facebook's directors and officers alleged, among others, breach of fiduciary duty and SEC violations based on allegations that despite promoting diversity among higher ranks, Facebook actually lacked diversity at such ranks, thereby damaging its reputation.[301] Similarly, a derivative action was filed against Wells Fargo earlier this year alleging that it failed to properly implement a "Diverse Search Requirement" for highly paid employees as promised,[302] and a fiduciary duty claim was filed against Danaher Corp. by a large institutional investor in 2020 alleging that the company breached its diversity goals because it did not have a single Black board member at the time.[303] Other companies have faced similar suits.[304]

Although courts have thus far found broad corporate DEI commitments to be "non-actionable puffery or aspirational" and thus "immaterial," that may not always be the case, particularly given the SEC's and investors' increased focus on ESG.[305] In particular, the SEC is expected to soon require more detailed and robust disclosures regarding human capital measures, such as DEI.[306]

Next, although employers can and do face reverse discrimination claims, it is important to remember that Title VII was enacted to combat the insidious effects of racial discrimination against Black people and other under-represented groups,[307] the persistence of which means that the greatest risk of litigation continues to lie in traditional causes of action as opposed to reverse claims. This is supported by EEOC and state fair employment practice agencies' data, which indicates that employers are generally less likely to face reverse discrimination charges than more traditional discrimination charges from individuals and groups who have historically faced societal and structural discrimination and underrepresentation.[308] Employers continue to have an obligation under Title VII to

---

[300] David Hood, *Lawsuits Challenge Corporate Diversity Pledges After Floyd*, Bloomberg Law, April 7, 2023, https://news.bloomberglaw.com/esg/host-of-companies-sued-alleging-unmet-diversity-equity-pledges.

[301] *See Facebook* v. *Zuckerberg*, 526 F. Supp. 3d 637 (N.D. Cal. Mar. 19, 2021).

[302] *Asbestos Workers Philadelphia Pension Fund* v. *Scharf*, No. 3:23-cv-01168 (N.D. Cal. Mar. 15, 2023).

[303] *In re: Danaher Corp. Shareholder Derivative Litigation*, No. 20-cv-02445 (D.D.C. Sept. 1, 2020).

[304] Erin M. Connell, Jessica R.L. James, and Necia Hobbes, *Achieving Workplace Equity in the New World of Pay Transparency and DEI Disclosures*, Practicing Law Institute, April 24, 2023, https://plus.pli.edu/Details/Details?fq=id:(373726-ATL5)#FID0EZG (discussing suits against Oracle, Qualcomm, and NortonLifeLock).

[305] *Id*.

[306] Enhanced Disclosures by Certain Investment Advisers and Investment Companies About Environmental, Social, and Governance Investment Practices, 87 FR 36654 (proposed June 17, 2022).

[307] *See, e.g.*, Paul M. Downing, *The Civil Rights Act of 1964: Legislative History; Pro and Con Arguments; Text*, Congressional Research Service (Aug. 1965), https://www.senate.gov/artandhistory/history/resources/pdf/CivilRights_CRSReport1965.pdf.

[308] *See, e.g.*, Donald Tomaskovic-Devey and Carly McCann, *Employment Discrimination Charge Rates: Variation and Sources*, Socius, 7 (2021), https://doi.org/10.1177/23780231211064389 (analyzing charge rates data from the EEOC and state fair employment practice agencies); *Wage Discrimination: Behind the Numbers*, Ctr. for Am. Progress, July 5, 2017, https://www.americanprogress.org/article/wage-discrimination-behind-numbers/ (same).

identify and remove barriers to equal employment opportunities, including policies that have a disparate impact on protected groups.

Additionally, given the recent surge in pay transparency legislation and requirements by state and local governments,[309] as well as efforts by the EEOC and OFCCP to collect employee pay data,[310] pay data and related information regarding job leveling and promotions will soon be under greater scrutiny than ever before. Importantly, the Equal Pay Act (EPA), which covers gender only, and a growing number of state and municipal laws arguably require employers not to rely on an individual's prior pay (which might have been based on societal or structural discrimination) in setting current pay, affirmatively bridging the gap to close any historical pay inequity.[311] Further, disparate impact cases under Title VII similarly hold employers liable for facially neutral practices that have a disparate impact on protected groups.[312]

Thus, the reality is that if employers abandon important DEI initiatives, they may perpetuate historic pay discrimination or other policies or practices that have a lopsided and unfair impact on certain protected classes, placing them at legal risk. The EEOC, OFCCP, parallel state agencies and private class action plaintiffs have instituted numerous investigations and lawsuits alleging as much.[313]

Support for such actions will likely remain, despite the *SFFA* decision. The Supreme Court Justices, though divided on the constitutionality of Harvard and UNC's

---

[309] *See* Erin M. Connell, Jessica R.L. James, and Necia Hobbes, *supra* note 304 (summarizing recent legislation).

[310] *See, e.g.*, Press Release, Equal Emp't Opportunity Comm'n, *EEOC Announces Independent Study Confirming Pay Data Collection is a Key Tool to Fight Discrimination*, Jul. 28, 2022, https://www.eeoc.gov/newsroom/eeoc-announces-independent-study-confirming-pay-data-collection-key-tool-fight; *Compliance Review Scheduling Letter 1250-0003 30-day FINAL*, U.S. Dep't of Labor: Off. of Federal Contractor Compliance Programs, https://www.reginfo.gov/public/do/PRAViewIC?ref_nbr=202304-1250-001&icID=259464 (proposed scheduling letter would require information on contractors' "compensation analys[es]").

[311] *See, e.g.*, *Rizo* v. *Yovino*, 950 F.3d 1217, 1228 (9th Cir. 2020) ("setting wages based on prior pay [violates the EPA because it] risks perpetuating the history of sex-based wage discrimination"). The federal EPA applies only to gender-based disparities, but many states have extended parallel EPA protections to disparities based on other protected characteristics, including race. *See, e.g.*, Cal. Lab. Code § 1197.5; N.Y. Lab. Law § 194; 820 Ill. Comp. Stat. 112/10(a).

[312] *See, e.g.*, *Griggs* v. *Duke Power Co.*, 401 U.S. 424, 430 (1971) ("practices, procedures, or tests neutral on their face, and even neutral in terms of intent, cannot be maintained if they operate to 'freeze' the status quo of prior discriminatory employment practices").

[313] *See, e.g.*, *Morgan* v. *United States Soccer Fedn.*, 25 F.4th 1102 (9th Cir. 2022); *Bank of New York Mellon Corp. Will Pay $1.9M in Back Wages, Interest to Resolve Compensation Discrimination Allegations at Jersey City Location*, U.S. Dep't of Labor, Nov. 21, 2022, https://www.dol.gov/newsroom/releases/ofccp/ofccp20221121; *Google LLC, U.S. Department of Labor Settlement Resolves Alleged Pay, Hiring Discrimination at California, Washington State Locations*, U.S. Dep't of Labor, Feb. 1, 2021, https://www.dol.gov/newsroom/releases/ofccp/ofccp20210201; *Riot Games, Inc. Agrees to $100 Million Settlement and Systemic Reforms to Resolve Allegations of Workplace Sex Discrimination and Harassment*, Cal. Dep't of Fair Emp. & Hous. (Dec. 27, 2021); Complaint, *Ross v. Hewett Packard Enterprise, Co.*, No. 18CV337830 (Santa Clara County Super. Ct. Nov. 8, 2018); First Amended Complaint, *Cahill et al.* v. *Nike, Inc.*, No. 3:18-cv-01477-JR (D. Or) (Nov. 19, 2018) (ECF 42).

admissions policies, were united in acknowledging the long history of discrimination against certain racial groups.[314]

Finally, employers that abandon DEI initiatives may risk various forms of business and public relations backlash.[315] Indeed, 82 corporations and business groups signed amicus briefs that were filed in the litigation for the *SFFA* decision, in which they urged the Court to retain affirmative action in higher education on the basis that the erosion of diversity at the university level could have detrimental effects upon corporate DEI efforts, which in turn would be detrimental to their businesses and industries.[316] The potential negative impact to businesses who abandon diversity efforts is significant and may include missing out on top talent, reduced creativity and innovation, reduced financial performance, poorer customer service and market alignment, and poorer accountability contributing to the proliferation of corporate scandals.[317] Additionally, curtailing DEI efforts can lead to reduced investment as many investors are increasingly encouraging employers to implement DEI initiatives, and investors pay a premium for employers that do so.[318]

The potential negative consequences of retreating on DEI initiatives are, perhaps, the tip of the iceberg, given that the full benefits of many DEI initiatives have only recently been studied and measured, and their impacts fully understood and realized. Employers that consider abandoning such initiatives might well face additional downstream consequences ranging from decreased employee morale and satisfaction to increased

---

[314] Justice Thomas acknowledged that he is "painfully aware of the social and economic ravages which have befallen my race and all who suffer discrimination[.]" *SFFA*, 143 S. Ct. at 2207–08 (Thomas, J., concurring). Justice Kavanaugh recognized that "racial discrimination still occurs, and the effects of past racial discrimination still persist." *Id*. at 2225 (Kavanaugh, J., concurring). Justice Jackson reported that historical and current racial disparities, emphasizing that "[g]ulf-sized race-based gaps exist with respect to the health, wealth, and well-being of American citizens. They were created in the distant past but have indisputably been passed down to the present day through the generations." *Id*. at 2263 (Jackson, J., dissenting).

[315] For additional information on the benefits of diversity, see section II of this Report.

[316] *See* Brief for Applied Materials, et al. as Amicus Curiae in Support of Respondents at 4, *SFFA*, 143 S. Ct. 2141 (2023); Brief for Major American Business Enterprises as Amicus Curiae Supporting Respondents at 9–12, *SFFA*, 143 S. Ct. 2141 (2023); Brief for Massachusetts Institute of Technology, Stanford University, International Business Machines Corp., and Aeris Communications, Inc as Amicus Curiae in Support of Respondents, *SFFA*, 143 S. Ct. 2141 (2023).

[317] *See, e.g.*, Simon Mundy and Patrick Temple-West, *How Corporate Scandals Get Swept Under The Rug*, Financial Times, Aug. 23, 2023, https://www.ft.com/content/75f53530-349d-43fc-81c9-dbe203f3134e.

[318] *See, e.g.*, McKinsey & Company, *The ESG Premium: New Perspectives on Value and Performance* (Feb. 2020), https://www.mckinsey.com/~/media/mckinsey/business%20functions/sustainability/our%20insights/the%20esg%20premium%20new%20perspectives%20on%20value%20and%20performance/the-esg-premium-new-perspectives-on-value-and-performance.pdf.

attrition rates[319] and, depending on the public relations consequences, even reduced consumer demand.[320]

## C.    Guidance for Private Employers

Since the majority opinion in the *SFFA* decision does not on its face alter the well-established law governing private employer decisions or workplace DEI programs, private employers continue to have a variety of tools available to lawfully foster diversity within their organizations.[321] Given the benefits of diversity for organizations and the business community discussed in section II, companies, including law firms, need not—and should not—abandon their commitment to advance DEI within their organizations, but should use the *SFFA* decision as an opportunity to review and enhance their workforce DEI initiatives to ensure that they are aligned with their recruitment, retention and development, and supplier diversity goals. Furthermore, given the current climate and changing legal landscape, it is prudent for companies to evaluate their DEI programs and initiatives to assess and mitigate any legal and reputational risks.

To proactively address and mitigate potential risk from future legal challenges, we recommend that companies: (1) communicate their continued commitment to their organization's DEI principles; (2) conduct a privileged assessment of their DEI programs (3) understand the internal and external perception of their DEI efforts; (4) identify compelling interests and develop measurable objectives for DEI programs; (5) increase controls over DEI disclosures; (6) properly educate and train managers and employees on DEI guardrails and practices; (7) collect, monitor and track DEI data; (8) ensure that DEI programs are enshrined within a framework of good governance and (9) monitor state and local laws, grassroot efforts and peer initiatives. Beyond risk mitigation, a recent report

---

[319] *See, e.g.*, Steve Heisler, *How DEI Efforts Lead to Better Employee Retention*, Am. Marketing Ass'n, Oct. 10, 2020, https://www.ama.org/marketing-news/how-dei-efforts-lead-to-better-employee-retention/; Laura Wronski, *CNBC/SurveyMonkey Workforce Happiness Index: April 2021*, SurveyMonkey, Apr. 2021, https://www.surveymonkey.com/curiosity/cnbc-workforce-survey-april-2021; *DEI in the workplace: Why it's important for company culture*, Univ. of Pennsylvania College of Liberal and Professional Studies, March 22, 2023, https://lpsonline.sas.upenn.edu/features/dei-workplace-why-its-important-company-culture.

[320] In 2017, Fenty Beauty, a company founded by R&B singer Rihanna, made a tidal wave entry in the makeup industry by introducing a foundation that came in 40 diverse shades with the ambitious aim to match the skin tone of all women. Making over $100 million in sales in its first 40 days on the market, the brand changed the beauty industry and made many companies reexamine how to reach new customers and access untapped markets through diversity. Fenty's success may not be a fluke. According to a 2015 study, companies with a culturally diverse leadership team are more likely to develop new products. *Fenty Beauty: Broadening Makeup's Palette*, Time Magazine, Oct. 4, 2018, https://time.com/collection/genius-companies-2018/5412503/fenty-beauty/; Funmi Fetto, *How Fenty Beauty Changes the State of Play in the Beauty Industry*, British Vogue, April 6, 2020 https://www.vogue.co.uk/beauty/article/rihanna-fenty-beauty-diversity; Modupe Akinnawonu, *Why Having A Diverse Team Will Make Your Products Better*, N.Y. Times, May 23, 2017, https://open.nytimes.com/why-having-a-diverse-team-will-make-your-products-better-c73e7518f677.

