## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

WILMER CUTLER PICKERING HALE
AND DORR LLP,

*Plaintiff*,

v.

EXECUTIVE OFFICE OF THE
PRESIDENT, *et al.*,

*Defendants*.

Case No. 1:25-cv-917

Judge Richard J. Leon

## PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

## TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................................. ii

INTRODUCTION ............................................................................................................... 1

LEGAL STANDARD .......................................................................................................... 2

ARGUMENT ..................................................................................................................... 3

    I.   Defendants' Threshold Arguments Are Meritless ................................................... 3

        A. WilmerHale's Complaint Is Not a "Shotgun Pleading" ................................. 3

        B. WilmerHale Has Article III Standing .......................................................... 4

        C. WilmerHale's Claims Are Ripe ................................................................... 11

        D. All of the Order Is Judicially Reviewable ..................................................... 15

    II.   Defendants' Rule 12(b)(6) Arguments Are Meritless ...................................... 20

        A.  WilmerHale Has Pleaded (and Proven) Multiple First Amendment Claims ............. 21

            1. The Complaint states a claim for First Amendment retaliation
               (Count I) ................................................................................................... 21

            2. The Complaint states a claim for viewpoint discrimination (Count II) ............... 24

            3. The Complaint states a claim under the Petition Clause (Count III) .................. 26

            4. The Complaint states a freedom of association claim (Count IV) ........................ 27

        B.  WilmerHale Has Pleaded (and Proven) That the Order Exceeds the President's
          Authority and Violates the Separation of Powers (Counts V, XI) ............................. 29

        C.  WilmerHale Has Pleaded (and Proven) Deprivations of Due Process and Equal
          Protection (Counts VI, VII, VIII) ................................................................. 32

        D.  WilmerHale Has Pleaded (and Proven) Violations of Its Clients' Fifth and Sixth
          Amendment Rights to Engage Counsel of Their Choice (Counts IX, X) .................. 37

    III.  Injunctive And Declaratory Relief Are Appropriate Against All Defendants ................ 39

CONCLUSION .................................................................................................................. 43

# TABLE OF AUTHORITIES

### Cases

*Air Excursions LLC v. Yellen,*
   66 F.4th 272 (D.C. Cir. 2023) ................................................................. 2

*\*Ams. for Prosperity Found. v. Bonta,*
   594 U.S. 595 (2021) ......................................................................... 27, 28

*\*Aref v. Lynch,*
   833 F.3d 242 (D.C. Cir. 2016) ............................................................... 21

*Armstrong v. Exceptional Child Ctr., Inc.,*
   575 U.S. 320 (2015) ............................................................................. 41

*Armstrong v. Exec. Off. of the President,*
   90 F.3d 553 (D.C. Cir. 1996) ................................................................ 39

*Ashcroft v. Iqbal,*
   556 U.S. 662 (2009) .............................................................................. 2

*Blue Shield of Va. v. McCready,*
   457 U.S. 465 (1982) .............................................................................. 6

*Boutilier v. INS,*
   387 U.S. 118 (1967) ............................................................................ 35

*Campbell v. District of Columbia,*
   894 F.3d 281 (D.C. Cir. 2018) ............................................................... 32

*Caplin & Drysdale, Chartered v. United States,*
   491 U.S. 617 (1989) ............................................................................ 10

*Cent. of Ga. R.R. Co. v. United States,*
   410 F.Supp. 354 (D.D.C. 1976) ............................................................. 41

*Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.,*
   473 U.S. 788 (1985) ............................................................................ 42

*\*DOL v. Triplett,*
   494 U.S. 715 (1990) ....................................................................... 10, 38

*El-Ganayni v. U.S. Dep't of Energy,*
   591 F.3d 176 (3d Cir. 2010) ................................................................. 18

*Eng v. Cooley*,
    552 F.3d 1062 (9th Cir. 2009) ................................................................ 21

*\*FCC v. Fox Television Stations, Inc.*,
    567 U.S. 239 (2012) ............................................................. 32, 33, 34

*FDIC v. Mallen*,
    486 U.S. 230 (1988) ............................................................................ 32

*Fed. Express Corp. v. U.S. Dep't of Com.*,
    39 F.4th 756 (D.C. Cir. 2022) ............................................................ 30

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*,
    561 U.S. 477 (2010) ............................................................................ 31

*Goodyear Tire & Rubber Co. v. Haeger*,
    581 U.S. 101 (2017) ............................................................................ 31

*Hamdi v. Rumsfeld*,
    542 U.S. 507 (2004) ............................................................................ 34

*In re Al-Nashiri*,
    47 F.4th 820 (D.C. Cir. 2022) ...................................................... 11, 12

*Interstate Com. Comm'n v. Cent. of Ga. R.R. Co.*,
    429 U.S. 968 (1976) ............................................................................ 41

*Jiggetts v. District of Columbia*,
    319 F.R.D. 408 (D.D.C. 2017) ............................................................. 3

*Joint Anti-Fascist Refugee Comm. v. McGrath*,
    341 U.S. 123 (1951) ............................................................................ 36

*League of Women Voters of U.S. v. Newby*,
    838 F.3d 1 (D.C. Cir. 2016) ............................................................... 11

*Lederman v. United States*,
    131 F.Supp.2d 46 (D.D.C. 2001) .................................................. 41, 42

*Lederman v. United States*,
    291 F.3d 36 (D.C. Cir. 2002) ............................................................. 41

*\*Lee v. Garland*,
    120 F.4th 880 (D.C. Cir. 2024) .................................................. 17, 18, 19

*Legal Servs. Corp. v. Velazquez,
    531 U.S. 533 (2001) ........................................................................... 21, 29, 31

Lozman v. City of Riviera Beach,
    585 U.S. 87 (2018) ..................................................................................... 24

Lujan v. Defs. of Wildlife,
    504 U.S. 555 (1992) ..................................................................................... 5

Maine v. Moulton,
    474 U.S. 159 (1985) ................................................................................... 38

Martin v. Locke,
    659 F.Supp.2d 140 (D.D.C. 2009) .............................................................. 5

Mathews v. Eldridge,
    424 U.S. 319 (1976) ................................................................................... 32

Maynard v. Melton,
    2021 WL 6845008 (D.D.C. Apr. 7, 2021) ................................................... 4

Maynard v. Melton,
    2023 WL 1963919 (D.D.C. Feb. 10, 2023) ................................................. 4

Meina Xie v. Tillerson,
    2017 WL 2656648 (D.D.C. June 15, 2017) ................................................. 5

Mills v. Am. Univ.,
    2022 WL 17719576 (D.D.C. Dec. 15, 2022) ............................................... 3

Mills v. District of Columbia,
    571 F.3d 1304 (D.C. Cir. 2009) .................................................................. 8

Minnesota v. Mille Lacs Band of Chippewa Indians,
    526 U.S. 172 (1999) ................................................................................... 15

NAACP v. Alabama ex rel. Patterson,
    357 U.S. 449 (1958) ................................................................................... 28

Nader v. Democratic Nat'l Comm.,
    567 F.3d 692 (D.C. Cir. 2009) .................................................................. 26

Nat'l Ass'n of Mut. Ins. Cos. v. HUD,
    693 F.Supp.3d 20 (D.D.C. 2023) ............................................................... 5

*Nat'l Council of Resistance of Iran v. Dep't of State*,
    251 F.3d 192 (D.C. Cir. 2001) ................................................................. 35

*Nat'l Fed'n of Fed. Emps. v. Greenberg*,
    983 F.2d 286 (D.C. Cir. 1993) .......................................................... 17, 18

*\*Nat'l Rifle Ass'n of Am. v. Vullo*,
    602 U.S. 175 (2024) ............................................................... 2, 24, 25

*Newman v. Moore*,
    743 F.Supp.3d 62 (D.D.C. 2024) ........................................................ 36

*News Am. Publ'g, Inc. v. FCC*,
    844 F.2d 800 (D.C. Cir. 1988) ............................................................ 37

*O'Donnell v. Barry*,
    148 F.3d 1126 (D.C. Cir. 1998) ..................................................... 32, 33

*P.R. Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.*,
    506 U.S. 139 (1993) ........................................................................ 41

*Plaut v. Spendthrift Farm, Inc.*,
    514 U.S. 211 (1995) ........................................................................ 31

*Pleasant Grove City v. Summum*,
    555 U.S. 460 (2009) ........................................................................ 25

*Printz v. United States*,
    521 U.S. 898 (1997) ........................................................................ 31

*Pursuing Am.'s Greatness v. FEC*,
    831 F.3d 500 (D.C. Cir. 2016) .............................................................. 8

*Ralls Corp. v. CFIUS*,
    758 F.3d 296 (D.C. Cir. 2014) ............................................................ 35

*Rattigan v. Holder*,
    689 F.3d 764 (D.C. Cir. 2012) ....................................................... 17, 18

*Reed v. Town of Gilbert*,
    576 U.S. 155 (2015) ........................................................................ 24

*Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*,
    487 U.S. 781 (1988) ........................................................................ 28

*Rust v. Sullivan,*
    500 U.S. 173 (1991)...................................................................................... 25

*SEC v. Jarkesy,*
    603 U.S. 109 (2024)...................................................................................... 29

*Sekhar v. United States,*
    570 U.S. 729 (2013)........................................................................................ 7

*Sessions v. Dimaya,*
    584 U.S. 148 (2018)...................................................................................... 35

*State Nat'l Bank of Big Spring v. Lew,*
    795 F.3d 48 (D.C. Cir. 2015).......................................................................... 5

*T.M. v. District of Columbia,*
    961 F.Supp.2d 169 (D.D.C. 2013).................................................................. 3

*Trump v. Hawaii,*
    585 U.S. 667 (2018)...................................................................................... 42

*Trump v. J. G. G.,*
    2025 WL 1024097 (U.S. Apr. 7, 2025) ........................................................ 34

*United States ex rel. Graber v. City of New York,*
    8 F.Supp.2d 343 (S.D.N.Y. 1998) ................................................................ 39

*United States v. Cronic,*
    466 U.S. 648 (1984)...................................................................................... 37

*United States v. Emor,*
    785 F.3d 671 (D.C. Cir. 2015)........................................................................ 5

*United States v. Matchett,*
    837 F.3d 1118 (11th Cir. 2016) .................................................................... 36

*USAID v. All. for Open Soc'y Int'l, Inc.,*
    570 U.S. 205 (2013)...................................................................................... 30

*Wheat v. United States,*
    486 U.S. 153 (1988)...................................................................................... 38

*Wisconsin v. Constantineau,*
    400 U.S. 433 (1971)................................................................................ 15, 32

*Wolman v. United States*,
  501 F.Supp. 310 (D.D.C. 1980) .................................................................. 41

*Wolman v. United States*,
  542 F.Supp. 84 (D.D.C. 1982) .................................................................... 41

*Wounded Knee Legal Def./Offense Comm. v. FBI*,
  507 F.2d 1281 (8th Cir. 1974) .................................................................... 10

*Youngstown Sheet & Tube Co. v. Sawyer*,
  343 U.S. 579 (1952) .................................................................................... 42

*Zhang v. USCIS*,
  978 F.3d 1314 (D.C. Cir. 2020) .................................................................. 16

**Constitutional Provision and Statutes**

U.S. Const. art. III, §1 ...................................................................................... 29

5 U.S.C. §702 ....................................................................................... 40, 42

28 U.S.C. §1346 ................................................................................................ 40

28 U.S.C. §1391 ................................................................................................ 40

**Regulations**

8 C.F.R. §31.205-33 .......................................................................................... 28

48 C.F.R. §44.101 .............................................................................................. 28

Exec. Order No. 12,968, 60 Fed. Reg. 40,245 (Aug. 2, 1995) ....................... 18

