<pre>
 1                    UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF COLUMBIA
 2

 3      * * * * * * * * * * * * * * *    )
        WILMER CUTLER PICKERING HALE     )    Civil Action
 4      AND DORR, LLP                    )    No. 25-00917
                                         )
 5                      Plaintiff,       )
                                         )
 6         vs.                           )
                                         )
 7      EXECUTIVE OFFICE OF THE          )    Washington, D.C.
        PRESIDENT, et al.,               )    April 23, 2025
 8                                       )    2:11 p.m.
                        Defendants.      )
 9      * * * * * * * * * * * * * * *    )

10

11

                    TRANSCRIPT OF PRELIMINARY INJUNCTION
12             BEFORE THE HONORABLE RICHARD J. LEON
                    UNITED STATES DISTRICT JUDGE
13


14
        APPEARANCES:
15
        FOR THE PLAINTIFF:       PAUL CLEMENT, ESQ.
16                               ERIN E. MURPHY, ESQ.
                                 JOSEPH J. DeMOTT, ESQ.
17                               MATTHEW ROWEN, ESQ.
                                 CLEMENT & MURPHY, PLLC
18                               706 Duke Street
                                 Alexandria, Virginia 22314
19
        FOR THE DEFENDANTS:      RICHARD LAWSON, ESQ.
20                               U.S. DEPARTMENT OF JUSTICE
                                 950 Pennsylvania Avenue, Northwest
21                               Washington, D.C. 20530

22      REPORTED BY:             LISA EDWARDS, RDR, CRR
                                 Official Court Reporter
23                               United States District Court for the
                                   District of Columbia
24                               333 Constitution Avenue, Northwest
                                 Room 6706
25                               Washington, D.C. 20001
                                 (202) 354-3269
</pre>

1          THE COURTROOM DEPUTY:  We're on the record in

2     Civil Action 25-917, *Wilmer Cutler Pickering Hale and Dorr,*

3     *LLP, versus the Executive Office of the President, et al.*

4          Starting with Plaintiff's counsel, please approach

5     the podium and state your appearance for the record.

6          MR. CLEMENT:  Good afternoon, your Honor.  Paul

7     Clement for the Plaintiffs.  And I'm joined at counsel table

8     by Erin Murphy, Matthew Rowen and Joseph DeMott.

9          THE COURT:  Welcome.

10          MR. CLEMENT:  Thank you.

11          MR. LAWSON:  Good afternoon, your Honor.  Richard

12     Lawson, deputy associate attorney general, for the

13     Department of Justice and the Defendants.

14          THE COURT:  Welcome.

15          All right, counsel.  We're here for arguments on

16     the various motions.  I'll hear from the Plaintiffs first.

17     You can have 20 minutes and ten minutes for rebuttal.  And

18     then we'll have 20 minutes and ten minutes for rebuttal for

19     the Defendants.

20          MR. CLEMENT:  Thank you, your Honor.  And may it

21     please the Court.

22          As I said, Paul Clement here for the Plaintiffs.

23     And I should note for the record that a good chunk of the

24     law firm that I represent is here as well on the other side

25     of the bar there.

 1          THE COURT:  They're more than welcome.

 2          MR. CLEMENT:  Your Honor, as this Court recognized

 3     in granting a TRO, the retaliatory nature of the executive

 4     order directed at WilmerHale is clear from its face; and it

 5     threatens both the firm's, quote, "very survival," end

 6     quote, and, quote, "the justice system at large," end quote.

 7          Now, to be sure, since the TRO was entered, the

 8     government has filed two briefs attempting to defend it.

 9     But nothing in those briefs undermines the twin conclusions

10     that the order is retaliatory in nature and inflicts

11     irreparable harm on WilmerHale and the adversarial system of

12     justice more broadly.

13          That suffices to underscore the need for permanent

14     relief.  That permanent relief should run to the order as a

15     whole, as the order itself and the president's actions in

16     revoking a similar order against Paul, Weiss underscore that

17     it was intended to stand or fall as a whole.

18          Indeed, Section 1 makes the connection express by

19     complaining about representations and *pro bono* activities

20     and proclaiming that, quote, "engaging in such egregious

21     actions should not have -- law firms that engage in such

22     egregious actions should not have access to our nation's

23     secrets."

24          THE COURT:  So it's your position that the Court

25     should analyze the order as a whole, not on a

1    section-by-section basis?

2            MR. CLEMENT:  That's right, your Honor.  I mean,

3    obviously, we don't -- we're happy to go section by section

4    if you would like.  But this order was designed as a whole.

5    I don't think you can really understand the operative

6    provisions of the order independent of Section 1.

7            And I think -- it's not just that Section 1 is a

8    complete preamble.  It really explains exactly what has

9    motivated the president's actions, and then it ties those

10    actions directly to the actions later in the order.  As I

11    say, it says that it's these egregious actions in

12    representing people *pro bono* and taking certain positions

13    that makes WilmerHale attorneys and associates ineligible to

14    have access to the nation's secrets, to have access to

15    government contracts, to have access to government

16    buildings.

17            THE COURT:  So by doing it this way, as you

18    suggest the Court should do, what effect or impact would

19    that have on the doctrine of severability, depending upon

20    how the Court analyzes certain sections?

21            MR. CLEMENT:  Sure.  So the way I would think

22    about it is that, you know, severability is usually a

23    question of legislative intent.

24            Here, I think it is a question of the president's

25    intent.  There's no nonseverability clause in the order or

1    anything else that would sort of influence your judgment

2    other than to look at the order, the structure of the order,

3    and make a judgment about whether it was intended to operate

4    as an operative whole or as sort of section by section, as

5    if those were independent things.

6         And I think it's crystal clear that the whole

7    order is tied together.  Section 1 explains how all the

8    various provisions are supposed to work and what motivated

9    all of those provisions.

10        And then I do think it's fair, based on the record

11   that you have before you, to take a look at what happened

12   with Paul, Weiss, because Paul, Weiss, like WilmerHale, was

13   subject to an order that essentially had the same operative

14   provisions in a comparable Section 1 that explained it, and

15   then when -- that was on March 14th.  And then on

16   March 21st, when there was a subsequent executive order, it

17   repealed the whole thing.  It didn't say, Well, we're going

18   to keep the security clearances issues or We're going to

19   keep the restrictions on the access to the government

20   buildings.

