# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| WILMER CUTLER PICKERING HALE AND DORR LLP, | ) ) ) ) | |
| Plaintiff, | ) ) | Civil Case No. 25-917 (RJL) |
| v. | ) ) ) | |
| EXECUTIVE OFFICE OF THE PRESIDENT, *et al.*, | ) ) ) | |
| Defendants. | ) ) ) | |

## MEMORANDUM OPINION
May **27**, 2025 [Dkt. #15; Dkt. #16]

The cornerstone of the American system of justice is an independent judiciary and an independent bar willing to tackle unpopular cases, however daunting.  The Founding Fathers knew this!  Accordingly, they took pains to enshrine in the Constitution certain rights that would serve as the foundation for that independence.  Little wonder that in the nearly 250 years since the Constitution was adopted no Executive Order has been issued challenging these fundamental rights.  Now, however, several Executive Orders have been issued directly challenging these rights and that independence.  One of these Orders is the subject of this case.  For the reasons set forth below, I have concluded that this Order must be struck down in its entirety as unconstitutional.  Indeed, to rule otherwise would be unfaithful to the judgment and vision of the Founding Fathers!

1

<u>BACKGROUND</u>

## I.    Factual Background

### A.    *WilmerHale*

Wilmer Cutler Pickering Hale and Dorr LLP ("WilmerHale" or "the firm") is a law firm with over 2,000 employees, approximately 1,200 of whom are lawyers. Compl. [Dkt. #1] ¶ 77. The firm has 12 offices around the world. *Id.* Its attorneys work in a variety of different sectors, including criminal defense, patent prosecution, securities law, and regulatory and government affairs, to name just a few. *See id.* ¶ 79.

The firm takes on "a wide array of clients, ranging from large corporations, colleges and universities, and Native American tribes to nimble start-ups and individuals accused of criminal and civil wrongs." *Id.* Its "litigation practice has long advocated for clients and causes across the ideological spectrum." *Id.* ¶ 81. Keeping with that practice, WilmerHale has represented clients in litigation against the federal Government during both Republican and Democratic administrations. *Id.* ¶ 82.[1]

Certain of WilmerHale's cases and clients have drawn the ire of President Trump. The Complaint highlights a few, including the firm's representation of: inspectors general alleging that President Trump improperly fired them, *id.* ¶ 83; the House of Representatives Committee on Ways and Means in litigation resulting in President Trump's disclosure of his personal tax returns, *id.* ¶ 84; the Joe Biden and Kamala Harris campaigns in election

---

[1] WilmerHale "sued the Clinton Administration at least 28 times, the Bush Administration at least 68 times, the Obama Administration at least 125 times, the first Trump Administration at least 45 times, and the Biden administration at least 97 times." *See* Pl.'s Statement of Undisputed Material Facts ("Pl.'s SUMF") [Dkt. #16-2] ¶ 42. Throughout this Memorandum Opinion, the cited paragraphs of WilmerHale's statement of material facts are undisputed unless otherwise noted.

litigation, *id.* ¶ 85; and the Democratic National Committee and state-level Democratic Party organizations in lawsuits brought by the Donald Trump campaign challenging the results of the 2020 presidential election, *id.* ¶ 86.

The firm's affiliation with Robert S. Mueller III ("Mueller") has also attracted the President's displeasure.  After a long and distinguished career in the Government, Mueller joined WilmerHale as a partner in 1993, and he remained there until he re-joined the Department of Justice ("DOJ") in 1995, where he ultimately served as the Director of the Federal Bureau of Investigation from 2001 to 2013.  *Id.* ¶ 89.  Thereafter, Mueller again returned to the firm for a few years before then-Acting Attorney General Rod Rosenstein appointed him to serve as Special Counsel charged with investigating allegations of Russian interference in the 2016 presidential election.  *Id.*  The Complaint alleges that, because of his role as Special Counsel, "Mueller personally became a target of President's Trump ire."  *Id.* ¶ 91.  The Complaint is replete with President Trump's statements on the investigation and Mueller's involvement.  *See id.* ¶¶ 90–91 (collecting quotes from President Trump:  "thugs"; "hit squad"; "National Disgrace!"; "hoax"; "witch hunt"; "very sick and dangerous people").  After the Special Counsel's Office issued its Report on the Investigation into Russian Interference in the 2016 President Election, Mueller rejoined WilmerHale.  *Id.* ¶¶ 92–93.  He has since retired from the firm.  *Id.* ¶ 93.

## B.    *Executive Orders*

During the 2024 presidential campaign, then-former President Trump "threatened to 'go after' his political opponents and warned that 'WHEN I WIN, those people that CHEATED will be prosecuted to the fullest extent of the Law,'" adding "'[p]lease beware

that this legal exposure extends to Lawyers.'" *Id.* ¶ 94 (footnotes omitted). After he won the 2024 election, President Trump renewed these warnings, stating that "[w]e have a lot of law firms that we're going to be going after, because they were very dishonest people." *Id.* (footnote omitted).

President Trump followed through on these threats. On February 25, 2025, he issued a memorandum to the heads of intelligence agencies instructing them "to suspend any active security clearances held by Peter Koski and all members, partners, and employees of Covington & Burling LLP who assisted former Special Counsel Jack Smith during his time as Special Counsel[.]" *Id.* ¶ 95. Jack Smith, as Special Counsel, had brought criminal charges against then-former President Trump in two cases. *Id.*

Covington & Burling and Jack Smith were not President Trump's only targets. Next up: Perkins Coie LLP. On March 6, 2025, President Trump issued an Executive Order entitled "Addressing Risks from Perkins Coie LLP," which instructed agencies "to terminate contracts with Perkins Coie, to require all federal contractors to disclose any business with Perkins Coie and then review all contracts with Perkins Coie's clients, to limit official access of Perkins Coie to federal Government buildings, and to limit Government officials from engaging in their official capacity with Perkins Coie employees." *Id.* ¶ 96; *see also* Exec. Order No. 14230, 90 Fed. Reg. 11781 (Mar. 11, 2025) ("Perkins Coie Order") (cited in Compl. ¶ 2 n.2).

The "Purpose" section of the Perkins Coie Order outlines its motivation. *See* Perkins Coie Order § 1. It accuses Perkins Coie of "dishonest and dangerous activity," including its representation of "failed Presidential candidate Hillary Clinton" in 2016 and

its involvement in election law litigation.  *See id.*; Compl. ¶¶ 96–98.  Perkins Coie sued to block enforcement of the Perkins Coie Order.  *See generally* Compl., *Perkins Coie LLP v. DOJ, et al.*, No. 1:25-cv-716 (D.D.C. filed Mar. 11, 2025), ECF No. 1.

Next came a March 14, 2025 Executive Order targeting Paul, Weiss, Rifkind, Wharton & Garrison LLP.  Compl. ¶ 100; Exec. Order No. 14237, 90 Fed. Reg. 13039 (Mar. 20, 2025) ("Paul Weiss Order") (cited in Compl. ¶ 2 n.2).  The Paul Weiss Order substantially mirrors the Perkins Coie Order.  *Compare* Perkins Coie Order *with* Paul Weiss Order.  The "Background" section of the Paul Weiss Order explains that it is, in part, a response to Paul Weiss partner Mark Pomerantz leaving the firm "to join the Manhattan District Attorney's office solely to manufacture a prosecution against [President Trump]."  Paul Weiss Order § 1; Compl. ¶ 100.

A few days later, President Trump announced that he had agreed to withdraw the Paul Weiss Order following a meeting with Paul Weiss's Chairman, Brad Karp.  Compl. ¶ 102.  The President then rescinded the Paul Weiss Order in toto.  *Id.* ¶ 103; Exec. Order No. 14244, 90 Fed. Reg. 13685 (Mar. 26, 2025) ("Paul Weiss Recission Order") (cited in Compl. ¶ 103 n.29).  The Paul Weiss Recission Order states that the firm had, among other conditions, "acknowledged the wrongdoing of its former partner Mark Pomerantz" and agreed to "dedicate[] the equivalent of $40 million in pro bono legal services during [President Trump's] term in office to support causes including assisting our Nation's veterans, fairness in the justice system, and combating anti-Semitism; and other similar initiatives."  Paul Weiss Recission Order § 1.

On March 25, 2025, President Trump issued another similar Executive Order, this time targeting Jenner & Block LLP. *See* Compl. ¶ 106; Exec. Order No. 14246, 90 Fed. Reg. 13997 (Mar. 28, 2025) ("Jenner & Block Order") (cited in Compl. ¶ 2 n.2). Like Perkins Coie, Jenner & Block sued to enjoin enforcement of the Executive Order. *See generally* Compl., *Jenner & Block LLP v. DOJ, et al.*, No. 1:25-cv-916 (D.D.C. Mar. 28, 2025), ECF No. 1.

### C. *The WilmerHale Order*

On March 27, 2025, only two days later after issuing the Jenner & Block Order, President Trump issued the Executive Order at issue in this case—the WilmerHale Order. Compl. ¶ 107; Exec. Order No. 14250, 90 Fed. Reg. 14549 (Apr. 3, 2025) ("WilmerHale Order" or "the Order"). The Order is entitled "Addressing Risks from WilmerHale" and largely tracks the Executive Orders issued against other large law firms. *See generally* WilmerHale Order. It contains six sections and is accompanied by a "Fact Sheet." Compl. Ex. B, Fact Sheet: President Donald J. Trump Addresses Risks from WilmerHale, The White House (Mar. 27, 2025) ("WilmerHale Fact Sheet" or "Fact Sheet") [Dkt. #1-2].

*Section 1 – Background.* The Background section of the Order outlines the risks supposedly posed by WilmerHale. It states, among other insinuations, that the firm has "abused its pro bono practice to engage in activities that undermine justice and the interests of the United States"; "supports efforts to discriminate on the basis of race"; "backs the obstruction of efforts to prevent illegal aliens from committing horrific crimes and trafficking deadly drugs"; and "furthers the degradation of the quality of American elections." WilmerHale Order § 1.

It further accuses WilmerHale of "employing lawyers who weaponize the prosecutorial power to upend the democratic process and distort justice." *Id.* Here, President Trump cites to WilmerHale "welcoming" Mueller and his colleagues to the firm despite their involvement in "one of the most partisan investigations in American history." *Id.* The Background section culminates in a declaration that this type of "weaponization of the justice system" must not be condoned. *Id.*

*Section 2 – Security Clearance Review.* This section contains two provisions. Section 2(a) instructs the heads of relevant agencies to "immediately take steps consistent with applicable law to suspend any active security clearances held by individuals at WilmerHale, pending a review of whether such clearances are consistent with the national interest." *Id.* § 2(a).[2] Section 2(b) orders the Office of Management and Budget ("OMB") to "identify all Government goods, property, material, and services, including Sensitive Compartmented Information Facilities, provided for the benefit of WilmerHale." *Id.* § 2(b). The heads of relevant agencies are then to cease providing such materials and services to the firm, "to the extent permitted by law." *Id.*

*Section 3 – Contracting.* Section 3 has multiple parts. First, "Government contracting agencies shall, to the extent permissible by law, require Government contractors to disclose any business they do with WilmerHale and whether that business is related to the subject of the Government contract." *Id.* § 3(a). Second, agency heads "shall review all contracts with WilmerHale or with entities that disclose doing business with

---

[2] Multiple WilmerHale attorneys hold security clearances. Compl. ¶ 139; Suppl. Decl. of Bruce M. Berman in Supp. of Pl.'s MSJ ("Suppl. Berman Decl.") [Dkt. #16-3] ¶ 28.

WilmerHale" and then:  (1) "take appropriate steps to terminate any contract, to the maximum extent permitted by applicable law . . . for which WilmerHale has been hired to perform any service"; (2) "otherwise align their agency funding decisions with the interests of the citizens of the United States [and] with the goals and priorities of [President Trump's] Administration as expressed in executive actions"; and (3) within 30 days of the Order, submit to OMB "an assessment of contracts with WilmerHale or with entities that do business with WilmerHale effective as of the date of this order and any actions taken with respect to those contracts in accordance with this order." *Id.* § 3(b).

*Section 4 – Racial Discrimination*.  Section 4 states that "[n]othing in this order shall be construed to limit the action authorized by section 4 of [the Perkins Coie Order]." *Id.* § 4.  The relevant section of the Perkins Coie Order, in turn, instructs the Chair of the Equal Employment Opportunity Commission ("EEOC") to "review the practices of representative large, influential, or industry leading law firms for consistency with Title VII of the Civil Rights Act of 1964."  Perkins Coie Order § 4(a).  The provision also instructs the Attorney General to investigate large law firms "who do business with Federal entities for compliance with race-based and sex-based non-discrimination laws." *Id.* § 4(b).

*Section 5 – Personnel*.  Section 5 contains two provisions.  First, it instructs agency heads to provide guidance on "limiting official access from Federal Government buildings to employees of WilmerHale" and "limiting Government employees acting in their official capacity from engaging with WilmerHale employees," with the cited goal of "ensur[ing] consistency with the national security and other interests of the United States."

WilmerHale Order § 5(a). Second, it states that agency officials shall refrain from hiring WilmerHale employees, absent a waiver from the relevant agency head. *Id.* § 5(b).

*Section 6 – General Provisions*. This section contains limiting provisions. It states that nothing in the WilmerHale Order shall be construed to impair (1) "the authority granted by law to an executive department or agency, or the head thereof"; or (2) OMB's functions "relating to budgetary, administrative, or legislative proposals." *Id.* § 6(a). It also mandates that the Order be implemented consistent with applicable law. *Id.* § 6(b).

*Fact Sheet*. The Fact Sheet accompanies the Order. It largely reiterates the allegations in the Background section of the Order, but further characterizes WilmerHale as a "rogue law firm." *See* WilmerHale Fact Sheet.

## II.    Procedural Background

One day after President Trump issued the Order, WilmerHale filed suit in this Court. *See generally* Compl. The Complaint's 11 counts allege that the Order violates the First, Fifth, and Sixth Amendments, the separation of powers, and the Spending Clause. *See id.* ¶¶ 129–226 (Counts I–XI). The Complaint seeks declaratory and injunctive relief.

Along with the Complaint, WilmerHale filed a motion for a temporary restraining order ("TRO") and a preliminary injunction ("PI"). *See* Pl.'s Mot. for TRO and PI [Dkt. #3]. This Court held a hearing on the TRO motion that same day, after which the Court granted a TRO enjoining enforcement of §§ 3 and 5 of the Order. *See* Min. Entry (Mar. 28, 2025); Mem. Order ("TRO Order") [Dkt. #10].

The parties subsequently submitted a proposed briefing schedule for dispositive motions and consented to the Court extending the TRO until final judgment. Joint Status

Report [Dkt. #13].  The Court adopted the briefing schedule, set oral argument for April 23, 2025, and extended the TRO pending resolution of the case.  Min. Order (Apr. 1, 2025).

Defendants filed a motion to dismiss, and WilmerHale filed a motion for summary judgment.  *See* Defs.' Mot. to Dismiss [Dkt. #15]; Defs.' Mem. in Supp. of Mot. to Dismiss ("Defs.' MTD") [Dkt. #15-1]; Pl.'s Mot. for Summ. J. [Dkt. #16]; Pl.'s Mem. of P. & A. in Supp. of Pl.'s Mot. for Summ. J. ("Pl.'s MSJ") [Dkt. #16-1].  The issues therein evidently piqued the interests of many third parties, as the Court has received over 30 amicus briefs, which are filed on the docket.  With the parties' briefs and amici's insights in hand, the Court held oral argument on April 23, 2025.  The matter is now ripe for decision.  *See* Pl.'s Opp'n to Defs.' MTD [Dkt. #104]; Defs.' Opp'n to Pl.'s MSJ [Dkt. #103].