[321] *See* Kenji Yoshino and David Glasgow, *What SCOTUS's Affirmative Action Decision Means for Corporate DEI*, Harvard Bus. Rev., Jul. 12, 2023, https://hbr.org/2023/07/what-scotuss-affirmative-action-decision-means-for-corporate-dei.

published by McKinsey & Company in partnership with the World Economic Forum[322] indicated that the success factors that yielded the "most significant, scalable, quantifiable and sustained impact" for minority groups across DEI initiatives were: "a nuanced understanding of the root causes, a meaningful definition of success, accountable and invested business leaders, a solution designed for its specific context, and rigorous tracking and course correction."[323] Accordingly, in addition to targeting risk mitigation, the guidance in this section can be adopted in order to strengthen the robustness and effectiveness of corporate DEI initiatives.

**Communicate continued commitment to DEI.** As an initial matter, private employers that remain committed to DEI may wish to assure employees that the *SFFA* decision does not impact their commitment to DEI principles and values. Leadership teams should be prepared to speak competently on the difference between race-conscious admissions considerations at educational institutions and legally permissible corporate DEI practices and policies. Additionally, employers should make sure that they communicate the tangible benefits of DEI generally, and of their DEI initiatives at their companies specifically. Companies can also reemphasize their DEI commitments to external stakeholders on dedicated DEI websites and through ESG reports.

**Assess existing DEI programs.** Companies should consider engaging external counsel to conduct legally privileged audits of their DEI programs in order to identify potential legal risks and seek advice on risk mitigation strategies. The scope of such review might include DEI-related policies and initiatives related to hiring, promotion and retention, compensation, goal setting, fellowships or internships, scholarships, mentorship and sponsorships, leadership development programs, diverse slate policies, compensation practices, supplier diversity programs and corporate giving programs.

The aim of such review is to confirm that: (1) these programs do not make or encourage decisions to be made on the basis of race or another protected characteristic; (2) diversity is appropriately and accurately defined across the enterprise; (3) internal and external written materials regarding DEI objectives and programs are accurate, consistent and, where appropriate, include the business-related criteria being used for evaluation; (4) ERGs are clearly described as voluntary, employee-led and open to all employees; and (5) appropriate oversight is in place for all DEI-related public statements (*e.g.*, vetting by DEI leads, legal teams and other relevant stakeholders). The assessment should extend beyond how relevant DEI programs are described, but also consider how they are understood and applied by decisionmakers. This is why robust training on DEI, especially at the manager level, is critical. For businesses with global operations, consideration should be given to

---

[322] *See* McKinsey & Company, *Diversity, Equity and Inclusion Lighthouses 2023*, (Jan. 13, 2023), https://www.mckinsey.com/featured-insights/diversity-and-inclusion/diversity-equity-and-inclusion-lighthouses-2023 (The Global Parity Alliance, a cross-industry group committed to advancing DEI globally, launched the DEI Lighthouse Programme in May 2022 to "identify initiatives that have resulted in significant, quantifiable, scalable and sustainable impact, and uncover what those initiatives have in common. The ambition is to equip leaders with these insights, contributing to faster DEI impact across the global business community.").

the legality and appropriateness of such reviews in jurisdictions outside of the United States.

While not traditionally considered to be within the parameters of a "DEI program," understanding how employees—and particularly underrepresented employees—are compensated is incredibly important. Thus, companies should also consider engaging in regular and robust privileged pay equity analyses.[324] Pay equity analyses can help businesses to identify potential legal risks and consider any need for adjustments to compensation systems or employee pay, as well as whether there should be modifications to job structure or descriptions, whether particular managers or departments are presenting challenges, and whether (and for whom) implicit bias or other DEI training may be necessary.[325]

**Assess perceptions of DEI efforts.** The assessment of DEI programs described above should also include an analysis of the *perception* of those programs by both employees and external stakeholders. Employers should consider including DEI questions in their annual and pulse surveys to better understand how employees perceive their DEI efforts. This qualitative data has utility alongside quantitative demographic data in understanding potential gaps and areas of opportunity.[326]

Science-backed "engagement interviews" are another method to assess whether the company's talent, including its underrepresented employees, believe they have the same opportunities to stay and advance as others.[327] An engagement interview is an informal one-on-one meeting between a group leader or supervisor and a junior employee.[328] The purpose is to ensure that each member of the team, with an intentional focus on historically marginalized groups, receives a direct touch point from a senior employee who can gauge their engagement, productivity, satisfaction and happiness at the company and follow up on any barriers to advancement after the interview.[329] These simple but effective interviews—and the strategic actions that follow—help engage employees and often mitigate the risk of losing talent.[330] These interviews also set a foundation of continuous

---

[324] *See, e.g.*, Erin M. Connell, Jessica R.L. James & Necia Hobbes, *Achieving Workplace Equity in the New World of Pay Transparency and DEI Disclosures*, Practicing Law Institute, April 24, 2023, https://plus.pli.edu/Details/Details?fq=id:(373726-ATL5); Lisa Burden, *Protecting privilege when conducting a pay audit*, Legal Dive, Jan. 13, 2023, https://www.legaldive.com/news/attorney-client-privilege-pay-audit-pay-disparities/640394/.

[325] *See, e.g.*, Erin M. Connell, *supra* note 304.

[326] *See* Lily Zheng, *To Make Lasting Progress on DEI, Measure Outcomes*, Harvard Bus. Rev., Jan. 27, 2023, https://hbr.org/2023/01/to-make-lasting-progress-on-dei-measure-outcomes.

[327] *See How to Use Stay Interviews to Improve Retention*, Monster, https://hiring.monster.com/resources/recruiting-strategies/interviewing-candidates/stay-interviews/ (last accessed Aug. 2, 2023); Richard Finnegan, *How to Conduct Stay Interviews: 5 Key Questions*, SHRM, https://www.shrm.org/resourcesandtools/hr-topics/employee-relations/pages/how-to-conduct-stay-interviews-part-2.aspx (last accessed Aug. 2, 2023); *Stay Interviews – An Important Tool for Boosting Law Firm Retention*, Thomson Reuters, April 14, 2022, https://legal.thomsonreuters.com/blog/conducting-stay-interviews.

[328] *See generally id.*

[329] *See generally id.*

[330] *See generally id.*

communication and collaboration for the future to sustain employees' productivity, upward career trajectory and retention.[331]

To understand external stakeholder views, employers can use surveys, perform social media and news sweeps and review external ratings. For example, Forbes partnered with Statista to create a list of America's Best Employers for Diversity based on surveys of over 45,000 U.S. employees.[332]

**Identify interests and develop measurable objectives.** The *SFFA* decision found that the benefits of diversity proffered by Harvard and UNC—namely, "training future leaders in the public and private sectors," "preparing graduates to 'adapt to an increasingly pluralistic society,'" "producing new knowledge stemming from diverse outlooks," "promoting the robust exchange of ideas"—while "commendable," "plainly worthy" goals, were not sufficiently measurable to pass strict scrutiny.[333] While DEI efforts by most private employers are not subject to strict scrutiny, it may be helpful for employers to identify the specific benefits of diversity in their workplaces and to develop programs and initiatives specifically tailored to further those benefits. Identifying such benefits can help employers demonstrate the legitimate business purpose and show how these programs contribute to the profitability of the business if their DEI efforts are challenged. It may also be helpful for employers to identify how DEI programs help address barriers to employment opportunities that would otherwise exist.

For more information on the benefits of diversity in workplaces, see section II.

**Increase internal controls.** Many challenges to DEI initiatives may arise from either internal communications or public disclosures about a company's DEI initiatives. Careful attention must be paid to appropriately and accurately describing those initiatives and the implications of making such disclosures. Statements can reiterate the company's commitment to DEI and open up opportunities, and describe aspirational diversity goals and how the company will achieve these goals through lawful means. Corporations should avoid statements which could be viewed as setting rigid numerical quotas or which place pressure on managers or recruiting and hiring professionals to achieve particular results.

Strong governance and leadership is essential in order to ensure that DEI messaging is accurate and consistent throughout the organization. For example, corporations should ensure that there are multiple, focused layers of review for all material communications including those from Communications or Marketing departments, Investor Relations and HR. All public—and internal—messaging should be reviewed by in-house legal teams to ensure alignment with commitments and previous messaging, as well as compliance with state and local laws, including discriminatory advertising.

**Implement education and training for all key partners.** Companies should confirm that recruiters, managers and employees, and those tasked with making

---

[331] *See generally id.*

[332] Rachel Rabkin Peachman, *America's Best Employers for Diversity*, Forbes, April 25, 2023, https://www.forbes.com/lists/best-employers-diversity/?sh=199e4d226468.

[333] 600 U.S. 72 (2023).

employment decisions understand the purpose of DEI programs as well as the key legal principles that govern those programs and perform their functions in a way that mitigates legal and reputational risks. Diversity, anti-discrimination, anti-harassment and implicit bias trainings, particularly for hiring managers, recruiters, members of compensation teams and similar, should be regularly updated. In the absence of a valid affirmative action plan, hiring managers and human resource professionals should be instructed that all employment decisions should be made based on candidate qualifications, not protected characteristics, and the basis for all employment decisions should be well documented. Managers and recruiters should neither be punished nor rewarded for hiring or promoting from underrepresented groups.

Research shows that unconscious bias and other stand-alone DEI training is mostly ineffective at cultivating and sustaining fair and equitable workplaces.[334] This type of training does not generally spur actions that lead to true behavioral change.[335] Instead, actively learning a new perspective—namely through empathy and proximity—has been shown to be one of the most effective methods of ultimately changing behavior and building an inclusive culture.[336] By creating opportunities for individuals to share their unique backgrounds and experiences, organizations can increase awareness of diversity challenges, create an openness to new perspectives and foster a sense of belonging.

For example, several law firms and in-house legal departments are currently piloting a research-based experiential learning initiative called the "DEI A/V Club." It introduces participants to a variety of DEI perspectives with the goal of fostering conversation, understanding and connection across their practice areas and legal teams. The DEI A/V Club is modeled on a book club format, offering a curated roster of relevant TED talks, podcasts and more. Participants meet monthly for facilitated conversations on topics including unconscious bias, racism, microaggressions and pay equity. All participating legal organizations have reported that these forums have been significantly more effective than prior "one-off" training sessions in building a deeper understanding of the importance of diversity and fair talent systems as well as strengthening connections across their teams.

**Appropriately collect, track, manage and utilize DEI data.** The ability to measure the efficacy of DEI programs through data increases organizational awareness of the performance of such programs and provides guidance on remedial actions that can be taken to address gaps. In addition to representation data, it is also important for organizations to measure the outcomes of their hiring, retention and promotion practices as well as their specific diversity initiatives and to periodically assess such data to identify and better understand patterns, gaps and opportunities for improvement regarding the same.

For example, a pipeline program targeted at underrepresented talent may not directly lead to increased diversity in the company. Assessing the demographic data of the participants, as well as, who applies to a full-time position; who is offered the position; and

---

[334] Francesca Gino & Katherine Coffman, *Unconscious Bias Training That Works*, Harvard Bus. Rev., Sept.-Oct. 2021, https://hbr.org/2021/09/unconscious-bias-training-that-works?registration=success.

[335] *See id.*

[336] *See id.*

who accepts it, can help the organization better understand the impact of the program and any processes that can be enhanced.

Organizations should carefully consider who has access to demographic data, both internally and externally, and for what purpose it is shared. Once an organization gathers data and conducts an appropriate review and analysis, they should be prepared to address concerning issues.

**Foster good practices.** Senior leadership teams should fully understand and be invested in achieving the objectives of their organization's DEI programs, which should be well-documented. Management should also be regularly updated through appropriate reporting channels on diversity-focused programs and challenges as they arise. Information reported to the leadership team should include, among others, demographic data relating to the workforce, promotions and attrition, number of complaints relating to discrimination or harassment, if any, and whether such claims were substantiated and the discipline imposed, and results from DEI assessments or other employee surveys.

**Monitor changes in state and local laws and initiatives.** In this dynamic environment, employers should be aware of state and local legislation and actions by state attorneys general aimed at both protecting and limiting DEI programs and any changes thereto. Companies should also monitor grassroots efforts—for example, by activist groups and shareholders. While some groups may seek to enforce laws that provide equal opportunity, others may seek to challenge corporate DEI initiatives and commitments. These efforts may be brought forth through campaigns, proxy battles or backlash efforts described above and will continue to evolve in the aftermath of the *SFFA* decision.

It may also be helpful for organizations to benchmark their peers' DEI programs, assessments and audits and how they communicate them. Participation in forums and memberships that provide opportunities to share ideas and brainstorm can also aid in developing and implementing robust DEI programming. However, as discussed above, companies should be mindful of the risks associated with collaboration in the context of sharing sensitive organizational information. Organizations should consult with internal or outside counsel regarding potential antitrust sensitivities.

**Rely on lawful strategies to achieve goals.** In addition to assessing risks, organizations should also continue to rely on lawful strategies to achieve workforce DEI goals relating to: (1) outreach and recruitment efforts; (2) retention; and (3) the advancement of underrepresented groups.