**Other Authorities**

Anna Bower, *Energy Dept. Instructs Employees to Gather Info on Deals with Law
  Firms*, Lawfare (Apr. 9, 2025), https://tinyurl.com/44u3dn4j ................ 14

Complaint, *United States v. LLM Placements, LLC*, No. 23-cv-2190
  (D.D.C. July 27, 2023), Dkt.1 ...................................................................... 4

*Executive Office of the President*, White House, https://www.whitehouse.gov/eop/
  (last visited Apr. 17, 2025) ......................................................................... 40

*Executive Office of the President,* White House:  President Barack Obama,
  https://obamawhitehouse.archives.gov/administration/eop
  (last visited Apr. 17, 2025) ......................................................................... 40

Memo. from Att'y Gen. Pamela Bondi & OMB Dir. Russell Vought, *Jenner*,
No. 1:25-cv-916 (D.D.C. Apr. 8, 2025), Dkt.21-1 ................................................... 14

Press Release, *In EEOC Settlement, Four 'BigLaw' Firms Disavow DEI and Affirm
Their Commitment to Merit-Based Employment Practices*, EEOC (Apr. 11, 2025)
https://tinyurl.com/29pf92va ................................................................................ 23

Kathryn Rubio, *Flying in the Face of Multiple Court Orders, CFTC Wants to 'Ensure
Compliance' with Executive Orders Targeting Biglaw*, Above the Law
(Apr. 10, 2025), https://tinyurl.com/2a8sup4e ...................................................... 14

*Texas v. ATF*,
No. 2:24-cv-89 (N.D. Tex. May 1, 2024) ............................................................... 39

Tr. of TRO Hearing, *Jenner & Block LLP v. U.S. Dep't of Just.*, No. 1:25-cv-916
(D.D.C. Mar. 31, 2025), Dkt.10 ........................................................... 11, 12, 16, 37

Tr. of TRO Hearing, *Perkins Coie LLP v. U.S. Dep't of Just.*, No. 1:25-cv-716
(D.D.C. Mar. 13, 2025), Dkt.22 .................................................................. 11, 12, 16

Tr. of TRO Hearing, *Susman Godfrey LLP v. Exec. Off. of the President*, No. 1:25-cv-
1107 (D.D.C. Apr. 16, 2025), Dkt.19 .................................................................... 16

*United States v. Washington*,
No. 4:18-cv-5189 (E.D. Wash. Dec. 10, 2018) ...................................................... 39

Russell T. Vought, *Implementation of the Executive Order on "Addressing Risks
From Perkins Coie LLP*," OMB Memorandum M-25-17 (Mar. 7, 2025),
https://bit.ly/42LM6rM ......................................................................................... 13

# INTRODUCTION

The government's motion to dismiss defends an order starkly different from the one the President issued.  By the government's telling, the Executive Order avowedly sanctioning WilmerHale for its First Amendment activity has no meaningful practical effect, is a reaction only to the Firm's employment practices, and seeks only to exercise oversight of the Firm's own government-contracting activities.  No one, least of all the President, would recognize the order the government describes or mistake it for the one the President signed.  Indeed, the government's narrative is belied by the President's candid explanation for why he imposed sanctions on WilmerHale: its choice of clients and cases and its affiliation with people the President dislikes.  The government's attempted rewrite is also belied by the Order's operative provisions (which restrict far more than WilmerHale's ability to enter into or provide services under government contracts) as well as the "Fact Sheet" that accompanied the Order, which the government tellingly ignores.  And the government's efforts to dismiss the Order as little more than a call for "guidance" not only fly in the face of its language and elide evidence confirming that government agencies stand ready and willing to take immediate steps to implement the President's attempt to punish WilmerHale—even in the face of a TRO—but are belied by the actions of the nine law firms (and counting) that have determined that the only way they can hope to save themselves from imminent partner departures and financial ruin is by reshaping their First Amendment activity to better suit the President's preferences.

Not content with just defending an order the President did not issue, the government also attacks a complaint WilmerHale did not file.  After bizarrely criticizing the Complaint's commonplace organization of the Order's numerous legal deficiencies, the government "organizes" its own motion with a provision-by-provision approach that *truly* leaves it unclear exactly what argument(s) it is advancing as to which claim(s).  The confusion about which claims the

government thinks are unripe or non-justiciable is ultimately beside the point, though, as the government's objections are uniformly meritless.   And its effort to treat the Order as an amalgamation of discrete and unrelated provisions, as opposed to a coordinated effort to address the perceived "risks from WilmerHale" (to quote the Order's title) ignores the crux of WilmerHale's Complaint and fails to address the critical point that "the Order was designed to work as an integrated whole, and its retaliatory and viewpoint-discriminatory motivations, which are 'clear from its face,' … permeate the entire Order."  MSJ.37 (quoting TRO.2).

At bottom, the government's motion rests on the remarkable claim that the real threat here is not to the constitutional rights of law firms and their clients, or to the judiciary's ability to fully and fairly adjudicate cases based on robust and unchilled advocacy, but to *the President*'s "right to speak."  MTD.2.  The government appears to have forgotten the signal lesson the Supreme Court unanimously reiterated this past Term (in a case the government conspicuously never cites):  While "[a] government official can share h[is] views freely and criticize particular beliefs … in the hopes of persuading others," "[he] cannot … use the power of the State to punish or suppress disfavored expression."  *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 188 (2024).  The Order unabashedly does the latter.  WilmerHale's challenges to the Order not only easily withstand the government's motion to dismiss, but also compel invalidation of the Order in its entirety.

## LEGAL STANDARD

A motion to dismiss must be denied if the complaint contains "'sufficient factual matter, accepted as true,' to support an inference of standing" and to state a claim for relief "that is plausible on its face."  *Air Excursions LLC v. Yellen*, 66 F.4th 272, 277 (D.C. Cir. 2023) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

# ARGUMENT

## I.    Defendants' Threshold Arguments Are Meritless.

### A.    WilmerHale's Complaint Is Not a "Shotgun Pleading."

The government begins by arguing that WilmerHale's Complaint is a "shotgun pleading" that violates Rule 8 of the Federal Rules of Civil Procedure. MTD.4. That argument is risible. The Complaint spans 56 pages and includes 11 counts because (as it explains) the blunderbuss Order violates at least four provisions of the Bill of Rights, the separation of powers, and several other constitutional provisions. Calling the Complaint's catalog of the Order's numerous infirmities "shotgun pleading" borders on frivolous. "[D]ismissal under Rule 8 is typically reserved for complaints that are so excessively long as to be unmanageable, or so poorly conceived and drafted that it is difficult to decipher a coherent, viable cause of action." *T.M. v. District of Columbia*, 961 F.Supp.2d 169, 175 (D.D.C. 2013) (Leon, J.); *see, e.g.*, *Mills v. Am. Univ.*, 2022 WL 17719576, at *4-5 (D.D.C. Dec. 15, 2022) (dismissing a 242-page "shotgun pleading" by a group of *pro se* litigants because it was so "verbos[e]," "confusing," and riddled with "irrelevant" information that it failed to provide "fair notice of the claim[s] being asserted"); *Jiggetts v. District of Columbia*, 319 F.R.D. 408, 414 (D.D.C. 2017) (dismissing a complaint consisting of "prolix, irrelevant, and scattershot assertions" that made it "virtually impossible to know which allegations of fact [we]re intended to support which claim(s) for relief"). WilmerHale's Complaint could not be farther from that.

To the contrary, the Complaint is both organized and focused. After identifying the parties and explaining the basis for jurisdiction and venue, *see* Compl. ¶¶17-76, the Complaint describes the Firm and its operations, highlighting the matters and associations that apparently triggered this extraordinary Order, *id.* ¶¶77-93. It then catalogs President Trump's repeated threats to "go after" law firms associated with causes and attorneys he dislikes, *id.* ¶¶94-106; summarizes the Order's

purported findings and the various sanctions it imposes, *id.* ¶¶107-18; and describes the myriad ways the Order would harm WilmerHale and its clients if the Order took effect, *id.* ¶¶119-28. Finally, the Complaint sets forth the 11 different ways in which the Order violates the Constitution. *Id.* ¶¶129-226. There is nothing remotely "imprecise" about that presentation. *Contra* MTD.4.

Defendants' most specific gripe is that the first paragraph of each claim "incorporates every [prior] paragraph, including any preceding counts." MTD.4. But that practice is beyond commonplace in this Circuit (and elsewhere), which is presumably why Defendants fail to cite a single case suggesting it is improper. In fact, the government itself routinely employs the same convention—including in this District, *see, e.g.*, Complaint, *United States v. LLM Placements, LLC*, No. 23-cv-2190 (D.D.C. July 27, 2023), Dkt.1—and courts in this District have expressly held that incorporating all preceding factual allegations *does not* violate Rule 8, so long as "[e]ach count includes additional allegations that make clear which of the broadly applicable facts specifically pertain to that count," *Maynard v. Melton*, 2021 WL 6845008, at *4 (D.D.C. Apr. 7, 2021), *R. & R. adopted*, 2023 WL 1963919 (D.D.C. Feb. 10, 2023). WilmerHale's Complaint does that, which is especially appropriate given that every count addresses a single Order designed to operate as an indivisible response to perceived "risks from WilmerHale."

At bottom, there is nothing indiscriminate or shotgun about WilmerHale's Complaint; it includes eleven targeted counts because the Executive Order crosses nearly a dozen constitutional lines.

### B.    WilmerHale Has Article III Standing.

At various points throughout their motion, Defendants appear to question WilmerHale's standing to press some or all of its claims. *See* MTD.17-19, 23, 29, 35. Whatever the exact scope of those standing objections, they are meritless. To establish standing, the Firm must show that it faces (1) an "actual or imminent" injury that is (2) "fairly traceable to the challenged action" and

(3) that it is "likely, as opposed to merely speculative, that the injury will be redressed by a favorable [judicial] decision." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992) (alterations omitted). The Firm easily establishes all three. That is unsurprising; the Firm is the "object of" the Order, and "there is ordinarily little question that a regulated … entity has standing to challenge an allegedly illegal statute or rule under which it is regulated." *Nat'l Ass'n of Mut. Ins. Cos. v. HUD*, 693 F.Supp.3d 20, 33-34 (D.D.C. 2023) (Leon, J.) (quotation marks omitted) (quoting *State Nat'l Bank of Big Spring v. Lew*, 795 F.3d 48, 53 (D.C. Cir. 2015) (Kavanaugh, J.)). The Firm has not only plausibly alleged the elements of standing, but substantiated them through detailed declarations and dozens of exhibits.[1]

1. As this Court recognized in granting a temporary restraining order, the Order "would cause specific, irreparable, and non-remediable economic and reputational harm" to WilmerHale, as well as "violations of [WilmerHale]'s constitutional rights," if it took effect. TRO.2-3. Indeed, "[the Firm]'s very survival is at stake." TRO.3.

To begin, the Order forces government contractors to "disclose any business they do with WilmerHale" and orders the heads of all federal agencies to consider terminating contracts not only "with WilmerHale" but also with all "entities that do business with [it]" (i.e., the Firm's clients). Order §3. The goal of that threat is to cow the Firm (and other lawyers) into submission by depriving it of clients, many of which "have contracts with federal agencies," and driving away

---

[1] "A district court deciding a motion to dismiss on jurisdictional grounds, such as standing, may consider evidence outside the complaint." *Meina Xie v. Tillerson*, 2017 WL 2656648, at *3 (D.D.C. June 15, 2017) (Leon, J.) (quoting *United States v. Emor*, 785 F.3d 671, 677 (D.C. Cir. 2015)). "If the court considers evidence outside of the pleadings, it may weigh that evidence and resolve any factual disputes, if necessary." *Martin v. Locke*, 659 F.Supp.2d 140, 145 (D.D.C. 2009) (Leon, J.). WilmerHale's Complaint more than plausibly pleads its injury-in-fact and the bases for its claims. The post-Complaint evidence cited throughout, which is not reasonably subject to dispute, serves only to confirm what is clear on the face of the Complaint.