21        And I think that's particularly telling with

22   respect to the security clearances, because when you look to

23   the agreement that Paul, Weiss made with the president,

24   there wasn't anything specific there as to national security

25   or the national interest or anything else.  There were some

1    agreements, mostly about providing $40 million in *pro bono*

2    services that were more to the president's liking.

3           And so this is a situation where, if the question

4    is sort of the president's intent as to how these orders are

5    supposed to operate, I think we have not just the order

6    itself, which is structured in a way that suggests it stands

7    or falls together, but we have the Paul, Weiss experience,

8    where the order was issued and then revoked *in toto*.

9           THE COURT:  Why don't you proceed on treating the

10   order as a whole.

11          MR. CLEMENT:  Sure.  So if we look at the order as

12   a whole, then the first question we confront is -- I think

13   is the question of the retaliatory intent that is reflected

14   in Section 1 and permeates the entire order.

15          And I don't want to belabor the point about

16   retaliatory intent because, as this Court indicated in the

17   TRO order, the retaliatory intent here is evident on the

18   face of the order.

19          As I've mentioned before, I'm used to situations

20   where you need to have discovery to sort of suss out a

21   forbidden intent.  But here, the president has made it easy

22   on all of us.  He's made his intent crystal clear in

23   Section 1 of the order, and that retaliatory intent

24   permeates the whole order and requires the invalidation of

25   the whole order.

```
 1              Now, I want to move on, though, because it's not
 2     just the retaliatory intent that's problematic; it's the
 3     viewpoint discrimination that is reflected there.  And that
 4     is another place where I think the Paul, Weiss experience
 5     and the experience of the law firms that have made
 6     agreements even without an executive order are particularly
 7     informative, because if you had any doubt about the
 8     viewpoint discrimination in the order itself -- and I think
 9     it would be hard to have doubts, because it is clear that
10     the president is exercised by particular kinds of litigation
11     on behalf of particular clients -- and, of course, the
12     president was also motivated by WilmerHale's own words and
13     its own press release welcoming Bob Mueller and some of his
14     colleagues back to the firm and applauding Bob Mueller for
15     his career of public service.
16              So we have viewpoint discrimination right there.
17     But then the actions of these other firms really reinforces
18     that because, in order to get these orders lifted or
19     obviated in the case of the firms other than Paul, Weiss,
20     what they've done is they've agreed to provide legal
21     services for some of the president's favored causes, favored
22     viewpoints.
23              So both in the order itself, we know which
24     viewpoints the president disfavors; and with respect to the
25     other deals that have been made with other law firms, we
```

1    know what viewpoints that the president favors.  So the

2    viewpoint discrimination is utterly obvious here.

3            So I think that the First Amendment problems with

4    the order as a whole are probably the most glaring flaws in

5    the executive order.

6            But in the long run, I actually think the most

7    pernicious flaws actually go to the separation of powers

8    because, in this case -- and there's really two elements to

9    the separation-of-powers problem here.  First and foremost,

10   this is essentially legislative in nature.  There is no

11   legislation that supports this authority.  This executive

12   order doesn't invoke legislation that would somehow give the

13   president the authority to do this.

14           This is essentially -- if Congress passed this

15   provision or authorized this provision, it would be about as

16   plain a bill of attainder as we've seen in this country for

17   decades and decades.  So for the president to do it himself

18   is actually a double violation, because he's essentially

19   usurping legislative authority to do it and then he's doing

20   something through executive fiat that all of the framers

21   would recognize as a bill of attainder.

22           And indeed, in preparing for the argument today,

23   there's one case I read that is not in the briefs, but I

24   think is telling, a case called *Ex parte Garland* from the

25   Supreme Court in 1866.  And it underscores that a bill of

1    attainder doesn't need to inflict criminal punishment.  The

2    punishment at issue in *Ex parte Garland* was being barred

3    from practicing law in the courts.

4         And Congress passed a law after the Civil War and

5    said, basically, if you were involved with the Confederacy,

6    you can't practice law in the courts in the United States.

7    And the Supreme Court invalidated that as a bill of

8    attainder and, in the process, laid the groundwork for the

9    second separation-of-powers problem here, which is they said

10   who gets to appear in the courts and make arguments in front

11   of the courts is an issue for the Article III courts.  It's

12   not an issue for Congress; it's not an issue for the

13   executive branch.

14        And that is to me what's particularly pernicious

15   here, because the things that are the basis for the

16   retaliation in Section 1 are almost exclusively

17   representations before the Article III courts.

18        And as it turns out, as best we can tell, if we

19   try to associate the complaints in Section 1 with actual

20   cases, those are cases where on almost every occasion

21   WilmerHale prevailed on behalf of its clients.  And the two

22   exceptions I've been able to identify, WilmerHale prevailed

23   in the district court for its clients and, on appeal, had at

24   least one dissenting jurist side with their position.

25        So we are not talking about a law firm that has

1    weaponized the judicial system in the way that any of us

2    would recognize in the Article III courts.  The lawsuits

3    that have formed the basis for this executive branch action

4    in the main were overwhelmingly successful.

5            And in that regard -- and none of them were the

6    basis of the Article III courts sanctioning the lawyers in

7    front of them for misbehavior, misconduct, misleading the

8    Court.

9            So under those circumstances, for the executive

10   branch to take it onto itself and impose punishment, impose

11   sanctions on the lawyers for those representations, is a

12   grave threat to the rule of law, Article III and the

13   separation of powers.

14           And of course, the problem, as I alluded to in the

15   earlier hearing, goes even deeper, because the signal this

16   sends to the whole bar is:  Watch out.  We're watching.  If

17   you're litigating against the government or you're not

18   litigating against the government, your behavior can be

19   punished.  And there's just no way to practice law under

20   those circumstances.

21           If I have to stand up here and argue in front of

22   the Court today with one eye on how this is going to be

23   perceived by the executive branch and how that's going to

24   influence the interest of my other clients, well, I might as

25   well go sit down.  That's not how you can practice law.

1    The Supreme Court in the *Velazquez* case said that

2    an independent judiciary depends on an independent bar.  And

3    this -- these orders are a direct and lethal threat to the

4    independent bar.