## LEGAL STANDARDS

Defendants move to dismiss the Complaint under Federal Rules of Civil Procedure 8(a), 12(b)(1), and 12(b)(6).

Rule 8(a) requires that a claim for relief include "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(1)(2).  The Court may dismiss the Complaint under this Rule if it is "so excessively long as to be unmanageable, or so poorly conceived and drafted that it is difficult to decipher a coherent, viable cause of action."  *T.M. v. District of Columbia*, 961 F. Supp. 2d 169, 175 (D.D.C. 2013).

A Rule 12(b)(6) motion to dismiss for failure to state a claim tests the legal sufficiency of the Complaint.  *See* Fed. R. Civ. P. 12(b)(6); *Herron v. Fannie Mae*, 861 F.3d 160, 173 (D.C. Cir. 2017).  To survive a Rule 12(b)(6) motion, the "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its

face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The Complaint must include "factual content" sufficient to allow the Court "to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

A Rule 12(b)(1) motion, on the other hand, tests the Court's subject-matter jurisdiction. Fed. R. Civ. P. 12(b)(1). "'Federal courts are courts of limited jurisdiction,' possessing 'only that power authorized by the Constitution and statute.'" *Gunn v. Minton*, 568 U.S. 251, 256 (2013) (quoting *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994)). WilmerHale bears the burden of demonstrating the Court's subject-matter jurisdiction over the claims at issue. *See Arpaio v. Obama*, 797 F.3d 11, 19 (D.C. Cir. 2015) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992)).

In deciding a motion under Rule 12(b), the Court may consider "the facts alleged in the complaint, any documents either attached to or incorporated in the complaint and matters of which [the Court] may take judicial notice." *EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624 (D.C. Cir. 1997). If "matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56 . . . ." *Holy Land Found. for Relief & Dev. v. Ashcroft*, 333 F.3d 156, 165 (D.C. Cir. 2003) (quoting Fed. R. Civ. P. 12(b)).

WilmerHale moves for summary judgment on each of its claims. Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court "must assume the truth of all statements proffered by the non-movant

except for conclusory allegations lacking any factual basis in the record." *Dist. Intown Props. Ltd. P'ship v. District of Columbia*, 198 F.3d 874, 878 (D.C. Cir. 1999). "'The mere existence of *some* alleged factual dispute between the parties' will not defeat summary judgment; 'the requirement is that there be no *genuine* issue of *material* fact.'" *Holcomb v. Powell*, 433 F.3d 889, 895 (D.C. Cir. 2006) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986)). "A fact is 'material' if a dispute over it might affect the outcome of a suit under governing law . . . . An issue is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Id.* (quoting *Anderson*, 477 F.3d at 248).

## <u>ANALYSIS</u>

### I. Framing

Before addressing the parties' arguments, the Court must resolve a threshold dispute: whether to analyze the Order as a whole or on a section-by-section basis. WilmerHale urges the Court to take the former approach, while defendants press for the latter.

The Complaint asserts 11 claims, each of which attacks the entire Order as unconstitutional. *See generally* Compl. Defendants, in moving to dismiss and opposing summary judgment, organize their arguments by section of the Order. *See* Defs.' MTD at 4 ("To provide some structure regarding this overbroad shotgun Complaint, Defendants have organized this motion to dismiss by addressing what appear to be Plaintiff's challenges to each section of the Executive Order.").

It is beyond dispute, however, that "[t]he plaintiff is 'the master of the complaint' and therefore controls much about [the] suit." *Royal Canin USA, Inc. v. Wullschleger*, 604 U.S. 22, 35 (2025) (quoting *Caterpillar Inc. v. Williams*, 482 U.S. 386, 398–99 (1987)). The plaintiff "gets to determine which substantive claims to bring against which defendants." *Id.* The defendant may then assert a "defense to a claim." Fed. R. Civ. P. 12(b).

Defendants here resist WilmerHale's framing of the Complaint because it "complicates Defendants' task in moving for dismissal." Defs.' MTD at 4. Defendants believe a section-by-section approach favors their defense because each section of the Order is an "act[] of executive discretion." Tr. of Apr. 23, 2025 Hearing ("Dispositive Mots. Hearing Tr.") [Dkt. #106] at 18:19–19:22. Unfortunately for defendants, the Court declines to follow their approach. WilmerHale, the master of its Complaint, chose to bring claims challenging the Order as a whole. Defendants attempt to infer which of WilmerHale's claims apply to which sections of the Order, *see* Defs.' MTD at 4, but this approach would require the Court to reconstrue—and likely misconstrue—the Complaint. Defendants themselves concede that in following this approach, their motion to dismiss can only address "what *appear* to be [WilmerHale]'s challenges to each section of the Executive Order." *See id.* (emphasis added).

The language of the Order and the record before the Court also support analyzing the Order as a whole. First, the Background section informs and is inextricably interwoven with each operative section of the Order. *See* WilmerHale Order § 1. It provides the President's justification for the Order and serves as a guide to federal agencies in

implementing the operative sections.[3]   Defendants admit that "portions" of § 1 "lend

support to each section," albeit not equally.   Dispositive Mots. Hearing Tr. 29:23–30:3.

The Order's operative provisions can thus only be understood in the context of § 1.[4]

      The President's treatment of the Paul Weiss Order underscores the unified nature of

the Order.   The Paul Weiss Order largely tracks the WilmerHale Order, with a Background

section and similar operative provisions.   *See generally* Paul Weiss Order.   When Paul

Weiss struck a deal with the President, he rescinded the Paul Weiss Order *in full*, citing the

firm's "remarkable change of course."   Compl. ¶¶ 102–03; Paul Weiss Rescission Order.

The President's treatment of the Paul Weiss Order shows that he "intended" these Executive

Orders "to stand or fall as a whole."   *See Minn. v. Mille Lacs Band of Chippewa Indians*,

526 U.S. 172, 173 (1999) (finding that an Executive Order was designed "to stand or fall

as a whole" because it "embodied a single, coherent policy").

      Given the structure of the Order and WilmerHale's decision to challenge it as a

whole, I will analyze WilmerHale's claims as it has pleaded them in the Complaint.

---

[3] For example, § 1 explains that law firms like WilmerHale "should not have access to our Nation's secrets, nor should such conduct be subsidized by Federal taxpayer funds or contracts."   WilmerHale Order § 1. Sections 2 and 3, in turn, instruct agencies and federal officials to suspend WilmerHale employees' security clearances and terminate any federal contracts for which WilmerHale provides services.

[4] The Order is akin to a gumbo.   Sections 2 through 5 are the meaty ingredients—*e.g.*, the Andouille, the okra, the tomatoes, the crab, the oysters.   But it is the roux—here, § 1—which holds everything together. A gumbo is served and eaten with all the ingredients together, and so too must the sections of the Order be addressed together.   As explained in this Memorandum Opinion, this gumbo gives the Court heartburn.

## II.    Justiciability

Throughout their motion to dismiss, defendants raise multiple justiciability issues, including standing, ripeness, and the political question doctrine.  I find that none bar this Court's review of WilmerHale's claims.  How so?

### A.    *Standing*

Defendants argue that WilmerHale and its clients do not have standing to challenge the Order.  *See* Defs.' MTD at 17–19, 23, 29.  "The doctrine of standing asks whether a litigant is entitled to have a federal court resolve his grievance."  *Kowalski v. Tesmer*, 543 U.S. 125, 128 (2004).  "This inquiry involves 'both constitutional limitations on federal-court jurisdiction and prudential limitations on its exercise.'"  *Id.* at 128–29 (quoting *Warth v. Seldin*, 422 U.S. 490, 498 (1975)).  One such prudential limitation implicated in this case is WilmerHale's ability to bring claims on behalf of its third-party clients.  *See LaRoque v. Holder*, 650 F.3d 777, 781–82 (D.C. Cir. 2011) (explaining the "prudential limitation" that a plaintiff "generally must assert his own legal rights and interest, and cannot rest his claim to relief on the legal rights or interests of third parties" (internal quotation marks omitted)); Compl. ¶¶ 158, 167, 207–08, 212, 220 (asserting third-party standing as to WilmerHale's freedom of association, right to petition, right to counsel, and spending power claims).

The Court may look to materials outside the Complaint in assessing standing, including sworn declarations.  *See, e.g.*, *Ctr. for Biological Diversity v. U.S. Int'l Dev. Fin. Corp.*, 585 F. Supp. 3d 63, 70 (D.D.C. 2022); *Garnett v. Zeilinger*, 323 F. Supp. 3d 58, 65 (D.D.C. 2018).  WilmerHale has the burden of establishing standing, and that burden "grows heavier at each stage of the litigation."  *Osborn v. Visa Inc.*, 797 F.3d 1057, 1063

(D.C. Cir. 2015). Unfortunately for defendants, WilmerHale has met its burden to show standing on its own behalf and on behalf of its clients.

### 1.    Article III Standing

To satisfy the "irreducible constitutional minimum of standing" under Article III, WilmerHale must show that it has "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of [defendants], and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). As an organization, WilmerHale "can assert standing on its own behalf, on behalf of its members or both." *Equal Rights Ctr. v. Post Props., Inc.*, 633 F.3d 1136, 1138 (D.C. Cir. 2011). WilmerHale asserts this organizational standing, which requires the firm, like an individual, to satisfy the standing elements. *Id.*

There can be no serious dispute over whether WilmerHale has standing to challenge the Order. "The Supreme Court has stated that 'there is ordinarily little question' that a regulated individual or entity has standing to challenge an allegedly illegal statute or rule under which it is regulated." *State Nat'l Bank of Big Spring v. Lew*, 795 F.3d 48, 53 (D.C. Cir. 2015) (Kavanaugh, J.) (quoting *Lujan*, 504 U.S. at 561–62). While neither a statute nor a rule, the Order makes clear that WilmerHale is its target. It is entitled "Addressing Risks from WilmerHale" and includes multiple directives targeting the firm, its employees, and its clients. *See generally* WilmerHale Order.

As to the first standing factor, WilmerHale has an injury in fact. WilmerHale plausibly alleges violations of its First Amendment rights. *See infra* Analysis III.A. The Order points to WilmerHale's "pro bono practices," "partisan representations," and

16

involvement in election and immigration litigation as among its motivations. WilmerHale Order § 1; *see* Compl. ¶¶ 131–35. The Court assumes that this advocacy on behalf of its clients is protected speech and petitioning activity. *See Tanner-Brown v. Haaland*, 105 F.4th 437, 444 (D.C. Cir. 2024). In response to this protected conduct, the Order suspends WilmerHale employees' security clearances and seeks to restrict these employees' access to federal buildings, engagement with federal employees, and use of Government goods and services, all of which are necessary for the firm to represent its clients. *See* WilmerHale Order §§ 1–3, 5; Compl. ¶¶ 137–42. Thus, WilmerHale has alleged cognizable injuries to its First Amendment rights. *See* Compl. ¶ 120; *cf. Moody v. NetChoice, LLC*, 603 U.S. 707, 731 (2024); *Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 19 (2020) (stating, in the context of injunctive relief, that "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury" (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976))).

WilmerHale has also alleged that the Order causes the firm economic injury. *See* Compl. ¶¶ 124–28; Decl. of Bruce M. Berman in Supp. of Pl.'s Mot. for TRO and PI ("Berman Decl.") [Dkt. #3-2] ¶¶ 76, 83; Suppl. Decl. of Bruce M. Berman in Supp. of Pl.'s MSJ ("Suppl. Berman Decl.") [Dkt. #16-3] ¶¶ 6–11. WilmerHale alleges that the Order places "serious constraints . . . on WilmerHale's employees' ability to do their jobs," thus creating "significant uncertainty for WilmerHale's existing clients." Compl. ¶¶ 124–25. When WilmerHale filed the Complaint, it alleged that it would "inevitably receive more inquiries from clients who are contemplating terminating their engagements with the Firm due to the Order." *Id.* ¶ 125. Indeed, that prediction has already materialized. At least one

17

new client has terminated its retention of the firm due to the Order, and "several existing clients have paused WilmerHale's engagements in government-facing matters—or declined to engage WilmerHale for new work—citing the Order."  Suppl. Berman Decl. ¶¶ 6, 8–10.

Moreover, the Order creates uncertainty for the firm's existing federal contractor "clients about whether a continued representation will come at the cost of lucrative government contracts."  Compl. ¶ 126; *see* WilmerHale Order § 3.  As of 2024, at least 21 of the firm's 25 largest clients in 2024 had contracts with federal agencies, and those clients accounted for more than 30% of the firm's total revenue that year.  Berman Decl. ¶ 30.  The Order pressures these clients to abandon WilmerHale or face loss of their contracts.  Compl. ¶¶ 126–27, 162.  The nature of these injuries suffices to satisfy the first prong of Article III standing.  *See Lepelletier v. FDIC*, 164 F.3d 37, 42 (D.C. Cir. 1999) ("[T]he denial of a business opportunity satisfies the injury requirement.").

Defendants argue that WilmerHale's alleged injuries are speculative.  Defs.' MTD at 18–19.  Focusing only on § 3 of the Order, they assert that since the firm has not alleged that it is a federal contractor or that it intends to bid for a contract, its injury is conjecture.  *Id.*  Please—that dog won't hunt!  The firm alleges that § 3 "discourages clients from retaining or maintaining WilmerHale as their counsel" by threatening to cancel the contracts of any entity which associates with WilmerHale.  Compl. ¶ 126–27.  This, in turn, causes "extensive, lasting damage to WilmerHale's current and future business prospects." *Id.* ¶ 127.  Thus, the economic injury that WilmerHale alleges does *not* depend on WilmerHale itself serving as a federal contractor.

This case is far afield from *Clapper v. Amnesty International USA*, 568 U.S. 398 (2013), which defendants invoke to argue that WilmerHale's risk of harm is too speculative because it relies upon the decisions of third parties not before the Court. *See* Defs.' MTD at 17–19. "*Clapper* does not require certainty; instead, it understandably holds a plaintiff's risk of harm cannot be based upon a 'highly attenuated chain of possibilities.'" *New York Republican State Comm. v. SEC*, 927 F.3d 499, 504 (D.C. Cir. 2019) (quoting *Clapper*, 568 U.S. at 410). "Unlike in *Clapper*, where the chain comprised several links," the four corners of the Order are causing damage to WilmerHale's business relationships. *See id.* at 504–05; Compl. ¶ 126. The causal chain contains at most two links, and it is certainly not highly attenuated!

As to the second and third factors, traceability and redressability pose no issue for WilmerHale. These two elements typically overlap in cases against Government actors because "if a government action causes an injury, enjoining the action usually will redress that injury." *Carpenters Indus. Council v. Zinke*, 854 F.3d 1, 6 n.1 (D.C. Cir. 2017). Such is the case here. WilmerHale has alleged the Order is the sole cause of the firm's constitutional and economic injuries. *See* Compl. ¶¶ 120–27. While defendants dispute the causal relationship between the Order and any client's decision to terminate its relationship with WilmerHale, this argument is absurd! Defs.' MTD at 18–19, 23. The Order imposes various restrictions on the firm's ability to serve its clients—"the lifeblood of any law firm"—and therefore "threatens the very viability of [its] business model." Compl. ¶¶ 124, 127. It also threatens to terminate federal contracts for any entity which does business with WilmerHale. *Id.* ¶ 126. Indeed, several of WilmerHale's clients have

explicitly cited the Order as the reason for either curtailing or terminating their relationships with the firm.  Suppl. Berman Decl. ¶¶ 6–10.[5]  WilmerHale has thus established Article III standing in its own right.