First, fostering a diverse workforce may become increasingly challenging in the wake of the *SFFA* decision to the extent that a decline in the number of diverse students attending colleges and universities, in turn, reduces the pipeline of diverse candidates for employment. Organizations must therefore reconsider and renew efforts to improve outreach and recruiting of diverse talent. Importantly, the *SFFA* decision did not foreclose efforts to develop a diverse pipeline and applicant pool, *i.e.*, non–zero sum efforts. Thus, outreach to and recruiting of diverse talent remains not only lawful, but crucial. Organizations seeking to amplify opportunities to attract and recruit diverse talent should

consider: (1) leveraging inclusive job postings; (2) expanding recruiting efforts beyond schools they have traditionally focused on; (3) targeting outreach to diverse student organizations and diverse career fairs; (4) recruiting candidates who have taken alternate paths in school or their careers; (5) implementing structural behavioral interviews; and (6) engaging with pipeline programs for high school and college students.

Second, preparing job postings to ensure that they utilize inclusive language is one of the first steps organizations can take in order to lawfully recruit diverse talent. Although Title VII prohibits employers from stating a preference for race or gender in job postings, it is lawful to encourage diverse and experienced candidates to apply for open positions by using inclusive language.

Employers can use job postings to highlight their commitment to fostering a welcoming environment for diverse candidates, including by explicitly stating their commitment to diversity and inclusion, listing or linking ERGs, or reiterating organizational efforts to attract and retain diverse talent (such as the organization's DEI initiatives).[337] Employers should also consider eliminating unnecessary technical jargon—provided it is not necessary for communicating the role's responsibilities—and gender-focused language from job postings.[338] Along with creating ambiguity in job responsibilities and skill requirements, using unnecessary technical jargon may have the effect of deterring otherwise qualified individuals, including diverse prospective applicants, from pursuing certain roles, resulting in reduced applications from underrepresented groups.[339] Similarly, using gender-based language may make it more difficult to attract and retain qualified employees from all groups.

Companies may also consider that diversity includes considerations beyond race and gender, such as SES, first-generation professionals, physical ability and geographic diversity. Utilizing a more expansive definition of diversity may make DEI programs more inclusive, provide additional opportunities for engagement with underrepresented groups and promote allyship.

Third, private employers can enhance the quality of their applicant pools and increase diversity by focusing on skills and qualifications that are relevant to effectively practicing law and expanding the range of schools from which they recruit via on-campus interviews.

By way of example, large national law firms[340] direct a significant amount of energy and resources towards recruiting from the top-ranked schools, using sources such

---

[337] *See* Becca Carnahan, *6 Best Practices for Creating an Inclusive and Equitable Interview Process*, Harvard Bus. Sch., May 25, 2023, https://www.hbs.edu/recruiting/insights-and-advice/blog/post/6-best-practices-to-creating-inclusive-and-equitable-interview-processes.

[338] *See id.*

[339] *See id.*

[340] Llana Kowarski, *Why Big Law Firms Care About Which Law School You Attend*, U.S. News & World Report, Aug. 1, 2018, https://www.usnews.com/education/best-graduate-schools/top-law-schools/articles/2018-08-01/why-big-law-firms-care-about-which-law-school-you-attend.

as the U.S. News & World Report law school rankings.[341] Underrepresented students, including Black, Hispanic and Native American students face increased challenges in accessing quality education, mentorship, tutoring, test-prep books, and LSAT prep courses,[342] contributing to underrepresentation at the top law schools.[343] While many Black, Hispanic and other underrepresented groups do attend top-ranked law schools, according to a recent study, the 23 most racially and ethnically diverse law schools all fall outside of the top 50 schools in the U.S. News & World Report rankings.[344]

Building strategic partnerships with college and university career services offices beyond the top-ranked schools will enable organizations to more fully consider talented individuals who are matriculating at a broader set of schools and enhance the diversity of applicant pools for employers.[345] For instance, in addition to pursuing underrepresented groups and other students at top-ranked elite schools, employers should consider directing recruiting efforts at a broader set of schools including, but not limited to, HBCUs, regional schools and other schools with diverse student bodies. Howard University School of Law, an HBCU, is typically outside of the top 50 schools in the U.S. News & World Report rankings, but has strong job placement statistics sending over 50 percent of its graduating class to national law firms, primarily in the New York, Washington, D.C. and California markets.[346] Similarly, the City University of New York School of Law is recognized as one of the most diverse law schools and has placed most of its graduates in full-time employment in New York.[347]

---

[341] *See* Robert Morse, Kenneth Hines, Eric Brooks & Sam Wellington, *Methodology: 2023–2024 Best Law Schools Rankings,* U.S. News & World Report, May 10, 2023, https://www.usnews.com/education/best-graduate-schools/articles/law-schools-methodology.

[342] *See, e.g.*, Marisa Manzi & Nina Totenberg, *'Already Behind': Diversifying The Legal Profession Starts Before The LSAT,* Nat'l Pub. Radio, Dec. 22, 2020, https://www.npr.org/2020/12/22/944434661/already-behind-diversifying-the-legal-profession-starts-before-the-lsat; *see also* Jay Rosner, *Op-Ed: The legal profession lacks diversity, and the LSAT makes matters worse*, L.A. Times, Dec. 13, 2022, https://www.latimes.com/opinion/story/2022-12-13/lsat-law-school-diversity-aba.

[343] *See, e.g.*, Phoebe Haddon A. & Deborah W. Post, *Misuse and Abuse of the LSAT: Making the Case for Alternative Evaluative Efforts and a Redefinition of Merit*, 80 St. John's L. Rev. 41 (2006).

[344] *See* Sarah Wood, *23 Racially and Ethnically Diverse Law Schools*, U.S. News & World Report, July 13, 2023, https://www.usnews.com/education/best-graduate-schools/the-short-list-grad-school/articles/racially-and-ethnically-diverse-law-schools.

[345] *See* Karen Sloan, *Is Big Law's Addiction to Elite Schools Hobbling Diversity Efforts*, Reuters, Oct. 18, 2021 https://www.reuters.com/legal/legalindustry/is-big-laws-addiction-t-14-hobbling-diversity-efforts-2021-10-18 ("Prestige and ability don't go hand-in-hand . . . If they really want to expand their ranks of Black associates, law firms should recruit from more schools, consider candidates outside the very top of their class and not wait for on-campus interviews to build relationships with diverse law students.").

[346] *Law School Transparency*, Howard Univ., https://www.lawschooltransparency.com/schools/howard.

[347] CUNY School of Law Newsroom, *CUNY Law Named Most Diverse Law School in the Nation,* March 13, 2023, https://www.law.cuny.edu/newsroom_post/cuny-law-named-most-diverse-law-school-in-the-nation/#:~:text=CUNY%20School%20of%20Law%20has,preLaw%20magazine's%20winter%202023%20issue; *Employment Summary for 2022 Graduates*, Am. Bar Ass'n, May 6, 2023, https://www.law.cuny.edu/wp-content/uploads/page-assets/career/employment-statistics/ABA-Summary-Employment-Report-_-2022-Class-CUNY-Law.pdf.

In addition to recruiting through on-campus interviews, employers may consider other ways to recruit diverse students such as developing and hosting mock interview programs as well as receptions and mentoring programs that include diverse students. Employers may also want to consider thoughtful and deliberate interactions with law school career services and faculty members to identify and encourage diverse applicants. While these recommendations focus on law firm recruitment, these strategies can be similarly applied to other private employers.

Fourth, private employers can also make connections with students and recruit through strategic sponsorships, thought leadership and events coordinated with the various student organizations at colleges and universities. Stanford Law School, for example, has over 60 student organizations, many of which are diversity based.[348] Most law schools—and undergraduate schools—have similar organizations on campus, and there are likewise national chapters which may also provide employers opportunities for partnership and recruitment.[349]

Employers can also direct recruiting beyond the schools themselves, by participating in non-traditional career fairs. For example, New York City has hosted an Annual Diversity Employment Day Career Fair and Roundtable for 23 years.[350] For law firms, such fairs include the highly attended Lavender Law[351] and the Minority Corporate Counsel Association's virtual diversity career fair.[352] Similar diversity-focused student job fairs exist at the regional and market-specific level.[353] These organizations and job fairs have long-standing commitments to breaking down barriers and increasing diversity and

---

[348] *See, e.g.*, Asian and Pacific Islander Law Students Association (APILSA), Black Law Students Association, Disability and Mental Health Network at Stanford (DAMNS), Middle Eastern and South Asian Law Students Association (MESALSA), Muslim Law Students Association (MLSA), Native American Law Students Association (NALSA), and Older and Wiser Law Students (OWLS). *See* Stanford Law School, *Directory: Organizations*, https://law.stanford.edu/organizations/?tax_and_terms=308&page=1 (last accessed Aug. 7, 2023).

[349] *See, e.g.*, National Asian Pacific American Law Student Association, *About Us*, https://www.napalsa.com/ (last accessed Aug. 7, 2023); National Association of Law Students With Disabilities, *About Us*, http://www.nalswd.org/about-us.html (last accessed Aug. 7, 2023); National Black Law Student Association, *About Us*, https://www.nblsa.org/about (last accessed Aug. 7, 2023); National Latino/a Law Students Association, *About Us*, https://www.nllsa.org/mission (last accessed Aug. 7, 2023); National Muslim Law Student Association, *About Us*, https://www.nmlsa.com/ (last accessed Aug. 7, 2023); National Native American Law Students Association, *About Us*, https://nationalnalsa.org/bylaws (last accessed Aug. 7, 2023); North American South Asian Law Students Association, *About Us*, https://www.nasalsa.org/ (last accessed Aug. 7, 2023).

[350] *See* City Career Fair, *23rd Annual Diversity Employment Day Career Fair and Roundtables*, https://citycareerfair.com/newyork/ (last accessed Aug. 17, 2023).

[351] *See* The LGBTQ+ Bar, *The 2024 Lavender Law Conference & Career Fair*, https://lgbtqbar.org/annual/career-fair (last accessed Aug. 7, 2023).

[352] *See* MCCA, *MCCA Virtual Diversity Career Fair*, https://mcca.com/virtual-diversity-career-fair/ (last accessed Aug. 7, 2023).

[353] *See, e.g.*, Southeastern Minority Job Fair, *Home*, https://semjf.org/ (last accessed Aug. 7, 2023); UC Davis School of Law, *Job Fairs*, https://law.ucdavis.edu/career-services/oci/job-fairs (last accessed Aug. 7, 2023) (Rocky Mountain Area Diversity Summit & Legal Career Fair); Northwest Minority Job Fair, http://www.nwmjf.org/ (last accessed Aug. 7, 2023).

provide yet another way to broaden an applicant pool beyond the traditional on-campus interview model.[354]

Fifth, private employers may consider revisiting traditional assumptions about characteristics that are needed to perform jobs for which they are hiring or indicative of employee success on the job. For example, while a track-record of academic success can be a useful data point, it is not the only factor that can assist in determining success on the job.

For example, over-reliance on a student's GPA might not be appropriate or determinative of a student's career outcome, and is often at the expense of evaluating a prospect's qualities and abilities more holistically. Identifying and focusing the recruitment and hiring process on criteria and qualifications that are necessary to perform the job,[355] and eliminating those that operate as unnecessary barriers to entry can be an effective strategy to expand the pool of diverse candidates[356]—for example, by looking at whether students have developed practical lawyering skills through clinics, term-time internships or other extracurricular activities.[357]

Recruiting candidates who have taken non-traditional or non-linear career paths may also help to advance an employer's diversity goals. For example, employers have created "returnship" programs, helping people to re-enter the workforce after a long break. These programs help to incentivize the hiring of candidates who may be otherwise overlooked despite being fully qualified.[358] In the legal industry, the OnRamp Fellowship is a platform that law firms and legal departments have used to recruit, as fellows are lawyers who have taken breaks from the workforce and are now looking to make a return.[359] The OnRamp program is effective at re-immersing diverse talent with legal organizations, as participants most often receive full time offers.[360] Indeed, since the program's inception in 2014, over 115 returning lawyers, one-third of whom were attorneys of color, were matched with law firms and legal organizations for paid fellowships; 89 percent of these fellows received offers to join firms on a full-time basis.[361] OnRamp plans to continue its efforts, with the goal of returning women lawyers—who

---

[354] Another resource for law firms is the Leadership Council on Legal Diversity, an organization of more than 400 corporate chief legal officers and law firm managing partners, which is devoted to creating a more equitable and diverse legal profession. *See* Leadership Council on Legal Diversity, *Our Mission*, https://www.lcld.com/about/ (last accessed Aug. 7, 2023).

[355] *See, e.g.*, *id.*

[356] *Id.*

[357] *Id.*

[358] Kathryn Vasal, *These Return-to-Work Programs Could Help Moms Reenter the Workforce*, CNN, Jun. 1, 2021, https://www.cnn.com/2021/06/01/success/returnship-programs/index.html.

[359] *See* Dylan Jackson, *39 Firms and Legal Departments Team Up to Bring Women Back to the Legal Workforce*, The Am. Lawyer, No. 1, 2021, https://www.law.com/americanlawyer/2021/11/01/36-firms-and-legal-departments-team-up-to-bring-women-back-to-the-legal-workforce/; Sara Randazzo, *For Female Lawyers, a Way Back In After Taking Time Off*, Wall Street J., May 26, 2016, https://www.wsj.com/articles/BL-LB-53875.

[360] *See* OnRamp Fellowship, *About the OnRamp Fellowship*, , https://onrampfellowship.com/about/ (last accessed July 31, 2023).