"potential clients" by making them "concern[ed] about losing government contracts." TRO.3; *see* Compl. ¶¶119-28; *see also* Declaration of Bruce M. Berman (Dkt.3-2) ¶¶30-31, 77 (hereinafter "Berman Decl."). If this secondary boycott took effect, it "would threaten almost one-third of [WilmerHale]'s revenues." TRO.3; *see* Compl. ¶¶124-27. And it is beyond serious debate that the intended victim of a secondary boycott has standing to challenge its legality. *See Blue Shield of Va. v. McCready*, 457 U.S. 465, 483-85 (1982).

The Order further harms WilmerHale by severely restricting its ability to do business—or even communicate—with the government. *See, e.g.*, Compl. ¶¶79, 115, 128. Section 2(b) directs all "heads of agencies" to "expeditiously cease" providing *any* "[g]overnment goods, property, material, [or] services … for the benefit of WilmerHale"—which, if it went into effect, would prohibit the Firm from (for example) using the Postal Service, accessing the SEC's EDGAR filing system, or going through TSA screening. The government notably does not defend that portion of the Order (because it is indefensible and inexplicable as anything other than a bare desire to retaliate), let alone argue that it does not harm WilmerHale (because it obviously does).

Nor is that all. Section 5 directs agency heads to restrict "employees of WilmerHale" from "access[ing] … Government buildings," "engaging with" government employees, and being "hir[ed]" by the federal government. And it is undisputed that the Firm's business is "inextricably intertwined with interactions with the federal government," as "WilmerHale attorneys are working on approximately 1,110 matters before or involving federal agencies." TRO.3; *see* Berman Decl. ¶¶79-81. Unfortunately, certain agencies have already proven themselves eager to enforce those provisions, even in the face of a TRO. *See* pp.13-14, *infra*. There is simply no debating that, if the Order were to take effect, the Firm "would be thoroughly hamstrung from representing clients."

TRO.4.    Indeed, as this Court already recognized, the "impact" of these restrictions on WilmerHale's "business and reputation cannot be overstated."  TRO.4; *see also* Compl. ¶¶121-28.

The Order's immediate suspension and threatened revocation of "any active security clearances held by individuals at WilmerHale," Order §2(a), similarly harm the Firm and its ability to represent clients.  Compl. ¶139; Berman Decl. ¶78.  While normally standing to challenge a suspension or revocation of a security clearance would rest with the individual holding the clearance, the government cannot indiscriminately suspend the clearances of everyone associated with a law firm and then deny the firm standing to object.  When the Order issued, more than 20 WilmerHale employees held security clearances.  Supplemental Declaration of Bruce M. Berman ¶28 (Dkt.16-3) (hereinafter "Suppl. Decl.").  The directive to suspend these clearances seriously impairs the Firm's ability—through those employees—-to take on matters involving national security, cybersecurity, defense contracting, and criminal investigations, and to practice before the Committee of Foreign Investment in the United States.  Berman Decl. ¶78.  What is more, at least five WilmerHale employees hold active clearances in connection with their service as military reservists.  *See* Compl. ¶88; Suppl. Decl. ¶¶28-29.  The Order suspends these patriots' security clearances, hampering their ability to serve their country based on their affiliation with WilmerHale.  *See* Berman Decl. ¶82.  It also harms WilmerHale's ability to recruit top attorneys: "At least one incoming employee has expressed concern about, and is considering revoking an acceptance of an offer of employment due to, the Order's implications for the employee's security clearance."  Suppl. Decl. ¶11; *see also* Compl. ¶123.

In sum, the government's submission that WilmerHale lacks standing to challenge an Executive Order entitled "Addressing Risks From WilmerHale" "sounds absurd, because it is," *Sekhar v. United States*, 570 U.S. 729, 738 (2013).  The Firm has amply demonstrated that it stands

to suffer several actual, imminent, and irreparable injuries, including "violations of [its] constitutional rights," "crippling [economic] losses," impairment of client relationships, and "severe" damage to its "business and reputation," should the Order ever take effect. TRO.2-4; *see* MSJ.42-44. And all these injuries flow directly from the challenged Order. Indeed, the whole point of the Order is to punish WilmerHale for representing clients and advocating causes the President disfavors and associating with attorneys the President dislikes. *See* Order §1. A judicial declaration that the Order is unconstitutional, coupled with a permanent injunction against its enforcement, will redress WilmerHale's injuries. The Firm plainly has Article III standing.

2. The government's counterarguments strain credulity. For example, Defendants insist that it is "speculation" whether the Order's restrictions will "affect[]" WilmerHale's client relationships. MTD.23, 30. That is both immaterial and wrong. A wealth of precedent establishes that deprivations of constitutional rights—particularly First Amendment rights—"unquestionably constitute[] irreparable injury," whether or not those deprivations manifest themselves in pocketbook injuries. *E.g.*, *Pursuing Am.'s Greatness v. FEC*, 831 F.3d 500, 511 (D.C. Cir. 2016) (quoting *Mills v. District of Columbia*, 571 F.3d 1304, 1312 (D.C. Cir. 2009)). Regardless, there is nothing speculative about the economic harm that the Order would inflict and is designed to inflict. Indeed, the mere *threat* of a similar executive order was enough to make nine leading law firms—including some of the most profitable firms in the world—preemptively wave the white flag, promising to curtail advocacy that the President disfavors and pledging tens of millions of dollars in pro bono legal services "to causes that the President … support[s]." Dkt.16-4 at 231 (Ex.34); *accord* Dkt.16-4 at 240-42 (Ex.36) (Willkie Agreement); Dkt.16-4 at 252-53 (Ex.39) (Milbank Agreement); *see also* Dkt.16-4 at 171 (Ex.26) (Paul Weiss chairman describing the Paul Weiss Order as "an unprecedented threat to [the] firm"). These firms did not do so out of some

sudden collective change of heart concerning their pro bono or hiring practices. They did so based on a felt need to avoid a grave threat to their bottom lines.[2]

As the willingness of other firms to pledge nearly a billion dollars in services dramatically confirms, there is nothing remotely speculative about the prospect that the Order will have its intended effect of causing WilmerHale to lose clients and/or work. Not only does the Complaint explain how this had already happened to other firms hit with a similar order, *see* Compl. ¶122, but WilmerHale itself has already experienced "significant economic loss," Berman Decl. ¶83; *see id.* ¶¶76, 86; Suppl. Decl. ¶¶6-8. For example, one client that had retained the Firm for a new matter terminated that retention after the Order issued, citing the Order as the reason. Suppl. Decl. ¶6. And "several existing clients have paused WilmerHale's engagements in government-facing matters—or declined to engage WilmerHale for new work—citing the Order." *Id.* ¶7. "Other existing clients have indicated to WilmerHale partners that they are considering whether to replace WilmerHale—or engage an additional firm on ongoing matters—out of concern that agencies, federal courts, and other actors in the justice system are hostile to the Firm." *Id.* ¶8. It is obvious, of course, that the TRO has provided much needed relief and prevented this kind of injury from becoming more widespread, by enjoining enforcement of these requirements against WilmerHale's clients and signaling a likelihood that the Court will issue permanent relief.

The government tries to brush all this aside by insisting that §3's "only" effect is to "terminate[] … contract[s] for which WilmerHale has been hired to perform any service." MTD.18 (ellipsis omitted). While that injury alone gives the Firm standing, it tells only part of

---

[2] That said, yielding to coercion may not solve anything. As an *amicus* brief here explains, "lawyers at firms that accede to the President's demands" face "inevitable and irresolvable ethical issues" and ongoing entanglements, as illustrated by the President's recent remarks about how he plans to use the firms' pro bono services. Br. of Legal Ethics Profs. (Dkt.97) at 4.

the story.  In fact, §3 requires "Government contractors to disclose *any* business they do with WilmerHale," including business that is *not* "related to the subject of [a] Government contract." Order §3(a).  It then directs all agency heads to re-assess all contracts "with entities that do business with WilmerHale," regardless of whether that business has any connection to a government contract.  Order §3(b).  This blatant secondary boycott of any entity associated with WilmerHale puts the Firm at imminent risk of losing clients—as do §5's access restrictions.  Compl. ¶138; *see also* Suppl. Decl. ¶10 (clients "need attorneys who can interact with federal government personnel" and "access federal buildings"); Berman Decl. ¶¶30-31, 77, 79-81.  Again, the notion that the target of a secondary boycott lacks standing to challenge the boycott's legality is frivolous.

The harm WilmerHale has already suffered likewise suffices to defeat Defendants' remarkable claim that any loss of business would "face a significant traceability issue."  MTD.18-19.  It is difficult to imagine how such losses could be traceable to anything *other* than the Order—particularly when clients are explicitly citing the Order as their reason for scaling back their relationships with WilmerHale.  *See* Suppl. Decl. ¶¶6, 8-9; *see also* Compl. ¶122.  Defendants offer no alternative theory about what is causing clients to do so, because there is none.

Finally, Defendants cursorily claim that WilmerHale "lacks standing to press" "claims based on" its clients' rights.  MTD.23.  But they cite nothing in support of that drive-by contention. And for good reason:  As WilmerHale's summary-judgment motion explains, *see* MSJ.28 n.5, 36, a long line of cases confirms attorneys' standing to contest government actions that impair their clients' abilities to exercise their constitutional rights.  *See, e.g.*, *DOL v. Triplett*, 494 U.S. 715, 720 (1990); *Caplin & Drysdale, Chartered v. United States*, 491 U.S. 617, 623 n.3 (1989); *Wounded Knee Legal Def./Offense Comm. v. FBI*, 507 F.2d 1281, 1284 (8th Cir. 1974).  These cases are obviously applicable here, where WilmerHale is being punished in large measure

*because* of the clients it has chosen to represent, and clients are being threatened based on their association with WilmerHale.  *See* Order §1.

### C.    WilmerHale's Claims Are Ripe.

The government's ripeness argument, *see* MTD.15-16, 28-31, likewise falls flat.  It was never a plausible argument, and the government's willingness to take immediate action against WilmerHale even in the face of this Court's TRO, *see* pp.13-14, *infra*, makes any claim to prematurity risible.  The ripeness doctrine does not mean that a plaintiff must wait for "Damocles's sword … to actually fall" before it may seek and obtain relief.  *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 9 (D.C. Cir. 2016).  So long as a case "presents a concrete legal dispute [and] no further factual development is essential to clarify the issues," it may proceed.  *In re Al-Nashiri*, 47 F.4th 820, 826 (D.C. Cir. 2022) (alteration in original).  WilmerHale's claims easily clear that bar, as events since the grant of the TRO have only underscored.

1. As the parties' March 31 joint status report indicates, this case presents questions of law that can readily be adjudicated based on the Order's text and facts about which there is no genuine dispute.  *See* Dkt.13 ¶3 ("The parties have agreed that they do not anticipate needing discovery in this case[.]").  The Firm's First Amendment claims exemplify the absence of any serious ripeness concern:  The claim of impermissible retaliation for protected expression requires no factfinding, as "[t]he retaliatory nature of the Executive Order at issue here is clear from its face."  TRO.2.  Count II alleges viewpoint discrimination, which likewise is evident on the face of the Order.  *Cf.* Tr. of TRO Hearing at 79:15-20, *Perkins Coie LLP v. U.S. Dep't of Just.*, No. 1:25-cv-716 (D.D.C. Mar. 13, 2025), Dkt.22 ("*Perkins* Tr.") ("[T]he plain language of Executive Order 14230 confirms that … government officials are attempting … to punish and suppress views that the government, or at least the current administration, disfavors."); Tr. of TRO Hearing at 49:3-5, *Jenner & Block LLP v. U.S. Dep't of Just.*, No. 1:25-cv-916 (D.D.C. Mar. 31, 2025), Dkt.10 ("*Jenner* Tr.") ("[T]he

11

reasons the Executive Order gives for its sanctions against Jenner … are viewpoints."). The burdens on the right to petition (Count III) and the freedom of association (Count IV) are equally clear from the Order alone, as is the lack of any legitimate government interest or narrow tailoring, which are purely legal considerations in all events. *See* MSJ.22-25.