5    And so I think the separation-of-powers issues

6    here are incredibly important.

7    Now, let me just address, if I can, a couple of

8    things that I think we are -- that the government has

9    indicated in its briefs, and I think ultimately get them

10   nowhere.  Obviously, I'll have a chance for rebuttal, so

11   I'll address some of that then as well.

12   But I think a couple of points.  We've heard over

13   and over again this idea that, Well, all Section 5 does is

14   ask for guidance.

15   But that gets the government nowhere, because

16   there's no guidance that can be consistent with our

17   constitutional system to implement this order because this

18   idea that, like, you need guidance -- the executive branch

19   already has lots of guidance for who can get into government

20   buildings.  Some government buildings everybody can come in.

21   The post office, pretty much anybody can come in.  The

22   Justice Department, you have to have an appointment.  And

23   then you get a red badge or you get a green badge.

24   So the only guidance that's even needed here is

25   guidance that would say, how is WilmerHale and their lawyers

1    disfavored vis-à-vis all the other lawyers in town who get

2    access based on neutral principles?

3            So there's no guidance here that can fix the

4    fundamental problem here, which is that a handful of law

5    firms are being singled out based on their representations

6    for disfavorable treatment.

7            The other problem about guidance -- and your Honor

8    already alluded to this in the earlier TRO hearing -- is

9    clients don't have time or the patience to wait and figure

10   out, well, I wonder how the guidance is going to turn out.

11           I mean, right now, today, WilmerHale is making

12   pitches for business with other -- against other law firms

13   that are not constrained by this kind of executive order.

14   When those clients are making their decisions as to who to

15   hire, they've got a choice between law firms that don't have

16   to wait for guidance and law firms that may be useless to

17   them or substantially hamstrung if the guidance comes out

18   and reflects the president's intent that they should have

19   restricted access to these buildings.

20           So waiting for guidance is absolutely no answer in

21   this context.

22           The same is true with the provisions in the

23   executive order that say "to the extent consistent with

24   law."

25           I mean, "to the extent consistent with law" with

1    this executive order is not at all.  It needs to be

2    enjoined.  It needs to be enjoined *in toto*.  And it is

3    not --

4               THE COURT:  One might say that's window dressing.

5               MR. CLEMENT:  One would say that's window dressing

6    at best.  And as -- you know, in the context of legislation,

7    it's quite common for somebody to come into court and say,

8    Well, I have an interpretation of this statute that avoids

9    the constitutional problem because it does nothing.

10              And the courts time and time again reject those

11   arguments.  And I think that applies *a fortiori* here,

12   because if this executive order accomplished nothing because

13   it only takes effect to the extent consistent with law, and

14   that extent is nothing, there would be nobody more

15   disappointed than the president himself.  And you can see

16   that from the fact sheet that accompanied the order.

17              The fact sheet doesn't talk about sort of, you

18   know, vague what-ifs or compliance.  It says:  We're going

19   to immediately suspend the security clearances of everybody

20   associated with WilmerHale.  Immediately suspend.

21              And it similarly talks in terms that the president

22   understood that this order was supposed to have effect -- it

23   was supposed to have immediate effect.  It has had an

24   immediate chilling effect on my clients.  And all of that, I

25   think we're at the point where it would be appropriate and

```
1    important to have permanent relief.

2              Before I sit down -- I don't have a clock right in

3    front of me, but if --

4              THE COURT:  You have five minutes left.

5              MR. CLEMENT:  If I have five minutes left -- I

6    mean, obviously, I'm here to answer any questions that your

7    Honor has.

8              But I would talk about some of the other

9    provisions -- the other constitutional provisions.  I

10   mean --

11             THE COURT:  Well, why don't you talk a little bit

12   about the expert report which you submitted by Mr. Leonard

13   and how he stresses, based on his 30 years of experience in

14   the security world -- at the highest levels, I might add, at

15   the end -- he stresses the individualized nature of gaining

16   security and having it withdrawn and how this order flies in

17   the face of the experience that he's accumulated, again, at

18   the very highest levels during the Bush Administration and

19   before then.

20             MR. CLEMENT:  So your Honor has already well

21   summarized the Leonard declaration.  But let me bring your

22   attention to one particular aspect of that that's important,

23   which is the individualized nature of this goes not just to

24   the decision to grant the security clearance or to revoke it

25   formally.  It also goes to suspension.
```

1          I mean, this idea of suspending security

2     clearances, that is something that happens in the real

3     world; but again, it's an individualized basis.

4          I mean, if somebody with a security clearance is

5     arrested tonight under very suspicious circumstances, the

6     national security community doesn't have to wait to suspend

7     a security clearance until they go through a very

8     individualized formal process.  They can suspend it, but

9     they suspend it based on the fact that that individual has

10    been arrested under very suspicious circumstances.

11         You also sort of see this in the reporting

12    requirements.  If you have a security clearance, you're

13    under obligations to report foreign travel, a bequest from

14    some relative, all of that stuff.  And of course, if you

15    don't do your individualized reporting, that can lead to a

16    suspension.  But it's all individualized.

17         And as the Leonard declaration makes clear, what

18    there isn't any room for in the traditional way of

19    proceeding with security clearances -- and equally

20    important, what is not off limits under *Lee v. Garland* is

21    this idea that we're going to not do this individualized;

22    we're going to have a suspension that's across the board of

23    everyone who's associated with WilmerHale.

24         And what I think makes that particularly

25    pernicious is because these are people -- these are roughly

1    20 people, 20 lawyers, who were granted the security

2    clearances only on the basis of those individualized

3    investigations that Mr. Leonard details.  And again, he

4    details -- there's 13 different factors that are taken into

5    account.  And all of these 20 individuals were flyspecked on

6    those 13 factors and granted security clearances, some of

7    whom have had security clearances for years and have

8    complied with the reporting requirements and are in good

9    standing.

10             And so to take something that is only granted on

11   an individualized basis and then suspend it across the board

12   based on a nonindividualized basis, I think, is really

13   unprecedented.

14             And it fits much more in the model of --

15             THE COURT:  I think he goes further and says -- as

16   I recall it, I think he says that that leads to danger to

17   national security if you start granting, suspending or

18   revoking based upon classification as opposed to an

19   individualized assessment.