### 2.    Third-Party Standing

WilmerHale also brings its right to petition, freedom of association, right to counsel, and Spending Clause claims on behalf of its clients.  *See* Compl. ¶¶ 158, 167, 209, 212, 220–24.  "[A] party 'generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties.'"  *Kowalski*, 543 U.S. at 129 (quoting *Warth*, 422 U.S. at 499).  This rule, however, is not "absolute."  *Id.* at 129–30.  There are "circumstances where it is necessary to grant a third party standing to assert the rights of another."  *Id.*

In assessing third-party standing, the Court weighs three "prudential considerations": "(1) '[t]he litigant must have suffered an "injury in fact," thus giving him or her a "sufficiently concrete interest" in the outcome of the issue in dispute,' (2) 'the litigant must have a close relation to the third party,' and (3) 'there must exist some hindrance to the third party's ability to protect his or her own interests.'"  *Lepelletier*, 164 F.3d at 43 (quoting *Powers v. Ohio*, 499 U.S. 400, 411 (1991)).  To satisfy the third prong— the hindrance requirement—a plaintiff must show that "there is some impediment to the

---

[5] Defendants also claim that WilmerHale lacks standing to pursue its due process claims because it cannot point to any injury traceable to § 5.  *See* Defs.' MTD at 29.  Section 5 directs heads of agencies to provide guidance limiting WilmerHale employees' access to federal building and prohibits agencies from hiring WilmerHale employees absent a waiver.  WilmerHale Order § 5.  WilmerHale has alleged and shown a protected liberty interest, *see infra* Analysis III.C.1, and, as discussed above, WilmerHale has proffered clear allegations of harm.

real party in interest's ability to assert his own legal rights."  *Al-Aulaqi v. Obama*, 727 F.

Supp. 2d 1, 31 (D.D.C. 2010) (citing *Singleton v. Wulff*, 428 U.S. 106, 118 (1976)).

WilmerHale satisfies all three requirements.  As to the first requirement, and as

discussed above, WilmerHale's constitutional and economic injuries are sufficient to show

injury in fact.  As to the second requirement, its attorney-client relationships are "sufficient

to confer third-party standing" for "existing client[s]."  *See Kowalski*, 543 U.S. at 130.

Indeed, the firm has proffered that most of its largest clients in 2024 had contracts with

federal agencies.  Berman Decl. ¶ 30.  WilmerHale has also proffered that it represents

clients in "government-facing" matters.  *Id.*[6]

The final hurdle is the third "hinderance" requirement.  For its First Amendment and

Spending Clause claims, WilmerHale has shown that its federal contractor clients are

hindered from bringing claims themselves because doing so would require them to disclose

their attorney-client relationships, which is the same First Amendment harm that

WilmerHale is trying to enjoin.  *See* Compl. ¶¶ 161–62.  "[T]he First Amendment offers

protection when an entity engag[es] in expressive activity, including compiling and

curating others' speech."  *Moody*, 603 U.S. at 731.  That is why the hinderance requirement

is relaxed for First Amendment claims.  *See Sec'y of State of Md. v. Joseph H. Munson Co.*,

467 U.S. 947, 957 (1984) (finding it non-dispositive "that there is no showing that [the

third-party] charity cannot bring its own lawsuit" because "[a]lthough such an argument

---

[6] This case is unlike those in which the Supreme Court has rejected attorneys' standing to bring claims on behalf of hypothetical clients, as WilmerHale has alleged the violation of existing clients' rights.  *Cf. Kowalski*, 543 U.S. at 130 ("The attorneys before us do not have a 'close relationship' with their alleged 'clients'; indeed, they have no relationship at all.").

might defeat a party's standing outside the First Amendment context, this Court has not found the argument dispositive in determining whether standing exists to challenge a statute that allegedly chills free speech"); *cf. Broadrick v. Oklahoma*, 413 U.S. 601, 612 (1973) ("Litigants . . . are permitted to challenge a statute not because their own rights of free expression are violated, but because of a judicial prediction or assumption that the statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression.").

WilmerHale may also bring its right to counsel claims on behalf of its clients. These claims "fall[] within that class of cases where" the Supreme Court has "'allowed standing to litigate the rights of third parties when enforcement of the challenged restriction *against the litigant* would result indirectly in the violation of third parties' rights.'" *See Kowalski*, 543 U.S. at 130 (quoting *Warth*, 422 U.S. at 510). As the Supreme Court explained in *U.S. Department of Labor v. Triplett*, when "enforcement of a restriction against the litigant prevents a third party from entering into a relationship with the litigant (typically a contractual relationship), to which relationship the third party has a legal entitlement (typically a constitutional entitlement), third-party standing has been held to exist." 494 U.S. 715, 720 (1990); *see Warth*, 422 U.S. at 510 (finding "standing to litigate the rights of third parties when enforc[ing] the challenged restriction against the litigant would result indirectly in the violation of third parties' rights"). Assuming the merits of WilmerHale's claims, the Order's restrictions against WilmerHale, the litigant, violate its third-party clients' constitutional right to counsel. *See* Compl. ¶¶ 206–17. These clients, according to

WilmerHale, are hindered from bringing claims themselves because the Order prevents the clients from retaining their counsel of choice, WilmerHale. Compl. ¶¶ 207–08, 213–16.

Having met all three prudential requirements, WilmerHale has comfortably established third-party standing to bring claims on behalf of its clients.

### 3.    <u>Ripeness</u>

Defendants also challenge the ripeness of WilmerHale's claims.[7] The Court rejects these arguments and finds that WilmerHale's claims are indeed ripe for review.

"The ripeness doctrine requires that the federal courts 'reserve[] judicial power for resolution of concrete and fully crystallized disputes.'" *In re Al-Nashiri*, 47 F.4th 820, 826 (D.C. Cir. 2022) (quoting *Cobell v. Jewell*, 802 F.3d 12, 21 (D.C. Cir. 2015)). In determining ripeness, the Court considers "(1) the fitness of the issues for judicial decision and (2) the hardship to the parties of withholding court consideration." *Id.* (quoting *Cobell*, 802 F.3d at 21).

*First*, the issues are clearly fit for judicial decision. WilmerHale's claims do not require further factual development for the Court to address the legal issues presented; indeed, the parties informed the Court that they "do not anticipate needing discovery in this case and that no party will request discovery in connection with . . . dispositive motions."

---

[7] Given that defendants advance their arguments section-by-section, it is not entirely clear how their ripeness arguments map onto WilmerHale's 11 claims for relief. Defendants appear to challenge the ripeness of the firm's attacks on § 2, *see* Defs.' MTD at 14–15, § 3, *see* Defs.' Opp'n to Pl.'s MSJ at 15–16, and § 5, *see* Defs.' MTD at 28–29. The Court will address ripeness as to all claims and as to the entire Order, as it is the Court's obligation to ensure the ripeness of all claims. *See Nat'l Park Hospitality Ass'n v. Dep't of Interior*, 538 U.S. 803, 808 (2003) (explaining that "the question of ripeness may be considered on a court's own motion").

*See* Joint Status Report [Dkt. #13] ¶ 3. Thus, the Court may adjudicate WilmerHale's claims based on the text of the Order and the factual record currently before the Court.

Defendants argue that the claims are not factually ripe because various sections of the Order instruct agency heads to take some action in the future. For example, § 2 suspends security clearances "pending further review of whether such clearances are consistent with the national interest," and § 5 instructs agency heads to "provide guidance" about limiting access to federal buildings and employees. *See* Defs.' MTD at 14–15, 28–29. Defendants thus urge the Court to wait and see how this guidance comes out before ruling on WilmerHale's claims. Please!

The Court need not wait. WilmerHale's claims turn on the constitutionality of the Order *as issued*—not on any guidance agency heads eventually release to implement the Order. The Complaint alleges, for example, that the Order has a chilling effect on speech and creates significant uncertainty for the firm's clients even before agency officials issue guidance or make factual findings. *See* Compl. ¶¶ 125–28, 142–43. Accordingly, the issues have already "crystallized into a concrete legal dispute" ready for this Court's decision. *See Al-Nashiri*, 47 F.4th at 826.

*Second*, "the hardship to the parties of withholding court consideration" is severe. *See id.* (quoting *Cobell*, 802 F.3d at 21). WilmerHale began feeling the effects of the Order when it was issued—one day before the firm filed its Complaint—and has since been losing clients despite this Court temporarily enjoining the Order. *See* Pl.'s Statement of

Undisputed Material Facts ("Pl.'s SUMF") [Dkt. #16-2] ¶¶ 135, 138,[8] 141; Suppl. Berman Decl. ¶ 6, 8–10; *see also* Compl. ¶¶ 121, 124–27. WilmerHale's clients have been left wondering if their attorneys will be able to, for example, enter federal courthouses for hearings, attend plea negotiations at U.S. Attorneys' offices, or engage with federal employees on regulatory matters. This uncertainty—and the attendant harm—escalates while the parties wait for the Court's decision.

As this Court stated during the TRO hearing, the Order is akin to a sword of Damocles hanging over WilmerHale's head. Tr. of Mar. 28, 2025 Hearing ("TRO Hearing Tr.") [Dkt. #11] at 27:2–28:1. The Court need not wait for the sword to fall before ruling on the case.

### 4.    <u>Political Question Doctrine</u>

Defendants argue that WilmerHale's challenges to § 2 of the Order are not judicially reviewable under our Circuit's decision in *Lee v. Garland*, 120 F.4th 880 (D.C. Cir. 2024). Defs.' MTD at 13–14. According to defendants, *Lee* requires this Court to dismiss the firm's claims to the extent they apply to § 2 because "courts may not review a decision to deny or revoke a security clearance even when the denial or revocation is challenged on statutory or even constitutional grounds." *Id.* (citing *Lee*, 120 F.4th at 883, 891). I find that *Lee*'s holding is not so broad as to shield § 2 from judicial review.

*Lee* holds that courts may not hear statutory and constitutional challenges to the merits of the revocation of an individual's security clearance. *See* 120 F.4th at 883. Our

---

[8] Defendants dispute this fact but provide no basis for that dispute. *See* Defs.' Resp. to Pl.'s SUMF [Dkt. #103-1]. The Court finds that there is no genuine dispute of material fact here.

Circuit reasoned that, under the political question doctrine, "federal courts generally may not second-guess the political branches' discretionary judgments about matters of national security," and "an Executive Branch decision to deny or revoke a security clearance is just such a judgment." *See id.* at 891.

However, our Circuit recognized that, "[o]f course, not every case touching on national security lies beyond judicial cognizance." *Id.*; *see also Nat'l Fed'n of Fed. Emps. v. Greenberg*, 983 F.2d 286, 289 (D.C. Cir. 1993) ("It is simply not the case that all security-clearance decisions are immune from judicial review."). Instead, "[e]ach question must be considered 'in terms of the history of its management by the political branches, of its susceptibility to judicial handling in the light of its nature and posture in the specific case, and of the possible consequences of judicial action.'" *Lee*, 120 F.4th at 891.

Here, the Court finds that § 2 is not "beyond judicial cognizance" for multiple reasons. *First*, the "nature and posture in [this] specific case" differ from those in *Lee*. *See id.* *Lee* bars judicial review of the *merits* of an *individual's* security clearance revocation. The WilmerHale Order, in contrast, demands immediate, blanket suspension of security clearances with no individualized review. WilmerHale Order § 2(a) (instructing agency heads to "immediately take steps consistent with applicable law to suspend any active security clearances held by individuals at WilmerHale"). At issue here is not the merits of any individual's suspension, but the process involved in the blanket suspension. Pl.'s Expert Report of J. William Leonard ("Leonard Report") [Dkt. #16-5] at 17–18 ("The WilmerHale Executive Order violates the[] bedrock principles of the security-clearance review process because it provides no individualized assessment of personal conduct in the

suspension of clearances.  The WilmerHale Executive Order contains no mention of, let alone any individualized assessment of the WilmerHale personnel who currently hold security clearances.").

Thus this case falls outside the ambit of *Lee*[9] and instead I look to our Circuit's reasoning in *Greenberg*.  *See generally Greenberg*, 983 F.2d 286.  That case, in relevant part, analyzed whether courts could hear constitutional challenges to certain questions asked during security clearance investigations.[10]  Our Circuit found that it could hear these challenges, since the issue was "the constitutionality of the methods used to gather information on which such judgments presumably will be based," not the "discretionary judgments regarding a particular employee's security clearance."  *Id.* at 290.  In doing so, the *Greenberg* court carefully distinguished between the "ends" of security clearance decisions—which are entrusted to the President—and the "means"—which the judiciary may properly scrutinize.  *Id.*[11]

---

[9] The Supreme Court precedent on which *Lee* relies—*Department of the Navy v. Egan*, 484 U.S. 518 (1988)—itself bars judicial review only of the substance of security clearance decisions.  *See Egan*, 484 U.S. at 526 (examining whether "the [Merit Systems Protection] Board may examine *the merits* of [a] security-clearance denial" (emphasis added)); *id.* at 529 ("[It] is not reasonably possible for an outside nonexpert body to review *the substance* of such a judgment and to decide whether the agency should have been able to make the necessary affirmative prediction with confidence." (emphasis added)).

[10] For example, one question "solicit[ed] a complete mental health and drug and alcohol use history." *Greenberg*, 983 F.2d at 287.

[11] *Greenberg* emphasizes our Circuit's concern with a wholesale ban on judicial review of security clearance-related decisions:

> Suppose the President has unlimited and judicially-unreviewable constitutional power to determine which Executive Branch employees will be given access to the nation's secrets. No one would suggest the government therefore could, despite the Fourth Amendment, conduct random searches without warrants in the hope of uncovering information about employees seeking security clearances.  Still less would anyone consider such unconstitutional searches and seizures to be immune from judicial review.

983 F.2d at 290.

WilmerHale challenges the President's process—or lack thereof—in suspending the firm's employees' security clearances. For example, the alleged constitutional injuries include the lack of individualized review (in violation of the Due Process Clause), and the targeting of WilmerHale employees for suspension as a form of retaliation for protected speech (in violation of the First Amendment). WilmerHale's expert opined that, based on his 30 years of experience in the national security arena, "the granting, suspending, and revoking of security clearances is a highly individualized process that involves a close and detailed factual analysis of the individual in question and provides any individual subject to this analysis with significant due process protections." Leonard Report ¶ 35. WilmerHale claims that § 2 fails to meet these requirements, and it is this process failure which the firm asks the Court to review. As such, the alleged harm exists regardless of whether the Government eventually determines there is merit to revoking an individual's security clearance. *See Lee*, 120 F.4th at 893 (explaining that *Greenberg* permits review where the "alleged injuries . . . exist regardless of how the government might have resolved any particular application"). *Greenberg* thus allows the Court to hear WilmerHale's challenges.

*Second*, § 2 of the Order does not invoke the national security concerns which barred judicial review of the security clearance revocation in *Lee*. *Cf. id.* at 891 ("[F]ederal courts generally may not second-guess the political branches' discretionary judgments about matters of *national security*." (emphasis added)); *id.* at 889 ("The political question doctrine applies perhaps most vigorously to issues bearing on *national security*." (emphasis added)). Section 2 references the "national interest," but nowhere cites "national security."