[361] *See id.*

often experience high levels of attrition due to a lack of flexible working arrangements—to the workplace.[362]

Sixth, employers may also consider requiring interviewers to interview candidates using structured behavioral interview questions. Behavioral interviews can be a lawful way to assess candidates based on their prior conduct in specific professional settings. As opposed to situational interviewing, behavioral interviewing permits interviewers to inquire about a candidate's past behavior to forecast future behavior rather than merely relying on hypotheticals.[363] It focuses on actual experiences to learn about an applicant's specific skills, abilities, behaviors and knowledge. For instance, the interviewer might ask for an example of a time they asked for feedback and why, or for an example of when the applicant had to work with someone who was difficult to get along with, and how they handled interactions with that person. By focusing on past achievements and behaviors, interviewers are less likely to be influenced by characteristics such as race and gender when assessing candidates.

Seventh, private employers may consider working more deliberately to foster greater exposure about career options and develop and enhance pipeline programs at the many stages of education that can improve diversity at their workplace. This can start as early as high school through internships or shadowing opportunities, offering college-bound high school students the opportunity to gain exposure to corporate work environments and professional experiences that will prepare the students for college and beyond. In order to increase relationships with diverse employment candidates, employers should consider building active relationships with associations, including affinity bars and organizations that have DEI "school-to-workforce" pipeline programs in place. Further, law firms can consider supporting urban debate leagues, which have been shown to have meaningful results in enhancing literacy and graduation rates for young students of color.[364]

Law firms can also establish pre-law fellowship programs that hire college students to work at the firm and provide them with exposure to career opportunities in areas they may not have had information or access to, as well as critical mentorship opportunities in

---

[362] *See* Catherine Baksi, *Bridging Gender Inequality Through 'Returnships'*, Raconteur Oct. 31, 2016, https://www.raconteur.net/diversity-and-inclusion-2016/bridging-gender-inequality-through-returnships. As stated on the OnRamp website, "[i]n 2021, Diversity Lab introduced OnRamp 200—the newest iteration of the Fellowship. Through this collective legal industry movement, Diversity Lab will work with legal organizations to bring 200 women lawyers back into the legal profession by 2025." *Id.* More generally, companies interested in hiring candidates that have taken non-linear paths have surged in recent years. *See* Caroline Castrillon, *Why Non-Linear Career Paths Are The Future*, Forbes, Feb. 26, 2023), https://www.forbes.com/sites/carolinecastrillon/2023/02/26/why-non-linear-career-paths-are-the-future/?sh=60bc70113a90. Abandoning a more traditional hiring approach, many companies have embraced a "skills-based" hiring approach. *Id.* This new approach has had the effect of expanding the talent pool, tearing through the "paper ceiling" that often holds back qualified, non-traditional candidates from being considered for roles. *Id.*

[363] *See* Jessica Elliott, *What Is Behavioral Interviewing? And How to Use It to Hire for Your Business*, CO – U.S. Chamber of Commerce, July 27, 2022, https://www.uschamber.com/co/run/human-resources/behavioral-interviewing.

[364] Briana Mezuk, *Urban Debate and High School Educational Outcomes for African American Males: The Case of the Chicago Debate League*, 78 J. Negro Ed. 290 (2009).

their pre-law years. In addition to giving students exposure to the corporate work environment, these programs—and other similar fellowships—can provide opportunities to engage current employees in a meaningful way. Employees can be asked to serve as a resource to assist students with school applications and hold workshops to support students as they continue their academic careers and navigate the application process for college and law school. Employers can also partner with organizations that provide career exposure, professional development and educational programs for students interested in pursuing legal careers.[365] For example, the ABA's National Pipeline Diversity Initiatives Directory—a searchable database of projects, programs and initiatives that encourages and equips diverse students to pursue legal careers—can serve as a starting point to access these programs.[366]

Finally, although being intentional in casting a wide net for talent is an obvious and necessary step to diversify a workplace, it is hardly sufficient. Employers should also implement programs aimed at the development, retention and advancement of diverse talent within their organizations and promote an inclusive work environment.[367] An effective development and retention program will increase the likelihood that diverse employees choose to stay.

To that end, development and retention programs will typically include a range of tools, including: (1) affinity groups and ERGs; (2) advice and mentorship programs coupled with feedback and evaluation; (3) formal training programs; (4) equitable work allocation systems; and (5) networking opportunities. While the role of each of these tools is discussed briefly below, this section is not intended to be a comprehensive treatment of the full range of development and retention tools available to employers, about which much has been written.[368]

Many employers sponsor affinity groups for their employees, including for employees from certain racial and ethnic backgrounds, or based on religion, gender, or sexual orientation. Some employers also sponsor groups for first-generation professionals, recognizing that such employees (who may hail from widely different backgrounds

---

[365] *See, e.g.*, *Thurgood Marshall Summer Law Internship Program*, https://www.nycbar.org/serving-the-community/diversity-and-inclusion/student-pipeline-programs/programs/thurgood-marshall-summer-law-internship.

[366] *See National Pipeline Diversity Initiatives Directory*, American Bar Association, americanbar.org/groups/diversity/diversity_pipeline/projects_initiatives/pipeline_diversity_directory/.

[367] *See* Minority Corporate Counsel Association, *U.S. Law Firm Diversity Survey Report 2022* at 20 ("Beyond outreach and recruiting, firms need to focus on their retention of attorneys, as high attrition of attorneys from underrepresented racial/ethnic groups will lead to lower diversity over time and decreasing levels of diversity at higher-level positions in the firm."), https://mcca.com/wp-content/uploads/2023/02/MCCA_US-Law-Firm-Diversity-Survey-2022.pdf.

[368] *See, e.g.*, William D. Henderson & Christopher Zorn, *Talent Analytics White Paper: Evidence-Based Strategies for Retaining High-Performing Midlevel Associates*, ALM Legal Intelligence, Sept. 2012, https://www.legalevolution.org/wp-content/uploads/sites/262/2021/07/ALM-Strategies-for-Retaining-Associate-Talent-Whitepaper.pdf; Terri Mottershead, *Innovating Talent Management in Law Firms*, Law Practice Today, Nov. 14, 2016, https://www.lawpracticetoday.org/article/innovating-talent-management-law-firms/.

themselves) often encounter similar issues integrating into a high-pressure workspace where behavioral expectations may be opaque.

Affinity groups can be very useful tools that support a diverse and inclusive work environment. First, they can assist underrepresented employees in avoiding feelings of isolation and imposter syndrome (*i.e.*, feeling like "there aren't a lot of people like me here") and provide a forum to discuss issues of common concern, offer informal mentorship from more senior diverse employees who can demystify the workplace for new entrants, and sponsor programming that can educate the broader work community on the issues, challenges and achievements of particular groups. Having affinity group leaders that can effectively communicate concerns to leadership is a powerful tool for employers to stay ahead of issues before they become more difficult to address.

Firms and companies can also leverage the impact of ERGs by looking for opportunities for ERGs to engage with each other and with non-diverse allies in the workplace. This can help in exploring issues and insights around intersectionality, as well as help bring greater visibility to workplace challenges that are shared across difference and those whose impact is felt more by some groups than by others. It can be valuable for ERGs to have one or more partner or executive non-diverse allies who affiliate with it in order to understand the goals and concerns of the group and provide perspectives, including on communications about the group within the firm. Other steps to strengthen the impact of ERGs in the DEI mission, and mitigate potential risks related to having exclusive programs, would include (1) opening participation in certain ERG gatherings to allies or not limiting inclusion or participation to members of specific demographic groups; (2) where appropriate, having group programming open to all members of the community to facilitate understanding and discussion and (3) having multiple affinity groups co-promote events to increase discovery of areas of common ground.

Effective advising and mentorship, coupled with constructive and timely feedback on performance, can be transformative in improving the quality of a new employee's experience and development, especially for employees from underrepresented groups. Mentors can provide guidance on how maximize learning and growth opportunities and navigate challenges, as well as give practical, industry-specific advice about the demands of the profession or company. As noted above, the degree to which an employee feels that someone at their company or firm is invested in their career is often a defining factor in whether they view their experience as positive.

To function well, management and partners acting as advisors and mentors should be trained in providing effective feedback and counseling (including across difference) and given a template of key questions to ask at different stages of an employee's career. In addition, there should be accountability to the organization's professional development team to ensure that these advisors and mentors are following through with their responsibilities and encourage switching up pairings when they are clearly not working.

Effective advice and mentorship programs should seek to achieve a range of objectives, including:

- Understanding issues the employee is experiencing and helping to resolve them;

- Clarifying commitment and performance expectations and behavioral norms;

- Getting to know the employee as an individual;

- Helping the employee assess their medium- and long-term career goals and identifying ways to position them to achieve those, whether for internal promotion opportunities or to pursue external opportunities in the future;

- Identifying important skills that need developing and helping the employee identify the work opportunities that will most directly improve those skills; and

- For high-potential employees that manifest the talent to become vice presidents, directors and partners, ensuring that firm or company leadership has them on their radar to track and develop (more on this below).

Although formal mentorship programs and practices should encompass and be available to all employees, diverse employees and first-generation professionals stand to benefit the most due to the obstacles that implicit bias (or lack of familiarity with the corporate world) may create in the formation of more informal relationships. Thus, mentorship can prevent promising first-generation professionals and/or employees from underrepresented backgrounds from leaving merely because they "fell through the cracks" of the talent tracking process. Within the legal profession, it can also help demystify the partnership process, assist attorneys in understanding their own partnership chances and identify additional skills or types of matters considered helpful to advance. For many of these employees, mentors ensure that they feel connected to someone at the company who is visibly invested in their career.

Advice and mentorship is most effective when it works together with a robust evaluation and feedback process. Effective feedback requires timeliness, candor and preparation and should convey specific and concrete suggestions for improvement. Ideally, any messaging from advisors and mentors would be informed by a holistic review of the employee's feedback messages so that the company can speak with one voice to provide guidance and a realistic assessment of future prospects. As noted above, it will be important for advisors and reviewers to be trained in how to give feedback and advice and to spot instances where misunderstandings are negatively impacting development.

Formal training can play a beneficial role in acculturating and developing new employees. In any industry, formal training can level the playing field for new entrants by providing clear guidance and instruction on skills and knowledge development, as well as soft skills such as working in teams, negotiation and client service. Employers with comprehensive training programs will have a better chance of developing and retaining their people, including diverse employees, because they will be better able to perform at

an earlier stage. The legal profession has traditionally relied primarily on an "apprenticeship model" of learning by doing. However, that approach in isolation can lead to inequitable outcomes depending on the distribution of work opportunities (more on that below) and the quality of feedback and senior lawyer interaction. For any workplace that relies on an apprenticeship model, some of the biases that could arise can be lessened by equal access to formal training.

Although all the tools described above can be powerful aids to the development and retention of new employees, access to challenging and "visible" work opportunities is crucial.[369] Substantive work experience tests and improves technical and soft skills, provides exposure to leadership and leadership opportunities and consequently offers an opportunity to forge relationships that will in turn lead to future work opportunities.[370] As a result, ensuring that work is fairly allocated is of paramount importance to maximizing development prospects. Not surprisingly, equitable work allocation is not just a tool for development but for retention. Companies should therefore ensure that people managers are allocating work and new opportunities equitably amongst their teams. A company's HR or other people organization should monitor evaluations and feedback processes to ensure that employees—in particular those from historically underrepresented backgrounds—are getting access to meaningful work and opportunities for advancement.

For law firms, studies show that satisfaction with the quality of one's work is a definitive factor in whether attorneys choose to stay at a firm.[371] But law firms' "free market" staffing system, where partners simply choose the associate with whom they want to work, often leads to partners consistently working with the same people—and excluding particular attorneys from valuable opportunities. Diverse attorneys may be particularly disadvantaged by unstructured staffing systems, as unconscious bias may play a role in allocating work to associates that have backgrounds more similar to senior lawyers.[372]

There are several approaches that can result in more equitable distribution of work opportunities in law firms. Centralized staffing overseen by dedicated professional development coordinators can identify instances where associates need work and ensure that assignments are allocated based on activity levels. Periodic review of associate activity levels with practice group leadership can serve as a cross-check against how the group is allocating assignments and identifying associates that are being under-allocated. Similarly, setting achievement benchmarks for attorneys at different levels (for example, litigation attorneys should have experience taking and defending depositions after a certain number of years of practice), and monitoring to ensure that attorneys are receiving the type of

---

[369] *See* Erin Macke, Gabriela Gall Rosa, Shannon Gilmartin & Caroline Simard, *Assignments Are Critical Tools to Achieve Workplace Gender Equity*, MITSloan, Jan. 4, 2022; Joan C. Williams and Marina Multhaup, *For Women and Minorities to Get Ahead, Managers Must Assign Work Fairly*, Harvard Business Review, Mar. 5, 2018, hbr.org/2018/03/for-women-and-minorities-to-get-ahead-managers-must-assign-work-fairly.

[370] *See id.*

[371] William D. Henderson & Christopher Zorn, *Talent Analytics White Paper: Evidence-Based Strategies for Retaining High-Performing Midlevel Associates*, ALM Legal Intelligence, Sept. 2012, https://www.legalevolution.org/wp-content/uploads/sites/262/2021/07/ALM-Strategies-for-Retaining-Associate-Talent-Whitepaper.pdf.

[372] *See id.*

assignments needed to meet those benchmarks, will also promote more equitable distribution of work opportunities.

The ability to build networks is an often overlooked but significant contributor to advancement in the corporate world. However, "a wealth of research finds that employees from underrepresented racial and ethnic groups find it more challenging to create networks that support their professional growth."[373] Companies should thus consider helping employees to build robust networks by leveraging strategic partnerships with clients and other external stakeholders. These initiatives can help diverse employees expand their networks beyond their workplace and develop helpful relationship skills that will be critical as they rise through the ranks.