WilmerHale's claims that the Order violates the separation of powers (Count V) and exceeds the spending power (Count XI) similarly do not turn on future contingencies or require factual development. Whether the President has authority to impose crushing penalties on law firms for representing causes and clients he dislikes before the Article III courts—and whether he may bar those firms from competing for federal contracts on equal footing with other entities— are pure questions of law. The same goes for the Firm's claims that the Order was imposed without due process (Count VI), is void for vagueness (Count VII), and constitutes an impermissible bill of attainder (Count VIII). Finally, infringements of the Fifth Amendment (Count IX) and Sixth Amendment (Count X) are also apparent from "the plain language of the executive order." *Perkins* Tr. 92:5. The Order's draconian sanctions "threaten[ WilmerHale attorneys'] ability to provide effective assistance of counsel to their clients," *id.* 92:21-22, and "target[ the Firm] for its activities in both" civil and criminal litigation, *Jenner* Tr. 51:3-4.

In short, none of WilmerHale's claims hinges on "contingent future events"; on the contrary, each "presents a concrete legal dispute" regarding an Executive Order that has already been issued and took effect immediately. *Cf. Al-Nashiri*, 47 F.4th at 826. "[N]o further factual development" is needed, let alone "essential," *id.*, for this Court to hold that the Order is blatantly unconstitutional in all its applications.

2. Defendants complain that it is not yet clear exactly how each agency would implement the Order if it took effect. MTD.27-29. But the precise modes and mechanisms various agencies

would take to enforce an unconstitutional order are beside the point. The government cannot seriously contend that there is any prospect that agencies would not enforce the Order *at all*, as that non-action would defeat the President's direction to address the "risks" from WilmerHale. Indeed, fear of that very thing has caused firm after firm to seek to avoid an Executive Order by committing tens of millions of dollars to causes ideologically in tune with the President. Moreover, any doubt on that score has been eliminated by the willingness of various agencies to take immediate action both before *and after* courts—including this Court—have ordered them to cease and desist.

For example, just one day after the President issued the Perkins Order, the Office of Management and Budget issued a memorandum directing the heads of executive departments and agencies to "review all Government contracts and subcontracts with Perkins and Coie LLP, as well as provision to Perkins and Coie LLP of goods, property, material, and services," and to "report back" within 30 days with "contract type, scope, period of performance, and value, along with any action taken." Russell T. Vought, *Implementation of the Executive Order on "Addressing Risks From Perkins Coie LLP*," OMB Memorandum M-25-17 (Mar. 7, 2025), https://bit.ly/42LM6rM. The Department of Justice also canceled a previously scheduled meeting with Perkins Coie attorneys that same day. Berman Decl. ¶59. As for WilmerHale, mere *hours* after the Order issued, two of the Firm's previously scheduled meetings with an agency that were supposed to take place on March 28, 2025—involving two unrelated matters—were abruptly postponed. Suppl. Decl. ¶4.

Indeed, even judicial relief has not stopped some agencies. Four days after this Court issued its TRO, officials at another agency "indefinitely postponed a planned meeting with WilmerHale attorneys in light of the Order," Suppl. Decl. ¶7, apparently because they had not yet received notice of this Court's order. And on April 7, 2025—more than a week after TROs and/or

preliminary injunctions were entered here and in *Jenner* and *Perkins*—the Department of Energy widely disseminated an email to government contractors stating that its "Office of General Counsel" directed agency officials to "ascertain whether the[ir] contractors have business dealings or contractual arrangement [*sic*]" with "WilmerHale," "Jenner," "Perkins Coie," or any other law firm principally based in Washington D.C.  Anna Bower, *Energy Dept. Instructs Employees to Gather Info on Deals with Law Firms*, Lawfare (Apr. 9, 2025), https://tinyurl.com/44u3dn4j.  And three days after *that*, the Commodity Futures Trading Commission sent an internal email (which was subsequently corrected) to the "All CFTC" listserv, instructing agency employees to "review" the WilmerHale, Jenner, and Perkins Orders—the executive orders, not the judicial decrees—"and ensure compliance with them."  Kathryn Rubio, *Flying in the Face of Multiple Court Orders, CFTC Wants to 'Ensure Compliance' with Executive Orders Targeting Biglaw*, Above the Law (Apr. 10, 2025), https://tinyurl.com/2a8sup4e.[3]

As all of that makes clear, WilmerHale is not alleging that it stands to suffer "injury on the basis of guidance which *has not been issued*."  MTD.28.  It is alleging that it stands to suffer— indeed, has already suffered—injury from the Order itself, even in the face of a TRO.  *See, e.g.*, Compl. ¶¶12-15.  That includes §2, which orders *immediate* (and indiscriminate) suspension of "any active security clearances held by individuals at WilmerHale." Order §2; *see* Compl. ¶139.

---

[3] Some of this non-compliance is no doubt attributable to the extraordinary nature of the "compliance" directive issued to the agencies.  *See* Memo. from Att'y Gen. Pamela Bondi & OMB Dir. Russell Vought, *Jenner*, No. 1:25-cv-916 (D.D.C. Apr. 8, 2025), Dkt.21-1.  That directive opened by remarking that "an unelected district court yet again invaded the policy-making and free speech prerogatives of the executive branch"; went on to opine that "the Supreme Court should swiftly constrain these judges' blatant overstepping of the judicial power"; claimed that "agencies are permitted to carry on their ordinary course of business which carries with it the authority to decide with whom to work"; and ended by "reserv[ing] the right to take all necessary and legal actions regarding 'lawfare,' national security concerns, and discriminatory practices involving Jenner & Block."  *Id.*

The directive to immediately suspend the clearances has already issued, Order §2, and the government appears to have every intention of carrying it out, as reflected in the Fact Sheet accompanying the Order (which the government conveniently ignores), *see* Dkt.16-4 at 263 (Ex.45) ("Security clearances held by WilmerHale employees will be immediately suspended."). Multiple WilmerHale employees and the Firm itself thus face an imminent threat of being prevented from effectively representing Firm clients in national-security-related matters or performing the full scope of their duties in the military Reserves. Suppl. Decl. ¶¶28-29; *see* Compl. ¶88. Given those uncontestable facts, the government's speculation that some agencies may choose to implement the Order's various commands in a manner that inflicts *less* injury, or does so less quickly, than some other agencies does not begin to make WilmerHale's claims unripe.

### D.    All of the Order Is Judicially Reviewable.

Finally, to the extent Defendants contend that various provisions of the Order are insulated from judicial review, they are wrong. The Order is a single, unified action, and its provisions "embod[y] a single, coherent policy, the predominant purpose of which [i]s" to punish WilmerHale for disfavored advocacy and associations. *Cf. Minnesota v. Mille Lacs Band of Chippewa Indians*, 526 U.S. 172, 191 (1999). Every part of the Order implicates (i.e., retaliates for) WilmerHale's First Amendment activity as well as its property and/or liberty interests, including its "good name," "reputation," and "integrity." *Wisconsin v. Constantineau*, 400 U.S. 433, 437 (1971); *see* MSJ.37-38. And each of the Order's operative provisions interferes with WilmerHale attorneys' ability to practice law by severely restricting their access to government information, resources, contracts, facilities, and employment, as well as their clients' rights to counsel. The Order *as a whole* thus blatantly violates the First Amendment, the Due Process Clause, and more.

The government tries to isolate §1 and treat it as a "preamble" with no "operative" effect that merely reflects the President's "opinions." MTD.2, 12. That ignores how the Order works.

As the government concedes, §1 provides the "factual explanation for the operational elements of the Executive Order" (although the statements in §1 most assuredly are *not* "factual"). MTD.8. And as this Court held in its temporary restraining order—and the *Jenner*, *Perkins*, and *Susman* courts concluded with respect to similar orders—that explanation is blatantly retaliatory and openly seeks to suppress disfavored viewpoints. TRO.2; *accord Jenner* Tr. 48:1-5, 48:20-49:8; *Perkins* Tr. 75:12-13, 79:21-80:13; *see also* Tr. of TRO Hearing at 27:4-5, 43:20-47:7, *Susman Godfrey LLP v. Exec. Off. of the President*, No. 1:25-cv-1107 (D.D.C. Apr. 16, 2025), Dkt.19. The Firm's challenge to Section 1—and need for injunctive relief against it—is therefore critical to WilmerHale's claims, as it lays bare that impermissible retaliation and viewpoint discrimination infect all "the operational elements of the Executive Order." MTD.8. So long as that provision is not enjoined, that official statement of the President's views cannot help but continue to inform federal agencies' dealings with WilmerHale with respect to actions that have not been expressly enjoined. Defendants cannot save that provision by trying to carve the Firm's claims into discrete provision-by-provision challenges that (they apparently think) better suit their defenses. That would not work in any case, because "plaintiffs are the masters of their own complaint," *Zhang v. USCIS*, 978 F.3d 1314, 1324 (D.C. Cir. 2020), but it is particularly inappropriate when it comes to claims that an entire document shares a single verboten retaliatory and viewpoint-discriminatory motive. This Court should enjoin enforcement of the whole Order, but in all events should expressly enjoin enforcement of Section 1, as the three other courts in this District to consider the question have done.

The government's efforts to insulate §2 from judicial review fare no better. The government concedes that decisions related to security clearances are not among the narrow set of exclusive executive powers that are categorically exempt from regulation by Congress or review

by the courts.  *See* MTD.14 (citing *Rattigan v. Holder*, 689 F.3d 764, 769 (D.C. Cir. 2012)); *accord Nat'l Fed'n of Fed. Emps. v. Greenberg*, 983 F.2d 286, 290 (D.C. Cir. 1993).  Nor could it argue otherwise; the Constitution prohibits retaliatory, en masse suspension and revocation of security clearances no less than it prohibits retaliatory, en masse suspension and revocation of other government benefits.  Defendants nevertheless assert that "challenges to Section 2" are barred by *Lee v. Garland*, 120 F.4th 880 (D.C. Cir. 2024), which they invoke for the proposition that "courts may not review a decision to deny or revoke a security clearance even when the denial or revocation is challenged on statutory or … constitutional grounds."  MTD.13.  That is not what *Lee* held—and the concerns that *Lee* expressed about reviewing the merits of *individualized security-clearance determinations* have no bearing here in all events.

*Lee* addressed, and insulates from judicial second-guessing, a security-clearance decision based on an individualized determination of the national-security interests of the United States.  The Order here, by contrast, directs wholesale suspension of the clearances of an undifferentiated class without individualized determination, and does so not based on any finding of a national-security risk, but for the express purpose of retaliation.  This case thus falls far outside the rationale and holding of *Lee*, and it is well within the purview of the Court to enjoin the Order in its entirety.  The Order does not contain any "decision to deny or revoke a security clearance" in the manner that *Lee* contemplates, MTD.13; it just "directs relevant agency heads" to suspend *all* WilmerHale employees' clearances immediately, pending further review, Order §2.  And Defendants themselves represent that agency officials will make traditional "national security eligibility determinations" (if at all) only in deciding whether to *rescind* suspensions, not in deciding whether to follow the President's command to impose them.  MTD.14-15.  That is critical, because it is the

individualized process, involving delicate judgment calls informed by national-security considerations, that *Lee* recognizes courts are ill-positioned to review.