20             MR. CLEMENT:  That's exactly right.  And he

21   also goes so far as to suggest it's also inconsistent with

22   all of the regulations and even the statutory directions

23   from Congress.

24             And I would only add, as the cherry to that

25   particular sundae, is I think that maps onto the D.C.

1    Circuit case law very well.  I know your Honor is familiar

2    with *Lee v. Garland*.  But *Lee v. Garland* expressly

3    distinguished an earlier case of the D.C. Circuit, the

4    *Federated Federal Employees v. Greenberg*.

5          And that was a decision written by Judge Randolph,

6    who is not somebody who takes national security issues

7    lightly.

8          THE COURT:  No.

9          MR. CLEMENT:  Judge Randolph, for a panel that

10    included Judge Edwards and Judge Sentelle, said that when

11    you have these kind of across-the-board issues -- and there

12    it was, What kind of questions are we going to ask in the

13    security clearance? -- that's not off limits under *Egan* and

14    political question cases.

15          So I think the distinction you see in the case law

16    is a distinction between these kind of across-the-board

17    generalized things, which can be challenged in court and are

18    justiciable, and the individualized determination that this

19    particular person poses this threat to national security.  I

20    think that makes perfect sense.  It would almost have to be

21    the rule because, otherwise, you could use these security

22    clearances to get around all sorts of constitutional

23    provisions.  The Republican president could come in and say,

24    Everybody associated with a Democrat, everybody who has ever

25    voted Democrat, is immediately suspended with their security

1     clearance.

2          Well, of course you can't have that as a matter of

3     the protections that you have against that kind of

4     partisanship and the fact that we don't have a spoils system

5     in our civil service.  But you can get around it if you

6     could make these kind of generalizations.

7          So I think that that aspect and the declaration

8     that your Honor has pointed to I think not only shows why

9     Section 2, even if you were going to go section by section,

10    is fundamentally infirm, but also I think shows that there's

11    a path here that does not implicate the *Lee v. Garland*

12    decision.

13         So I'll be back with you in rebuttal.  But I

14    appreciate your Honor's attention.  Thank you.

15         THE COURT:  Very good.  Thank you.

16         Mr. Lawson.

17         MR. LAWSON:  Good afternoon, your Honor.

18         THE COURT:  Good afternoon.

19         MR. LAWSON:  I think at a high level, the Court

20    asked the question about reviewing in whole or by section.

21    Obviously the Court has seen our pleadings.  We have

22    attacked this issue section by section.  There is a --

23         THE COURT:  I thought I'd tee it up for you.

24         MR. LAWSON:  Thank you.

25         There is -- at a very high level, I think the

 1    biggest point of difference between the parties, and I

 2    suspect will be driving the Court's decision and guide most

 3    of its ruling, is whether or not these provisions, the main

 4    operative sections, 2, 3, 4 and 5, are acts of executive

 5    discretion or if they are punishment.

 6            And that, I think, really is going to drive all of

 7    this analysis, particularly as it relates to the claims

 8    about viewpoint retaliation and a First Amendment issue.  As

 9    I read those cases, the retaliation does have to involve

10    some level of punishment.

11            We are viewing these sections, 2, 3, 4 and 5, as

12    not punishment, just the -- the effort of the executive --

13            THE COURT:  Isn't the threat to the ongoing

14    business of a major law firm punishment?  Just the threat

15    alone.

16            MR. LAWSON:  I would submit that these --

17            THE COURT:  How can that not be punishment?

18            MR. LAWSON:  Well, if we can take the sections

19    individually and figure out -- I would -- I guess I'm

20    disputing the point that this order and these sections,

21    separately or together, really aren't an absolute threat, an

22    absolute punishment.  These are discretionary points.

23            Section 2, which you were just having a discussion

24    with Mr. Clement about, there is great deference given to

25    the executive on security clearances.

1          Section 3 regarding contracting:  extraordinary

2     deference by Congress to the executive on how to fill that

3     out.

4          Section 4, the direction to the EEOC:  This is, on

5     a broad level -- obviously, the section is important from

6     the Perkins executive order.

7          And Section 5, again, it's regarding the guidance.

8          Is it possible in Section 5, regarding access to

9     staff, access to offices -- could guidance be issued that is

10    so horrific that it prevents a Wilmer attorney going to the

11    Bureau of Prisons to meet a client and prep for trial?

12         Yes, it could be that way.  But no guidance has

13    been issued that is posing that level of threat.  It's not

14    ripe on that point.  And there are ways of access to

15    buildings, access to staff, that would be consistent.  Just

16    by way of example --

17         THE COURT:  How do you think clients would take

18    that?

19         MR. LAWSON:  I'm sorry?

20         THE COURT:  How do you think clients would take

21    the admonition from a Wilmer attorney that this issue is not

22    ripe yet, so don't worry about it?  Do you see, in the

23    practical real world, that would be an answer that would be

24    acceptable to a prospective client if you need to tell him

25    the guidance hasn't been issued?

1          MR. LAWSON:  No.  I can -- I can see the Court's

2     concern.  I can see the question and the issue there.

3          But whether or not that's actionable, I don't

4     think we can say it's actionable until we see what it says.

5          I think we just -- we have to -- we have to have

6     the ripe issue of, what is it prohibiting?  Is it

7     prohibiting Department of Justice staff from appearing at a

8     WilmerHale CLE on diversity?  That's one thing.

9          Is it barring access to the courthouse?  Something

10    else.

11         We don't know what it is.  It hasn't been -- it

12    hasn't been defined.  It's been frozen because of the

13    Court's order in this and the other cases.

14         THE COURT:  You'd have to add a lot of judges to

15    this court to deal with all the motions that would have to

16    be litigated to deal with that kind of potential unraveling.

17         MR. LAWSON:  Well, I mean, as it relates to this

18    particular case, one way, if the Court denies the motion for

19    summary judgment and also denies the motion to dismiss and

20    we proceed, the Court could easily amend the temporary

21    restraining order to allow for the development of the

22    guidance.  Maybe not even -- not allow it to be implemented,

23    but at least it will be ripe; it will be concise, concrete

24    and reviewable.