*See* WilmerHale Order § 2(a).  *Lee* does not require the Court to give unlimited deference to the broad concept of national interest.[12]  *See* Leonard Report ¶ 49 ("Tellingly, Section 2 of the WilmerHale Executive Order never uses the term 'national security,' and instead only mentions the 'national interest,' a term that is markedly broader than the 'national security interest' that serves as the touchstone of a security-clearance review. . . .'").  *Lee* is grounded in the Executive Branch's discretion on issues related to national security, which apparently is not the basis for § 2 of the Order.

*Third*, the history of the issues at play here supports judicial review.  *See Lee*, 120 F.4th at 891 ("Historical practice is important in determining the scope of executive power." ).  Plaintiff's expert opined that, based on his decades of experience, § 2 is nearly unprecedented.  *See* Leonard Report ¶ 46 ("Simply put, a blanket suspension of all security clearances at a law firm of over 2,000 employees, including approximately 1,200 attorneys, was—prior to March 2025—unprecedented in scope . . . ."); *id.* at ¶ 49.  In fact, the closest analogy WilmerHale's expert could draw is "to the repudiated and discredited" revocation of security clearances from individuals with alleged Communist sympathies during the Red Scare.  *Id.* ¶¶ 38, 46.  As such, the extraordinary nature of this case easily distinguishes it from *Lee* and supports judicial review.

For all these reasons, I find that WilmerHale's challenges to § 2 are indeed judicially reviewable.  The merits of those challenges are discussed *infra*.

---

[12] In fact, *Lee* references "national security" 27 times.  It references "national interest" zero times.

## III.    Merits

I will now proceed to the merits of WilmerHale's claims.  At the outset, I reject defendants' argument that the Complaint is a "shotgun pleading" in violation of Federal Rule of Civil Procedure 8.  *See* Defs.' MTD at 4.  The Complaint is a far cry from a "handicap" to defendants and the Court.  *See id.*  To the contrary, its 56 pages and 11 counts are concise and well-organized, and it provides fair notice of the claims WilmerHale is pursing against defendants.  *Cf. Jiggetts v. District of Columbia*, 319 F.R.D. 408, 414–15 (D.D.C. 2017).

Defendants' Rule 12(b)(6) motion and WilmerHale's motion for summary judgment require more discussion.  As explained above, I will address the Order as a whole.  *See supra* Analysis I.

### A.    *First Amendment Claims*

The Complaint includes four counts alleging that the WilmerHale Order violates the First Amendment.  *See* Compl. ¶¶ 129–44 (Count I), 145–52 (Count II), 153–59 (Count III), 160–71 (Count IV).  All survive defendants' motion to dismiss.  All warrant summary judgment for WilmerHale!

### 1.    <u>Count I – First Amendment – Retaliation for Protected Expression</u>

"[T]he First Amendment prohibits government officials from retaliating against individuals for engaging in protected speech."  *Lozman v. City of Riviera Beach*, 585 U.S. 87, 90 (2018).  WilmerHale alleges that "[t]he Order blatantly defies this bedrock principle of constitutional law."  Compl. ¶ 130.  I agree!

To establish First Amendment retaliation, WilmerHale must plausibly allege and then prove: "(1) [WilmerHale] engaged in conduct protected under the First Amendment; (2) [defendants] took some retaliatory action sufficient to deter a person of ordinary firmness in [WilmerHale's] position from speaking again; and (3) a causal link between the exercise of a constitutional right and the adverse action taken against [WilmerHale]." *Aref v. Lynch*, 833 F.3d 242, 258 (D.C. Cir. 2016) (quoting *Banks v. York*, 515 F. Supp. 2d 89, 111 (D.D.C. 2007)).

WilmerHale represents a range of clients in litigation. *See* Compl. ¶¶ 79–87, 131; Pl.'s SUMF ¶¶ 37–40, 42–49. This advocacy is unquestionably protected conduct under the First Amendment. *See Legal Servs. Corp. v. Velazquez*, 531 U.S. 533, 545 (2001) (treating "the analysis of certain legal issues" and their "presentation to the courts" as "speech and expression"); *Lehnert v. Ferris Faculty Ass'n*, 500 U.S. 507, 528 (1991) ("We long have recognized the important political and expressive nature of litigation."); *McDonald v. Smith*, 472 U.S. 479, 484 (1985) ("[F]iling a complaint in court is a form of petitioning activity . . . ."); *see also Ukrainian-Am. Bar Ass'n v. Baker*, 893 F.2d 1374, 1380 (D.C. Cir. 1990) ("[T]he first amendment guarantees the[] right to be free of governmental restraints on 'political expression' and that right is violated if the Government affirmatively interferes with constitutionally protected litigation as a form of political expression."). This is true even to the extent WilmerHale's clients are unpopular, controversial, or disfavored. *See NAACP v. Button*, 371 U.S. 415, 444–45 (1963) ("[T]he Constitution protects expression and association without regard . . . to the truth, popularity, or social utility of the ideas and beliefs which are offered.").

31

The WilmerHale Order is, on its face, retaliation for the firm's protected speech. Indeed, § 1 outlines the motivations of the Order, including WilmerHale's pro bono practice, "obvious partisan representations to achieve political ends," and involvement in immigration and election litigation. *See* WilmerHale Order § 1; WilmerHale Fact Sheet; *see also* Compl. ¶¶ 133–34.

The Order goes on to impose a kitchen sink of *severe* sanctions on WilmerHale for this protected conduct!  In addition to vilifying the firm in § 1, it suspends WilmerHale employees' security clearances, with a looming threat of full revocation of those clearances, WilmerHale Order § 2(a); coerces the firm's federal contractor clients to end their engagements with the firm or face cancellation of their contracts, *id.* § 3; targets the firm for investigation into supposed racial discrimination, *id.* § 4; threatens to bar its employees from entering federal buildings or engaging with federal employees, *id.* § 5(a); and prohibits agencies from hiring firm employees absent a waiver from the relevant agency heads, *id.* § 5(b).

Any one of those sanctions would cause clients to strongly reconsider their engagements with WilmerHale.  Taken together, the provisions constitute a staggering punishment for the firm's protected speech!  The Order is intended to, and does in fact, impede the firm's ability to effectively represent its clients!  For example, WilmerHale attorneys may not be able to enter federal courthouses for trial, meet with federal regulators, or access classified materials necessary for working on national security matters. *See* Compl. ¶¶ 79, 137–39.  The Order also pressures the firm's federal contractor clients to

either end their relationships with WilmerHale or face possible cancellation of their contracts. *Id.* ¶ 141.

This, in turn, has severe economic consequences for the firm. *Id.* ¶¶ 124–27. The ability to effectively serve clients is the heart of the firm's business model. *Id.* Clients have already begun ending or curtailing their relationships with WilmerHale. Pl.'s SUMF ¶¶ 138–41. The impact of losing federal contractor clients would be staggering, as "[a]t least 21 of WilmerHale's 25 largest clients in 2024 have contracts with federal agencies. These 21 clients accounted for more than 30% of the Firm's revenue in 2024—nearly $500 million." *Id.* ¶ 32.

This "retaliatory action" is more than "sufficient to deter a person of ordinary firmness in [WilmerHale's] position from speaking again." *See Aref*, 833 F.3d at 258 (internal quotation marks omitted). The Order shouts through a bullhorn: If you take on causes disfavored by President Trump, you will be punished! Other firms facing similar Executive Orders have capitulated to President Trump. *See, e.g.*, Pl.'s SUMF ¶¶ 87–91 (explaining that Paul Weiss reached an agreement with President Trump to revoke the Paul Weiss Order because it was "an unprecedented threat to the firm" (citing Pl.'s MSJ Ex. 26 [Dkt. #16-4] at 168–76));[13] *id.* ¶¶ 102–09 (explaining that Skadden, Arps, Slate, Meagher

---

[13] Defendants dispute these facts as "[c]haracterization that is immaterial as the cited material speaks for itself." Defs.' Resp. to Pl.'s SUMF. The relevant paragraphs of WilmerHale's statement of material facts are largely direct quotes from the cited sources, with no characterization. *See* Pl.'s SUMF ¶¶ 87–91. The Court thus finds that there is no genuine dispute as to these facts.

& Flom LLP, Willkie Farr & Gallagher LLP, and Milbank LLP reached agreements with President Trump to proactively avoid Executive Orders);[14] *see also* Compl. ¶¶ 102–03.

Finally, § 1 makes clear the causal link between the protected speech and the retaliatory conduct. This Background section characterizes WilmerHale's representation of certain causes as "harmful," "egregious," and "partisan," and states that the purpose of the Order is to "address the significant risks associated with law firms" like WilmerHale. WilmerHale Order § 1. The sanctions laid out in §§ 2 through 5 follow this Background section and are plainly the result of those findings.

Defendants argue that the Order is not retaliation or punishment, as each section is a valid exercise of Executive discretion. *See* Defs.' MTD at 19–21; Dispositive Mots. Hearing Tr. at 19:18–20:16 ("MR. LAWSON: . . . I'm disputing the point that this order and these sections, separately or together, really aren't an absolute threat, an absolute punishment. These are discretionary points."). The plain language of § 1—which defendants concede "lend[s] support to each section," Dispositive Mots. Hearing Tr. at 29:23–30:3—and the context of the Order prove otherwise. Each of the provisions is crafted to cripple the firm by, for example, threatening to restrict WilmerHale employees' access to federal courthouses—a sanction devastating to a law firm which appeared in federal court over 340 times in the last year. *See* Pl.'s SUMF ¶ 29. Together or individually, the Order's sections constitute "sufficiently adverse action to give rise to an actionable First Amendment claim." *See Hous. Cmty. Coll. Sys. v. Wilson*, 595 U.S. 468, 477 (2022).

---

[14] For the same reasons as those set out in note 13, *supra*, the Court finds that there is no genuine dispute as to the facts in these paragraphs.

In sum, WilmerHale has both alleged and shown that the Order is retaliation for protected speech in violation of the First Amendment.  I will therefore **DENY** defendants' motion to dismiss to the extent it seeks to dismiss Count I of WilmerHale's Complaint and **GRANT** WilmerHale's motion for summary judgment as to Count I.

## 2.    Count II – First Amendment – Viewpoint Discrimination

"At the heart of the First Amendment's Free Speech Clause is the recognition that viewpoint discrimination is uniquely harmful to a free and democratic society." *NRA of Am. v. Vullo*, 602 U.S. 175, 187 (2024); *see also Rosenberger v. Rector of Univ. of Va.*, 515 U.S. 819, 828 (1995) ("It is axiomatic that the government may not regulate speech based on its substantive content or the message it conveys.").  As such, "[t]he government must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rational for the restriction." *Rosenberger*, 515 U.S. at 829. Such viewpoint discrimination is "an egregious" violation of the First Amendment. *Id.*

Here, WilmerHale claims that the Order targets the firm for its disfavored viewpoints and punishes it for expressing those viewpoints.  Compl. ¶¶ 145–52.  The Court finds that WilmerHale has both alleged and shown this First Amendment violation!

As explained in Analysis III.A.1, *supra*, WilmerHale's representation of clients in litigation is speech.  The Order attacks the viewpoints WilmerHale expressed over the course of these representations, describing WilmerHale's work as "partisan" and "political," and maligning WilmerHale's advocacy on behalf of causes disfavored by President Trump.  *See* WilmerHale Order § 1; WilmerHale Fact Sheet ("WilmerHale pursues partisan goals, supports efforts to discriminate on the basis of race, and backs the

obstruction of efforts to prevent illegal aliens from committing horrific crimes and trafficking deadly drugs within our borders."); Compl. ¶¶ 146–47; Pl.'s SUMF ¶¶ 116, 129–30.[15]  The Order is also motivated by WilmerHale's decision to "welcom[e]" Mueller to the firm and its statements that Mueller "embodies the highest value of our firm and profession."  WilmerHale Order § 1; Compl. ¶ 148; Pl.'s SUMF ¶ 117.[16]

President Trump can "share [his] views freely and criticize particular beliefs, and [he] can do so forcefully in the hopes of persuading others to follow [his] lead."  *Vullo*, 602 U.S. at 188.  He cannot, however, "use the power of the State to punish or suppress disfavored expression."  *Id.*  The First Amendment bars the Government "from relying on the 'threat of invoking legal sanctions and other means of coercion . . . to achieve the suppression' of disfavored speech."  *Id.* at 189 (alteration in original) (quoting *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 67 (1963)).

Yet that is exactly what the Order here does:  It both threatens and imposes sanctions and uses other means of coercion to suppress WilmerHale's representation of disfavored causes and clients.  For example, § 4 targets WilmerHale for investigation by the EEOC and the Attorney General.  WilmerHale Order § 4 (incorporating Perkins Coie Order § 4).  This is the President, in essence, wielding the investigative and prosecutorial powers of the State to punish and suppress WilmerHale's advocacy.  *See Vullo*, 602 U.S. at 187 ("[Vullo] could not wield her power, however, to threaten enforcement actions . . . .").  Sections 2

---

[15] For the same reasons as those set out in note 13, *supra*, the Court finds that there is no genuine dispute as to the facts in these paragraphs.

[16] For the same reasons as those set out in note 13, *supra*, the Court finds that there is no genuine dispute as to the fact in this paragraph.

and 5 also directly punish the firm for its disfavored speech by suspending security clearances, threatening to revoke access to federal buildings and bar engagement with federal employees, and prohibiting federal agencies from hiring WilmerHale employees absent a waiver. *See* WilmerHale Order §§ 2, 5.

Additionally, § 3 attempts to suppress WilmerHale's speech indirectly by pressuring the firm's federal contractor clients to terminate their relationships with the firm or face cancellation of their contracts. As the Supreme Court stated in *Vullo*, "a government official cannot do indirectly what she is barred from doing directly: A government official cannot coerce a private party to punish or suppress disfavored speech on her behalf." 602 U.S. at 190 (citing *Bantam Books*, 372 U.S. at 67–69). Here, § 3 instructs federal contractors "to disclose any business they do with WilmerHale and whether that business is related to the subject of the Government contract." WilmerHale Order § 3(a). It then instructs agency heads to review their contracts with entities who do business with the firm and (1) "terminate any contract . . . for which WilmerHale has been hired to perform any service"; and, much more broadly, (2) "align their agency funding decisions with the interests of the citizens of the United States; with the goals and priorities of [the] Administration . . . ; and as heads of agencies deem appropriate." *Id.* § 3(b).

WilmerHale has shown that § 3 "could be reasonably understood to convey a threat of adverse government action in order to punish or suppress [the firm's] speech." *See Vullo*, 602 U.S. at 191; *see* Compl. ¶¶ 9, 141. It presents a federal contractor with a Hobson's choice: End its relationships with WilmerHale, or face review and possible termination of all of its federal contracts. As the Supreme Court noted in *Vullo*, the power of the

Government official taking action is relevant, and "the greater and more direct the government official's authority, the less likely a person will feel free to disregard a directive from the official." 602 U.S. at 191–92. There is no Executive official with "greater" or "more direct" authority than the President of the United States! It is thus hard to imagine federal contractors would feel free to disregard the implicit directive in § 3 to terminate their engagements with WilmerHale. *See id.* at 193 (explaining that the "threat need not be explicit"). Given that "[a]t least 21 of WilmerHale's 25 largest clients in 2024 have contracts with federal agencies" and that "[t]hese 21 clients accounted for more than 30% of [WilmerHale's] revenue in 2024," the impact of losing these clients on WilmerHale's business would be ruinous. *See* Pl.'s SUMF ¶ 32.