For client-service focused companies (and law firms), partnerships with clients around diversity can take several forms, including:

- Bringing together affinity groups and ERGs from the employer and selected clients for events, potentially with guest speakers;

- Running training sessions focused on building skills that employees at both organizations need;

- Collaborating to identify secondment opportunities;

- Jointly sponsoring selected events that provide diverse employees at different organizations the opportunity to get to know each other; and

- Working with clients on public service initiatives that address legal issues faced by disadvantaged or marginalized communities, which can demonstrate a shared commitment to promoting social justice and equality.

Employers that develop a robust and diverse leadership and advancement pipeline will be well-positioned to lead in a diverse world in the future. Key components to such a pipeline can include carefully structured succession plans and identifying and addressing other structural barriers to advancement.

Employers wishing to diversify future company leadership should structure succession plans in a way that seeks to eliminate implicit and structural biases and focuses on the roles being planned for.

Traditional succession planning often relies on measures that cause leaders to select individuals who are like them, based on factors ranging from whether the individual took a traditional career path, to relationships with partners and senior leaders, to whether an

---

[373] Justin Dean, John Rice, Wallrick Williams, Brittany Pineros, Daniel Acosta, Ian Pancham, and Mike Snelgrove, *The Real Reason Diversity is Lacking at the Top*, Nov. 19, 2020, https://www.bcg.com/publications/2020/why-is-diversity-lacking-at-top-of-corporations (citing Herminia Ibarra, *Race, Opportunity, and Diversity of Social Circles in Managerial Networks*, Academy of Management Journal, June 1995).

individual is viewed as a "fit."[374] Assessments of "potential" may also rely on subjective factors that are particularly subject to implicit bias, such as intuition.[375] And factors such as past experience or current performance, although one part of the equation, might be more reflective of who has had access to more opportunities in the past—not necessarily who has the necessary skills for a role in the future.[376] These types of succession planning considerations create a structural barrier to diversity given that leadership in many organizations is still largely White and male.[377]

Employers seeking to develop a more objective and inclusive succession plan should start, just as they do in recruiting, by looking at the specific skill set and qualifications required for the role being planned for.[378] Potential, too, should be measured not in the abstract, but based on the traits and skills required for a specific role.[379] Focus on a specific role also allows for the use of other DEI recruiting strategies, such as a diverse slate of candidates,[380] and for targeted leadership development where there is a gap between an individual's traits and skills and those required for specific roles. Role-focused succession planning can allow for greater transparency, provide the basis for meaningful and actionable advice to employees on what they need to do to advance[381] and keep the focus on building a robust pipeline for each key role in order to ensure continuity—rather than relying too heavily on one or two "favorite sons" to take the reins.[382]

For law firms, achieving Mansfield Certification has helped to improve rates of diversity among leadership. Over 300 law firms now participate, and firms that have achieved certification annually for several years have increased diversity in their leadership ranks above and beyond their typical rate pre-Mansfield.[383] The Mansfield Rule "measures whether law firms and [corporate] legal departments are considering a broad pool of talent—including historically underrepresented groups such as women lawyers,

---

[374] Laura Clydesdale, et al., *Your Diversity Problem Might Actually Be a Succession Planning Problem*, Talent Quarterly, Mar. 25, 2022, https://www.talent-quarterly.com/your-diversity-problem-might-actually-be-a-succession-planning-problem/.

[375] Lisa Blais, *To Get Diversity Right, Get Potential Right*, EgonZehnder, Jan. 1, 2017, https://www.egonzehnder.com/insight/to-get-diversity-right-get-potential-right.

[376] *Id*.; Ann Marie Olszewski, *Succession Planning: Is It Part of Your DEI Strategy*, LinkedIn, Sept. 22, 2022, linkedin.com/pulse/succession-planning-part-your-dei-strategy-ann-marie-olszewski/.

[377] *See e.g.*, Amanda Robert, *Law Firm Leaders Are Still Mostly White and Male, ABA Diversity Survey Says*, ABA Journal, May 16, 2022, https://www.abajournal.com/web/article/law-firm-leaders-are-still-mostly-white-and-male-aba-diversity-survey-says.

[378] Ann Marie Olszewski, *supra* note 376; Sheryl Estrada, *Why Succession Planning With a D&I Focus Supports Business Continuity*, HR Dive, Aug. 17, 2020, hrdive.com/news/succession-planning—diversity-inclusion-business-continuity/583617/.

[379] Lisa Blais, *supra* note 375.

[380] *Lawyers' Toolkit for Diversity & Inclusion*, D.C. Bar Association, https://www.dcbar.org/getmedia/c10cfbb4-3ccb-4d33-82c4-f481d7b83ea0/Lawyers-Toolkit-for-Diversity-Inclusion (accessed Aug. 3, 2023).

[381] Laura Clydesdale, *supra* note 374; Ann Marie Olszewski, *supra* note 376.

[382] *See, e.g.*, Jeremy Harper, *Developing a Succession Plan That Supports Diversity*, HR Certification Institute, Feb. 14, 2022, https://www.hrci.org/community/blogs-and-announcements/hr-leads-business-blog/hr-leads-business/2022/02/14/developing-a-succession-plan-that-supports-diversity.

[383] Julia DiPrete, *What is Mansfield Certification and Why is it so Important for Law Firms*, Vault, Dec. 9, 2022, https://vault.com/blogs/vaults-law-blog-legal-careers-and-industry-news/what-is-mansfield-certification-and-why-is-it-so-important-for-law-firms.

underrepresented racial and ethnic lawyers, LGBTQ+ lawyers, and lawyers with disabilities—for leadership roles and career advancement opportunities. In addition, legal departments are asked to consider a broad pool of talent for outside counsel roles."[384]

Employers can also identify and address other barriers to advancement by considering the factors that impact employee career trajectories at their company, and how those factors may create a greater hurdle for underrepresented minorities. Examples include:

- How salaries and other financial incentives are structured. Companies should review their compensation packages to ensure that they are not unduly disadvantaging diverse employees. At law firms, it is important for firms to review how origination credit is allocated and managed (and whether, for example, partners involved in client service and maintaining client relationships are being fairly acknowledged).[385]

- For client service firms, how underrepresented minorities and women may be impacted by a client or firm's desire to have a diverse team participate in a pitch or other nonbillable assignment. (If there are fewer underrepresented minorities and senior women, they may be asked to play this nonbillable role more often than their peers who are White and male.)[386]

- The types of social and business development activities that are available and encouraged. Consider whether some employees may feel left out of the firm's opportunities for relationship-building. Companies should consider offering a broad range of opportunities so that all employees feel they can participate and contribute in some way.

- How parental leave is handled. Companies can improve retention by providing and encouraging a generous parental leave for new parents of all genders, regardless of the path to parenthood.[387]

---

[384] *Mansfield Overview*, Diversity Lab, https://www.diversitylab.com/pilot-projects/mansfield-overview/.

[385] *Accelerating Progress on Gender Equity in Law Firms*, Fairfax Assoc., May 17, 2022, https://fairfaxassociates.com/insights/accelerating-progress-on-gender-equity-in-law-firms/; Miguel Eaton, *Diversity & Inclusion in Business Development: 5 Lessons Learned*, American Bar Assoc., Sept. 10, 2021, https://www.americanbar.org/groups/labor_law/publications/ebc_news_archive/issue-summer-2021/diversity-and-inclusion/.

[386] *See id.*

[387] John Murph, *Survey Emphasizes Need for Updated Parental Leave Policies*, D.C. Bar Assoc., May 20, 2021, https://www.dcbar.org/news-events/news/survey-emphasizes-need-for-updated-parental-leave-; Kelsey Heino, *Oh, Baby! Accommodating Parental Leave in Your Small Firm*, Amer. Bar Assoc., Jan. 31, 2019, https://www.americanbar.org/groups/litigation/committees/solo-small-firm/practice/2019/accommodating-parental-leave-in-your-small-firm/; Arlene S. Hirsch, *The Importance of Promoting Parental Leave for New Fathers*, SHRM, July 12, 2023, https://www.shrm.org/resourcesandtools/hr-topics/benefits/pages/the-importance-of-promoting-parental-leave-for-new-fathers.aspx.

- How fertility and family-planning challenges are handled and/or acknowledged. Some employees face family-planning challenges during crucial years in their career path, and the support—or lack thereof—that they receive can impact their trajectory for years to come. Not surprisingly, companies have found that comprehensive fertility benefits, as well as bereavement leave for fertility losses (miscarriage, failed surrogacy, etc.), have helped them not only recruit but retain diverse employees.[388]

- The extent to which flexible and reduced hours work schedules are permitted and supported. These types of programs can be crucial for retention, particularly for parents of young children and other caretakers.[389]

Lastly, many organizations have developed supplier diversity programs as a way to both diversify business risks and help small and diverse business owners. These programs are also a great way to support and engage local communities and foster public trust. Again, while the *SFFA* decision does not directly impact these efforts, there may be some risk associated with how organizations describe and implement their supplier diversity programs. To mitigate risks, organizations should review their supplier diversity materials to ensure that contracts are not being awarded on the basis of race (or another protected status). Moreover, organizations should consider zero-sum alternatives to increasing the diversity in their supplier base by investing in resources that train small and diverse businesses on how to apply for certification, properly manage financial records and insurance requirements and compete for business. Organizations can also consider updating payment timeline provisions in supplier contracts from the standard 90-day or 60-day payment cycle to a 30-day commitment, thereby ensuring that diverse suppliers can participate and are not self-excluding due to longer pay cycles.

---

[388] Karen Kaplowitz, *Best Law Firms for Women & Diversity: The DEI Best Practices Behind the Numbers*, Seramount, June 1, 2023, https://seramount.com/articles/best-law-firms-for-women-diversity-the-dei-best-practices-behind-the-numbers/.

[389] Joan C. Williams, *Still Struggling? Implementing "Part-Time" Programs That Work*, Minority Corp. Counsel Assoc. (last accessed Aug. 3, 2023), https://mcca.com/mcca-article/still-struggling/; *ABA Survey: Most Lawyers Want Options For Remote Work, Court and Conferences*, American Bar Assoc., Sept. 28, 2022, *https://www.americanbar.org/news/abanews/aba-news-archives/2022/09/aba-survey-lawyers-remote-work/*; Ruiqi Chen, *Flexible Work Could Boost Diversity for In-House Law Departments*, Bloomberg Law, July 30, 2021, https://news.bloomberglaw.com/business-and-practice/flexible-work-could-boost-diversity-for-in-house-law-departments.

# V.    IMPLICATIONS OF THE *SFFA* DECISION FOR THE JUDICIARY

The issues before the Supreme Court in the *SFFA* decision did not directly pertain to actions by the judiciary. Thus, the *SFFA* decision should not impinge on the judiciary's commitment to advancing DEI, either as employers or in the fulfillment of their official duties. At the outset, we note that decision-making influenced by racial bias has no place in the courts, in either hiring or the adjudication of disputes.[390] Moreover, promoting DEI in the judiciary is an urgent and paramount goal because it is vital to maintaining public trust and upholding the rule of law. Given the judiciary's unique role in our democracy, this section offers a different focus and approach than the sections addressing the private sector. This section, drafted by the Judiciary Working Group, outlines best practices for courts to aid in advancing their DEI goals while avoiding any appearance of impropriety.

This section includes a discussion of: (1) helpful strategies and leadership communication; (2) incorporation of diversity considerations into HR and other hiring practices; (3) bias training and educational outreach for judges, court staff, uniformed personnel and jurors; (4) collaboration and communication with community and local organizations; and (5) the utility of data collection and analysis. These suggestions are also consistent with those described in former Secretary Jeh Johnson's seminal 2020 report on *Equal Justice in New York State Courts*.

In addition to the recommendations provided below, courts should consider undertaking a review of their DEI efforts to identify risks and opportunities, when implementing the best practices outlined in section V of this report.

## A.    Strategy and Leadership Communication

It is important for the court's commitment to diversity to be messaged from the top levels of court leadership. To that end, courts should consider: (1) promoting judgeships as viable career opportunities for attorneys of all backgrounds, through transparent selection procedures and educational seminars; (2) developing a comprehensive strategic plan that includes DEI considerations throughout the entirety of its operations; (3) developing or updating their mission statements to include support for diversity; (4) encouraging judicial leadership to demonstrate awareness of personal and organizational bias; and (5) recognizing accountability as an ethical duty.

**A diverse judiciary representative of the public it serves.** Courts should eliminate barriers to people from diverse backgrounds seeking election or appointment to judgeships.

As noted in the Equal Justice Report, underrepresentation in the judiciary in New York State has persisted across all non-White groups. Though the representation of Black judges has steadily improved over the past 30 years, for the Latinx and Asian communities, the gap between their respective share of the population and judges widened in the late 1990s before more recently narrowing, but remains larger for both communities than they

---

[390] *See, e.g., Brown v Board of Educ.*, 349 U.S. 294, 300–01 (1955); 42 U.S.C. § 2000e-2(m); N.Y Admin. Code § 8-101 *et seq*.

were in 1991.[391] Judicial selection procedures vary greatly among states, and appropriate procedures for ensuring the selection of qualified candidates from a diverse pool will inevitably vary according to jurisdiction.[392]  While the specific procedures used for judicial selection is a complex subject that is beyond the scope of this report, we offer the following broad suggestions to help courts further their diversity and inclusion efforts:

Irrespective of whether judges are elected or appointed, procedures for seeking judicial nomination or appointment should be transparent, well publicized and designed to attract a diverse range of candidates. Courts should consider posting such information on court websites in an intuitive and conspicuous location, such as under a "Careers" tab. In addition to making opportunities more widely known, courts should also consider working with bar associations and affinity groups to routinely host continuing legal education programs with detailed information on the pathways to becoming a judge.[393]

Additionally, in jurisdictions where judicial officers or their designees either have appointment authority or take part in the screening process, it is important for these judicial officers or their designees to promote diversity and inclusion in the judicial appointment and screening processes.  Attorneys from a wide variety of backgrounds should be invited to participate in the procedures for interviewing judicial candidates.[394]

Equally important to initiatives that attract diverse candidates to the bench are initiatives that are designed to retain diverse judges and support their progression within the judiciary. Once judges are appointed or elected, court administration should clearly communicate procedures for opportunities for judicial promotions. The factors and considerations involved in judicial promotions should be clear and transparent.[395]

**A comprehensive strategic plan.** To demonstrate their commitment to enhancing judicial and workforce diversity, judicial leaders should also develop a comprehensive strategic plan that incorporates both mandatory educational programming, and human resource policies and practices that promote DEI.