Here, of course, that individualized process led to the *granting* of security clearances to some 20 WilmerHale employees. WilmerHale is not asking this Court to second-guess any of those individualized decisions, any other "discretionary judgments about matters of national security," MTD.13 (quoting *Lee*, 120 F.4th at 891), or any "assessment[s] of intangible qualities such as 'loyalty to the United States, strength of character, trustworthiness, honesty, reliability, discretion, and sound judgment,'" *Lee*, 120 F.4th at 893 (quoting Exec. Order No. 12,968, 60 Fed. Reg. 40,245, 40,250 (Aug. 2, 1995)). Indeed, the Court could *not* second-guess any such assessments, because the Order does not make any. It instead imposes an immediate sanction on an entire group across the board, which the D.C. Circuit has repeatedly said can and should be subject to judicial review. *See, e.g.*, *Rattigan*, 689 F.3d at 770-71; *Greenberg*, 983 F.2d at 290; *accord El-Ganayni v. U.S. Dep't of Energy*, 591 F.3d 176, 183 (3d Cir. 2010); *see also* Former Senior Gov't Officials Br. (Dkt.75) at 7-8.

Nor will reviewing that Firm-wide sanction require this Court "to make nuanced judgments about the ... motivation" for the President's "call for [suspension and] further review" of all clearances held by WilmerHale employees. *Contra* MTD.13-14 (quoting *Lee*, 120 F.4th at 893). Section 1 of the Order openly declares the President's motive: He is punishing WilmerHale for representing clients and causes he disfavors and employing attorneys he dislikes. Indeed, Defendants acknowledge that "Section 2 of the Executive Order is based on" the findings laid out in §1, MTD.14 (citing Compl. ¶¶108-11); *accord* MTD.8—none of which constitutes the type of national-security determination *Lee* protects. Moreover, §2 does not even mention national security, but only "the national interest"—an undefined term that underscores that no one believes

that maintaining security clearances granted only after elaborate, individualized inquiries actually endangers national security. The President's rescission of the Paul Weiss Order, moreover, defeats any claim that §2 has anything to do with individualized national-security determinations. Although that order likewise demanded immediate suspension of Paul Weiss employees' security clearances, supported only by vague allusions to "national security," Dkt.16-4 at 148, 150 (Ex.21), the President rescinded the order *in its entirety* just one week later, without any mention of national security, *see* Dkt.16-4 at 164-67 (Ex.25). The President instead cited Paul Weiss' "acknowledg[ment]" of "the wrongdoing of its former partner Mark Pomerantz," who participated in a criminal investigation of the President; the firm's agreement to conduct "client selection," "attorney hiring," and "pro bono" litigation in a manner that is more in line with the President's views, Dkt.16-4 at 165 (Ex.25); and the firm's pledge to "dedicate the equivalent of $40 million in pro bono legal services over the course of President Trump's term to support the Administration's initiatives," Dkt.16-4 at 162 (Ex.24). That is not "a 'sensitive and inherently discretionary judgment call'" about national security. *Lee*, 120 F.4th at 893. It is naked retaliation based on protected speech and petitioning (subject to revocation based on promises of protected speech and petitioning activity more to the President's liking).

Here, too, it is plain on the face of the Order that none of "the President's concerns about" WilmerHale relates to national security. *See* MTD.1; Order §1. The President is instead using a blanket suspension and reassessment of security clearances as one of several levers to punish WilmerHale for constitutionally protected activities. *See* Order §2; *see also* Former Senior Gov't Officials Br. (Dkt.75) at 7 ("The Order's directive to immediately suspend security clearances through a blanket decree directed at an entire class of people without process contravenes … settled practice" and is "contrary to the express will of Congress[.]"). This Court can perform its task of

determining whether the Order (including §2) unconstitutionally retaliates against WilmerHale for protected expression and petitioning, whether it reflects impermissible viewpoint discrimination, and whether it was issued consistent with the Due Process Clause, without performing anything that remotely resembles "an 'examination of the basis' of a decision to revoke a security clearance," MTD.14.   And it would be more than passing strange for this Court to hold that the Order unconstitutionally retaliates against protected speech and seeks to suppress disfavored viewpoints—which it undoubtedly can do as to *other* operative provisions—yet nevertheless allow §2 to stand despite it being fruit of the same poisonous tree.   Defendants tellingly identify no case in which a court has allowed government action to stand after finding it retaliatory or viewpoint discriminatory.   This case should not be the first.

## II.    Defendants' Rule 12(b)(6) Arguments Are Meritless.

WilmerHale has not only stated 11 different claims that the Order is unconstitutional, *see* Compl. ¶¶129-226, but substantiated those claims through legal arguments and detailed evidentiary submissions, *see* MSJ.14-36; Berman Decl.; Suppl. Decl.; Decl. of Joseph J. DeMott (Dkt.16-4) at 11-297 (Exs.1-48); Expert Report of J. William Leonard (Dkt.16-5).   Lacking any cogent argument that any of WilmerHale's claims fails as a matter of law, Defendants' motion largely engages in obfuscation.   Instead of directly addressing each constitutional defect the Complaint identifies with the Order as whole, the government organizes its motion based on the five sections of the Order, and then repeatedly misrepresents the Firm's claims, incorrectly suggesting that each one is geared at some isolated provision (and even that some provisions are not challenged at all, *see* MTD.13 n.1).   In reality, WilmerHale challenges the Order in its entirety, and its grounds for doing so are meritorious—and unquestionably plausible.

## A.   WilmerHale Has Pleaded (and Proven) Multiple First Amendment Claims.

### 1.   The Complaint states a claim for First Amendment retaliation (Count I).

To state a claim for First Amendment retaliation, WilmerHale must plausibly allege (1) that it "engaged in conduct protected under the First Amendment"; (2) that the government "took some retaliatory action sufficient to deter a person of ordinary firmness in [WilmerHale]'s position from speaking again"; and (3) that there is "a causal link between the exercise of a constitutional right and th[at] adverse action." *Aref v. Lynch*, 833 F.3d 242, 258 (D.C. Cir. 2016). The Firm has alleged all three elements (and established them all as well, *see* MSJ.14-18).

Defendants do not dispute that WilmerHale engages in conduct protected by the First Amendment when advocating on behalf of its clients. *See, e.g.*, *Legal Servs. Corp. v. Velazquez*, 531 U.S. 533, 542-49 (2001) ("advocacy by [an] attorney to the courts" is "speech and expression" that enjoys First Amendment protection); *Eng v. Cooley*, 552 F.3d 1062, 1069 (9th Cir. 2009) ("[S]tate action designed to retaliate against and chill an attorney's advocacy for his or her client strikes at the heart of the First Amendment." (brackets omitted)). They instead make the remarkable claim that "[t]he Executive Order is not a punishment or a sanction." MTD.10. That is both wrong and irrelevant. The relevant question is not whether WilmerHale, or its attorneys, or its clients, have an absolute right to government contracts, security clearances, or access to government buildings. *Contra* MTD.10. It is whether depriving them of those things they had previously enjoyed (or might in the future enjoy) *because of* WilmerHale's protected advocacy would "deter a person of ordinary firmness in [WilmerHale]'s position from speaking again." *Aref*, 833 F.3d at 258.

The answer to that question is plainly yes, as both common sense and the actions of other law firms underscore. The Order imposes substantial costs on WilmerHale's protected activities

in myriad ways, including: (1) vilifying it as a bad actor that "engage[s] in conduct detrimental to critical American interests," Order §1; (2) immediately suspending its employees' security clearances, *id.* §2; (3) forcing its clients to disclose their relationships with the Firm, *id.* §3(a); (4) seeking to terminate federal contracts held by Firm clients, *id.* §3(b); and (5) restricting Firm employees' access to federal officials, buildings, services, materials, and employment, *id.* §§2(b), 5.    As this Court already noted, these sanctions are so severe that they threaten WilmerHale's "very survival," leaving "no doubt" that they "chill[] speech and legal advocacy." TRO.2-3.    Indeed, the same sanctions *have* deterred nine of the Nation's wealthiest law firms, causing them to abandon advocacy as usual and instead agree to devote massive sums "to causes that the President … support[s]."    Dkt.16-4 at 231 (Ex.34); *accord* Dkt.16-4 at 160-63 (Ex.24), 240-42 (Ex.36), 252-53 (Ex.39).

As for whether there is a causal link between WilmerHale's constitutionally protected advocacy and the sanctions the Order imposes, §1 of the Order proclaims as much, as Defendants effectively concede.    For example, §1 explains that the President is punishing WilmerHale for purportedly "engag[ing] in obvious partisan representations to achieve political ends," "support[ing] efforts to discriminate on the basis of race," and "further[ing] the degradation of the quality of American elections."    And even the government's motion acknowledges that "WilmerHale's activities … in its capacity as a law firm offering legal representation"—including its representation of Harvard University in the *Students for Fair Admissions* litigation and its representation of groups challenging state voter-identification and voter-registration laws—are part of the "explanation" for the Order.    MTD.8 (citing Compl. ¶¶109-11).    All of that makes this an open-and-shut case of impermissible retaliation.

Perhaps recognizing that, Defendants resort to misdirection.  For example, just as much of their motion is written as if the Order were focused exclusively on the Firm's diversity, equity, and inclusion practices, rather than its constitutionally protected representations and associations, much of Defendants' motion is written as if WilmerHale's retaliation claim is focused exclusively on the investigation that the EEOC recently launched into certain of the Firm's diversity, equity, and inclusion practices.  *See* MTD.26-27.  Even were that the case, when the government identifies some 20 law firms with employment practices that allegedly require investigation, and then prioritizes the investigation of firms singled out because of their advocacy (while dropping the investigations of firms that pledge legal resources for the President's favored causes), the inference of retaliation is inescapable.  *See* Compl. ¶¶147, 202; Order §4; *see also* Press Release, *In EEOC Settlement, Four 'BigLaw' Firms Disavow DEI and Affirm Their Commitment to Merit-Based Employment Practices*, EEOC (Apr. 11, 2025) https://tinyurl.com/29pf92va.  But Count I is not remotely limited to the EEOC investigation; it challenges myriad harms directly imposed by this Order, including indiscriminate suspension of security clearances, restrictions on access to federal buildings, and a threatened secondary boycott.  Compl. ¶¶137-42.

Nor can Defendants obtain dismissal by reframing WilmerHale's claim as an attack on the government's power "to enter into, manage, and terminate contracts" and investigate potential violations of civil rights laws.  MTD.19-21.  No one denies the government's power to "terminate … contractors for poor performance," MTD.7-8, 19-20, and no one is "claim[ing] … First Amendment protections for employment practices involving racial discrimination," MTD.20.  WilmerHale is challenging an executive order blacklisting and sanctioning it for First Amendment activity.  *See, e.g.*, Compl. ¶¶131-36.  Whether the retaliation takes the form of singling out firms to investigate widely shared employment practices, or singling out firms to deny them access to

buildings and contracting opportunities available to virtually every other firm, makes no difference. After all, even in areas where it enjoys considerable discretion, the government may not use that discretion to "retaliat[e] against individuals for engaging in protected speech" it dislikes in an effort to prompt expressive activity more to the President's liking. *Lozman v. City of Riviera Beach*, 585 U.S. 87, 90 (2018); *see also, e.g.*, *Vullo*, 602 U.S. at 180.