25         We don't have that here.  We're playing a guessing

 1    game.

 2          And so that's the issue there.

 3          Counsel for the Plaintiffs has raised concerns

 4    about the breadth of what Section 5 could be.  The Court has

 5    obviously understood some of the concerns about that.

 6          But we just -- it's not concrete.  That's our

 7    issue there.  We can have no end of parade of horribles, but

 8    we need to have that definiteness to have it be justiciable.

 9    That's our main point on that point.

10          But again, to go back to the example I gave a

11    moment ago about, you know, perhaps it's a bar on attending

12    CLEs on diversity issues or something along these lines,

13    that's within the prerogative of the executive to decide,

14    where will staff go?  Obviously, going in an official

15    capacity.  You know, if someone wants to pay their own way

16    and attend, that's one thing.  But someone who is appearing

17    as XYZ official from ABC agency, that would be something

18    that I would submit is within the prerogative of the

19    executive.

20          So there's a way that Section 5 can fit within

21    executive discretion.

22          Section 4 -- I'll just go in reverse order here --

23    Section 4 with the EEOC direction, this is a classic example

24    of the executive having a concern on a legal issue; you

25    know, improper use of race, sex and ethnicity stereotypes

1    in -- in private practice of sending a direction to the

2    EEOC:  Take a look; see what you've got there.  That's

3    really all Section 4 is dealing with.

4            Section 3 I think we discussed at some length at

5    the prior hearing.  And just to recap, there is a very large

6    body of case law supporting the use of executive order -- or

7    the use of executive orders to further public policy and

8    social policy through the procurement power.

9            So again, these contractual issues with

10   subcontractors:  well supported as a use of executive power.

11           And again, the concerns as laid out in this

12   executive order are on racial discrimination.  And that's

13   the -- there's the strongest body of case law that's very

14   well supportive of the use of executive order through the

15   procurement power to further that end.

16           And then, of course, returning now to Section 2,

17   the case law that the Court knows better than I, I'm sure,

18   is very supportive of the merits being given over to the

19   executive.

20           And as it relates to Section 2 and the Court's

21   concerns and issues addressed with Plaintiff's counsel, I

22   would just call out that the immediate steps are to be taken

23   consistent with applicable law.

24           Now, I understand the Court's concerns about, is

25   this just general surplusage or is it meaningful?

1         I read the key cases, *Egan* and *Lee*, as holding

2    that following proper protocols and procedures on

3    enforcing -- as it relates to the grant, revocation,

4    suspension of security clearances, is justiciable, is

5    reviewable.  The merits, maybe not.  But at least that

6    process.

7         So to the degree there are processes involved,

8    the -- what is being painted as sort of a blanket or

9    wholesale immediate suspension is subject to the applicable

10   law, which would involve following the protocols and

11   procedures; and then the order specifically calls for

12   pending a review of whether the clearances are merited.  So

13   there is that individual review.

14        I understand the Court's consideration of the

15   expert opinion.  His statements are what his statements are

16   on that point.

17        But I would submit that what's driving Section 2

18   is the inherent authority of the executive.  And to give an

19   example on this, if the Court were to adopt some of the

20   language -- or the statements from the expert into an order,

21   there is this risk that now, all of a sudden, an immediate

22   urgency -- emergency pops up.  The executive is having to

23   deal with this --

24             THE COURT:  Isn't that what suspension is for?

25             MR. LAWSON:  Yes.  But if it's -- if it's, like, a

1    larger group, if it's more than, like, a group of two or

2    three people or five people or 100 people that he has a

3    concern with, this or future presidents might have a concern

4    with people who are a member of a certain group, it's like:

5    Wait a minute.  We've got to stop, pause and then we're

6    going to dive into each of these people.  This Court's order

7    on this point is going to drive how that future issue is

8    dealt with.

9            And I don't mean to belittle the concerns from the

10    Court on this point, but I would just draw the Court's

11    attention to the section that it is not eliminating the

12    individual review.  That is, as I read the issues counsel

13    mentioned -- Mr. Clement mentioned the bill of attainder

14    issues.  Obviously, the expert is talking about the large

15    group, that blacklisting and so forth.

16            This is not that.  This allows for the

17    individualized review to take place.

18            So I think, again, going back to where I was

19    driving from, on the 30,000-foot level, are these

20    punishments or are these valid -- a valid exercise of

21    executive discretion?

22            And I think for all of them, they are and they

23    suffice.

24            And obviously, as to Section 1, I know they're

25    seeking to enjoin it, but the Court declined on the TRO

1    level.  And I would submit that these are protected

2    government speech issues at that point.

3            I can't remember if it was this or another court,

4    but it was almost along the lines of a press conference.

5            THE COURT:  Speaking of speech, why don't you

6    spend a few minutes addressing the First Amendment concerns

7    that Mr. Clement outlined in great detail in his pleading.

8            MR. LAWSON:  So as to the First Amendment concern,

9    the issue that I see with how that applies here is, again,

10   downstream of the idea of:  Is this retaliation or not?  Is

11   this punishment or not?

12           THE COURT:  It's pretty clear it's retaliation --

13           MR. LAWSON:  Well, I would submit --

14           THE COURT:  -- on the face of it.  At least to

15   this Court.

16           MR. LAWSON:  I think --

17           THE COURT:  Maybe not some other court.  But I

18   have already staked that position out in my TRO.

19           MR. LAWSON:  I'm sorry?

20           THE COURT:  I already staked that position out in

21   my TRO.

22           MR. LAWSON:  Well, I would submit that these

23   concerns are properly within the president's realm to have

24   an opinion on as far as his concerns about --

25           THE COURT:  No one is concerned about his

1    opinions; they're concerned about his actions.

2            MR. LAWSON:  Well, that's where I -- again, to go

3    back to the section-by-section analysis I just gave as to,

4    are these actions within the discretion given to the

5    executive?  I would say yes.

6            And so to the degree that there's a First

7    Amendment concern, none of these -- let's talk about the

8    bill of attainder for a minute.  The big concern with those

9    bill-of-attainder cases was that it was a bar from the

10   ability to practice, a bar on the ability to do your chosen

11   profession.