Defendants maintain that "the fact that a funding program supports one point of view does not establish viewpoint discrimination against disfavored alternatives." Defs.' MTD at 20–21. Defendants cite to the Supreme Court's decision in *Rust v. Sullivan* for the proposition that "'the Government has not discriminated on the basis of viewpoint' merely by 'fund[ing] one activity to the exclusion of the other.'" *Id.* (quoting 500 U.S. 173, 193 (1991)). *Rust* is inapposite, though. That case addressed the constitutionality of regulations implementing Title X of the Public Health Service Act, which provided federal funding for family-planning services but mandated that "none of the funds appropriated . . . shall be used in programs where abortion is a method of family planning." *Rust*, 500 U.S. at 178. The implementing regulations barred funding of projects which "encourage, promote, or advocate abortion as a method of family planning." *Id.* at 180.

The Supreme Court upheld the implementing regulations' restrictions, explaining that the Government does not "unconstitutionally discriminate[] on the basis of viewpoint when it chooses to fund a program dedicated to advancing certain permissible goals[] because the program in advancing those goals necessarily discourages alternative goals." *Id.* at 194. This is where the WilmerHale Order is critically different from the regulations in *Rust*. Section 3 of the Order does not create or address a federally-funded program designed to advance a certain Government viewpoint, as was at issue in *Rust*. Instead, § 3 applies to federal contracting writ large, and there can be no claim that all federal contracts together constitute a program designed to promote a specific Government message. *Cf. id.* at 194–95 (describing *Rust* as "a case of the Government refusing to fund activities, including speech, which are specifically excluded from the scope of the project funded").

*Rust* distinguished "situations in which the Government has placed a condition on the *recipient* of the subsidy rather than on a particular program or service, thus effectively prohibiting the recipient from engaging in the protected conduct outside the scope of the federally funded program." *Id.* at 197. The Supreme Court emphasized that the *Rust* regulations governed the scope of a Title X project's activities, but that a grantee could continue to perform abortions and provide related services through programs separate from Title X-funded programs. *Id.* at 196. The WilmerHale Order, on the other hand, requires federal contractors to disclose *any* affiliation with the firm, regardless of whether WilmerHale is involved in their federal contracts. *See* WilmerHale Order § 3(a). The Order is thus keyed to the *recipient* of federal funds, not to the particular contract funded.

*Cf. Rust*, 500 U.S. at 197.[17] The WilmerHale Order does not seek to preserve a program designed to promote a specific Government message, and instead effectively bars federal contractors' association with WilmerHale even outside the scope of their federal contracts.

In sum, the Order and Fact Sheet make clear that President Trump disfavors WilmerHale's representation of certain causes and the firm's statements regarding Mueller. The Order suppresses that disfavored speech by imposing severe sanctions on WilmerHale both directly and indirectly. This viewpoint discrimination is "an egregious" violation of the First Amendment! *See Rosenberger*, 515 U.S. at 829. As such, I will **DENY** defendants' motion to dismiss to the extent it seeks dismissal of Count II and **GRANT** summary judgment for WilmerHale as to Count II.

### 3.  Count III – First Amendment – Right to Petition the Government

The First Amendment protects the right "to petition the Government for a redress of grievances." U.S. Const. amend. I. Filing and pursuing lawsuits are forms of protected petitioning. *See Borough of Duryea v. Guarnieri*, 564 U.S. 379, 387 (2011) ("This Court's precedents confirm that the Petition Clause protects the right of individuals to appeal to courts and other forums established by the government for resolution of legal disputes.");

---

[17] *Rust* itself distinguishes a Supreme Court case which more closely aligns with the facts currently before the Court. *See Rust*, 500 U.S. at 197. In *FCC v. League of Women Voters of California*, the Supreme Court invalidated a law which barred noncommercial television and radio stations that received federal grants from "engag[ing] in editorializing," even in programs unrelated to federal grants. *See generally* 468 U.S. 364 (1984). The Supreme Court found that, under the law, "a noncommercial educational station that receives only 1% of its overall income from [federal] grants is barred absolutely from all editorializing." *Id.* at 400. The WilmerHale Order is similar: If an entity "receives only 1% of its overall income from" federal contracts, it is effectively "barred absolutely from" association with WilmerHale. *See id. Rust* explained that these types of prohibitions, unlike the restrictions upheld in *Rust*, are invalid because they "effectively prohibit[] the recipient from engaging in the protected conduct outside the scope of the federally funded program." *Rust*, 500 U.S. at 197.

*Am. Bus Ass'n v. Rogoff*, 649 F.3d 734, 738 (D.C. Cir. 2011) ("The right 'extends to [petitioning] all departments of the Government,' including administrative agencies and courts." (alteration in original) (quoting *Cal. Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 510 (1972))); *Nader v. Democratic Nat'l Comm.*, 567 F.3d 692, 696 (D.C. Cir. 2009) ("[T]he Supreme Court has treated lawsuits as petitions."). This right to petition is "integral to the democratic process." *Borough of Duryea*, 564 U.S. at 388; *see also BE&K Constr. Co. v. NLRB*, 536 U.S. 516, 524–25 (2002) ("We have recognized this right to petition as one of 'the most precious of the liberties safeguarded by the Bill of Rights,' and have explained that the right is implied by 'the very idea of a government, republican in form[.]'" (citations omitted)).

WilmerHale has both alleged and shown that the Order violates the Petition Clause by (1) punishing the firm for its past representation of clients in litigation and (2) undermining the firm's ability to pursue litigation in the future. Compl. ¶¶ 153–71. The Order explicitly targets WilmerHale at least in part for the litigation it has pursued, including election and immigration lawsuits. *See* WilmerHale Order § 1;[18] Compl. ¶¶ 82–87 (identifying specific lawsuits); Pl.'s SUMF ¶¶ 43, 47–49. After identifying these

---

[18] Section 1 alleges that WilmerHale "is yet another law firm that has abandoned the profession's highest ideals and abused its pro bono practice to engage in activities that undermine justice and the interests of the United States." WilmerHale Order § 1. It contends that the firm "engages in obvious partisan representations to achieve political ends, supports efforts to discriminate on the basis of race, backs the obstruction of efforts to prevent illegal aliens from committing horrific crimes and trafficking deadly drugs within our borders, and furthers the degradation of the quality of American elections, including by supporting efforts designed to enable noncitizens to vote." *Id.*

purportedly harmful lawsuits,[19] the Order then sanctions the firm for pursuing these cases. *See* WilmerHale Order §§ 2–5; Compl. ¶¶ 113–16, 155.

The Order, however, goes further than punishing WilmerHale for past petitioning. It also creates hurdles to prevent the firm from pursuing future lawsuits. For example, § 5 directs agencies to limit the firm's employees' access to federal buildings and ability to engage with federal employees. WilmerHale Order § 5(a). The Order also suspends their security clearances, which restricts their access to the classified information they need to pursue cases involving national security. *Id.* § 2; Compl. ¶ 157. These limitations would severely hinder WilmerHale's ability to effectively bring cases.[20] *See* Compl. ¶¶ 79, 138–39; Pl.'s SUMF ¶ 28 ("At any given moment, WilmerHale attorneys may be working on over 1,000 matters before or involving dozens of federal agencies.").

Since the Order significantly impairs WilmerHale's First Amendment right to petition, it is subject to "exacting scrutiny." *See Elrod*, 427 U.S. at 362 ("It is firmly established that a significant impairment of First Amendment rights must survive exacting scrutiny."). Under this standard, defendants must show "a substantial relation between the [impairment] and a sufficiently important government interest." *See Ams. for Prosperity*

---

[19] The Petition Clause protects only lawsuits brought "in good faith." *See Nader*, 567 F.3d at 696 ("[W]hen a person petitions the government for redress, the First Amendment prohibits any sanction on that action . . . so long as the petition was in good faith."). There can be no serious claim that WilmerHale's lawsuits were not brought in good faith; in fact, many of the lawsuits were successful. *See* Compl. ¶ 155.

[20] Defendants counter that WilmerHale will still be able to petition "by written communication with government officials." Defs.' MTD at 29. To the extent the firm would be able to engage with federal employees in writing—which is not clear on the face of the Order—this would still significantly hamper the firm's ability to advocate on behalf of its clients. Defendants conveniently ignore that investigations or litigation might require in-person attendance in federal buildings and face-to-face engagement with federal employees for depositions, in-court hearings, advocacy presentations, and more.

*Found. v. Bonta*, 594 U.S. 595, 607 (2021) (quoting *Doe v. Reed*, 561 U.S. 186, 196 (2010)). The impairment must also "be narrowly tailored to the government's asserted interest." *Id.* at 608.

Defendants have shown neither a substantial relation to a sufficiently important government interest nor that the Order is narrowly tailored to that interest. Defendants invoke national security as the Government interest supporting the restrictions on WilmerHale's ability to petition outlined in § 5. Defs.' MTD at 29–30; *see* WilmerHale Order § 5 (stating that the guidance implementing the restrictions should be written to "ensure consistency with the national security and other interests of the United States"). WilmerHale concedes that "national security is of course an important government interest[.]" Pl.'s Opp'n to Defs.' MTD at 34. Yet the firm maintains—and the Court agrees—that the Order is not substantially related to that interest.

Other than a passing reference to WilmerHale's involvement in election and immigration litigation, the Order does not explain how WilmerHale's conduct has threatened national security or how restricting its access to federal buildings or federal employees would remedy those threats. *See* Leonard Report ¶ 51 ("[T]he behavior that the WilmerHale Executive Order deems problematic—attorneys representing clients in court—is not of the type that has ever in my experience been deemed conduct relating to a 'national security' interest."). Instead, and as I have already found, the Order is plainly motivated by the President's desire to retaliate against WilmerHale for its protected activity, *see supra* Analysis III.A.1. This is not a legitimate Government interest, and the Order's unsupported assertion of national security will not save it!

Finally, even if I agreed that the Order's restrictions on WilmerHale's right to petition are substantially related to national security, those restrictions are not narrowly tailored. The provisions sweep broadly to implicate all WilmerHale employees and clients, regardless of their involvement in certain cases or their affiliation with Mueller. As such, the Order fails exacting scrutiny and is unconstitutional under the Petition Clause. I will therefore **DENY** defendants' motion to dismiss to the extent it seeks to dismiss Count III and **GRANT** WilmerHale's motion for summary judgment as to Count III.

### 4.    <u>Count IV – First Amendment – Free Association</u>

The Supreme Court has "long understood as implicit in the right to engage in activities protected by the First Amendment a corresponding right to associate with others." *Bonta*, 594 U.S. at 605–06 (quoting *Roberts v. United States Jaycees*, 468 U.S. 609, 622 (1984)). Compelled disclosure of affiliation with groups engaged in advocacy can violate this First Amendment right. *See id.* at 607. WilmerHale alleges that the Order compels the firm's federal contractor clients to disclose their affiliation with WilmerHale, which engages in advocacy on their behalf and on behalf of other clients. Compl. ¶¶ 161–63. I find that this disclosure violates the First Amendment freedom of association.

The Order compels "Government contractors to disclose any business they do with WilmerHale." WilmerHale Order § 3(a). It then instructs agencies to terminate any contracts for which WilmerHale has been hired to perform services and to "otherwise align their agency funding decisions with the interests of the citizens of the United States; with the goals and priorities of [President Trump's] Administration . . . ; and as heads of agencies deem appropriate." *Id.* § 3(b). This is plainly a compelled disclosure of federal contractors'

association with WilmerHale and an accompanying threat of reprisal—cancellation of federal contracts—for that association. *See* Compl. ¶¶ 162–63.[21]

The Order's compelled disclosure is subject to—and fails—exacting scrutiny. *See Bonta*, 594 U.S. at 607.[22] Defendants assert that the Government has an interest in (1) "managing its contracts, with an eye towards an undisputed federal interest" of preventing racial discrimination, *see* Defs.' Opp'n to Pl.'s MSJ at 9–15; and (2) monitoring WilmerHale as a subcontractor, *see* Defs.' MTD at 21. Even if these interests are important, defendants cannot show a substantial relation between the Order and these goals, or that the Order is narrowly tailored to achieve those goals. *See Bonta*, 594 U.S. at 607–08.

The Order "require[s] Government contractors to disclose *any* business they do with WilmerHale," regardless of whether that business is related to a federal contract. *See* WilmerHale Order § 3(a) (emphasis added). Defendants have not explained how a federal contractor's affiliation with WilmerHale on "any business"—even business unrelated to the contract[23]—is substantially related to defendants' proffered interests in "ensur[ing] that there is no transfer of taxpayer dollars to entities that engage in racial discrimination" or

---

[21] At least one federal contractor received an email from a federal agency on March 28, 2025 requesting that the contractor disclose whether it has any business relationship with WilmerHale. Pl.'s SUMF ¶ 134.

[22] Defendants assert that the disclosure at issue here should be subject to relaxed scrutiny, as it involves only "factual" disclosure. *See* Defs.' MTD at 21–22. Defendants' cited case, *American Meat Institute v. U.S. Department of Agriculture*, 760 F.3d 18 (D.C. Cir. 2014), is inapposite. *American Meat Institute* involved commercial speech and disclosure of "'purely factual and uncontroversial information' about attributes of the product or service being offered." *See id.* at 26. The WilmerHale Order has made association with the firm controversial by branding it as a "rogue" law firm, *see* WilmerHale Fact Sheet, and publicly accusing it of "weaponization of the justice system," *see* WilmerHale Order § 1. Thus, the relaxed standard applied in *American Meat Institute* is inapplicable here.

[23] WilmerHale has federal contractor clients who have engaged the firm to work on matters unrelated to those federal contracts. Berman Decl. ¶ 31.

managing contracts on which WilmerHale is a subcontractor. *See* Defs.' MTD at 2, 21. It is certainly not clear to this Court!

The Order is also not narrowly tailored. *See Bonta*, 594 U.S. at 607–08. "The 'government may regulate in the [First Amendment] area only with narrow specificity[.]'" *Id.* at 610 (first alteration in original) (quoting *Button*, 371 U.S. at 433). The Supreme Court has warned that "[w]hen it comes to 'a person's beliefs and associations,' '[b]road and sweeping state inquiries into these protected areas . . . discourage citizens from exercising rights protected by the Constitution." *Id.* (alterations in original) (quoting *Baird v. State Bar of Ariz.*, 401 U.S. 1, 6 (1971) (plurality opinion)). That is exactly what § 3 does here. The sweeping inquiry into "any business" federal contractors do with WilmerHale—and the threatened reprisals for that affiliation—discourages those contractors from exercising their protected right to associate with WilmerHale. The Order thus does not operate with the required narrow specificity.

Accordingly, the Order is an unconstitutional impairment on the firm's and federal contractors' freedom of association. As such, I will **DENY** defendants' motion to dismiss to the extent that it seeks to dismiss Count IV and **GRANT** WilmerHale's motion for summary judgment as to Count IV.

### B.    *Separation of Powers and Spending Clause Claims*

WilmerHale asserts two claims related to the separation of powers and the Spending Clause. Compl. ¶¶ 172–82 (Count V), 218–26 (Count XI). Analyzing each in turn, the Court finds for WilmerHale on the separation of powers claim, but for defendants on the Spending Clause claim.