Courts' engagement in strategic planning is well documented throughout the United States. In 2016, the National Center for State Courts ("NCSC") estimated that "31 state administrative offices, one U.S. territory, the Federal Courts, and the District of Columbia courts" all had some form document "that [could] be referred to as a strategic plan." [396] Today, strategic planning in state courts has ballooned. Through grant funding provided by NCSC, federal agencies and several other organizations, state courts have been developing

---

[391] *See* Equal Justice Report, *supra* note 145, at 33.

[392] *See* Equal Justice Report, *supra* note 145, at 67-70.

[393] Equal Justice Report, *supra* note 145, at 31; *see also How to Become a Judge*, New York City Bar Association, (2018), https://www.nycbar.org/pdf/report/become_a_judge.pdf.

[394] Equal Justice Report, *supra* note 145, at 68.

[395] *Id.* at 67.

[396] Peter C. Kiefer, *The Role of Strategic Planning and Strategic Management in the Courts* (May 2016), https://www.ncsc.org/__data/assets/pdf_file/0019/19234/role-of-strategic-planning-and-strategic-management-in-the-courts.pdf.

systemwide and initiative-based plans in growing numbers.[397] "Courts must rely on a deliberate process to determine organizational values, mission, vision, goals, and objectives."[398]

**A mission statement that supports diversity.** Many courts have existing mission statements that set forth goals to promote justice by upholding the law in an efficient and fair manner.[399] As a component of strategic planning, courts should update their mission statements to specifically acknowledge the effects of bias and discrimination, and the court's responsibility to minimize such effects in the judicial process.

For example, in 2021, the New York State Unified Court System revised its mission statement, which previously read:

> *The mission of the Unified Court System (UCS) is to deliver equal justice under the law and to achieve the just, fair and timely resolution of all matters that come before our courts.*

The new mission statement now includes additional language to reflect the court's expanded commitment:

> *In the service of our mission, the UCS is committed to operating with integrity and transparency, and to ensuring that all who enter or serve in our courts are treated with respect, dignity and professionalism. We affirm our responsibility to promote a court system free from any and all forms of bias and discrimination and to promote a judiciary and workforce that reflect the rich diversity of New York State.*

Publicly declaring these mindful goals establishes diversity as an ongoing pursuit and encourages courts to cultivate an atmosphere that leverages the collective strengths of their workforce. The declaration further drives the goal of building public trust and confidence in the judiciary by operating a legal system that more accurately reflects the communities it serves.

**Awareness of personal and organizational biases.** Bias negatively impacts the fair administration of justice. To ensure that personal biases do not impact judicial decision making and impartiality, it is important that judges and non-judicial staff become aware of their own biases and develop tools and skills for identifying and ameliorating them. Judicial

---

[397] National Center for State Courts, *Justice for All State Planning Documents* (2018), https://www.ncsc.org/__data/assets/pdf_file/0016/26305/jfa-lessons-learned-final-2018.pdf.

[398] State Justice Institute, *Strategic Planning*, https://www.sji.gov/priority-investment-areas/strategic-planning/.

[399] *See, e.g.*, Superior Court of California, County of Riverside, *Court Mission Statement*, https://www.riverside.courts.ca.gov/GeneralInfo/Mission/mission.php; Texas Judicial Branch Fourth Court of Appeals, *Mission Statement*, https://www.txcourts.gov/4thcoa/mission-statement/; Delaware Courts Justice of the Peace Court, Mission, *Vision & Goals*, https://courts.delaware.gov/jpcourt/mission.aspx; Florida Supreme Court, *Mission & Vision*, https://supremecourt.flcourts.gov/About-the-Court/Mission-Vision.

leaders should consider enlisting subject matter experts to guide and assist in the development of mandatory bias education programs that focus on understanding and identifying explicit and implicit bias. Engaging social scientists and other relevant experts in the field will enable courts to develop informed and targeted strategies for moving forward and to create organizational capacity to further these values.

**Accountability.** It is essential that the people who serve our courts—especially those who lead them—inspire confidence. Every state has a code or rules that govern judicial conduct which includes upholding the integrity and independence of the judiciary, avoiding the appearance of impropriety and upholding the duties of judicial office fairly and impartially. In New York, the rules of judicial conduct go a bit further. They expressly require judges to perform their duties "without bias or prejudice against or *in favor* of any person," and prohibit judges "by words or [by] conduct" from manifesting bias or prejudice based upon a host of identities, including but not limited to, race, gender, age, disability, sexual orientation and SES. New York additionally mandates that judges "require staff, court officials and others subject to the judge's direction and control" to likewise refrain from any such words or conduct.[400] The state also requires judges to ensure that attorneys appearing before them do so.

Courts should also ensure that they have clear policies and protocols for investigating claims of bias, harassment and discrimination. Adopting an anonymous reporting system and clear "no retaliation" policies are fundamental to ensuring that claimants feel safe coming forward.[401]

Importantly, to engender public trust and the trust of the workforce, courts should be steadfast in their duty to hold accountable those who demonstrate bias or prejudice against litigants, colleagues or other stakeholders.[402] Decision matrices can help ensure that similar actions result in similar discipline without undue regard to title or seniority.

**Capacity building.** Mindful of the importance of diversity in the profession, members of the judiciary should broadly support measures that create equal opportunities for attorneys to take on lead roles in their courtrooms.[403] Likewise, when making

---

[400] 22 NYCRR 100.3(4) ("A judge shall perform judicial duties without bias or prejudice against or in favor of any person. A judge in the performance of judicial duties shall not, by words or conduct, manifest bias or prejudice, including but not limited to bias or prejudice based upon age, race, creed, color, sex, sexual orientation, gender identity, gender expression, religion, national origin, disability, marital status or socioeconomic status, and shall require staff, court officials and others subject to the judge's direction and control to refrain from such words or conduct.").

[401] Equal Justice Report, *supra* note 145 at 87.

[402] Yousueng Han & Sounman Hong, *The Impact of Accountability on Organizational Performance in the U.S. Federal Government: The Moderating Role of Autonomy*, 39 Rev. of Pub. Personnel Admin. 3 (2019); Jeffrey J. Rachlinski et al., *Does Unconscious Bias Affect Trial Judges?*, 84 Notre Dame L. Rev. 1195 (2009).

[403] New York State Bar Association, *The Time is Now: Achieving Equality for Women Attorneys in the Courtroom and in ADR*, at 14-15 61-62, 67 (2020) (hereinafter NYSBA 2020 Report), /https://nysba.org/app/uploads/2020/06/5.-Report-and-recommendations-of-Commercial-and-Federal-Agenda-Item-11-2-1.pdf; New York State Bar Association, *If Not Now, When? Achieving Equality for Women Attorneys in the Courtroom and in ADR*, at 23 (Nov. 2017) (hereinafter NYSBA 2017 Report),

discretionary appointments, including internships, clerkships, court referees, mediator, special masters and guardian ad litem positions, the judiciary should put in place policies that demonstrate its commitment to diversity and equal opportunity.[404]

Human Resources plays a pivotal role in creating a diverse, inclusive and equitable workplace and is instrumental in formulating and implementing policies and strategies that actively promote diversity. Courts should consider setting clear and inclusive HR policies which aim to: (1) promote transparency and accessibility in application procedures; (2) promote a diverse applicant pool; (3) develop inclusive civil service exams and other written evaluation tools; and (4) implement structured interviews conducted by diverse interview panels consisting of individuals from various backgrounds, experiences, and perspectives.

Courts' employment applications and hiring processes should be clear and transparent to the public at-large. At the inception of the hiring process, relevant personnel compiling employment opportunities should review the same to ensure that they cater to a wide and diverse audience. For example, courts should consistently evaluate whether educational or experience requirements remain appropriate. Courts should further focus on "making the hiring process more user friendly for diverse candidates"[405] by, for example, providing free test preparation materials for any exams required to fill the position, distributing hard copy applications to those who may not necessarily have access to technology and ensuring that candidates are provided with constructive feedback where applicable.[406]

To increase awareness of judicial opportunities, courts should engage in focused outreach to communities with higher percentages of underrepresented groups. These efforts can be strengthened by using inclusionary language for job postings. Plain language and inclusive wording in job postings can positively influence the diversity and inclusivity of applicant pools and promote fairer recruitment practices.[407]  Similarly, posting opportunities in LGBTQ+ centers, HBCUs, bar associations, fraternal organizations, faith communities, local colleges, career fairs and social media may also aid in attracting diverse applicants.[408]

Most local, state and federal government positions are filled through the civil service examination process. Civil service exams should be developed by professional exam developers trained in exam development and the *Uniform Guidelines on Employee*

---

https://www.actl.com/docs/default-source/default-document-library/task-force-on-mentoring/aba_nysba_achieveing_equality_women_attorneys.pdf?sfvrsn=43726969_4.

[404] NYSBA 2020 Report, *supra* note 403, at 63-64, 68; NYSBA 2017 Report, *supra* note 403, at 23, 34.

[405] Equal Justice Report, *supra* note 145, at 96.

[406] *Id.* at 96-98.

[407] Lien Wille & Eva Derous, *Getting the Words Right: When Wording of Job Ads Affects Ethnic Minorities' Application Decisions*, 31 Mgmt. Commc'n Q. 533 (2017).

[408] Equal Justice Report, *supra* note 145, at 46; Patrick J. Carrington, *A Court System's Guide to Increasing Diversity and Fostering Inclusion* 16 (National Center for State Courts), https://www.ncsc.org/__data/assets/pdf_file/0018/66321/a_court_systems_guide_Carrington.pdf; Hon. Janet DiFiore, Equal Justice in the New York State Courts: 2020-2021 Year in Review, at 31-32 (2021), https://www.nycourts.gov/LegacyPDFS/publications/2021-Equal-Justice-Review.pdf.

*Selection Procedures* and include exam validation, job analysis, item analysis and adverse impact analysis.[409] Exam content and qualifications should be based on comprehensive job analysis studies and input from diverse subject-matter-experts. Exam developers should aim to minimize and reduce the adverse impact of written exams by implementing fair and inclusive practices that minimize bias and create a level playing field for all test-takers.

As discussed above, a well-developed and implemented structured interview format reduces bias in the interview selection process.[410] In order to reduce bias and ensure that candidates are evaluated fairly based on merit, interviewers must be trained to conduct structured interviews effectively. Structured interviews involve standardized questions and evaluation criteria to ensure fairness and consistency in the selection process. Interview questions should be designed to assess a candidate's knowledge, skills and abilities, while also probing for their commitment to diversity and inclusivity. The questions should be job-related behavioral or situational questions. In order to demonstrate the court's commitment to diversity and anti-discrimination policies, the court may consider incorporating questions related to diversity and anti-discrimination policies, as applicable.

## B.    Bias Training and Educational Outreach

Anti-bias training and educational programming for judges, court staff, uniformed personnel and jurors foster the courts' commitment to DEI.

Regular mandatory bias training for judges is a crucial step towards alleviating racial injustice within the court system.[411] Several experts have posited that such training should be administered by experts in the field to facilitate relevant and nuanced discussions and incorporate practical guidance. This training should include how to respond when witnessing unacceptable or questionable behavior by others in a court setting.[412] The training must acknowledge that issues of racial and cultural bias are intersectional,[413] and

---

[409] Uniform Guidelines on Employee Selection Procedures (1978), https://www.govinfo.gov/content/pkg/CFR-2011-title29-vol4/xml/CFR-2011-title29-vol4-part1607.xml.

[410] Julia Levashina et al., *The Structured Employment Interview: Narrative and Quantitative Review of the Research Literature*, 67 Personnel Psychol. 241 (2014).

[411] Pamela M. Casey et al., *Addressing Implicit Bias in the Courts*, 49 Ct. Rev. 64, 65-69 (2013); Hon. Edwina Richardson-Mendelson, Equal Justice in the New York State Courts: 2022 Year in Review, at 8 (2022), https://www.nycourts.gov/LegacyPDFS/publications/22-Equal-Justice-Review.pdf; Equal Justice Report, *supra* note 145, at 81-83.

[412] Renee N. Allen & DeShun Harris, *#SocialJustice: Combatting Implicit Bias in an Age of Millennials, Colorblindness, & Microaggressions*, 18 U. Md. L.J. Race Relig. Gender & Class 1, 19-28 (2018); Francesca Gino & Katherine Coffman, *Unconscious Bias Training that Works*, Harvard Business Review, Sept.-Oct. 2021, https://hbr.org/2021/09/unconscious-bias-training-that-works.