### 2. The Complaint states a claim for viewpoint discrimination (Count II).

Count II plausibly alleges that the Order "'use[s] the power of the State to punish or suppress disfavored expression'" on the basis of viewpoint. Compl. ¶146 (quoting *Vullo*, 602 U.S. at 188). Viewpoint-based distinctions are an "egregious form of content discrimination" that is anathema to the First Amendment. *Reed v. Town of Gilbert*, 576 U.S. 155, 168-71 (2015). And the Order openly admits that it is sanctioning WilmerHale in an effort to suppress disfavored viewpoints. For example, the Order asserts that the Firm has used "its pro bono practice to engage in activities that undermine justice," specifically criticizing its alleged "obstruction" of the Administration's immigration-enforcement policies and involvement in litigation regarding "American elections." Compl. ¶147 (quoting Order §1). The Order also targets WilmerHale based on the speech and presumed viewpoints of a former partner, Robert Mueller, and on WilmerHale's own characterization of Mr. Mueller's public service. Compl. ¶148. In particular, the Order asserts that Mr. Mueller presided over "one of the most partisan investigations in American history," which "epitomize[d] the weaponization of government," and criticizes WilmerHale for "reward[ing]" Mr. Mueller "by welcoming [him] to the firm" after his service as Special Counsel and stating that he "embodies the highest value[s] of our firm and profession." Order §1. The Order then declares that Mr. Mueller's actions "must not be rewarded" or "condoned," *id.*, and proceeds to sanction WilmerHale for expressing a contrary view.

24

Defendants insist that the government "is 'entitled to say what it wishes.'" MTD.12 (quoting *Pleasant Grove City v. Summum*, 555 U.S. 460, 467-68 (2009)). Indeed, that is true. But no one doubted the President's views on these matters, and the Order does not stop at expressing "the Government's own opinions." *Contra* MTD.12. It goes on to impose severe sanctions on WilmerHale for expressing different ones. And while "[a] government official can share her views freely and criticize particular beliefs … in the hopes of persuading others," "she cannot … use the power of the State to punish or suppress disfavored expression." *Vullo*, 602 U.S. at 188. The Order unabashedly does just that.

Defendants also cite *Rust v. Sullivan*, 500 U.S. 173, 193 (1991), for the proposition that the government does not "discriminate[] on the basis of viewpoint' merely by 'fund[ing] one activity to the exclusion of the other.'" MTD.20-21 (second alteration in original). But the Order does not fund certain activities to the exclusion of others (or fund anything at all); it imposes a host of draconian sanctions on WilmerHale and its clients, sanctions that mostly have nothing to do with federal funding. *See* Order §§2, 5. Moreover, to the extent §3 involves "[c]hoosing who to contract with," MTD.20-21, it instructs agency officials not only to blacklist WilmerHale, but also to boycott all "entities that do business with WilmerHale," based on viewpoints that the President perceives the Firm to have expressed in protected speech that has no connection whatsoever to any government contract, let alone all of them. There is a fundamental difference between excluding viewpoints as necessary to preserve the government's own message (e.g., by excluding an advocate for veganism from a beef marketing program) and enforcing government orthodoxy and punishing dissenting viewpoints on which the free marketplace of ideas and our adversarial system of justice depend. The Constitution permits the former but forbids the latter. And the Order is all about the latter.

### 3.    The Complaint states a claim under the Petition Clause (Count III).

The Complaint plausibly alleges a violation of the Petition Clause.  *See* Compl. ¶¶153-59.  Indeed, it plausibly alleges that the Order abridges the right to petition in at least three ways.  First, it sanctions WilmerHale attorneys for petitioning the federal courts on behalf of clients or causes that the President disfavors.  That implicates the longstanding rule that "the First Amendment prohibits any sanction on" the act of filing a petition with the government "so long as the petition was in good faith."  *Nader v. Democratic Nat'l Comm.*, 567 F.3d 692, 696 (D.C. Cir. 2009).  Second, the Order broadly restricts "Government employees acting in their official capacity from engaging with WilmerHale employees."  Order §5(a).  Third, the Order directs agency officials to restrict WilmerHale employees' access to federal buildings.  *Id.*  The last two restrictions will inevitably prevent WilmerHale from filing petitions on behalf of clients seeking redress from courts, agencies, or government officials.  And none of the restrictions can survive "exacting scrutiny," as the lone interest underlying the Order—trying to impede the ability of law firms to represent clients in matters the President does not like—is not even a legitimate, much less an "important," governmental interest, and the Order devastates practice groups that have done nothing to draw the President's ire.  *See* MSJ.22-23.

Defendants barely even address WilmerHale's right-to-petition claim, and they fail to identify any ground for dismissing it.  *See* MTD.29.  There is nothing "conclusory" about WilmerHale's allegations in support of this claim.  *Contra* MTD.29.  As just explained, the Firm has identified three distinct ways in which the Order restricts petitioning.  *See* Compl. ¶¶155-57.  Nor is the claim limited to §5 of the Order, as the government suggests (although that would not be grounds for dismissing it anyway).  *Contra* MTD.29.  As the Complaint explains, the *entire* Order punishes WilmerHale for claims the Firm has previously brought on behalf of its clients.  Compl. ¶155.  And even assuming that the Order's restrictions on accessing government buildings

and "engaging with" government officials would permit WilmerHale attorneys to petition "by written communication," MTD.29—which is far from clear—the Order would still impose serious burdens on petitioning that cannot survive exacting scrutiny. Forcing WilmerHale lawyers to petition with one hand tied behind their back, while other law firms (including those offering tens of millions of dollars to subsidize the President's favored causes) are free to fight freestyle, plainly violates the Petition Clause—and inflicts untold economic hardship on WilmerHale in the process. Count III thus survives Defendants' motion to dismiss.

### 4. The Complaint states a freedom of association claim (Count IV).

Lastly, WilmerHale has pleaded—and proven—that the Order violates the First Amendment freedom of association. First, the demand that government contractors "disclose any business they do with WilmerHale," Order §3(a), significantly burdens clients' constitutionally protected activity of choosing to retain and associate with WilmerHale. *See* Compl. ¶¶160-67. The Supreme Court has made clear that "compelled disclosure of affiliation with groups engaged in advocacy may constitute as effective a restraint on freedom of association as other forms of governmental action." *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 606 (2021) (alterations omitted). Here, the disclosure requirements' obvious goal is to chill expression by subjecting WilmerHale clients who have government contracts to risks of economic reprisal and other forms of governmental hostility. In addition, the Order impairs WilmerHale attorneys' First Amendment right to associate with colleagues who previously served in the Special Counsel's Office and with pro bono and other clients of their choosing—e.g., state and local governments that have challenged the President's immigration-related policies, and the eight inspectors general who are challenging the President's recent attempt to terminate them—by penalizing their choice to represent clients who are adverse to the President. Compl. ¶¶168-69.

Again, Defendants have no cogent response.  They suggest that the government is "entitled" to request information about "when business conducted with WilmerHale is 'related to the subject of [a] Government contract'" because (they say) WilmerHale may be "a government subcontractor."  MTD.21.  But the government provides no support for that assertion—likely because it is baseless.  Federal regulations define a "subcontract" as a contract "to furnish supplies or services for performance of a prime contract."  48 C.F.R. §44.101.  That language applies to services that contribute *directly* to fulfillment of a contract, not to legal advice provided to the prime contractor by an outside law firm.  *See* 8 C.F.R. §31.205-33 (recognizing legal advice as an allowable cost in some cases, but not classifying law firms as subcontractors).  In all events, even accepting the government's dubious "subcontractor" premise, its conclusion still would not follow, because the Order's plain text sweeps far more broadly than the government would have this Court believe.  The Order requires contractors "to disclose *any* business they do with WilmerHale" *and* to specify "whether that business is related to the subject of [a] Government contract."  Order §3(a).  That underscores that the point is not to monitor government contractors and subcontractors, but to facilitate a secondary boycott of law firms the President dislikes.

The burdens on association, moreover, are in no way mitigated either by the disclosure's "factual" nature or because the disclosure must be made "only to the Government."  *Contra* MTD.22.  The Supreme Court has expressly held that "compelled statements of 'fact' … burden[] protected speech."  *Riley v. Nat'l Fed'n of the Blind of N.C, Inc.*, 487 U.S. 781, 797-98 (1988); *see also Ams. for Prosperity Found*, 594 U.S. at 606 ("It is hardly a novel perception that compelled disclosure of affiliation with groups engaged in advocacy may constitute as effective a restraint on freedom of association as [other] forms of governmental action." (quoting *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 462 (1958))).  And informing the government about one's dealings

28

with WilmerHale is hardly "uncontroversial" or innocuous, *contra* MTD.22, as the President has branded WilmerHale a "rogue law firm[]," Dkt.16-4 at 283 (Ex.45), and ordered agencies to consider canceling contracts with all "entities that do business with [it]," Order §3(b). That is the opposite of narrow tailoring. There is no basis for dismissing WilmerHale's freedom of association claim.

### B. WilmerHale Has Pleaded (and Proven) That the Order Exceeds the President's Authority and Violates the Separation of Powers (Counts V, XI).

In addition to its First Amendment claims, WilmerHale has plausibly alleged that the Order exceeds the President's authority, interferes with the Article III courts' exercise of "[t]he judicial Power," and exceeds the spending power. Compl. ¶173 (quoting U.S. Const. art. III, §1).

As detailed in the Complaint, the President has no statutory or constitutional authority to sanction WilmerHale for its involvement in litigation of which he does not approve, particularly by issuing what amounts to a bill of attainder. *See* Compl. ¶¶175-81. The separation of powers precludes either Congress or the Executive from attempting "to exclude from litigation those arguments and theories [it] finds unacceptable but which by their nature are within the province of the courts to consider." *Velazquez*, 531 U.S. at 546. The Executive Branch cannot simply take it upon itself to declare filings directed toward a coordinate branch of government to be so far beyond the pale as to warrant sanction, especially when many of those pleadings have not only escaped judicial sanction, but yielded victories for clients and plaudits from presiding jurists. As the Supreme Court recently reiterated, the Constitution forbids "concentrat[ion] [of] the roles of prosecutor, judge, and jury in the hands of the Executive Branch." *SEC v. Jarkesy*, 603 U.S. 109, 140 (2024). That is precisely what the Order tries to accomplish.

Defendants' counterarguments fall flat. The government begins by invoking caselaw regarding nonstatutory review of agency action—i.e., claims seeking to challenge as *ultra vires*

agency action that Congress has explicitly shielded from judicial review under the Administrative Procedure Act. *See* MTD.6. To be sure, when Congress has expressly restricted judicial review, nonstatutory review remains available "only for the narrow purpose of obtaining injunctive relief against agency action taken 'in excess of its delegated powers and contrary to a specific prohibition' in the law." *Fed. Express Corp. v. U.S. Dep't of Com.*, 39 F.4th 756, 763 (D.C. Cir. 2022). But that limitation has nothing to do with this case. Defendants point to no statute authorizing the President or any executive agency to punish law firms for engaging in disfavored advocacy, let alone any provision of the U.S. Code shielding efforts to do so from judicial review. That is because there is none—which is part and parcel of why the Order is *ultra vires*.

The best the government can muster is to claim that the Order is an exercise of congressionally delegated authority to impose conditions on the receipt of federal funds. MTD.20-21. But that authority does not—and cannot—include the power the President purported to exercise here, as Congress itself lacks the power to "leverage funding to regulate speech outside the contours of the program itself." *USAID v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 214-15 (2013). Yet that is precisely what the Order does. *Contra* MTD.22 (falsely stating that §3 "only applies to contracts 'for which WilmerHale has been hired to perform any service'"). While the government is free to "terminate … contractors for poor performance," MTD.8, the secondary boycott the Order directs has nothing to do with any contractor's performance. The Constitution prohibits both Congress and the President from using the spending power to punish WilmerHale's clients based on the Firm's protected speech, association, and petitioning. Simply put, the spending power cannot be used as a cudgel for beating disfavored speakers into submission and suppressing viewpoints with which the President disagrees. To the best of the Firm's knowledge, no prior President has even tried to take comparable action. And in the separation-of-powers arena,

30

that kind of "prolonged reticence" is best explained by the absence of authority to take the novel action. *Plaut v. Spendthrift Farm, Inc.*, 514 U.S. 211, 230 (1995); *see also Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 505-06 (2010); *Printz v. United States*, 521 U.S. 898, 907-08 (1997); Former Senior Gov't Officials Br. (Dkt.75) at 9-13.