12           That's not accomplished here.  Now, I know there's

13   a parade of horribles that could be referenced if the

14   Section 5 guidance ever comes out and it's as bad as it's

15   thought.  But it doesn't have to be.  So even removing that,

16   there's nothing here that's a bar.

17           There is no right to government contracts.

18   There's no --

19           THE COURT:  What do you mean, it doesn't have to

20   be?  What does that mean?

21           MR. LAWSON:  The guidance in Section 5 can be

22   consistent with any constitutional concerns, whether on the

23   First Amendment, due process, right to counsel, any of that.

24   There is a way of drafting that guidance so that it can be

25   consistent with this, with all of the concerns that have

1    been raised.

2            And so that's where I would say that to the degree

3    that there is, you know, a concern about this being

4    punishment, I think if you look at those cases where the

5    punishment was found, you're seeing a theme of this person

6    is being deprived of an ability to engage in their vocation.

7            That's not being done here.  There's no right to

8    national security secret clearances under 2.  There's no

9    right to government contracts under 3.  Certainly no right

10   to violate Title VII, which is what Section 4 deals with.

11   And as to Section 5, access to buildings, access to

12   government staff, access to government employment:  Soundly

13   within the discretion of the executive to set boundaries

14   consistent with the constitutional concerns that have been

15   raised.

16           So we can -- there is a way for all of these

17   provisions to fall within executive discretion that's been

18   granted by Congress, granted by the Constitution.

19           And so there will be -- to the degree the Court is

20   inclined to grant any of the provisions being sought by

21   Plaintiff, extraordinary care needs to be written that isn't

22   so broad that it is tying the hands of the executive.

23           Obviously, for decades, the procurement power was

24   used to advance social policy in fighting discrimination.

25           To the degree the Court grants anything for

1    Section 3, I urge caution that it's not written so broadly

2    it interrupts that power.

3         Obviously, there are many, many cases that have

4    dealt with national security on this.  This Court's order as

5    to Section 2 will be similar on that point.

6         Section 4, interestingly, is actually one of the

7    more -- the points that we are most concerned with because

8    it's at such a high level as far as we would like you to --

9         THE COURT:  What if the Court disagrees with you

10   and decides to treat it as a whole?

11        MR. LAWSON:  As a whole?

12        THE COURT:  Yes.  Not on a section-by-section

13   basis.

14        MR. LAWSON:  Well, I would submit --

15        THE COURT:  Which is the direction the Court is

16   leaning in.  I'll give you a little heads-up there.

17        MR. LAWSON:  I appreciate that.

18        THE COURT:  That's the direction I'm leaning in.

19        MR. LAWSON:  And from that, I'm assuming the Court

20   is concerned that, as a whole, this is an attack on First

21   Amendment rights of representing certain --

22        THE COURT:  It kind of looks that way.

23        MR. LAWSON:  I would submit, your Honor, if you

24   take the granular approach that we urge of looking at those

25   sections, looking at the portions of the executive order in

```
 1   Section 1 that lend support to each section, Section 1 is
 2   broadly written.  Not all of Section 1 supports each of
 3   those provisions equally.
 4        There are very big concerns with -- on Section 4
 5   as far as, what could possibly be improper with the
 6   executive urging an agency to investigate an area of
 7   concern?  And that's really all Section 4 is asking for.
 8   That's a very hard order to state, Oh, no, that's
 9   retaliatory.  That's going to call -- the consequences of
10   executive action for how investigatory agencies prioritize
11   what they look at, tying the hands of the executive going
12   that way has tremendous consequences that I don't think this
13   Court has to reach on that point.
14        So I don't know if that quite answers the Court's
15   question or -- on that point.
16        THE COURT:  Not particularly.
17        MR. LAWSON:  Well --
18        THE COURT:  You can try -- keep trying, if you
19   wish.
20        MR. LAWSON:  Well, I wish.
21        The --
22        THE COURT:  You've got about three minutes.
23        MR. LAWSON:  I understand.
24        Again, I would just drive back to, at that high
25   level, you know, the executive has the ability to engage in
```

1    these discretionary acts.  There are no rights to all of

2    these points that --

3                THE COURT:  There are First Amendment rights.

4                MR. LAWSON:  There are First Amendment rights.

5    I --

6                THE COURT:  But you're not even prepared to

7    concede that.

8                MR. LAWSON:  No.  I don't think I can concede --

9                THE COURT:  Or the chilling effect on their First

10   Amendment rights --

11               MR. LAWSON:  I don't think I can --

12               THE COURT:  -- a combination of all these

13   ingredients.

14               MR. LAWSON:  I don't think I can concede that.

15               The -- I don't view this as -- if it could be

16   viewed -- if any one of these sections were overstepping

17   discretionary bounds, then maybe.

18               But these, I submit --

19               THE COURT:  Mr. Clement says that these

20   combination of components pose a challenge to the checks and

21   balances between the various branches of the government.

22               MR. LAWSON:  Well, I understood the checks and

23   balance.  And I guess we have two rebuttals here, so we can

24   clarify that.  But I understood the checks and balance angle

25   is the constitutional prohibition on the -- Congress not

1    being able to issue bills of attainder, with bills of

2    attainder being an issue of, hey, Congress sets the law; the

3    judiciary determines the punishment.

4         Again, you see the issue I'm driving at.  If this

5    isn't punishment, there is no separation-of-powers issue

6    because there's no bill-of-attainder issue.  It has to be

7    the punishment -- for it to be punishment.  And the classic

8    examples of all those blacklists, total ban:  There is no

9    total ban here.

10        I understand -- noting the caveat about Section 5,

11   because we don't have the guidance, there is no total ban.

12   So if there were a total ban, then some of those concerns

13   would be firmer.

14        THE COURT:  Well, save up your swings for your

15   rebuttal.

16        MR. LAWSON:  Thank you, your Honor.

17        THE COURT:  I think there's a different case he's

18   working on.  How about you?

19        MR. CLEMENT:  I agree with you, your Honor.  And

20   I'm going to take a couple of swings myself.  So let me

21   start with this idea that there's no punishment here.

22        Now, the first point to make about that is,

23   punishment isn't actually the test for most of the

24   constitutional claims we're bringing.

25        THE COURT:  Okay.

1          MR. CLEMENT:  The prohibition on viewpoint

2    discrimination, just to pick one, is not limited to

3    viewpoint discrimination in punishment.