1.     **Count V –** *Ultra Vires* **Presidential Action – Separation of Powers**

"[T]he President's power, if any, to issue [an Executive Order] must stem either from an act of Congress or from the Constitution itself." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952); *accord Mille Lacs Band*, 526 U.S. at 188–89. President Trump purportedly issued the WilmerHale Order pursuant to "the authority vested in [him] as President by the Constitution and the laws of the United States of America." WilmerHale Order. WilmerHale argues that neither the Constitution nor any statutory authority empowers the President to issue the Order, and in fact the Order violates the separation of powers by usurping judicial authority to identify and sanction abuses of the judicial process.[24] Pl.'s MSJ at 26–27. At the very least, the latter is certainly true!

This claim epitomizes a key dispute between the parties. WilmerHale urges the Court to view the Order as a single, retaliatory action and conclude that no authority "empowers the President to sanction a law firm for representing his political opponents or handling lawsuits that he perceives to be contrary to his interests or those of the United

---

[24] WilmerHale frames this count as a challenge to the Order as *ultra vires*. Compl. ¶ 75. Defendants, citing to *Federal Express Corp. v. U.S. Department of Commerce* ("*FedEx*"), argue that *ultra vires* claims must meet a very high bar and are unavailable when there is an alternative procedure for review of the alleged violation. Defs.' MTD at 6 (citing 39 F.4th 756, 765 (D.C. Cir. 2022)). *FedEx*'s limitations on *ultra vires* review are inapplicable to this case. FedEx was challenging the Department of Commerce's interpretation of the 2018 Export Controls Act, but it was unable to bring an Administrative Procedure Act ("APA") claim because Congress had barred APA review of Commerce's functioning under the Act. *Id.* at 762–63. Our Circuit found that a "demanding standard [was] necessary" in reviewing FedEx's *ultra vires* claim because FedEx sought "the intervention of an equity court where Congress ha[d] not authorized statutory judicial review." *Id.* at 765. Here, WilmerHale is not advancing an *ultra vires* claim to avoid an explicit determination by Congress that statutory judicial review should not be available. Instead, the firm's arguments are grounded in the separation of powers, an area which is firmly within the Court's province. *See generally Youngstown*, 343 U.S. 579; *see also Dart v. United States*, 848 F.2d 217, 224 (D.C. Cir. 1988) ("When an executive acts *ultra vires*, courts are normally available to reestablish the limits on his authority.").

States." *See* Pl.'s MSJ at 26; *see also* Compl. ¶ 175. Defendants, on the other hand, insist that viewing the Order section-by-section reveals that each section is a proper exercise of Executive discretion. *See, e.g.*, Defs.' MTD at 29 ("Start with Plaintiff's *ultra vires* claim, which remarkably suggests that Federal agencies lack any authority to control over [sic] who can enter their buildings or interact with their employees on official business.").

Even if the Court found that each section *could* be grounded in Executive power, the directives set out in each section clearly *exceed* that power! The President, by issuing the Order, is wielding his authority to punish a law firm for engaging in litigation conduct the President personally disfavors. Thus, to the extent the President does have the power to limit access to federal buildings, suspend and revoke security clearances, dictate federal hiring, and manage federal contracts, the Order surpasses that authority and in fact usurps the Judiciary's authority to resolve cases and sanction parties that come before the courts!

The Constitution vests "[t]he judicial Power of the United States" in the Supreme Court and such inferior courts established by Congress. U.S. Const. art. III, § 1. "Article III is 'an inseparable element of the constitutional system of checks and balances' that 'both defines the power and protects the independence of the Judicial Branch.'" *Stern v. Marshall*, 564 U.S. 462, 482–83 (2011) (quoting *N. Pipeline Constr. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 58 (1982) (plurality opinion)). "Under 'the basic concept of separation of powers . . . the "judicial Power of the United States" . . . can no more be shared' with another branch than 'the Chief Executive, for example, can share with the Judiciary the veto power, or the Congress share with the Judiciary the power to override a Presidential veto.'" *Id.* at 483 (quoting *United States v. Nixon*, 418 U.S. 683, 704 (1974)).

This judicial power includes the inherent authority to sanction attorneys for their conduct in Article III courts. "Federal courts possess certain 'inherent powers,' . . . 'to manage their own affairs so as to achieve the orderly and expeditious disposition of cases.'" *Goodyear Tire & Rubber Co. v. Haeger*, 581 U.S. 101, 107 (2017) (quoting *Link v. Wabash R. Co.*, 370 U.S. 626, 630–31 (1962)). The Supreme Court has "outlined the scope of the inherent power of the federal courts." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43 (1991). A federal court's inherent powers include, but are not limited to, the authority to "discipline attorneys who appear before it," "punish for contempt," "vacate its own judgment upon proof that a fraud has been perpetrated upon the court," and "conduct an independent investigation in order to determine whether [the court] has been the victim of fraud." *Id.* at 43–44. Accordingly, judicial "authority includes 'the ability to fashion an appropriate sanction for conduct which abuses the judicial process.'" *Goodyear*, 581 U.S. at 107 (quoting *Chambers*, 501 U.S. at 44–45).

It necessarily follows that this judicial power is exclusive of the other two branches. *See Stern*, 564 U.S. at 483 ("In establishing the system of divided power in the Constitution, the Framers considered it essential that 'the judiciary remain[] truly distinct from both the legislature and the executive.'" (quoting The Federalist No. 78, at 466 (C. Rossiter ed. 1961) (A. Hamilton))); *N. Pipeline Constr. Co.*, 458 U.S. at 59 ("[O]ur Constitution unambiguously enunciates a fundamental principle – that the 'judicial Power of the United States' must be reposed in an independent Judiciary. It commands that the independence of the Judiciary be jealously guarded . . . ."); *Plaut v. Spendthrift Farm, Inc.*, 514 U.S. 211, 218 (1995) ("Congress cannot vest review of the decisions of Article III courts in officials

49

of the Executive Branch."); The Federalist No. 78, at 466 (C. Rossiter ed. 1961) (A. Hamilton) ("The complete independence of the courts of justice is peculiarly essential . . . .").

The Order sanctions WilmerHale and its attorneys for their conduct before Article III courts. *See* WilmerHale Order § 1; *supra* Analysis III.A.1 (finding that the Order constitutes punishment). This encroaches on the Judiciary's exclusive power to sanction attorneys. *See Goodyear*, 581 U.S. at 107. If the President believed that the firm "engaged in improper legal advocacy," he should have "appeal[ed] to the judiciary to make appropriate findings and fashion an appropriate sanction." Compl. ¶¶ 94, 108–11, 180; Pl.'s MSJ at 28.[25] The Executive was not empowered to take it upon itself to sanction this purportedly improper conduct!

This attempted usurpation "threatens severe impairment of the judicial function" by "sift[ing] out" certain challenges and cases. *See Velazquez*, 531 U.S. at 546. "An informed, independent judiciary presumes an informed, independent bar." *See id.* at 545. The Order leaves attorneys wary of making certain arguments and representing certain clients for fear of retribution from the Executive Branch. *See* Amicus Br. of 342 Former Judges in Supp. of Pl.'s MSJ ("Former Judges Amicus Br.") [Dkt. #99] at 5 ("A court cannot be confident that the facts and law relevant to a matter have been fully presented if a firm must look over its shoulder in fear of becoming the target of punitive action such as the Order."). This

---

[25] The Order's attempts to punish WilmerHale's litigation conduct is particularly concerning because the President and the Executive Branch were among the parties in the relevant litigation. *See, e.g.*, Compl. ¶ 83 ("WilmerHale filed a lawsuit in February on behalf of the inspector general of eight federal agencies . . . alleging that President Trump improperly fired them . . . ."); *id.* ¶ 84 ("WilmerHale has represented clients in matters directly adverse to President Trump's personal and political interests.").

contravenes the long-standing adversarial nature of our legal system, and "[t]he Constitution does not permit the Government to confine litigants and their attorneys in this manner." *See Velazquez*, 531 U.S. at 548; *see also* Former Judges Amicus Br. at 6 ("Efforts to use governmental power to bend lawyers to the political interests or views of an administration may impair the candor on which judges rely and usurp judges' role in regulating the conduct of lawyers who appear before them. The adversarial system cannot function properly with such an incursion into the judicial role.").

In short, the WilmerHale Order violates the separation of powers by attempting to usurp the Judiciary's authority to resolve cases and sanction abuses of the judicial process. "A scheme so inconsistent with accepted separation-of-powers principles" must fall. *See Velazquez*, 531 U.S. at 546. I will therefore **DENY** defendants' motion to dismiss to the extent it seeks to dismiss Count V and **GRANT** WilmerHale's motion for summary judgment as to Count V.[26]

## 2.    Count XI – Spending Power (U.S. Const. Art. I, § 8) – Unconstitutional Conditions on Government Contracts

The Constitution's Spending Clause grants Congress the federal spending power. *See* U.S. Const., art. I, § 8, cl. 1. "Incident to this power, Congress may attach conditions on the receipt of federal funds, and has repeatedly employed the power 'to further broad policy objectives by conditioning receipt of federal moneys upon compliance by the recipient with federal statutory and administrative directives.'" *S.D. v. Dole*, 483 U.S. 203,

---

[26] WilmerHale also alleges that the Order "effectively functions" as an unlawful bill of attainder. Compl. ¶ 181. While it is not clear to what extent, if any, the Constitution's prohibition on bills of attainder applies to the Executive Branch, the Court need not reach this issue.

206 (1987) (quoting *Fullilove v. Klutznick*, 448 U.S. 448, 474 (1980)); *see Rust*, 500 U.S. at 195 n.4 ("Congress' power to allocate funds for public purposes includes an ancillary power to ensure that those funds are properly applied to the prescribed use.").

WilmerHale alleges that the Order violates the Spending Clause by imposing unconstitutional conditions on federal contracts. Compl. ¶¶ 219, 222–25. The firm claims that § 3 of the Order "make[s] it a *de facto* condition of all federal government contracts that the contractor is prohibited from retaining any WilmerHale lawyer to represent it for any purpose," which violates the First, Fifth, and Sixth Amendments. *Id.* ¶ 224. The Court finds that the firm has failed to state a Spending Clause claim.

The Spending Clause is implicated when Congress imposes a spending or funding condition. *See, e.g.*, *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 208, 213–21 (2013) (holding that the spending conditions Congress placed on funding in the United States Leadership Against HIV/AIDS, Tuberculosis, and Malaria Act of 2003 violated the Spending Clause); *Dole*, 483 U.S. at 206 (holding that Congress did not violate the Spending Clause by requiring states to raise the minimum drinking age to receive federal funds); *N.Y. v. United States*, 505 U.S. 144, 167, 174–75 (1992) (holding that "the conditions attached to [] funds by Congress" violated the Spending Clause).

WilmerHale has not, however, alleged a connection between § 3 and a mandate from Congress, which is fatal to its Spending Clause claim.[27] The President issued the Order,

---

[27] WilmerHale's reliance on *Board of County Commissioners v. Umbehr*, 518 U.S. 668 (1996) to state a claim under the Spending Clause is misplaced. *Umbehr* analyzes the unconstitutional conditions doctrine under the First Amendment—not the Spending Clause. *See* 518 U.S. at 673–74. In *Umbehr*, the Supreme Court held that that First Amendment protects independent contractors from termination in retaliation for

which directs executive agency heads to take various actions to impose allegedly unconstitutional conditions on federal contracts. Compl. ¶¶ 114, 223–26. Tellingly, the Complaint points to "*[d]efendants'* attempts to impose unconstitutional conditions on federal contracts." *See id.* ¶ 226 (emphasis added). The defendants are largely agencies and agency heads; none belong to the Legislative Branch. WilmerHale nowhere alleges Congressional action and in fact concedes that "Congress has not even purported to authorize the President to impose such sanctions on law firms that take on disfavored representations." Pl.'s MSJ at 29.

WilmerHale has not and cannot state a claim under the Spending Clause.[28] As such, I will **GRANT** defendants' motion to dismiss to the extent it seeks to dismiss Count XI and **DENY AS MOOT** WilmerHale's motion for summary judgment as to Count XI. Count XI will be **DISMISSED WITH PREJUDICE**.

### C.  *Due Process and Equal Protection*

WilmerHale alleges that the Order violates the Due Process Clause and the Equal Protection Clause of the Fifth Amendment. Compl. ¶¶ 183–205. WilmerHale brings two Due Process claims alleging that: (1) the Order deprives WilmerHale and its employees of protected liberty and property interests without due process of law, *id.* ¶¶ 183–91 (Count

---

their exercise of freedom of speech. *Id.* at 686. While WilmerHale's Spending Clause claim does allege that § 3 "violates the First Amendment right to freedom of association," *see* Compl. ¶ 223, the firm chose to bring this as a Spending Clause claim and was thus required to plead some action by Congress.

[28] WilmerHale's summary judgment briefing attempts to reframe the Spending Clause claim as a separation of powers claim. *See* Pl.'s MSJ at 28–29 ("To be sure, Congress can authorize the President to impose conditions on the receipt of federal funds. . . . Congress has not even purported to authorize the President to impose such sanctions on law firms that take on disfavored representations, and they are every bit as forbidden to the Executive Branch as they are to the Legislature."). The Court need not evaluate this alternative ground for its Spending Clause claim, as WilmerHale did not allege it in the Complaint.

VI); and (2) the Order is unconstitutionally vague, *id.* ¶¶ 192–97 (Count VII). WilmerHale's Equal Protection claim asserts that the Order singles the firm out for punishment because of President Trump's "deep-seated animus" against the firm. *Id.* ¶¶ 198–205 (Count VIII). The Court finds for WilmerHale on the Due Process claims, but for defendants on the Equal Protection claim.

### 1.    Count VI – Fifth Amendment – Due Process Clause (Procedural Due Process)

The Due Process Clause of the Fifth Amendment guarantees that the Government will provide due process of law before depriving an individual "of life, liberty, or property." U.S. Const. amend. V. WilmerHale alleges that "[t]he Order deprives the firm and its employees of protected liberty and property interests" "without *any* meaningful process." Compl. ¶ 184. To establish a due process violation, WilmerHale must prove: "(i) deprivation of a protected liberty or property interest; (ii) by the government; (iii) without the process that is 'due' under the Fifth Amendment." *N.B. ex rel. Peacock v. District of Columbia*, 794 F.3d 31, 41 (D.C. Cir. 2015) (citations omitted); *see Reed v. Goertz*, 598 U.S. 230, 236 (2023). I find that WilmerHale's claim meets this standard.

"The first inquiry in every due process challenge is whether the plaintiff has been deprived of a protected interest in 'liberty' or 'property.' Only after finding the deprivation of a protected interest do[es the Court] look to see if the [Government's] procedures comport with due process." *Gen. Elec. Co. v. Jackson*, 610 F.3d 110, 117 (D.C. Cir. 2010) (quoting *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 59 (1999)). The Supreme Court recently reiterated that "'the Due Process Clause specially protects' only 'those

fundamental rights and liberties which are, objectively, deeply rooted in this Nation's history and tradition.'" *Dep't of State v. Munoz*, 602 U.S. 899, 910 (2024) (quoting *Washington v. Glucksberg*, 521 U.S. 702, 720–21 (1997)).