[413] Equal Justice Report, *supra* note 145, at 82, n.214; *see* Merrill Perlman, *The Origin of the Term Intersectionality*, Colum. Journalism Rev. (2018), https://www.cjr.org/language_corner/intersectionality.php.

that discrimination based on race often overlaps with class, gender, sexual orientation, immigration status and beyond.[414]

There is an equal need for bias training for non-judicial personnel. Court staff and uniformed personnel interact with court visitors and other stakeholders in a variety of capacities. Court personnel, in every role, must be trained in the skill of treating court visitors from diverse and other backgrounds with dignity and fairness and to successfully navigate challenges that may arise.[415]

Requiring bias education for jurors will serve to enhance fairness in trials. While the law requires jurors to be impartial racial and cultural biases can prevent people from acting fairly.[416] Prospective jurors are shown an orientation video at the start of service in many courthouses across the country.[417] Any such video should include a segment on implicit bias.[418] The video should describe what implicit bias is, explain why the way our brains work can lead to bias and discuss strategies that jurors can employ to mitigate underlying biases or stereotypes in decision-making.[419] Courts should also formulate uniform rules to explicitly permit and endorse addressing juror bias during voir dire as well as develop model jury instructions that explain the concept of bias and remind the members of the jury to be aware of their implicit biases, as well as all other forms and sources of bias.[420]

## C.     Engage with the Community and Local Organizations

Community outreach serves an important role in building trust and nurturing confidence in the judiciary, and in advancing equal opportunity by inspiring individuals

---

[414] Equal Justice Report, *supra* note 145, at 82; Melissa L. Breger, *Making the Invisible Visible: Exploring Implicit Bias, Judicial Diversity, and the Bench Trial*, 53 U. Rich. L. Rev. 1039, 1077 (2019); Peggy Li, *Hitting the Ceiling: An Examination of Barriers to Success for Asian American Women*, 29 Berkeley J. Gender L. & Just. 140, 148-149 (2014).

[415] Equal Justice Report, *supra* note 145, at 61-65.

[416] Anna Roberts, *(Re)forming the Jury: Detection and Disinfection of Implicit Juror Bias*, 44 Conn. L. Rev. 827, 835-837 (2012); Samuel R. Sommers & Phoebe C. Ellsworth, *White Juror Bias: An Investigation of Prejudice against Black Defendants in the American Courtroom*, 7 Psychol. Pub. Pol'y & L. 201, 220-221 (2001).

[417] Ruth V. McGregor, *State Courts and Judicial Outreach*, 21 Geo. J. Legal Ethics 1283, 1290 (2008).

[418] A. Roberts, *supra* note 416, at 860-866; Lee J. Curley, James Munro, & Itiel E. Dror, *Cognitive and Human Factors in Legal Layperson Decision Making: Sources of Bias in Juror Decision Making*, 62 Med., Sci., & the Law 206, 212 (2022); Jerry Kang et al., *Implicit Bias in the Courtroom*, 59 UCLA L. Rev. 1124, 1181-1182 (2012).

[419] 2022 Year in Review Report, *supra* note 411, at 9; N.Y. Unified Court Sys., *Jury Service and Fairness*, http://www.nyjuror.gov/ (last visited August 1, 2023).

[420] Anona Su, *A Proposal to Properly Address Implicit Bias in the Jury*, 31 Hastings Women's L.J. 79, 83-85 (2020); Caroline B. Crocker & Margaret Bull Kovera, *The Effects of Rehabilitative Voir Dire on Juror Bias and Decision Making*, 34 Law & Hum. Behav. 212, 224-226 (2010); Hon. Mark W. Bennett, *Unraveling the Gordian Knot of Implicit Bias in Jury Selection: The Problems of Judge Dominated Voir Dire, the Failed Promise of Batson, and Proposed Solutions*, 4 Harvard L. Rev & Policy 149, 158-161 (2010); Rachael A. Ream, *Limited Voir Dire: Why it Fails to Detect Juror Bias*, 23 Crim. Just. 22, 25-27 (2009); A.B.A., *Keeping Close Watch on Implicit Bias in the Courts* (August 11, 2022), https://www.americanbar.org/news/abanews/aba-news-archives/2022/08/keeping-close-watch-on-implicit-bias-in-the-courts/.

from diverse backgrounds to pursue careers as lawyers and judges. To that end, courts should consider: (1) creating robust community outreach efforts, including through the use of public hearings and community meetings, listening sessions and surveys; (2) establishing centralized and innovative civic engagement programs; and (3) taking steps to ensure that courthouses are inclusive.

Courts should actively create opportunities for interactions with communities that are positive via public hearings, meetings and listening tours. These interactions engage the public in identifying challenges affecting their communities. Such opportunities are particularly important for underserved and low-income communities.[421] Public hearings allow the court to learn of the public's experiences and concerns, including their perceptions about racial and ethnic bias or discrimination,[422] while providing a platform for courts to educate communities about available court programs and services.[423] Courts should also use in-court and local surveys to ensure that there are systematic procedures for requesting and acting upon regular feedback.

To reach a wider audience, courts should use web-based technology, social media and broadcast media to engage and educate communities. Members of the public who cannot otherwise physically attend public meetings or other community outreach activities can often be reached through online communications.

Court leaders should also consider forming local committees in their jurisdictions. Local committees comprised of members of the court and community who understand local dynamics and nuances, regional politics and historic mores, can help with implementing reforms at the local court level aimed at changing the institutional culture.[424]

While many judges and court staff engage in civic-related activities on their own, as a best practice, a centralized organizational structure to monitor, promote and enhance civic engagement is strongly recommended. Schools, educators and many community-based programs regularly seek learning opportunities through the courts. Maintaining a registry for courthouse tours and for available speakers to address specific subject matter areas is a strong first step for developing a centralized civic engagement plan.

A model initiative that leverages technological resources is the Second Circuit's Justice For All: Courts and Community program. Through a computer-based court learning center and interactive museum-like exhibits, the public—from school children to senior

---

[421] National Center for State Courts, *Public Engagement Pilot Projects*, https://www.ncsc.org/consulting-and-research/areas-of-expertise/racial-justice/resources/community-engagement-initiative/public-engagement-pilot-projects.

[422] The Neb. Minority and Justice Task Force, *Final Report* (April 2011), https://digitalcommons.unl.edu/cgi/viewcontent.cgi?article=1099&context=publicpolicypublications.

[423] Superior Court of California, County of Orange, *Leadership Academy*, https://www.occourts.org/directory/education/leadership-academy.html.

[424] National Center for State Courts, *The Evolving Science on Implicit Bias: An Updated Resource for the State Court Community* at 21-25 (2021), https://ncsc.contentdm.oclc.org/digital/collection/accessfair/id/911; 2022 Year in Review Report, *supra* note 411, at 20.

citizens—can learn about the federal courts, historic cases and iconic lawyers.[425] These in-court experiences allow members of the public to learn about the court system and the experience of working within the judicial system.

The physical courthouse environment and how it looks can also help to foster a positive experience for court users. The photographs, portraits and artworks displayed in our governmental buildings signal to its users who belongs and is welcome.[426] Displaying portraits of jurists from various backgrounds or artwork honoring local community members can send the message to court visitors, from the moment they enter the courthouse, that they will be treated fairly and with respect.[427]

### D.    Data Collection and Analysis

Lastly, courts should maintain rigorous data on the make-up of members of the judiciary, court personnel and applicants for positions in the court system. Such data should be made available to the public to support transparency.

Current efforts made by some states to maintain robust diversity data on judges[428] should be expanded to include law clerks and other judiciary personnel, which is currently generally lacking.[429] The judiciary should consider developing metrics and reporting requirements for each court, and systematically collecting and publishing diversity-related data on at least an annual basis.[430] Participation in the data collection should be voluntary, and the data should be handled sensitively, and should be released only under limited circumstances—*e.g.*, in aggregate on a state-wide and court-level basis.[431] The collected data should be comprehensive and cover a range of diversity categories, including gender identity and sexual orientation. The data should also be collected using clear and accepted methods, and reliable practices that are sufficiently detailed to allow other researchers to

---

[425]    Justice For All: Courts and the Community Initiative, *Courthouse Visits*, https://justiceforall.ca2.uscourts.gov/courthouse_visits.html.

[426] Heather L. Stuckey & Jeremy Nobel, *The Connection Between Art, Healing, and Public Health: A Review of Current Literature*, 100 Am. J. Pub. Health 254, 254 (2010); 2022 Year in Review Report, *supra* note 411, at 27-28, 30-31, 48.

[427] 2022 Year in Review Report, *supra* note 411, at 27.

[428] *See* Amanda Powers & Alicia Bannon, State Supreme Court Diversity — May 2022 Update, Brennan Ctr. for Justice, May 25, 2022, https://www.brennancenter.org/our-work/research-reports/state-supreme-court-diversity-may-2022-update (discussing data compiled by states); *see also* Judicial Council of California, Judicial Officer (JO) Demographic Data, https://www.courts.ca.gov/13418.htm (last visited July 29, 2023).

[429] Jeremy D. Fogel, et al., *Law Clerk Selection and Diversity: Insights from Fifty Sitting Judges of the Federal Courts of Appeals*, 137 Harv. L. Rev. (forthcoming 2023) ("An annual report of law clerk demographics that is official, complete, and public would go a long way toward remedying the invisibility of the issues identified in our study . . .. For law clerks, we suggest annual collection of this information, along with the court or jurisdiction where they are clerking, the law school they attended, veteran status, and socioeconomic indicators such as parental education or whether they were the first in their family to attend college or law school.").

[430] Yuvraj Joshi, Diversity Counts: *Why States Should Measure the Diversity of Their Judges and How They Can Do It* at 24–26 (Lamba Legal 2017), https://legacy.lambdalegal.org/in-court/legal-docs/20170607_diversity-counts.

[431] *Id*. at 24, 26.

replicate their findings.[432] Courts should also collect measurable and quantifiable data on the effectiveness of existing programs for addressing grievances involving violations of HR practices and policies.

---

[432] *Id.* at 25.

## CONCLUSION

The *SFFA* decision is a setback for preserving the benefits that flow from fostering diversity in our university classrooms. It is also a call to action for those committed to the principles of DEI. We offer the guidance and recommendations in this report to support higher education institutions, law firms, businesses and our judiciary in maintaining their commitment to diversity and achieving their DEI goals in a manner which is consistent with the Supreme Court's ruling and mitigates the potential risks of a changing legal landscape.

# [APPENDIX A]

# Report of the New York State Bar Association
# Task Force on Advancing Diversity
# Summary of Recommendations and Guidance

This Appendix provides a high-level summary of the Task Force on Advancing Diversity's recommendations and guidance for educational institutions, corporations, law firms and the state court system in the context of advancing their respective DEI efforts.

This summary is not intended to provide legal advice, and no legal or business decision should be based on its content.

## I.    Law Schools and Other Higher Education Institutions

- Any effort to advance diversity in law schools should focus on the mission of the university and how values and goals associated with that mission are articulated and pursued. Having and articulating important institutional goals, including diversity in legal education, remain permissible.

- Define the attributes to be given weight in the admissions process in advance and ensure that they are connected to the mission identified by the institution.

- Comprehensively consider viable race-neutral strategies to advance broader institutional diversity and equity goals, including SES, place-based and other potential admissions policies and ensure that race-neutral strategies reflect alignment with authentic institutional aims.

- Design application materials to collect demographic data (in conformance to the Court's guidance in the *SFFA* decision on the permissible role of race in the admissions process). Collection of disaggregated data may be important for research and evaluation purposes.

- Re-examine existing admissions policies and practices to address barriers to equitable educational access and consider reevaluating the criteria for assessing merit, including: (1) using standardized tests; (2) legacy, athlete and donor preferences; (3) providing resources to alleviate the financial burden on law school applicants; and (4) developing methods for recruitment that can help diminish the pervasive disparities in law student enrollment and graduation among students of varying generational, racial or ethnic, and socio-economic backgrounds.

- Consider implementing recruitment and outreach strategies that extend beyond schools from which educational institutions have traditionally recruited to also encompass less-well-represented institutions and achieve a broadly diverse applicant pool.

- Directly engage with legislatures to advocate for new or expanded financial aid funding.

- Increase outreach to, investment in and collaboration with prospective students and affiliative partners.

- Implement broad-based support programs (*e.g.*, the Equal Opportunity Programs in New York), which can help address students' ancillary and complementary admissions needs, such as test preparation, financial assistance, academic and mentorship support, and related resources. In designing and implementing these programs, institutions should ensure that additional requirements do not inadvertently disadvantage participating students compared to the rest of the student body.

- Consider explicitly referencing eligible student groups that may otherwise be underrepresented in all marketing materials, programming and related eligibility descriptions to signal to prospective diverse candidates that their applications for admission are truly welcome.

- Foster inclusive learning environments, both inside and outside the classroom and create a sense of belonging and support for historically underrepresented students. Diversity plan–related initiatives should include alumni, foundation representatives, donors, law firms, legal clients and government. Active engagement of key stakeholders facilitates consistent messaging about core values, including the elimination of bias, as well as guidance on implementing new policies and practices, which will lead to increased buy-in and trust throughout the community.

- Use testimonials from diverse scholarship and specialized program participants to convey to potential applicants, and the broader community, the demographic scope of awardees while also inherently conveying eligibility standards.

- Consider specialized campus-wide training as part of diversity initiatives to address critical changes in policy and practice focusing on cultural competence as well as identifying, eliminating, and disrupting bias to ensure that students of all backgrounds experience a respectful climate in which they can thrive.

- Train key personnel and stakeholders in admissions, financial aid, enrollment, diversity equity and inclusion, institutional advancement and student success groups to ensure a holistic effort and response campus-wide.