Once again, then, this case is not some broadscale attack on the federal government's "authori[ty] to enter into, manage, and terminate contracts," MTD.19, or to exercise "control over who can enter their buildings or interact with their employees on official business," MTD.29. Count V instead alleges that the President lacks authority "to sanction a law firm for representing his political opponents or handling lawsuits that he perceives to be contrary to his interests or those of the United States," Compl. ¶175, and Count XI alleges that "the government may not terminate contracts because of the contractor's protected expression … or deny or terminate a government contract on a basis that infringes the contractor's constitutional rights," *id.* ¶219. That some of the sanctions the Order imposes relate to government contracting, *see* Order §3, or entering federal buildings and engaging with federal employees, *see* Order §5, does not shield them from judicial review for compliance with those constraints. Whatever the extent of the President's delegated or inherent power over federal contracts, buildings, and employees, the President may not wield that power in an effort "to exclude from litigation those arguments and theories [he] finds unacceptable but which by their nature are within the province of the courts to consider." *Velazquez*, 531 U.S. at 546. The federal judiciary—not the President—has "inherent power[]" to determine whether an attorney (or a litigant) has "abuse[d] the judicial process" and "to fashion an appropriate sanction." *Goodyear Tire & Rubber Co. v. Haeger*, 581 U.S. 101, 107 (2017). Those narrow, but critical, principles are what Counts V and XI seek to vindicate.

### C.    WilmerHale Has Pleaded (and Proven) Deprivations of Due Process and Equal Protection (Counts VI, VII, VIII).

WilmerHale has stated three plausible Fifth Amendment claims.  The Order (1) deprives the Firm of constitutionally protected interests without due process of law (Count VI); (2) is void for vagueness, as it deters future speech and advocacy by failing to provide clarity about what is prohibited and inviting arbitrary enforcement (Count VII); and (3) singles out WilmerHale for adverse treatment without a constitutionally legitimate justification (Count VIII).

1. Count VI plausibly alleges that the Order deprives WilmerHale of at least three independently cognizable liberty and property interests.  *See* Compl. ¶¶183-91.  First, the Order "largely preclud[es]" the Firm and its attorneys "from pursuing [their] chosen career."  *O'Donnell v. Barry*, 148 F.3d 1126, 1141 (D.C. Cir. 1998); *see also Campbell v. District of Columbia*, 894 F.3d 281, 288 (D.C. Cir. 2018) (recognizing cognizable liberty interest in "a chosen profession free from unreasonable governmental interference").  Second, the Order deprives WilmerHale of its "good name, reputation, honor, [and] integrity."  *Constantineau*, 400 U.S. at 437; *see also FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253-56 (2012) (Executive Branch "findings of wrongdoing" that "could have an adverse impact on [an entity's] reputation" must be issued in accordance with due process).  Third, the Order deprives WilmerHale of its constitutionally protected property interest in contracts with its clients by incentivizing federal contractors to cut ties with the Firm.  *See FDIC v. Mallen*, 486 U.S. 230, 240 (1988).  The Due Process Clause requires notice and an opportunity to be heard before such deprivations, *see Mathews v. Eldridge*, 424 U.S. 319, 333 (1976), yet the government provided none before issuing and beginning to implement the Order, Compl. ¶¶189-90.

The government's scattershot arguments provide no basis to dismiss WilmerHale's due-process claim.  As an initial matter, the government nowhere responds to the Firm's well-pleaded

allegations that the Order prevents WilmerHale attorneys from pursuing their chosen profession and interferes with their contractual relationships with existing clients. Perhaps that is because that is the whole point of the Order. By its terms, the Order specifically prohibits WilmerHale, its employees, and its clients from working for the government. Order §§2, 3, 5(b). The Order also restricts attorneys' ability to represent clients in court and before government agencies, *id.* §5(a)— provisions that "largely preclud[e]" WilmerHale employees from providing effective legal services, *O'Donnell*, 148 F.3d at 1141. And while Defendants insist that all of this is hypothetical, the Order has already operated to frustrate the Firm's ability to represent its clients, *see* Berman Decl. ¶¶77-81; Suppl. Decl. ¶¶4-10—just as the Firm predicted it would when it filed its Complaint (within 24 hours of the Order's issuance), *see* Compl. ¶¶119-28.

Defendants at least offer an argument about the Firm's (and its attorneys') reputational interests. *See* MTD.9, 29. But what they offer is unavailing. The government first contends that WilmerHale's procedural-due-process claim fails because the Firm supposedly "has not identified any defamatory act on the part of Defendants." MTD.9. That makes no sense. WilmerHale has brought a due-process claim, not a defamation claim. While §1 of the Order is indeed defamatory, a plaintiff need not plead defamation to establish that government action that harmed its reputation was taken without due process. After all, the point of such a claim is that the government has deprived the citizen of the process necessary to determine whether the government's explicit (or even implicit) charge is true or defamatory. The second *FCC v. Fox* case proves the point. There, the FCC had sanctioned Fox for airing an unscripted speech in which "the singer Cher" uttered a fleeting expletive and another unscripted speech in which "a person named Nicole Richie" uttered two. 567 U.S. at 247, 256. The Commission issued those orders, however, without "fair notice … that fleeting expletives … could be found actionably indecent." *Id.* at 258. That entitled Fox to

"relief" on its due-process claim because "the challenged orders," which contained "findings of wrongdoing," "could have an adverse impact on Fox's reputation." *Id.* at 255-56.

This case follows *a fortiori*. No notice preceded the Order, which not only accuses WilmerHale of "engag[ing] in activities that undermine justice," "abandon[ing] the profession's highest ideals," and "further[ing] the degradation of the quality of American elections," Order §1, but also brands WilmerHale a "rogue law firm" and alleges that WilmerHale has engaged in grievous "misconduct," Dkt.16-4 at 283-84 (Ex.45). The Order further accuses the Firm of "earmarking hundreds of millions of their clients' dollars for destructive causes" and "abus[ing] its pro bono practice to engage in activities that undermine justice and the interests of the United States." Order §1. All of that together likely *would* suffice to satisfy the standard for defamation. But that aside, it strains credulity to think that an executive order that does all that does not infringe on the Firm's (and its attorneys') reputational interest(s) and trigger the protections of the Due Process Clause.

As a last-ditch effort, Defendants claim that the adequacy of the process due here either "depends on what guidance the agency heads will issue" or suffices no matter what because "Section 5 is tied to 'the national security' of the United States." MTD.29. The former argument once again fights the well-pleaded premise (borne out by reality) that, absent judicial intervention, the Order would immediately operate to harm the Firm's liberty and property interests. As for the latter, national security is of course an important government interest, but the Executive Branch cannot render the Due Process Clause a dead letter simply by crying "national security." Existing law, for example, underscores that national security and individualized process are not mutually exclusive. *See, e.g.*, *Trump v. J. G. G.*, 2025 WL 1024097, at *1-2 (U.S. Apr. 7, 2025) (per curiam); *Hamdi v. Rumsfeld*, 542 U.S. 507, 533-35 (2004) (plurality); *Ralls Corp. v. CFIUS*, 758

F.3d 296, 320 (D.C. Cir. 2014); *Nat'l Council of Resistance of Iran v. Dep't of State*, 251 F.3d 192, 201, 208-09 (D.C. Cir. 2001). And suspending nearly two dozen security clearances that were granted through a careful, individualized process via a casual, en masse order that can then be rescinded via a comparably en masse order if circumstances having nothing to do with national-security change, *see* pp.17-19, *supra*, is plainly inconsistent with due process. The Firm has stated a more-than-plausible due-process claim.

2. Count VII plausibly alleges that the Order is void for vagueness, as the Order gives WilmerHale no (let alone fair) notice of what it prohibits and how the Firm can avoid violating it. Granted, the Order makes clear that WilmerHale is being punished because of its representations of some of the President's political opponents and affiliation with former government officials he dislikes. And the Order expressly accuses the Firm of "tak[ing] actions that threaten public safety and national security, limit constitutional freedoms, degrade the quality of American elections, [and] undermine bedrock American principles." Order §1. But the Order is conspicuously silent about what aspect of WilmerHale's multifarious conduct triggered the Order's massive sanctions. It is also similarly vague about when, and to what extent, WilmerHale employees must be barred from federal government buildings (and whether that includes courts), "engaging with" federal employees (ditto), and being hired by the federal government. Order §5.

Perhaps because of those intractable problems, Defendants begin with the startling claim that the Order *cannot* be void for vagueness *as a matter of law* because it "neither" "define[s]" criminal offenses" nor "fix[es] the permissible sentences for criminal offenses." MTD.11. The government quickly pivots away from that argument, however—and for good reason: Precedent squarely "forecloses [it]." *Sessions v. Dimaya*, 584 U.S. 148, 156 (2018) (plurality); *see also Boutilier v. INS*, 387 U.S. 118, 123 (1967) ("[T]his Court has held the 'void for vagueness' doctrine

applicable to civil as well as criminal actions."). In addition to "laws that define crimes" and "fix sentences," "the vagueness doctrine applies" to all "laws that regulate the primary conduct of private citizens," including (as relevant here) "'laws that restrict speech,' and 'laws that regulate businesses.'" *Newman v. Moore*, 743 F.Supp.3d 62, 72 (D.D.C. 2024) (quoting *United States v. Matchett*, 837 F.3d 1118, 1119, 1122 (11th Cir. 2016) (Pryor, J., respecting the denial of rehearing)).

The Order unquestionably flunks the vagueness test. Indeed, the government's contrary arguments betray a fundamental misunderstanding of vagueness principles. The government insists that ruling for the Firm on this claim would "call into question the constitutionality of the civil rights laws." MTD.12. But those laws have comfortably co-existed with vagueness doctrines for decades, and nothing in WilmerHale's objection to being punished based on vague aspersions remotely endangers that co-existence. Defendants also make the baffling assertion that the Order must clear only a very "low bar" because "all that is at stake are government contracts." MTD.11. Again, that blinks reality. As this Court already recognized, what is "at stake" here is WilmerHale's "very survival." TRO.3. Given those stakes, it was incumbent on the President to provide more than just passing references to purported "misconduct" and people he dislikes. "Instead, the Order is replete with the types of vague and flexible executive allegations, unsupported by evidence, that can vary with 'mood or political philosophy,' making them 'weapons which can be made as sharp or as blunt as the occasion requires.'" Former Senior Gov't Officials Br. (Dkt.75) at 8-9 (quoting *Joint Anti-Fascist Refugee Comm. v. McGrath*, 341 U.S. 123, 176 (1951) (Douglas, J., concurring)). The Order is a paradigmatic vague government action. There are no grounds for dismissing Count VII.

3. Count VIII plausibly alleges an equal-protection claim. The only basis the Order invokes for singling out WilmerHale is the constitutionally protected actions of a handful of its current and former attorneys. *See* Order §1. But a bare desire to punish is not a rational basis for government action, especially when the conduct that drew the government's ire took the form of protected speech. *See News Am. Publ'g, Inc. v. FCC*, 844 F.2d 800, 802 (D.C. Cir. 1988).

Given the remarkable forthrightness of the Order's motivations and intent, it is difficult to imagine an argument that could justify dismissal. The government certainly does not offer any. Defendants "begin" by asserting that "the class-of-one theory of equal protection is inapplicable in the government employment context," MTD.22, but that is beside the point. To be sure, the Order restricts the ability of government agencies to hire WilmerHale lawyers and staff. *See* Order §§3, 5(b). But that is just one small piece of the unconstitutional puzzle that is this Order. The Order also severely restricts WilmerHale's (but not others') ability to do business with the federal government, *see, e.g.*, Order §§2(b), 5, and it is undisputed that the Firm's business is "inextricably intertwined with interactions with the federal government," TRO.3; *see* Berman Decl. ¶¶79-81. If the Order were to take effect, the Firm (but not others) "would be thoroughly hamstrung from representing clients," TRO.4, all because the Executive has decided it does not like the Firm's representations and associations. Defendants have identified no valid basis to dismiss Count VIII.