4          Now, nobody thinks getting into a public forum or

5    not has to be punishment in order for the government not to

6    be able to prohibit access on the basis of viewpoint.

7          So on a lot of these things, punishment is

8    actually beside the point.

9          Same with retaliation.  The question on

10   retaliation is whether the action would influence somebody

11   of ordinary firmness.  We can talk about these other law

12   firms in a second, which I think demonstrate beyond a shadow

13   of a doubt that, whether this is punishment or not, it would

14   influence the judgments of law firms of ordinary firmness.

15   And it takes, frankly, a law firm of extraordinary firmness

16   to be in court challenging these things.

17         But even as to those constitutional claims where

18   punishment is the test -- and I will grant you that, for the

19   bill of attainder, for example, that punishment is the

20   test -- I think we have punishment in spades here, and I

21   actually find the idea that this isn't punitive to be

22   somewhat bewildering.

23         THE COURT:  It's retaliatory.  There's no question

24   in my mind.

25         MR. CLEMENT:  Exactly.  Exactly.

 1          But as to whether it's punishment, just for a

 2     moment on that, I mean, in the context of a law firm to say

 3     that you are not going to have access to -- unfettered

 4     access that your peer firms are going to have to government

 5     buildings, that you're not going to have the same kind of

 6     security clearances, especially if you're trying to have a

 7     national security practice -- and WilmerHale has one of the

 8     finest national security practices in the country -- and

 9     then, if you tell that law firm that its clients are going

10     to have to make disclosures to the government about who's

11     representing them and about what, if they're a government

12     contractor that are different from their peer firms, all of

13     that, it seems to me, would qualify as punishment.

14          THE COURT:  What would you consider a peer firm?

15     Firms of over a thousand lawyers?  How would you describe

16     it?

17          MR. CLEMENT:  Well, there's so many different ways

18     to come at that.  But maybe I'll talk about for a second the

19     nine firms that have made a deal with the government rather

20     than suffer these kind of executive orders.

21          THE COURT:  Skadden.

22          MR. CLEMENT:  The Skaddens, the Kirklands, the

23     Lathams.

24          THE COURT:  Paul, Weiss.

25          MR. CLEMENT:  Paul, Weiss.

1          And I think even my friend from the government

2     would agree that a $125 million fine is punishment.  And

3     from the perspective of most of these law firms, the last

4     ones to settle, the Lathams, the Kirklands, they were

5     willing to pony up $125 million in *pro bono* services in

6     order to avoid this kind of executive order.

7          So those peer firms' actions speak louder than

8     words, and they say that being subject to one of these

9     executive orders is worse than a $125 million fine.

10         So the punishment here, I think, is clear beyond

11    cavil.

12         So the second thing I want to address in rebuttal

13    is my friend from the government says, Well, really you

14    should understand Section 1 is government speech.

15         That is the precise argument that was rejected

16    unanimously in the *Vullo* case, the *NRA v. Vullo* case in the

17    Supreme Court.

18         And this would not be a difficult case before

19    *Vullo*.  But *Vullo* is, it seems like, the Supreme Court

20    trying to say, You can't do what the executive order

21    purports to do here.

22         And what *Vullo* focused on in particular that

23    was -- arose in the context of the DFS regulator in New York

24    and putting pressure on people in order to not provide

25    services to the NRA.

1          And what the Court focused in on -- and I think

2     it's important, and I think it's related to an observation

3     that you made in the TRO hearing -- is that if the

4     government wants to go after somebody and their speech, it's

5     particularly effective to try to go after third parties who

6     they provide services to, or vice versa, because the

7     insurance Lloyd's of London, they don't have much of an

8     incentive to stand up for gun rights.  So if the pressure is

9     imposed on them, they'll fold easily, whereas the NRA would

10    have stood tall and resisted.

11          And in the same way, the reason that this

12    executive order is so pernicious is it put pressure -- it

13    puts pressure on the clients.  The executive branch

14    understands that, as this Court underscored at the TRO

15    hearing, clients are skittish.  Clients are nervous.  They

16    want to make sure, if they're going to hire a lawyer, that

17    that lawyer is going to be there throughout the

18    representation, able to defend them, able to have a fair

19    hearing in a government office building, able to get into

20    the door of the government office building.  That's what

21    clients need, and that's what this executive order goes

22    after, I think entirely consciously, and makes it

23    particularly pernicious.

24          Now, my friend on the other side also talks a lot

25    about discretion and the discretion of the executive.

1          But with all due respect, the discretion of the

2    executive branch does not extend to retaliation.  It does

3    not extend to viewpoint discrimination.  It does not extend

4    to providing punishment without any due process, any notice.

5          Again, I have barely talked about due process

6    because the First Amendment and separation-of-powers

7    violations here are so glaring.  But all of this came on to

8    WilmerHale.  There was no notice.  There was no opportunity

9    for a hearing.  There was no predeprivation process or

10   anything like it in this case.

11         So I'm a big believer, frankly, in executive

12   discretion, but executive discretion is always limited by

13   the Constitution.  And our complaint shows you about 11

14   different ways in which the executive discretion that's

15   trying to be exercised here violates the Constitution.

16         The fourth point I'd just like to make in

17   rebuttal, but also to potentially forecast to the remedy

18   here:  I think that to the extent this Court is inclined to

19   look at this order as a whole, that's exactly the right way

20   to look at it.  And I think it lends itself to the kind of

21   relief this Court could order.  Obviously, that's within the

22   discretion of the Court.

23         But I think it would be quite straightforward to

24   say that this executive order is unconstitutional *in toto* as

25   a matter of declaratory relief and then simply enjoin any

1    and all action based on this executive order.

2              I think that gets to the gist of this order being

3    unconstitutional, root and branch, and no action should take

4    place on the basis of this order.

5              And then I think in terms of framing who's subject

6    to that order, it needs to be very, very broad.  I mean, the

7    government, in their compliance efforts, doesn't even seem

8    to understand every agency that is subject to the

9    president's discretion to retaliate against WilmerHale.  And

10   so we need relief here that is comprehensive.