WilmerHale pleads a protected liberty interest in its right to petition the Government under the First Amendment. Compl. ¶ 188 ("[T]he Order deprives WilmerHale of its protected liberty interest in its First Amendment right to petition the government because it restricts access to government buildings and government personnel."). The Supreme Court has recognized that the right to petition is "integral to the democratic process," *Borough of Duryea*, 564 U.S. at 388, and "one of 'the most precious of the liberties safeguarded by the Bill of Rights," *BE&K Constr. Co.*, 536 U.S. at 524 (quoting *United Mine Workers*, 389 U.S. at 222). This is because "[t]he very idea of government, republican in form, implies a right on the part of its citizens to . . . petition for a redress of grievances." *De Jonge v. Or.*, 299 U.S. 353, 364 (1937) (quoting *United States v. Cruikshank*, 92 U.S. 542, 552 (1875)). Accordingly, the Court finds that the right to petition is "deeply rooted in this Nation's history and tradition." *See Munoz*, 602 U.S. at 910; *see also Trentadue v. Integrity Comm.*, 501 F.3d 1215, 1236–37 (10th Cir. 2007) (finding that the plaintiff "has a liberty interest in his First Amendment right to petition the government").

WilmerHale has shown that the Government deprived the firm of this protected liberty interest. "[T]he right to petition extends to all departments of the Government[.]" *BE&K Constr. Co.*, 536 U.S. at 525 (quoting *Cal. Motor Transp. Co.*, 404 U.S. at 510). As discussed in Analysis III.A.3, the Order violates WilmerHale's First Amendment right to petition by obstructing the firm's ability to bring and pursue lawsuits. For example, the

Order seeks to restrict WilmerHale attorneys' access to federal buildings and ability to engage with Government counsel in civil and criminal cases. *See* Compl. ¶¶ 153–59. These restrictions infringe on WilmerHale's protected liberty interest in its right to petition the Government for redress.

Finally, President Trump issued the Order without any due process. At its core, due process requires "notice of the proposed official action and 'the opportunity to be heard at a meaningful time and in a meaningful manner.'" *Ralls Corp. v. CFIUS*, 758 F.3d 296, 318 (D.C. Cir. 2014) (quoting *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976)). Defendants concede that "WilmerHale was given no notice that the Order or Fact Sheet was forthcoming" and that "WilmerHale was not given the opportunity to respond to the allegations in the Order or Fact Sheet." Pl.'s SUMF ¶ 131; Defs.' Resp. to Pl.'s SUMF [Dkt. #103-1] at 4 (stating that paragraph 131 is "[u]ndisputed"). That does not comport with due process. *See Ralls Corp.*, 758 F.3d at 318 ("Both the Supreme Court and this Court have recognized that the right to know the factual basis for the action and the opportunity to rebut the evidence supporting that action are essential components of due process.").[29]

The Order deprives the firm of its protected liberty interest in petitioning the Government without notice or an opportunity to respond. Accordingly, it violates procedural due process. I will therefore **DENY** defendants' motion to dismiss to the extent

---

[29] Even assuming *arguendo* that national security concerns justify certain provisions of the Order, such as §§ 2 and 5, WilmerHale was still owed due process. *See Ralls Corp.*, 758 F.3d at 318–20 (finding that the "lack of process constitute[d] a clear constitutional violation, notwithstanding the Appellees' substantial interest in national security").

it seeks to dismiss Count VI and **GRANT** WilmerHale's motion for summary judgment as to Count VI.

### 2.    Count VII – Fifth Amendment – Due Process Clause (Void for Vagueness)

"A fundamental principle in our legal system is that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required." *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012). The Due Process Clause thus "requires the invalidation of laws that are impermissibly vague"—specifically, a law is void for vagueness if it "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." *Id.* (quoting *United States v. Williams*, 553 U.S. 285, 304 (2008)). This void for vagueness doctrine "addresses at least two connected but discrete due process concerns: first, that regulated parties should know what is required of them so they may act accordingly; second, precision and guidance are necessary so that those enforcing the law do not act in an arbitrary or discriminatory way." *Id.*

WilmerHale alleges that "[t]he Order is unconstitutionally vague because it does not give WilmerHale fair notice of what is prohibited and how the Firm can avoid sanctions in the future." Compl. ¶ 194. I agree!

As a threshold matter, the doctrine of void for vagueness applies to the Order. Courts have applied the doctrine to civil actions, as well as criminal actions. *See Fox*, 567 U.S. at 258 (setting aside Federal Communications Commission regulations under the void for vagueness doctrine); *Boutilier v. INS*, 387 U.S. 118, 123 (1967) ("It is true that this

Court has held the 'void for vagueness' doctrine applicable to civil as well as criminal actions."). Defendants nonetheless argue that the doctrine is inapplicable because the Order "is not proscriptive in nature." Defs.' MTD at 11. Not so. The Order directs the suspension of WilmerHale employees' security clearances; orders federal contractors to disclose their relationships with WilmerHale; and seeks to restrict firm employees' ability to access federal buildings, engage with federal employees, and obtain federal employment. WilmerHale Order §§ 2, 3, 5. These directives instruct federal agencies to take punitive, adverse action against WilmerHale and its employees.

The Order does not provide WilmerHale with notice of how it should act in the future to avoid these sanctions. *See Fox*, 567 U.S. at 253. President Trump allegedly issued the Order because WilmerHale has "abandoned the profession's highest ideals" and "abused its pro bono practice to engage in activities that undermine justice and the interests of the United States." WilmerHale Order § 1. He points to WilmerHale's "obvious partisan representations," "efforts to discriminate on the basis of race," "obstruction of efforts to prevent illegal aliens from committing horrific crimes," and "efforts . . . to enable noncitizens to vote." *Id.* The Court agrees that the Order "leaves no doubt that WilmerHale is being punished because it has represented some of the President's political opponents and advanced positions with which he disagrees," but it "does not specify what aspect of WilmerHale's conduct triggered its massive sanctions." Compl. ¶ 195. Moreover, the Order's invocation of concepts such as "bedrock American principles" and "the interests of the United States" leave WilmerHale and its employees guessing about how to modify their conduct to avoid the Order's sanctions.

Under the most generous reading of the Order, it condemns WilmerHale's involvement in immigration and election litigation. It does not, however, otherwise explain what conduct the President considers to be undermining the interests of the United States. The Order essentially leaves it to WilmerHale to predict which causes and which attorneys the President personally dislikes and then steer clear of those causes and attorneys. This chilling effect triggers serious vagueness concerns. *See Fox*, 567 U.S. at 253–54 ("When speech is involved, rigorous adherence to those requirements is necessary to ensure that ambiguity does not chill protected speech."); *Reno v. ACLU*, 521 U.S. 844, 871–72 (1997) ("The vagueness of such a regulation raises special First Amendment concerns because of its obvious chilling effect on free speech.").

The Order also fails to provide the "precision and guidance [] necessary so that those enforcing the law do not act in an arbitrary or discriminatory way." *See Fox*, 567 U.S. at 253. The Order directs agency officials to take action against WilmerHale to ensure "consistency" with the "national interest," "the goals and priorities of [the] Administration," and "the interests of the United States." WilmerHale Order §§ 2, 3, 5. Read in the context of the Order, these phrases are most narrowly construed to mean those interests which the President condones or, in their broadest construction, whatever an agency head thinks is in the interest of the American people. To say the least, the Order is fraught with the risk of arbitrary or discriminatory enforcement! *See Fox*, 567 U.S. at 253.

As such, I find that the Order fails to provide "fair notice of conduct that is forbidden or required," *see id.*, and is therefore void for vagueness. I therefore will **DENY**

defendants' motion to dismiss to the extent it seeks to dismiss Count VII and **GRANT** WilmerHale's motion for summary judgment as to Count VII.

### 3.  Count VIII – Fifth Amendment – Equal Protection

The Fifth Amendment's guarantee of equal protection commands that "all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985); *see Bolling v. Sharpe*, 347 U.S. 497, 498–99 (1954). WilmerHale advances a "class of one" equal protection claim, which requires the firm to show that it "has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *See Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (per curiam). These two elements are "essential." *3883 Conn. LLC v. District of Columbia*, 336 F.3d 1068, 1075 (D.C. Cir. 2003).

WilmerHale alleges that the "very purpose" of the Order "is to discriminate against WilmerHale and WilmerHale alone," imposing punitive measures on the firm which do "not apply to many similarly situated firms or lawyers, even when the Order itself complains that certain practices are widespread among large law firms." Compl. ¶ 202. The Order, according to WilmerHale, singles the firm out "for engaging in constitutionally protected speech and legal advocacy that President Trump does not like." *Id.* ¶ 204.

At the outset, the Court rejects defendants' argument for dismissing WilmerHale's equal protection claim. These arguments are grounded in assessing the treatment of WilmerHale as a federal contractor. *See* Defs.' MTD at 22 ("To begin, the class-of-one theory of equal protection is inapplicable in the government employment context."); *id.* at 23 ("[WilmerHale] is not 'similarly situated' to other potential government contractors who

do not engage in unlawful DEI practices."). Defendants ignore the plain text of the Complaint and the Order. WilmerHale posits that it has been treated differently from "similarly situated firms," Compl. ¶ 202, and the Order was purportedly issued to address the risks associated with "'Big Law' firms," WilmerHale Order § 1. The appropriate class for WilmerHale is not federal contractors, but instead some set of large law firms. The Court therefore rejects defendants' argument.

Nevertheless, WilmerHale has failed to plausibly allege a group of "similarly situated" firms. The Complaint references "large law firms," and implies that some of those law firms may engage in the same practices of which WilmerHale is accused. *See* Compl. ¶ 202. Nowhere in the Complaint does WilmerHale concretely identify the similarly situated firms, and instead leaves the Court to guess who they are. In fact, when the Court asked WilmerHale's counsel who are WilmerHale's "peer firms," counsel conceded that "there's so many different ways to come at that" and otherwise did not provide guidance on how to draw the circle around similarly situated firms. Dispositive Mots. Hearing Tr. 34:14–20 ("THE COURT: What would you consider a peer firm? Firms of over a thousand lawyers? How would you describe it? MR CLEMENT: Well, there's so many different ways to come at that. But maybe I'll talk about for a second the nine firms that have made a deal with the government rather than suffer these kinds of executive orders.").

WilmerHale also does not address how the firm could have been "singled out" when it acknowledges that multiple other firms either received or were threatened with Executive Orders. *See* Compl. ¶¶ 96–98 (Perkins Coie), ¶¶ 100–03 (Paul Weiss), ¶ 106 (Jenner &

Block); Pl.'s SUMF ¶¶ 102–03 (Skadden), ¶¶ 104–06 (Wilkie Farr & Gallagher), ¶¶ 107–09 (Milbank);[30] Dispositive Mots. Hearing Tr. 34:17-20 (stating that "nine firms [] have made a deal with the government rather than suffer these kinds of executive orders"); *see also* Compl. ¶ 12 ("The President's sweeping attack on WilmerHale (*and other firms*) is unprecedented and unconstitutional" (emphasis added)); *id.* ¶¶ 104–05 (alleging that President Trump issued a directive aimed generally "at law firms and lawyers he disfavors" and directing the Attorney General "to consider whether allegedly improper attorney conduct warrants 'reassessment of security clearances held by the attorney or termination of any Federal contract for which the relevant attorney or law firm has been hired to perform services'"). The WilmerHale Order itself states that the President "is committed to addressing the significant risks associated with law firms, particularly so-called 'Big Law' firms," not just WilmerHale. WilmerHale Order § 1.

The Complaint fails to identify the similarly situated firms while simultaneously admitting that there are multiple large law firms which have received the same treatment as WilmerHale. Thus, the firm cannot establish a "class of one" equal protection claim. I will **GRANT** defendants' motion to dismiss to the extent it seeks to dismiss Count VIII and **DENY AS MOOT** WilmerHale's motion for summary judgment as to Count VIII. Count VIII will be **DISMISSED WITH PREJUDICE**.

---

[30] For the same reasons as those set out in note 13, *supra*, the Court finds that there is no genuine dispute as to the facts in these paragraphs.

### D.    *Right to Counsel Claims*

WilmerHale alleges that the Order violates its clients' right to counsel of their choice under both the Fifth Amendment and Sixth Amendment.  Compl. ¶¶ 206–09 (Count IX), 210–17 (Count X).  The Sixth Amendment guarantees the right to counsel in criminal matters, *see* U.S. Const. amend. VI, while the Fifth Amendment's Due Process Clause provides for the right to counsel in civil matters, *see American Airways Charters, Inc. v. Regan*, 746 F.2d 865, 873 (D.C. Cir. 1984) (citing *Powell v. Alabama*, 287 U.S. 45, 68–69 (1932)).  The Court finds that WilmerHale succeeds as to its Sixth Amendment claim, but not as to its Fifth Amendment claim.

### 1.    <u>Count IX – Fifth Amendment – Right to Counsel</u>

WilmerHale asserts that "[t]he Fifth Amendment protects both lawyers' and clients' due-process rights in establishing and maintaining attorney-client relationships, including the client's right to choose counsel and the lawyer's corresponding right to maintain that representation free from arbitrary or unjustified government interference."  Compl. ¶ 207. The Court finds that WilmerHale has not sufficiently alleged a violation of the Fifth Amendment right to counsel.

Under *Triplett*, the primary case on which WilmerHale relies, the firm is required to show that the alleged violation of the Fifth Amendment right to counsel "made attorneys unavailable to [the] clients."  *See* 494 U.S. at 722.  *Triplett* "call[ed] into question the constitutionality of the Department of Labor's administration of [a] provision of the Black Lung Benefits Act of 1972 which prohibits the acceptance of attorney's fees for the representation of claimants, except such fees as are approved by the Department."  *Id.* at

717.  An attorney argued that this restriction on fees "violate[d] the Due Process Clause of the Fifth Amendment because it render[ed] qualified attorneys unavailable and thereby deprive[d] claimants of legal assistance in the prosecution of their claims."  *Id.*

The Supreme Court rejected the attorney's claim, as he failed to show "that the regime made attorneys unavailable to his prospective clients."  *Id.* at 722.  It was not enough to provide "anecdotal evidence" from three lawyers that the regime produced too few lawyers.  *Id.* at 723–24.  In fact, the Supreme Court found this evidence "blatantly insufficient to meet [the attorney's] burden of proof."  *Id.*

WilmerHale's allegations are even more deficient.  WilmerHale nowhere alleges that its clients are unable to obtain alternative qualified counsel.  In fact, the Complaint acknowledges that there are "many similarly situated firms" who have not been targeted by Executive Orders.  Compl. ¶ 202; *see also* Suppl. Berman Decl. ¶ 9 ("Other existing clients have indicated to WilmerHale partners that they are considering whether to replace WilmerHale—or engage an additional firm on ongoing matters . . . ."); *id.* ¶ 10 ("Clients who need attorneys who can interact with federal government personnel, access federal buildings, and access classified information may well take existing or new business to other firms.").  Thus, WilmerHale has not met and cannot meet its burden to show that the alleged violation of the Fifth Amendment right to counsel deprived its clients of qualified attorneys.  *See Triplett*, 494 U.S. at 722.

The Court will **GRANT** defendants' motion to dismiss to the extent it seeks to dismiss Count IX and **DENY AS MOOT** WilmerHale's motion for summary judgment on Count IX.  Count IX will be **DISMISSED WITH PREJUDICE**.

2. <u>**Count X – Sixth Amendment – Right to Counsel**</u>

The Sixth Amendment guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence."  U.S. Const. amend. VI.  This guarantee requires providing a criminal defendant with "a fair opportunity to secure counsel of his own choice."  *Luis v. United States*, 578 U.S. 5, 11 (2016) (quoting *Powell*, 287 U.S. at 53).  "The right to select counsel of one's choice" is "the root meaning of the constitutional guarantee" to counsel protected by the Sixth Amendment.  *United States v. Gonzalez-Lopez*, 548 U.S. 140, 147–48 (2006).