- Design assessment and audit procedures to ensure that the resources and support necessary for compliance are accessible, especially where race-neutral considerations are at issue.

- Commit to purposeful and lawful strategies to improve representation of faculty from diverse backgrounds and culturally competent leadership.

- Implement trainings and coursework grounded in racial justice to promote anti-racist educational settings.

- Recognize the emotional impact that public dialogue around diversity, the *SFFA* decision and race generally may have on campus stakeholders. Provide support to ensure the mental health and well-being of students, campus faculty and staff across the learning community as they navigate a shifting and contested landscape regarding racial diversity in legal education.

- Purposefully design wellness, and social, cultural and academic programming to show all students, especially underrepresented and first-generation students, that they are valued, that they belong and that they have a place in the legal profession.

## II.    Private Employers: Corporations and Law Firms

- Communicate a continued commitment to the organization's DEI principles.

- Assess existing DEI programs and consider engaging external counsel to conduct a legally privileged audit of DEI programs.

- Assess perceptions of DEI efforts, including through an analysis of the perception of DEI programs by employees and external stakeholders.

- Identify the specific benefits of diversity in the workplace and develop programs and initiatives specifically tailored to further those benefits.

- Increase internal controls over communications and disclosures about DEI initiatives, paying careful attention to appropriately and accurately describing those initiatives and the implications of making such disclosures.

- Implement education and training for all key partners, managers and employees to ensure that recruiters and those tasked with making employment decisions understand the purpose of DEI programs, as well as the key legal principles that govern those programs, and perform their functions in a way that mitigates legal and reputational risks.

- Appropriately collect, track, manage and utilize DEI data to increase organizational awareness of the performance of DEI programs.  In addition, measure the outcomes of hiring, retention and promotion practices, as well as specific diversity initiatives, and periodically assess such data to identify and better understand patterns, gaps and opportunities for improvement.

- Foster good practices and ensure that senior leadership teams understand, and are invested in achieving, the objectives of the organization's DEI programs, which should be well-documented.

- Monitor changes in state and local laws and initiatives aimed at protecting and limiting DEI programs and any changes thereto.

- Rely on lawful strategies to achieve goals relating to: (1) outreach and recruitment efforts; (2) retention; and (3) the advancement of underrepresented groups. Organizations seeking to amplify opportunities to attract and recruit diverse talent should consider: (i) leveraging inclusive job postings; (ii) expanding recruiting efforts beyond schools they have traditionally focused on; (iii) targeting outreach to diverse student organizations and diverse career fairs and leveraging relationships with bar associations; (iv) recruiting candidates who have taken alternate paths in school or their careers; (v) implementing structural behavioral interviews; and (vi) engaging with pipeline programs for high school and college students.

- Consider implementing development and retention programs that incorporate a range of tools, including: (1) affinity groups and ERGs; (2) advice and mentorship programs coupled with feedback and evaluation; (3) formal training programs; (4) equitable work allocation systems; and (5) networking opportunities.

- Consider implementing effective advice and mentorship programs that seek to achieve a range of objectives, including:

    (1)    Understanding issues the employee is experiencing and helping to resolve them;

    (2)    Clarifying commitment and performance expectations and behavioral norms;

    (3)    Getting to know the employee as an individual;

    (4)    Helping the employee assess their medium- and long-term career goals and identifying ways to position them to achieve those, whether for internal promotion opportunities or to pursue external opportunities in the future;

    (5)    Identifying important skills that need developing and helping the employee identify the work opportunities that will most directly improve those skills; and

    (6)    For high-potential employees that manifest the talent to become vice presidents, directors and partners, ensuring that firm or company leadership has them on their radar to track and develop.

- Consider, as regards client-service focused companies (and law firms), forming partnerships with clients around diversity, which may take several forms, including:

    (1)    Bringing together affinity groups and ERGs from the employer and selected clients for events, potentially with guest speakers;

    (2)    Running training sessions focused on building skills that employees at both organizations need;

    (3)    Collaborating to identify secondment opportunities;

    (4)    Jointly sponsoring selected events that provide diverse employees at different organizations the opportunity to get to know each other; and

    (5)    Working with clients on public service initiatives that address legal issues faced by disadvantaged or marginalized communities, which can demonstrate a shared commitment to promoting social justice and equality.

- Consider factors that impact employee career trajectories at their company, and how those factors may create a greater hurdle for underrepresented minorities. Examples include:

    (1)    How salaries and other financial incentives are structured;

    (2)    For client service firms, how underrepresented minorities and women may be impacted by a client or firm's desire to have a diverse team participate in a pitch or other nonbillable assignment;

      (3)     The types of social and business development activities that are available and encouraged;

      (4)     How parental leave is handled;

      (5)     How fertility and family-planning challenges are handled and/or acknowledged; and

      (6)     The extent to which flexible and reduced hours work schedules are permitted and supported.

- Consider the development of supplier diversity programs as a way to both diversify business risks and help small and diverse business owners.

## III.    The Judiciary

- In order to ensure that judicial commitment to diversity is messaged from the top levels of court leadership, courts should consider:

      (1)     promoting judgeships as viable career opportunities for attorneys of all backgrounds, through transparent selection procedures and educational seminars;

      (2)     eliminating barriers to people from diverse backgrounds seeking election or appointment to judgeships and clearly communicating procedures for opportunities for judicial promotions;

      (3)     developing a comprehensive strategic plan that incorporates both mandatory educational programming, and human resource policies and practices that promote DEI, including those which aim to: (i) promote transparency and accessibility in application procedures; (ii) promote a diverse applicant pool; (iii) develop inclusive civil service exams and other written evaluation tools; and (iv) implement structured interviews conducted by diverse interview panels consisting of individuals from various backgrounds, experiences, and perspectives;

      (4)     developing or updating mission statements to include support for diversity, and to specifically acknowledge the effects of bias and discrimination, and the court's responsibility to minimize such effects in the judicial process;

      (5)     encouraging judicial leadership to demonstrate awareness of personal and organizational bias, including by enlisting

subject matter experts to guide and assist in the development of mandatory bias education programs for judges, court staff, uniformed personnel and jurors that focus on understanding and identifying explicit and implicit bias;

(6)     recognizing accountability as an ethical duty and ensuring that there are clear policies and protocols for investigating claims of bias, harassment and discrimination; and

(7)     broadly supporting measures that create equal opportunities for attorneys to take on lead roles in their courtrooms, putting in place policies that demonstrate the court's commitment to diversity and equal opportunity in discretionary appointments;

(8)     ensuring that employment applications and hiring processes are clear and transparent to the public at-large; and

(9)     engaging in focused outreach to communities with higher percentages of underrepresented groups.

- Civil service exams should be developed by professional exam developers trained in exam development and the *Uniform Guidelines on Employee Selection Procedures* and include exam validation, job analysis, item analysis and adverse impact analysis. Exam content and qualifications should be based on comprehensive job analysis studies and input from diverse subject-matter-experts. Exam developers should aim to minimize and reduce the adverse impact of written exams by implementing fair and inclusive practices that minimize bias and create a level playing field for all test-takers.

- Consider collaboration and communication with community and local organizations, including:

(1)     creating robust community outreach efforts, including through the use of public hearings and community meetings, listening sessions and surveys;

(2)     establishing centralized and innovative civic engagement programs; and

(3)     taking steps to ensure that courthouses are inclusive.

- Consider the utility of data collection and analysis and maintain rigorous data on the make-up of members of the judiciary, court personnel and applicants for positions in the court system, which should be made available to the public to support transparency.

- Consider incorporating a well-developed and implemented structured interview format, which reduces bias, in the interview selection process.

# Exhibit 8

 **U.S. Equal Employment Opportunity Commission**

**Press Release**
01-21-2025

# President Appoints Andrea R. Lucas EEOC Acting Chair

WASHINGTON – The U.S. Equal Employment Opportunity Commission (EEOC) today announced that President Donald J. Trump has named Commissioner Andrea R. Lucas Acting Chair of the EEOC. Lucas has served as an EEOC Commissioner since 2020, having been nominated by President Trump during his first term.

"I am honored to be chosen by President Trump to lead the EEOC, our nation's premier civil rights agency enforcing federal employment antidiscrimination laws," Lucas said. "I look forward to restoring evenhanded enforcement of employment civil rights laws for all Americans. In recent years, this agency has remained silent in the face of multiple forms of widespread, overt discrimination. Consistent with the President's Executive Orders and priorities, my priorities will include rooting out unlawful DEI-motivated race and sex discrimination; protecting American workers from anti-American national origin discrimination; defending the biological and binary reality of sex and related rights, including women's rights to single-sex spaces at work; protecting workers from religious bias and harassment, including antisemitism; and remedying other areas of recent under-enforcement."

During her tenure on the Commission, Lucas has **written and spoken (https://www.eeoc.gov/andrea-r-lucas-acting-chair#section1)** frequently about challenging and emerging issues in employment and civil rights law to educate workers about their rights, help employers comply with their responsibilities, and correct common misunderstandings about the law.

"Our employment civil rights laws are a matter of individual rights. We must reject the twin lies of identity politics: that justice is measured by group outcomes and that civil rights exist solely to remedy harms against certain groups," Lucas said. "I intend to dispel the notion that only the 'right sort of' charging party is welcome through our doors and to reinforce instead the fundamental belief enshrined in the Declaration of Independence and our civil rights laws—that all people are 'created equal.' I am committed to ensuring equal justice under the law and to focusing on equal opportunity, merit, and colorblind equality."

Before her appointment to the EEOC, Lucas practiced labor and employment law for an international law firm in Washington, D.C. Earlier in her career, she clerked on the United States District Court for the Eastern District of Virginia. More information about Lucas is available at **https://www.eeoc.gov/andrea-r-lucas-acting-chair (https://www.eeoc.gov/andrea-r-lucas-acting-chair)** .

The EEOC is the sole federal agency authorized to investigate and litigate against private companies and other private employers for violations of federal laws prohibiting employment discrimination. For public employers, the EEOC shares jurisdiction with the Department of Justice's Civil Rights Division; the EEOC is responsible for investigating public sector charges before referring them to DOJ for potential litigation. The EEOC also is responsible for coordinating the federal government's employment antidiscrimination effort. More information about the EEOC is available at **www.eeoc.gov (http://www.eeoc.gov)** . Stay connected with the latest EEOC news by subscribing to our **email updates (https://public.govdelivery.com/accounts/USEEOC/subscriber/new)** .

# Exhibit 9



# Office of the Attorney General
## Washington, D. C. 20530

February 5, 2025

MEMORANDUM FOR ALL DEPARTMENT EMPLOYEES

FROM:                  THE ATTORNEY GENERAL

SUBJECT:           ENDING ILLEGAL DEI AND DEIA DISCRIMINATION
                            AND PREFERENCES

The Department of Justice is committed to enforcing all federal civil rights laws and ensuring equal protection under the law. As the United States Supreme Court recently stated, "[e]liminating racial discrimination means eliminating all of it." *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 206 (2023). On January 21, 2025, President Trump issued Executive Order 14173, *Ending Illegal Discrimination and Restoring Merit-Based Opportunity*, 90 Fed. Reg. 8633 (Jan. 21, 2025), making clear that policies relating to "diversity, equity, and inclusion" ("DEI") and "diversity, equity, inclusion, and accessibility" ("DEIA") "violate the text and spirit of our longstanding Federal civil-rights laws" and "undermine our national unity." *Id.* at 8633.

To fulfill the Nation's promise of equality for all Americans, the Department of Justice's Civil Rights Division will investigate, eliminate, and penalize illegal DEI and DEIA preferences, mandates, policies, programs, and activities in the private sector and in educational institutions that receive federal funds.[1]

## I.      Ending Illegal DEI And DEIA Discrimination and Preferences

By March 1, 2025, consistent with Executive Order 14173, the Civil Rights Division and the Office of Legal Policy shall jointly submit a report to the Associate Attorney General containing recommendations for enforcing federal civil-rights laws and taking other appropriate measures to encourage the private sector to end illegal discrimination and preferences, including policies relating to DEI and DEIA. The report should address:

- Key sectors of concern within the Department's jurisdiction;

---

[1] This memorandum is intended to encompass programs, initiatives, or policies that discriminate, exclude, or divide individuals based on race or sex. It does not prohibit educational, cultural, or historical observances—such as Black History Month, International Holocaust Remembrance Day, or similar events—that celebrate diversity, recognize historical contributions, and promote awareness without engaging in exclusion or discrimination.

Memorandum for all Department Employees                                                    Page 2
Subject:  Ending Illegal DEI And DEIA Discrimination and Preferences

- The most egregious and discriminatory DEI and DEIA practitioners in each sector of concern;

- A plan including specific steps or measures to deter the use of DEI and DEIA programs or principles that constitute illegal discrimination or preferences, including proposals for criminal investigations and for up to nine potential civil compliance investigations of entities that meet the criteria outlined in section 4(b)(iii) of Executive Order 14173;

- Additional potential litigation activities (including interventions in pending cases, statement of interest submissions, and amicus brief submissions), regulatory actions, and sub-regulatory guidance; and

- Other strategies to end illegal DEI and DEIA discrimination and preferences and to comply with all federal civil-rights laws.

## II.    Guidance to Institutions Receiving Federal Funds

Educational agencies, colleges, and universities that receive federal funds may not "treat some students worse than others in part because of race." *Students for Fair Admissions*, 600 U.S. at 304 (Gorsuch, J., concurring).  Consistent with the January 21, 2025, Executive Order, the Department of Justice will work with the Department of Education to issue directions, and the Civil Rights Division will pursue actions, regarding the measures and practices required to comply with *Students for Fair Admissions*.