### D.    WilmerHale Has Pleaded (and Proven) Violations of Its Clients' Fifth and Sixth Amendment Rights to Engage Counsel of Their Choice (Counts IX, X).

Finally, the Order violates the constitutional rights to counsel of WilmerHale's clients guaranteed by the Fifth and Sixth Amendments. *See Jenner* Tr. 50:19-51:5 (concluding that Jenner is likely to succeed on the merits of its right-to-counsel claims). The right to counsel not only is "the means through which the other rights … are secured," *United States v. Cronic*, 466 U.S. 648, 653 (1984), but "is indispensable to the fair administration of our adversarial system," *Maine v.*

*Moulton*, 474 U.S. 159, 168 (1985).  Indeed, the right is so essential that it finds voice in not one, but two Bill of Rights provisions.  *See, e.g.*, *Triplett*, 494 U.S. at 720-21 (the Fifth Amendment protects clients' right to choose their counsel as well as lawyers' corresponding right to maintain a representation free from arbitrary or unjustified governmental interference); *Wheat v. United States*, 486 U.S. 153, 159 (1988) (the Sixth Amendment guarantees not only effective assistance of counsel but also the "right to choose one's own counsel," in criminal cases).  Under the plain terms of the Order, however, WilmerHale attorneys are precluded from performing a wide range of tasks required of counsel, *see* Order §5(a), and WilmerHale's clients are effectively stripped of the right to counsel of their choice as a result, *see* MSJ.35-36.

The government's contrary assertions are unpersuasive.  Indeed, they depend on distorting both what WilmerHale has alleged and what the Order does.  The government contends that the Firm's right-to-counsel claim is limited to the Order's "require[ment that] government contractors [have] to disclose their business with WilmerHale."  MTD.23.  That ignores most of what the Firm has alleged.  The Complaint clearly alleged what is equally clear on the face of the Order:  The Order "instruct[s] all federal-agency leaders to limit government employees from engaging with WilmerHale personnel" and "restrict[s] WilmerHale lawyers' access to all government buildings," remarkably broad restrictions that together "eviscerate[] the Firm's ability to provide effective representation and advocacy for its clients in proceedings against the government" and otherwise.  Compl. ¶¶213-14; *see also id.* ¶¶207-09.  Defendants cannot simply ignore these well-pleaded allegations.  And the arguments they do make do not move the needle.  It is common sense that "compelling government contractors to publicly disclose their business relationships with WilmerHale" *does* "coerce[] clients to choose between retaining their government contracts—and, in many cases, their economic survival—and exercising their constitutional right to select counsel

of their choice." *Id.* ¶215.  Despite the government's *ipse dixit*, WilmerHale need not show that

the Order would "make it *impossible* to represent its clients in criminal or civil proceedings."

MTD.23 (emphasis added).  Such a sky-high bar would effectively render the Fifth and Sixth

Amendment counsel rights dead letters.

## III. Injunctive And Declaratory Relief Are Appropriate Against All Defendants.

Finally, the government argues that the Executive Office of the President ("EOP") and

United States are improper defendants.  MTD.31-35.  That is incorrect.

First, the government cites no authority that even remotely suggests that EOP is not a

proper defendant.  Defendants instead cite two authorities for the undisputed fact that EOP

comprises numerous sub-entities with varying responsibilities.  *See* MTD.31-32.  But the same

could be said of virtually every federal agency, all of which are amenable to suit nevertheless.  So

too with EOP.  Nor is the government helped by the fact that the Firm also named one of EOP's

components, the Office of Management and Budget ("OMB").  Plaintiffs routinely name both an

agency and one of its components.  *See, e.g.*, *Texas v. ATF*, No. 2:24-cv-89 (N.D. Tex. May 1,

2024) (naming both ATF and its parent agency).  Indeed, the United States itself follows suit

(literally) by naming states and state agencies, *see, e.g.*, *United States v. Washington*, No. 4:18-cv-

5189 (E.D. Wash. Dec. 10, 2018), or states and political subdivisions, *see, e.g.*, *United States ex*

*rel. Graber v. City of New York*, 8 F.Supp.2d 343 (S.D.N.Y. 1998).  In fact, even in Defendants'

own cited case, *Armstrong v. Executive Office of the President*, 90 F.3d 553 (D.C. Cir. 1996), the

plaintiff named both EOP and a component (the National Security Council).  Moreover, given that

the President purported to bar access to all federal buildings without exempting either the New

Executive Office Building (home of OMB) or the Old Executive Office Building (home of other

sub-entities of EOP), the Firm was well advised to name both.  WilmerHale should not penalized for naming all the entities the President has directed to retaliate against the Firm.[4]

Defendants fare no better in arguing that suits "alleging unconstitutional action by the Government" cannot be brought against the United States.  MTD.32.  Congress has specifically provided that "[t]he United States may be named as a defendant in any … action" alleging adverse agency action, thereby waiving its sovereign immunity in such cases.  5 U.S.C. §702.  The same provision also states that "a judgment or decree may be entered against the United States."  *Id.* None of that is surprising or controversial.  Nor does it stand alone.  Congress has expressly conferred federal jurisdiction over certain "claim[s] against the United States … founded … upon the Constitution," 28 U.S.C. §1346(a)(2), and Title 28 more broadly contemplates that federal courts will hear "civil action[s] in which a defendant is … the United States," *id.* §1391(e)(1).

Defendants nonetheless contend (at 33) that §702 defeats suits against the United States because its language is subject to the proviso that "any … injunctive decree shall specify the Federal … officers (by name or by title) … personally responsible for compliance."  5 U.S.C. §702. But whatever impact that proviso has on the scope of injunctive relief, it has no impact on whether the United States is a proper defendant.  WilmerHale also seeks (among other things) a declaratory judgment, and Defendants cite nothing suggesting that a declaratory judgment cannot run against the United States.  The scope of injunctive relief and the proper officers named in an injunctive decree are therefore not issues that need to be addressed at the motion-to-dismiss stage.  But, to

---

[4] Notably, it is unclear which agencies now compose the EOP, as the EOP's organization appears to change from one administration to the next.  *Compare Executive Office of the President*, White House, https://www.whitehouse.gov/eop/ (last visited Apr. 17, 2025) (omitting, *e.g.*, the National Security Council) *with Executive Office of the President,* White House:  President Barack Obama, https://obamawhitehouse.archives.gov/administration/eop (last visited Apr. 17, 2025). WilmerHale thus cannot confirm whether the Firm or its clients interact or contract with other EOP components, all of which are subject to the Order's directives.

preview, the government cannot deny a successful plaintiff meaningful relief by ordering an unlawful whole-of-government retaliatory action and then forcing the plaintiff to identify and name every officer subject to the unlawful order.  To the contrary, under those circumstances, directing relief to named officers *and the United States* is not just permissible, but necessary to secure full relief.  Indeed, there is nothing novel about an injunction running against the United States.  Courts in this District have enjoined the United States, including in First Amendment challenges.  *See, e.g.*, *Lederman v. United States*, 131 F.Supp.2d 46, 63-64 (D.D.C. 2001), *aff'd and injunction expanded*, 291 F.3d 36, 48 (D.C. Cir. 2002); *Wolman v. United States*, 501 F.Supp. 310, 312 (D.D.C. 1980), *vacated on other grounds*, 542 F.Supp. 84 (D.D.C. 1982); *Cent. of Ga. R.R. Co. v. United States*, 410 F.Supp. 354, 358 (D.D.C. 1976), *aff'd sub nom. Interstate Com. Comm'n v. Cent. of Ga. R.R. Co.*, 429 U.S. 968 (1976).  This Court should do so here.

Defendants' reliance on *Puerto Rico Aqueduct & Sewer Authority v. Metcalf & Eddy, Inc.*, 506 U.S. 139 (1993), and *Armstrong v. Exceptional Child Center, Inc.*, 575 U.S. 320 (2015), is misplaced.  Both cases concerned claims filed against state-government entities and thus addressed the *Ex parte Young* exception to Eleventh Amendment immunity.  Neither speaks to whether a private party can sue the United States for injunctive relief.  Defendants seek to get around this problem by describing *Armstrong* as "explaining that *Ex parte Young* and the principles governing suits against federal officials are similar."  MTD.32.  But any similarity ends with the multiple congressional statutes expressly authorizing suits against the United States (and waiving sovereign immunity).  There is no basis for relying on inapposite judge-made rules from the Eleventh Amendment context to override such clear statutory text.  Not surprisingly, *Armstrong* does not remotely address—much less embrace—Defendants' argument.  Nor does any other case they cite.

Finally, nothing in WilmerHale's Complaint "seek[s] to dodge" courts' general reluctance to enjoin the President.  MTD.33.  The Complaint makes clear that the United States was named to permit injunctive relief against the "specified action[s]" of "federal agencies" subject to but not explicitly identified by the Order.  Compl.¶71.  Again, both Congress and this Court have made clear that injunctive relief *can* be entered against the United States.  *See* 5 U.S.C. §702; *see also, e.g.*, *Lederman*, 131 F.Supp.2d at 63-64.  To the extent that naming the United States and allowing injunctive relief to run against the United States when the President has directed impermissible whole-of-government actions obviates the need to enjoin the President directly, that is not a "dodge," but a measure of respect for a coordinate branch of government that avoids unnecessary confrontation among the branches.

To the extent the government is suggesting that courts' general reluctance to enjoin the President precludes this Court from reviewing the Order *at all*, or providing *any* relief if it deems the Order unlawful, that is plainly wrong.[5]  The Supreme Court has repeatedly reviewed constitutional challenges to presidential proclamations.  *See, e.g.*, *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 582 (1952); *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 795-96 (1985); *Trump v. Hawaii*, 585 U.S. 667, 682-83 (2018).  Defendants cite no case holding judicial review (or relief) unavailable for any challenge remotely similar to the Firm's claims.  That is unsurprising; to hold that the judiciary is powerless to address egregiously

---

[5] The government also makes a drive-by standing argument to the same effect, asserting that "if Plaintiff cannot even identify the agencies it wishes to enjoin, it certainly cannot identify any cognizable injury traceable to those agencies."  MTD.35.  But the government points to no authority for the notion that the only way to challenge an Executive Order that enlists the full weight of the administrative state to unconstitutionally penalize WilmerHale is by naming as a defendant literally every single agency in the federal government.  In any event, in addition to naming the EOP and the United States, the Complaint names 25 agencies (as well as their respective agency heads) as Defendants.  And there is no serious argument that the injuries the Firm stands to suffer at the hands of those agencies would not be traceable to each agency.

unconstitutional executive action *precisely because* it was taken by the President would render the President a law unto himself.

## CONCLUSION

The government's motion to dismiss should be denied.

April 17, 2025                                    Respectfully submitted,

                                    *s/ Paul D. Clement*
                                    PAUL D. CLEMENT (D.C. Bar No. 433215)
                                    ERIN E. MURPHY (D.C. Bar No. 995953)
                                    MATTHEW D. ROWEN (D.C. Bar No. 176865)
                                    JOSEPH J. DEMOTT (Virginia Bar No. 93981,
                                                    D.D.C. Bar ID #D00561)
                                    CLEMENT & MURPHY, PLLC
                                    706 Duke Street
                                    Alexandria, VA 22314
                                    (202) 742-8900
                                    paul.clement@clementmurphy.com

                                    *Attorneys for Plaintiff Wilmer Cutler*
                                    *Pickering Hale and Dorr LLP*