11             And if your Honor took a look at the compliance

12   memo that was provided with respect to Judge Bates's order

13   that's in a footnote in our last brief, they need a real

14   compliance memo, not "An unelected federal judge has told us

15   we have to do something, but we don't think he or she is

16   right."

17             That's not compliance.  That's not the way the

18   Justice Department typically ensures that there is

19   compliance with a federal judge's order.

20             The point I'll sit down on, your Honor, is one

21   that we've talked about a fair amount already.  But again,

22   my friend from the government, about the best thing he can

23   tell you is, Well, this looks really bad, but we're going to

24   give some guidance, and maybe the guidance is going to make

25   it look a little bit better.

1           There is no guidance in the world that can fix

2    this problem, because the gist of this order is to single

3    out WilmerHale and figure out how we're going to treat it

4    worse than other law firms and how we're going to

5    disadvantage WilmerHale.  The order of this executive order

6    itself -- the title of this executive order tells you what

7    this is on about:  addressing the risks posed by WilmerHale.

8           Now, the way you do that is you have guidance

9    eventually that tells you exactly how to deny access, how to

10   deny security clearances, how to interfere with government

11   contracting and client relationships and all of the rest.

12          No -- there are certain things in government that

13   no guidance can fix.  There's an executive order that says,

14   Go discriminate on the basis of race and issue some guidance

15   on how to do it.  You don't have to wait for the guidance.

16   It's unconstitutional, root and branch.

17          And my friend also talks a lot about tying the

18   executive's hands.

19          THE COURT:  They talk about national interests,

20   sometimes distinguishing it from national security.  They

21   don't define what national interests are in that situation.

22   Presumably, it's broader.

23          MR. CLEMENT:  It has to be broader and --

24          THE COURT:  It has to be.

25          MR. CLEMENT:  -- presumably, it's in the eye of

1    the beholder.  And that's both problematic, but it also

2    underscores that no decision of the D.C. Circuit or the

3    Supreme Court has ever said -- that I'm aware of says you

4    have to defer to the president's view of the national

5    interest.

6              National security, sure, especially based on an

7    individualized determination.

8              But in a sense, they give away the game when they

9    talk about the national interest rather than national

10   security.  Even they can't quite bring themselves to say

11   that WilmerHale lawyers, all 20 of whom have gone through

12   this exhaustive individualized process and been determined

13   fit to have a security clearance, they can't really bring

14   themselves to say that those lawyers pose a national

15   security risk.

16             So they fudge a little bit, talk about the

17   national interest.

18             With respect, that doesn't get it done.  And, in a

19   way, ultimately, it's kind of offensive to those that are

20   really concerned about the national security.  And it

21   dilutes, frankly -- I mean, courts should defer to the

22   executive when it's truly about the national security

23   interests of the United States.  But if we're going to

24   fudge, no deference is appropriate.

25             And let me finish on this note, your Honor:  My

1    friend also talks about tying the hands of the executive,

2    and you don't want to tie the hands of the executive.

3          Well, with all respect, there are some subjects

4    where the executive's hands should be tied.  And that gets

5    to retaliation.  That gets to viewpoint discrimination.

6    That gets to interference with the separation of powers and

7    representations before the Article III courts.  If the

8    executive is inclined to interfere with the traditions that

9    are essentially necessary to have the rule of law in the

10   adversarial system of justice, the president's hands should

11   be tied.

12          Thank you, your Honor.

13          MR. LAWSON:  So Mr. Clement referenced the *Vullo*

14   case.  I think that's a good point to kind of finish where I

15   was starting as to whether or not this is punishment.

16          And in that case, the regulatory body up there was

17   threatening to use its powers as the sovereign to coerce

18   other parties, on threat of further investigation, to cease

19   doing business with another entity.  That qualified as

20   punishment in that case.

21          We don't have that here.  All of these sections

22   involve not the use of the executive power as sovereign to

23   go and exact punishment.  This is the executive determining

24   who should be trusted with secrets.  Section 2.  Who should

25   we contract with?  Section 3.  What should be the priorities

1    for policing antidiscrimination laws?  Section 4.  What

2    should we be doing as far as interaction with our staff on

3    these issues?  Section 5.

4              None of them involve those same issues in *Vullo*.

5              So I understand the Court's concerns.  I have

6    certainly heard the Court's questions and comments and

7    statements regarding its view of the nature of this order.

8              So I'm not -- you know, while I respectfully

9    disagree that it's purely retaliatory or anything like that,

10   to the degree the Court is inclined to grant any portion of

11   this, I hope I can impart at least that one concern, that

12   the traditional -- or the easy analogy to the *Vullo* line of

13   cases doesn't really hold here.  This involves discretion.

14             And to the degree the Court is granting any

15   portion of this order, it's going to be -- I say again --

16   tying the hands of the executive with consequences that

17   could be unpleasant and only visible in the long term.

18             So that is the biggest point that I would leave

19   the Court with here, is to be mindful that this point deals

20   with discretion and not with punishment.

21             Beyond that, I don't have any other specific

22   points to raise in rebuttal.

23             THE COURT:  Thank you.

24             MR. LAWSON:  Thank you.

25             THE COURT:  Well, I appreciate, of course, that

1    the parties would like a ruling in short order, as quick as

2    possible.

3              There are so many issues of truly unusual and

4    major importance here.  It's not like the opinion will be

5    turned out in a matter of days.  It will be more like weeks.

6    But it will get the highest priority among my cases, I can

7    promise you that.

8              And hopefully, it will not be too late.  I'll try

9    to avoid that as well.

10             Thank you for your assistance, counsel.  We stand

11   in recess.

12             (Proceedings concluded.)

13

14

15

16

17

18

19

20

21

22

23

24

25

**CERTIFICATE**

1

2

3            I, LISA EDWARDS, RDR, CRR, do hereby

4    certify that the foregoing constitutes a true and accurate

5    transcript of my stenographic notes, and is a full, true,

6    and complete transcript of the proceedings produced to the

7    best of my ability.

8

9

10           Dated this 23rd day of April, 2025.

11

12           /s/ Lisa Edwards, RDR, CRR
             Official Court Reporter
13           United States District Court for the
               District of Columbia
14           333 Constitution Avenue, Northwest
             Washington, D.C. 20001
15           (202) 354-3269

16

17

18

19

20

21

22

23

24

25