The Supreme Court and our Circuit Court have recognized the right to counsel of one's choice as "fundamental," *see Luis*, 578 U.S. at 12, but "not absolute," *United States v. Friedman*, 849 F.2d 1488, 1490 (D.C. Cir. 1988); *see also Wheat v. United States*, 486 U.S. 153, 166 (1988).  For example, "a defendant may not insist on representation by an attorney he cannot afford or . . . insist on the counsel of an attorney who has a previous or ongoing relationship with an opposing party."  *Wheat*, 486 U.S. at 159.

Absent an exception, a defendant is entitled to "the counsel he believes to be best." *Gonzalez-Lopez*, 548 U.S. at 146.  The "[d]eprivation of the right is 'complete' when the defendant is erroneously prevented from being represented by the lawyer he wants, regardless of the quality of the [alternative] representation he received."  *Id.* at 148.  A defendant alleging a violation of this Sixth Amendment right need not show that alternative counsel was ineffective or prejudiced his case.  *See id.*  "To argue otherwise is to confuse the right to counsel of choice—which is the right to a particular lawyer regardless of comparative effectiveness—with the right to effective counsel—which imposes a baseline

requirement of competence on whatever lawyer is chosen or appointed." *Id.*;[31] *see also id.* at 150 ("A choice-of-counsel violation occurs *whenever* the defendant's choice is wrongfully denied.").

Here, WilmerHale has alleged and shown that the Order "infringes the Sixth Amendment right to counsel of [its] clients" by "eviscerat[ing] the Firm's ability to provide effective representation and advocacy for its clients." Compl. ¶¶ 213–16. The firm represents "individuals accused of criminal . . . wrongs." *Id.* ¶ 79; *see* Berman Decl. ¶¶ 8, 15, 17, 20. This work requires entering federal buildings and engaging with federal employees. For example, "WilmerHale attorneys representing criminal defendants often meet with prosecutors in U.S. Attorneys' offices in-person to advocate for their clients." Compl. ¶ 79; *see also* Berman Decl. ¶¶ 20–21 ("WilmerHale Litigation and Controversy Department lawyers must interact with federal employees . . . to make presentations to prosecutors."). It can also require active security clearances, depending on the matter. Pl.'s SUMF ¶ 24 ("The Firm has multiple attorneys with active security clearances, which are necessary to represent clients in cases involving sensitive government information, including in . . . criminal investigations."); Berman Decl. ¶ 78.

---

[31] In reaching this conclusion, the Supreme Court took care to distinguish the Sixth Amendment right to counsel from the Fifth Amendment Due Process right to counsel. *See Gonzalez-Lopez*, 548 U.S. at 146–48. The Due Process protections are grounded in the right to a fair trial, while the Sixth Amendment protection is a distinct right to counsel of choice. *See id.* at 147 ("The earliest case generally cited for the proposition that 'the right to counsel is the right to the effective assistance of counsel,' was based on the Due Process Clause rather than on the Sixth Amendment." (citation omitted)). Accordingly, while WilmerHale was required to show its clients could not obtain effective assistance of counsel for its Fifth Amendment right to counsel claim, it need not make such a showing with respect to its Sixth Amendment claim.

By barring WilmerHale attorneys from federal buildings, prohibiting their engagement with federal employees, and suspending their security clearances, the Order effectively prevents the firm's attorneys from representing their clients in criminal matters. *See* WilmerHale Order §§ 2, 5; Compl. ¶¶ 79, 125, 213–14; Pl.'s SUMF ¶ 24; Berman Decl. ¶¶ 20–21, 78, 81.  The Order also coerces WilmerHale's federal contractor clients to choose between their contracts and their engagements—including engagements on criminal matters—with WilmerHale.  *See* WilmerHale Order § 3; Compl. ¶¶ 126, 215.  These directives may thus cause the firm's criminal defendant clients to abandon the firm and seek alternate counsel;[32] some clients have already begun to do so.  *See* Pl.'s SUMF ¶¶ 135, 138,[33] 141; Suppl. Berman Decl. ¶¶ 5–10.

Though the Order does not *directly* prohibit criminal defendants from hiring WilmerHale as their counsel, it certainly has that effect!  The Supreme Court has indicated that indirect infringements on the right to counsel of choice can violate the Sixth Amendment.  *See Luis*, 578 U.S. at 10 ("[T]he pretrial restraint of legitimate, untainted assets needed to retain counsel of choice violates the Sixth Amendment.").  This is a logical conclusion, as the Government "cannot do indirectly what [it] is barred from doing directly."  *See Vullo*, 602 U.S. at 190 (citing *Bantam Books*, 372 U.S. at 67–69); *see also Students for Fair Admissions, Inc. v. President & Fellows of Harv. Coll.*, 600 U.S. 181, 230 (2023) ("[W]hat cannot be done directly cannot be done indirectly. The Constitution deals

---

[32] As explained above, the existence of alternative qualified counsel for these clients is irrelevant.  The violation of WilmerHale's clients' Sixth Amendment right was "complete" when President Trump issued the Order.  *See Gonzalez-Lopez*, 548 U.S. at 148.

[33] Defendants dispute paragraph 138 but provide no basis for that dispute.  *See* Defs.' Resp. to Pl.'s SUMF.  The Court thus finds that there is no genuine dispute here.

with substance, not shadows[.]" (quoting *Cummings v. Missouri*, 71 U.S. 277, 4 Wall. 277, 325 (1867))).

The indirect infringement on the right to counsel here is severe, as explained above. I see no reason to ignore this violation simply because it is not a direct, explicit prohibition on representation of criminal clients. The intended and actual effect of the Order's sanctions is to drive clients away from WilmerHale! Taking into consideration the source of these directives—the President of the United States—along with the breadth of the sanctions, the Court finds that the Order materially "undermine[s] the value of" the firm's clients' right to counsel of choice. *See Luis*, 578 U.S. at 12. Accordingly, I will **DENY** defendants' motion to dismiss to the extent it seeks to dismiss Count X and **GRANT** WilmerHale's motion for summary judgment as to Count X.

## REMEDIES

WilmerHale has shown that it is entitled to summary judgment on Counts I–VII and X, which allege that the Order violates the First, Fifth, and Sixth Amendments and the separation of powers. The Court next considers the appropriate remedies. WilmerHale asks for a declaratory judgment and permanent injunction relief. Compl. at 56 (Prayer for Relief); Pl.'s MSJ at 36–45. The Court has found that the Order is unconstitutional and will issue a declaratory judgment to that effect.[34] The Court will also issue injunctive relief, but only as to some of the defendants. *See infra* note 35.

---

[34] While the Order includes a provision that "[t]his order shall be implemented consistent with applicable law," *see* WilmerHale Order § 6(b), the Court has found that the Order *as issued* is unconstitutional.

The Court can properly enjoin enforcement of the Order. "[I]t is now well established that '[r]eview of the legality of Presidential action can ordinarily be obtained in a suit seeking to enjoin the officers who attempt to enforce the President's directive.'" *Chamber of Com. of the United States v. Reich*, 74 F.3d 1322, 1328 (D.C. Cir. 1996) (quoting *Franklin v. Mass.*, 505 U.S. 788, 828 (1992) (Scalia, J., concurring in part and concurring in the judgment)). Accordingly, "courts have power to compel subordinate executive officials to disobey illegal Presidential commands." *Id.* (quoting *Soucie v. David*, 448 F.2d 1067, 1072 n.12 (D.C. Cir. 1971)). Thus, when the President issues an unlawful Executive Order, "the proper course is to seek to enjoin a member of the executive branch from carrying out the executive order at issue." *McCray v. Biden*, 574 F. Supp. 3d 1, 11 (D.D.C. 2021). That is what WilmerHale has done here.[35]

---

[35] Defendants move to dismiss two defendants, the Executive Office of the President ("EOP") and the United States. Defs.' MTD at 31–35. Addressing each in turn, the Court finds both are proper defendants. *First*, "EOP is an entity comprising a number of other entities, offices and establishments" with a variety of responsibilities. *Id.* at 31. Defendants complain that naming EOP without specifying whether the Complaint seeks relief as to any particular EOP entity is "puzzling and improper." *Id.* at 31–32. Defendants fail to provide any legal authority for dismissing EOP on that basis. *Second*, defendants seek dismissal of the United States because WilmerHale "cannot sue for injunctive relief against the entire Government *qua* Government." *Id.* at 32. Here the Court looks to the waiver of sovereign immunity in 5 U.S.C. § 702. *See Trudeau v. FTC*, 456 F.3d 178, 186 (D.C. Cir. 2006) (holding that "§ 702's waiver of sovereign immunity permits not only [plaintiff's] APA cause of action, but his nonstatutory and First Amendment actions as well," because the "APA's waiver of sovereign immunity applies to any suit whether under the APA or not" (quoting *Reich*, 74 F.3d at 1328)). Section 702 states that "[t]he United States may be named as a defendant in any [] action, and a judgment or decree may be entered against the United States," if the action (1) is in a court of the United States; (2) seeks relief other than money damages; and (3) "stat[es] a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority." WilmerHale has met these requirements, and thus the United States is a proper defendant. Defendants argue that the Court may not issue injunctive relief against the United States because § 702 requires "[t]hat any mandatory or injunctive decree shall specify the Federal officer or officers (by name or title), and their successors in office, personally responsible for compliance." This is true, but it speaks only to the scope of the injunctive relief the Court issues. WilmerHale also seeks declaratory relief, and § 702 does not bar declaratory relief against the United States. As such, I need not and will not dismiss the United States from the case!

To obtain permanent injunctive relief, WilmerHale must establish "(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between [WilmerHale] and [defendants], a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *Anatol Zukerman & Charles Krause Reporting, LLC v. USPS*, 64 F.4th 1354, 1364 (D.C. Cir. 2023) (quoting *eBay Inc. v. MercExchange*, 547 U.S. 388, 391 (2006)). The last two factors merge when the Government is the opposing party. *Id.*

WilmerHale has shown that it will suffer irreparable injury absent an injunction. "It has long been established that the loss of constitutional freedoms, 'for even minimal periods of time, unquestionably constitutes irreparable injury.'" *Mills v. District of Columbia*, 571 F.3d 1304, 1312 (D.C. Cir. 2009) (quoting *Elrod*, 427 U.S. at 373) (discussing a motion for a preliminary injunction); *see also Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013) ("[S]uits for declaratory and injunctive relief against the threatened invasion of a constitutional right do not ordinarily require proof of any injury other than the threatened constitutional deprivation itself." (quoting *Davis v. District of Columbia*, 158 F.3d 1342, 1346 (D.C. Cir. 1998))). Here, WilmerHale has shown that the Order violates the firm's First, Fifth, and Sixth Amendment rights, as well as its clients' First and Sixth Amendment rights.

WilmerHale has also shown that the Order will cause economic injury sufficient to warrant injunctive relief. While "economic loss does not, in and of itself, constitute irreparable harm," there is an exception when "the loss threatens the very existence of the

movant's business." *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985). Such is the case here. "A large proportion" of WilmerHale's litigation matters are in federal court, and its litigation group frequently represents clients in investigations involving federal agencies. Pl.'s SUMF ¶¶ 18–19. Even outside of federal litigation and investigations, WilmerHale's matters involve significant engagement with federal agencies and employees. *See, e.g., id.* ¶¶ 21–23, 26–28. Moreover, federal contractors constitute 21 of WilmerHale's 25 largest clients and account for more than 30% of the firm's revenue. *Id.* ¶ 32. WilmerHale has thus shown that the Order "threaten[s] the very viability of the Firm's business model." Compl. ¶ 124.

Despite the issuance of a TRO one day after President Trump announced the Order, existing clients have been curtailing their relationships with WilmerHale and new clients are taking their business elsewhere. Pl.'s SUMF ¶¶ 138–41. The monetary value of these current and future client relationships is difficult to calculate. *See Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 404 (2d Cir. 2004) ("We have found, for example, that injunctive relief is appropriate where it would be 'very difficult to calculate monetary damages that would successfully redress the loss of a relationship with a client that would produce an indeterminate amount of business in years to come.'" (quoting *Ticor Title Ins. Co. v. Cohen*, 173 F.3d 63, 69 (2d Cir. 1999))).

Absent an injunction, WilmerHale's injuries will likely continue. *See* Suppl. Berman Decl. ¶¶ 10–15. WilmerHale attorneys are currently scheduled to appear in hearings, trials, and appellate proceedings in the upcoming months; the Order, unless enjoined, creates significant uncertainty about whether the firm's attorneys would be able

to appear for these proceedings.  *See id.* ¶ 13(d).  Additionally, "a number of existing clients have expressed concerns about continuing to work with WilmerHale if . . . the Order fully takes effect, even though they would otherwise wish to continue working with the Firm."  *Id.* ¶ 10.

The Court also finds that the balance of the equities and public interest support issuing a permanent injunction.  The Order is unconstitutional, and thus defendants do not have a legitimate interest in enforcing the Order.   In fact, it is "obvious" that the "enforcement of an unconstitutional law is always contrary to the public interest."  *Gordon*, 721 F.3d at 653.  Enjoining the Order serves the public interest by, for example, eliminating an obstacle to free speech and preserving the independent and adversarial nature of our judicial system.   The balance of the equities and public interest thus strongly favor injunctive relief.

The final question is whether the Court could or should sever any sections of the Order.[36]  The Order does not contain a severability clause.  *See generally* WilmerHale Order; *cf. League of United Latin Am. Citizens v. EOP*, 2025 WL 1187730, at *58 (D.D.C. Apr. 24, 2025) (finding an Executive Order severable where "[t]he Executive Order itself contains a severability clause").  Additionally, as explained in Analysis I, the operative provisions of the Order are intertwined with § 1, and the President's treatment of the Paul Weiss Order underscores the unified nature of the WilmerHale Order too.  The language of

---

[36] While the Supreme Court has "never addressed whether *Executive Orders* can be severed into valid and invalid parts, and if so, what standard should govern the inquiry," it has "assume[d], arguendo, that the severability standard for statutes also applies to Executive Orders."  *Mille Lacs Band*, 526 U.S. at 191.

the WilmerHale Order and the record before the Court thus indicate that the President intended for the Order to "embod[y] a single, coherent policy," designed "to stand or fall as a whole." *See Mille Lacs Band*, 526 U.S. at 173. The Court will therefore enjoin the *entire* WilmerHale Order.

### CONCLUSION

For the reasons set forth above, I find the Order is unconstitutional. The Court will **GRANT IN PART** and **DENY IN PART** each parties' dispositive motion. Defendants' motion to dismiss will be **DENIED** except to the extent it seeks to dismiss Counts VIII, IX, and XI, which will be **DISMISSED WITH PREJUDICE**. WilmerHale's motion for summary judgment will be **GRANTED** as to Counts I–VII and X, and **DENIED AS MOOT** as to Counts VIII, IX, and XI. The Court will issue both declaratory and permanent injunctive relief.[37] An Order consistent with the above accompanies this Memorandum Opinion.

RICHARD J. LEON
United States District Judge

---

[37] Given that the Court will issue a permanent injunction barring enforcement of the Order, the Court will also **DENY AS MOOT** WilmerHale's Motion for a Preliminary Injunction [Dkt. #3].